**ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK P.C.**
875 Third Avenue, 9th Floor
New York, New York 10022
Fred B. Ringel
Steven B. Eichel
*Attorneys for the Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

*In re*:

**85 FLATBUSH RHO MEZZ LLC,** *et al.*,[1]

          Debtors.
-----------------------------------------------------------X

Chapter 11

Case No.: 20-23280 (RDD)

(Jointly Administered)

**DECLARATION OF DAVID GOLDWASSER IN SUPPORT OF DEBTORS' REPLY TO SECURED CREDITOR 85 FLATBUSH MEZZ LLC'S OBJECTION TO DEBTORS' MOTION FOR ENTRY OF ORDER EXTENDING EXCLUSIVE RIGHT TO FILE A PLAN OF REORGANIZATION AND TO SOLICIT ACCEPTANCES TO THEIR PLAN AND FOR RELATED RELIEF**

  **David Goldwasser** declares under penalty of perjury that these statements are true and correct:

  1.  I am the managing member of GC Realty Advisors, LLC, the manager of 85 Flatbush RHO Mezz LLC ("Mezz"), 85 Flatbush RHO Hotel LLC ("Hotel") and 85 Flatbush RHO Residential LLC ("Residential," and defined together with Mezz

---

[1] The Debtors in these jointly administered chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are 85 Flatbush RHO Mezz LLC. (6184); 85 Flatbush RHO Hotel LLC (5027); and 85 Flatbush RHO Residential LLC (2261).

{01100615.DOCX;6 }

and Hotel, as the "Debtors"), and am thoroughly familiar with the facts set forth below.

## Background

2.  Mezz is the 100% owner of Hotel and Residential. The Debtor's property is located at 85 Flatbush Extension, Brooklyn, New York ("Property"). The Property is a 132,641 square foot, twelve-story, mixed-use building consisting of a 174-room boutique hotel on the first six floors known as the Tilery Hotel Brooklyn, a 58,652 square foot 64-unit luxury multi-family building and a 5,642 square foot parking garage. The residential component of the Property has nine studios, 26 one-bedroom units, and 29 two-bedroom units. Five of the 64 units are occupied. Residential intends to convert the residential units into condominiums.

3.  When the Debtors filed their chapter 11 cases in December 2020, the hospitality industry generally and the Debtors, in particular, were still feeling the full effect of the Covid-19 pandemic and the consequent government-mandated shutdown in New York City. The Debtors went from a thriving hotel business with its related services operating profitably at near capacity to a hotel with between 10% and 15% occupancy.

4.  The pandemic's devasting impact was so severe that the only way to boost occupancy in the early stages of the pandemic was for the Debtors to enter a short-term contract with the city of New York from May 15, 2020, to June 30, 2020, to house homeless New Yorkers on a temporary basis. The cash flow from this

{01100615.DOCX;6 }

2

contract allowed the Debtors to continue to employ its workforce, although on a reduced scale, and continue to provide revenue to its vendors. The Hotel reopened to the public on July 15, 2020, and has remained open, but until recently, a severely curtailed occupancy rate had limited revenue. As a result, Mezz, Hotel, and Residential have been unable to pay their current debt service obligations to their secured lenders.

5. The Debtors, however, intended to persevere through these difficult times, confident that eventually, the re-opening of the New York economy would permit its decimated revenue stream to revert to the vibrancy of 2019 and its hotel operations to return to profitability. In addition, the revitalized economy would allow the Debtors to find a market for the 64 luxury condominium units, which mainly were vacant. Together, the revenue from the hotel and the capital from the sales of condominium units would provide the capacity to reorganize under the auspices of chapter 11. Indeed, in the six months since the start of 2021, the increasing level of vaccinations in New York City, along with other signs of increased economic activity, such as the recent re-opening of the nearby Barclays Center, have given the Debtors renewed confidence that its strategic decision to keep its doors open will pay off as the hospitality industry recovers.

6. The Debtors also expect that as the vitality of its hospitality business is restored, Residential will be able to proceed with its plans to complete the conversion of the residential units into luxury condominiums and sell them. The

{01100615.DOCX;6 }

3

Debtors estimate the sales could yield between $50 to $70 million. The five occupied units yield some rental income that contributes to the normal operations of the residential property.

7.  On December 18, 2020 ("Petition Date"), the Debtors filed separate voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Together with their petitions for relief, the Debtors have filed their schedules of assets and liabilities and lists of creditors and executory contracts required under section 521 of the Bankruptcy Code and Rule 1007 of the Bankruptcy Rules.

8.  The Debtors requested court approval to establish bar dates for filing proofs of claim in these chapter 11 cases. The Court entered an order setting a claims bar date for April 21, 2021.

9.  The Debtor's cases are large, having nearly $100 million in funded debt, and their organizational structure is also complex. Mezz is the 100% owner of Hotel and Residential. 85 RHO LLC is the 100% owner of Mezz and is owned 50% by 85 Flatbush Extension LLC and 50% by 85 Flatbush Realty LLC.

