UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| 85 FLATBUSH RHO MEZZ LLC, et al.[1], | Case No. 20-23280-RDD |
| Debtors. | |

------------------------------------------------------------x

| | |
|---|---|
| 85 FLATBUSH MEZZ LLC, | |
| Plaintiff, | Adversary Proceeding No. |
| - against – | |
| TH HOLDCO LLC as assignee of 85 Flatbush Avenue 1 LLC in its capacity as the Debtor's Prepetition mortgage lender to 85 Flatbush RHO Hotel and 85 Flatbush RHO Residential, | |
| Defendant. | |

------------------------------------------------------------x

**ADVERSARY COMPLAINT BY MEZZANINE LENDER
FOR DECLARATORY JUDGMENT AND SPECIFIC
PERFORMANCE TO ENFORCE CERTAIN PURCHASE OPTION
RIGHTS UNDER THE PARTIES' INTERCREDITOR AGREEMENT**

The plaintiff herein, 85 Flatbush Mezz LLC ("Plaintiff" or "Mezzanine Lender"), by its litigation co-attorneys, Goldberg Weprin Finkel Goldstein LLP, as and for its Adversary Complaint against the defendant herein, TH Holdco LLC (the "Defendant" or "New Senior Lender"), as the assignee of the Debtors' pre-petition senior mortgage lender, 85 Flatbush Avenue 1 LLC (the "Original Senior Lender") (collectively, the "Senior Lenders"), respectfully alleges as follows:

---

[1] The Debtors in these jointly administered Chapter 11 cases are identified as follows: 85 Flatbush RHO Mezz LLC ("Mezz Debtor"); 85 Flatbush RHO Hotel LLC ("Hotel Debtor"); and 85 Flatbush RHO Residential LLC ("Residential Debtor") (collectively hereafter referred to as the "Debtors").

**PRELIMINARY STATEMENT**

1. This adversary proceeding seeks resolution of an emerging and significant controversy between the Debtors' respective New Senior Lender and Mezzanine Lender regarding their respective rights and obligations under a certain Intercreditor Agreement, dated as of September 19, 2019 (the "ICA"). In 2019, the Debtors refinanced their hotel operations and real estate development project with separate but interconnected mortgage loans and mezzanine borrowing. The interplay between the various credit facilities is governed by the ICA, a copy of which is annexed hereto as Exhibit "A".

2. While the priority structure of the Senior Mortgage Loans is clearly established by the ICA, the Mezzanine Lender nevertheless still retains various cure and purchase option rights thereunder designed to provide the Mezzanine Lender the opportunity to protect its collateral position in the event of mortgage defaults and an enforcement action.

3. The specific dispute at issue here relates to the Original Senior Lender's repeated failure to provide the Mezzanine Lender with the required Purchase Option Notices under Section 11(a) of the ICA once a declaration of a monetary default was issued on July 16, 2020, and again on August 20, 2020, when the debt was accelerated, and the Original Senior Lender commenced a state court foreclosure action.

4. Although the Mezzanine Lender was provided with a notice to cure the monetary defaults under Section 10(a) on July 16, 2020 (the "July Notice") (a copy of which is annexed hereto as Exhibit "B"), the ICA required much more than this lone notice. Besides a notice under Section 10, the Original Senior Lender was also required to issue a separate and independent Purchase Option Notice under Section 11(a) each and every time a Purchase Option Event occurred.

2

5. Moreover, the issuance of Purchase Option Notices was required even if the Mezzanine Lender did not elect to cure the monetary defaults pursuant to the July Notice. To this effect, Section 11(a) states as follows:

Section 11.  Right to Purchase Senior Loan.

