# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:                                                          Chapter 11

85 FLATBUSH RHO MEZZ LLC, et al.[1],                            Case No. 20-23280-RDD

                              Debtors.
-------------------------------------------------------------x
85 FLATBUSH MEZZ LLC,

                              Plaintiff,                         Adversary Proceeding No.

          - against –

TH HOLDCO LLC as assignee of 85 Flatbush
Avenue 1 LLC in its capacity as the Debtor's
Prepetition mortgage lender to 85 Flatbush RHO
Hotel and 85 Flatbush RHO Residential,

                              Defendant.
-------------------------------------------------------------x

### ADVERSARY COMPLAINT BY MEZZANINE LENDER FOR DECLARATORY JUDGMENT AND SPECIFIC PERFORMANCE TO ENFORCE CERTAIN PURCHASE OPTION RIGHTS UNDER THE PARTIES' INTERCREDITOR AGREEMENT

The plaintiff herein, 85 Flatbush Mezz LLC ("Plaintiff" or "Mezzanine Lender"), by its

litigation co-attorneys, Goldberg Weprin Finkel Goldstein LLP, as and for its Adversary

Complaint against the defendant herein, TH Holdco LLC (the "Defendant" or "New Senior

Lender"), as the assignee of the Debtors' pre-petition senior mortgage lender, 85 Flatbush

Avenue 1 LLC (the "Original Senior Lender") (collectively, the "Senior Lenders"), respectfully

alleges as follows:

---

[1] The Debtors in these jointly administered Chapter 11 cases are identified as follows: 85
Flatbush RHO Mezz LLC ("Mezz Debtor"); 85 Flatbush RHO Hotel LLC ("Hotel Debtor"); and
85 Flatbush RHO Residential LLC ("Residential Debtor") (collectively hereafter referred to as
the "Debtors").

### PRELIMINARY STATEMENT

1.      This adversary proceeding seeks resolution of an emerging and significant controversy between the Debtors' respective New Senior Lender and Mezzanine Lender regarding their respective rights and obligations under a certain Intercreditor Agreement, dated as of September 19, 2019 (the "ICA").  In 2019, the Debtors refinanced their hotel operations and real estate development project with separate but interconnected mortgage loans and mezzanine borrowing.  The interplay between the various credit facilities is governed by the ICA, a copy of which is annexed hereto as Exhibit "A".

2.      While the priority structure of the Senior Mortgage Loans is clearly established by the ICA, the Mezzanine Lender nevertheless still retains various cure and purchase option rights thereunder designed to provide the Mezzanine Lender the opportunity to protect its collateral position in the event of mortgage defaults and an enforcement action.

3.      The specific dispute at issue here relates to the Original Senior Lender's repeated failure to provide the Mezzanine Lender with the required Purchase Option Notices under Section 11(a) of the ICA once a declaration of a monetary default was issued on July 16, 2020, and again on August 20, 2020, when the debt was accelerated, and the Original Senior Lender commenced a state court foreclosure action.

4.      Although the Mezzanine Lender was provided with a notice to cure the monetary defaults under Section 10(a) on July 16, 2020 (the "July Notice") (a copy of which is annexed hereto as  Exhibit "B"), the ICA required much more than this lone notice.  Besides a notice under Section 10, the Original Senior Lender was also required to issue a separate and independent Purchase Option Notice under Section 11(a) each and every time a Purchase Option Event occurred.

5.      Moreover, the issuance of Purchase Option Notices was required even if the Mezzanine Lender did not elect to cure the monetary defaults pursuant to the July Notice.  To this effect, Section 11(a) states as follows:

> Section 11.      Right to Purchase Senior Loan.
>
>         (a)      Upon the occurrence of a Purchase Option Event, Senior Lender shall provide prompt written notice thereof to Mezzanine Lender (a "**Purchase Option Notice**"), and Mezzanine Lender shall have the right to elect to purchase, in whole but not in part, the Senior Loan for the Loan Purchase Price, payable in immediately available funds, by delivering to Senior Lender written notice of Mezzanine Lender's intention to purchase the Senior Loan (the "**Purchase Notice**"), together with a deposit in an amount equal to ten percent (10%) of the Loan Purchase Price (as may be increased in accordance with Section 11(c), the "**Purchase Deposit**"), provided that such right may only be exercised, and such purchase may only be consummated, if (x) no Mezzanine Lender Intercreditor Event of Default exists at the time of such exercise or at the time such purchase is to be consummated, and (y) the Purchase Notice is sent within thirty (30) days after Mezzanine Lender's receipt of the Purchase Option Notice (the "**Notice Period**"). The purchase of the Senior Loan pursuant to such right shall be consummated at a closing at the offices of Senior Lender or its counsel in New York, New York on a date not later than ninety (90) days following Mezzanine Lender's delivery of the Purchase Notice to Senior Lender. At such closing, concurrently with payment to Senior Lender of the Loan Purchase Price, Senior Lender shall deliver or cause to be delivered to Mezzanine Lender all Senior Loan Documents and all amounts then held in any reserve or escrow account controlled by or held on account of the Senior Lender, and Senior Lender shall execute in favor of Mezzanine Lender or its designee assignment documentation, in form and substance reasonably acceptable to Mezzanine Lender and Senior Lender, at the sole cost and expense of Mezzanine Lender, to assign the Senior Loan and Senior Lender's rights under the Senior Loan Documents (without recourse, representations or warranties, except for representations as to the outstanding balance of the Senior Loan, representations that except for the Senior Loan Documents delivered to Mezzanine Lender, the Senior Loan has not been modified or amended, and representations from Senior Lender that it is the legal and beneficial owner of the entire Senior Loan (or if there is more than one Senior Lender, the portion of the Senior Loan being transferred by such Senior Lender) and that the Senior Loan will be free and clear of any lien, security interest, option or other charge or encumbrance upon the closing of the purchase of the Senior Loan).

6.      The Original Senior Lender's repeated failure to issue Purchase Option Notices has now taken on greater import in the wake of the recent sale and assignment of the Senior

3

Mortgage Loans by the Original Senior Lender to the New Senior Lender on or about February 4, 2022. The New Senior Lender is a newcomer to the ICA and the alliances which were in existence no longer apply.

7.     Following acquisition of the Senior Loans, the Defendant filed a Creditor's Liquidating Plan dated February 24, 2022 (ECF No. 151) (without notice or consultation with the Mezzanine Lender) predicated upon a sale of the Debtors' Hotel and Residential property (the "Creditor's Plan") that leaves virtually no opportunity for a recovery by the Mezzanine Lender.

8.     As part of the proposed Creditor's Plan, the New Senior Lender relies upon the ICA to attempt to deeply subordinate the claim of the Mezzanine Lender to the point of likely elimination, even though the Purchase Option Notice provisions of the ICA were never honored.

9.     To be sure, the ICA is weighted heavily in favor of the Senior Lenders as the holder of the mortgage loans. However, the ICA is not totally one-sided: the Mezzanine Lender's ability to purchase the Senior Mortgage Loans is an important fallback protection which has been ignored and trampled upon by the Creditor's Plan.

10.     The New Senior Lender acquired the Senior Mortgage Loan subject to the terms of the ICA and remains bound by the consequences of the Original Senior Lender's multiple breaches thereunder. Accordingly, the Mezzanine Lender is filing this Adversary Complaint seeking a Declaration of Rights as follows: (i) that the Original Senior Lender breached the ICA on July 16, 2020, when, *inter alia*, it declared a default under the Senior Loan Documents and again breached the ICA on August 20, 2020, when it filed a mortgage enforcement action, and again upon the filing of the bankruptcy petitions by the Debtor on December 18, 2020, without issuing a Purchase Option Notice on either occasion as required by Section 11(a) of the ICA; and (ii) the Mezzanine Lender continues to retain the right to purchase the Senior Loan Documents

for a Loan Purchase Price that should be properly computed as of the first Purchase Option Event on July 16, 2020. In turn, the Mezzanine Lender is also entitled to an award of specific performance directing and compelling the New Senior Lender to sell the Senior Loan Documents to the Mezzanine Lender in accordance with the provisions of Section 11(a) based upon a Loan Purchase Price calculated as of July 16, 2020, as itemized in the schedule annexed hereto as Exhibit "C".

## CORE JURISDICTION OF THE BANKRUPTCY COURT

11. This Adversary Proceeding directly impacts the New Senior Lender's efforts to seek approval of a Disclosure Statement and Confirmation of the Creditor's Plan. Even though the Adversary Proceeding is between creditors of the Debtor's estates, the future course of these Chapter 11 cases is directly impacted by a resolution of this action (particularly since the parties or their predecessors have each filed proofs of claim in connection with the Chapter 11 cases and are deemed to have consented to Bankruptcy Court jurisdiction).

12. The Bankruptcy Court retains the constitutional right and authority to enter a final judgment in this matter. The Complaint presents a "core proceeding" under 28 U.S.C. § 157(b)(2)(A), (B), (K), (L) and (O) in that this matter concerns (i) the administration of the Debtors' Chapter 11 cases; (ii) involves the disposition, treatment, allowance or disallowance of claims against the Debtors' estates; (iii) relates to the confirmability of the Creditor's Plan (and perhaps the Debtors' competing plan); and (iv) otherwise affects the liquidation of the assets of the Debtors' estates and the adjustment of creditor relationships.

## PARTIES

13. The Mezzanine Lender herein is a New York limited liability company, having a principal place of business located at 225 Broadway, New York, NY 10007.

14.     The New Senior Lender herein is a Delaware limited liability company authorized to do business in the State of New York, having a registered office c/o CT Corporation System, 28 Liberty Street, New York, NY 10005.

## BACKGROUND FACTS

### (A) The Senior and Mezzanine Loans

15.     The Debtors each filed voluntary Chapter 11 petitions under title 11 of the U.S. Code on December 18, 2020 in response to enforcement actions taken by the holders of the senior and mezzanine loans.  Since that time, the Debtors have operated as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108, and their respective Chapter 11 cases are being jointly administered pursuant to Order dated December 28, 2020 (ECF No. 20).

16.     Pre-petition, Plaintiff made a mezzanine loan to the Mezz Debtor in the principal amount of $6,000,000 on September 19, 2019 (the "Mezzanine Loan") pursuant to that certain Mezzanine Loan Agreement of even date and accompanying Mezzanine Promissory Note, executed and delivered in favor of the Mezzanine Lender.  The Mezzanine Loan is secured by an equity pledge as described below.

17.     Contemporaneously with the Mezzanine Loan, the Hotel and Residential Debtors obtained senior mortgage refinancing from 85 Flatbush Avenue I LLC (previously defined as the "Original Senior Lender"), in the total principal amount of $70 million (the "Senior Mortgage Loan").  The Senior Mortgage Loan is memorialized by a certain Consolidated, Amended and Restated Mortgage, likewise dated September 19, 2019 and corresponding Assignment of Leases and Rents, both duly recorded with the City Register, Kings County.

18.     In contrast to the Senior Lenders' Mortgages encumbering the Debtor's real property, the Mezzanine Loan is secured by a pledge of the Mezz Debtor's 100% membership

interest in the Hotel and Residential Debtors pursuant to that certain (i) Ownership Interests Pledge And Security Agreement made as of September 19, 2019, with respect to 85 Flatbush RHO Hotel LLC and (ii) Ownership Interests Pledge And Security Agreement made as of September 19, 2019, with respect to 85 Flatbush RHO Residential LLC, both executed by the Debtor in favor of the Mezzanine Lender regarding the Collateral (collectively, the "Pledge Agreement").

19.    The Mezzanine Lender duly perfected the Pledge Agreement by filing requisite UCC financing statements with the proper state and local agencies.  As a result, the Mezzanine Lender holds a duly enforceable lien and security interest against the membership interests held by the Mezzanine Debtor in the other co-Debtors.

20.    However, because the Mezzanine Lender does not hold direct mortgage liens, the disposition of the Senior Mortgage Loan (particularly with respect to any enforcement action taken in connection therewith) adversely impacts the Mezzanine Lender's collateral and could very well foreclose out any residual equity.

21.    Accordingly, as is customary in connection with mezzanine loans of this type, the Original Senior Lender and the Mezzanine Lender entered into the ICA to, *inter alia*, establish an agreed framework, protocols and requirements relating to the exercise of the parties' respective rights and remedies upon a mortgage default or enforcement action.   While the Mezzanine Lender's rights are comparatively circumscribed by the ICA, they are not eliminated. To the contrary, the ICA contains express provisions benefiting the Mezzanine Lender as to what needs to occur upon a mortgage default, acceleration or the filing of a foreclosure action.

**(B)  The Provisions of the ICA Relevant to this Dispute**

22.     Critical to this lawsuit are the provisions of Sections 10 and 11(a) of the ICA,

which expressly placed upon the Senior Lender specific notice requirements whenever (and each

time) a Purchase Option Event occurs, which term is defined as follows:

> "Purchase Option Event" means any of the following: "(i) Borrower has become a
> debtor in any Proceeding; (ii) the Senior Loan has been accelerated, (iii) any
> Enforcement Action described in clause (i) or (ii) of such definition has been
> commenced with respect to the Senior Loan, and/or (iv) any Senior Loan Event of
> Default with respect to a monetary Event of Default or a non-monetary Event of
> Default exists and is continuing for a period of at least ninety (90) days (subject to
> the provisions of Section 10 hereof)."

(See Exhibit "A", p. 9).

23.     In turn, for purposes of the ICA, an Enforcement Action means any:

(i) judicial or non-judicial foreclosure proceeding, the exercise of any power of
sale, the obtaining of a receiver or the taking of any other enforcement action
against the Premises or any portion thereof or Borrower, including, without
limitation, the taking of possession or control of the Premises or any portion
thereof, (ii) acceleration of, or demand or action taken in order to collect, all or
any indebtedness secured by all or any portion of the Premises (other than giving
of notices of default and statements of overdue amounts) or (iii) exercise of any
right or remedy available to Senior Lender under the Senior Loan Documents, at
law, in equity or otherwise with respect to Borrower and/or any portion of the
Premises; provided, however, that, in no event shall the giving of notices of
default, the giving of statements of overdue amounts, the giving of notices of
Senior Lender's reservation of rights, and/or the exercise of any of Senior
Lender's rights or remedies with respect to the Lease Purchase Option be an
Enforcement Action.

24.     By virtue of these definitional sections, there are multiple and varied events which

trigger the Senior Lender's notice and purchase option requirements (which are mutually

exclusive).  In fact, the ICA imposes upon the Senior Lender independent notice requirements

each and every time a Purchase Option Event occurs regardless of whether the Mezzanine

Lender previously declined to cure defaults or previously failed to exercise its purchase option

rights.

25.     Moreover, the requirement to issue a Purchase Option Notice continues unabated unless the Mezzanine Lender fails to timely close on acquiring the Senior Loan after exercising a Purchase Option Notice in accordance with the provision of Section 11(a) which provides:

> "… if Mezzanine Lender had delivered a Purchase Notice, but the closing of Mezzanine Lender's purchase of the Senior Loan fails to occur in accordance with this Section 11(a) as described in clause (C) above solely as a result of the action or inaction of Mezzanine Lender (a "**Purchase Option Default**"), then the rights of Mezzanine Lender to purchase the Senior Loan set forth in this Section 11(a) shall thereupon be of no further force or effect with respect to any subsequent Senior Loan Default Notice and Senior Lender shall have the right to accept a DIL without sending a DIL Notice.  The failure of Senior Lender to provide a Purchase Notice to Mezzanine Lender regarding the occurrence of a Purchase Option Event shall have no adverse effect on Senior Lender other than the resulting extension of the time in which the Purchase Notice may be given."

26.     The last sentence of the quoted portion makes clear that while the Senior Lender cannot be held liable to the Mezzanine Lender for monetary damages for failing to timely issue a Purchase Option Notice, the requirement cannot be waived or eliminated, but is extended.  Once issued, however, any notice of a Purchase Option Event should properly be given retroactive effect to when the first Purchase Option Event actually occurred, which in this case is July 16, 2020.

27.     There is nothing in the ICA to indicate that the failure to provide a Purchase Option Notice has absolutely no consequences.  Indeed, as a matter of equity and logic, the Senior Lender cannot benefit from a breach of Section 11(a) by insisting on a higher purchase price than the one which would have been in effect had timely notice been given.

**(C) The Senior Lender Disregarded the Purchase Option Notice  Requirement**

28.     To date, not a single Purchase Option Notice was ever issued by the Senior Lenders even though multiple Purchase Option Events have occurred.  If nothing else, the Senior

Lenders (both Original and New) are consistent in their abject failure to abide by the ICA in this regard.

29.    The only notice given under the ICA was the July Notice to cure sent in accordance with Section 10(a) and *not* Section 11(a) of the ICA (*See,* Exhibit "B").

30.    Among other things, the July Notice lists default in the payment of monthly interest due under the Senior Loans, first occurring on March 1, 2020, and continuing on April 1, 2020, May 1, 2020, June 1, 2020 and July 1, 2020, which are defined under the July Notice as the "Existing Senior Loan Monthly Payment Events of Default".

31.    Manifestly, the declaration of a payment default constitutes an absolute Purchase Option Event and mandates the issuance of a Purchase Option Notice under Section 11(a) irrespective of any notice to cure under Section 10(a).

32.    Yet, the Original Senior Lender only issued the single July Notice to cure, disregarding entirely the import of Section 11(a) and the corresponding definitional sections relating to the need to issue a separate Purchase Option Notice upon each occurrence of a Purchase Option Event.

33.    Additionally, other Purchase Option Events occurred after July 16, 2020, which were also completely ignored by the Original Senior Lender.  For example, the Original Senior Lender accelerated the indebtedness and commenced a foreclosure action on August 20, 2020 in Supreme Court, Kings County, all without issuance of a separate Purchase Option Notice.

34.    Regardless of any prior motives or intent, the fact remains that while the requirement to issue a Purchase Option Notice can be extended, it cannot be eliminated or ignored, and the Mezzanine Lender is entitled to assert its right to acquire the Senior Loans as of the earliest possible date for a Purchase Option Event.

35.     Insofar as enforcement of rights are concerned, the ICA is very clear that under Section 31 thereof, monetary damages as not available, and instead, the Mezzanine Lender may enforce its rights relating to the failure to receive Purchase Option Notices through the remedies of injunction, declaratory judgment and specific performance.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Declaratory Relief)

36.     The Mezzanine Lender repeats and realleges each and every allegation contained in the preceding paragraphs hereof as though the same were more fully set forth at length below.

37.     The Senior Lenders' obligation to provide a Purchase Option Notice in accordance with Section 11(a) of the ICA each time a Purchase Option Event occurred is an integral component of the ICA and is otherwise delineated in clear and unambiguous terms.

38.     That the Mezzanine Lender in its discretion did not elect to cure the mortgage payment defaults pursuant to the July Notice does not in any manner vitiate, negate or otherwise excuse the requirement that the Original Senior Lender issue separate Purchase Option Notices in accordance with Section 11(a) on, among other dates, July 16, 2020 and again on August 20, 2020.

39.     The Mezzanine Lender's rights to insist on the issuance of a Purchase Option Notice as of the earliest possible date of July 16, 2022 cannot be abridged or waived, pursuant to the express terms of the ICA, which contains a clear "no waiver" clause in Section 23, applicable to both the Senior Lenders and the Mezzanine Lender, providing as follows:

> No failure on the part of Mezzanine Lender and Senior Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

40.    Notwithstanding the occurrence of multiple Purchase Option Events, the Senior Lender never previously issued a Purchase Option Notice as required by Section 11(a) of the ICA.

41.    The July Notice issued under Section 10 of the ICA does not reference the Mezzanine Lender's Purchase Option Rights and does not qualify as a Purchase Option Notice for purposes of Section 11(a) of the ICA.  Even if it did, the Mezzanine Lender was entitled to a separate Purchase Option Notice on August 20, 2020, and on December 18, 2020 for that matter (the commencement of bankruptcy).

42.    Had a proper and conforming Purchase Option Notice been issued by the Original Senior Lender on July 16, 2020, the Mezzanine Lender was ready, willing and able to exercise its Purchase Option Rights at that time.

43.    The Federal Declaratory Judgment Act (28 U.S. Code § 2201) empowers this Court to declare the effect of the rights and legal relations of the parties in a case of an actual controversy.

44.    Augmenting the Court's power, the ICA also, by consent, recognizes that the Mezzanine Lender retains the right to seek both a Declaratory Judgment and Specific Performance in the event the Senior Lenders breach or violate the ICA pursuant to Section 31, which provides in relevant as follows:

> Senior Lender and Mezzanine Lender agree that upon a breach of this Agreement by Senior Lender, on the one hand, or Mezzanine Lender, on the other hand, the remedies of injunction, declaratory judgment and specific performance shall be available to such non-breaching party.

45.    The failure to issue a Purchase Option Notice constitutes a clear and continuing breach of the ICA.  Almost from the founding of the Republic, it has been a maxim of American law that for every wrong there is a remedy, and the remedy here is a declaration of rights that the

Senior Lender repeatedly violated the ICA, conferring upon the Mezzanine Lender the right to acquire the Senior Loans at a Loan Purchase Price that would have been in effect as of July 16, 2020.

46.    In view of all of the foregoing, the Mezzanine Lender is entitled to a Declaratory Judgment finding and declaring that an actual controversy exists relating to the parties' respective rights and obligations under the ICA that (i) that the Original Senior Lender breached the ICA on July 16, 2020, when, *inter alia*, it declared a default under the Senior Loan Documents and again breached the ICA on August 20, 2020, when it filed a mortgage enforcement action, and again upon the filing of the bankruptcy petitions by the Debtor on December 18, 2020, without issuing a Purchase Option Notice on either occasion as required by Section 11(a) of the ICA; and (ii) the Mezzanine Lender continues to retain the right to purchase the Senior Loan Documents for a Loan Purchase Price which should be properly computed as of the first neglected Purchase Option Event on July 16, 2020.

### AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Contract/Specific Performance)

47.    Plaintiff repeats and alleges each and every allegation contained in the preceding paragraphs hereof as though the same were more fully set forth at length here.

48.    The Mezzanine Lender and the New Senior Lender are bound by the terms of the ICA, which constitutes a valid, binding and enforceable written contract supported by fair and adequate consideration.

49.    The ICA has been breached and violated by the Senior Lenders as a result of its repeated failure to provide the Mezzanine Lender with Purchase Option Notices on July 16, 2020, August 20, 2020, and December 18, 2020.

50.    The Mezzanine Lender is not in default of the ICA and is eligible to receive the full benefits and rights conferred by Section 11(a) relating to the issuance of Purchase Option Notices replete with the opportunity to exercise its Purchase Option rights as of July 16, 2020.

51.    The Mezzanine Lender has no adequate remedy at law and its rights to acquire the Senior Loans are unique as matter of law.

52.    In view of the foregoing, the Mezzanine Lender is entitled to an award of specific performance directing the New Senior Lender to sell and assign the Senior Loans to the Mezzanine Lender based upon a Loan Purchase Price equal to what the Loan Purchase Price would have been as of July 16, 2020, when the first Purchase Option Notice should have been issued.

WHEREFORE, Plaintiff seeks the entry of a judgment as follows:

a.    Granting declaratory judgment on the First Cause of Action;

b.    Granting specific performance on the Second Cause of Action; and

c.    Granting such other relief as may be just and proper.

