**Hearing Date: April 6, 2022, at 10:00 a.m. (prevailing Eastern Time)**

Lauren Macksoud
Sarah M. Schrag
**DENTONS US LLP**
1221 Avenue of the Americas
25th Floor
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
Email: lauren.macksoud@dentons.com
        sarah.schrag@dentons.com

Robert Richards  (admitted *pro hac vice*)
**DENTONS US LLP**
233 S. Wacker Drive
Suite 5900
Chicago, IL 60606
Telephone: (312) 876-8000
Facsimile: (312) 876-7934
Email: robert.richards@dentons.com

*Counsel to TH Holdco LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>   85 FLATBUSH RHO MEZZ LLC, et al.,[1]<br><br>            Debtors | Case No. 20-23280 (RDD)<br>Chapter 11<br><br><br>(Jointly Administered) |

**TH HOLDCO LLC'S COMBINED (A) RESPONSE TO OBJECTIONS TO MOTION TO APPROVE (I) THE ADEQUACY OF INFORMATION IN THE DISCLOSURE STATEMENT, (II) SOLICITATION AND NOTICE PROCEDURES, (III) FORMS OF BALLOTS, AND (IV) CERTAIN DATES WITH RESPECT THERETO AND (B) OBJECTION TO DEBTORS' DISCLOSURE STATEMENT FOR AMENDED PLAN OF REORGANIZATION**

---

[1] The Debtors (as defined) in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include: 85 Flatbush RHO Mezz LLC (6184); 85 Flatbush RHO Hotel LLC (5027); and 85 Flatbush RHO Residential LLC (2261).

## <u>TABLE OF CONTENTS</u>

<b>Page</b>

I.    PRELIMINARY STATEMENT ........................................................................... 1

II.   BACKGROUND ............................................................................................... 6

III.  ARGUMENT .................................................................................................... 9

    A.    Response to Mezz Objection to TH Disclosure Statement Motion ........................ 9

    B.    Response to Debtors' Objection to TH Disclosure Statement Motion ................ 12

    C.    Objection to Debtors' Disclosure Statement ........................................................ 16

        (i)    The Debtors' Amended Plan is Not Feasible ................................................... 16

        (ii)   The Debtors' Amended Plan is Unconfirmable Given That It Violates the Absolute Priority Rule ........................................................................................ 20

        (iii)   The Disclosure Statement Does Not Contain Sufficient Information ........... 21

        (iv)   The Debtors' Disclosure Statement Should Be Adjudged Under the Heightened Scrutiny Standard ........................................................................... 26

CONCLUSION .......................................................................................................... 29

US_Active\121156344\V-6

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of America Nat. Trust and Sav. Assn. v. 203 North LaSalle Street
Partnership*,
526 U.S. 434 (1999)...................................................................................25

*In re 18 RVC, LLC*,
485 B.R. 492 (Bankr. E.D.N.Y. 2012)...........................................................16, 20

*In re Am. Capital Equip., LLC*,
688 F.3d 145 (3d Cir. 2012)........................................................................17

*In re Astria Health*,
623 B.R. 793 (Bankr. E.D. Wash. 2021) .......................................................27

*In re Avianca Holdings S.A.*,
632 B.R. 124 (Bankr. S.D.N.Y. 2021).............................................................21

*In re Babayoff*,
445 B.R. 64 (Bankr. E.D.N.Y. 2011) .............................................................26

*In re Baker*,
118 B.R. 24 (Bankr. S.D.N.Y. 1990).............................................................24

*In re Congregation Birchos Yosef*,
Memorandum of Decision on Debtor's Motion to Enforce the Automatic Stay,
Case No. 15-22254-rdd, Docket No. 123 .......................................................2

*In re Country U.S.A., Inc.*,
74 B.R. 28 (Bankr. S.D. Fla. 1987)...............................................................19

*In re Dakota Rail, Inc.*,
104 B.R. 138 (Bankr. D. Minn. 1989) ...........................................................22

*In re Drexel Burnham Lambert Grp., Inc.*,
157 B.R. 532 (S.D.N.Y. 1993)......................................................................24

*In re eToys, Inc.*,
331 B.R. 176 (Bankr. D. Del. 2005) .............................................................27

*In re Family Christian, LLC*,
533 B.R. 600, 628 (Bankr. W.D. Mich. 2015).................................................27

US_Active\121156344\V-6

*In re Forest Grove*, LLC,
    448 B.R. 729 (Bankr. D.S.C. 2011) ................................................22

*In re Galerie Des Monnaies of Geneva, Ltd.*,
    55 B.R. 253, 259 (Bankr. S.D.N.Y. 1985) ................................................21

*In re Goodman Bros. Steel Drum Co., Inc.*,
    247 B.R. 604 (Bankr. E.D.N.Y. 2000) ................................................21

*In re GSC, Inc.*,
    453 B.R. 132, 157 n. 27 (Bankr.S.D.N.Y.2011) ................................................17, 19

*In re Innkeepers USA Tr.*,
    442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010) ................................................27

*In re Michelson*,
    141 B.R. 715 (Bankr. E.D. Cal. 1992) ................................................22

*In re Moshe*,
    567 B.R. 438, 447 (Bankr. E.D.N.Y. 2017) ................................................17

*In re MSR Hotels & Resorts, Inc.*,
    No. 13-11512 (SHL), 2013 WL 5716897, (Bankr. S.D.N.Y. Oct. 1, 2013) ................................................27

*In re Pecht*,
    57 B.R. 137, 139 (Bankr. E.D. Va. 1986)) ................................................17

*In re Pine Lake Village Apartment Co.*,
    19 B.R. 819 (Bankr. S.D.N.Y. 1982), *reargument denied* 21 B.R. 478 ................................................19

*In re Prudential Energy Co.*,
    59 B.R. 765 (Bankr. S.D.N.Y. 1986) ................................................22

*In re Quigley Co.*,
    377 B.R. 110, 115 (Bankr.S.D.N.Y.2007) ................................................16, 17

*In re Ralph C. Tyler*,
    156 B.R. 995 (Bankr. N.D. Ohio 1993) ................................................19

*In re River Village Assocs.*,
    181 B.R. 795 (E.D. Pa. 1995) ................................................21

*In re Stanley Hotel, Inc.*,
    13 B.R. 926 (Bankr. D.Colo.1981) ................................................22

*Tex. Extrusion Corp. v. Lockheed Corp.* (*In re Tex. Extrusion Corp.*),
    844 F.2d 1142 (5th Cir. 1988) ................................................21

*In re Valrico Square Ltd. P'ship*,
    113 B.R. 794 (Bankr. S.D. Fla. 1990) .................................................................................20

*In re Vill. Red Rest. Corp.*,
    No. 18-10960 (MEW), 2021 WL 3889793 (Bankr. S.D.N.Y. Aug. 31, 2021) ......................23

*In re Weiss-Wolf, Inc.*,
    59 B.R. 653 (Bankr. S.D.N.Y. 1986) ...................................................................................20

**Statutes**

11 U.S.C § 363 ......................................................................................................23, 24, 29

11 U.S.C. § 549 ............................................................................................................16, 24

11 U.S.C. § 1124 ....................................................................................................18, 19, 20

11 U.S.C § 1125 ...............................................................................11, 12, 16, 21, 22, 26

11 U.S.C § 1129(a)(10) ................................................................................................27

**Other Authorities**

7 Collier on Bankruptcy P 1125.02 (16th 2022) ...........................................................26

Federal Rules of Bankruptcy Procedure
    Rule 2002(b) .........................................................................................................4

H.R. REP. 103-835, 48, 1994 U ...................................................................................19

iv

TH Holdco LLC ("TH Holdco") submits this combined response (the "Combined Response") to objections filed with respect to its *Motion to Approve (I) Adequacy of Information in the Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballots, and (IV) Certain Dates with Respect Thereto* [Docket No. 158] (the "TH Disclosure Statement Motion") and the related Disclosure Statement [Docket No. 152] (the "TH Disclosure Statement") and also hereby objects to the Debtors' recently filed Disclosure Statement [Docket No. 162] (the "Debtors Disclosure Statement"), and as follows:

## I.     PRELIMINARY STATEMENT[2]

1.    The Debtors filed these bankruptcy cases in December of 2020 on the same day as a scheduled UCC foreclosure auction by the Mezz Lender. The docket has sat largely dormant during the past 16 months despite the fact that this is a relatively straightforward real estate case.