10. On or about September 19, 2019, Hotel and Residential each executed a Consolidated, Amended and Restated Note ("Note") payable to the senior secured lender 85 Flatbush Avenue 1 LLC ("Senior Lender") in the amount of $70,000,000, which Note was secured by Consolidated. Amended and Restated Mortgage and Security Agreement ("Mortgage") and Assignment of Leases and Rents ("Assignments of Rents"), which constituted a lien on the property. The loan was

guaranteed by non-debtor Lipa Rubin, who is the manager of 85 Flatbush Realty LLC.

11. In addition, there is a Mezzanine Loan Agreement, dated as of September 19, 2019, made by and between Mezz and Mezzanine Lender, for a loan in the principal amount of $6,000,000 ("Mezz Loan"), which Mezz Loan is evidenced by a Mezzanine Promissory Note, dated as of September 19, 2019 ("Mezz Note"), and secured by the (i) Ownership Interests Pledge and Security Agreement for Hotel, dated as of September 19, 2019, and (ii) Ownership Interests Pledge and Security Agreement for Residential, dated as of September 19, 2019, both executed by Mezz in favor of Mezzanine Lender, and under which Mezz granted to Mezzanine Lender a priority security interest in the collateral (as defined in the Mezzanine Loan Agreement). Non-debtor Lipa Rubin also guarantees the Mezz Loan.

12. The Debtors' secured creditors are also sophisticated players in the New York real estate lending market.

13. The Debtors have made substantial progress since the Petition Date, first focusing on stabilizing operations when entering chapter 11 and arranging their financial affairs and administration of their business to comply with the Bankruptcy Code. Along with preparing their Schedules and Statement of Financial Affairs ("SOFAs") for each Debtor, the Debtors also reviewed and analyzed prepetition transactions both within 90 days of filing the bankruptcy cases and within one year of the cases for insiders. The Debtors also arranged for the

{01100615.DOCX;6 }

5

transition of their many bank accounts to newly established debtor in possession bank accounts to ensure compliance with the United States Trustee operating guidelines. The Debtors also reviewed all of their insurance policies and organized the information to ensure the proper coverages were in force. The Debtors have filed the monthly operating reports for all three Debtors through April 2021.

14. The Debtors also executed a smooth transition into chapter 11 by obtaining crucial first-day orders to allow it to pay pre-petition wages for its employees, ensure the continuation of its utility services, and resolved a potentially contested 366 proceeding in exchange for a modest deposit. The Debtors also negotiated a final cash collateral order with its Senior Lender to permit the continuation of its business on an uninterrupted basis under a negotiated budget.

15. As the financial markets have started to improve, the Debtors now have a realistic opportunity to obtain new capital or to locate a replacement lender in order to confirm a plan of reorganization and exit from bankruptcy. To accomplish this goal, the Debtors contacted the Senior Lender to discuss a framework to move the case forward to confirm a plan. The Debtors have been and continue to be engaged in discussions with the Senior Lender regarding the negotiation of a Plan Term Sheet, which will, among other things, provide for the consensual restructuring of the Senior Lender's Debt based on new financing and a new equity infusion from existing equity holders or a new joint venture partner. It

is anticipated that if the Debtors cannot file a plan based on either of the above, the Debtors will pivot towards a sale process.

16. To run a process to locate new financing or a joint venture partner, the Debtors are negotiating to retain Teneo Capital LLC ("Teneo") as its investment banker, to conduct the search for refinancing, or to obtain a joint venture partner. The Debtors expect to move to retain the Teneo soon and are interviewing real estate brokers to market and sell the property as a backup plan should new financing or capital prove unavailable.

17. Continued exclusivity will permit the Debtors to maintain flexibility, so competing plans do not derail the nascent restructuring process. Extending the Exclusivity Periods will benefit the Debtors' estates, their creditors, and all other key parties in interest. Further, since the Petition Date, the Debtors have paid their vendors and third-party partners in the ordinary course of business or as otherwise provided by the Court's orders. The Debtors have maintained their ability to continue to pay their bills throughout these chapter 11 cases, given the liquidity provided through cash collateral and continued support from its equity holders and improving operating results.

18. This is the Debtors' first request for an extension of the Exclusivity Periods. Amid a global pandemic, the Debtors have accomplished a great deal and continue to work diligently towards emergence. The short time that the Debtors have spent in chapter 11 to date warrants extending the Exclusivity Periods. The

Debtors are not seeking an extension of the Exclusivity Periods to pressure or prejudice any of their stakeholders. On the contrary, the Debtors propose an extension of exclusivity to engage such creditors in restructuring negotiations without the distraction and confusion that multiple competing plans could create.

19.     Thus, the Debtors respectfully submit that they have shown sufficient "cause" to extend the Debtors' exclusive right to file a plan of reorganization to and including August 17, 2021, and if the Debtors file a plan of reorganization on or before that date, extending the Debtors' right to solicit acceptances to their proposed plan of reorganization to and including October 14, 2021.

Under 28 U.S.C. §1746, I declare under penalty of perjury that these statements are true and correct.

Dated:  June 4, 2021
        New York, New York

                                        /s/ David Goldwasser
                                        David Goldwasser

{01100615.DOCX;6 }