(a) Upon the occurrence of a Purchase Option Event, Senior Lender shall provide prompt written notice thereof to Mezzanine Lender (a "**Purchase Option Notice**"), and Mezzanine Lender shall have the right to elect to purchase, in whole but not in part, the Senior Loan for the Loan Purchase Price, payable in immediately available funds, by delivering to Senior Lender written notice of Mezzanine Lender's intention to purchase the Senior Loan (the "**Purchase Notice**"), together with a deposit in an amount equal to ten percent (10%) of the Loan Purchase Price (as may be increased in accordance with Section 11(c), the "**Purchase Deposit**"), provided that such right may only be exercised, and such purchase may only be consummated, if (x) no Mezzanine Lender Intercreditor Event of Default exists at the time of such exercise or at the time such purchase is to be consummated, and (y) the Purchase Notice is sent within thirty (30) days after Mezzanine Lender's receipt of the Purchase Option Notice (the "**Notice Period**"). The purchase of the Senior Loan pursuant to such right shall be consummated at a closing at the offices of Senior Lender or its counsel in New York, New York on a date not later than ninety (90) days following Mezzanine Lender's delivery of the Purchase Notice to Senior Lender. At such closing, concurrently with payment to Senior Lender of the Loan Purchase Price, Senior Lender shall deliver or cause to be delivered to Mezzanine Lender all Senior Loan Documents and all amounts then held in any reserve or escrow account controlled by or held on account of the Senior Lender, and Senior Lender shall execute in favor of Mezzanine Lender or its designee assignment documentation, in form and substance reasonably acceptable to Mezzanine Lender and Senior Lender, at the sole cost and expense of Mezzanine Lender, to assign the Senior Loan and Senior Lender's rights under the Senior Loan Documents (without recourse, representations or warranties, except for representations as to the outstanding balance of the Senior Loan, representations that except for the Senior Loan Documents delivered to Mezzanine Lender, the Senior Loan has not been modified or amended, and representations from Senior Lender that it is the legal and beneficial owner of the entire Senior Loan (or if there is more than one Senior Lender, the portion of the Senior Loan being transferred by such Senior Lender) and that the Senior Loan will be free and clear of any lien, security interest, option or other charge or encumbrance upon the closing of the purchase of the Senior Loan).

6. The Original Senior Lender's repeated failure to issue Purchase Option Notices has now taken on greater import in the wake of the recent sale and assignment of the Senior

3

Mortgage Loans by the Original Senior Lender to the New Senior Lender on or about February 4, 2022. The New Senior Lender is a newcomer to the ICA and the alliances which were in existence no longer apply.

7.  Following acquisition of the Senior Loans, the Defendant filed a Creditor's Liquidating Plan dated February 24, 2022 (ECF No. 151) (without notice or consultation with the Mezzanine Lender) predicated upon a sale of the Debtors' Hotel and Residential property (the "Creditor's Plan") that leaves virtually no opportunity for a recovery by the Mezzanine Lender.

8.  As part of the proposed Creditor's Plan, the New Senior Lender relies upon the ICA to attempt to deeply subordinate the claim of the Mezzanine Lender to the point of likely elimination, even though the Purchase Option Notice provisions of the ICA were never honored.

9.  To be sure, the ICA is weighted heavily in favor of the Senior Lenders as the holder of the mortgage loans. However, the ICA is not totally one-sided: the Mezzanine Lender's ability to purchase the Senior Mortgage Loans is an important fallback protection which has been ignored and trampled upon by the Creditor's Plan.

10. The New Senior Lender acquired the Senior Mortgage Loan subject to the terms of the ICA and remains bound by the consequences of the Original Senior Lender's multiple breaches thereunder. Accordingly, the Mezzanine Lender is filing this Adversary Complaint seeking a Declaration of Rights as follows: (i) that the Original Senior Lender breached the ICA on July 16, 2020, when, *inter alia*, it declared a default under the Senior Loan Documents and again breached the ICA on August 20, 2020, when it filed a mortgage enforcement action, and again upon the filing of the bankruptcy petitions by the Debtor on December 18, 2020, without issuing a Purchase Option Notice on either occasion as required by Section 11(a) of the ICA; and (ii) the Mezzanine Lender continues to retain the right to purchase the Senior Loan Documents

for a Loan Purchase Price that should be properly computed as of the first Purchase Option Event on July 16, 2020. In turn, the Mezzanine Lender is also entitled to an award of specific performance directing and compelling the New Senior Lender to sell the Senior Loan Documents to the Mezzanine Lender in accordance with the provisions of Section 11(a) based upon a Loan Purchase Price calculated as of July 16, 2020, as itemized in the schedule annexed hereto as Exhibit "C".