Dated: New York, New York
       March 23, 2022

Goldberg Weprin Finkel Goldstein LLP
*Litigation Co-Counsel for the Plaintiff*
1501 Broadway, 22nd Floor
New York, New York 10036
(212) 221-5700

By: _____
       Kevin J. Nash, Esq.
       A Member of the Firm

INTERCREDITOR AGREEMENT

between

**85 FLATBUSH AVENUE 1 LLC**,

as Senior Lender,

and

**85 FLATBUSH MEZZ LLC**

as Mezzanine Lender

Dated as of September 19, 2019

Premises:     85 Flatbush Avenue Extension
Condominium Commercial Unit, Hotel Unit and Residential Unit
Brooklyn, New York 11201

## **TABLE OF CONTENTS**

Section 1.    Certain Definitions; Rules of Construction.............................................................2

Section 2.    Approval of Loans and Loan Documents. ...........................................................13

Section 3.    Representations and Warranties.........................................................................14

Section 4.    Transfer of Mezzanine Loan or Senior Loan. ......................................................18

Section 5.    Enforcement of Mezzanine Loan Documents.......................................................19

Section 6.    Modifications, Amendments, Etc. ......................................................................24

Section 7.    Subordination of Mezzanine Loan and Mezzanine Loan Documents. ..................28

Section 8.    Payment Subordination.....................................................................................29

Section 9.    Rights of Subrogation; Bankruptcy. ..................................................................31

Section 10.    Rights of Cure.................................................................................................33

Section 11.    Right to Purchase Senior Loan. ........................................................................35

Section 12.    Approvals.......................................................................................................38

Section 13.    Loan Components; Additional/Replacement Promissory Notes; Cooperation; Senior Loan Resizing. .........................................................................................39

Section 14.    Obligations Hereunder Not Affected. ...............................................................41

Section 15.    Notices. ..........................................................................................................42

Section 16.    Estoppel..........................................................................................................43

Section 17.    Renovation Reserve Fund ................................................................................43

Section 18.    Further Assurances..........................................................................................43

Section 19.    No Third Party Beneficiaries; No Modification. .................................................43

Section 20.    Successors and Assigns....................................................................................44

Section 21.    Counterpart Originals......................................................................................44

Section 22.    Governing Law; Jurisdiction; Waiver of Jury Trial.............................................44

Section 23.    No Waiver; Remedies. .....................................................................................45

Section 24.    No Joint Venture...............................................................................................45

Section 25.    Captions. ........................................................................................................45

Section 26.    Conflicts.........................................................................................................45

Section 27.    No Release.......................................................................................................45

Section 28.    Continuing Agreement......................................................................................45

Section 29.    Severability. ....................................................................................................45

Section 30.    Expenses. ........................................................................................................46

Section 31.    Injunction. .......................................................................................................46

Section 32.    Mutual Acknowledgments and Disclaimer............................................................47

Section 33.    Time of Essence.............................................................................................50

Section 34.    Financing of the Mezzanine Loan.........................................................................51

Section 35.    Affiliated Mezzanine Lender.. ..............................................................................52

EXHIBIT A          -       Legal Description of Premises
EXHIBIT B          -       Senior Loan Documents
EXHIBIT C          -       Mezzanine Loan Documents
EXHIBIT D          -       Permitted Fund Managers

SCHEDULE I         -       Borrower
SCHEDULE II                Mezzanine Borrower

## INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT (this "**Agreement**"), dated as of September 19, 2019 (the "**Effective Date**") between **85 FLATBUSH AVENUE 1 LLC**, a Delaware limited liability company, having an address at 520 Madison Avenue, Suite 3501, New York, New York 10022, as senior lender (in such capacity, together with its successors and assigns, "**Senior Lender**"), and **85 FLATBUSH MEZZ LLC** a New York limited liability company, having an address at c/o The Bluestone Group, 225 Broadway, 32nd Floor, New York, New York 10007, as mezzanine lender ("**Mezzanine Lender**").

## RECITALS

A.    85 FLATBUSH RHO HOTEL LLC, a Delaware limited liability company ("**Commercial Borrower**"), is the fee owner of the real property commonly known as 85 Flatbush Avenue Extension, Condominium Commercial Unit and Hotel Unit, Brooklyn, New York 11201, as more fully described in Exhibit A attached hereto (collectively, the "**Commercial Premises**");

B.    85 FLATBUSH RHO RESIDENTIAL LLC, a Delaware limited liability company ("**Residential Borrower**", and together with the Commercial Borrower, individually and/or collectively, "**Borrower**") is the fee owner of the real property commonly known as 85 Flatbush Avenue Extension, Condominium Residential Unit, Brooklyn, New York 11201, as more fully described in Exhibit A attached hereto (the "**Residential Premises**", and together with the Commercial Premises, collectively, the "**Premises**");

C.    85 FLATBUSH RHO MEZZ LLC, a Delaware limited liability company (the "**Mezzanine Borrower**") is the owner of one hundred percent (100%) of the equity interest in each Borrower.

D.    Pursuant to the terms, provisions and conditions of that certain Consolidated, Amended and Restated Mortgage and Security Agreement, dated as of the date hereof (as the same may be amended, restated, supplemented, or otherwise modified and in effect from time to time, the "**Mortgage**") which encumbers the Premises, Senior Lender made a loan to Borrower in the original principal amount of Seventy Million and 00/100 Dollars ($70,000,000.00) (the "**Senior Loan**").

E.    Borrower's obligations under the Senior Loan are evidenced by that certain Consolidated, Amended and Restated Note dated as of the date hereof in the original principal amount of Seventy Million and 00/100 Dollars ($70,000,000.00), as executed and delivered by Borrower in favor of Senior Lender (as the same may be amended, restated, extended, renewed, supplemented, split, severed, allonged, or otherwise modified, or further assigned from time to time, the "**Senior Note**").

F.    Pursuant to the terms, provisions and conditions of that certain Mezzanine Loan Agreement, dated as of the date hereof, (as the same may be amended, restated, supplemented, or otherwise modified and in effect from time to time, the "**Mezzanine Loan Agreement**") between Mezzanine Borrower and Mezzanine Lender, Mezzanine Lender made a loan to Mezzanine Borrower in the original principal amount of Six Million and 00/100 Dollars ($6,000,000.00) (the "**Mezzanine Loan**").

1

G.    Mezzanine Borrower's obligations under the Mezzanine Loan are evidenced by that certain Mezzanine Promissory Note dated as of the date hereof in the original principal amount of Six Million and 00/100 Dollars ($6,000,000.00) as executed and delivered by Mezzanine Borrower in favor of Mezzanine Lender (as the same may be amended, restated, extended, renewed, supplemented, split, severed, allonged, or otherwise modified, or further assigned from time to time, the "**Mezzanine Note**"), and secured by those certain certain Ownership Interests Pledge and Security Agreements, each dated as of the date hereof from Mezzanine Borrower to Mezzanine Lender (as the same may be amended, restated, supplemented, or otherwise modified and in effect from time to time, individually and/or collectively, the "**Pledge Agreement**").  The Pledge Agreement encumbers the Equity Collateral (as such term is hereinafter defined).

H.    Senior Lender and Mezzanine Lender desire to enter into this Agreement to provide for the relative priority of the Senior Loan Documents (as such term is hereinafter defined) and the Mezzanine Loan Documents (as such term is hereinafter defined) on the terms and conditions herein below set forth, and to evidence certain agreements with respect to the relationship between the Mezzanine Loan and the Mezzanine Loan Documents, on the one hand, and the Senior Loan and the Senior Loan Documents, on the other hand.

NOW, THEREFORE, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Senior Lender and Mezzanine Lender hereby agree as follows:

Section 1.    <u>Certain Definitions; Rules of Construction</u>.

(a)    As used in this Agreement, the following capitalized terms shall have the following meanings:

"**Acceptable Transferee**" means a Person that, together with its Affiliates (i) has not been the subject of a workout or restructuring on account of its obligations and liabilities to Senior Lender or any of its Affiliates during the period commencing as of the date that is five (5) years prior to the date hereof and ending on the date of the proposed transfer to such Person (the "**Evaluation Period**"), (ii) has not otherwise commenced any litigation against such Senior Lender or any of its Affiliates during the Evaluation Period, (iii) has otherwise paid and performed its obligations and liabilities to Senior Lender or any of its Affiliates in all material respects in accordance with the respective terms thereof or otherwise as approved by Senior Lender or any of its Affiliates, (iv) has not been the subject of a Proceeding, (v) neither it, nor any member of its board of directors or senior management, has been indicted for or convicted of any felony involving a crime or crimes of moral turpitude, (vi) has not been and is not a Prohibited Person, and (vii) has furnished to Senior Lender any documentation and such other information or evidence as may be reasonably requested by Senior Lender to carry out and be satisfied with the results of all Senior Lender's applicable and customary customer due diligence requirements, including contact information, credit, judgment, lien, litigation, bankruptcy, criminal and watch list searches regarding the proposed transferee and any other Persons required by Senior Lender's standard "know your customer" and Patriot Act reviews and requirements. Senior Lender acknowledges that as of the Effective Date, Initial Loan Pledgee is an Acceptable Transferee.

"**Affiliate**" means, as to any particular Person, any Person directly or indirectly, through one or more intermediaries, Controlling, Controlled by or under common Control with the Person or Persons in question.

"**Agreement**" means this Agreement, as the same may be amended, restated, supplemented, or otherwise modified and in effect from time to time, pursuant to the terms hereof.

"**AIL**" has the meaning provided in Section 11(d) hereof.

"**Award**" has the meaning provided in Section 8(c) hereof.

"**Bankruptcy Code**" shall mean Title 11 U.S.C. § 101 *et seq*., and the regulations adopted and promulgated pursuant thereto (as the same may be amended from time to time).

"**Bluestone QT**" means (a) the initial named Mezzanine Lender, (b) Initial Loan Pledgee, or (c) their respective Affiliates.

"**Borrower**" has the meaning provided in the Recitals hereto.

"**Broad Affiliate**" means, as to any particular Person, any Person, directly or indirectly through one or more intermediaries, Controlling, Controlled by or under common Control (defined only as set forth in clause (b) below) with, the Person in question.  As used solely in this definition of "Broad Affiliate," "Control" means (a) the ownership, directly or indirectly, in the aggregate of ten percent (10%) or more of the beneficial ownership interests of an entity, or (b) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, whether through the ability to exercise voting power, by contract or otherwise (other than possession of voting or control rights granted to the Mezzanine Lender pursuant to the related Mezzanine Loan Documents, the exercise of which is contingent upon the occurrence and continuance of an Event of Default under the Mezzanine Loan Documents, unless and until so exercised by Mezzanine Lender).  "Controlled by", "Controlling" and "under common Control with" shall have the respective correlative meanings thereto.

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"**Carry Guaranty**" means that certain Debt Service and Carry Guaranty dated as of the date hereof given by Guarantor in favor of Senior Lender.

"**Continuing Senior Event of Default**" means a Senior Event of Default for which (i) Senior Lender has provided notice of such Event of Default to Mezzanine Lender in accordance with Section 10(a) hereof and (ii) the cure period provided to Mezzanine Lender in Section 10(a) hereof has expired and such Senior Event of Default has not been cured by Mezzanine Borrower or Mezzanine Lender or waived in writing by Senior Lender.

"**Control**" means the ownership, directly or indirectly, in the aggregate of more than fifty percent (50%) of the beneficial ownership interests of an entity and the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, whether through the ability to exercise voting power, by contract or otherwise;

provided, however, for purposes of determining whether a Person is an Affiliate of Borrower, "**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, whether through the ability to exercise voting power, by contract or otherwise. "**Controlled by**," "**Controlling**" and "**under common Control with**" shall have the respective correlative meaning thereto.

"**Creditworthy Transferee Affiliate**" means an Affiliate of an Equity Collateral Enforcement Transferee which (i) complies with all financial covenants set forth in the Senior Loan Recourse Agreements, including any minimum net worth or liquid asset requirements; provided, that if the Equity Collateral Enforcement Transferee is a Bluestone QT, then the minimum net worth and liquid asset requirements shall be $75,000,000.000 and $2,000,000.00, respectively, (the "**BSG Financial Covenants**"), (ii) is not subject to sovereign immunity, (iii) is not the subject of a Proceeding, and (iv) is otherwise acceptable to Senior Lender in its sole and absolute discretion.

"**Directing Mezzanine Lender**" has the meaning provided in Section 4(b) hereof.

"**Directing Senior Lender**" has the meaning provided in Section 4(d) hereof.

"**Effective Date**" has the meaning provided in the first paragraph of this Agreement.

"**Eligibility Requirements**" means, with respect to any Person, that such Person (i) has total assets (in name or under management) in excess of Six Hundred Million and 00/100 Dollars ($600,000,000.00) and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of Two Hundred Fifty Million and 00/100 Dollars ($250,000,000.00) and (ii) is regularly engaged in the business of making or owning (or, in the case of a pension advisory firm or similar fiduciary, regularly engaged in managing investments in) commercial real estate loans (including mezzanine loans to direct or indirect owners of commercial properties, which loans are secured by pledges of direct or indirect ownership interests in the owners of such commercial properties) or operating commercial mortgage properties.

"**Enforcement Action**" means any (i) judicial or non-judicial foreclosure proceeding, the exercise of any power of sale, the acceptance of a deed or assignment in lieu of foreclosure, the obtaining of a receiver or the taking of any other enforcement action against the Premises or any portion thereof or Borrower, including, without limitation, the taking of possession or control of the Premises or any portion thereof, (ii) acceleration of, or demand or action taken in order to collect, all or any indebtedness secured by all or any portion of Premises (other than giving of notices of default and statements of overdue amounts) or (iii) exercise of any right or remedy available to Senior Lender under the Senior Loan Documents, at law, in equity or otherwise with respect to Borrower and/or any portion of the Premises; provided, however, that, in no event shall the giving of notices of default, the giving of statements of overdue amounts and/or the giving of notices of Senior Lender's reservation of rights be an Enforcement Action.

"**Equity Collateral**" means the equity interests in Borrower pledged pursuant to the Pledge Agreement.

"**Equity Collateral Enforcement Action**" means either (i) any action or proceeding or other exercise of Mezzanine Lender's rights and remedies under the Pledge Agreement, the other Mezzanine Loan Documents, applicable law or in equity with respect to a foreclosure or other realization upon the Equity Collateral (other than the giving of notices of default or statements of overdue amounts), including obtaining or accepting title to the Equity Collateral in satisfaction of all or any portion of the Mezzanine Loan, (ii) accepting title to the Equity Collateral from a receiver or similar agent with respect to the Equity Collateral, (iii) exercising rights of control over Borrower through the exercise of voting rights with respect to the Equity Collateral or otherwise, or (iv) otherwise obtaining, selling or transferring the Equity Collateral or the proceeds thereof.

"**Equity Collateral Enforcement Transferee**" means (i) any transferee of all or any portion of the Equity Collateral upon an Equity Collateral Enforcement Action or (ii) Mezzanine Lender or any assignee or designee thereof that exercises any rights of control over Borrower pursuant to the provisions of the Mezzanine Loan Documents or otherwise.

"**Event of Default**" as used herein means (i) with respect to the Senior Loan and the Senior Loan Documents, any Event of Default thereunder which has occurred and is continuing (*i.e.*, has not been cured by Borrower in accordance with the terms of the Senior Loan Documents or by Mezzanine Lender in accordance with the terms of this Agreement, regardless of whether any cure period applicable thereto remains available hereunder, or waived by Senior Lender) and (ii) with respect to the Mezzanine Loan and the Mezzanine Loan Documents, any Event of Default thereunder which has occurred and is continuing (*i.e.*, has not been cured by Mezzanine Borrower in accordance with the terms of the Mezzanine Loan Documents or waived by Mezzanine Lender).

"**Governmental Authority**" shall mean any court, board, agency, commission, office, central bank or other authority of any nature whatsoever for any governmental unit (federal, State, county, district, municipal, city, country or otherwise) or quasi-governmental unit whether now or hereafter in existence.

"**Guarantor**" means LIPA RUBIN, an individual, or any guarantor or indemnitor from time to time a party to any Senior Loan Recourse Agreements or Mezzanine Loan Recourse Agreements.

"**Guaranty Claim**" has the meaning provided in Section 5(f) hereof.

"**Guaranty Notice**" has the meaning provided in Section 5(f) hereof.

"**Initial Loan Pledgee**" means Sorkin Flatbush Mezzanine Debt LLC, any Affiliate thereof or any other entity Controlled by Howard Sorkin.

"**Initial Mezzanine Lender**" has the meaning provided in the Recitals hereof.

"**Loan Party**" means each of Borrower, Guarantor, any manager that is an Affiliate of Borrower and/or Guarantor and each other direct or indirect legal or beneficial owner of Borrower.

"**Loan Pledgee**" has the meaning provided in Section 33 hereof.

"**Loan Purchase Extension Deposit**" has the meaning provided in <u>Section 11(c)</u> hereof.

"**Loan Purchase Price**" means an amount determined on the date that the Mezzanine Lender purchases the Senior Loan in accordance with <u>Section 11</u> hereof that is equal to the sum of (without duplication) (a) the aggregate outstanding principal balance thereof, together with all accrued interest at the Senior Loan Preferred Rate (including default interest, if any, calculated at the "Default Rate", as defined in the Senior Note), and other amounts due thereon (including, without limitation, the applicable Senior Loan Prepayment Premium and the Senior Loan Exit Fee) at the Senior Loan Preferred Rate, which such amounts shall be deemed due and payable for the purpose of calculating the Loan Purchase Price with respect to the Senior Loan, (b) any protective advances made by Senior Lender or any servicer for the Senior Loan, (c) all other sums of any nature whatsoever due and owing under the Senior Loan Documents, (d) post-petition interest, (e) any workout fee, special servicing fee or liquidation fee payable to the special servicer pursuant to any servicing agreement, and (f) all reasonable and actual costs and expenses (including legal fees and expenses) incurred by Senior Lender in enforcing the terms of the Senior Loan Documents.

"**Mezzanine Borrower**" has the meaning provided in the <u>Recitals</u> hereto.

"**Mezzanine Carry Guaranty**" means that certain Debt Service and Carry Guaranty dated as of the date hereof given by Guarantor for the benefit of Mezzanine Lender.

"**Mezzanine Lender**" has the meaning provided in the first paragraph of this Agreement.

"**Mezzanine Lender Intercreditor Event of Default**" means the occurrence of any of the following:

(i)     Mezzanine Lender shall be in material breach of any term, covenant, condition or agreement on its part to be performed or observed and contained in this Agreement, including, without limitation, any failure on the part of Mezzanine Lender to pay or turn over to Senior Lender any amount which Mezzanine Lender is so required to pay or turn over to Senior Lender in accordance with this Agreement.

(ii)     Mezzanine Lender shall: (A) commence a voluntary case under the Bankruptcy Code or other federal bankruptcy laws (as now or hereafter in effect); (B) file a petition seeking to take advantage of any other applicable law, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up, or composition or adjustment of debts; (C) consent to, or fail to contest in a timely and appropriate manner, any petition filed against it in an involuntary case under such bankruptcy laws or other applicable law or consent to any proceeding or action described in the immediately following subsection (D); (D) apply for or consent to, or fail to contest in a timely and appropriate manner, the appointment of, or the taking of possession by, a receiver, custodian, trustee, or liquidator of itself or of a substantial part of its property, domestic or foreign; (E) admit in writing in a legal proceeding its inability to pay its debts as they become due; (F) make a general assignment for the benefit of creditors; (G) make a

6

fraudulent conveyance as to creditors under any applicable law as determined by a court of competent jurisdiction; or (H) take any corporate or partnership action for the purpose of effecting any of the foregoing.

(iii)     A case or other proceeding shall be commenced against Mezzanine Lender in any court of competent jurisdiction seeking: (A) relief under the Bankruptcy Code or other federal bankruptcy laws (as now or hereafter in effect) or under any other applicable law, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up, or composition or adjustment of debts; or (B) the appointment of a trustee, receiver, custodian, liquidator or the like of such Person, or of all or any substantial part of the assets, domestic or foreign, of such Person, and in the case of either clause (A) or (B) such case or proceeding shall continue undismissed or unstayed for a period of one hundred twenty (120) consecutive calendar days, or an order granting the relief requested in such case or proceeding (including, but not limited to, an order for relief under such Bankruptcy Code or such other federal bankruptcy laws) shall be entered.

(iv)     Mezzanine Lender shall disavow, revoke or terminate this Agreement or shall otherwise challenge or contest in any action, suit or proceeding in any court or before any Governmental Authority the validity or enforceability of this Agreement.

(v)     Mezzanine Lender shall object to, oppose, hinder, contest, interfere with or seek to enjoin or restrain (whether through remedies of injunction, declaratory judgment or specific performance, the filing of a lis pendens, or otherwise) the exercise of rights or remedies by Senior Lender under the Senior Loan Documents while any Senior Event of Default or Continuing Senior Event of Default exists, in any case, except to the extent that the exercise of such rights or remedies are not in accordance with the terms of this Agreement.

(vi)     Mezzanine Lender attempts to foreclose, realize upon or otherwise acquire the Equity Collateral (directly or indirectly, at any tier of ownership) or otherwise undertakes an Equity Collateral Enforcement Action in violation of the terms of this Agreement.

(vii)     Mezzanine Lender Transfers any interest in the Mezzanine Loan except as expressly permitted hereunder.

"**Mezzanine Loan**" has the meaning provided in the Recitals hereto.

"**Mezzanine Loan Agreement**" has the meaning provided in the Recitals hereto.

"**Mezzanine Loan Documents**" means the Mezzanine Loan Agreement, the Mezzanine Note, and the Pledge Agreement, together with all documents and instruments set forth on Exhibit C hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"**Mezzanine Loan Modification**" has the meaning provided in Section 6(b) hereof.

"**Mezzanine Loan Recourse Agreements**" means, collectively, all guaranties and indemnity agreements (including, without limitation, the Guaranty (as such term is defined in the Mezzanine Loan Agreement)) delivered in connection with the Mezzanine Loan and identified as "Mezzanine Loan Recourse Agreements" on Exhibit C hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"**Mezzanine Note**" has the meaning provided in the Recitals hereto.

"**Monetary Cure Period**" has the meaning provided in Section 10(a) hereof.

"**Mortgage**" has the meaning provided in the Recitals hereto.

"**Notice Period**" has the meaning provided in Section 11(a) hereof.

"**Permitted Fund Manager**" means any Person that on the date of determination is (a) one of the Persons listed on Exhibit D or any other nationally-recognized manager of investment funds investing in debt or equity interests relating to commercial real estate, or (b) investing through a fund with committed capital of at least $500,000,000.  Notwithstanding the foregoing, no Person shall be a Permitted Fund Manager if (i) such Person is the subject of any Proceeding, (ii) such Person is a Prohibited Person, or (iii) such Person is Borrower, Mezzanine Borrower, Guarantor, or a Broad Affiliate of any of the foregoing.

"**Person**" means any individual, sole proprietorship, corporation, general partnership, limited partnership, limited liability company or partnership, joint venture, association, joint stock company, bank, trust, estate unincorporated organization, federal, state, county or municipal government (or any agency or political subdivision thereof), endowment fund or other form of entity, or any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Pledge**" has the meaning provided in Section 33 hereof.

"**Pledge Agreement**" has the meaning provided in the Recitals hereto.

"**Pledge Arrangement**" means the pledge being made as of the date hereof in favor of Initial Loan Pledgee.

"**Premises**" has the meaning provided in the Recitals hereto.

"**Proceeding**" means any case, proceeding or other action, whether voluntary or involuntary, under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, or other relief with respect to debts or debtors.

"**Prohibited Person**" means any Person:

(i)       listed in the annex to, or who is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and

8

relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "**Executive Order**");

(ii)    that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)    with whom a Person is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(iv)    who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(v)    that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or at any replacement website or other replacement official publication of such list; or

(vi)    who is an Affiliate of a Person listed in clauses (i) through (v) above.

"**Property Manager**" means the property manager of all or any part of the Premises.