2.    In mid-October of 2021, after repeated delays and extensions and 9 months after these cases were filed, the Debtors obtained Court approval to retain Jones Long LaSalle ("JLL") as a real estate advisor to market and sell the Hotel Property and the Residential Property (together, the "Property"). The Debtors' exclusivity terminated on November 25, 2021 and their solicitation period terminated on January 25, 2022.[3] While the Debtors filed a plan during that period, they did not file a disclosure statement or sale and bid procedures for their sale based plan. The Debtors now claim, in their objection to the TH Disclosure Statement Motion [Docket No. 166 at pp. 3-4] that JLL's marketing resulted in three bids, and that they were in the process of negotiating an LOI with a final bidder at a price of allegedly $87.5 million when the senior mortgage debt was traded

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such term in the Debtors' *Amended Plan of Reorganization* [Docket No. 161] (the "Amended Plan").

[3] *See Order Extending Exclusive Right to File a Plan of Reorganization and To Solicit Acceptances for the Debtors' Plan and For Related Relief* [Docket No. 125].

1

(after the Debtors' exclusivity terminated).  The Debtors do not disclose any additional details concerning their purported negotiations with any of the bidders, do not provide a copy of the draft LOI, and do not furnish any details regarding any of the LOI's terms, including whether any due diligence, financing or other material closing conditions were required.

3.      Also in mid-October 2021, Franco Famularo, an executive with Ohana Real Estate (an affiliate of TH Holdco), had discussions with Isaac Hager, a minority owner of the 85 Flatbush RHO Mezz LLC (the "Mezz Debtor"), who purported to have authority to represent the Debtors, and met with Mr. Hager for an on-site tour of the Property.  *See* Declaration of Franco Famularo filed in support of this Combined Response at ¶3.  During these discussions, on behalf of the Debtors, Mr. Hager demanded that as part of any bid from Ohana or its nominee, the owners of the Mezz Debtor be "made whole" by a payment of at least $20 million, including at least $15 million of cash consideration. *Id.*  Mr. Hager asserted that payment must be made for the benefit of equity, even though the Debtors did not expect creditors to be paid in full, and required that any deal was predicated on Mr. Hager remaining as an investor in the Property.  *Id.*  When Mr. Famularo asked Mr. Hager why the Debtors expected a full recovery including a substantial cash payment when the creditors were being impaired, Mr. Hager represented that a separate rabbinical court ruling regarding a settlement between Mr. Hager and the majority owner of the Property effectively took precedence over the bankruptcy court process.[4] *Id.*  At no point did the Debtors' refer Ohana to JLL, suggest that Ohana negotiate through JLL, or propose that Ohana be a stalking horse bidder to acquire the Property.  *Id.* at ¶4.  Ohana considered the Debtors' demands to be

---

[4] As this Court has previously held, rabbinical court proceedings are a violation of the automatic stay, and any decrees issued by a rabbinical court in violation of the automatic stay are void *ab initio.  See generally, In re Congregation Birchos Yosef*, Memorandum of Decision on Debtor's Motion to Enforce the Automatic Stay, Case No. 15-22254-rdd, Docket No. 123; *aff'd* 699 F. App'x 91, 92 (2d Cir. 2017) (summary order).

2

unrealistic and improper, and determined that further negotiations with Debtors would not be productive. *Id.*

4.      Ohana thereafter continued to perform due diligence on the Property based on publicly available information (including key pleadings in the Bankruptcy Case docket and claims registers) and information provided by the then current senior lender, 85 Flatbush Avenue 1 LLC (the "Pre-petition Lender"). *Id.* at ¶5.

5.      On November 3, 2021, Mr. Famularo was forwarded an unsolicited email from a real estate broker in New York City (not JLL) (the "November Email"). *Id.* at ¶6. This email was originally sent by the broker to Chris Smith of Ohana, and the broker was soliciting interest from Ohana to provide capital to back the Debtors' business plan to seek a longer-term lease with DHS. The unsolicited email from the broker included information that clearly came from the Debtors, including (i) a market appraisal valuing the Property at $94 million as of September 11, 2019 (from the Debtors' original acquisition financing process) and (ii) a form of a DHS Lease which appears to be terminable at any time by DHS. This broker appears to be acting for the Debtors and/or its principals outside of the JLL process and in support of an insider bid. *Id.* A copy of the November Email with relevant portions of attachments is attached hereto as Exhibit 1[5]. Ohana did not engage with the broker at that time.

6.      Separately, in early January 2022, Mr. Famularo received an unsolicited call from that same real estate broker in New York City (not JLL) who claimed to represent the Debtors. *Id.* at ¶7. Without knowing about Ohana's familiarity with the Property and ongoing due diligence or acknowledging the November Email, that broker stated that he was helping the Debtors find mezzanine debt and equity to help them maintain ownership of the property. *Id.* Mr. Famularo

---

[5] A complete copy of the appraisal, which is voluminous, can be provided upon request.

again declined to engage further, but it was apparent that the Debtors were still acting outside of the JLL process in an attempt to retain ownership of the property.  *Id.*

7.      All of the above made clear that the Debtors' principals and affiliates were interested only in maximizing recovery to equity and were putting their own interests ahead of those of the creditors.  This was concerning to Ohana, as was the Debtors' failure to move their sale plan along (by, for example, not filing a disclosure statement within the exclusivity period). *Id.* at ¶8.  As such, through its affiliate TH Holdco, Ohana purchased the debt directly from the Pre-petition Lender after the Debtors' exclusivity expired.  *Id.*

8.      Now, in the face of potentially losing the Property, and over two months after TH Holdco's purchase of the Debt, the Debtors have filed the Amended Plan, which is clearly not fully developed and is in no position to be voted on or confirmed.   Nonetheless, the Debtors seek approval of their Disclosure Statement on a mere seven days' notice – a full 21 days shy of the 28 days required under Bankruptcy Rule 2002(b).  The Debtors' motion to shorten notice [Docket No. 164] provides little if any justification for such extreme and possibly prejudicial relief.

9.      The Debtors' actions to date demonstrate that their principals were never genuinely interested selling the Property and getting the creditors paid unless there was something in it for them as the out of the money equity.  Indeed, the Debtors have taken a host of actions designed to chill bidding on the Property, including (i) the Debtors' decision to lease the Property to the New York City Department of Homeless Services ("DHS"), (ii) the Debtors' decision to keep the apartment units vacant despite a dramatically improved leasing environment[6], and (iii) the Debtors' decision to vacate the Hotel for much of the second half of 2021 while comparable hotel

---

[6] The Debtors acknowledge entering into a month-to-month lease with DHS (Debtors' Disclosure Statement at 11). This post-petition action, taken without notice and a hearing or Bankruptcy Court approval, would also appear to be designed to chill bidding.

properties in Brooklyn operated at a 75% average occupancy between June 2021 and December 2021.[7] What is clear from the last 16 months is that the Debtors have been intentionally stalling the bankruptcy cases in order to buy time to allow them to raise the funds needed to refinance the Property. With pressure now mounting as a result of the TH Plan (defined below), the Debtors have filed their own Amended Plan, which lacks the concrete information as to feasibility that would be necessary for creditors to have adequate information to vote on that plan.