### CORE JURISDICTION OF THE BANKRUPTCY COURT

11.  This Adversary Proceeding directly impacts the New Senior Lender's efforts to seek approval of a Disclosure Statement and Confirmation of the Creditor's Plan. Even though the Adversary Proceeding is between creditors of the Debtor's estates, the future course of these Chapter 11 cases is directly impacted by a resolution of this action (particularly since the parties or their predecessors have each filed proofs of claim in connection with the Chapter 11 cases and are deemed to have consented to Bankruptcy Court jurisdiction).

12.  The Bankruptcy Court retains the constitutional right and authority to enter a final judgment in this matter. The Complaint presents a "core proceeding" under 28 U.S.C. § 157(b)(2)(A), (B), (K), (L) and (O) in that this matter concerns (i) the administration of the Debtors' Chapter 11 cases; (ii) involves the disposition, treatment, allowance or disallowance of claims against the Debtors' estates; (iii) relates to the confirmability of the Creditor's Plan (and perhaps the Debtors' competing plan); and (iv) otherwise affects the liquidation of the assets of the Debtors' estates and the adjustment of creditor relationships.

### PARTIES

13.  The Mezzanine Lender herein is a New York limited liability company, having a principal place of business located at 225 Broadway, New York, NY 10007.

14. The New Senior Lender herein is a Delaware limited liability company authorized to do business in the State of New York, having a registered office c/o CT Corporation System, 28 Liberty Street, New York, NY 10005.

## **BACKGROUND FACTS**

### (A) The Senior and Mezzanine Loans

15. The Debtors each filed voluntary Chapter 11 petitions under title 11 of the U.S. Code on December 18, 2020 in response to enforcement actions taken by the holders of the senior and mezzanine loans. Since that time, the Debtors have operated as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108, and their respective Chapter 11 cases are being jointly administered pursuant to Order dated December 28, 2020 (ECF No. 20).

16. Pre-petition, Plaintiff made a mezzanine loan to the Mezz Debtor in the principal amount of $6,000,000 on September 19, 2019 (the "Mezzanine Loan") pursuant to that certain Mezzanine Loan Agreement of even date and accompanying Mezzanine Promissory Note, executed and delivered in favor of the Mezzanine Lender. The Mezzanine Loan is secured by an equity pledge as described below.

17. Contemporaneously with the Mezzanine Loan, the Hotel and Residential Debtors obtained senior mortgage refinancing from 85 Flatbush Avenue I LLC (previously defined as the "Original Senior Lender"), in the total principal amount of $70 million (the "Senior Mortgage Loan"). The Senior Mortgage Loan is memorialized by a certain Consolidated, Amended and Restated Mortgage, likewise dated September 19, 2019 and corresponding Assignment of Leases and Rents, both duly recorded with the City Register, Kings County.

18. In contrast to the Senior Lenders' Mortgages encumbering the Debtor's real property, the Mezzanine Loan is secured by a pledge of the Mezz Debtor's 100% membership

interest in the Hotel and Residential Debtors pursuant to that certain (i) Ownership Interests Pledge And Security Agreement made as of September 19, 2019, with respect to 85 Flatbush RHO Hotel LLC and (ii) Ownership Interests Pledge And Security Agreement made as of September 19, 2019, with respect to 85 Flatbush RHO Residential LLC, both executed by the Debtor in favor of the Mezzanine Lender regarding the Collateral (collectively, the "Pledge Agreement").

19.  The Mezzanine Lender duly perfected the Pledge Agreement by filing requisite UCC financing statements with the proper state and local agencies. As a result, the Mezzanine Lender holds a duly enforceable lien and security interest against the membership interests held by the Mezzanine Debtor in the other co-Debtors.