"**Protective Advances**" means all sums advanced for the purpose of payment of real estate taxes (including special assessments or payments in lieu of real estate taxes), maintenance costs, insurance premiums or other items (including capital items) which Senior Lender and/or Mezzanine Lender reasonably determines are necessary to preserve, protect, maintain or defend the Premises or priority of the lien of the Senior Loan Documents Premises or the Equity Collateral, respectively, from any intervening lien, forfeiture, casualty, loss, waste or other impairment, diminution or reduction in value, including, without limitation, (a) the completion of any applicable alterations or improvements which have theretofore been commenced or are deemed necessary for the leasing, marketing or maintenance of the Premises and (b) with respect to the Mezzanine Loan, amounts advanced by Mezzanine Lender pursuant to Section 10 hereof.

"**Purchase Deposit**" has the meaning provided in Section 11(a) hereof.

"**Purchase Notice**" has the meaning provided in Section 11(a) hereof.

"**Purchase Option Event**" means any of the following: (i) Borrower has become a debtor in any Proceeding; (ii) the Senior Loan has been accelerated, (iii) any Enforcement Action described in clause (i) or (ii) of such definition has been commenced with respect to the Senior Loan, and/or (iv) any Senior Loan Event of Default with respect to a monetary Event of Default or a non-monetary Event of Default exists and is continuing for a period of at least ninety (90) days (subject to the provisions of Section 10 hereof).

"**Purchase Option Notice**" has the meaning provided in Section 11(a) hereof.

"**Qualified Manager**" means a property manager of the Premises which is reasonably acceptable to Senior Lender, and at a minimum, (A) is a reputable management company having at least ten (10) years' experience in the management of commercial properties with similar size, scope, use, and value as the Premises and in the jurisdiction in which the Premises are located ("**Similar Properties**"), (B) has, for at least ten (10) years prior to its engagement as property manager, managed at least 1,000,000 square feet of commercial real estate and at least ten (10) similar properties, and (C) is not the subject of a Proceeding.  Notwithstanding the foregoing, no Person shall be deemed to be a Qualified Manager if (i) Senior Lender certifies to Mezzanine Lender that such Person is not an Acceptable Transferee; or (ii) such Person is Mezzanine Borrower or an Affiliate of Mezzanine Borrower.

"**Qualified Transferee**" means (i) the initial named Mezzanine Lender or an Affiliate thereof, (ii) the initial named Senior Lender or an Affiliate thereof, (iii) Initial Loan Pledgee, and/or (iv) one or more of the following:

(A)     a real estate investment trust, bank, saving and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan, provided that any such Person referred to in this clause (iii)(A) satisfies the Eligibility Requirements;

(B)     an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, or an institutional "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended, provided that any such Person referred to in this clause (iii)(B) satisfies the Eligibility Requirements;

(C)     an institution substantially similar to any of the foregoing entities described in clauses (iii)(A) or (iii)(B) that satisfies the Eligibility Requirements;

(D)     any Person Controlled by any of the Persons described in clauses (iii)(A) or (iii)(C) above; provided, however, no Person described in this clause (iii)(D) shall be a Qualified Transferee unless the obligations of such Person are guaranteed by a Qualified Transferee that is described in clauses (iii)(A), (iii)(B) or (iii)(C) and that satisfies the Eligibility Requirements, pursuant to a guaranty that is in form and substance satisfactory to, and which guaranty has been unconditionally delivered to Senior Lender; or

(E)     an investment fund, limited liability company, limited partnership or general partnership where a Permitted Fund Manager or a Person that is otherwise a Qualified Transferee under clauses (iii)(A), (iii)(B), (iii)(C) or (iii)(D) of this definition acts as the general partner, managing member or fund manager and at least 50% of the equity interests in such investment vehicle are owned, directly or indirectly, by one or more Persons that are otherwise Qualified Transferees under clauses (iii)(A), (iii)(B), (iii)(C) or (iii)(D) of this definition; or

Notwithstanding the foregoing, no Person shall be deemed to be a Qualified Transferee if (x) such Person is not an Acceptable Transferee; or (y) if such Person is Mezzanine Borrower or an Affiliate of Mezzanine Borrower.

"**Redirection Notice**" has the meaning provided in <u>Section 33</u> hereof.

"**Replacement Guaranties**" shall mean a Guaranty and Environmental Indemnity Agreement (which Environmental Indemnity Agreement shall provide that, unless caused by the acts or omissions (when otherwise obligated to act) of the Mezzanine Lender, or such other person or entity giving such replacement Environmental Indemnity Agreement, or any affiliate(s) thereof, the obligations such replacement guarantor shall only accrue from and after such time as such person or entity (or affiliate thereof) takes title to the Premises or exercises control thereon (whether pursuant to an assignment in lieu of foreclosure, an exercise of voting control, or otherwise)) each delivered by a Creditworthy Transferee Affiliate (which must maintain a minimum net worth of $75,000,000.00 and liquid assets of $2,000,000.00), respectively in connection with the consummation of an Equity Collateral Enforcement Action in substantially the same form as the applicable Senior Loan Recourse Agreements, subject to such commercially reasonable comments as are acceptable to the Senior Lender (including, without limitation, that the Guaranty shall be fashioned as a so-called "recourse carve-out guaranty")

"**Replacement Pledge Agreement**" has the meaning provided in <u>Section 5(b)(viii)</u> hereof.

"**Senior Event of Default**" means an Event of Default under the Senior Loan Documents.

"**Senior Financing Loan**" shall mean any assignment, collateral assignment, pledge and/or other Transfer of the Senior Loan as collateral security for any financing provided to Senior Lender and/or its Affiliates from time to time.

"**Senior Lender**" has the meaning provided in the first paragraph of this Agreement.

"**Senior Loan**" has the meaning provided in the <u>Recitals</u> hereto.

"**Senior Loan Default Notice**" has the meaning provided in <u>Section 10(a)</u> hereof.

"**Senior Loan Exit Fee**" means forty-five hundredths of one percent (0.45%) of the principal sum of the Senior Loan.

"**Senior Loan Documents**" means the Senior Note and the Mortgage, together with the instruments and documents set forth on <u>Exhibit B</u> hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"**Senior Loan Liabilities**" means, collectively, all of the indebtedness, liabilities and obligations of Borrower under any Senior Loan Document including, without limitation (i) the principal amount of, and accrued interest on (including any interest which accrues after the commencement of any Proceeding relating to Borrower, if such interest would be allowed in such Proceeding), the Senior Loan, (ii) all other indebtedness, obligations and liabilities of Borrower to Senior Lender now existing or hereafter incurred or created under the Senior Loan Documents, and (iii) all other indebtedness, obligations and liabilities of Borrower to Senior Lender now

existing or hereafter incurred, created and arising from or relating to the Senior Loan, including interest thereon and any other amounts payable in respect thereof or in connection therewith, including any late charges, default interest, prepayment, yield maintenance, breakage or lockout fees or premiums, exit fees, advances, post-petition interest, and special servicing, workout, and liquidation fees.

"**Senior Loan Modification**" has the meaning provided in Section 6(a) hereof.

"**Senior Loan Preferred Rate**" means a rate per annum equal to the greater of (i) LIBOR (or if LIBOR is unavailable, the then applicable Alternative Rate) plus Six and 00/100 percent (6.00%).

"**Senior Loan Prepayment Premium**" means the Prepayment Premium (as defined in the Senior Loan Documents) applicable to the Senior Loan, but calculated at the Senior Loan Preferred Rate (and not the Interest Rate).

"**Senior Loan Recourse Agreements**" means, collectively, all guaranties and indemnity agreements (including, without limitation, the Guaranty (as such term is defined in the Mortgage)) delivered in connection with the Senior Loan and identified on Exhibit B hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"**Senior Note**" has the meaning provided in the Recitals hereto.

"**Separate Collateral**" means (i) the Equity Collateral and (ii) any other collateral given as security for the Mezzanine Loan pursuant to the Mezzanine Loan Documents, in each case not constituting security for the Senior Loan.

"**Transfer**" means any assignment, pledge, conveyance, sale, transfer, mortgage, encumbrance, grant of a security interest, issuance of a participation interest, conversion, or other disposition, either directly or indirectly, by operation of law or otherwise. "**Transferred**" and "**Transferring**" shall have the respective correlative meanings thereto.

(b)    For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(i)    all capitalized terms defined in the recitals to this Agreement shall have the meanings ascribed thereto whenever used in this Agreement and the terms defined in this Agreement have the meanings assigned to them in this Agreement, and the use of any gender herein shall be deemed to include the other genders;

(ii)    all capitalized terms not otherwise defined herein shall have the meaning assigned to them in the Senior Loan Documents;

(iii)    all references in this Agreement to designated Sections, Subsections, Paragraphs, Articles, Exhibits, Schedules and other subdivisions or addenda without reference to a document are to the designated sections, subsections, paragraphs and articles

and all other subdivisions of and exhibits, schedules and all other addenda to this Agreement, unless otherwise specified;

(iv)     a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall apply to Paragraphs and other subdivisions;

(v)     the headings and captions used in this Agreement are for convenience of reference only and do not define, limit or describe the scope or intent of the provisions of this Agreement;

(vi)     the terms "includes" or "including" shall mean without limitation by reason of enumeration;

(vii)     the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision;

(viii)     the words "to Mezzanine Lender's knowledge" or "to the knowledge of Mezzanine Lender" (or words of similar meaning) shall mean to the actual knowledge of officers of Mezzanine Lender with direct oversight responsibility for the Mezzanine Loan without independent investigation or inquiry and without any imputation whatsoever;

(ix)     the words "to Senior Lender's knowledge" or "to the knowledge of Senior Lender" (or words of similar meaning) shall mean to the actual knowledge of officers of Senior Lender with direct oversight responsibility for the Senior Loan without independent investigation or inquiry and without any imputation whatsoever;

(x)     unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined;

(xi)     the use of the term "Mezzanine Lender" to refer to any Person shall include, as applicable, each designee of such Person that takes title to (a) Equity Collateral pursuant to an Equity Collateral Enforcement Action, or (b) the Senior Loan pursuant to a purchase thereof in accordance with Section 11 hereof; and

(xii)     the term "satisfactory" or "acceptable" with reference to any matter to be reviewed or approved by Senior Lender or Mezzanine Lender shall mean in form and substance satisfactory to Senior Lender or Mezzanine Lender, as applicable, in its sole and absolute discretion; and references to the "consent" or "approval" of Senior Lender or Mezzanine Lender shall mean such consent or approval in Senior Lender's or Mezzanine Lender's, as applicable, sole and absolute discretion.

Section 2.     Approval of Loans and Loan Documents.

(a)     Mezzanine Lender hereby acknowledges that (i) it has received and reviewed, and, subject to the terms and conditions of this Agreement, hereby consents to and

approves of the making of the Senior Loan and, subject to the terms and provisions of this Agreement, all of the terms and provisions of the Senior Loan Documents, (ii) the execution, delivery and performance of the Senior Loan Documents will not constitute a default or an event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Mezzanine Loan Documents, (iii) Senior Lender is under no obligation or duty to, nor has Senior Lender represented that it will, see to the application of the proceeds of the Senior Loan by Borrower or any other Person to whom Senior Lender disburses such proceeds, and (iv) any application or use of the proceeds of the Senior Loan for purposes other than those provided in the Senior Loan Documents shall not affect, impair or defeat the terms and provisions of this Agreement or the Senior Loan Documents. Mezzanine Lender hereby acknowledges and agrees that any condition precedent to Mezzanine Lender's consent to senior and/or mortgage financing as set forth in the Mezzanine Loan Documents or any other agreements with Mezzanine Borrower, as they apply to the Senior Loan Documents or the making of the Senior Loan, have been satisfied or waived.

(b)     Senior Lender hereby acknowledges that (i) it has received and reviewed, and, subject to the terms and conditions of this Agreement, hereby consents to and approves of the making of the Mezzanine Loan and, subject to the terms and provisions of this Agreement, all of the terms and provisions of the Mezzanine Loan Documents, (ii) the execution, delivery and performance of the Mezzanine Loan Documents will not constitute a default or an event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Senior Loan Documents, (iii) Mezzanine Lender is under no obligation or duty to, nor has Mezzanine Lender represented that it will, see to the application of the proceeds of the Mezzanine Loan by Mezzanine Borrower or any other Person to whom Mezzanine Lender disburses such proceeds, and (iv) any application or use of the proceeds of the Mezzanine Loan for purposes other than those provided in the Mezzanine Loan Documents shall not affect, impair or defeat the terms and provisions of this Agreement or the Mezzanine Loan Documents.   Senior Lender hereby acknowledges and agrees that any conditions precedent to Senior Lender's consent to mezzanine financing as set forth in the Senior Loan Documents or any other agreements with Borrower, as they apply to the Mezzanine Loan Documents or the making of the Mezzanine Loan, have been either satisfied or waived.

Section 3.     <u>Representations and Warranties</u>.

(a)     Mezzanine Lender hereby represents and warrants as follows:

(i)     <u>Exhibit C</u> attached hereto and made a part hereof is a true, correct and complete listing of all of the Mezzanine Loan Documents as of the date hereof. To Mezzanine Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under any of the Mezzanine Loan Documents.  The Mezzanine Loan has been fully funded.

(ii)     <u>Exhibit E</u> attached hereto and made a part hereof is a true, correct and complete listing of all of the documents evidencing the Pledge Arrangement with Initial Loan Pledgee (the "**Mezz Pledge Documents**") as of the date hereof.  To Mezzanine Lender's knowledge, there currently exists no default or event which, with the giving of

notice or the lapse of time, or both, would constitute a default under any of the Mezz Pledge Documents.

(iii)    Mezzanine Lender is the legal and beneficial owner of the entire Mezzanine Loan free and clear of any lien, security interest, option or other charge or encumbrance other than (a) any lien or security interest granted to any Loan Pledgee as contemplated by the provisions of Section 33, and (b) the Pledge Arrangement.

(iv)    There are no conditions precedent to the effectiveness of this Agreement as to Mezzanine Lender that have not been satisfied or waived.

(v)    Mezzanine Lender has, independently and without reliance upon Senior Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

(vi)    Mezzanine Lender is duly organized and is validly existing under the laws of the jurisdiction under which it was organized with full power to execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

(vii)    All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of Mezzanine Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

(viii)    Mezzanine Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of Mezzanine Lender enforceable against Mezzanine Lender in accordance with its terms subject to (x) applicable bankruptcy, reorganization, insolvency and moratorium laws, and (y) general principles of equity which may apply regardless of whether a proceeding is brought at law or in equity.

(ix)    No consent of any other Person and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by Mezzanine Lender of this Agreement or consummation by Mezzanine Lender of the transactions contemplated by this Agreement.

(x)    None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement will (v) violate or conflict with any provision of the organizational or governing documents of Mezzanine Lender, (w) to Mezzanine Lender's knowledge, violate, conflict with, or result in the breach or termination of, or otherwise give any other Person the right to terminate, or constitute (or with the giving of notice or lapse of time, or both, would constitute) a default under the terms of any material contract, mortgage, lease, bond, indenture, agreement, or other instrument to which Mezzanine Lender is a party or to which any of its properties are subject, (x) to Mezzanine Lender's knowledge, result in the creation of any lien, charge, encumbrance, mortgage, lease, claim, security interest, or other right or interest upon the properties or assets of Mezzanine Lender pursuant to the terms of any such material

contract, mortgage, lease, bond, indenture, agreement, franchise, or other instrument (*provided, however*, that Mezzanine Lender and any holder of any interest in the Mezzanine Loan shall have the right to enter into the Pledge Arrangement and to grant a lien, charge, encumbrance, claim or security interest in the Mezzanine Loan held by Mezzanine Lender or any portion thereof to a Loan Pledgee as contemplated by the provisions of <u>Section 33</u>), (y) violate any judgment, order, injunction, decree, or award of any court, arbitrator, administrative agency or governmental or regulatory body of which Mezzanine Lender has knowledge against, or binding upon, Mezzanine Lender or upon any of the securities, properties, assets, or business of Mezzanine Lender or (z) to Mezzanine Lender's knowledge, constitute a violation by Mezzanine Lender of any statute, law or regulation that is applicable to Mezzanine Lender.

(xi)    The Mezzanine Loan is not cross-defaulted with any loan other than the Senior Loan. The Premises do not secure any loan from Mezzanine Lender to Mezzanine Borrower or any other Affiliate of Borrower.

(xii)    As of the date hereof, there are no threatened (in writing) legal proceedings against the Mezzanine Lender.

(xiii)    Mezzanine Lender is a Qualified Transferee without relying on being (A) expressly named in such definition, (B) an Affiliate of a Person that is a Qualified Transferee solely as a result of being expressly named in such definition, or (C) Controlled by, Controlling or under common Control with, any Person described in clause (i) of such definition or that is a Qualified Transferee solely as a result of being expressly named in such definition.

(b)    Senior Lender hereby represents and warrants as follows:

(i)    <u>Exhibit B</u> attached hereto and made a part hereof is a true, correct and complete listing of the Senior Loan Documents as of the date hereof.  To Senior's knowledge, true, correct and complete copies of all Senior Loan Documents in effect as of the date hereof have been delivered (or will be delivered) to Mezzanine Lender.  To Senior Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under any of the Senior Loan Documents.  The Senior Loan has been fully funded.

(ii)    Senior Lender is the legal and beneficial owner of the entire Senior Loan free and clear of any lien, security interest, option or other charge or encumbrance, other than as permitted herein (i.e. a Senior Financing Loan).

(iii)    There are no conditions precedent to the effectiveness of this Agreement as to Senior Lender that have not been satisfied or waived.

(iv)    Senior Lender has, independently and without reliance upon Mezzanine Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

(v)      Senior Lender is duly organized and is validly existing under the laws of the jurisdiction under which it was organized with full power to execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

(vi)     All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of Senior Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

(vii)    Senior Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of Senior Lender enforceable against Senior Lender in accordance with its terms subject to (x) applicable bankruptcy, reorganization, insolvency and moratorium laws and (y) general principles of equity which may apply regardless of whether a proceeding is brought at law or in equity.

(viii)   No consent of any other Person and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by Senior Lender of this Agreement or consummation by Senior Lender of the transactions contemplated by this Agreement.

(ix)     None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement will (v) violate or conflict with any provision of the organizational or governing documents of Senior Lender, (w) to Senior Lender's knowledge, violate, conflict with, or result in the breach or termination of, or otherwise give any other Person the right to terminate, or constitute (or with the giving of notice or lapse of time, or both, would constitute) a default under the terms of any material contract, mortgage, lease, bond, indenture, agreement, or other instrument to which Senior Lender is a party or to which any of its properties are subject, (x) to Senior Lender's knowledge, result in the creation of any lien, charge, encumbrance, mortgage, lease, claim, security interest, or other right or interest upon the properties or assets of Senior Lender pursuant to the terms of any such material contract, mortgage, lease, bond, indenture, agreement, franchise or other instrument, (y) violate any judgment, order, injunction, decree or award of any court, arbitrator, administrative agency or governmental or regulatory body of which Senior Lender has knowledge against, or binding upon, Senior Lender or upon any of the securities, properties, assets, or business of Senior Lender or (z) to Senior Lender's knowledge, constitute a violation by Senior Lender of any statute, law or regulation that is applicable to Senior Lender.

(x)      The Senior Loan is not cross-defaulted with any other loan (except the Mezzanine Loan). The Premises do not secure any other loan from Senior Lender to Borrower, Mezzanine Borrower or any other Affiliate of Borrower.  The Equity Collateral does not secure any other loan from Senior Lender to Borrower, Mezzanine Borrower or any other Affiliate of Borrower.

(xi)     As of the date hereof, there are no threatened (in writing) legal proceedings against the Senior Lender.

Section 4.        Transfer of Mezzanine Loan or Senior Loan.

(a)        Mezzanine Lender shall not Transfer any portion of its beneficial interest in the Mezzanine Loan except as provided for on the terms and conditions set forth in this Section 4(a); provided, that the entering into of the Pledge Arrangement as of the Effective Date (and any enforcement thereof in accordance with the terms thereof and of this Agreement) shall not violate this Section 4.  Subject to the provisions of this Section 4(a), Mezzanine Lender shall be permitted to Transfer up to 49% of its beneficial interest in the Mezzanine Loan to a Qualified Transferee; provided, however that there shall never be more than two (2) holders of the Mezzanine Loan at any given time.  Mezzanine Lender shall not consummate any Transfer of all or any portion of its beneficial interest in the Mezzanine Loan unless Mezzanine Lender shall have provided Senior Lender with the following at least five (5) Business Days prior to the proposed Transfer: (i) such information as Senior Lender may reasonably require in order to determine whether the proposed transferees qualifies as a Qualified Transferee (including contact information, credit, judgment, lien, litigation, bankruptcy, criminal and watch list searches regarding the proposed transferee and any other Persons required by Senior Lender's standard "know your customer" and Patriot Act reviews and requirements), and (ii) a certification that such Transfer will be made in accordance with this Section 4(a).  If such search results and/or documentation are not acceptable to Senior Lender, in its reasonable discretion, such transferee shall not be a Qualified Transferee even if such transferee otherwise satisfies the requirement of a Qualified Transferee contained elsewhere in this Agreement.  Mezzanine Lender shall be responsible for the actual costs of any such required searches and the delivery of any such requested documentation. Any such transferee must assume in writing the obligations of Mezzanine Lender hereunder and agree to be bound by the terms and provisions hereof. Such proposed transferee shall also remake each of the representations and warranties contained herein for the benefit of Senior Lender. Mezzanine Lender agrees that there shall be no Transfer of all or any portion of the direct or indirect ownership interests and/or managerial control over Mezzanine Lender unless no Mezzanine Lender Intercreditor Event of Default has occurred (and solely with respect to a Mezzanine Lender Intercreditor Event of Default pursuant to subsection (i) of its definition, is continuing) and the Person to whom such interests and managerial control would be Transferred is a Qualified Transferee in accordance with the procedures set forth in this Section 4(a).

(b)        If following a proposed Transfer, more than one Person will hold a direct interest in the Mezzanine Loan, as a condition precedent to and in connection with the occurrence of any such Transfer, the holder(s) of more than fifty percent (50%) of the principal amount of the Mezzanine Loan shall designate by written notice to Senior Lender one of such Persons (the "**Directing Mezzanine Lender**") to act on behalf of all such Persons holding an interest in the Mezzanine Loan. The Directing Mezzanine Lender shall have the sole right to receive any notices which are required to be given or which may be given to Mezzanine Lender pursuant to this Agreement and to exercise the rights and power given to Mezzanine Lender hereunder, including any approval rights of Mezzanine Lender; provided, that until the Directing Mezzanine Lender has been so designated, the last Person known to Senior Lender to hold more than a fifty percent (50%) direct interest in the Mezzanine Loan shall be deemed to be the Directing Mezzanine Lender. Once the Directing Mezzanine Lender has been designated hereunder, Senior Lender shall be entitled to rely on such designation until it has received written notice from the holder(s) of more than fifty percent (50%) of the principal amount of the Mezzanine Loan of the designation of a different Person to act as the Directing Mezzanine Lender.

18

(c)    Senior Lender may, from time to time, in its sole and absolute discretion and without any prior notice to Mezzanine Lender, Transfer all or any portion of the Senior Loan or any interest therein (including, without limitation, in connection with a Senior Financing Loan), and notwithstanding any such Transfer or subsequent Transfer, the Senior Loan and the Senior Loan Documents shall be and remain a senior obligation in the respects set forth in this Agreement to the Mezzanine Loan and the Mezzanine Loan Documents in accordance with the terms and provisions of this Agreement; provided that any such direct transferee (excluding any transferee that is only purchasing a participation interest in the Senior Loan) assumes in writing the obligations of Senior Lender hereunder accruing from and after such Transfer and agrees to be bound by the terms and provisions hereof, and notwithstanding any such Transfer or subsequent Transfer, the Senior Loan and the Senior Loan Documents shall be and remain a senior obligation in the respects set forth in this Agreement to the Mezzanine Loan and the Mezzanine Loan Documents in accordance with the terms and provisions of this Agreement.  Notwithstanding the foregoing, Senior Lender shall not at any time transfer all or any portion of the Senior Loan or any interest therein (including participation interests) to Borrower, Mezzanine Borrower, Guarantor, or any Affiliate or Broad Affiliate thereof.  Senior Lender shall give the Mezzanine Lenders written notice of any Transfer of the Senior Loan permitted under the foregoing provisions of this <u>Section 4(c)</u> concurrently therewith or promptly thereafter. provided that no such notice shall be required in connection with a Senior Financing Loan  For the avoidance of doubt, and not in limitation of the foregoing, Senior Lender may, at any time, and from time to time, in its sole discretion, grant, issue or sell participations, sub-participations or other indirect, contractual interests in the Senior Loan to any Person.