10.    TH Holdco is filing an improved and further slightly amended plan concurrently with this Combined Response and a redline showing changes from the original TH Plan filed on February 20, 2022. The TH Plan is feasible, provides a means to conclude these cases by June 2022, and ensures payment in full of priority tax claims and, Chapter 11 administrative expenses as well as unsecured claims in the hotel and residential cases.

11.    The main improvements are (i) increasing TH Holdco's credit bid to $90 million, (ii) increasing the upfront cash pool for Class 6 (85 Flatbush RHO Hotel General Unsecured Claims) and Class 8 (85 Flatbush RHO Residential General Unsecured Claims) from $200,000 to $1,250,000 as an initial distribution to those unsecured creditors and providing that those claims will be paid in full with interest (including additional cash from TH Holdco ownership if needed) by the first anniversary of the Effective Date and (iii) making certain changes to the Transfer Tax exemption informally requested by the New York State Department of Taxation and Finance.

12.    The Debtors' Amended Plan, by contrast, is not feasible and violates the absolute priority rule and other confirmation requirements. First, the Debtors' payoff calculation of TH Holdco's Secured Claim is wrong, as the Debtors incorrectly assert that TH Holdco is not entitled to default interest on account of its claim, despite having agreed to default interest in the Final

---

[7] *See* Smith Travel Research (a leading provider of market data on the hotel industry).

Cash Collateral Order (defined below).  Given this, the Debtors' Plan Fund is simply not sufficient to fund outstanding secured, administrative and priority claims, rendering the Amended Plan not feasible.

13.     Further, while the Amended Plan teases a 100% recovery for unsecured creditors, such recovery is entirely uncertain because (i) it is premised on the occurrence of future events that may never happen (*i.e.* (a) closing on $78,000,000 of Exit Financing, (b) approximately $10 million of new value contributed by existing equity and (c) execution of an "anticipated" lease with DHS, and related cash flow therefrom) and (ii) it provides that holders of allowed general unsecured claims will be paid "on or the later of one (1) year from the Effective Date" and the date on which such claim becomes an allowed claim.  The Amended Plan does not disclose the terms of the Exit Financing, the DHS Lease, or provide evidence of the funding sources for the Debtors' new equity investment, and such information will not be disclosed until after voting is complete.[8] The Amended Plan also wrongly characterizes unsecured creditors as unimpaired, thereby stripping them of their opportunity to vote on a plan which may not be feasible and which does not pay them in full in cash on the Effective Date, as is necessary for unimpaired status.

14.     As discussed below, Courts in this Circuit, and other courts agree that a disclosure statement describing a plan that cannot be confirmed cannot be approved, regardless of the amount of disclosure it contains.  Because the Debtors' Amended Plan cannot be confirmed, the Debtors' Disclosure Statement cannot be approved.

## II.     **BACKGROUND**

15.     The Debtors filed these bankruptcy cases on December 18, 2020 (the "Petition

---

[8] The Debtors' Disclosure Statement provides that the Exit Financing Term Sheet and the DHS Lease are exhibits to the Disclosure Statement, but further provides that those exhibits will be included in a Plan Supplement, which will not be filed until five business days prior to the Confirmation Hearing.

Date").

16.     On March 29, 2021, this Court entered the *Final Consent Order Authorizing (I) Use of Cash Collateral, (II) Granting Adequate Protection, and (III) Granting Related Relief* [Docket No. 64] (the "Final Cash Collateral Order"), which at paragraph 14, provides that "the Debtors and the Lender agree that as of the Petition Date, the principal amount of the Lender's claims against the estates of the Debtors is $85,158,815.99 (the "Lender Claim").  The Final Cash Collateral Order lists the components of the Lender Claim, which clearly include default interest, and provides that the Lender Claim will "continue to accrue interest and additional charges pursuant to and under the Loan Documents."  The Debtors further go on to "acknowledge and agree that the Lender has a valid and enforceable lien on the Property."

17.     On March 31, 2021 and August 17, 2021 respectively, the Debtors filed motions to extend the exclusivity period.  [*See* Docket Nos. 65 and 103].  Per the Court's Order dated September 15, 2021 [Docket No. 124], the Debtors plan and voting solicitation exclusivity terminated on January 25, 2022.

18.     On January 28, 2022, TH Holdco purchased that certain proof of claim number 3 filed by the Pre-petition Lender evidencing the first priority mortgage loan and secured note encumbering the Property (the "TH Holdco Mortgage") and took assignment of the Consolidated, Amended and Restated Note dated September 19, 2019 (together, the "Prepetition Secured Claim").

19.     On February 4, 2022, TH Holdco filed a Bankruptcy Rule 3001 Notice of Transfer of Claim, which disclosed the sale of the TH Holdco Mortgage.  [Docket No. 24, Case No. 20-23281].  On February 6, 2022, the Debtors and 85 Flatbush Mezz (the "Mezz Lender") received additional notice of the deadline to object to the transfer.  [Docket No. 25, Case No. 20-23281].

7

US_Active\121156344\V-6

Neither the Debtors nor the Mezz Lender[9] filed an objection to the notice.

20.    On February 20, 2022, *TH Holdco filed its Chapter 11 Plan Filed by Creditor TH Holdco LLC* [Docket No. 151] (the "TH Plan") and the related Disclosure Statement.  TH Holdco filed the TH Disclosure Statement Motion on February 24, 2022.  Objections were due by March 24, 2022 at 4:00 p.m. (prevailing Eastern Time), which was the full 28 day notice period.

21.    On March 23, 2022, the Mezz Lender filed that certain *Adversary Complaint by Mezzanine Lender for Declaratory Judgement and Specific Performance to Enforce Certain Purchase Option Rights Under the Parties' Intercreditor Agreement* [Adv. Pro. No. 22-07022, Docket No. 1].

22.    On March 24, 2022, the Mezz Lender filed its Objection to the TH Disclosure Statement Motion [Docket No. 160] (the "Mezz Objection").

23.    On March 30, 2022, the Debtors filed their objection to the TH Disclosure Statement Motion [Docket No. 166] six days after the deadline.  That same day, the Debtors filed the Amended Plan and corresponding Debtors' Disclosure Statement.

24.    The New York State Department of Taxation and Finance (the "NYS Dept. of Taxation") has filed proofs of claim totaling at least $1.8 million in outstanding administrative tax claims.  [*See* Claim Nos. 1, 7 and 14-1 filed in the Debtors' cases].  To date, the Debtors have not filed tax returns, which are necessary to calculate amounts that will be owed in order to effectuate any plan.  The NYS Dept. of Taxation advised TH Holdco's counsel that they have been asking that those tax returns be filed since early in these cases.  The Debtors in their Disclosure Statement

---

[9] The Mezz Lender is party to that certain Intercreditor Agreement, dated September 19, 2019 (the "ICA"), a copy of which is attached at Docket No. 1-1 in the Adversary Proceeding.  Pursuant to Section 4(c) of the ICA, Pre-petition Lender had the right, "in its sole and absolute discretion and without any prior notice of Mezzanine Lender" to transfer all or any portion of the Senior Loan, provided that the direct transferee (i.e., TH Holdco) assumed in writing the obligations of Senior Lender under the ICA accruing from and after such transfer.  ICA § 4(c).  TH Holdco reserves all rights and remedies under the ICA.

state that to "the extent tax returns are required for the tax periods asserted, Debtors will arrange for returns to be prepared and filed and to reconcile with New York State regarding the actual priority amounts due, if any." *See* Debtors Disclosure Statement, p. 18. This appears to be another delay tactic and failure to move this case along.