20.  However, because the Mezzanine Lender does not hold direct mortgage liens, the disposition of the Senior Mortgage Loan (particularly with respect to any enforcement action taken in connection therewith) adversely impacts the Mezzanine Lender's collateral and could very well foreclose out any residual equity.

21.  Accordingly, as is customary in connection with mezzanine loans of this type, the Original Senior Lender and the Mezzanine Lender entered into the ICA to, *inter alia*, establish an agreed framework, protocols and requirements relating to the exercise of the parties' respective rights and remedies upon a mortgage default or enforcement action. While the Mezzanine Lender's rights are comparatively circumscribed by the ICA, they are not eliminated. To the contrary, the ICA contains express provisions benefiting the Mezzanine Lender as to what needs to occur upon a mortgage default, acceleration or the filing of a foreclosure action.

**(B) The Provisions of the ICA Relevant to this Dispute**

22. Critical to this lawsuit are the provisions of Sections 10 and 11(a) of the ICA, which expressly placed upon the Senior Lender specific notice requirements whenever (and each time) a Purchase Option Event occurs, which term is defined as follows:

> "Purchase Option Event" means any of the following: "(i) Borrower has become a debtor in any Proceeding; (ii) the Senior Loan has been accelerated, (iii) any Enforcement Action described in clause (i) or (ii) of such definition has been commenced with respect to the Senior Loan, and/or (iv) any Senior Loan Event of Default with respect to a monetary Event of Default or a non-monetary Event of Default exists and is continuing for a period of at least ninety (90) days (subject to the provisions of Section 10 hereof)."

(See Exhibit "A", p. 9).

23. In turn, for purposes of the ICA, an Enforcement Action means any:

> (i) judicial or non-judicial foreclosure proceeding, the exercise of any power of sale, the obtaining of a receiver or the taking of any other enforcement action against the Premises or any portion thereof or Borrower, including, without limitation, the taking of possession or control of the Premises or any portion thereof, (ii) acceleration of, or demand or action taken in order to collect, all or any indebtedness secured by all or any portion of the Premises (other than giving of notices of default and statements of overdue amounts) or (iii) exercise of any right or remedy available to Senior Lender under the Senior Loan Documents, at law, in equity or otherwise with respect to Borrower and/or any portion of the Premises; provided, however, that, in no event shall the giving of notices of default, the giving of statements of overdue amounts, the giving of notices of Senior Lender's reservation of rights, and/or the exercise of any of Senior Lender's rights or remedies with respect to the Lease Purchase Option be an Enforcement Action.

24. By virtue of these definitional sections, there are multiple and varied events which trigger the Senior Lender's notice and purchase option requirements (which are mutually exclusive). In fact, the ICA imposes upon the Senior Lender independent notice requirements each and every time a Purchase Option Event occurs regardless of whether the Mezzanine Lender previously declined to cure defaults or previously failed to exercise its purchase option rights.

25.     Moreover, the requirement to issue a Purchase Option Notice continues unabated unless the Mezzanine Lender fails to timely close on acquiring the Senior Loan after exercising a Purchase Option Notice in accordance with the provision of Section 11(a) which provides:

> "… if Mezzanine Lender had delivered a Purchase Notice, but the closing of Mezzanine Lender's purchase of the Senior Loan fails to occur in accordance with this Section 11(a) as described in clause (C) above solely as a result of the action or inaction of Mezzanine Lender (a "**Purchase Option Default**"), then the rights of Mezzanine Lender to purchase the Senior Loan set forth in this Section 11(a) shall thereupon be of no further force or effect with respect to any subsequent Senior Loan Default Notice and Senior Lender shall have the right to accept a DIL without sending a DIL Notice.  The failure of Senior Lender to provide a Purchase Notice to Mezzanine Lender regarding the occurrence of a Purchase Option Event shall have no adverse effect on Senior Lender other than the resulting extension of the time in which the Purchase Notice may be given."

26.     The last sentence of the quoted portion makes clear that while the Senior Lender cannot be held liable to the Mezzanine Lender for monetary damages for failing to timely issue a Purchase Option Notice, the requirement cannot be waived or eliminated, but is extended.  Once issued, however, any notice of a Purchase Option Event should properly be given retroactive effect to when the first Purchase Option Event actually occurred, which in this case is July 16, 2020.