(d)    If following a proposed Transfer, more than one Person will hold a direct interest in the Senior Loan, as a condition precedent to and in connection with the occurrence of any such Transfer, the holder(s) of more than fifty percent (50%) of the principal amount of the Senior Loan shall designate by written notice to Mezzanine Lender one of such Persons (the "**<u>Directing Senior Lender</u>**") to act on behalf of all such Persons holding an interest in the Senior Loan. The Directing Senior Lender shall have the sole right to receive any notices which are required to be given or which may be given to Senior Lender pursuant to this Agreement and to exercise the rights and power given to Senior Lender hereunder, including any approval rights of Senior Lender; provided, that until the Directing Senior Lender has been so designated, the last Person known to Mezzanine Lender to hold more than a fifty percent (50%) direct interest in the Senior Loan shall be deemed to be the Directing Senior Lender.  Once the Directing Senior Lender has been designated hereunder, Mezzanine Lender shall be entitled to rely on such designation until it has received written notice from the holder(s) of more than fifty percent (50%) of the principal amount of the Senior Loan of the designation of a different Person to act as the Directing Senior Lender.

Section 5.    <u>Enforcement of Mezzanine Loan Documents</u>.

(a)    Notwithstanding the terms and provisions of, or the security provided under, the Mezzanine Loan Documents, and subject to the terms of this Agreement, Mezzanine Lender may commence and/or consummate an Equity Collateral Enforcement Action, but shall only have the right to commence and/or consummate an Equity Collateral Enforcement Action in the manner provided for in this <u>Section 5</u>.

(b)      Mezzanine Lender shall not consummate any Equity Collateral Enforcement Action unless each of the following conditions is satisfied:

(i)      The Equity Collateral Enforcement Transferee is (x) an Acceptable Transferee and (y) a Qualified Transferee, and Mezzanine Lender shall have provided Senior Lender with such evidence that the Equity Collateral Enforcement Transferee is an Acceptable Transferee and a Qualified Transferee;

(ii)      Without limiting the provisions of Section 5(b) hereof, Mezzanine Lender shall have provided to Senior Lender not less than ten (10) Business Days' notice of the date and time at which such Equity Collateral Enforcement Action shall be undertaken.  In the event Junior Mezzanine Lender or any purchaser at a UCC sale obtains title to the Separate Collateral, Senior Lender acknowledges and agrees that any such transfer shall not constitute a breach or default under the Senior Loan Documents and the Senior Loan Documents shall remain in full force and effect and that any transfer fee or assumption fee in the Senior Loan Documents or any of the Senior Loan Documents shall be waived as a condition to such transfer, provided that all the conditions in Section 4 and Section 5 are met.  Senior Lender also acknowledges and agrees that they will not impose any unreasonable fees or delays in connection with such Transfer; provided, however, Mezzanine Lender shall in any event pay or reimburse Senior Lender and their servicer(s) for all actual and reasonable fees, costs and expenses incurred by Senior Lender or their servicer(s) in connection with such Transfer and the documentation and deliveries relating thereto.  To the extent that any Qualified Transferee (or any other party) acquires the Equity Collateral in accordance with the provisions and conditions of this Agreement, such Qualified Transferee (or such other party) shall acquire the same subject to the Senior Loan and the terms, conditions and provisions of the Senior Loan Documents for the balance of the term thereof, which shall not be accelerated by Senior Lender solely due to such acquisition and shall remain in full force and effect; provided, however, that such Qualified Transferee shall have caused Borrower to reaffirm in writing, all of the terms, conditions and provisions of the Senior Loan Documents on Borrower's part to be performed.  Nothing herein is intended as a waiver by any Senior Lender of any default or of any rights or remedies any Senior Lender may have as a result of any default or otherwise under any of the Senior Loan Documents or at law or in equity; provided, however, (i) the transferee shall not be required to cure the non-payment of accelerated principal or principal due at maturity, and (ii) following the completion of the acquisition of the Equity Collateral, the transferee of such Equity Collateral shall have such time as is reasonably necessary to cure or cause to be cured any non-monetary default under the Senior Loan that remains uncured as of the date of such transfer, so long as (A) such transferee is continuously and diligently pursuing such cure, and (B) the default is not caused by a Proceeding of Borrower.   In addition, any non-monetary default under the Senior Loan that remains uncured as of the date of such transfer and is not reasonably susceptible of being cured by such transferee shall be deemed to have been waived, provided that there is no material impairment to the value, use or operation of the Premises taken as a whole resulting from such non-monetary default that is not cured by Mezzanine Lender within ten (10) Business Days after receipt of written notice from Senior Lender describing such material impairment in reasonable detail.  Nothing in this subsection constitutes a waiver of, or extends the cure period for, any monetary default or any default that commences after the date of such transfer.

(iii)     Mezzanine Lender or the Equity Collateral Enforcement Transferee shall, as a condition precedent to any Equity Collateral Enforcement Action, have caused a Creditworthy Transferee Affiliate to execute and deliver, as of the date of such Equity Collateral Enforcement Action, to Senior Lender the Replacement Guaranties.  Such Creditworthy Transferee Affiliate shall (A) satisfy (and covenant to continue to satisfy at all times during the effectiveness of the Replacement Guaranties) all financial covenants set forth in the Senior Loan Recourse Agreements, including any minimum net worth or liquid asset requirements; provided, that if the Equity Collateral Enforcement Transferee is a Bluestone QT, then the minimum net worth and liquid asset requirements shall be $75,000,000.00 and $2,000,000.00, respectively, (B) not be a Prohibited Person and (C) satisfy Senior Lender's standard "know your customer" and Patriot Act reviews and requirements.  The forms of the Replacement Guaranties shall exclude any provisions in the Senior Loan Recourse Agreements providing for the termination thereof upon the foreclosure under the Mezzanine Loan, a transfer in lieu of foreclosure or other acquisition of Mezzanine Borrower by Mezzanine Lender.  Concurrently with the delivery of the Replacement Guaranties, the applicable Creditworthy Transferee Affiliate shall deliver to Senior Lender true and correct certified copies of the organizational documents for such Creditworthy Transferee Affiliate and the resolutions that authorize such Creditworthy Transferee Affiliate to execute and deliver such Replacement Guaranties, and counsel to the applicable Creditworthy Transferee Affiliate shall deliver to Senior Lender an opinion in form and substance reasonably satisfactory to Senior Lender as to the due authorization, execution, delivery and enforceability of such Replacement Guaranties;

(iv)     Prior to the consummation of any Equity Collateral Enforcement Action or other exercise of control over the Borrower, Mezzanine Lender or the Equity Collateral Enforcement Transferee shall have cured or caused to be cured all defaults under the Senior Loan Documents except for those non-monetary defaults that are not susceptible of being cured by Mezzanine Lender or the Equity Collateral Enforcement Transferee without foreclosure on the Equity Collateral which, in Senior Lender's reasonable discretion do not materially impair the value, use or operation of the Premises or have a material adverse effect on Senior Lender's interests, rights and remedies under the Senior Loan Documents (so long as Mezzanine Lender or the Equity Collateral Enforcement Transferee shall be diligently and continuously pursuing a cure of such non-monetary default at the time of the Equity Collateral Enforcement Action or the foreclosure on the Equity Collateral). Notwithstanding the foregoing, in the event that Borrower, prior to the transfer of the Equity Collateral pursuant to the Equity Collateral Enforcement Action or otherwise exercising control over the Borrower, has failed to repay the Senior Loan in full upon the maturity thereof (as the same may be accelerated pursuant to the Senior Loan Documents, but subject to the terms of this Agreement), Mezzanine Lender or the Equity Collateral Enforcement Transferee shall have either (i) repaid the Senior Loan in full or (ii) consummated the purchase of the Senior Loan pursuant to the terms, and subject to the conditions, provided in <u>Section 11(a)</u>, in either case as a condition precedent to the transfer of the Equity Collateral pursuant to the Equity Collateral Enforcement Action.

(v)     Mezzanine Lender or the Equity Collateral Enforcement Transferee, as applicable, shall have caused Borrower to reaffirm in writing, subject to any applicable exculpatory provisions as are set forth in the Senior Loan Documents, all of the terms,

conditions and provisions of the Senior Loan Documents on Borrower's part to be performed, in form and substance reasonably satisfactory to Senior Lender;

(vi)    Prior to Mezzanine Lender or the Equity Collateral Enforcement Transferee, as applicable, taking title to the Equity Collateral or otherwise exercising control over the Borrower, and after giving effect thereto, no Mezzanine Lender Intercreditor Event of Default shall exist;

(vii)    Prior to Mezzanine Lender or the Equity Collateral Enforcement Transferee, as applicable, taking title to the Equity Collateral or otherwise exercising control over the Borrower, Mezzanine Lender or the Equity Collateral Enforcement Transferee, as applicable, shall provide a certificate from an officer of Mezzanine Lender or the Equity Collateral Enforcement Transferee, certifying that all conditions required to be satisfied prior to Mezzanine Lender or the Equity Collateral Enforcement Transferee taking title to the Equity Collateral in connection with an Equity Collateral Enforcement Action set forth in this <u>Section 5</u> have been timely satisfied, and within five (5) Business Days following the consummation of such Equity Collateral Enforcement Action, Mezzanine Lender or the Equity Collateral Enforcement Transferee, as applicable, shall provide a certificate from an officer of Mezzanine Lender or the Equity Collateral Enforcement Transferee, certifying that all conditions required to be satisfied in connection with an Equity Collateral Enforcement Action set forth in this <u>Section 5</u> have been timely satisfied; and

(viii)    Prior to Mezzanine Lender or the Equity Collateral Enforcement Transferee (as applicable) taking title to the Equity Collateral, Mezzanine Lender or the Equity Collateral Enforcement Transferee (as applicable) shall execute and deliver to Senior Lender, as of the date of such Equity Collateral Enforcement Action, a pledge and security agreement in form and substance reasonably satisfactory to Senior Lender and Mezzanine Lender (or the Equity Collateral Enforcement Transferee) (the "**Replacement Pledge Agreement**") pursuant to which Mezzanine Lender or the Equity Collateral Enforcement Transferee (as applicable) shall pledge and grant to Senior Lender a first priority security interest in all of Mezzanine Lender's or the Equity Collateral Enforcement Transferee's (as applicable) right, title and interest in, to and under the Equity Collateral (along with any other collateral customarily pledged in standard arms-length pledge and security agreements). In connection with the execution and delivery of the Replacement Pledge Agreement, Mezzanine Lender or the Equity Collateral Enforcement Transferee (as applicable) shall execute and deliver to Senior Lender and/or file (or authorize Senior Lender, in the name and on behalf of Mezzanine Lender or the Equity Collateral Enforcement Transferee (as applicable), to file) in the appropriate jurisdiction(s) any additional documentation reasonably requested by Senior Lender (including, but not limited to, an acknowledgement of pledge and security agreement, original certificated limited liability company interests in the Borrower, and UCC-1 financing statements).

(c)    Prior to or simultaneously in connection with commencing any Equity Collateral Enforcement Action, Mezzanine Lender shall provide Senior Lender with notice of the Event of Default which would permit Mezzanine Lender to commence such Equity Collateral Enforcement Action pursuant to the Mezzanine Loan Documents. Mezzanine Lender shall

(promptly after receipt, delivery, service, or execution thereof, as applicable) provide Senior Lender with copies of any and all material notices, pleadings, agreements, motions and briefs served upon or otherwise delivered to any party to any Equity Collateral Enforcement Action, any judgment rendered in such Equity Collateral Enforcement Action, any agreement in settlement of the dispute underlying such Equity Collateral Enforcement Action, and otherwise keep Senior Lender reasonably apprised as to the status of any Equity Collateral Enforcement Action in a timely manner.

(d)    Senior Lender agrees that the consummation of an Equity Collateral Enforcement Action in strict accordance with Section 5 hereof shall not itself constitute a breach or default under the Senior Loan Documents. However, if Mezzanine Lender or the Equity Collateral Enforcement Transferee takes title to the Equity Collateral or otherwise exercises control over the Borrower in connection with any Equity Collateral Enforcement Action, and does not comply with any of the requirements that are set forth in this Section 5 as required in connection therewith, such failure shall, at the election of Senior Lender, be a Senior Event of Default, time being of the essence and such Equity Collateral Enforcement Action shall, with no requirement of any further action on the part of Senior Lender, be deemed void ab initio.

(e)    Subject to the terms and conditions of this Agreement, Mezzanine Lender may exercise its rights and remedies, in law, in equity or otherwise, in order to realize on any Separate Collateral that is not Equity Collateral.

(f)    Nothing contained herein shall limit or restrict the right of Mezzanine Lender to exercise its rights and remedies, at law, in equity, or otherwise, in order to realize on any Separate Collateral that is not Equity Collateral (including exercising any remedy against Guarantor under the applicable Mezzanine Loan Recourse Agreement (a "**Guaranty Claim**")) and to apply the proceeds therefrom as it deems appropriate in its sole discretion (i.e., without payment subordination), provided, however, Mezzanine Lender hereby agrees that it shall give Senior Lender at least ten (10) days prior written notice (the "**Guaranty Notice**") before exercising any rights or remedies to collect a judgment with respect to a Guaranty Claim (other than the giving of notices of default and statements of overdue amounts), and that (i) it shall not enforce after receiving judgment against such Guarantor in connection with the Mezzanine Loan or otherwise seek to collect any amounts or otherwise assert or enforce any rights or remedies (other than the giving of a notice reserving Mezzanine Lender's rights) against such Guarantor in connection with the Mezzanine Loan during any period when there is any outstanding claim that has been filed by Senior Lender against Guarantor, or if there is any outstanding claim by Senior Lender of which Guarantor has been notified in writing in connection with the Senior Loan (which notification may be given at any time prior to, concurrently with, or after delivery of such Guaranty Notice), which claim has not been fully satisfied, (ii) if Senior Lender asserts any claim against Guarantor in connection with the Senior Loan following the taking by Mezzanine Lender of any action described in the preceding clause (i), and Senior Lender notifies Mezzanine Lender in writing that Senior Lender has asserted (or is about to assert) such claim, then Mezzanine Lender shall immediately, upon receipt of such written notice from Senior Lender, cease and desist any further action of the type described in the preceding clause (i) until such time as all claims by Senior Lender against Guarantor have been fully satisfied, and any right of payment of Mezzanine Lender under a Guaranty Claim shall be subject and subordinate in all respects to the rights and claims of Senior Lender against such Guarantor.  In the event that Mezzanine Lender has received proceeds

of a Guaranty Claim asserted by it, and Senior Lender has notified Mezzanine Lender prior to the date on which such proceeds are received by Mezzanine Lender that Senior Lender has a Guaranty Claim, then the proceeds of any such Guaranty Claim asserted by Mezzanine Lender shall be promptly delivered to Senior Lender to be held in trust for the benefit of Senior Lender and Mezzanine Lender, subject to this <u>Section 5</u> and to be applied as follows: (A) if Senior Lender is successful in its Guaranty Claim and fails to recover the amount of such Guaranty Claim from Guarantor, then Senior Lender shall have the right to apply any amounts held pursuant to this <u>Section 5(f)</u> to the Senior Loan Liabilities until paid in full; and (B) if such Guaranty Claim is unsuccessful or paid in full by Guarantor, Senior Lender shall promptly return such amounts to Mezzanine Lender and same shall be applied toward the indebtedness, liabilities and obligations of Mezzanine Borrower under the Mezzanine Loan Documents.  Any right of payment of a Mezzanine Lender under a Mezzanine Loan Recourse Agreement that is required to be turned over to Senior Lender pursuant to this <u>Section 5(f)</u> shall be subject and subordinate as provided in this <u>Section 5(f)</u> in all respects to the rights and claims of Senior Lender against Guarantor.

(g)     Notwithstanding anything to the contrary in the Senior Loan Documents, in the event that Mezzanine Lender (or its nominee or designee) or the Equity Collateral Enforcement Transferee forecloses or otherwise realizes on the Equity Collateral, thereafter Mezzanine Lender or the Equity Collateral Enforcement Transferee or such designee or nominee, in the capacity as the managing member of Borrower, and Senior Lender, shall cooperate in good faith to amend the Senior Loan Documents to allow equity transfers consistent with those permitted under the Mortgage with such changes as may be necessary to reflect the organizational structure of Mezzanine Lender (or its nominee or designee) or such Equity Collateral Enforcement Transferee, as applicable.

Section 6.     <u>Modifications, Amendments, Etc.</u>

(a)     Senior Lender shall have the right without the consent of or prior notice to Mezzanine Lender to enter into or grant any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver (collectively, a "**Senior Loan Modification**") of the Senior Loan or the Senior Loan Documents; provided, however, that so long as no Mezzanine Lender Intercreditor Event of Default then exists, Senior Lender shall not effect any Senior Loan Modification without the prior written consent of Mezzanine Lender to the extent that such Senior Loan Modification would (i) increase the interest rate or principal amount of the Senior Loan, except for increases in principal to cover Protective Advances, (ii) increase in any other material respect any monetary obligations of Borrower under the Senior Loan Documents or impose any new or additional fees not provided for in the Senior Loan Documents, (iii) other than pursuant to acceleration in accordance with the Mortgage or any extension option granted to Borrower under the Mortgage, extend or shorten the scheduled maturity date of the Senior Loan, (iv) convert or exchange the Senior Loan into or for any other indebtedness or subordinate any of the Senior Loan to any indebtedness of Borrower or any Broad Affiliate thereof, (v) waive, amend or modify the provisions limiting transfers of direct or indirect interests in Borrower or the Premises, (vi) cross default the Senior Loan with any other indebtedness, (vii) obtain any direct or indirect equity interest in Borrower or Mezzanine Borrower or obtain any contingent interest, additional interest or so-called "kicker" in Borrower or Mezzanine Borrower measured on the basis of the cash flow or appreciation of the Premises, (viii) extend the period during which voluntary prepayments are prohibited or during which prepayments require the

payment of a prepayment fee or premium or yield maintenance charge or exit fee, impose any prepayment fee, premium or yield maintenance charge or exit fee in connection with the Senior Loan when none is now required or increase the amount of any such prepayment fee, premium or yield maintenance charge or exit fee, (ix) modify the definition of "Event of Default" under the Senior Loan Documents so as to add new events of default or make any existing events of default more onerous, (x) consent to a higher strike price with respect to any new or extended interest rate cap agreement entered into in connection with the extended term of the Senior Loan or waive any requirement for any future or replacement cap agreement, (xi) impose more restrictive financial covenants on Borrower and/or Guarantor than those set forth in the Senior Loan Documents, (xii) release or modify the scope of the liability of Guarantor, except pursuant to and in accordance with the terms of the Senior Loan Documents, (xiii) impose any reserve requirements, except to the extent expressly contemplated under the Senior Loan Documents, (xiv) release the lien on all or any material portion of the Premises or the Lease and Rents (each as defined in the Senior Loan Documents) or any other material portion of the collateral originally granted under the Senior Loan Documents (except as may be permitted or required in accordance with the provisions and conditions of the Senior Loan Documents), (xv) waive or materially modify or amend any material insurance requirements (including any deductibles, limits, qualifications of insurers or terrorism insurance requirements), or any material casualty or condemnation provisions, (xvi) waive, amend or modify in any material respect any requirement of Borrower with respect to alterations under the Mortgage, (xvii) spread the lien of the Mortgage to encumber additional real property, or otherwise accept a grant of lien on or a security interest in any collateral or any property of Borrower or any other Person not originally granted or contemplated to be granted under the Senior Loan Documents (except to the extent expressly contemplated by the Senior Loan Documents), (xviii) forgive or waive any indebtedness due from Borrower to Senior Lender pursuant to the Senior Loan Documents, (xix) modify Section 11 of the Senior Note or (xx) modify or amend in any material respect the operating agreements of Borrower; provided, however, that notwithstanding the foregoing, Senior Lender may, in its sole and absolute discretion, without Mezzanine Lender's consent, (A) waive or refrain from declaring or enforcing any Senior Event of Default or any other provision of the Senior Loan Documents, (B) grant forbearances and extensions for performance, waivers of covenants, and consents, or otherwise diminish Borrower's or any Guarantor's obligations thereunder or (C) enter into other amendments of the Senior Loan Documents which do not fall within any of the above clauses (i) through (xx) above, in each such case, in such manner and order, and on such terms and conditions, as Senior Lender sees fit in its sole and absolute discretion, and Senior Lender's elections as aforesaid or its course of conduct in connection therewith shall not be deemed to involve a "Senior Loan Modification" or otherwise give rise to any claim or cause of action by Mezzanine Lender against Senior Lender, provided, however, Senior Lender shall not enter into a Senior Loan Modification during the period commencing on the date on which Mezzanine Lender delivers Senior Lender written notice of its exercise of its right to purchase the Senior Loan under Section 11 until the time period to complete such purchase expires.  Any amounts funded by Senior Lender under and in accordance with the Senior Loan Documents as a result of (X) the making of any Protective Advances or other advances by Senior Lender or (Y) interest accruals or accretions and any compounding thereof (including default interest), pursuant to the terms of the Senior Loan Documents shall not be deemed to contravene this Section 6(a). During the existence of a Continuing Senior Event of Default or while any Mezzanine Lender Intercreditor Event of Default exists, Senior Lender may effect any Senior Loan Modification without the consent of Mezzanine Lender in the case of a work-out or other

surrender, extension, compromise, release, renewal, or indulgence relating to the Senior Loan, except that under no circumstance shall modifications as described in *clause (i)* (with respect to increase in principal amount only), clause (iii) (with respect to shortening the scheduled maturity date of the Senior Loan only), clause (v) (to the extent such modification would limit or prohibit the exercise of remedies and realization upon the Equity Collateral by Mezzanine Lender or a Loan Pledgee in accordance with the terms hereof or cause such exercise to constitute an Event of Default under the Senior Loan), clause (vi), clause (viii), or clause (xiv) be made without the written consent of Mezzanine Lender; and provided further, that notwithstanding anything to the contrary above, during the continuance of a default that is caused by a Proceeding of Borrower or any consolidated entity that includes the Borrower (to which Senior Lender shall have not consented), Senior Lender shall not be obligated to obtain the consent of Mezzanine Lender to a Senior Loan Modification in the case of any proposed plan of reorganization including Borrower or any other consolidated entity that includes the Borrower under such Proceeding. Notwithstanding anything to the contrary contained in this Agreement, the implementation of provisions in the Senior Loan Documents which in accordance with their express terms become effective automatically upon an Event of Default under the Senior Loan Documents or following the maturity or acceleration of the Senior Loan (including, without limitation, provisions providing for the accrual of interest at the default rate specified in the Senior Loan Documents, the change in the underlying index with respect to which interest is calculated or the imposition of any premium or fee; provisions upon which certain approval rights of Senior Lender become effective; or provisions under which changes in the priorities applicable under cash management arrangements take effect, in each case while an Event of Default under the Senior Loan Documents exists) shall not be deemed for any purpose of this Agreement to be an "Enforcement Action" or to involve any "Senior Loan Modification" or other action that is restricted under this Agreement. In addition, in no event shall the exercise by Senior Lender of any right of set-off that is available to it in accordance with the Mortgage be deemed for any purpose of this Agreement to be an "Enforcement Action" or to involve any "Senior Loan Modification" or other action that is restricted under this Agreement. Notwithstanding any provision of the Mezzanine Loan Documents to the contrary, Mezzanine Lender agrees that neither a Senior Loan Modification permitted hereunder or an Enforcement Action permitted hereunder shall give rise to a default under the Mezzanine Loan Documents, and Mezzanine Lender shall not notice or otherwise declare a default under the Mezzanine Loan Documents on the basis of any such permitted Senior Loan Modification or Enforcement Action.