## III.    <u>ARGUMENT</u>

**A.**    ***Response to Mezz Objection to TH Disclosure Statement Motion***

25.    The Mezz Objection, which is based on an adversary proceeding filed by Mezz Lender [Case No. 22-07022] (the "<u>Adversary Proceeding</u>"), is both improper and without merit.

26.    Pursuant to the ICA, Mezz Lender is prohibited from objecting to the TH Plan (and was prohibited from commencing the Adversary Proceeding). Specifically, under the ICA, it is a Mezzanine Lender Intercreditor Event of Default if Mezz Lender shall "object to, oppose, hinder, contest, interfere with or seek to enjoin or restrain . . . the exercise of rights or remedies by [TH Holdco] under the Senior Loan Documents while any Senior Event of Default or Continuing Senior Event of Default exists . . . ." Because TH Holdco is seeking to enforce and collect on the outstanding Senior Loan via the TH Plan, and the Mezz Objection and Adversary Proceeding, at minimum, seek to hinder or delay confirmation of the TH, the Mezz Objection and the Adversary Proceeding violate the ICA.

27.    Additionally, the Mezz Objection and the Adversary Proceeding violate Section 9(d) of the ICA, which provides, in relevant part, that Mezz Lender "shall not . . . take any other action in any Proceeding by or against Borrower," *i.e.*, in any bankruptcy proceeding by or against 85 Flatbush RHO Hotel LLC and 85 Flatbush RHO Residential LLC, "without the prior written consent of" TH Holdco. Because TH Holdco did not provide its written consent to the Mezz Objection or the Adversary Proceeding, they were filed in contravention of the ICA.

28.    Moreover, the Mezz Objection is essentially an objection to TH Holdco's

9

Bankruptcy Rule 3001 Notice of Transfer of Claim, rather than a legitimate objection to the adequacy of the TH Disclosure Statement. *See, e.g.,* Mezz Objection at ¶ 6 (claiming that TH Holdco lacks "standing to enforce rights under the Senior Loan that belong instead to [Mezz] Lender"). Having failed to object to the Notice of Transfer of Claim within the authorized time period (which has long since expired), Mezz Lender cannot now do so under the guise of the Mezz Objection.

29.     Further, and in any event, there is no reason that the Adversary Proceeding -- which is nothing more than a transparent attempt by Mezz Lender to extract holdup value from its out of the money position -- should delay the solicitation of votes on the TH Plan.

30.     There can be no dispute that, at this juncture, TH Holdco holds title to the claims against the Debtors. Pursuant to Section 4(c) of the ICA, Pre-petition Lender had the right, "in its sole and absolute discretion and without any prior notice to [Mezz] Lender" to transfer all or any portion of the Senior Loan. ICA § 4(c). Thus, contrary to Mezz Lender's conclusory contentions, the sale of the TH Holdco Mortgage did not breach the ICA, Mezz Objection at ¶ 3, TH Holdco's purchase of the TH Holdco Mortgage was not "subject to [Mezz] Lender's purchase option rights[,]" Mezz Objection at ¶ 4, and TH Holdco's right to enforce the TH Holdco Mortgage does not "belong instead" to Mezz Lender, Mezz Objection at ¶¶ 6. The TH Plan, therefore, is not "patently unconfirmable" as Mezz Lender suggests.

31.     Finally, the premise of the Adversary Proceeding -- that Mezz Lender is entitled to retroactively invoke its purchase option rights and purchase the Senior Loan based on a purchase price calculated as of July 2020 -- is fundamentally flawed for a host of reasons.

32.     *First*, Mezz Lender's claims are directly contrary to the plain language of the ICA which provides, at the loan purchase price is to be determined on the date that the Mezz Lender

purchases the Senior Loan, and that "[t]he failure of Senior Lender to provide a Purchase Notice to Mezzanine Lender regarding the occurrence of a Purchase Option Event shall have no adverse effect on Senior Lender other than the resulting extension of the time in which the Purchase Notice may be given." *Second*, Mezz Lender was not ready, willing and able to consummate the purchase of the Senior Loan in July of 2020 or thereafter because, among other things, Mezz Lender did not have the funds to consummate the purchase of Senior Loan. *Third*, pursuant to the terms of the ICA, Mezz Lender was not entitled to exercise the loan purchase option or consummate the purchase of the Senior Loan because it had breached several terms of the ICA, including but not limited to its obligation to provide Pre-Petition Lender with notices concerning its enforcement actions against the equity collateral. *Fourth*, Mezz Lender's claims are barred by equitable doctrines such as laches, unconscionable or inexcusable delay, bad faith, and unclean hands, because Mezz Lender failed to assert its rights for almost two years, despite being aware of each and every event that would give rise to its purchase option right. *Fifth*, Mezz Lender's claims are barred by waiver and/or estoppel because Mezz Lender failed to object to the transfer of the Senior Loan to TH Holdco at the time it was notified thereof.[10]

33.    While TH Holdco maintains that the Adversary Proceeding is meritless, for purposes of meeting the requirement that the TH Disclosure Statement contain "adequate information" under Section 1125, TH Holdco is amenable to inserting the following language in the TH Disclosure Statement:

> On March 23, 2022, Mezz Lender filed an adversary proceeding against TH Holdco alleging that 85 Flatbush Avenue failed to send Mezz Lender purchase option notices pursuant to the ICA in July of 2020, August of 2020 and December of 2020, and that Mezz Lender retains the right to purchase the Senior Loan at the loan purchase price calculated as of July 16, 2020.

---

[10] The facts underlying these defenses, as well as additional defenses, are detailed more fully in TH Holdco's Answer to the Complaint which is being filed in the Adversary Proceeding today.

TH Holdco believes that the Mezz Lender Adversary Proceeding lacks merit and will be promptly dismissed because, among other things, (i) Mezz Lender's claims are contrary to the express terms of the ICA, (ii) Mezz Lender was not ready, willing and able to consummate the purchase of the Senior Loan on closing date contemplated by the ICA, including because it did not have the funds to consummate the purchase, (iii) pursuant to the ICA, Mezz Lender was not entitled to exercise the loan purchase option or consummate the purchase of the senior loan because of various events of default, and (iv) Mezz Lender's claims are barred by equitable doctrines such as laches, unconscionable or inexcusable delay, bad faith, unclean hands, waiver and estoppel.

A ruling on the Mezz Lender Adversary Proceedings, however, is not a condition to confirmation of the TH Holdco Plan.

34.     TH Holdco is filing an answer and affirmative defenses in the Adversary Proceeding today and is prepared to promptly litigate the Adversary Proceeding to conclusion prior to confirmation of any chapter 11 plan.

35.     TH Holdco reserves all other rights and remedies and damages as against the Mezz Lender under the ICA, at law, in equity or otherwise, including without limitation, (i) arising from the fact that the Mezz Lender's Adversary Proceeding and the Mezz Objection violate the ICA and (ii) arising from any future actions by the Mezz Lender in opposition to the TH Plan or in support of the Debtors' Amended Plan are violations of the ICA.