27.     There is nothing in the ICA to indicate that the failure to provide a Purchase Option Notice has absolutely no consequences.  Indeed, as a matter of equity and logic, the Senior Lender cannot benefit from a breach of Section 11(a) by insisting on a higher purchase price than the one which would have been in effect had timely notice been given.

**(C) The Senior Lender Disregarded the Purchase Option Notice Requirement**

28.     To date, not a single Purchase Option Notice was ever issued by the Senior Lenders even though multiple Purchase Option Events have occurred.  If nothing else, the Senior

9

Lenders (both Original and New) are consistent in their abject failure to abide by the ICA in this regard.

29. The only notice given under the ICA was the July Notice to cure sent in accordance with Section 10(a) and *not* Section 11(a) of the ICA (*See,* Exhibit "B").

30. Among other things, the July Notice lists default in the payment of monthly interest due under the Senior Loans, first occurring on March 1, 2020, and continuing on April 1, 2020, May 1, 2020, June 1, 2020 and July 1, 2020, which are defined under the July Notice as the "Existing Senior Loan Monthly Payment Events of Default".

31. Manifestly, the declaration of a payment default constitutes an absolute Purchase Option Event and mandates the issuance of a Purchase Option Notice under Section 11(a) irrespective of any notice to cure under Section 10(a).

32. Yet, the Original Senior Lender only issued the single July Notice to cure, disregarding entirely the import of Section 11(a) and the corresponding definitional sections relating to the need to issue a separate Purchase Option Notice upon each occurrence of a Purchase Option Event.

33. Additionally, other Purchase Option Events occurred after July 16, 2020, which were also completely ignored by the Original Senior Lender. For example, the Original Senior Lender accelerated the indebtedness and commenced a foreclosure action on August 20, 2020 in Supreme Court, Kings County, all without issuance of a separate Purchase Option Notice.

34. Regardless of any prior motives or intent, the fact remains that while the requirement to issue a Purchase Option Notice can be extended, it cannot be eliminated or ignored, and the Mezzanine Lender is entitled to assert its right to acquire the Senior Loans as of the earliest possible date for a Purchase Option Event.

35. Insofar as enforcement of rights are concerned, the ICA is very clear that under Section 31 thereof, monetary damages as not available, and instead, the Mezzanine Lender may enforce its rights relating to the failure to receive Purchase Option Notices through the remedies of injunction, declaratory judgment and specific performance.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Declaratory Relief)**

36. The Mezzanine Lender repeats and realleges each and every allegation contained in the preceding paragraphs hereof as though the same were more fully set forth at length below.

37. The Senior Lenders' obligation to provide a Purchase Option Notice in accordance with Section 11(a) of the ICA each time a Purchase Option Event occurred is an integral component of the ICA and is otherwise delineated in clear and unambiguous terms.

38. That the Mezzanine Lender in its discretion did not elect to cure the mortgage payment defaults pursuant to the July Notice does not in any manner vitiate, negate or otherwise excuse the requirement that the Original Senior Lender issue separate Purchase Option Notices in accordance with Section 11(a) on, among other dates, July 16, 2020 and again on August 20, 2020.

39. The Mezzanine Lender's rights to insist on the issuance of a Purchase Option Notice as of the earliest possible date of July 16, 2022 cannot be abridged or waived, pursuant to the express terms of the ICA, which contains a clear "no waiver" clause in Section 23, applicable to both the Senior Lenders and the Mezzanine Lender, providing as follows:

> No failure on the part of Mezzanine Lender and Senior Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

11

40. Notwithstanding the occurrence of multiple Purchase Option Events, the Senior Lender never previously issued a Purchase Option Notice as required by Section 11(a) of the ICA.

41. The July Notice issued under Section 10 of the ICA does not reference the Mezzanine Lender's Purchase Option Rights and does not qualify as a Purchase Option Notice for purposes of Section 11(a) of the ICA. Even if it did, the Mezzanine Lender was entitled to a separate Purchase Option Notice on August 20, 2020, and on December 18, 2020 for that matter (the commencement of bankruptcy).