(b)     Mezzanine Lender shall have the right without the consent of Senior Lender in each instance to enter into any amendment, deferral, extension, modification, renewal, replacement, consolidation, supplement or waiver (collectively, a "**Mezzanine Loan Modification**") of the Mezzanine Loan or the Mezzanine Loan Documents provided that no such Mezzanine Loan Modification shall, unless the prior written consent of Senior Lender has been obtained: (i) increase the interest rate or principal amount of the Mezzanine Loan, except for increases in principal to cover Protective Advances by Mezzanine Lender, (ii) increase in any other material respect any monetary obligations of Mezzanine Borrower under the Mezzanine Loan Documents or impose any new or additional fees not provided for in the Mezzanine Loan Documents, (iii) extend or shorten the scheduled maturity date of the Mezzanine Loan (other than by acceleration and except that Mezzanine Lender may permit Mezzanine Borrower to exercise any extension options in accordance with the terms and provisions of the Mezzanine Loan Documents), (iv) convert or exchange the Mezzanine Loan into equity interests or for any other

indebtedness or subordinate any of the Mezzanine Loan to any indebtedness of Mezzanine Borrower or any Broad Affiliate thereof, (v) provide for any direct or indirect equity interest in Borrower or Mezzanine Borrower or any additional contingent interest, additional interest or so-called "kicker" measured on the basis of the cash flow or appreciation of the Premises (or other similar equity participation in Mezzanine Borrower), (vi) cross default the Mezzanine Loan with any other indebtedness other than the Senior Loan, (vii) intentionally omitted, (viii) impose more restrictive financial covenants on Mezzanine Borrower and/or Guarantor than those set forth in the Mezzanine Loan Documents, (ix) release or modify the scope of the liability of Guarantor, except pursuant to and in accordance with the terms of the Mezzanine Loan Documents, (x) impose any reserve requirements, except to the extent expressly contemplated under the Mezzanine Loan Documents, or modify Section 2(b) of the Mezzanine Loan Agreement or any other documents related to the Renovation Reserve Fund (as defined in the Mezzanine Loan Agreement), (xi) waive, amend or modify the provisions limiting transfers of direct or indirect interests in Borrower, Mezzanine Borrower or the Premises, (xii) consent to a higher strike price with respect to any new or extended interest rate cap agreement entered into in connection with the extended term of the Mezzanine Loan or waive any requirement for any future or replacement cap agreement, (xiii) extend the period during which voluntary prepayments are prohibited or during which prepayments require the payment of a prepayment fee or premium or yield maintenance charge or exit fee, impose any prepayment fee, premium or yield maintenance charge or exit fee in connection with the Mezzanine Loan when none is now required or increase the amount of any such prepayment fee, premium or yield maintenance charge or exit fee, (xiv) modify the definition of "Event of Default" under the Mezzanine Loan Documents so as to add new events of default or make any existing events of default more onerous, (xv) impose any new or additional fees not provided for in the Mezzanine Loan Documents, (xvi) waive, amend or modify the provisions limiting transfers of direct or indirect interests in Borrower or Mezzanine Borrower, (xvii) modify or amend the terms and provisions of the Mezzanine Loan Documents with respect to the manner, timing, priority, amounts, sequence of distribution or method of the application of payments, under the Mezzanine Loan Documents, (xviii) release its lien on any Equity Collateral or any other material portion of the collateral originally granted under the Mezzanine Loan Documents (except as may be required or permitted in accordance with the terms of the Mezzanine Loan Documents as of the date hereof in exchange for prepayment in full in cash of the Mezzanine Loan), (xix) modify, amend or waive any obligation or liability of the guarantor under the Mezzanine Loan with respect to the Mezzanine Loan debt being recourse to such guarantor pursuant to and in accordance with the related guaranties and indemnity agreements, or (xx) release any guarantor under any guaranties and indemnity agreements delivered with respect to the Mezzanine Loan except pursuant to and in accordance with the terms of the Mezzanine Loan Agreement and acceptance of a guaranty from one or more replacement guarantors in accordance therewith. Notwithstanding the foregoing, if a Continuing Senior Event of Default or a Mezzanine Lender Intercreditor Event of Default exists, then no Mezzanine Loan Modification may be entered into without the prior written consent of Senior Lender (which consent may be granted or withheld in Senior Lender's sole and absolute discretion). In addition and notwithstanding the foregoing provisions of this Section 6(b), any amounts funded by Mezzanine Lender under the Mezzanine Loan Documents as a result of (A) the making of any Protective Advances or other advances by Mezzanine Lender or (B) interest accruals or accretions and any compounding thereof (including default interest), pursuant to the existing terms of the Mezzanine Loan Documents or any

Mezzanine Loan Modification made in accordance with this Agreement, shall not be deemed to contravene this Section 6(b).

(c)    Senior Lender shall deliver to Mezzanine Lender copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Senior Loan Documents (including any side letter and/or any material written waivers or consents entered into, executed or delivered by Senior Lender, but not any fee letter or derivative contract that is exclusively between Borrower and Senior Lender or its Affiliates) within a reasonable time after any of such applicable instruments have been executed by Senior Lender; provided, any delay or failure to provide such copies shall have no adverse effect on Senior Lender other than being subject to injunctive relief. Notwithstanding the foregoing, in no event shall Senior Lender be required to deliver to Mezzanine Lender copies of consents with respect to leases, budgets, insurance policies, contracts relating to the operation or maintenance of the Premises or other consents granted in the ordinary course of the administration of the Senior Loan that do not materially increase the obligations of Borrower.

(d)    Mezzanine Lender shall deliver to Senior Lender copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Mezzanine Loan Documents (including any side letters, material written waivers or consents entered into, executed or delivered by Mezzanine Lender) within a reasonable time after any of such applicable instruments have been executed by Mezzanine Lender.

Section 7.    Subordination of Mezzanine Loan and Mezzanine Loan Documents.

(a)    Except as otherwise expressly provided in this Agreement, Mezzanine Lender hereby subordinates and makes junior the Mezzanine Loan, the Mezzanine Loan Documents and the liens and security interests created thereby, and all rights, remedies, terms and covenants contained therein to (i) the Senior Loan, (ii) the liens and security interests created by the Senior Loan Documents, and (iii) all of the terms, covenants, conditions, rights and remedies contained in the Senior Loan Documents, and no extensions, amendments modifications, consolidations, supplements, replacements, and/or restatements of or to the Senior Loan Documents or waivers of any provisions thereof shall affect the subordination thereof as set forth in this Section 7(a). Mezzanine Lender hereby acknowledges and agrees that the Mezzanine Loan is not secured by a lien on the Premises or any of the other collateral securing the Senior Loan or any other assets of Borrower.

(b)    Except as otherwise expressly provided in this Agreement and except with respect to the Separate Collateral, every document and instrument included within the Mezzanine Loan Documents shall be subject and subordinate to each and every document and instrument included within the Senior Loan Documents and all extensions, modifications, consolidations, supplements, amendments, replacements and restatements of and/or to the Senior Loan Documents to the extent such extensions, modifications, consolidations, supplements, amendments, replacements and restatements are permitted by the terms hereof; provided, however, the Separate Collateral, and the Mezzanine Lender's rights and remedies in and with respect thereto, shall be at all times subject to Mezzanine Lender's satisfaction and compliance with all of the provisions and conditions of this Agreement.

28

(c)    Subject to and without limiting the provisions of Section 5(d) hereof, this Agreement shall not be construed as subordinating and shall not subordinate or impair Mezzanine Lender's first lien priority right, estate and interest in and to the Separate Collateral and Senior Lender hereby acknowledges and agrees that Senior Lender does not have and shall not hereafter acquire, any lien on, or any other interest whatsoever in, the Separate Collateral, or any part thereof, and that the exercise of remedies and realization upon the Separate Collateral by Mezzanine Lender in accordance with the terms and provisions of this Agreement shall not in and of itself constitute a default or an Event of Default under the Senior Loan Documents.

Section 8.    Payment Subordination.

(a)    Except (i) as otherwise expressly provided in Section 8(b) hereof and (ii) in connection with the exercise by Mezzanine Lender of its rights and remedies with respect to the Separate Collateral in accordance with the terms of this Agreement (including Section 5(d) hereof) and the application of proceeds therefrom as Mezzanine Lender deems appropriate in its sole discretion, all of Mezzanine Lender's rights to payment of the Mezzanine Loan and the obligations evidenced by the Mezzanine Loan Documents are hereby subordinated to all of Senior Lender's rights to payment by Borrower and Guarantor of the Senior Loan and the obligations secured by the Senior Loan Documents, and Mezzanine Lender shall not accept or receive payments (including whether in cash or other property and whether received directly, indirectly or by set-off, counterclaim or otherwise) from Borrower, Mezzanine Borrower, any Affiliate of Borrower or Mezzanine Borrower, any Person in Control of Mezzanine Borrower and/or from the Premises (or any portion thereof or any other collateral securing the Senior Loan) prior to the date that all obligations of Borrower to Senior Lender under the Senior Loan Documents are indefeasibly paid in full.  If a Proceeding shall have occurred and has not been dismissed or if a Senior Event of Default or a Mezzanine Lender Intercreditor Event of Default exists, Senior Lender shall be entitled to receive payment and performance in full of all amounts due or to become due to Senior Lender before Mezzanine Lender is entitled to receive any payment on account of the Mezzanine Loan. All payments or distributions upon or with respect to the Mezzanine Loan which are received by Mezzanine Lender contrary to the provisions of this Agreement shall be received and held in trust by Mezzanine Lender for the benefit of Senior Lender and shall be paid over to Senior Lender promptly after such receipt in the same form as so received (with any necessary endorsement) to be applied (in the case of cash) to, or held as collateral (in the case of non-cash property or securities) for, the payment or performance of the Senior Loan Liabilities in accordance with the terms of the Senior Loan Documents. Nothing contained herein shall prohibit Mezzanine Lender from making Protective Advances (and adding the amount thereof to the principal balance of the Mezzanine Loan) notwithstanding the existence of Senior Event of Default.

(b)    Provided that no Mezzanine Lender Intercreditor Event of Default exists, Mezzanine Lender may accept regularly scheduled payments of any interest due and payable from time to time which Mezzanine Borrower is obligated to pay Mezzanine Lender in accordance with the terms and conditions of the Mezzanine Loan Documents and Mezzanine Lender shall have no obligation to pay over to Senior Lender any such amounts; provided, however, that Mezzanine Lender may not accept any voluntary prepayment of the Mezzanine Loan until such time as the Senior Loan Liabilities have been paid in full, unless Senior Lender otherwise consents thereto (which consent may be granted or withheld in Senior Lender's sole and absolute discretion).

(c)     In the event of a casualty to the buildings or improvements constructed on any portion of the Premises or a condemnation or taking under a power of eminent domain of all or any portion of the Premises, Senior Lender shall have a first and prior interest in and to any payments, awards, proceeds, distributions, or consideration arising from any such event (the "**Award**"). If the amount of the Award is in excess of all amounts owed to Senior Lender under the Senior Loan Documents, however, and either the Senior Loan has been paid in full or Borrower is entitled to a remittance of same under the Senior Loan Documents other than to restore the Premises, such excess Award or portion to be so remitted to Borrower shall be paid to or at the direction of Mezzanine Lender, unless other Persons have claimed the right to such awards or proceeds, in which case Senior Lender shall only be required to provide notice to Mezzanine Lender of such excess Award and of any other claims thereto. In the event of any competing claims for any such excess Award, Senior Lender shall continue to hold such excess Award until Senior Lender receives an agreement signed by all Persons making a claim to the excess Award or a final order of a court of competent jurisdiction directing Senior Lender as to how and to which Person(s) the excess Award is to be distributed. Notwithstanding the foregoing, in the event of a casualty or condemnation, Senior Lender may release the Award from any such event to Borrower if and to the extent required or permitted by the terms and conditions of the Senior Loan Documents in order to repair and restore the Premises in accordance with the terms and provisions of the Senior Loan Documents. No portion of the Award made available to Borrower for the repair or restoration of the Premises shall be subject to attachment by Mezzanine Lender.

(d)     <u>Payments to Mezzanine Lender under the Senior Loan</u>.

(i)     Senior Lender shall pay Mezzanine Lender, to the extent actually collected from Borrower, an amount equal to, if greater than zero, the difference between (x) the amount of interest (based on the non-default rate) received from Borrower with respect to the portion of the Senior Loan held by Senior Lender calculated at the Interest Rate thereunder, and (y) the amount of non-default interest that would have come due on such portion of the Senior Loan held by Senior Lender if the Interest Rate were the Senior Loan Preferred Rate (the "**Rate Spread**"). The portion of the Rate Spread applicable to the amount of the Senior Loan then actually funded shall be paid on or about the first of each month for so long as a Bluestone QT is the owner and holder of the Mezzanine Loan. Notwithstanding anything to the contrary set forth herein, Mezzanine Lender shall be entitled to the amount of interest contemplated by this Section 8(d)(i) only for so long as a Bluestone QT is the owner and holder of the Mezzanine Loan.

(ii)     Promptly following any prepayment of the Senior Loan, Senior Lender shall pay to Mezzanine Lender the difference between the Prepayment Premium received from Borrower and the Senior Loan Prepayment Premium.

(iii)     Promptly following the receipt of the same from Borrower, Senior Lender shall pay to Mezzanine Lender any portion of the Exit Fee received from Borrower in excess of the Senior Loan Exit Fee.

Notwithstanding anything to the contrary in this Paragraph 8, it is understood and agreed that the Mezzanine Lender shall at all times be entitled to retain the amounts held in any interest reserve maintained by Mezzanine Lender under the Mezzanine Loan Documents (or maintained

by Senior Lender on behalf of Mezzanine Lender, but only to the extent of the funds in such reserve account that are for the benefit of Mezzanine Lender in accordance with the terms of the Mezzanine Loan Documents and Senior Loan Documents), as well as its pro rata share of the Additional Borrower Equity Contribution required to be made by Borrower in accordance with the terms of the Senior Loan Documents and Mezzanine Loan Documents. In addition, it is understood and agreed that any Required Release Price (as defined in that certain Condominium Release Price Agreement dated as of the date hereof by and among Senior Lender, Mezzanine Lender, Borrower and Mezzanine Borrower (the "**RPA**")) received in connection with a sale of Unit (as defined in the RPA) in accordance with the terms of the RPA shall be applied on a pro rata basis as between Senior Lender and Mezzanine Lender (i.e. Mezzanine Lender shall receive 6/76th of every Required Release Price dollar received). Further, for the avoidance of doubt, Senior Lender shall be entitled to the entire extension fee due and payable under the Senior Loan, and Mezzanine Lender shall be entitled to the entire extension fee due and payable under the Mezzanine Loan.

Section 9.    Rights of Subrogation; Bankruptcy.

(a)    Each of Mezzanine Lender and Senior Lender hereby waives any requirement for marshaling of assets in connection with any foreclosure of any security interest or any other realization upon collateral in respect of the Senior Loan Documents or the Mezzanine Loan Documents, as applicable, or any exercise of any rights of set-off or otherwise.

(b)    No payment or distribution to Senior Lender pursuant to the provisions of this Agreement and no Protective Advance by Mezzanine Lender shall entitle Mezzanine Lender to exercise any right of subrogation in respect thereof prior to the indefeasible satisfaction in full of the Senior Loan Liabilities, and Mezzanine Lender agrees that, except with respect to the enforcement of its remedies under the Mezzanine Loan Documents permitted hereunder, prior to the indefeasible satisfaction in full of the Senior Loan Liabilities it shall not acquire, by subrogation or otherwise, any lien, estate, right or other interest in any portion of the Premises or any other collateral now securing the Senior Loan or the proceeds therefrom that is or may be prior to, or of equal priority to, any of the Senior Loan Documents, or the liens, rights, estates and interests created thereby.

(c)    Subject to Section 27 of this Agreement, the provisions of this Agreement shall be applicable both before and after the commencement of a Proceeding with respect to Borrower, Guarantor or any other Loan Party. Until such time as the Senior Loan Liabilities are indefeasibly paid in full, Mezzanine Lender shall not, and shall not solicit any person or entity to, direct or cause Mezzanine Borrower to direct or cause Borrower or any entity which controls Borrower (the "**Borrower Group**") to: (i) commence any Proceeding with respect to Borrower, Guarantor or any Loan Party; (ii) institute proceedings to have Borrower, Guarantor or any Loan Party adjudicated a bankrupt or insolvent; (iii) consent to, or take any action to further the institution of any Proceeding against Borrower, Guarantor or any Loan Party; (iv) file a petition or consent to the filing of a petition seeking reorganization, arrangement, adjustment, winding-up, dissolution, composition, liquidation or other relief by or on behalf of Borrower, Guarantor or any Loan Party; (v) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for Borrower, Guarantor, any Loan Party, the Premises (or any portion thereof) or any other collateral securing the Senior Loan (or any portion thereof); (vi) make an assignment for the benefit of any creditor of Borrower, Guarantor or any

Loan Party; (vii) seek to consolidate the Premises or any other assets of Borrower, Guarantor or any Loan Party with the assets of Mezzanine Borrower or any member of the Borrower Group in any Proceeding; or (viii) take any action in furtherance of any of the foregoing. Subject to the provisions of this Agreement, if Mezzanine Lender commences an Equity Collateral Enforcement Action, and pursuant to such Equity Collateral Enforcement Action, Mezzanine Lender takes title to the Equity Collateral, exercises voting power to direct or cause the direction of the management or policies of the Equity Collateral, or otherwise acquires the Equity Collateral, then from and after the date title to such Equity Collateral is vested in Mezzanine Lender or other Equity Collateral Enforcement Transferee or from and after the date Mezzanine Lender exercises such voting power, as applicable, Mezzanine Lender or such other Equity Collateral Enforcement Transferee shall be bound by the terms and provisions of the respective organizational documents of Borrower regarding bankruptcy, the applicable Creditworthy Transferee Affiliate shall be bound by the terms and provisions of the guaranties and indemnities required to be delivered pursuant to Section 5(a)(iii) regarding bankruptcy, and Borrower shall remain bound by the terms and provisions of the Senior Loan Documents regarding bankruptcy.

(d)     If Mezzanine Lender is deemed to be a creditor of Borrower, Guarantor or any Loan Party in any Proceeding, (i) Mezzanine Lender hereby agrees that it shall not make any election, give any consent, commence any action, credit bid on all or any portion of the collateral for the Senior Loan or file any motion, claim, obligation, notice or application or take any other action in any Proceeding by or against Borrower or Guarantor without the prior written consent of Senior Lender, except to the extent necessary to preserve or realize upon Mezzanine Lender's interest in the Equity Collateral; provided, however, that any such filing shall not be as a creditor of Borrower and shall be subject to the provisions of Section 5(d) hereof, (ii) Senior Lender may vote in any such Proceeding any and all claims of Mezzanine Lender, and Mezzanine Lender hereby appoints Senior Lender as its agent, and grants to Senior Lender an irrevocable power of attorney coupled with an interest, and its proxy, for the purpose of exercising any and all rights and taking any and all actions available to Mezzanine Lender in connection with any case by or against Borrower or any Guarantor in any Proceeding, including without limitation, the right to file and/or prosecute any claims, to vote to accept or reject a plan, to make any election under Section 1111(b) of the Bankruptcy Code, (iii) Mezzanine Lender shall not challenge (or join in another party's challenge to) the validity or amount of any claim submitted in such Proceeding by Senior Lender in good faith or any valuations of the Premises or any other Senior Loan collateral submitted by Senior Lender in good faith in such Proceeding, or take any other action in such Proceeding which is adverse to Senior Lender's enforcement of its claim or receipt of adequate protection (as that term is defined in the Bankruptcy Code), (iv) Mezzanine Lender waives any right to object to (or join in another party's objection to), and shall be deemed to have consented to: (a) any Loan Party's use of any cash collateral to the extent of any consent thereto given by Senior Lender, (b) any request by Senior Lender for adequate protection (as that term is defined in the Bankruptcy Code), (c) any debtor-in-possession financing provided to any Loan Party by Senior Lender, by any Affiliate of Senior Lender, or by any third party with Senior Lender's consent, (d) any motion by Senior Lender for dismissal of the Proceeding or for relief from the automatic stay (as defined in the United States Bankruptcy Code), (e) any request by Senior Lender for post-petition interest, and (f) any sale of any Loan Party's assets to the extent that Senior Lender has consented thereto; and (v) without Senior Lender's consent, Mezzanine Lender shall not, and waives any and all rights to: (a) request adequate protection (as that term is defined in the Bankruptcy Code) (and in the event any such adequate protection is awarded to Mezzanine Lender,

any adequate protection in the form of cash is hereby assigned to Senior Lender and any adequate protection in the form of a lien on or security interest in the Premises or any other collateral for the Senior Loan is hereby subordinated to all of Senior Lender's rights, liens, or security interests in or to the Premises and such collateral), (b) provide debtor-in-possession financing to any Loan Party without the consent of the Senior Lender (unless such debtor-in-possession financing shall pay the Senior Loan in full), (c) file or support any motion for dismissal of the Proceeding or relief from the automatic stay (as defined in the Bankruptcy Code), (d) request any post-petition interest, (e) request any sale of any Loan Party's assets, or (f) file, propose, support, accept, or reject any plan of reorganization of any Loan Party.

Section 10.    <u>Rights of Cure</u>.

(a)    Prior to Senior Lender commencing any Enforcement Action under the Senior Loan Documents and provided that no Mezzanine Lender Intercreditor Event of Default then exists, Senior Lender shall provide written notice of the default which would permit Senior Lender to commence such Enforcement Action to Mezzanine Lender, whether or not Senior Lender is obligated to give notice thereof to Borrower (each, a "**Senior Loan Default Notice**"), and, so long as no Mezzanine Lender Intercreditor Event of Default exists, shall permit Mezzanine Lender an opportunity to cure such default in accordance with the provisions of this <u>Section 10(a)</u>; provided, however, that nothing contained herein shall prohibit Senior Lender from commencing any Enforcement Action under the Senior Loan Documents after such notice is provided to Mezzanine Lender. In the event Senior Lender has delivered a Senior Loan Default Notice that has not been cured by Mezzanine Lender pursuant to this <u>Section 10</u>, Senior Lender shall provide Mezzanine Lender with copies of any and all material notices relating to such Event of Default, and otherwise upon request keep Mezzanine Lender reasonably apprised as to the current status of any Enforcement Action; <u>provided</u>, that Senior Lender's compliance with its obligations under this sentence shall not constitute a condition to completing an Enforcement Action (or otherwise give rise to any right of Mezzanine Lender to, or to move or otherwise seek to, stay, delay, postpone, prevent or otherwise interfere with such Enforcement Action), so long as such Enforcement Action is otherwise implemented in accordance with the terms and provisions of this Agreement.  Subject to the foregoing, if the default is a monetary default relating to a liquidated sum of money (including the payment of any amounts by Borrower to any Person other than Senior Lender which failure to pay constitutes a Senior Event of Default), Mezzanine Lender shall have until ten (10) Business Days after the later of (i) the giving by Senior Lender of the Senior Loan Default Notice and (ii) the expiration of Borrower's cure provision, if any (a "**Monetary Cure Period**") to cure such monetary default at the Senior Loan Preferred Rate (including the payment to Senior Lender of any out-of-pocket costs and expenses, losses, liabilities, obligations, actual damages, penalties and disbursements imposed on, actually incurred by Senior Lender due to or arising from such Monetary Cure Period).  Mezzanine Lender shall not have the right to cure as hereinabove set forth with respect to monthly scheduled debt service payments on the Senior Loan for more than four (4) times in the aggregate unless Mezzanine Lender in proceeding with an Equity Collateral Enforcement Action (*i.e.*, there shall be no limitation on the number of times that Mezzanine Lender may cure a monetary default during the prosecution of an Equity Collateral Enforcement Action).  Subject to the foregoing, if the default is of a non-monetary nature, Mezzanine Lender shall have until thirty (30) days after the later of (A) the date of the applicable Senior Loan Default Notice, and (B) the expiration of Borrower's cure period, if any, for such non-monetary default provided in the Senior Loan Documents to cure such non-monetary default; provided, however, if

such non-monetary default is susceptible of cure but cannot reasonably be cured within such period and if curative action was promptly commenced and is being continuously and diligently pursued by Mezzanine Lender, Mezzanine Lender shall be given an additional period of time as is reasonably necessary for Mezzanine Lender in the exercise of due diligence to cure such non-monetary default for so long as (i) Mezzanine Lender makes or causes to be made timely payment of Borrower's regularly scheduled monthly principal and/or interest payments under the Senior Loan and any other amounts due under the Senior Loan Documents (including the payment of any amounts by Borrower to any Person other than Senior Lender which failure to pay constitutes a Senior Event of Default), (ii) such period of time does not exceed one hundred twenty (120) days in total (including the initial cure period described above) to cure the default, (iii) such default is not caused by a Proceeding with respect to Borrower, Guarantor or any Loan Party, and (iv) during such non-monetary cure period, there is, in Senior Lender's judgment (which may be exercised in Senior Lender's sole and absolute discretion), no material impairment to the value, use or operation of the Premises.   Any additional cure period granted to Mezzanine Lender hereunder shall automatically terminate upon the commencement of a Proceeding with respect to Borrower, Guarantor or any Loan Party.