**B.     *Response to Debtors' Objection to TH Disclosure Statement Motion***

36.     The Debtors argue that the TH Disclosure Statement does not provide sufficient information, as required by Section 1125 of the Bankruptcy Code.  TH Holdco disagrees with this contention, but nonetheless includes below (and in the Amended Disclosure Statement being filed today) a response addressing each of the alleged deficiencies.

| Debtors' Allege TH Disclosure Statement fails to: | TH Holdco's Response |
|---|---|
| Disclose any information with respect to the post confirmation auction and sale process for | Bidding procedures are being added as an exhibit to the Amended Disclosure Statement |

| Debtors' Allege TH Disclosure Statement fails to: | TH Holdco's Response |
|---|---|
| the Property | and are based on bidding procedures approved by this Court in the East Village case. [*See* In re East Village Properties LLC, Docket No 17-22453-rdd]. |
| Disclose any information on the marketing of the Property in advance of the post-confirmation auction and sale of the Property | A proposed form of Purchase Agreement again based on the one approved by this Court in the East Village case is being filed as an exhibit to the Amended Disclosure Statement along with additional description of the auction process. [*See* In re East Village Properties LLC, Docket No 17-22453-rdd]. |
| Provide information related to TH's purported claim for post-petition interest, attorney's fees and costs and pre-payment fees other than to note: "To be provided at Disclosure Statement Hearing" | Additional information has been provided on post-petition accruals in the Amended Disclosure Statement. |
| Disclose if it intends to confirm the Mezz component of the Plan; | There do not appear to be sufficient proceeds for a distribution to the Mezz Lender. Any recovery which would otherwise go to the Mezz Lender belong to TH Holdco under the ICA. The Debtors cannot amend the ICA through a Chapter 11 plan. |
| Disclose how TH is entitled to credit bid for the Property in the amount of "at least $85 million" | The basis of TH Holdco's pre-petition and post-petition claims are set forth in the Amended Disclosure Statement. Credit bidding is a matter of right under the senior loan documents and applicable case law. The senior liens are specifically acknowledged and agreed in the Final Cash Collateral Order. The Debtors initial plan specifically contemplated a credit bid by the Pre-Petition Lender and provided that any reference in that plan to the Pre-Petition Lender included any nominee, designee or assignee of the Pre-Petition Lender to whom the Pre-Petition Lender has assigned or transferred its claim for purpose of making a credit bid [*See* Docket No. 142 at 2]. |
| Disclose how TH came to acquire the senior loan from the Pre-Petition Lender | Additional detail has been added to the Amended Disclosure Statement on this point. |

13

| Debtors' Allege TH Disclosure Statement fails to: | TH Holdco's Response |
|---|---|
| Disclose why any post-petition agreement entered into by the Debtors is (i) outside of the ordinary course of their approval; and (ii) why they would be void or voidable under §549 of the Bankruptcy Code | This is a matter of law and is now addressed below in this Combined Response with supporting case law. |
| Disclose why TH Holdco is entitled to pre-petition and post-petition interest, costs and fees in connection with its treatment under the Plan in the event the Hotel Property and/or Residential Property is sold to a party other than TH Holdco | TH Holdco is entitled to this under the Final Cash Collateral Order and applicable law. Additional explanation has been added in the Amended Disclosure Statement. |
| Disclose why the New York City secured tax claims in Classes 4 and 5 are impaired and not being paid in full | The TH Plan pays these claims in full under the Priority Tax Treatment and in its Amended Plan, also provides that Allowed Claims in Classes 4 and 5 will be paid in full on the Effective Date. |
| Disclose any estimate of the amount of the Plan Fund which is the source of payment to all classes of creditors under the TH Plan. The Plan Fund is defined as: "the aggregate of: (1) the Sale Proceeds, which shall be allocable to the Hotel Property and/or the Residential Property as set forth in the Purchase Agreement; (2) the TH Holdco Additional Consideration; and (3) the Debtors' available Cash which shall be utilized to make payments to creditors in accordance with the terms of the Plan." | Additional detail has been provided on this point in the Amended Disclosure Statement. |
| Disclose why the Plan satisfies the Best Interests Test when TH acknowledges the "continuing adverse impact on the hospitality industry as a whole" which implicates the value of the Hotel Property and Residential Property, and TH's intentions with respect to the Debtors' future operations while the Debtors' Plan provides for guaranteed rental income from the DHS Lease | The best interests test is sufficient and shows that the recovery under the TH Plan is much higher than a recovery in a Chapter 7 case. TH Holdco's owners, with large financial resources, are providing the funding for the TH Plan.  So creditor payments under the TH Plan are not dependent on future operations. |
| Demonstrate feasibility of the Plan, particularly the amount TH would fund for payment of Chapter 11 Administrative Expenses, and Priority Claims and its financial wherewithal to fund any such amounts | TH Holdco requested this information several times through Debtors' counsel starting in early February, 2022.  *See* email chain attached as <u>Exhibit 2</u> hereto. Debtors' counsel provided the attached response minutes prior to this filing. *Id.*  Requiring the Debtors' to |

14

| Debtors' Allege TH Disclosure Statement fails to: | TH Holdco's Response |
|---|---|
| | set an administrative claims bar date for mid May 2022 would provide better information to the Court and the parties to evaluate both plans. TH Holdco is adding the numbers from the Debtors Liquidation Analysis (Debtors' Disclosure Statement at 53) including $398,654.32 for Chapter 11 Administrative Claims and $633,682.55 for Priority Unsecured Claims. These amounts do not specify which Estate or Estates they relate to. |
| Disclose a current appraised value of the Hotel Property and Residential Property | No appraisal is required. The JLL marketing process and TH Holdco bid are both current market tests. The Debtors state that the JLL process resulted in three offers around $80 million. The fact that the Debtors only think they can raise $78 million of debt financing (if they can actually do so) is also a market sign of the value of the Properties. The Debtors assert that the final bid they were in the process of negotiating was for $87.5 million. The Debtors assert that they were in the process of negotiating a bid for $87.5 million. The Debtors' or their principals, through an alternative broker, also provided a pre-pandemic appraisal for the Property valuing the Property at $94 million as of September 2019. |
| Address the issues related to the intercreditor agreement between TH Holdco and the Mezz Lender as raised by the recently filed adversary proceeding filed by Mezz against TH Holdco | TH Holdco is filing an answer in the Adversary Proceeding today. The Adversary Proceeding lacks merit for several reasons, including without limitation that (i) Mezz Lender's claims are contrary to the express terms of the ICA, (ii) Mezz Lender was not ready, willing and able to consummate the purchase of the Senior Loan in July of 2020 or thereafter, including because it did not have the funds to consummate the purchase, (iii) pursuant to the ICA, Mezz Lender was not entitled to exercise the loan purchase option or consummate the purchase of the senior loan because of various breaches of the ICA by Mezz Lender, and (iv) Mezz Lender's |

15

| Debtors' Allege TH Disclosure Statement fails to: | TH Holdco's Response |
|---|---|
| | claims are barred by equitable doctrines such as laches, unconscionable or inexcusable delay, bad faith, unclean hands, waiver and estoppel.<br><br>The Adversary Proceeding can be decided prior to the confirmation hearing and is not a basis to prevent the TH Plan from being considered by and voted upon by the creditors pending a June 2022 confirmation date |

37.     The TH Disclosure Statement supports a feasible plan and discloses a guaranteed minimum of what creditors will recover under the TH Plan. The TH Disclosure Statement provides sufficient information on which creditors can assess the validity and merits of the TH Plan. Accordingly, the TH Disclosure Statement should be approved and sent out for voting by the impaired creditors.

**C.      *Objection to Debtors' Disclosure Statement***

38.     There are two general bases on which a disclosure statement should not be approved: (i) the underlying plan is patently unconfirmable; and (ii) the disclosure statement does not contain adequate information. *See* 11 U.S.C. § 1125(a)(1); *In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) (stating that courts will not approve a disclosure statement that describes a "patently unconfirmable" plan, which is on its face, incapable of confirmation as a matter of law). Here, both reasons exist.