42. Had a proper and conforming Purchase Option Notice been issued by the Original Senior Lender on July 16, 2020, the Mezzanine Lender was ready, willing and able to exercise its Purchase Option Rights at that time.

43. The Federal Declaratory Judgment Act (28 U.S. Code § 2201) empowers this Court to declare the effect of the rights and legal relations of the parties in a case of an actual controversy.

44. Augmenting the Court's power, the ICA also, by consent, recognizes that the Mezzanine Lender retains the right to seek both a Declaratory Judgment and Specific Performance in the event the Senior Lenders breach or violate the ICA pursuant to Section 31, which provides in relevant as follows:

> Senior Lender and Mezzanine Lender agree that upon a breach of this Agreement by Senior Lender, on the one hand, or Mezzanine Lender, on the other hand, the remedies of injunction, declaratory judgment and specific performance shall be available to such non-breaching party.

45. The failure to issue a Purchase Option Notice constitutes a clear and continuing breach of the ICA. Almost from the founding of the Republic, it has been a maxim of American law that for every wrong there is a remedy, and the remedy here is a declaration of rights that the

Senior Lender repeatedly violated the ICA, conferring upon the Mezzanine Lender the right to acquire the Senior Loans at a Loan Purchase Price that would have been in effect as of July 16, 2020.

46. In view of all of the foregoing, the Mezzanine Lender is entitled to a Declaratory Judgment finding and declaring that an actual controversy exists relating to the parties' respective rights and obligations under the ICA that (i) that the Original Senior Lender breached the ICA on July 16, 2020, when, *inter alia*, it declared a default under the Senior Loan Documents and again breached the ICA on August 20, 2020, when it filed a mortgage enforcement action, and again upon the filing of the bankruptcy petitions by the Debtor on December 18, 2020, without issuing a Purchase Option Notice on either occasion as required by Section 11(a) of the ICA; and (ii) the Mezzanine Lender continues to retain the right to purchase the Senior Loan Documents for a Loan Purchase Price which should be properly computed as of the first neglected Purchase Option Event on July 16, 2020.

### AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Contract/Specific Performance)

47. Plaintiff repeats and alleges each and every allegation contained in the preceding paragraphs hereof as though the same were more fully set forth at length here.

48. The Mezzanine Lender and the New Senior Lender are bound by the terms of the ICA, which constitutes a valid, binding and enforceable written contract supported by fair and adequate consideration.

49. The ICA has been breached and violated by the Senior Lenders as a result of its repeated failure to provide the Mezzanine Lender with Purchase Option Notices on July 16, 2020, August 20, 2020, and December 18, 2020.

13

50. The Mezzanine Lender is not in default of the ICA and is eligible to receive the full benefits and rights conferred by Section 11(a) relating to the issuance of Purchase Option Notices replete with the opportunity to exercise its Purchase Option rights as of July 16, 2020.

51. The Mezzanine Lender has no adequate remedy at law and its rights to acquire the Senior Loans are unique as matter of law.

52. In view of the foregoing, the Mezzanine Lender is entitled to an award of specific performance directing the New Senior Lender to sell and assign the Senior Loans to the Mezzanine Lender based upon a Loan Purchase Price equal to what the Loan Purchase Price would have been as of July 16, 2020, when the first Purchase Option Notice should have been issued.

WHEREFORE, Plaintiff seeks the entry of a judgment as follows:

a. Granting declaratory judgment on the First Cause of Action;

b. Granting specific performance on the Second Cause of Action; and

c. Granting such other relief as may be just and proper.

Dated: New York, New York
March 23, 2022

        Goldberg Weprin Finkel Goldstein LLP
        *Litigation Co-Counsel for the Plaintiff*
        1501 Broadway, 22nd Floor
        New York, New York 10036
        (212) 221-5700

        By: _____
                Kevin J. Nash, Esq.
                A Member of the Firm