(b)    The provisions of Section 5(a) hereof shall apply to any Equity Collateral Enforcement Action undertaken by Mezzanine Lender, including any Equity Collateral Enforcement Action in connection with the cure rights set forth in this Section 10.

(c)    If the maturity of the Senior Loan shall have been accelerated as a result of a Senior Event of Default, then, provided that Mezzanine Lender pays to Senior Lender, within the time period available for cure hereunder, all past-due sums (including, without limitation, all principal, interest, Protective Advances and other costs and expenses) that are due under the Senior Loan, together with all out-of-pocket costs and expenses incurred by Senior Lender in connection with such acceleration or as a result of such Senior Event of Default, including, without limitation, reasonable legal fees and expenses, and no other Senior Event of Default exists, the Senior Loan shall be deemed to have been reinstated and in full force and effect, the same as if the acceleration had not occurred.

(d)    Notwithstanding anything to the contrary contained in this Agreement, in the event Borrower fails to repay the Senior Loan in full upon the maturity thereof or if the Senior Loan has been accelerated and Mezzanine Lender has not duly and timely exercised its rights of cure as provided herein (and, to the extent applicable, in accordance with Section 10(c)), Mezzanine Lender shall have the right to purchase the Senior Loan pursuant to the terms, and subject to the conditions, provided in Section 11(a), and shall not have any rights of "cure" on account thereof under this Section 10.

(e)    Notwithstanding anything to the contrary contained in this Agreement, including, without limitation, any applicable limits on the commencement or pursuit by Senior Lender of any Enforcement Action, Senior Lender shall have the right at any time and from time to time to make any Protective Advance and to take any action reasonably necessary (including, without limitation, the placement of insurance with respect to the Premises) in order to preserve, protect, maintain or defend the Premises or priority of the lien of the Senior Loan Documents from any intervening lien, forfeiture, casualty, loss, waste or other impairment, diminution or reduction in value, including, without limitation, the completion of any applicable alterations or

improvements which have theretofore been commenced or are deemed necessary for the leasing, marketing or maintenance of the Premises.

(f)    Mezzanine Lender acknowledges and agrees that, effective upon the completion of any Enforcement Action, Mezzanine Lender hereby releases and disclaims any approval rights, consent rights, cure rights, rights to demand payment or any other rights or claims it had, has or may have, whether now existing or hereafter arising, under any attornment, subordination, non-disturbance, "will-serve," or similar agreement entered into between Mezzanine Lender and any lessee of or contractor, vendor or service provider to Borrower or the Premises, and agrees that Senior Lender, any transferee of the Premises upon such Enforcement Action and each above-mentioned lessee, contractor, vendor and service provider may rely upon the foregoing release and disclaimer.

(g)    Mezzanine Lender shall not to enter any agreement with Borrower, Mezzanine Borrower, Guarantor, any Loan Party, or any respective Affiliate of any of the foregoing, to exercise any cure rights or other rights under this <u>Section 10</u> in any manner designed for the purpose of extending any cure rights or period of time that the Borrower has to comply with such provisions under the Senior Loan Documents.

Section 11.    <u>Right to Purchase Senior Loan</u>.

(a)    Upon the occurrence of a Purchase Option Event, Senior Lender shall provide prompt written notice thereof to Mezzanine Lender (a "**Purchase Option Notice**"), and Mezzanine Lender shall have the right to elect to purchase, in whole but not in part, the Senior Loan for the Loan Purchase Price, payable in immediately available funds, by delivering to Senior Lender written notice of Mezzanine Lender's intention to purchase the Senior Loan (the "**Purchase Notice**"), together with a deposit in an amount equal to ten percent (10%) of the Loan Purchase Price (as may be increased in accordance with <u>Section 11(c)</u>, the "**Purchase Deposit**"), provided that such right may only be exercised, and such purchase may only be consummated, if (x) no Mezzanine Lender Intercreditor Event of Default exists at the time of such exercise or at the time such purchase is to be consummated, and (y) the Purchase Notice is sent within thirty (30) days after Mezzanine Lender's receipt of the Purchase Option Notice (the "**Notice Period**"). The purchase of the Senior Loan pursuant to such right shall be consummated at a closing at the offices of Senior Lender or its counsel in New York, New York on a date not later than ninety (90) days following Mezzanine Lender's delivery of the Purchase Notice to Senior Lender.  At such closing, concurrently with payment to Senior Lender of the Loan Purchase Price, Senior Lender shall deliver or cause to be delivered to Mezzanine Lender all Senior Loan Documents and all amounts then held in any reserve or escrow account controlled by or held on account of the Senior Lender, and Senior Lender shall execute in favor of Mezzanine Lender or its designee assignment documentation, in form and substance reasonably acceptable to Mezzanine Lender and Senior Lender, at the sole cost and expense of Mezzanine Lender, to assign the Senior Loan and Senior Lender's rights under the Senior Loan Documents (without recourse, representations or warranties, except for representations as to the outstanding balance of the Senior Loan, representations that except for the Senior Loan Documents delivered to Mezzanine Lender, the Senior Loan has not been modified or amended, and representations from Senior Lender that it is the legal and beneficial owner of the entire Senior Loan (or if there is more than one Senior Lender, the portion of the Senior Loan being transferred by such Senior Lender) and that the Senior Loan will be free

and clear of any lien, security interest, option or other charge or encumbrance upon the closing of the purchase of the Senior Loan).  Notwithstanding anything to the contrary contained in this Section 11, (i) the right of Mezzanine Lender to exercise the right to purchase the Senior Loan by delivering the Purchase Notice in accordance with this Section 11(a) shall automatically terminate upon the earlier to occur of (X) the expiration of the Notice Period in the event Mezzanine Lender has failed to deliver the Purchase Notice to Senior Lender prior to the expiration of the Notice Period, and (Y) the cure or waiver of the Senior Event of Default(s) that are the subject of the Senior Loan Default Notice, and (II) the right of Mezzanine Lender to purchase the Senior Loan following the timely delivery of a Purchase Notice shall, subject to Section 11(c), automatically terminate if the closing of the purchase of the Senior Loan has not been consummated within ninety (90) days following the delivery of the Purchase Notice.  The Purchase Deposit shall be: (A) if the closing of Mezzanine Lender's purchase of the Senior Loan occurs in accordance with this Section 11(a), applied to the Loan Purchase Price; (B) if the closing of Mezzanine Lender's purchase of the Senior Loan does not occur in accordance with this Section 11(a) because the applicable Purchase Option Event no longer exists or the Senior Event of Default(s) which are the subject of the Senior Loan Default Notice are cured before the end of the Notice Period or before the date on which the purchase of the Senior Loan is to be consummated and Mezzanine Lender has elected not to proceed with such purchase, returned to Mezzanine Lender; or (C) if the closing of Mezzanine Lender's purchase of the Senior Loan fails to occur in accordance with this Section 11(a) due to the actions or inactions of Mezzanine Lender, retained by Senior Lender as liquidated damages.  Mezzanine Lender agrees that such deposit is a fair and reasonable amount to be retained by Senior Lender as liquidated damages and shall not constitute a penalty or forfeiture. In addition to such liquidated damages, if Mezzanine Lender has delivered a Purchase Notice, but the closing of Mezzanine Lender's purchase of the Senior Loan fails to occur in accordance with this Section 11(a) as described in clause (C) above solely as a result of the action or inaction of Mezzanine Lender (a "**Purchase Option Default**"), then the rights of Mezzanine Lender to purchase the Senior Loan set forth in this Section 11(a) shall thereupon be of no further force or effect with respect to any subsequent Senior Loan Default Notice and Senior Lender shall have the right to accept a DIL without sending a DIL Notice.  The failure of Senior Lender to provide a Purchase Notice to Mezzanine Lender regarding the occurrence of a Purchase Option Event shall have no adverse effect on Senior Lender other than the resulting extension of the time in which the Purchase Notice may be given.

(b)    Mezzanine Lender covenants not to enter any agreement with Borrower or any Affiliate thereof to purchase the Senior Loan pursuant to subsection (a) above or in connection with any refinancing of the Senior Loan in any manner designed to avoid or circumvent the provisions of the Senior Loan Documents, including, without limitation, those which require the payment of a yield maintenance or breakage charge in connection with a prepayment of the Senior Loan by Borrower.

(c)    Notwithstanding anything to the contrary contained herein, the ninety (90) day period following delivery of the Purchase Notice during which Mezzanine Lender is required to consummate such purchase, may be extended for an additional thirty (30) days upon payment to the Senior Lender of an additional non-refundable deposit in an amount equal to ten percent (10%) of the Loan Purchase Price (the "**Loan Purchase Extension Deposit**"), which shall become part of the Purchase Deposit and shall be applied in accordance with Section 11(a).  The right of Mezzanine Lender to purchase the Senior Loan following the timely delivery of a Loan Purchase

Extension Deposit shall, automatically terminate if the closing of the purchase of the Senior Loan has not been consummated within thirty (30) days following the delivery of the Loan Purchase Extension Deposit.

(d)    Notwithstanding anything to the contrary contained herein, so long as no Mezzanine Lender Intercreditor Event of Default shall have occurred and be continuing. Senior Lender shall not accept title to all or any portion of the Premises by a deed-in-lieu of foreclosure except in accordance with the applicable provisions set forth in the Carry Guaranty; provided, however, that notwithstanding the satisfaction by Borrower of the conditions for tender set forth in the Carry Guaranty (such satisfaction being referred to as the "**Tender**"), Senior Lender shall not accept title to all or any portion of the Premises by deed-in-lieu of foreclosure following Borrower's election to Tender to Senior Lender if, (i) on or prior to the Cut-off Date (as defined in the Carry Guaranty), Mezzanine Lender causes a credit entity reasonably satisfactory to Senior Lender that satisfies either, (A) if the entity is a Bluestone QT, the BSG Financial Covenants, or (B) if the entity is not a Bluestone QT, financial net worth and liquidity covenants reasonably acceptable to Senior Lender (and in any event, which are no less than the BSG Financial Covenants), to deliver to Senior Lender a replacement Carry Guaranty (in substantially the form of the Carry Guaranty and otherwise in form and substance reasonably satisfactory to Senior Lender; together with a legal opinion reasonably acceptable to Senior Lender that opines as to the due authorization, execution, delivery and enforceability of such replacement Carry Guaranty) effective as of the Cut-off Date (it being understood that Senior Lender and Mezzanine Lender shall use good faith efforts to anticipate the date on which Borrower will successfully Tender to Senior Lender in order to grant Mezzanine Lender sufficient time to cause the delivery of the aforementioned replacement Carry Guaranty to Senior Lender on or prior to the Cut-off Date; provided, however, that if the Senior Lender and Mezzanine Lender are unable to anticipate the date of such successful Tender, then Mezzanine Lender shall be permitted to cause the delivery of the aforementioned replacement Carry Guaranty to Senior Lender (together with the aforementioned legal opinion) within seven (7) Business Days following the date on which Mezzanine Lender has notice that a successful Tender occurred (it being further understood that any such replacement Carry Guaranty being delivered after the Tender Date must be effective as of the Cut-off Date)), and (ii) within ten (10) Business Days of the date that Senior Lender receives a satisfactory Tender, either, (A) a designated Affiliate of Mezzanine Lender (such entity, the "**DIL Designee**") consummates a deed-in-lieu of foreclosure pursuant to the terms of the Mezzanine Carry Guaranty and this Agreement (including Section 5 herein (as may also be applicable to a deed-in-lieu of foreclosure)) and such DIL Designee agrees in writing to assume all of the obligations of Borrower under the Senior Loan Documents (except as otherwise set forth herein) and each of DIL Designee and Mezzanine Lender have satisfied all of the conditions precedent set forth in Section 5 of this Agreement (as may also be applicable to a deed-in-lieu of foreclosure) and all other conditions, requirements and deliveries otherwise customarily applicable to a loan assumption as determined in Senior Lender's reasonable satisfaction (including the delivery of satisfactory Replacement Guarantees from a Creditworthy Transferee Affiliate) (collectively, the "**Loan Assumption Conditions**"), or (B) Mezzanine Lender shall have consummated an assignment-in-lieu of foreclosure in full satisfaction of the terms and conditions set forth in this Agreement (including Section 5 herein and such other conditions as are otherwise customarily applicable to a loan assumption as reasonably determined by Senior Lender) and the Mezzanine Carry Guaranty. If Mezzanine Borrower fails to tender an assignment-in-lieu of foreclosure, or if Borrower fails to tender a deed-in-lieu of foreclosure, to Mezzanine Lender, within such ten (10)

Business Day period, then, (x) Senior Lender shall instruct Borrower to deliver a deed-in-lieu of foreclosure to the DIL Designee so long as Mezzanine Lender has designated such DIL Designee to Senior Lender within such ten (10) Business Day period, and (y) such DIL Designee shall be permitted to accept such deed-in-lieu of foreclosure if such DIL Designee and Mezzanine Lender have satisfied all of the Loan Assumption Conditions. If Borrower fails to tender a deed-in-lieu of foreclosure pursuant to the preceding sentence, Mezzanine Lender shall be permitted the opportunity to complete an Equity Collateral Enforcement Action in compliance with <u>Section 5</u> of this Agreement. Provided Senior Lender complies with the terms and conditions set forth in this <u>Section 11(d)</u>, if Mezzanine Lender is unable to satisfy the conditions set forth in <u>Section 5</u> of this Agreement within thirty (30) days of the Cut-Off Date (or, so long as Mezzanine Lender is using commercially reasonable efforts to complete an Equity Collateral Enforcement Action, such reasonable further period of time (not to exceed forty-five (45) days in the aggregate) as may be required for Mezzanine Lender to complete an Equity Collateral Enforcement Action in accordance with <u>Section 5</u> of this Agreement; <u>provided</u>, <u>however</u>, that if Mezzanine Lender is unable to complete an Equity Collateral Enforcement Action within such period of time, then Senior Lender shall provide Mezzanine Lender with an additional ten (10) Business Day period to exercise its right to purchase the Senior Loan set forth in <u>Section 11(a)</u> above), then Senior Lender shall be permitted to accept from Borrower a deed-in-lieu of foreclosure at any time thereafter in accordance with the applicable provisions set forth in the Carry Guaranty. Notwithstanding anything to the contrary contained herein, (I) Mezzanine Lender shall not accept or cause a designee to accept an assignment-in-lieu of foreclosure with respect to the Equity Collateral unless such acceptance is in strict accordance with the applicable provisions set forth in the Mezzanine Carry Guaranty (it being agreed that if Mezzanine Borrower shall fail to satisfy any of the applicable tender conditions set forth therein, then Mezzanine Lender shall be permitted to satisfy same) and all of the conditions precedent set forth in <u>Section 5</u> of this Agreement have been fully complied with to Senior Lender's reasonable satisfaction, and (II) Mezzanine Lender shall not accept or cause any designee to accept a deed-in-lieu of foreclosure with respect to the Premises unless such acceptance is in strict accordance with the applicable provisions set forth in the Mezzanine Carry Guaranty (it being agreed that if Mezzanine Borrower shall fail to satisfy any of the applicable tender conditions set forth therein, then Mezzanine Lender shall be permitted to satisfy same) and all of the conditions precedent set forth in this Agreement (including the terms and conditions set forth in <u>Section 5</u> above and this <u>Section 11(d)</u>) have been fully complied with to Senior Lender's reasonable satisfaction, and in each case, any acceptance by Mezzanine Lender or its designee of an assignment-in-lieu of foreclosure or deed-in-lieu of foreclosure in violation of this <u>Section 11(d)</u> shall be *void ab initio*. Notwithstanding anything to the contrary, Senior Lender shall have the right to accept a deed-in-lieu of foreclosure (i) at any time during the continuance of a Mezzanine Lender Intercreditor Default, (ii) if a Purchase Option Default shall have occurred, or (iii) if no assignment-in-lieu of foreclosure is consummated during the DIL Period.

(e)     Without limiting the other rights provided hereunder, Mezzanine Lender shall be entitled to bid at a foreclosure of the Premises as permitted by applicable law.

Section 12.     <u>Approvals</u>.  Notwithstanding anything to the contrary in the Senior Loan Documents or Mezzanine Loan Documents:

(a)       Senior Lender and Mezzanine Lender acknowledge and agree that any consent and approval rights of any type or kind relating to any collateral securing the Senior Loan that may be granted to Mezzanine Lender under the Mezzanine Loan Documents are hereby made expressly subject and subordinate to any rights of Senior Lender under the Senior Loan Documents to approve of or consent to such actions and if Senior Lender approves of or consents to any such action or if such action is expressly permitted under the Senior Loan Documents, Mezzanine Lender shall be deemed to have approved of or consented to such action. If a Continuing Senior Event of Default or a Mezzanine Lender Intercreditor Event of Default exists, then the approval rights of Mezzanine Lender with respect to leases of the Premises shall be of no force or effect, and the failure of Mezzanine Borrower to obtain the consent of Mezzanine Lender with respect to any such lease shall not be a default or event of default under Mezzanine Loan Documents.

(b)       In the event both Mezzanine Lender and Senior Lender shall have the right to replace the Property Manager at any time, and Senior Lender shall fail to exercise such right within thirty (30) days of such right arising (but only if no Mezzanine Lender Intercreditor Event of Default then exists), Mezzanine Lender may exercise such right, provided such exercise may be superseded by any subsequent exercise of such rights by Senior Lender pursuant to the Senior Loan Documents. Upon the occurrence of any event which would entitle Mezzanine Lender to cause the termination of the Property Manager pursuant to the Mezzanine Loan Documents, Mezzanine Lender shall have the right to select, or cause the selection, of a replacement property manager (including any asset manager) or leasing agent for the Premises, but only if no Mezzanine Lender Intercreditor Event of Default then exists, which replacement manager, asset manager and/or leasing agent shall (i) either (A) be subject to Senior Lender's reasonable approval or (B) be a Qualified Manager and (ii) enter into a subordination agreement with Senior Lender substantially in the form of the comparable instrument delivered by the Property Manager in connection with the closing of the Senior Loan. Notwithstanding anything in this Section 12(b) to the contrary, if a Senior Event of Default then exists or any other event shall have occurred pursuant to which Senior Lender has the right to select any replacement manager, asset manager and/or leasing agent pursuant to the Senior Loan Documents, Senior Lender shall have the sole right to select any replacement manager, asset manager and/or leasing agent, whether or not a new manager or agent was retained by Mezzanine Lender, so long as such replacement manager is a Qualified Manager, and once Senior Lender shall have appointed a replacement Property Manager pursuant to its rights under the Senior Loan Documents, Mezzanine Lender shall have no further rights to terminate (or require Mezzanine Borrower to cause Borrower to terminate) such replacement Property Manager or to appoint (or require Mezzanine Borrower to cause Borrower to appoint) a further replacement to such replacement Property Manager.

(c)       Mezzanine Lender's approval rights under the Mezzanine Loan Documents shall terminate in the event Mezzanine Lender or an Affiliate of Mezzanine Lender acquires the equity interests in Borrower.

(d)       Approvals and modifications under the Senior Loan Document or other transaction among Senior Lender and Borrower that do not violate the terms of this Agreement will not result in any default or recourse event under the Mezzanine Loan Documents.

Section 13.    Loan   Components;   Additional/Replacement   Promissory   Notes; Cooperation; Senior Loan Resizing.

(a)    Mezzanine Lender hereby acknowledges and agrees that notwithstanding anything to the contrary contained herein, at any time and from time to time, subject to the applicable terms and conditions of the Senior Loan Documents, Senior Lender may create components of the Senior Loan (including, without limitation, by splitting the Senior Note into one or more additional or replacement promissory notes, which such promissory notes may be *pari passu* or senior/subordinate in right of payment in Senior Lender's sole discretion, change the balances, amortization and interest rate of the Senior Loan (and of any components thereof (including, without limitation, any additional or replacement promissory notes created pursuant to this Section 13 that may be created by Senior Lender), in each case without the consent of Mezzanine Lender, provided that the weighted average interest rate, monthly amortization in the aggregate among the components (including, without limitation, any such promissory notes) of the Senior Loan and the aggregate principal balance of the Senior Loan shall remain the same (without any rate creep) and there shall be no adverse economic or other material adverse effect on the Mezzanine Loan, no material increase in Borrower's obligations and no material decrease in Borrower's rights or remedies under the Senior Loan Documents, no material increase in Mezzanine Borrower's obligations under the Mezzanine Loan Documents and no material decrease in Mezzanine Lender's rights, remedies or protections thereunder, in each case, as a result of any such modifications of the Senior Loan.  Senior Lender shall reimburse Mezzanine Lender for all reasonable, out-of-pocket costs and expenses incurred by Mezzanine Lender in connection with the creation of any components (including, without limitation, any such promissory notes) of the Senior Loan.  For the avoidance of doubt, Senior Lender shall not have the right to create any additional tranches of mezzanine debt senior in priority to the Mezzanine Loan secured by direct or indirect interests in Borrower.