*(i)      The Debtors' Amended Plan is Not Feasible*

39.     It is black letter law that a disclosure statement describing a plan that cannot be confirmed cannot be approved, regardless of the amount of disclosure it contains. *See, e.g.*, *In re 18 RVC, LLC*, 485 B.R. 492, 495 (Bankr. E.D.N.Y. 2012) ("a bankruptcy court should not approve a disclosure statement if the proposed plan which it describes is incapable of confirmation.")

16

(citing *In re GSC, Inc.*, 453 B.R. 132, 157 n. 27 (Bankr.S.D.N.Y.2011) and *Quigley*, 377 B.R. at

115; *see also In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012).  Courts may deny

approval of disclosure statements where the plans they describe are "patently unconfirmable." *See,*

*e.g., In re Moshe*, 567 B.R. 438, 447 (Bankr. E.D.N.Y. 2017) (denying approval of disclosure

statement where plan failed to provide for appropriate rate of interest on cure payments).  "A plan

is patently unconfirmable where (1) confirmation defects  cannot be overcome by creditor voting

results and (2) those defects concern matters upon which all material facts are not in dispute or

have been fully developed at the disclosure statement hearing." *Am. Capital Equip.*, LLC, 688

F.3d at 154–55. Soliciting votes on an unconfirmable plan "would be futile," *Quigley*, 377 B.R. at

116, and it is therefore "incumbent upon the court to decline approval of the disclosure statement

and prevent diminution of the estate." *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986)).

40.    There are several reasons why the Amended Plan is not feasible.  First, the

Amended Plan is unconfirmable because it is predicated on an intentionally improper calculation

of the TH Holdco Secured Claim and is in direct violation of the Final Cash Collateral Order.  The

Debtors' Disclosure Statement provides that the Plan Fund, estimated to be approximately $88.6

million, "will be sufficient to satisfy the Allowed TH Holdco Secured Claim and all other Allowed

Claims of Mezz, Hotel and Residential in full."  Debtors' Disclosure Statement at 7.  The Debtors'

Disclosure Statement allocates $83,517,778 for the Class 3 TH Holdco Secured Claim (an amount

calculated by denying TH Holdco interest at the default rate, which it is entitled to).  But the

Disclosure Statement does not provide sufficient information to support the Debtors' contention

that TH Holdco is not entitled to default interest or an explanation absent its improper position on

the calculation of the TH Holdco Secured Claim, the Debtors lack sufficient funding to confirm

the Amended Plan.

17

41.    TH Holdco is entitled to default interest on account of its claim because (i) such interest is provided for per the terms of the TH Holdco Prepetition Loan Agreement, and (ii) the Debtors agreed to provide default interest in the Final Cash Collateral Order.  That order totals the Lender Claim at $85,158,815.99 as of the Petition Date and specifically *includes* a calculation of default interest for the period February 2020 to the Petition Date in December 2020.  The defaults that existed for 10 months pre-petition in 2020 were not cured and continued throughout these cases.  So interest would also be calculated at the default rate post-petition as well.  In the Final Cash Collateral Order, the Debtors expressly agreed that the Lender Claim would continue to accrue interest and additional charges, which this Court approved.  The Debtors cannot simply ignore the terms of the final and non-appealable Final Cash Collateral Order or seek to modify or vacate it over a year after it was entered.  Since the calculation of TH Holdco's Secured Claim is much higher than reflected in the Debtors' Amended Plan (even just based on the $85.1 million agreed pre-petition claim amount), the Debtors' Plan Fund is insufficient and the Amended Plan cannot be confirmed.

42.    Second, the Amended Plan is not feasible because the Debtors wrongly classify unsecured creditors as unimpaired and denies such creditors the right to vote.  The Debtors' Disclosure Statement provides that Holders of Allowed General Unsecured Claims will be paid "on or the later of one (1) year from the Effective Date" and the date on which such claim becomes an allowed claim and not in full in cash on the Effective Date of the Debtors Plan.  *See* Disclosure Statement at 20.  This delay of payment constitutes impairment.

43.    Under Section 1124 of the Bankruptcy Code, "a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan . . . leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles

the holder of such claim or interest." 11 U.S.C. § 1124(1). Any alteration of these rights constitutes impairment, even if the value of the rights is enhanced. *GSC, Inc.*, 453 B.R. at 177. Section 1124(1) cannot be used as a basis for categorizing costs as unimpaired, and therefore to deem such class to have accepted the plan. *See In re Ralph C. Tyler*, 156 B.R. 995 (Bankr. N.D. Ohio 1993).

44.     Former Section 1124(3) provided that a claim was not impaired if a plan provided for cash payment to the creditor in the amount of the allowed claim on the plan's effective date. This "cash out" exception was deleted as part of the 1994 amendments to Bankruptcy Code. However, legislative history makes clear that the deletion of Section 1124(3) was Congress's mechanism for eliminating ambiguity in Section 1124 regarding whether a class could be considered unimpaired if the claims were to be paid in full on the effective date, but without postpetition interest. H.R. REP. 103-835, 48, 1994 U.S.C.C.A.N. 3340, 3356. Thus, Section 1124(1) requires that a class be paid in full on the effective date of the plan, plus receive postpetition interest, to be deemed unimpaired. *Id.* Any class is deemed impaired if such class (i) is not paid in full on the effective date, or (ii) will not receive postpetition interest on their claim. 11 U.S.C. § 1124(1); *see also In re Pine Lake Village Apartment Co*., 19 B.R. 819 (Bankr. S.D.N.Y. 1982), *reargument denied* 21 B.R. 478 (where proposed repayment of deficiency claim would not be made in cash on the effective date of the plan to extent of the allowed amount, mortgagee's claim did not fall within the impairment exclusion for full cash payment); *In re Country U.S.A., Inc*., 74 B.R. 28, 29 (Bankr. S.D. Fla. 1987) (class of claims that debtors proposed to pay in quarterly installments, beginning 90 days after effective date of plan, constituted "impaired" class of claims).

45.     A disclosure statement should not be approved where the proposed plan provides

19

for the improper classifications of claims. *In re Weiss-Wolf, Inc.*, 59 B.R. 653, 655 (Bankr. S.D.N.Y. 1986) (not approving disclosure statement where claims were improperly classified and stating that "nothing precludes" considering the proper classification of claims "at an early point in an appropriate case"); *18 RVC, LLC*, 485 B.R. at 495 (declining to approve disclosure statement where claims were improperly classified and stating that "a bankruptcy court should not approve a disclosure statement if the proposed plan which it describes is incapable of confirmation"); *In re Valrico Square Ltd. P'ship*, 113 B.R. 794 (Bankr. S.D. Fla. 1990) (stating that the issue of proper or improper classification of claims did not have to be deferred for consideration confirmation hearing, as deferral would merely delay consideration of inevitable objection at cost to creditors).

46.     Given the clear statutory language of Section 1124, the Debtors' Class 6 and 8 general unsecured claimants are improperly classified. The Debtors' Disclosure Statement therefore should not be approved.