(b)    At the request of Senior Lender, prior to a Securitization of the Senior Loan, subject to the applicable terms and conditions of the Senior Loan Documents and the Mezzanine Loan Documents, Mezzanine Lender shall use reasonable efforts, at Senior Lender's sole cost and expense, to satisfy, and to cooperate with Senior Lender in attempting to cause Borrower and Mezzanine Borrower to satisfy, the market standards to which Senior Lender customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies in connection with the Securitization of the Senior Loan, including, entering into (or consenting to, as applicable) any modifications to this Agreement or the Senior Loan Documents or the Mezzanine Loan Documents, and to cooperate with Senior Lender in attempting to cause Borrower and Mezzanine Borrower to execute such modifications to the Senior Loan Documents and the Mezzanine Loan Documents, in any such case, as may be reasonably requested by the Rating Agencies to effect the Securitization; provided, however, (A) Mezzanine Lender shall not be required to modify or amend this Agreement or the Mezzanine Loan Documents (or consent to such modification of the Senior Loan Documents), if such modification or amendment would (I) increase or decrease (to more than a *de minimis* extent) any non-economic obligations or increase or decrease any economic obligations of Mezzanine Borrower under the Mezzanine Loan Documents, or (II) decrease (to more than a *de minimus* extent) Mezzanine Lender's rights, remedies or protections thereunder or under this Agreement or (III) have any adverse economic effect or otherwise have any material adverse effect on the Mezzanine Loan, and (B) no Senior Loan Modification or Mezzanine Loan Modification requiring the consent of Mezzanine Lender may be entered into without the prior written consent of Mezzanine Lender whose consent is required pursuant to Section 6(a) or Section 6(b) hereof.  In connection with any Securitization, upon Senior Lender's written request and at Senior Lender's sole cost and expense, Mezzanine Lender agrees to provide for inclusion in any

disclosure document relating to the related Securitization such non-confidential and non-proprietary information concerning Mezzanine Lender as Senior Lender reasonably determines to be necessary or appropriate.  Subject to the qualifications in clauses (A) through (B) above, Mezzanine Lender agrees that if any portion of the Senior Loan is to be included as an asset of a Securitization, Mezzanine Lender shall at Senior Lender's request (and at Senior Lender's sole cost and expense), reasonably cooperate with the reasonable requests of each Rating Agency and Senior Lender in connection with such Securitization.   Senior Lender shall reimburse Mezzanine Lender for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees), incurred by Mezzanine Lender in considering, responding to, negotiating and implementing any cooperation, modifications or other actions requested by Senior Lender in connection with this Section 13(b).  Notwithstanding the foregoing, the rights of Senior Lender set forth in this Section 13(b) are limited to the initial named Senior Lender hereunder and its Affiliates, and no successors or assigns of the initial named Senior Lender hereunder or its Affiliates shall have any obligations or rights under this Section 13(b).  For the avoidance of doubt, the parties agree that Borrower's or Mezzanine Borrower's obligation to enter into any amendment or modification to the Senior Loan Documents or any the Mezzanine Loan Documents shall be subject to the obtaining of any consent of Mezzanine Lender that is required hereunder, and no Borrower or Mezzanine Borrower shall be in default of its obligations under any of the Senior Loan Documents or the Mezzanine Loan Documents to enter into any amendment or modification if the consent of Mezzanine Lender required hereunder is not obtained.  Notwithstanding anything to the contrary contained in this Section 13 or otherwise, Mezzanine Lender shall not be required to provide any information with respect to any direct or indirect investors in Mezzanine Lender or any Affiliates of Mezzanine Lender (or any direct or indirect investors in any such Affiliates), unless providing such information is required by applicable law.

Section 14.    Obligations Hereunder Not Affected.

(a)    All rights, interests, agreements and obligations of Senior Lender and Mezzanine Lender under this Agreement shall remain in full force and effect irrespective of:

(i)    any lack of validity or enforceability of the Senior Loan Documents or the Mezzanine Loan Documents or any other agreement or instrument relating thereto;

(ii)    any taking, exchange, release or non-perfection of any other collateral, or any taking, release or amendment or waiver of or consent to or departure from any guaranty, for all or any portion of the Senior Loan or the Mezzanine Loan;

(iii)    any manner of application of collateral, or proceeds thereof, to all or any portion of the Senior Loan or the Mezzanine Loan, or any manner of sale or other disposition of any collateral for all or any portion of the Senior Loan or the Mezzanine Loan or any other assets of Borrower or Mezzanine Borrower or any other Affiliates of Borrower;

(iv)    any change, restructuring or termination of the corporate structure or existence of Borrower or Mezzanine Borrower or any other Affiliates of Borrower or Mezzanine Borrower; or

(v)      any other circumstance which might otherwise constitute a defense available to, or a discharge of, Borrower, Mezzanine Borrower or a subordinated creditor or a senior creditor subject to the terms hereof.

(b)      This Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of all or any portion of the Senior Loan is rescinded or must otherwise be returned by Senior Lender upon the insolvency, bankruptcy or reorganization of Borrower or otherwise, or if at any time any payment of all or any portion of the Mezzanine Loan is rescinded or must otherwise be returned by Mezzanine Lender, upon the insolvency, bankruptcy or reorganization of Mezzanine Borrower or otherwise, all as though such payment had not been made.

Section 15.    <u>Notices</u>.   All notices, demands, requests, consents, approvals or other communications required, permitted or desired to be given hereunder shall be in writing delivered by hand or reputable overnight courier addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party may hereafter specify in accordance with the provisions of this <u>Section 15</u>. Any such notice, demand, request, consent, approval or other communication shall be deemed to have been received: (a) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day) and (b) on the next Business Day if sent by an overnight commercial courier, in each case addressed to the parties as follows:

To Mezzanine Lender

85 Flatbush Mezz LLC
c/o The Bluestone Group
225 Broadway, 32nd Floor
New York, New York 10007
Attention:  Eli Tabak and Marc Mendelsohn

With a copy to:

David I. Keusch, Esq.
Keusch Law PLLC
80 Fifth Avenue, Suite 1201
New York, NY 10011
Email: davidk@davidklaw.com

To Senior Lender:

85 Flatbush Avenue 1 LLC
c/o Madison Realty Capital
520 Madison Avenue, Suite 3501
New York, New York 10022
Attention:  Josh Zegen

And:

Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017
Attention: Jerold C. Feuerstein, Esq.

Section 16.    <u>Estoppel</u>.

(a)    Mezzanine Lender shall, within ten (10) days following a request from Senior Lender, but no more than two (2) times in any twelve (12) month period, provide Senior Lender with a written statement setting forth the then current outstanding principal balance of the Mezzanine Loan, the aggregate accrued and unpaid interest under the Mezzanine Loan, and stating whether to Mezzanine Lender's knowledge any default or Event of Default exists under the Mezzanine Loan.

(b)    Senior Lender shall, within ten (10) days following a request from Mezzanine Lender, but no more than two (2) times in any twelve (12) month period, provide Mezzanine Lender with a written statement setting forth the then current outstanding principal balance of the Senior Loan, the aggregate accrued and unpaid interest under the Senior Loan, and stating whether to Senior Lender's knowledge any default or Event of Default exists under the Senior Loan.

Section 17.    <u>Renovation Reserve Fund</u>:  Mezzanine Lender acknowledges and agrees that Mezzanine Borrower is granting to Mortgage Lender a first priority perfected security interest in the Replacement Reserve Fund established under the Mezzanine Loan, and all amounts and proceeds therein.  Notwithstanding anything to the contrary set forth in the Mezzanine Loan Documents, it is acknowledged and agreed by Mezzanine Lender that Senior Lender shall have all rights in and control over, and shall incur any obligations or liability with respect to, the Replacement Reserve Fund and the disbursements made therefrom as contemplated by, and in accordance with, Section 2(b) of the Mezzanine Loan Agreement.

Section 18.    <u>Further Assurances</u>.  So long as all or any portion of the Senior Loan and the Mezzanine Loan remains unpaid and the Mortgage encumbers the Premises, Mezzanine Lender, Senior Lender will each execute, acknowledge and deliver in recordable form and upon demand of the other, any other instruments or agreements reasonably required in order to carry out the provisions of this Agreement or to effectuate the intent and purposes hereof.

Section 19.    <u>No Third Party Beneficiaries; No Modification</u>.  The parties hereto do not intend the benefits of this Agreement to inure to Borrower, Mezzanine Borrower or any other Loan Party, or any other Person, other than Mezzanine Lender and Senior Lender. This Agreement may not be changed or terminated orally, but only by an agreement in writing signed by the party against whom enforcement of any change is sought. Neither Senior Lender nor Mezzanine Lender may provide a copy of this Agreement, or disclose the contents hereof, to Borrower, Mezzanine Borrower, Guarantor, or any Broad Affiliate of Borrower or Mezzanine Borrower or Guarantor

43

Section 20.    <u>Successors and Assigns</u>.  This Agreement shall bind all successors and permitted assigns of Mezzanine Lender, Senior Lender shall inure to the benefit of all successors and permitted assigns of Mezzanine Lender and Senior Lender.

Section 21.    <u>Counterpart Originals</u>.  This Agreement may be executed in counterpart originals, each of which shall constitute an original, and all of which together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or electronic image scan transmission (such as a ".pdf" file) will be effective as delivery of an original manually-executed counterpart of the Agreement.

Section 22.    <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>.

(a)    **THIS AGREEMENT WAS NEGOTIATED AND MADE BY THE PARTIES HERETO IN THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY. THE PARTIES HERETO HEREBY AGREE THAT IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. EACH OF THE PARTIES HERETO HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, AND THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.**

(b)    **ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST ANY PARTY HERETO ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK COUNTY, NEW YORK, AND EACH PARTY HERETO WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING AND HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.**

(c)    **SENIOR LENDER AND MEZZANINE LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OR OMISSION OF EITHER PARTY OR ANY EXERCISE BY ANY PARTY OF THEIR RESPECTIVE RIGHTS HEREUNDER (INCLUDING, WITHOUT LIMITATION, ANY ACTION BASED ON CONTRACT, ANY ALLEGED TORT OR OTHERWISE). THIS WAIVER IS A MATERIAL INDUCEMENT FOR SENIOR LENDER AND MEZZANINE LENDER TO ENTER INTO THIS AGREEMENT.**

Section 23.     No Waiver; Remedies.  No failure on the part of Mezzanine Lender and Senior Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 24.     No Joint Venture.  Nothing provided herein is intended to create a joint venture, partnership, tenancy-in-common or joint tenancy relationship between or among any of the parties hereto.

Section 25.     Captions.  The captions in this Agreement are inserted only as a matter of convenience and for reference, and are not and shall not be deemed to be a part hereof.

Section 26.     Conflicts.  As between Senior Lender, on the one hand, and Mezzanine Lender, on the other, in the event of any conflict, ambiguity or inconsistency between the terms and conditions of this Agreement and the terms and conditions of any of the Senior Loan Documents or the Mezzanine Loan Documents, the terms and conditions of this Agreement shall control.

Section 27.     No Release.  Nothing herein contained shall operate to (a) release Borrower from (a) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Senior Loan Documents or any liability of Borrower under the Senior Loan Documents or (b) release Mezzanine Borrower from its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Mezzanine Loan Documents or any liability of Mezzanine Borrower under the Mezzanine Loan Documents.

Section 28.     Continuing Agreement.  This Agreement is a continuing agreement and shall remain in full force and effect until the earliest of (a) payment in full of the Senior Loan, (b) transfer of the Premises by foreclosure of the Mortgage or by deed-in-lieu of foreclosure (in each case, subject to and in accordance with the terms and provisions of this Agreement), (c) the consummation of any Equity Collateral Enforcement Action and (d) payment in full of the Mezzanine Loan; provided, however, that (i) any rights or remedies of either party hereto arising out of any breach of any provision hereof occurring prior to such date of termination shall survive such termination and (ii) any provision hereof which, by its express terms, is applicable upon or following the completion of an Equity Collateral Enforcement Action, shall survive such termination.  If at any time any payment in full of the Senior Loan or the Mezzanine Loan is rescinded in whole or in part or must be otherwise restored or returned in whole or in part upon the insolvency, bankruptcy or reorganization of Borrower or Mezzanine Borrower, as applicable, or otherwise, then, upon the restoration or return of any portion of such payment in full, Senior Lender's or Mezzanine Lender's, as applicable, rights and obligations hereunder shall be reinstated as though such payment in full (or portion thereof so restored or returned, as the case may be) had not been made at such time.

Section 29.     Severability.  In the event that any provision of this Agreement or the application hereof to any party hereto shall, to any extent, be invalid or unenforceable under any applicable statute, regulation, or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such statute,

regulation or rule of law, and the remainder of this Agreement and the application of any such invalid or unenforceable provisions to parties, jurisdictions or circumstances other than to whom or to which it is held invalid or unenforceable, shall not be affected thereby nor shall same affect the validity or enforceability of any other provision of this Agreement.  Furthermore, the parties shall in good faith endeavor to replace any provision held to be invalid or unenforceable with a valid and enforceable provision that closely resembles, and that has the same economic effect as, the provision held to be invalid or unenforceable.

Section 30.    Expenses.

(a)    To the extent not paid by Borrower or out of or from any collateral securing the Senior Loan which is realized by Senior Lender, Mezzanine Lender agrees upon demand to pay to Senior Lender the amount of any and all reasonable expenses, including the reasonable out-of-pocket fees and expenses of its counsel and of any experts or agents, which Senior Lender may incur in connection with the (i) exercise or enforcement of any of the rights of Senior Lender against Mezzanine Lender hereunder to the extent that Senior Lender is the prevailing party in any dispute with respect thereto or (ii) failure by Mezzanine Lender to perform or observe any of the provisions hereof.

(b)    To the extent not paid by Mezzanine Borrower or out of or from any collateral securing the Mezzanine Loan which is realized by Mezzanine Lender, Senior Lender agrees upon demand to pay to Mezzanine Lender the amount of any and all reasonable expenses, including the reasonable out-of-pocket fees and expenses of its counsel and of any experts or agents, which Mezzanine Lender may incur in connection with the (i) exercise or enforcement of any of the rights of Mezzanine Lender against Senior Lender hereunder to the extent that Mezzanine Lender is the prevailing party in any dispute with respect thereto or (ii) failure by Senior Lender to perform or observe any of the provisions hereof.

Section 31.    Injunction.  Senior Lender, on the one hand, and Mezzanine Lender, on the other hand, each acknowledge (and waive any defense based on a claim) that monetary damages are not an adequate remedy to redress a breach by the other party hereunder and that a breach by Senior Lender or Mezzanine Lender hereunder would cause irreparable harm to the other party hereunder. Accordingly, Senior Lender and Mezzanine Lender agree that upon a breach of this Agreement by Senior Lender, on the one hand, or Mezzanine Lender, on the other hand, the remedies of injunction, declaratory judgment and specific performance shall be available to such non-breaching party. Notwithstanding the foregoing, if Senior Lender shall exercise any right or remedy under the Senior Loan Documents that is not in violation of this Agreement, including without limitation, any Enforcement Action, Mezzanine Lender agrees not to object to, oppose, hinder, contest, interfere with or seek to enjoin or restrain any such action (whether through remedies of injunction, declaratory judgment or specific performance, the filing of a lis pendens, or otherwise) in violation of this Agreement, all of which remedies are hereby waived. Nothing contained in this Section 30 shall prejudice the rights of any party hereto, in connection with any action in which a preliminary injunction, temporary restraining order or similar relief is sought against it, to seek an order for an appropriate bond to be posted in compliance with applicable law to protect it from the adverse consequences of such preliminary injunction, temporary restraining order or similar relief.

Section 32.    <u>Mutual Acknowledgments and Disclaimer</u>.

(a)    Each of Senior Lender and Mezzanine Lender are sophisticated lenders and/or investors in real estate and their respective decision to enter into the Senior Loan and the Mezzanine Loan is based upon their own independent expert evaluation of the terms, covenants, conditions and provisions of, respectively, the Senior Loan Documents and the Mezzanine Loan Documents and such other matters, materials and market conditions and criteria which Senior Lender and Mezzanine Lender deem relevant. Each of Senior Lender and Mezzanine Lender has not relied in entering into this Agreement, and respectively, the Senior Loan, the Senior Loan Documents, the Mezzanine Loan or the Mezzanine Loan Documents, upon any oral or written information, representation, warranty or covenant from the other, or any of the other's representatives, employees, Affiliates or agents other than the representations and warranties of the other contained herein. Each of Senior Lender and Mezzanine Lender further acknowledges that no employee, agent or representative of the other has been authorized to make, and that Senior Lender and Mezzanine Lender have not relied upon, any statements, representations, warranties or covenants other than those specifically contained in this Agreement. Without limiting the foregoing, each of Senior Lender and Mezzanine Lender acknowledges that the other has made no representations or warranties as to the Senior Loan or the Mezzanine Loan or the Premises (including the cash flow of the Premises, the value, marketability, condition or future performance thereof, the existence, status, adequacy or sufficiency of the leases, the tenancies or occupancies of the Premises, or the sufficiency of the cash flow of the Premises, to pay all amounts which may become due from time to time pursuant to the Senior Loan or the Mezzanine Loan).

(b)    Each of Senior Lender and Mezzanine Lender acknowledges that the Senior Loan and the Senior Loan Documents, on the one hand, and the Mezzanine Loan and the Mezzanine Loan Documents, on the other hand, are distinct, separate transactions, loans and documents, separate and apart from each other.

(c)    Each of Senior Lender and Mezzanine Lender assumes all responsibility for keeping itself informed as to the condition (financial or otherwise) of Borrower, Mezzanine Borrower, the condition of the Premises and all other collateral and other circumstances and, except for notices expressly required by this Agreement, neither Senior Lender, on the one hand, nor Mezzanine Lender, on the other hand, shall have any duty whatsoever to obtain, advise or deliver information or documents to the other relative to such condition, business, assets and/or operations.

(d)    The relationship between Senior Lender, on the one hand, and Mezzanine Lender, on the other hand, shall be solely an ordinary contractual business relationship involving arm's length parties. Mezzanine Lender agrees that Senior Lender does not owe any fiduciary or other duty to Mezzanine Lender in connection with the administration of the Senior Loan, the Senior Loan Documents, and that Senior Lender does not have a relationship of confidence or trust to Mezzanine Lender and no provision in this Agreement, and no course of dealing between or among any of the parties hereto, nor the acquisition by Senior Lender of any information relating to the Premises, Borrower, Mezzanine Borrower or otherwise, shall be deemed to create any fiduciary duty or relationship of confidence or trust owing by Senior Lender to Mezzanine Lender, and Mezzanine Lender agrees not to assert the existence of any such duty or relationship.

(e)    Senior Lender agrees that Mezzanine Lender does not owe any fiduciary or other duty to Senior Lender in connection with the administration of the Mezzanine Loan, the Mezzanine Loan Documents, and that Mezzanine Lender does not have a relationship of confidence or trust to Senior Lender and no provision in this Agreement, and no course of dealing between or among any of the parties hereto, nor the acquisition by Mezzanine Lender of any information relating to the Premises, Borrower, Mezzanine Borrower or otherwise, shall be deemed to create any fiduciary duty or relationship of confidence or trust owing by Mezzanine Lender to Senior Lender, and Senior Lender agrees not to assert the existence of any such duty or relationship.

(f)    Except for the express obligations of Senior Lender in favor of Mezzanine Lender under this Agreement, Senior Lender undertakes no responsibility to Mezzanine Lender to review or inform Mezzanine Lender of any matter; to provide Mezzanine Lender with any credit or other information concerning the business, operations, property, financial and other condition or creditworthiness of Borrower, Mezzanine Borrower, Guarantor or other Affiliate thereof which may come into possession of Senior Lender or any of its respective officers, directors, employees, agents or Affiliates; to act for Mezzanine Lender; or to provide any advice or services to Mezzanine Lender, in connection with any phase of Borrower's or Mezzanine Borrower's business or operations or any other matter relating to Borrower, Mezzanine Borrower, the Senior Loan, the Mezzanine Loan or the Premises. If Senior Lender provides any information to Mezzanine Lender, such provision of information does not create any duty to Mezzanine Lender, or involve any representation or warranty that the information provided is true, correct, or complete, and such information will be provided exclusively on an as is, where is, with all faults basis, without any rights on the part of Mezzanine Lender to rely upon Senior Lender in any way with respect thereto. Mezzanine Lender shall not rely upon any work product or advice provided to Senior Lender by any consultant to or agent of Senior Lender, and shall make its own independent arrangements for obtaining the services and advice of consultants.

(g)    Except for the express obligations of Mezzanine Lender in favor of Senior Lender under this Agreement, Mezzanine Lender undertakes no responsibility to Senior Lender to review or inform Senior Lender of any matter; to provide Senior Lender with any credit or other information concerning the business, operations, property, financial and other condition or creditworthiness of Borrower, Mezzanine Borrower, Guarantor or other Affiliate thereof which may come into possession of Mezzanine Lender or any of its respective officers, directors, employees, agents or Affiliates; to act for Senior Lender; or to provide any advice or services to Senior Lender, in connection with any phase of Borrower's or Mezzanine Borrower's business or operations or any other matter relating to Borrower, Mezzanine Borrower, the Senior Loan, the Mezzanine Loan or the Premises. If Mezzanine Lender provides any information to Senior Lender, such provision of information does not create any duty to Senior Lender, or involve any representation or warranty that the information provided is true, correct, or complete, and such information will be provided exclusively on an as is, where is, with all faults basis, without any rights on the part of Senior Lender to rely upon Mezzanine Lender in any way with respect thereto. Senior Lender shall not rely upon any work product or advice provided to Mezzanine Lender by any consultant to or agent of Mezzanine Lender, and shall make its own independent arrangements for obtaining the services and advice of consultants; provided, that, the foregoing shall not apply from and after an Equity Collateral Enforcement Action.

(h)     Senior Lender shall have no obligation whatsoever to Mezzanine Lender to assure that the Premises or other collateral for the Senior Loan exists or is owned by Borrower or is cared for, protected, maintained, leased or insured, or that any property taxes, assessments or other charges thereon are paid, or as to the performance or observance by Borrower of the Senior Loan Documents or Mezzanine Borrower of the Mezzanine Loan Documents, or to inspect the properties or books of, or make any other investigation of, Borrower or Mezzanine Borrower or to undertake any appraisal or evaluation of the Premises.

(i)     Mezzanine Lender shall have no obligation whatsoever to Senior Lender to assure that the Equity Collateral or other collateral for the Mezzanine Loan exists or is owned by Mezzanine Borrower or is cared for, protected, maintained, leased or insured, or that any property taxes, assessments or other charges thereon are paid, or as to the performance or observance by Borrower of the Senior Loan Documents or Mezzanine Borrower of the Mezzanine Loan Documents, or to inspect the properties or books of, or make any other investigation of, Borrower or Mezzanine Borrower or to undertake any appraisal or evaluation of the Equity Collateral; provided, that, the foregoing shall not apply from and after an Equity Collateral Enforcement Action.

(j)     Except for the express obligations of Senior Lender in favor of Mezzanine Lender under this Agreement, all of which are purely contractual obligations, Senior Lender shall have no obligation whatsoever to Mezzanine Lender under any duty of care, provided that nothing herein shall limit any liabilities of Senior Lender otherwise arising by operation of law to the extent resulting from its own gross negligence or willful misconduct. Except for the express respective obligations of Mezzanine Lender in favor of Senior Lender under this Agreement, all of which are purely contractual obligations, Mezzanine Lender shall not have any obligation whatsoever to Senior Lender under any duty of care, provided that nothing herein shall limit any liabilities of Mezzanine Lender otherwise arising by operation of law to the extent resulting from its own gross negligence or willful misconduct.

(k)     Without limiting the express respective obligations of Senior Lender in favor of Mezzanine Lender under this Agreement, in connection with the administration of the Senior Loan and the exercise of rights and remedies in relation to Borrower, the Premises and the other collateral for the Senior Loan, and any act, omission or event related thereto, Senior Lender may act in any manner it may deem appropriate, in its sole discretion, and no act or omission in connection therewith shall be deemed for any purpose to comprise interference with the rights of Mezzanine Lender under the Mezzanine Loan Documents or with the prospective economic advantage of Mezzanine Lender, and any and all claims or causes of action based on any such claims of interference are hereby unconditionally and irrevocably waived and released by Mezzanine Lender.

(l)     Without limiting the express respective obligations of Mezzanine Lender in favor of Senior Lender under this Agreement, in connection with the administration of the Mezzanine Loan and the exercise of rights and remedies in relation to Borrower, the Equity Collateral and the other collateral for the Mezzanine Loan, and any act, omission or event related thereto, Mezzanine Lender may act in any manner it may deem appropriate, in its sole discretion, and no act or omission in connection therewith shall be deemed for any purpose to comprise interference with the rights of Senior Lender under the Senior Loan Documents or with the

prospective economic advantage of Senior Lender, and any and all claims or causes of action based on any such claims of interference are hereby unconditionally and irrevocably waived and released by Senior Lender.