(ii)     *The Debtors' Amended Plan is Unconfirmable Given That It Violates the Absolute Priority Rule*

47.     TH Holdco is currently owed over $107 million (and ongoing accrued interest and costs) would need to be paid in full in cash before there could be any distribution to the Mezz Lender. The Debtors' Amended Plan and Disclosure Statement provide for a return to the Mezz Lender. But for so long as an amount up to the full face amount of the TH Holdco Secured Claim remains outstanding to TH Holdco (including all post-petition interests and costs allowed by the ICA), the Mezz Lender is not entitled to any payment and any such proposed payment under the Debtors' Amended Plan violates the absolute priority rule. Therefore, any amount that the Debtors propose to pay to the Mezz Lender under the Amended Plan would need to then be paid over to TH Holdco. The Debtors cannot rewrite or modify the ICA through a Chapter 11 plan.

20

(iii)    *The Disclosure Statement Does Not Contain Sufficient Information*

48.    Section 1125(b) of the Bankruptcy Code conditions solicitation of a plan upon "a written disclosure statement approved . . . by the court as containing adequate information." 11 U.S.C. § 1125(b).  Section 1125(a) of the Bankruptcy Code defines "adequate information" as information "in sufficient detail, as far as is reasonably practicable . . . that would enable [] a hypothetical investor . . . to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1).

49.    A disclosure statement is "a most important step in reorganizations and . . . must include facts informing its creditors of the financial results of acceptance or rejection of a plan." *In re Goodman Bros. Steel Drum Co., Inc.*, 247 B.R. 604, 610 (Bankr. E.D.N.Y. 2000) (citing *In re Galerie Des Monnaies of Geneva, Ltd.*, 55 B.R. 253, 259 (Bankr. S.D.N.Y. 1985)).  The disclosure statement "is relied on by both the creditors of the debtor before they vote on the plan of reorganization, and by the bankruptcy court before approving it.  Given this reliance, it is crucial that a debtor be absolutely truthful so that the disclosure statement meets the Code standard in § 1125 of enabling '... a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan ...'").  *Galerie Des Monnaies of Geneva,* 55 B.R. at 259.  "Accordingly, disclosure statements must contain factual support for any opinions contained therein since opinions alone do not provide the parties voting on the plan with sufficient information upon which to formulate decisions.  *In re Avianca Holdings S.A.*, 632 B.R. 124, 130 (Bankr. S.D.N.Y. 2021) (citing 7 Collier on Bankruptcy ¶ 1125.02[2]).

50.    Whether a disclosure statement contains adequate information for purposes of section 1125 of the Bankruptcy Code is within the sole discretion of the Bankruptcy Court and is to be determined on a case by case basis.  *Tex. Extrusion Corp. v. Lockheed Corp.* (*In re Tex. Extrusion Corp.*), 844 F.2d 1142, 1157 (5th Cir. 1988); *In re River Village Assocs.*, 181 B.R. 795, 804 (E.D. Pa. 1995).  However, as a general rule, "[t]he plan proponent bears the ultimate risk of

21

nonpersuasion on the questions of compliance with the requirement to disclose adequate information . . . ." *In re Michelson*, 141 B.R. 715, 720 (Bankr. E.D. Cal. 1992). Generally, a disclosure statement must contain all pertinent information bearing on the success or failure of the proposals in the plan of reorganization. *In re Stanley Hotel, Inc.*, 13 B.R. 926, 929 (Bankr. D.Colo. 1981). Here, the Debtors' Disclosure Statement fails to do so.

51.     The Disclosure Statement is deficient for a number of reasons. First, the Debtors' Amended Plan is partially premised on income to be received from a long-term lease with DHS for use of the Property as a homeless shelter. The Debtors' objection to the TH Disclosure Statement Motion, however, describes the DHS Lease as merely "anticipated" and provides no meaningful details about that lease (which income is the basis for its plan and distribution to unsecured creditors under its plan). *See* Docket No. 166 at 4. Courts have found that mere statements of opinion or belief, without accompanying factual support, are inadequate when seeking approval of a disclosure statement. *In re Prudential Energy Co.*, 59 B.R. 765, 768 (Bankr. S.D.N.Y. 1986) ("Creditors are not required or expected to rely on inferences. Disclosure of material facts is what is required."). In fact, opinions with little or no basis in fact can render the disclosure statement misleading. *In re Dakota Rail, Inc.*, 104 B.R. 138 (Bankr. D. Minn. 1989) ("A disclosure statement is misleading where it contains glowing opinions or projections, having little or no basis in fact and/or contradicted by known fact."). In *In re GAC Storage El Monte, LLC*, the court found that the debtor did not comply with section 1125 of the Bankruptcy Code where it failed to provide sufficient information regarding a recently executed master lease for its facility, even though the rental income due to the debtor under master lease was to be the sole source of funding for the plan. 489 B.R. 747 (Bankr. N.D. Ill. 2013); *see also In re Forest Grove*,

LLC, 448 B.R. 729 (Bankr. D.S.C. 2011) (finding disclosure statement and addendums were deficient in several respects relating to property valuations and funding of debtor's plan).

52.     The Debtors' Disclosure Statement fails to describe the material terms of the DHS Lease (such as the rental payments due under the lease, or the term of the lease), and fails to indicate how likely it is that the DHS Lease will in fact be finalized.  Since the DHS Lease is not finalized and may not be finalized by the time creditors are required to vote on the Debtors' Amended Plan (if ever) it is impossible for creditors to determine whether the Amended Plan will be feasible.  But those concerns aside, clearly, entry into the DHS Lease has the potential to negatively impact the value of the Property, particularly if the Debtors' Amended Plan is not feasible or otherwise is not confirmed.  For instance, TH Holdco intends to operate the property as a hotel and a market rate residential or condo project and would not likely credit bid on the Property if a long-term DHS Lease were in place.  Temporary occupancies subject the Property to additional wear and tear, and risk of damage.  Therefore, the Debtors must provide additional disclosure as to the terms of the DHS Lease and seek proper authorization from this Court to enter into the DHS Lease.

53.     Section 363 of the Bankruptcy Code requires a debtor to provide parties in interest with notice and a hearing prior to any use, sale or lease of property of the estate, outside of the ordinary court of business.  The DHS Lease falls squarely into this category.

54.     While the term "ordinary course of business" is not defined in the Bankruptcy Code, "[i]n general, the purpose of the various 'ordinary course' provisions is to leave undisturbed certain normal financial relations between a debtor and other parties." *In re Vill. Red Rest. Corp*., No. 18-10960 (MEW), 2021 WL 3889793, at *16 (Bankr. S.D.N.Y. Aug. 31, 2021) ("The key . . . is to distinguish between routine operations (which a debtor can pursue without the need for

individualized court approval) and transactions that are sufficiently unusual, unique or significant from the perspective of creditors that they require court approval.")).  If there is any doubt as to whether a transaction is out of the ordinary course of business, § 363 approval should be sought.  *In re Drexel Burnham Lambert Grp., Inc.*, 157 B.R. 532, 537 (S.D.N.Y. 1993) ("where the[] goals [of § 363] are not furthered, a debtor should first seek order from the court before engaging in any transaction.") (citation omitted).  "A post-petition lease which is out of the ordinary course of business and which is not authorized either by the Bankruptcy Code or the court can be disregarded pursuant to 11 U.S.C. § 549(a)." *In re Baker*, 118 B.R. 24, 29 (Bankr. S.D.N.Y. 1990).

55.    The Debtors have already entered into post-petition month-to-month leases with DHS (*see* Debtors' Disclosure Statement at 11) without notice and a hearing, or Bankruptcy Court approval, despite such lease being out of the ordinary course of the Debtors' business.  It is clear that the Debtors' equity holders are pursuing these leases in order to chill bidding so that they may maintain their interests in the Property.  Therefore, the Debtors should be required to file a Bankruptcy Code Section 363 motion prior to entry into the DHS Lease or any other similar lease affecting the Property so that the Court may determine whether such leases are an appropriate at this late stage of the bankruptcy cases, and with a potential auction of the Property pending.