(m)     None of Senior Lender, or any affiliate, officer, director, employee, attorney, or agent of Senior Lender, shall have any liability with respect to, and Mezzanine Lender hereby waives, releases, and agrees not to sue any of them upon, any claim for any special, indirect, incidental, or consequential damages suffered or incurred by Mezzanine Lender in connection with, arising out of, or in any way related to, this Agreement or any of the Senior Loan Documents or Mezzanine Loan Documents, or any of the transactions contemplated by this Agreement or any of the Senior Loan Documents or Mezzanine Loan Documents. Mezzanine Lender hereby waives, releases, and agrees not to sue Senior Lender or any of Senior Lender's affiliates, officers, directors, employees, attorneys, or agents for punitive damages in respect of any claim in connection with, arising out of, or in any way related to, this Agreement, or any of the Senior Loan Documents or Mezzanine Loan Documents or any of the transactions contemplated by this Agreement or any of the Senior Loan Documents or Mezzanine Loan Documents.

(n)     None of Mezzanine Lender, or any affiliate, officer, director, employee, attorney, or agent of Mezzanine Lender, shall have any liability with respect to, and Senior Lender hereby waives, releases, and agrees not to sue any of them upon, any claim for any special, indirect, incidental, or consequential damages suffered or incurred by Senior Lender in connection with, arising out of, or in any way related to, this Agreement or any of the Senior Loan Documents or Mezzanine Loan Documents, or any of the transactions contemplated by this Agreement or any of the Senior Loan Documents or Mezzanine Loan Documents. Senior Lender hereby waives, releases, and agrees not to sue Mezzanine Lender or any of Mezzanine Lender's affiliates, officers, directors, employees, attorneys, or agents for punitive damages in respect of any claim in connection with, arising out of, or in any way related to, this Agreement, or any of the Senior Loan Documents or Mezzanine Loan Documents or any of the transactions contemplated by this Agreement or any of the Senior Loan Documents or Mezzanine Loan Documents.

(o)     No obligation or liability whatsoever of Senior Lender which may arise at any time under this Agreement or any other Senior Loan Document shall be personally binding upon, nor shall resort for the enforcement thereof be had to, the property of any of Senior Lender's shareholders, directors, officers, employees or agents, regardless of whether such obligation or liability is in the nature of contract, tort or otherwise.

(p)     No obligation or liability whatsoever of Mezzanine Lender which may arise at any time under this Agreement or any other Mezzanine Loan Document shall be personally binding upon, nor shall resort for the enforcement thereof be had to, the property of any of Mezzanine Lender's partners, members, shareholders, directors, officers, employees or agents, regardless of whether such obligation or liability is in the nature of contract, tort or otherwise.

Section 33.     <u>Time of Essence</u>.  Time is of the essence of any provision of this Agreement which requires any obligation to be performed, or right or option exercised, within a specific period of time.

Section 34.    <u>Financing of the Mezzanine Loan</u>.    Notwithstanding any other provision hereof to the contrary, Senior Lender consents to Mezzanine Lender's sale in connection with a repurchase agreement facility or pledge (each, a "**Pledge**") of the Mezzanine Loan (or any interest therein) and of the Separate Collateral to any Person which (i) has extended a credit facility, including, without limitation, credit in the form of a repurchase agreement facility, to Mezzanine Lender, (ii) is Initial Loan Pledgee or would otherwise satisfy the requirements of a Qualified Transferee or a financial institution whose long-term unsecured debt is rated at least "A" (or the equivalent) or better by a Rating Agency, and (iii) which is not Borrower, Mezzanine Borrower or a Broad Affiliate of Borrower or of Mezzanine Borrower (a "**Loan Pledgee**"), on the terms and conditions set forth in this <u>Section 33</u>.  It is also agreed that the sale by Mezzanine Lender of the Mezzanine Loan to a Qualified Transferee and the simultaneous agreement by Mezzanine Lender to repurchase the Mezzanine Loan under an arrangement documented as a repurchase agreement shall qualify as a Pledge, <u>provided</u> that all applicable terms and conditions of this <u>subsection (a)</u> are complied with; <u>further</u> <u>provided</u> that a Loan Pledgee that is not either (x) Initial Loan Pledgee or (y) a Qualified Transferee may not take title to Equity Collateral except in accordance with <u>Section 6(a)</u> hereof.  Upon written notice by Mezzanine Lender to Senior Lender that a Pledge has been effected and the address for notice purposes of the Loan Pledgee, Senior Lender agrees to acknowledge receipt of such notice and thereafter agrees: (A) to give such Loan Pledgee written notice of any Mezzanine Lender Intercreditor Event of Default by Mezzanine Lender which has made a Pledge to such Loan Pledgee under this Agreement of which default Senior Lender has actual knowledge; (B) with respect to a Mezzanine Lender Intercreditor Event of Default pursuant to section (i) of the definition thereof, to allow Loan Pledgee a period of ten (10) days (in respect of a monetary default) and a period of thirty (30) days (in respect of a nonmonetary default) to cure a default by Mezzanine Lender in respect of its obligations to Senior Lender hereunder; provided, however, if such non-monetary default is susceptible of cure but cannot reasonably be cured within such period and if curative action was promptly commenced and is being continuously and diligently pursued by Loan Pledgee, Mezzanine Lender shall be given an additional period of time as is reasonably necessary for Loan Pledgee in the exercise of due diligence to cure such non-monetary default (not to exceed one hundred twenty (120) days), but such Loan Pledgee shall not be obligated to cure any such default; (C) that no amendment or modification of this Agreement which adversely affects the rights or obligations of Mezzanine Lender, and no waiver or termination of this Agreement, shall be effective against such Loan Pledgee without the written consent of such Loan Pledgee, which consent shall not be unreasonably withheld, conditioned or delayed (<u>provided</u> that the consent of such Loan Pledgee shall not be required unless Mezzanine Lender's consent was required pursuant to the terms of this Agreement to effect such modification, waiver or termination); (D) that Senior Lender shall give to such Loan Pledgee copies of any Senior Loan Default Notice promptly following the giving of same to Mezzanine Lender and accept any cure thereof by such Loan Pledgee made in accordance with the provisions of <u>Section </u>10 of this Agreement as if such cure were made by Mezzanine Lender; (E) that Senior Lender and Mezzanine Lender shall deliver to such Loan Pledgee such estoppel certificate(s) as such Loan Pledgee shall reasonably request, <u>provided</u> that any such estoppel certificate(s) shall be in the form contemplated by <u>Section 18(b)</u> or such other form reasonably acceptable to Senior Lender and Mezzanine Lender; and (F) that, upon written notice (a "**Redirection Notice**") to Senior Lender or Mezzanine Lender by such Loan Pledgee that Mezzanine Lender is in default beyond applicable cure periods under Mezzanine Lender's obligations to such Loan Pledgee pursuant to the applicable credit agreement between Mezzanine

Lender and such Loan Pledgee (which notice need not be joined in or confirmed by Mezzanine Lender), and until such Redirection Notice is withdrawn or rescinded by such Loan Pledgee, Senior Lender shall remit to the applicable Loan Pledgee and not to Mezzanine Lender, any payments that Senior Lender would otherwise be obligated to pay to Mezzanine Lender from time to time pursuant to this Agreement, any Senior Loan Document, Mezzanine Loan Document or any other agreement between Senior Lender or Mezzanine Lender that relates to the Senior Loan or the Mezzanine Loan. Mezzanine Lender unconditionally and absolutely releases Senior Lender from any liability to Mezzanine Lender on account of Senior Lender's compliance with any Redirection Notice believed in good faith (without any duty of inquiry of any kind) by Senior Lender to have been delivered by Mezzanine Lender's Loan Pledgee. A Loan Pledgee shall be permitted to fully exercise its rights and remedies against Mezzanine Lender, and realize on any and all collateral granted by Mezzanine Lender to such Loan Pledgee (and accept an assignment in lieu of foreclosure as to such collateral), in accordance with applicable law. In such event, Senior Lender shall recognize such Loan Pledgee (and any transferee that is also a Qualified Transferee at any foreclosure or similar sale held by such Loan Pledgee or any Transfer in lieu of such foreclosure), and its successors and assigns, as the successor to Mezzanine Lender's rights, remedies and obligations under this Agreement and the Mezzanine Loan Documents and any such Loan Pledgee or Qualified Transferee shall assume in writing (for the benefit of Senior Lender and its successors and assigns) the obligations of Mezzanine Lender hereunder accruing from and after such Transfer and agrees to be bound by the terms and provisions hereof (it being agreed that, notwithstanding anything to the contrary contained herein, such Loan Pledgee shall not be required to so assume Mezzanine Lender's obligations hereunder prior to such realization on such collateral). The rights of a Loan Pledgee under this Section 16 shall remain effective unless and until such Loan Pledgee shall have notified Senior Lender in writing that its interest in the Mezzanine Loan has terminated. Senior Lender acknowledges that a Pledge has been effected with Initial Loan Pledgee and that it has received the address for notice purposes of the Initial Loan Pledgee..

Section 35.    Affiliated Mezzanine Lender. Notwithstanding anything in this Agreement to the contrary, in the event that at any time the Mezzanine Loan is held by any Person who is a Broad Affiliate of Borrower or the Mezzanine Borrower, such Person: (i) shall have no rights under Sections 4 (except the right to Transfer interests in accordance with Section 4 to Persons that are not Mezzanine Borrower or any Broad Affiliates of Mezzanine Borrower), 5, 6, 8, 9(d), 10, 12(b), 11, 15, or 16 hereof; (ii) may not take an Equity Collateral Enforcement Action; (iii) may not engage in any Mezzanine Loan Modification of the Mezzanine Loan or the Mezzanine Loan Documents without Senior Lender's prior written consent, which may be withheld in the sole discretion of Senior Lender; (iv) collect any default interest, late payment charges or other fees and expenses that would otherwise be payable to the Mezzanine Lender pursuant to the Mezzanine Loan Documents; (v) gain access to any electronic platform for the distribution of materials or information between Senior Lender and any other Mezzanine Lender; or (vi) receive (and hereby waives any right which it would otherwise have to receive) any "asset status reports" or any correspondence or materials or notices from Senior Lender or any other Mezzanine Lender (or servicer or any other agent of Senior Lender or any other Mezzanine Lender, as applicable) of, or to participate in, any discussions, meetings or conference calls (among Senior Lender and any other Mezzanine Lender or otherwise) regarding or relating to any workout discussions or litigation or foreclosure strategy (or potential litigation strategy) involving the Mezzanine Loan or the Senior Loan, other than in its capacity as Borrower or a Mezzanine Borrower to the extent

discussions and negotiations are being conducted with Borrower or such Mezzanine Borrower (as distinct from internal discussions and negotiations among the various creditors), in each case, without Senior Lender's prior written consent and each other Mezzanine Lender's prior written consent, which may be withheld in the sole discretion of Senior Lender or such Mezzanine Lender, as applicable.

[NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, Senior Lender and Mezzanine Lender have executed this Agreement as of the Effective Date.

**SENIOR LENDER:**

**85 FLATBUSH AVENUE 1 LLC**
a Delaware limited liability company

By: _____
Name: Joshua Zegen
Title: Authorized Signatory

**MEZZANINE LENDER:**

**85 FLATBUSH MEZZ LLC**

By: _____

Name: _Eli TABAK_

Title: _Authorized Signatory_

## EXHIBIT A

The Condominium Units (hereinafter referred to as the "Units") known as Units CU (Commercial Unit) and HU (Hotel Unit) in the Building (hereinafter referred to as the "Building") known as the 85 Flatbush Condominium and by the Street Number 85 Flatbush Avenue Extension, Borough of Brooklyn, County of Kings, City and State of New York, said Units being designated and described as unit numbers CU and HU in a certain Declaration dated June 28, 2016, made by 85 Flatbush LLC pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act") establishing a plan for Condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate, which Declaration was recorded in the Office of the New York City Register on April 6, 2017 in CRFN 2017000134763 (which Declaration and Amendments thereto are collectively referred to as the "Declaration"). The Units are also designated as Tax Lots 1201 and 1202 in Block 120 on the Tax Map of the City of New York, County of Kings and on the Floor Plans of the Building, certified by Kutnicki, Bernstein Architects on March 17, 2017, as Condominium Plan No. 3893 and also filed in the Office of the New York City Register on April 6, 2017 as CRFN 2017000134764.

TOGETHER with an undivided 4.2529% interest, as to Unit CU and an undivided 56.2177% interest, as to Unit HU, in the Common Elements as such term is defined in the Declaration.

ALL that certain plot piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings and State of New York, bounded and described as follows:

BEGINNING at a point formed by the intersection of the westerly side of Duffield Street with the northerly side of Tillary Street;

RUNNING THENCE northerly along the westerly of Duffield Street, 209 feet 0 inches;

THENCE westerly parallel with Concord Street, 100 feet 3 inches;

THENCE northerly parallel with Bridge Street, 25 feet 0 inches;

THENCE westerly parallel with Concord Street, 41 feet 4-3/4 inches;

THENCE southerly along the easterly side of Flatbush Avenue Extension 255 feet 10-3/8 inches to the northerly side of Tillary Street;

THENCE easterly along the northerly side of Tillary Street, 40 feet 9 inches to the westerly side of Duffield Street, the point or place of BEGINNING.

FOR INFORMATION ONLY: Said premises being known as 85 Flatbush Avenue Extension, Units CU and HU, Brooklyn, and being designated as Lots 1201 and 1202 in Block 120 on the Tax Map of the City of New York, County of Kings.

EXHIBIT B

<u>Senior Loan Documents</u>

1. Affidavit of Title and Other Borrower Representations
2. Certification of Rent Roll (85 Flatbush RHO Hotel LLC)
3. Certification of Rent Roll (85 Flatbush RHO Residential LLC)
4. Collateral Assignment of Contracts, Condo Docs, Contract Deposits
5. Conditional Guaranty
6. Condominium Release Price Agreement
7. Consolidated, Amended and Restated Note
8. Consolidated, Amended and Restated Mortgage and Security Agreement
9. 255 Affidavit to Assignment of Leases and Rents
10. Assignment of Leases and Rents
11. Section 291-F (85 Flatbush RHO Hotel LLC)
12. Section 291-F (85 Flatbush RHO Residential LLC)
13. 255 Affidavit to Consolidated, Amended and Restated Mortgage and Security Agreement
14. Gap Note
15. Gap Mortgage
16. Debt Service and Carry Guaranty
17. Designation of Agent for Service
18. Environmental Indemnity Agreement
19. Guaranty of Completion
20. Guaranty
21. Mailing Address Verification Form (85 Flatbush RHO Hotel LLC)
22. Mailing Address Verification Form (85 Flatbush RHO Residential LLC)
23. USA Patriot Act Disclosure
24. Opinion Letter
25. Statement of Undertaking
26. Title Checklist
27. UCC-1 Financing Statement (County)
28. UCC-1 Financing Statement (State)
29. W-9 (Borrower – 85 Flatbush RHO Hotel LLC)
30. W-9 (Borrower – 85 Flatbush RHO Residential LLC)
31. W-9 (Guarantor)
32. Affidavit of Property Management (85 Flatbush RHO Hotel LLC)
33. Affidavit of Property Management (85 Flatbush RHO Residential LLC)
34. Assignment and Subordination of Hotel F&B Restaurant Management Agreement
35. Assignment and Subordination of Hotel Management Agreement
36. Assignment and Subordination of Management Agreement (Residential)
37. Cash Collateral and Reserve Agreement (Security Deposits)
38. Cash Collateral and Reserve Agreement (Cash Flow of Hotel Operations)
39. Cash Collateral and Reserve Agreement (Cash Flow of Residential Operations)
40. Undertaking
41. Loan Settlement Statement

EXHIBIT C

<u>Mezzanine Loan Documents</u>

1. Mezzanine Promissory Note
2. Mezzanine Loan Agreement
3. Conditional Guaranty
4. Debt Service and Carry Guaranty
5. Environmental Indemnity Agreement
6. Guaranty of Completion
7. Guaranty
8. Mailing Address Verification Form
9. Opinion Letter
10. Statement of Undertaking
11. W-9
12. Subordination of Hotel F&B Restaurant Management Agreement
13. Subordination of Hotel Management Agreement
14. Subordination of Management Agreement (Residential)
15. Cash Collateral and Reserve Agreement (Hotel Renovations)
16. Undertaking
17. Loan Settlement Statement

EXHIBIT D
Permitted Fund Managers

1.  iStar Financial Inc.

2.  Archon Capital, L.P.

3.  Goldman, Sachs & Co.

4.  The Blackstone Group International Ltd.

5.  Colony Capital, Inc.

6.  Praedium Group

7.  Fortress Investment Group LLC

8.  Lonestar Funds

9.  One William Street Capital Management, L.P.

10. Clarion Partners

11. Walton Street Capital, LLC

12. Starwood Capital Group/Starwood Financial Trust

13. BlackRock, Inc.

14. AREA Property Partners

15. Garrison Investment Group

16. LoanCore Capital

17. Rockpoint Group

18. Torchlight Investors

19. Westbrook Partners

20. WestRiver Capital

21. Apollo Global Management LLC

22. Brookfield

23. The Bluestone Group

EXHIBIT E

Mezz Pledge Documents

1. Ownership Interests Pledge and Security Agreement (85 Flatbush RHO Hotel LLC)
2. Ownership Interests Pledge and Security Agreement (85 Flatbush RHO Residential LLC)
3. Share Certificate with Endorsement (85 Flatbush RHO Hotel LLC)
4. Share Certificate with Endorsement (85 Flatbush RHO Residential LLC)
5. Instruction to Register Pledge with Confirmation Statement (85 Flatbush RHO Hotel LLC)
6. Instruction to Register Pledge with Confirmation Statement (85 Flatbush RHO Residential LLC)
7. UCC-1 Financing Statement (Pledge – 85 Flatbush RHO Hotel LLC)
8. UCC-1 Financing Statement (Pledge – 85 Flatbush RHO Residential LLC)

**85 FLATBUSH AVENUE 1 LLC**
c/o Madison Realty Capital
520 Madison Ave., Suite 3501
New York, New York 10022

July 16, 2020

**VIA EMAIL AND OVERNIGHT FEDERAL EXPRESS**

85 Flatbush Mezz LLC
c/o The Bluestone Group
225 Broadway, 32nd Floor
New York, New York 10007
Attention:  Eli Tabak and Marc Mendelsohn
Email:  ETabak@Bluestonegrp.com and MMendelsohn@Bluestonegrp.com

David I. Keusch, Esq.
Keusch Law PLLC
80 Fifth Avenue, Suite 1201
New York, NY 10011
Email: davidk@davidklaw.com

> Re:   Intercreditor Agreement dated as of September 19, 2019 (the "**Intercreditor Agreement**") by and between 85 FLATBUSH AVENUE 1 LLC, a Delaware limited liability company ("**Senior Lender**"), and 85 FLATBUSH MEZZ LLC, a New York limited liability company ("**Mezzanine Lender**").

Dear Mr. Tabak and Mr. Mendelsohn:

Reference is hereby made to the above-captioned Intercreditor Agreement. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Intercreditor Agreement.

This letter hereby constitutes a Senior Loan Default Notice delivered by Senior Lender in accordance with Section 10(a) of the Intercreditor Agreement.

Pursuant to Section 10(a) of the Intercreditor Agreement, Senior Lender is required to notify Mezzanine Lender in writing of any default or Event of Default under any Senior Loan Document which would permit Senior Lender to commence an Enforcement Action under the Senior Loan Documents. Written notice is hereby given that Borrower (1) has failed to pay the scheduled Monthly Payments (as such term is defined in the Senior Note) of interest due on the Payment Dates (as defined in the Senior Note) occurring on March 1, 2020, April 1, 2020, May 1, 2020, June 1, 2020 and July 1, 2020 (collectively, the "**Existing Senior Loan Monthly Payment Events of Default**"), and (2) has failed to pay real estate taxes due and payable with respect to the Premises as of January 2020 and July 2020 (collectively, the "**Existing Senior Loan Tax Payment Events of Default**"; and together with the Existing Senior Loan Monthly Payment Events of Default, collectively, the "**Existing Senior Loan Events of Default**"), in each case in accordance with the terms and conditions of the Senior Loan

Documents, and therefore an Event of Default exists under the Senior Loan with respect to each of the foregoing payment failures by Borrower.

Pursuant to Section 10(a) of the Intercreditor Agreement, Mezzanine Lender shall have ten (10) Business Days after the later of (i) the giving by Senior Lender of this Senior Loan Default Notice and (ii) the expiration of Borrower's cure period, if any (the "**Monetary Cure Period**"), to cure the Existing Senior Loan Events of Default at the Senior Loan Preferred Rate (including the payment to Senior Lender of any out-of-pocket costs and expenses, losses, liabilities, obligations, actual damages, penalties and disbursements imposed on, actually incurred by Senior Lender due to or arising from such Monetary Cure Period). For the avoidance of doubt, in order to effectively cure the Existing Senior Loan Monthly Payment Events of Default at the Senior Loan Preferred Rate, Mezzanine Lender shall be required to remit to Senior Lender an aggregate amount of $368,272.22, comprised of (a) $70,727.78 with respect to the March 1, 2020 Monthly Payment, (b) $75,605.56 with respect to the April 1, 2020 Monthly Payment, (c) $73,166.67 with respect to the May 1, 2020 Monthly Payment, (d) $75,605.56 with respect to the June 1, 2020 Monthly Payment and (e) $73,166.67 with respect to the July 1, 2020 Monthly Payment.

If it is your intention to cure the Existing Senior Loan Events of Default, please provide assurances of same within five (5) Business Days following the receipt of this Senior Loan Default Notice. Pursuant to the terms and conditions of the Intercreditor Agreement, failure by Mezzanine Lender to cure the Existing Senior Loan Events of Default within ten (10) Business Days following the date of this Senior Loan Default Notice shall (1) evidence Mezzanine Lender's intention to waive the cure rights provided for in Section 10(a) of the Intercreditor Agreement and allow Senior Lender to pursue its rights and remedies thereunder, including commencing and consummating an Enforcement Action under the Senior Loan Documents and (2) convert each of the Existing Senior Loan Events of Default into Continuing Senior Events of Default for all intents and purposes under the Intercreditor Agreement.

Furthermore, please be advised that in the event Mezzanine Lender elects to cure the Existing Senior Loan Events of Default in accordance with the Intercreditor Agreement and this Senior Loan Default Notice, Mezzanine Lender shall have no further right or ability under the Intercreditor Agreement to cure any future monetary defaults of Borrower with respect to monthly scheduled debt service payments due under the Senior Loan, as Section 10(a) of the Intercreditor Agreement precludes Mezzanine Lender from curing Borrower's failure to make monthly scheduled debt service payments under the Senior Loan more than four (4) times in the aggregate unless Mezzanine Lender is proceeding with an Equity Collateral Enforcement Action.

This notice is without prejudice to Senior Lender's rights and remedies, at law, in equity, under the Senior Loan Documents and the Intercreditor Agreement. Please do not hesitate to contact us with any questions you may have.

Sincerely,

**85 FLATBUSH AVENUE 1 LLC**,

By: _____

Name: Shoshana Carmel
Title: Authorized Signatory

cc:

Kriss & Feuerstein LLP
360 Lexington Avenue, 12th Floor
New York, New York 10017
Attention: Jerold Feuerstein, Esq.

| 85 Flatbush - Payoff 7/16/20 | | |
|---|---|---|
| Principal: | $ | 70,000,000.00 |
| Nominal Interest Due 2/1/20 -7/16/20 | $ | 2,190,412.78 |
| Default Interest Due 2/1/20 - 7/16/20 | $ | 3,988,778.89 |
| Exit Fee | $ | 525,000.00 |
| Servicing Fee: | $ | 58,333.33 |
| **Total Payoff Due:** | **$** | **76,762,525.00** |