56.    Similarly, the Debtors have not provided a term sheet or evidence of a financing commitment for the $78 million of Exit Financing discussed in their Disclosure Statement.  Voting creditors, which all general unsecured creditors should be in this case, have no basis to determine whether the Debtors' Amended Plan is committed or viable until such documentation is disclosed. Indeed, the certainty of the Exit Financing, and the ability to close on such financing quickly is critical to the Plan Fund and distributions to creditors under the Debtors' Amended Plan.  The Disclosure Statement provides that the Exit Financing term sheet will be filed with the Plan

24

Supplement as late as five business days before the Confirmation Hearing. *See* Disclosure Statement at 40. This is likely past the voting deadline.

57.     Further, the Debtors have not provided any information regarding the total amount of outstanding administrative claims. The Debtors' professionals should set an administrative bar date for mid-May 2022, which will provide important information for the plan confirmation hearing. A proposed form of administrative bar date notice is attached hereto as Exhibit 3.

58.     The Debtors have also failed to file tax returns, despite discussions with the taxing authority about the need to file those returns since early in these Chapter 11 cases. These tax returns are required in order to determine amounts owed to the NYS Dept. of Taxation. The Debtors and their counsel are the only ones capable of providing this information and there is no reason those tax returns cannot be filed before the Confirmation Hearing.

59.     There is no commitment filed for the new value equity commitment which is also critical to the Debtors' Amended Plan. There is no explanation as to how the amount of new value was arrived at or how that proposed new value will be market tested under the standard set forth in the United States Supreme Court's decision in *Bank of America Nat. Trust and Sav. Assn. v. 203 North LaSalle Street Partnership*, 526 U.S. 434 (1999). If the Debtors truly believe in the $120 million valuation for the Property discussed in their Disclosure Statement (Debtors' Disclosure Statement at 13) and that the treatment of claims proposed in their Amended Plan is confirmable, then it would appear that the value of the new equity far exceeds the new value being paid for the new equity.

60.     Further, the Debtors' Disclosure Statement lacks sufficient information because:

  a.     Section V of the Debtors' Disclosure Statement on Certain Risk Factors Affecting the Debtors is far too cursory, including on the risks noted in this Combined Response;

25

b.    There is no detailed rationale given for the release provision in the Debtors' Amended Plan (discussed at page 39 of the Debtors' Disclosure Statement) nor what investigation or analysis was done regarding the releases or the consideration being given therefore; and

c.    The tax discussion at page 48 of the Debtors' Disclosure Statement is non-substantive and does not meet the current standards for discussion of tax consequences in a disclosure statement.[11]

Accordingly, the Debtors' Disclosure Statement cannot be approved.

*(iv)    The Debtors' Disclosure Statement Should Be Adjudged Under the Heightened Scrutiny Standard*

61.    The Amended Plan upon which the Disclosure Statement is premised proposes to deny unsecured creditors a right to vote on a plan that does not provide them with payment in full on the effective date, if ever, all while maintaining the Debtors' existing equity holders' interests in the Property and providing for a return to the Mezz Lender, coincidently the only two classes not impaired under the Debtors' Amended Plan.  The Debtors' Amended Plan has all of the hallmarks of an insider transaction that, if granted, will provide insiders with valuable releases.  Given this, the Court should apply a heightened pleading standard in reviewing the Debtors' Disclosure Statement rather than the business judgment standard.

62.    Further, these Estates have not been substantively consolidated and the confirmability of the Amended Plan must be evaluated on an Estate by Estate basis.  Assuming this Court agrees that Class 3 (the senior secured loan claims held by TH Holdco in the 85 Flatbush RHO Hotel case and the 85 Flatbush RHO Residential case), Class 6 (the 85 Flatbush RHO Hotel

---

[11] Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" to mean, with respect to tax disclosures, "a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case." 11 U.S.C. § 1125(a)(1); *In re Babayoff*, 445 B.R. 64, 78 (Bankr. E.D.N.Y. 2011) ("[W]here a disclosure statement omits a meaningful . . . description of . . . tax consequences under the plan, it does not serve the bankruptcy purpose of enabling a creditor to make an informed decision about the plan."); *see also* 7 Collier on Bankruptcy P 1125.02 (16th 2022) (stating that since 2005, § 1125(a) has "expressly provided" for adequate disclosure of federal tax consequences of a plan).

26

General Unsecured Claims) and Class 8 (the 85 Flatbush RHO Residential General Unsecured Claims) (which the Debtors propose to pay a year after the Effective Date) are in fact impaired and entitled to vote, then the votes of those classes must be considered in determining whether the impaired accepting class requirement in Section 1129(a)(10) of the Bankruptcy Code has been satisfied in the 85 Flatbush RHO Hotel and 85 Flatbush RHO Residential cases and related plans.

63.    It is well established that bankruptcy courts apply heightened scrutiny "when the transaction [in] question is with an insider of the debtor." *In re MSR Hotels & Resorts, Inc.*, No. 13-11512 (SHL), 2013 WL 5716897, at *1 (Bankr. S.D.N.Y. Oct. 1, 2013) (citing *In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010)); *see also In re Astria Health*, 623 B.R. 793, 801 (Bankr. E.D. Wash. 2021) ("Heightened scrutiny is warranted when an insider benefits from a compromise or release that a debtor in possession proposes on behalf of its bankruptcy estate."); *In re Family Christian, LLC*, 533 B.R. 600, 628 (Bankr. W.D. Mich. 2015) ("The insider nature of the relationship again requires this court to view this attempt to bypass certain requirements of a plan with heightened scrutiny."); *In re eToys, Inc.*, 331 B.R. 176, 200 (Bankr. D. Del. 2005) (applying heightened scrutiny to transaction with insider because "[w]hen faced with such divided loyalties, directors [and officers] have the burden of establishing the entire fairness of the transaction to survive careful scrutiny by the courts.") (brackets in original). "In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *Innkeepers*, 442 B.R. at 231.

64.    Here, the undisputed facts demonstrate the insider beneficial nature of the proposed Amended Plan and Disclosure Statement, as evidenced by the Debtors' ownership structure and

27

the nature of the releases to be granted under the Amended Plan.  The Debtors' Disclosure Statement does not provide any justification for such broad releases or any investigation related thereto or consideration for the releases.  Accordingly, prudence requires that the Debtors' Disclosure Statement be adjudged under the heightened scrutiny standard.

## **CONCLUSION**

For the above stated reasons, (i) the Objections should be overruled, (ii) the Debtors' Disclosure Statement should not be approved, (iii) the TH Disclosure Statement should be approved and allowed to be sent for voting, (iv) the Debtors should be ordered to file tax returns by May 11, 2022, (v) an administrative expense claims bar date should be set for May 11, 2022 to provide more information on the amount of those claims for the Confirmation Hearing and (vi) the Debtors should be required to file a motion under Section 363 of the Bankruptcy Code prior to entering into the DHS Lease or any other material lease involving the Property.

Dated: April 4, 2022
New York, New York

**DENTONS US LLP**

___/s/ Lauren Macksoud___
Lauren Macksoud
Sarah M. Schrag
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6700
Fax: (212) 768-6800
Email: lauren.macksoud@dentons.com
            sarah.schrag@dentons.com

-and-

Robert Richards  (admitted *pro hac vice*)
**DENTONS US LLP**
233 S. Wacker Drive
Suite 5900
Chicago, IL 60606
Telephone: (312) 876-8000
Facsimile: (312) 876-7934
Email: robert.richards@dentons.com

*Counsel to TH Holdco LLC*

US_Active\121156344\V-6