Lauren Macksoud
Sarah M. Schrag
**DENTONS US LLP**
1221 Avenue of the Americas
25th Floor
New York, New York 10020
Telephone: (212) 768-6700
Facsimile:  (212) 768-6800
E-mail: lauren.macksoud@dentons.com
            sarah.schrag@dentons.com

Robert Richards  (admitted *pro hac vice*)
**DENTONS US LLP**
233 S. Wacker Drive
Suite 5900
Chicago, IL 60606
Telephone: (312) 876-8000
Facsimile: (312) 876-7934
Email: robert.richards@dentons.com

*Counsel to TH Holdco LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>   85 FLATBUSH RHO MEZZ LLC, et al.,[1]<br><br>          Debtors | Case No. 20-23280 (RDD)<br>Chapter 11<br><br>(Jointly Administered) |

<u>**SECOND AMENDED DISCLOSURE STATEMENT**</u>

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE SECOND AMENDED PLAN AS PROPOSED BY TH HOLDCO (THE "PLAN")**

**ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS SECOND AMENDED DISCLOSURE STATEMENT FOR THE PLAN PROPOSED BY TH HOLDCO (THE "DISCLOSURE STATEMENT") HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED**

---

1 The Debtors (as defined) in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include: 85 Flatbush RHO Mezz LLC. (6184); 85 Flatbush RHO Hotel LLC (5027); and 85 Flatbush RHO Residential LLC (2261).

US_Active\121219192\V-5{01146798.DOCX;2 }US_Active\121219192\V-2

**FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.   THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES.**

US_Active\121219192\V-5

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION................................................................................................ 1

II.    HISTORY OF THE DEBTORS AND THE BANKRUPTCY FILING ..................... 4

    1.    History of the Debtors and Description of the Debtors' Business......................... 4

    2.    Senior Loan Background ................................................................. 5

    3.    85 Flatbush Mezz Loan Agreement and Intercreditor Agreement ......................... 5

    4.    Operations and Debt Service ......................................................... 5

    5.    December 2020 Foreclosure Sale ..................................................... 5

III.    POSTPETITION DEVELOPMENTS ................................................................ 6

    1.    Debtors' Counsel ......................................................................... 6

    2.    Early Substantive Motions in Debtors' Cases ...................................... 6

    3.    Cash Collateral ........................................................................... 6

    4.    The Debtors' Exclusivity Periods ................................................... 10

    5.    Claims Bar Date ......................................................................... 10

    6.    Filed and Scheduled Claims........................................................... 11

    7.    JLL Engagement as Real Estate Advisor and Marketing of the Assets................ 15

    8.    Debtors' Original Plan ................................................................. 16

    9.    Meeting and Discussion with the Debtors' Minority Owner............................... 16

    10.    Purchase of the Senior Mortgage Loan............................................... 17

    11.    Debtors' Amended Plan and Disclosure Statement ................................. 18

    12.    Mezz Lenders' Adversary Proceeding ................................................ 19

IV.    THE CHAPTER 11 PLAN FILED BY TH HOLDCO ..................................... 19

    1.    Classification of Claims................................................................ 19

    2.    Unclassified Claims/Administrative Claims........................................... 20

3.      Priority Tax Claims..................................................................... 21

4.      Professional Fee Claims.............................................................. 21

5.      U.S. Trustee Fees........................................................................ 22

6.      Classified Claims ........................................................................ 22

7.      MEANS FOR IMPLEMENTATION. ........................................ 31

        A.      The Plan Fund. ................................................................ 31

        B.      Minimum Cash Distributions.......................................... 32

        C.      Setoffs. ............................................................................ 32

        D.      The Sale. .......................................................................... 32

        E.      Withholding and Reporting Requirements. .................... 34

        F.      Exemption From Certain Transfer Taxes. ...................... 34

        G.      Effectuating Documents; Further Transactions. ............. 34

        H.      Avoidance Actions and Other Causes of Action. ........... 35

        I.      Closing of the Chapter 11 Cases..................................... 35

        J.      Wind Down....................................................................... 35

        K.      Executory Contracts and Unexpired Leases ................... 35

        L.      Conditions Precedent to the Confirmation Hearing and the
                Effective Date. ................................................................ 38

        M.      Effect of Confirmation. ................................................... 39

V.      MECHANICS OF HOW THE PLAN MAY BE ACCEPTED OR
        REJECTED ............................................................................... 42

1.      Who May Vote............................................................................ 43

2.      Voting Procedures...................................................................... 43

        A.      Solicitation Period........................................................... 43

3.      Confirmation of the Plan........................................................... 44

        A.      Confirmation Hearing ..................................................... 44

US_Active\121219192\V-5

       B.      Objections to Confirmation ........................................................ 44

    4.      Requirements for Confirmation of the Plan ........................................ 44

       A.      Best Interests Test ..................................................................... 44

       B.      Feasibility of the Plan ............................................................... 45

       C.      Acceptance by Impaired Classes ............................................... 46

       D.      Cramdown ................................................................................ 46

**VI.    U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ..................... 46**

**VII.   ALTERNATIVES TO THE PLAN .............................................................. 51**

**VIII.  RETENTION OF JURISDICTION ............................................................. 52**

**IX.    CONCLUSION ........................................................................................ 54**

**<u>EXHIBIT A</u>  AMENDED CHAPTER 11 PLAN FILED BY TH HOLDCO ...........................**

**<u>EXHIBIT B</u>  LIQUIDATION ANALYSIS ...........................................................................**

**<u>EXHIBIT C</u>  SUMMARY OF CLAIMS BY ESTATE (BOTH SCHEDULED
CLAIMS AND FILED PROOFS OF CLAIM) .................................................**

**<u>EXHIBIT D</u>  REDLINES SHOWING DIFFERENCES BETWEEN AMENDED TH
HOLDCO PLAN AND DEBTORS PLANS ........................................................**

**<u>EXHIBIT E</u>  PROPOSED FORM OF SALE AND BID PROCEDURES ..............................**

**<u>EXHIBIT F</u>  PROPOSED FORM OF PURCHASE AGREEMENT ........................................**

US_Active\121219192\V-5

## I.    **INTRODUCTION**

On December 18, 2020 (the "Petition Date"), the Debtors each filed a voluntary petition pursuant to Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")[2] in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their respective business and manage their respective assets as debtors-in-possession.  As of the date hereof, no creditors' committee has been appointed in these Chapter 11 Cases.

TH Holdco, LLC ("TH Holdco") currently holds debt secured by the assets of 85 RHO Hotel and  85 RHO Residential, which debt was acquired on January 28, 2022 as discussed below. Contemporaneously with the confirmation and sale process, TH Holdco's authority and standing to proceed with an action of the Debtors' Properties is being challenged by the Mezz Lender pursuant to a separate adversary proceeding (defined below) based upon alleged violations of the parties' Intercreditor Agreement.  This Adversary Proceeding shall be determined by the Bankruptcy Court prior to the start of the Auction of the Properties.  If the Mezz Lender prevails in the Adversary Proceeding by final order or judgment, it reserves the right to exercise certain purchase option rights and acquire the senior mortgage loans, whereupon the Auction may be cancelled and/or the Plan may be modified.

In the meanwhile, TH Holdco files this Disclosure Statement pursuant to § 1125 of the Bankruptcy Code.  TH Holdco is indirectly owned by Ohana related entities ("Ohana").  Ohana is a vertically integrated investment firm focused on full-service hotels.  Ohana invests in both equity and credit opportunities through dedicated commingled fund vehicles.  Founded in 2009, Ohana is currently headquartered in Redwood City, California and has approximately $2.0 billion under management (including $0.7 billion in regulatory assets under management).  Ohana has available cash, liquid investments and/or available lines of credit more than sufficient to fund this Plan and is prepared to provide all of the funding required by TH Holdco to confirm this Plan.  More information about Ohana is available on its website, www.ohanare.com.

This Disclosure Statement is provided to all of the known creditors and parties in interest of any of the Debtors in order to disclose information deemed material, important, and necessary for the creditors to arrive at a reasonably informed decision in exercising their rights to vote on TH Holdco's proposed Plan, filed concurrently herewith.  A copy of the Plan accompanies this Disclosure Statement and is attached hereto as **Exhibit A**.  Capitalized terms used but not defined in this Disclosure Statement shall have the meaning for those terms set forth in the Plan.

The Debtors originally filed their own Chapter 11 plan on November 24, 2021 [Docket No. 142] (the "Debtors Original Plan") but never filed a disclosure statement related to the Debtors Original Plan.  Like the Plan proposed by TH Holdco, the Debtors Original Plan also contemplated an auction for the Hotel Property and the Residential Property as the means to effectuate that Plan.

---

2 Unless otherwise specifically stated, all references to "§" or "section" herein are to a section of the Bankruptcy Code; all references to "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); all references to "Local Rule" are to the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

US_Active\121219192\V-5

The Debtors have filed an amended Plan of Reorganization [Docket No. 161] on March 30, 2022 which is discussed below ("Debtors' Amended Plan"), as well as the Debtors' Disclosure Statement for Amended Plan of Reorganization of 85 Flatbush RHO Mezz LLC, 85 Flatbush RHO Hotel, LLC, and 85 Flatbush RHO Residential LLC [Docket. No. 162] (the "Debtors' Disclosure Statement").

A redline showing the differences between the Debtors' Amended Plan and the current amended Plan proposed by TH Holdco is attached as **Exhibit D-1** to this Disclosure Statement (the "Redline Comparison of the Current Plans"). A redline showing the differences between the Debtors' Original Plan contemplating a sale of the Property and the current amended Plan filed by TH Holdco is attached as **Exhibit D-2** to this Disclosure Statement.

TH Holdco asserts that its Plan is better than the Debtors Amended Plan and the Debtors Original Plan. ~~With respect to the Debtors Amended Plan, in TH Holdco's view, the TH Holdco Plan is better for, among other reasons, the following reasons:~~The Mezz Lender does not share this view.

With respect to the Debtors Amended Plan, the TH Holdco Plan is better in TH Holdco's view among other reasons because:

1.      TH Holdco asserts that the Debtors Amended Plan will not meet the feasibility requirement for confirmation.

> For instance, the Agreed March 2021 Cash Collateral Order acknowledges in Paragraph 14 of that Order that post-petition interest on the "Lender's claim will continue to accrue and additional charges pursuant to the Loan Documents, **subject to the next sentence**. The extent to which the Lender Claim is a Secured Claim will be determined by the Court based on the value of the Lender's Collateral, and is subject to section 506(a) and (b) of the Bankruptcy Code, and to applicable non-bankruptcy law, provided, however, that the Debtor acknowledges and agrees that the Lender has a valid and enforceable lien on the Property." TH Holdco asserts that the Debtors' Amended Plan, however, is predicated on no post-petition interest being paid to TH Holdco.

> Furthermore, the Debtors' Amended Plan is subject to financing in the amount of $78 million. No financing commitment has been filed to date and if and when any such financing commitment is filed, TH Holdco asserts that it may be subject to material contingencies or delays in closing and there is no assurance that such financing will ultimately close.

> Furthermore, the Debtors' Amended Plan is subject to entry into a long-term agreement with the New York City Department of Homeless Services ("DHS") which has not been filed of public record nor approved by the Bankruptcy Court.

> Furthermore, the Debtors' Amended Plan is also contingent on an new value equity contribution of not less than $9,611,096.

2.      If TH Holdco ~~is~~prevails in the Adversary Proceeding against the Mezz Lender pursuant to final order or judgment and is otherwise the successful bidder, pursuant to its proposed

plan, TH Holdco will pay Allowed General Unsecured Claims in Classes 6 (85 Flatbush RHO Hotel General Unsecured Claims) and 8 (85 Flatbush RHO Residential General Unsecured Claims) in full in Cash with interest. Unlike the Debtors Amended Plan, TH Holdco is funding an initial distribution pool for those unsecured creditors of $1.25 million so there will be an immediate and substantial distribution to those unsecured creditors. The remaining amount will be paid with interest within 12 months of the Effective Date including by funding from TH Holdco's ownership if needed to make sure there is sufficient funds to make that payment. Debtor asserts that there is no assured funding from TH Holdco's ownership in the event that any distributions beyond the $1.25 million are not paid and TH Holdco breaches its obligations under the Plan. Moreover, the Mezz Lender asserts that TH Holdco's ability to pursue an Auction will ultimately be negated by a successful challenge under the parties' Intercreditor Agreement in the Adversary Proceeding.

In contrast, the Debtors Amended Plan has no immediate payment to Allowed General Unsecured Claims in Classes 6 (85 Flatbush RHO Hotel General Unsecured Claims) and 8 (85 Flatbush RHO Residential General Unsecured Claims) and provides that "Cash from the rental income generated by the DHS Lease allocable to the [applicable Property] . . . will be payable on the **later** of one (1) year from the Effective Date and the date on which such . . . General Unsecured Claim becomes an [Allowed Claim] . . ." [Debtors Amended Plan, Sections 4.6 and 4.8]. TH Holdco asserts that there is no assured funding from Debtors' ownership in the event that the income from any DHS Lease is insufficient to pay those unsecured claims in full with interest or if the Debtors' breach the DHS Lease in any manner.

3.      Chapter 11 Administrative Expenses and Priority Claims to the extent ultimately Allowed need to be paid in order to meet the standards to confirm a Chapter 11 plan. TH Holdco's Plan provides additional cash consideration in addition to the TH Holdco Credit Bid in order to pay those expenses. TH Holdco asserts that the Debtors expected Plan Fund of $88,612,000.00 is not only insufficient to pay the TH Holdco's Secured Claim (including post-petition interest and costs) in full but is also not sufficient to pay priority tax claims and expected Chapter 11 administrative expenses. TH Holdco has not agreed to any funding or carve out from its lien on the Hotel Property and Residential Property or cash proceeds of its collateral to pay those Chapter 11 Administrative Expense or Priority Claims under the Debtors' Plan. TH Holdco will abide by the terms of the Carve Out provided for in the Cash Collateral Order. TH Holdco asserts that claims processing in the 85 Flatbush RHO Hotel and 85 Flatbush RHO Residential cases will be completed under its Plan on or about the Effective Date of the Plan, allowing for quicker distributions to creditors under its Plan rather than the Debtors' Amended Plan, which allows a much longer period for claims objections and claims processing and for related distribution holdbacks.

4.      TH Holdco asserts that there are no identified Avoidance Actions and Causes of Action here and therefore, there is no reason for ongoing Debtor entities or alternatively, any liquidating trust after the Effective Date of a Chapter 11 plan. Therefore, TH Holdco asserts its Plan will not require material funding for post-Effective Date administration and that the Chapter 11 Cases can be quickly closed. The Plan contemplates that the Debtors shall be dissolved promptly after the Effective Date, with the Disbursing Agent to hold any funds for any Disputed Claims or other winddown expenses not yet paid or pre-paid. [PENDING APPROVAL: Pursuant to § 1125 of the Bankruptcy Code, after a hearing, and a notice to all creditors and other interested parties, TH Holdco has obtained an order of the Bankruptcy Court dated April __, 2022, approving

this Disclosure Statement for submission to the holders of claims against, or interests in, the Debtors and setting the date of the hearing for the Bankruptcy Court to consider confirmation of the Plan.  [Docket No. __ ].

The Bankruptcy Court has set _____, 2022, at 10:00 a.m. (prevailing Eastern Time) as the date for a hearing on the confirmation of the Plan (the "Confirmation Hearing Date").]

The purpose of this Disclosure Statement is to inform all claimholders and interest holders of information that may be deemed material, important, and necessary for such claimholders and interest holders to make an informed judgment about the Plan, and to vote for the acceptance or rejection of the Plan, where voting is necessary.  Solicitation of acceptances from classes that are not entitled to vote on the Plan, either because such class is not impaired or is conclusively deemed to have accepted or rejected the Plan, is not required.

The approval by the Bankruptcy Court of this Disclosure Statement does not constitute a recommendation as to the merits of the Plan, only that the Disclosure Statement contains "adequate information" from which creditors may form an opinion as to the merits of the Plan.  Each creditor and interest holder should read the Disclosure Statement and the Plan in their entirety.

## II.    HISTORY OF THE DEBTORS AND THE BANKRUPTCY FILING

85 Flatbush RHO Mezz LLC ("85 Flatbush RHO Mezz" or the "Mezz Debtor") is the 100% owner of 85 Flatbush RHO Hotel LLC ("85 Flatbush RHO Hotel") and 85 Flatbush RHO Residential LLC ("85 Flatbush RHO Residential").  The property is located at 85 Flatbush Extension, Brooklyn, New York (the "Property").  The Property is a 132,641 square foot, twelve-story, mixed-use property consisting of a 174-room boutique hotel on the first six (6) floors known as the Tillary Hotel Brooklyn, a 58,652 square foot 64-unit luxury multi-family building and a 5,642 square foot parking garage (together, the "Hotel Property").  The residential component of the Property has nine (9) studios, twenty-six (26) one-bedroom units, and twenty-nine (29) two-bedroom units (together, the "Residential Property").  Of the sixty-four (64) units, currently, up to five (5) are occupied.  [Docket No. 103].   TH Holdco asserts that the Debtors intentionally reduced residential occupancy as part of their business plan to convert the residential units to condominiums.

### 1.    History of the Debtors and Description of the Debtors' Business

85 Flatbush RHO Hotel owns and operates the Tillary Hotel Brooklyn, a 174 room boutique hotel located at 85 Flatbush Avenue Extension, Brooklyn, New York at the intersection of Tillary Street and Flatbush Extension, just off the base of the Manhattan Bridge.  The Property is a 12-story mixed use property consisting of the hotel, a sixty-four (64) unit luxury multifamily building and a parking garage.  The hotel operates from the first six (6) floors of the property.  The hotel is a full service upper upscale boutique hotel which also features a business center, fitness center, meeting space, restaurant, café and bar.  85 Flatbush RHO Hotel is the fee owner of the six (6) floors it occupies, and 85 Flatbush RHO Residential owns the other six (6) floors.

US_Active\121219192\V-5

### 2.    Senior Loan Background

The Property was acquired on September 19, 2019.  The original senior lender, 85 Flatbush Avenue 1, LLC ("85 Flatbush Avenue"), through an assignment of mortgage from CMTG JP Finance, extended to Hotel and Residential a loan in the original principal amount of $57,500,000 plus a new advance in the amount of $12,500,000 for a total principal loan amount of $70,000,000 evidenced by a consolidated, amended and restated note and consolidated, amended and restated mortgage and security agreement, which was assigned to TH Holdco on January 28, 2022 (the "TH Holdco Prepetition Loan Agreement").  The TH Holdco Prepetition Loan Agreement term was for 24 months, with a maturity date of October 1, 2021.  That maturity date has not been extended.

### 3.    85 Flatbush Mezz Loan Agreement and Intercreditor Agreement

On September 19, 2019, 85 Flatbush Mezz LLC ("85 Flatbush Mezz" or "Mezz Lender") advanced a loan to 85 Flatbush RHO Mezz in the original principal amount of $6,000,000 secured by the 85 Flatbush Hotel Pledge Agreement and 85 Flatbush Residential Pledge Agreement (the "85 Flatbush Mezz Loan Agreement").

85 Flatbush Avenue as the original senior lender and 85 Flatbush Mezz as the mezzanine lender are party to an Intercreditor Agreement dated September 19, 2019 and amended as of July 23, 2020 (the "Intercreditor Agreement") which set forth certain rights between the two lenders. 85 Flatbush Avenue's interest and rights under the Intercreditor Agreement are now assigned to TH Holdco.  TH Holdco reserves all rights and remedies under the Intercreditor Agreement.

### 4.    Operations and Debt Service

85 Flatbush RHO Hotel made regular monthly payments of interest on the TH Holdco Prepetition Loan Agreement until February 2020.  The COVID-19 pandemic forced the Hotel Property to close for the entire month of April 2020.  From May 15, 2020 until June 30, 2020, the Hotel Property provided homeless shelter services pursuant to an agreement with the NYC Department of Homeless Services, which provided the Hotel Property with some operating income.  As of July 15, 2020, the Hotel Property reopened for business but with a substantially reduced occupancy rate and the closure of its fitness center, meeting room and food service.  The Hotel Property currently continues to operate, with twenty-two (22) employees on payroll, including those essential to maintaining and securing the Hotel Property.  The Debtors did not pay their current debt service obligations to their secured lenders.

### 5.    December 2020 Foreclosure Sale

Prior to the bankruptcy filing, a Uniform Commercial Code foreclosure auction of the pledge equity interest was scheduled by 85 Flatbush Mezz for December 15, 2020 and then, at the Debtors' request, was rescheduled on two occasions with a final sale date of December 18, 2020. On December 18, 2020, the Debtors filed their Chapter 11 petitions and the automatic stay prevented the foreclosure sale from going forward.

Pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their business and manage their assets as debtors-in-possession.  As of the date hereof, no creditors' committee has been appointed in these Chapter 11 Cases.

## III.    POSTPETITION DEVELOPMENTS

### 1.    Debtors' Counsel

After the Filing Date, the Debtors filed an application to retain and employ Robinson Brog Leinwand Greene Genovese & Gluck P.C. as its bankruptcy counsel [Docket No. 40], which the Bankruptcy Court approved thereafter [Docket No. 62].

### 2.    Early Substantive Motions in Debtors' Cases

On December 18, 2020, the Debtors filed a *Motion for Approval of Adequate Assurance of Payment to Utility Services and Continuation of Service*.  [Docket No. 3].  The Bankruptcy Court entered an interim order granting the Motion on December 28, 2020, and a final order on January 6, 2021.  [Docket Nos. 22 and 29].

On December 20, 2020, the Debtors filed a *Motion to Authorize Debtors' to Pay Wages and Compensation and for Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations*.  [Docket No. 6].  The Bankruptcy Court entered an interim wage order on December 28, 2020, and a final wage order on January 13, 2021.  [Docket Nos. 22 and 32].

### 3.    Cash Collateral

On December 20, 2020, 85 Flatbush RHO Hotel filed a *Motion to Use 85 Flatbush Avenue's Cash Collateral*.  [Docket No. 5].  On December 28, 2020, the Bankruptcy Court entered an *Interim Order Granting Debtors Motion to Use Cash Collateral*.  [Docket No. 21].  The Bankruptcy Court entered a second Interim Cash Collateral Order on January 19, 2021.  [Docket No. 34].  On March 29, 2021, the Court entered a *Final Consent Order Authorizing the Use of Cash Collateral and Granting Adequate Protection between the Debtors and 85 Flatbush Avenue* [Docket No. 64] (the "Agreed Final Cash Collateral Order").  The Agreed Final Cash Collateral Order is now a Final Order.

The Agreed Final Cash Collateral Order provided the following regarding the acknowledgements and rights of 85 Flatbush Avenue as senior lender (defined in the Agreed Final Cash Collateral Order as "Lender"), which rights are now held by TH Holdco as successor to 85 Flatbush Avenue:

> a.    "Debtors acknowledge and agree that the Loan Documents are legal, valid, and binding obligations of the Debtors, and that the Loan Documents are enforceable against the Debtors in accordance with their respective terms."

> b.    "Debtors acknowledge and agree that the Lender has duly perfected, valid, non-avoidable, first priority liens on and security interests in its pre-petition collateral . . . to secure the obligations under the Loan Documents."

c.      "Debtors acknowledge and agree that the Pre-Petition Obligations, Pre-Petition Liens, and Loan Documents are not subject to counterclaims, rights of offset, claims, or other defenses of any kind."

d.      "Debtors acknowledge and agree that all cash, accounts receivable, and other proceeds in the Debtors custody, possession, or control as of the Petition Date, and all cash, accounts receivable, and other proceeds coming into the Debtors' possession or control after the Petition Date, constitute Cash Collateral in which the Lender has an interest."

e.      "Debtors and the Lender have agreed to the Debtors' use of Cash Collateral to operate their respective property and to provide adequate protection to the Lender in accordance with the terms set forth subject to the Bankruptcy Court's approval and entry of this Final Order."

f.      "Notwithstanding anything else herein to the contrary in this Final Order, should the Debtors have, for any month, on a cash basis, an excess of cash receipts less the expenses set forth in the Approved Budget (including any permitted variance) from operation of the Property (such excess described as the 'Net Profits'), the Debtors will pay the Net Profits for that month in excess of $10,000 to the Lender up to the amount of monthly interest accruing on the note underlying the Lender's claim as adequate protection payments, even if such amounts are or were in the Approved Budget, which payments shall be applied only to the Lender's allowed secured claim."

g.      "Cash Collateral shall not be used to pay the costs of (a) investigating whether any claims or causes of action exist against the Lender or (b) litigating any claim or cause of action against the Lender, except that Cash Collateral in an amount not to exceed $15,000 in the aggregate may be used to pay the allowed fees and expenses of counsel (with the exception of counsel to the Debtors) authorized by the Court to investigate the Pre-Petition Obligations, Pre-Petition Liens, and Loan Documents."

h.      "Lender is granted, and the Debtors hereby grant to the Lender, first priority, valid, and perfected replacement liens on and security interests in all the Debtors' now existing and hereafter acquired real and personal property and assets and all cash and non-cash proceeds thereof (collectively, 'Post-Petition Collateral'), which first priority, valid, and perfected replacement liens and security interests shall be deemed to be effective nunc pro tunc from the Petition Date without further action by the Lender, except that the replacement liens and security interests shall not attach to any claims or causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548, or 549 or its proceeds, excluding recoveries under 11 U.S.C. § 549 on account of Post-Petition Collateral. Any Diminution in the value of the valid, perfected and enforceable Pre-Petition Liens in favor of the Lender securing the Pre-Prepetition Obligations caused by the Debtors' use of the Lender's Cash Collateral that is not compensated by Post-Petition Collateral shall constitute a cost and expense of administration in the bankruptcy cases in accordance with

US_Active\121219192\V-5

§ 503(b)(1) of the Bankruptcy Code and shall have a superpriority status under § 507(b) of the Bankruptcy Code and thus will be paid ahead of all other costs and expenses of administration of the bankruptcy cases, including, without limitation, those specified in §§ 503(b) or 507(a) of the Bankruptcy Code; subject only to: (i) the fees of the United States Trustee under 28 U.S.C. § 1930, statutory interest thereon, and fees of the Clerk of the Court; (ii) all accrued and unpaid claims for unpaid fees, costs, and expenses incurred at any time before the Termination Date (as defined below), payable to estate professionals, retained by the Debtors whose retention is approved by the Bankruptcy Court pursuant to §§ 327 or 328 of the Bankruptcy Code ("Professional Persons," and the fees, costs, and expenses of Professional Persons, the "Professional Fees"), to the extent that such Professional Fees are allowed by the Bankruptcy Court at any time (i.e., before or after the Termination Date) on an interim or final basis; (iii) all Professional fees incurred on or after the Termination Date by Professional Personals and allowed by the Bankruptcy Court at any time whether before or after the Termination Date whether allowed by an interim order or otherwise, not to exceed $75,000 (collectively, items (ii) and (iii) are hereinafter referred to as the 'Carve-Out') and (iv) no more than $15,000 for the commissions, fees and expenses of any Chapter 7 trustee appointed in these cases, provided, however, that none of those funds may be used to challenge or object to Lender's claims and liens, and provided further, that Lender has no liability for, or obligation to advance such funds. For the avoidance of doubt, the Carve Out will be senior to any claims arising under or relating to and liens securing the Lender's Collateral including, without limitation, any administrative or superpriority claims and all forms of adequate protection liens or security interests."

   i.      "The postpetition replacement liens and security interests granted to the Lender pursuant to this Final Order are automatically perfected by operation of law upon the Court's entry of this Final Order nunc pro tunc from the Petition Date without further action by the Lender. The Lender may, but shall not be required to, file any Uniform Commercial Code financing statements and record any additional documents in any jurisdiction or take any other or further action to validate or perfect the security interests and liens granted to it pursuant to and in accordance with this Final Order. If the Lender deems it necessary or convenient, the Debtors shall execute and deliver to the Lender, or shall have executed and delivered to the Lender, all in form and substance reasonably satisfactory to the Lender, any other agreements, instruments, documents, or writings to evidence the terms of this Final Order, the use of Cash Collateral, and/or the Lender's liens and security interests, and the Lender may request from time to time the execution and delivery of Uniform Commercial Code financing statements, continuation statements, amendments to financing statements, and any other agreements, instruments, and/or documents relating to the use of Cash Collateral and/or the security interests and liens granted hereunder. The Debtors hereby authorize the execution and filing of all financing statements, amendments, continuations, and other agreements, instruments, and documents desired by the Lender or the perfection of the security interests and liens granted hereunder, and Debtors agree to and the Lender shall receive a lifting of the automatic stay for the limited purpose of carrying out the

US_Active\121219192\V-5

purposes of this Section. Furthermore, the Debtors irrevocably authorize the filing of a carbon, photographic or other reproduction of this Final Order as a financing statement and agree that such filing is sufficient as a financing statement subject to applicable state law.

j.      "All the liens on and security interests in the Post-Petition Collateral granted under this agreement are deemed to be effective on and after the Petition Date, will continue in full force and effect, and will survive the Termination Date . . ."

k.      "[T]he Debtors may use Cash Collateral on an emergency basis, in an amount not to exceed, in any one month, the sum of $2,500 per month, except that the Debtors must notify the Lender within 24 hours after the Debtors make any such expenditures. The Debtors shall also promptly provide the Lender with appropriate documentation related to such emergency expenditures. The Debtors must obtain the Lender's permission before making or incurring any obligation or making or incurring any emergency expenditures from the Cash Collateral in excess of the $2,500 per month allowance."

**l.      "The Lender has provided the Debtors with a payoff statement containing the amounts set forth in this paragraph. The Lender represents that the calculations set forth on the payoff statement are true and correct. The Debtors and the Lender agree that as of Petition Date, the principal amount of the Lender's claims against the estates of the Debtors is $85,158,815.99 ('Lender Claim'), which claim consists of these components:**

> **Unpaid principal balance $70,000,000.00**
> **Contract interest to 2/29/20 $496,222.22**
> **Default Interest to 12/18/20 $13,673,333.32**
> **(less) Interest Paid $(1,201.91)**
> **Protective Advance for Taxes $247,849.21**
> **Interest on Protective Advance $25,115.39**
> **Legal Fees $28,605.00**
> **Late Fee $24,751.00**
> **Entity Fees $2,641.74**
> **Exit Fee $525,000.00**
> **Servicing Fee $136,500.00**

**<u>The Lender's Claim will continue to accrue interest and additional charges pursuant to and under the Loan Documents</u>, subject to the next sentence. The extent to which the Lender Claim is a secured claim will be determined by the Court based on the value of the Lender's Collateral, and is subject to § 506(a) and (b) of the Bankruptcy Code, and to applicable non-bankruptcy law, provided however that the Debtor acknowledges and agrees that the Lender has a valid and enforceable lien on the Property."** [BOLDING AND UNDERLINING ADDED]

m.     "This Final Order: (a) shall not limit the amount of the Lender's Claim against the Debtors and the guarantor, as well as any portion of that claim for interest, fees, costs, and expenses; and (b) does not constitute a waiver of any rights of the Lender under the Bankruptcy Code or otherwise including any rights for adequate protection, relief from the stay, and to object to a plan and disclosure statement, except as specifically provided otherwise here."

n.     "The Debtors acknowledge that the Loan Documents (as modified and supplemented here and to the extent enforceable under the Bankruptcy Code) will constitute valid, binding, and enforceable obligations of the Debtors in accordance with their terms. The Debtors are authorized to do and perform all acts, to make, execute, and deliver all agreements, assignments, instruments, and documents to give effect to any of the terms of this Final Order."

### 4.      The Debtors' Exclusivity Periods

The Debtors' exclusive right to file a Chapter 11 plan was set to expire on April 19, 2021. On March 31, 2021, the Debtors filed a *Motion to Extend the Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement* [Docket No. 65] ("First Motion to Extend Exclusivity Period"). On June 25, 2021, the Court held a hearing on the First Motion to Extend the Exclusivity Period, wherein it granted relief in the Debtors' favor and overruled all objections. [Docket No. 99]. On August 17, 2021, the Debtors filed a *Second Motion to Extend the Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement* [Docket No. 103] ("Second Motion to Extend Exclusivity Period"). The objections to the Second Motion to Extend Exclusivity Period were resolved through an agreed order summarized below.

On September 21, 2021, the Court entered an *Order Extending Exclusive Right to File a Plan of Reorganization and to Solicit Acceptances for the Debtors' Plan and For Related Relief* [Docket No. 125] (the "Final Exclusivity Order"). The Final Exclusivity Order extended Debtors' exclusive right to file a Chapter 11 plan through November 24, 2021 (the "Exclusivity Period"), and provided that if the Debtors filed a Chapter 11 plan during the Exclusivity Period, they would have the exclusive right to solicit acceptances for such plan through January 24, 2022 (the "Acceptance Period").

On November 24, 2021, the Debtors filed the Debtors' Original Plan. The Debtors' Original Plan was based on a sales process including an opportunity for the holder of senior mortgage debt or its nominee to credit bid and is in many ways similar to the TH Holdco Plan (see redline of those plans filed as Exhibit D-2 to the original TH Holdco Disclosure Statement [Docket No. 152]. Debtors never filed a disclosure statement related to the Debtors' Original Plan or otherwise solicited acceptance of the Debtors' Original Plan or sought a further extension of the Acceptance Period. Therefore, the Exclusivity Period and the Acceptance Period have now both expired.

### 5.      Claims Bar Date

On March 12, 2021, the Debtors filed a *Motion to Establish a Deadline to File Proofs of Claim*. [Docket No. 55]. In accordance with Bankruptcy Rule 3003(c)(3), by order dated March

15, 2021 [Docket No. 58] (the "Bar Date Order"), the Bankruptcy Court fixed April 21, 2021 (the "Bar Date") as the last day by which general creditors would be permitted to file claims in the Debtors' Chapter 11 Cases, and June 16, 2021 as the last day for governmental units to file claims in the Debtors' Chapter 11 Cases (the "Governmental Bar Date"). On May 26, 2021, the Debtors filed an Amended Schedule E/F scheduling additional creditors who may have claims against the Debtors. [Docket Nos. 80 and 81]. Pursuant to the Bar Date Order, the deadline to file a proof of claim for creditors scheduled on Amended Schedule E/F was extended to June 28, 2021 ("Supplemental Bar Date"). Pursuant to Bankruptcy Rule 3003(c)(2), any creditor whose claim had not been scheduled by the Debtors or was scheduled as disputed, contingent, or unliquidated and has failed to file a proof of claim on or before the Bar Date, the Supplemental Bar Date, or the Governmental Bar Date, as the case may be, is deemed not to be a creditor with respect to such claim for purposes of voting on and receiving a distribution under a Chapter 11 plan.

### 6.   Filed and Scheduled Claims

A listing by Estate of all of the filed proofs of claim and scheduled claims is attached as **Exhibit C** to this Disclosure Statement. An overview of the filed claims follows:

### i.   *Hotel Claims*

Secured Claims

TH Holdco filed a Secured Claim in the amount of $85,158,815.99, not including post-petition interest and other costs, against 85 Flatbush RHO Hotel. 85 Flatbush RHO Hotel scheduled this claim, originally held by 85 Flatbush Avenue, in the amount of $70,000,000.00, and the Agreed Final Cash Collateral Order acknowledged a total amount owed of $85,158,815.99, as discussed in detail above. To the extent that the value of the senior mortgagee's collateral exceeds this total prepetition claim amount, then TH Holdco asserts it is entitled to post-petition accrued amounts as follows as of April 5, 2022 (with additional post-petition interest, fees and costs continuing to accrue after April 5, 2022) and that there is no interest-on-interest in its calculation below:

| Nature of Post-petition Claims | Post-petition Amount Asserted by TH Holdco |
|---|---|
| Post-petition Interest at Default Rate | $22,073,333 |
| Post-petition Interest at Default Rate on Protective Advance | $78,155 |
| Post Loan Acquisition Attorney's Fees and Costs in 2022 | At least $275,000 |
| TOTAL POST-PETITION AS OF APRIL 5, 2022 | At least $22,426,488 |
| TOTAL PRE-PETITION AND POST-PETITION AS OF APRIL 5, 2022 | In excess of $107 million |

US_Active\121219192\V-5

The Bankruptcy Court has not made any final determination as to the post-petition amounts owed to TH Holdco at this time.  TH Holdco reserves all of its rights under the Final Cash Collateral Order.

<u>Chapter 11 Post-petition Administrative Claims and Priority Claims</u>

According to the Monthly Operating Reports filed as of November 30, 2021, post-petition administrative claims in 85 Flatbush RHO Hotel total $947,715.13.  The Debtors may assert that they are jointly and severally liable for professional fees in the amount of $236,000 as of March 25, 2022 net of retainers according to an email from Debtors counsel.[3]  There may be additional Chapter 11 professional fees and administrative expenses which may be accrued or asserted.

In its April 4, 2022 email, Debtors' counsel also states that "Outstanding RE Taxes aggregate approximately $1,620,000."  In its April 5, 2022 follow up e-mail, Debtors' counsel states that:

Per Debtors' manager, regarding RE taxes, the property is identified as block 00120 with 4 separate lots:

Lot 7503: assigned by NYC Department of Finance representing the whole building which is then broken down to:

Lot 1201: commercial unit next to the Hotel

Lot 1202: hotel property

Lot 1203: residential and garage property

Charges due as of 4/1/2022 by lot:

7503: $935.26

1201: $3,897.73

1202: $1,573,921.88

1203: $40,875.91

---

[3]     In that April 4, 2022 email, Debtors' counsel notes with respect to the estimated professional fees "that this is for informational purposes only and without prejudice to professionals' rights to seek court approval of all outstanding fees and expenses incurred in connection with these cases.  Obviously, fees and expenses will continue to accrue as the cases proceed.  Any applications for professional compensation will set forth the amounts due for that application's time period."

US_Active\121219192\V-5

Certain priority tax claims were also filed against 85 Flatbush RHO Hotel.  The New York State Department of Labor filed a claim in the amount of $0.00 pursuant to § 507(a) of the Bankruptcy Code in the event future liabilities become due.  The New York State Tax Department filed two claims in the amounts of 91,872.965 and $635,682.55.  85 Flatbush RHO Hotel did not schedule any priority unsecured claims.  The Debtors' have identified real property taxes due on the block and lot numbers comprising the Hotel Property and the Residential Property as totaling $1,619,630.78, which claims will continue to accrue interest and other charges.

Unsecured Claims

85 Flatbush RHO Hotel scheduled a total of $1,731,153.91 in nonpriority unsecured claims.  Together with filed proofs of claim, there are a total of $2,570,342.13 in nonpriority unsecured claims asserted against 85 Flatbush RHO Hotel.  See **Exhibit C** for a detailed listing of the scheduled claims and filed proofs of claim for each Estate.  In Exhibit A, Part 2 of the Debtors' Filed Disclosure Statement (Docket No. 162-2), the Debtors list combined non-insider unsecured creditors of $1,758,901.79 and provided additional detail on Claims by Class as set forth in the Debtors' Disclosure Statement and summarized in a chart below.

## ii.    *Residential Claims*

Secured Claims

TH Holdco filed a Secured Claim in the amount of $85,158,815.99, not including post-petition interest and other costs, against 85 Flatbush RHO Residential.  85 Flatbush RHO Residential scheduled this claim, originally held by 85 Flatbush Avenue, in the amount of $70,000,000.00.

Chapter 11 Post-petition Administrative Claims and Priority Claims

The Debtors may assert that they are jointly and severally liable for professional fees in the amount of $236,000 as of March 25, 2022 net of retainers according to an email from Debtors counsel.[4]  There may be additional Chapter 11 professional fees and administrative expenses which may be accrued or asserted.  85 Flatbush RHO Residential did not schedule any priority unsecured claims, and no proofs of claim asserting priority claims were filed against 85 Flatbush RHO Residential.

In its April 4, 2022 email, Debtors' counsel also states that "Outstanding RE Taxes aggregate approximately $1,620,000."  In its April 5, 2022 follow up e-mail, Debtors' counsel states that:

Per Debtors' manager, regarding RE taxes, the property is identified as block 00120 with 4 separate lots:

Lot 7503: assigned by NYC Department of Finance representing the whole building which is then broken down to:

---

[4]    *See* Footnote 3 above.

US_Active\121219192\V-5

Lot 1201: commercial unit next to the Hotel

Lot 1202: hotel property

Lot 1203: residential and garage property

Charges due as of 4/1/2022 by lot:

7503: $935.26

1201: $3,897.73

1202: $1,573,921.88

1203: $40,875.91

Unsecured Claims

85 Flatbush RHO Residential scheduled a total of $766,664.00 in nonpriority unsecured claims. Together with filed proofs of claim, there are a total of $1,175,320.00 nonpriority unsecured claims against 85 Flatbush RHO Residential. See **Exhibit C** for a detailed listing of the scheduled claims and filed proofs of claim for each Estate.

### iii.    *Mezz Claims*

Secured Claims

To date, filed Secured Claims against 85 Flatbush RHO Mezz total $7,787,611.90. Flatbush Mezz LLC filed a Secured Claim in the amount of $7,787,500.00. The Debtors scheduled this claim in the amount of $6,000,000.00. The New York City Department Finance filed a Secured Claim in the amount of $111.90.

Chapter 11 Post-petition Administrative Claims and Priority Claims

The Debtors may assert that they are jointly and severally liable for professional fees in the amount of $236,000 as of March 25, 2022 net of retainers according to an email from Debtors counsel.[5] There may be additional Chapter 11 professional fees and administrative expenses which may be accrued or asserted.

The New York City Department of Finance filed an administrative priority claim in the amount of $1,119,193.86 in the 85 Flatbush RHO Mezz case. There may be additional Chapter 11 professional fees and administrative expenses which may be accrued or asserted.

85 Flatbush RHO Mezz did not schedule any priority unsecured claims, and no proofs of claim asserting priority claims were filed against 85 Flatbush RHO Mezz.

---

[5]    See Footnote 3 above

US_Active\121219192\V-5

Unsecured Claims

85 Flatbush RHO Mezz scheduled $766,331.00 nonpriority unsecured claims. Together with filed proofs of claim, there are $1,166,564.88 nonpriority unsecured claims against 85 Flatbush RHO Mezz. See **Exhibit C** for a detailed listing of the scheduled claims and filed proofs of claim for each Estate.

A review of the back-up filed with most of the proofs of claim filed against Mezz reflect that the claims are properly asserted against Hotel and should be reclassified as such.

### 7.    JLL Engagement as Real Estate Advisor and Marketing of the Assets

On September 7, 2021, the Debtors filed an *Application for an Order Authorizing the Retention of Real Estate Advisor*, to permit JLL to arrange a joint venture, financing or recapitalization, sell, or otherwise dispose of the Hotel Property. [Docket No. 114]. On October 12, 2021, the Court entered an *Order Authorizing Retention of JLL as Real Estate Advisor*. [Docket No. 133].

Upon information and belief, JLL has prepared marketing materials and established a data room for due diligence by potential bidders and has been soliciting offers on the assets for several months now. Upon information and belief, no offer which would be sufficient to pay or refinance the obligations on the senior mortgage debt in full has been communicated to TH Holdco or 85 Flatbush Avenue as the predecessor holder of the senior mortgage debt.

In their filed Disclosure Statement (Docket No. 162, page 12), the Debtors summarize their marketing efforts as follows:

> JLL launched their marketing efforts on October 12, 2021, creating and establishing a data room for interested parties which was accessible immediately upon their executing a confidentiality agreement. A total of 69 confidentiality agreements were executed and JLL conducted 14 tours of the Hotel Property and the Residential Property. The marketing period continued through November 17, 2021. A total of six (6) written offers were received, that were later narrowed down to three (3) potential purchasers for the Hotel Property and the Residential Property for in excess of $80,000,000 . . .

In the Debtors filed objection to TH Holdco LLC's Motion to Approve (I) Adequacy of Information in the Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballot and (IV) Certain Dates with Respect Thereto (Docket No. 166, paragraph 6), the Debtors also state that:

> The Debtor's negotiation of a LOI with the final of the three bidders for $87,500,000 came to a crashing halt upon TH's acquisition of the mortgage loan and related loan documents.

TH Holdco asserts that the Debtors' statement show their general marketing process was completed by November 17, 2021 (or nearly two months before TH Holdco's purchase of the Class 3 Claim or any other potential buyer's knowledge of that claim purchase) and that the Debtors had then focused on 3 bidders resulting in an alleged top bid of $87,500,000 as a letter of intent (again before TH Holdco's purchase of the Class 3 Claim or any other potential buyer's knowledge of

15

that claim purchase). There is no description of any due diligence, financing or other material contingency in that letter of intent in the Debtors' filed pleadings. Further, TH Holdco asserts that there is no assurance provided by the Debtors that the LOI and any subsequent purchase agreement would have been finalized at that $87,500,000 alleged price versus a lower final price from that final bidder.

TH Holdco asserts that the marketing process run by JLLand this Plan are the best indicator of the value of the Properties and that no separate appraisal is required. TH Holdco disputes the valuation of $120 million in the Debtors' Disclosure Statement and notes the Debtors do not attach any such valuation or provide detailed support for that valuation, which is belied by the bids received in 5 months of marketing by the Debtors and JLL as described in the Debtors' Disclosure Statement and quoted in this Disclosure Statement. TH Holdco notes that at the Debtors $120 million valuation, TH Holdco would be entitled to all of its post-petition interest and costs in full set forth in this Disclosure Statement as an oversecured creditor. Debtors' dispute certain of TH Holdco's assertions regarding the Properties value and its entitlement to all of its post-petition interest and costs.

## 8.    Debtors' Original Plan

On November 24, 2021, the Debtors filed their Debtors' Original Plan. Like the Plan proposed by TH Holdco, the Debtors' Original Plan envisioned an auction pursuant to Sale and Bid Procedures approved by the Bankruptcy Court including the rights of the holder of the senior mortgage debt to credit bid. The Debtors' Original Plan then envisioned a distribution of any cash proceeds from the sale of the assets or cash on hand at the Debtors pursuant to the priority waterfall set forth in the Debtors' Original Plan. While the Debtors' Original Plan provided for the possibility that General Unsecured Creditors in the 85 Flatbush RHO Hotel and 85 Flatbush RHO Residential Chapter 11 Cases or creditors in the 85 Flatbush RHO Mezz case could receive a distribution if there was sufficient funds in the Plan Fund, TH Holdco asserts that there was no assurance there would in fact be any such proceeds available for distribution to those classes.

## 9.    Meeting and Discussion with the Debtors' Minority Owner and Due Diligence

TH Holdco asserts that in mid-October 2021, Franco Famularo, an executive with Ohana Real Estate (which is an affiliate of TH Holdco), had discussions with Isaac Hager, a minority owner of Mezz Debtor, who purported to have authority to represent the Debtors. Mr. Famularo met with Mr. Hager for an on-site tour of the Property in October of 2021. During their discussions, TH Holdco asserts that Mr. Hager, acting for the Debtors, demanded that as part of any bid from Ohana or its nominee, the owners of the Mezz Debtor be "made whole" by a payment of at least $20 million, including at least $15 million of cash consideration. TH Holdco asserts that Mr. Hager asserted that payment must be made for the benefit of equity, even though the Debtors did not expect creditors to be paid in full, and required that any deal was predicated on Mr. Hager remaining as an investor in the Property. TH Holdco asserts that when Mr. Famularo asked Mr. Hager why the Debtors expected a full recovery including a substantial cash payment when the creditors were being impaired, Mr. Hager represented that a separate rabbinical court ruling regarding a settlement between Mr. Hager and the majority owner of the Property effectively took precedence over the bankruptcy court process.

16

TH Holdco asserts that at no point did Mr. Hager or the Debtors' refer Ohana to JLL, suggest that Ohana negotiate through JLL, or propose that Ohana be a stalking horse bidder to acquire the Property.  Ohana considered the Debtors' demands to be unrealistic and improper, and determined that further negotiations with Debtors would not be productive.

Ohana thereafter continued to perform due diligence on the Property based on publicly available information (including key pleadings in the Bankruptcy Case docket and claims registers) and information provided by the then current senior lender, 85 Flatbush Avenue 1 LLC.

On November 3, 2021, TH Holdco asserts that Mr. Famularo was forwarded an unsolicited email from a real estate broker in New York City (not JLL) (the "November Email") which has been filed with the Bankruptcy Court.  This email was originally sent by the broker to Chris Smith of Ohana, and the broker was soliciting interest from Ohana to provide capital to back the Debtors' business plan to seek a longer-term lease with DHS.  TH Holdco asserts that the unsolicited email from the broker included information that clearly came from the Debtors, including (i) a market appraisal valuing the Property at $94 million as of September 11, 2019 (from the Debtors' original acquisition financing process) and (ii) a form of a DHS Lease which appears to be terminable at any time by DHS. This broker appears to be acting for the Debtors and/or its principals outside of the JLL process and in support of an insider bid.  TH Holdco asserts that Ohana did not engage with the broker at that time.

Separately, in early January 2022, TH Holdco asserts that Mr. Famularo received an unsolicited call from that same real estate broker in New York City (not JLL) who claimed to represent the Debtors.  Without knowing about Ohana's familiarity with the Property and ongoing due diligence or acknowledging the November Email, TH Holdco asserts that broker stated that he was helping the Debtors find mezzanine debt and equity to help them maintain ownership of the Property.  TH Holdco asserts Ohana again declined to engage further, but it was apparent that the Debtors were still acting outside of the JLL process in an attempt to retain ownership of the property.

TH Holdco asserts that this led Ohana to believe that the Debtors' principals and affiliates were interested only in maximizing recovery to equity and were putting their own interests ahead of those of the creditors.  This was concerning to Ohana, as was the Debtors' failure to move their sale plan along (by, for example, not filing a disclosure statement within the exclusivity period). As such, through its affiliate TH Holdco, Ohana purchased the debt directly from the Pre-petition Lender after the Debtors' exclusivity expired as discussed below.

Debtors dispute certain of TH Holdco's assertions set forth above.

**10.     Purchase of the Senior Mortgage Loan**

After the Debtors' failed to file a disclosure statement related to the Debtors Original Plan providing for a sale of the Properties on January 24, 2022, TH Holdco, an affiliate of Ohana, purchased the senior mortgage loan.  TH Holdco viewed the Debtors' failure to timely file its Disclosure Statement as a further sign it was not moving this case forward towards a confirmable plan and there was no assurance the Debtors would timely move forward with a confirmable plan or a bid which was in the best interest of the Estates and their creditors versus the insiders of the

Debtors.  This is reinforced in TH Holdco's view by the Debtors failure to file its amended plan and any disclosure statement until March 30, 2022, more than two years after its initial default, in a form that TH Holdco asserts is not feasible or otherwise confirmable and seemingly in response to the April 6 Hearing on TH Holdco's Disclosure Statement.

In early February, 2022, TH Holdco through its counsel reached out to Debtors' counsel to explore whether a consensual Chapter 11 plan could be reached and proposed a joint business/legal call between the parties.  TH Holdco asserts that proposal was ignored by Debtors' counsel. Additionally, given the Debtors' had information on accrued Chapter 11 Administrative Expenses not publicly available, TH Holdco's counsel asked Debtors' counsel for an analysis of the cash necessary to pay priority claims and Chapter 11 administrative expenses which Debtors' counsel agreed to provide.  TH Holdco's counsel then followed up with Debtors' counsel on the analysis which Debtors' counsel was being advised was being worked on.  Finally parts of that analysis were provided on April 4, 2022 by Debtors' counsel to TH Holdco's counsel. Additional claims information regarding the scheduled and filed claims has since been provided by Debtors' counsel to TH Holdco's counsel.

## 11.   Debtors' Amended Plan and Disclosure Statement

On March 30, 2022, the Debtors filed their (i) Amended Plan of Reorganization of 85 Flatbush RHO Mezz, LLC, 85 Flatbush RHO Hotel, LLC and 85 Flatbush RHO Residential LLC [Docket No. 161] and (ii) Disclosure Statement for Amended Plan of Reorganization of 85 Flatbush RHO Mezz LLC, 85 Flatbush RHO Hotel, LLC, and 85 Flatbush RHO Residential LLC [Docket No. 162].  Unlike the Debtors Original Plan, the Debtors Amended Plan is a plan of reorganization rather than a sale based plan.  The Debtors Amended Plan is conditioned on $78 million of exit financing but no financing commitment has been filed by the Debtors.  The Debtors Amended Plan is also conditioned on an equity contribution of $9,611,096 from the existing equity interests.  Further, the Debtors Amended Plan is conditioned on finalizing and obtaining Bankruptcy Court approval for a long-term occupancy with the New York Department of Homeless Services to operate a homeless shelter.  No documentation for any of those contingencies is being filed with the Debtors' Disclosure Statement and the Debtors may not file those material documents until after any voting deadline on the Debtors Amended Plan.

As discussed at page 3 of this Disclosure Statement and other pleadings filed by TH Holdco in the Bankruptcy Cases, TH Holdco asserts that the Debtors Amended Plan is not confirmable for a number of different reasons, any one of which is in TH Holdco's view fatal to confirmation of the Debtors Amended Plan.  Further, TH Holdco asserts that its amended Plan is better for creditors than the Debtors Amended Plan and is feasible and confirmable as discussed in that section of this Disclosure Statement.  In particular, TH Holdco asserts that the payments to the 85 Flatbush RHO Hotel General Unsecured Creditors (Class 6) and 85 Flatbush RHO Residential General Unsecured Creditors (Class 8) are much quicker and are ultimately backed up by funding from Ohana, the ownership of TH Holdco.  Debtors dispute this assertion as there has been no showing by TH Holdco as to (1) why there is a need for payment to General Unsecured Creditors to be paid in installments;  (2) TH Holdco and Ohana's ability to fund Plan payments; (3) the escrow of Plan funding amounts required on the Closing and/or Effective Dates of the Plan; or (4) creditor remedies in the event payments under the Plan are not funded.

12.    **Mezz Lenders' Adversary Proceeding**

On March 23, 2022, Mezz Lender filed an adversary proceeding (Adversary Proceeding 7:22-ap-07022-RDD) (the "Adversary Proceeding") against TH Holdco alleging that 85 Flatbush Avenue failed to issue purchase option notices ~~to the Mezz Lender pursuant to the Intercreditor Agreement~~as required by the ICA after certain purchase option events occurred, beginning in July of 2020, August of 2020 and December of 2020, and that Mezz Lender retains the right to purchase the Senior Loan at the loan purchase price calculated as of July 16, 2020.  TH Holdco filed its answer and affirmative defenses to that Adversary Proceeding (Adversary Proceeding Docket No. 6) on April 4, 2022 and has propounded certain discovery on the Mezz Lender.  The Mezz Lender ~~asserts~~and TH Holdco anticipate being in a position to complete discovery within approximately sixty (60) days so as to be in a position to file potential dispositive motions by mid-June, with the goal of obtaining a determination of the Mezz Lender's claims in the Adversary Proceeding before an Auction of the Properties The parties have taken diametrically opposed positions in the Adversary Proceeding.  The Mezz Lender submits that the failure to provide the required purchase option notices ~~pursuant to the Intercreditor Agreement~~ cannot be genuinely disputed~~,~~ and ~~further asserts that~~ the appropriate remedy is for the Mezz Lender to have the opportunity to purchase the Senior ~~Loan~~Loans for a purchase price calculated under the ICA as of July 16, 2020. ~~ TH Holdco disputes this.~~

TH Holdco believes that the Mezz Lender Adversary Proceeding lacks merit and asserts that it will be promptly dismissed because, among other things, (i) Mezz Lender's claims are contrary to the express terms of the ICA, (ii) Mezz Lender was not ready, willing and able to consummate the purchase of the Senior Loan on closing date contemplated by the ICA, including because it did not have the funds to consummate the purchase, (iii) pursuant to the ICA, Mezz Lender was not entitled to exercise the loan purchase option or consummate the purchase of the senior loan because of various events of default, and (iv) Mezz Lender's claims are barred by equitable doctrines such as laches, unconscionable or inexcusable delay, bad faith, unclean hands, waiver and estoppel.

A ruling on the Mezz Lender Adversary Proceeding, however, is not a condition to confirmation of the TH Holdco Plan.

IV.    **THE CHAPTER 11 PLAN FILED BY TH HOLDCO[6]**

**THIS SECTION OF THIS DISCLOSURE STATEMENT PRESENTS ONLY A SUMMARY OF THE PLAN, WHICH IS ATTACHED HERETO AS EXHIBIT A. CREDITORS ARE URGED TO CONSULT WITH COUNSEL IN ORDER TO DETERMINE WHETHER TO VOTE FOR OR AGAINST THE PLAN.**

1.    **Classification of Claims**

A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified

---

6  Capitalized terms used but not defined in this summary of the Plan shall have the meanings given to such terms as set forth in the Plan.

in a different Class to the extent that any remainder of the Claim or Interest qualifies within the
description of such different Class.  A Claim or Interest is in a particular Class only to the extent
that the Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and has not
been paid, released, or otherwise satisfied or dealt with prior to the Effective Date.  Except as
expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective
Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed
Claim unless and until such Claim is deemed under this Plan or the Bankruptcy Code or the
Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order,
in the Chapter 11 Cases allowing such Claim., subject to a determination of the Mezz Lender's
claims in the Adversary Proceeding.  Nothing herein shall otherwise impact the TH Holdco Credit
Bid and TH Holdco's rights under orders of this Bankruptcy Court or the Intercreditor Agreement.

The term "impaired" as used below shall have the same meaning it has pursuant to § 1124
of the Bankruptcy Code.  Thus, a Class of Claims is impaired under the Plan unless, with respect
to each and every Claim in the Class, the holder of such Claim receives, on the Effective Date of
the Plan, the total Allowed amount of such Claim in cash or the Plan leaves unaltered the legal,
equitable, and contractual rights to which such Claim entitles the holder thereof.

## 2.    Unclassified Claims/Administrative Claims

Administrative Claims are not classified under the Plan.  Administrative Claims are
Allowed Claims against the applicable Debtor for any costs or expenses of the Chapter 11 Case
under §§ 503(b) and 507(a)(1) of the Bankruptcy Code, including all actual and necessary expenses
of preservation of the applicable Debtor's Estate.  Such Allowed Administrative Claims are to be
paid in full (to the extent not already paid during the Chapter 11 Cases), in cash on the later of:  (i)
the Effective Date; (ii) the date such Claim becomes Allowed; and (iii) such other date and upon
such other terms as may be agreed upon by the holder of such Claim and the applicable Debtor, or
as ordered by the Bankruptcy Court.

All requests for payment of Administrative Claims that accrued out of the ordinary course
of business during the Administrative Period shall be filed and served on the Debtors and TH
Holdco not later than thirty (30) calendar days after notice of the Confirmation Date, with the
exception of the Administrative Claims of Professional Persons retained pursuant to order of the
Bankruptcy Court, which are subject to Court approval after notice and hearing and shall be paid
on or before the Effective Date or as otherwise ordered by the Bankruptcy Court.  Notwithstanding
anything in the Plan to the contrary, objections to such requests shall be filed and served within
sixty (60) calendar days after the Effective Date.

Except as specified above, all Allowed Administrative Claims shall receive cash from the
Distribution Agent in the amount of such Allowed Administrative Claim on the later of (i) the
Effective Date and (ii) the date such Administrative Claim becomes an Allowed Administrative
Claim, or at such other date and upon such other terms as may be agreed upon the holder of the
Allowed Administrative Claims and the Distribution Agent or TH Holdco or ordered by the
Bankruptcy Court.

Any Allowed Administrative Claim based on a liability incurred by the applicable Debtor
in the ordinary course of business during the Chapter 11 Case may be paid in the ordinary course

US_Active\121219192\V-5

of business in accordance with the terms and conditions of any agreement relating thereto, and any Allowed Administrative Claim may be paid on such other terms as may be agreed on between the holder of such Allowed Administrative Claim and the applicable Debtor.

Allowed Administrative Claims shall be paid from the Plan Fund.

### 3.    Priority Tax Claims

Priority Tax Claims are not classified under the Plan.  Unless otherwise agreed to by the Distribution Agent and a holder of an Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practical, the later of the Closing Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course.

Allowed Priority Tax Claims shall be paid from the Plan Fund.

### 4.    Professional Fee Claims

Professional Fee Claims are not classified under the Plan.  Any Professional Person seeking allowance of a Professional Fee Claim shall file, with the Bankruptcy Court, its final application for allowance of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date and in connection with the preparation and prosecution of such final application no later than thirty (30) calendar days after the Effective Date which date may be extended by agreement between the parties.  Any objections to such Professional Fee Claims must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than sixty (60) calendar days after the Effective Date or such other date as established by the Bankruptcy Court, all of which are subject to approval by the Bankruptcy Court on an interim and/or final basis.

All Professional Persons seeking allowance by the Bankruptcy Court of a Professional Fee Claim shall be paid in full in cash in such amounts as are approved by the Bankruptcy Court: (i) upon the later of (x) the Effective Date and (y) fourteen (14) calendar days after the date upon which the order relating to the allowance of any such Professional Fee Claim is entered; or (ii) upon such other terms as may be mutually agreed upon between the holder of such Professional Fee Claim and the Disbursing Agent.  On the Effective Date, to the extent known, the Disbursing Agent shall reserve and hold in a segregated account cash in an amount equal to all accrued but unpaid Professional Fee Claims as of the Effective Date, which cash shall be disbursed solely to the holders of Allowed Professional Fee Claims with the remainder to be reserved until all Professional Fee Claims have been either Allowed and paid in full or disallowed by a Final Order, at which time any remaining cash in the segregated account shall become the sole and exclusive property of TH Holdco.  All post-Confirmation Professional Fees and expenses for services rendered by the Professional Persons in connection with the Chapter 11 Cases and the Plan shall be paid in the ordinary course by the Disbursing Agent.

The Estimated Professional Fee Escrow will be established by the Debtors or TH Holdco ten (10) days prior to the Effective Date and will hold sufficient Cash to pay the Fee Claims in

full, less any applicable retainers held by such professionals, subject to their Allowance by the Bankruptcy Court upon the later of (i) the Effective Date or (ii) the date upon which the order relating to any such Allowed Fee Claim is entered or (iii) upon such other terms and conditions as may be agreed to between the holder of such an Allowed Fee Claim, and TH Holdco.  The Estimated Professional Fee Escrow shall be funded first from the Debtors' cash on hand as of the Effective Date of the Plan and thereafter from the Plan Fund.

### 5.    **U.S. Trustee Fees**

The Disbursing Agent shall pay all outstanding U.S. Trustee Fees of the applicable Estate on an ongoing basis on the date such U.S. Trustee Fees become due and payable, until such time as a final decree is entered closing the applicable Chapter 11 Case, the applicable Chapter 11 Cases is converted or dismissed, or the Bankruptcy Court orders otherwise.

U.S. Trustee Fees shall be paid from the Plan Fund.

### 6.    **Classified Claims**

The Plan provides for the division of claims and interests into separate classes.  The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with § 1126 of the Bankruptcy Code, and (c) deemed to reject the Plan.  In accordance with § 1123 of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and, thus, are excluded from the classes of Claims and Interests set forth in Section 3 of the Plan.  Unless otherwise noted below, classified claims shall be paid from the Plan Fund.

In the Debtors' Disclosure Statement, the Debtors provide approximate amounts of total Claims for each Class in the Plan.  TH Holdco has not been able to fully verify those amounts yet but provides them as additional information below.  Actual Allowed Claims may end up being more or less than the amounts set forth below and TH Holdco and all other parties in interest reserve the right to object to any claim to the extent not already allowed in a Final Order of the Bankruptcy Court.

US_Active\121219192\V-5

| Class | Designation | Treatment | Approximate Amount in Debtors' Disclosure Statement | Entitled to Vote |
|-------|-------------|-----------|-----------------------------------------------------|------------------|
| 1 | 85 Flatbush RHO Hotel Other Priority Claims | Unimpaired | $635,682.55 | No (presumed to accept) |
| 2 | 85 Flatbush RHO Residential Other Priority Claims | Unimpaired | $0 | No (presumed to accept) |
| 3 | TH Holdco Secured Claim | Impaired | $85,158,816 (does not include post-petition amounts) | Yes |
| 4 | 85 Flatbush RHO Hotel Other Secured Claims | Unimpaired | $1,548,320.12 | No (presumed to accept) |
| 5 | 85 Flatbush RHO Residential Other Secured Claims | Unimpaired | $40,111.67 | No (presumed to accept) |
| 6 | 85 Flatbush RHO Hotel General Unsecured Claims | Impaired | $1,174,927.93 | Yes |
| 7 | 85 Flatbush RHO Hotel Existing Equity Interests | Impaired | n/a | Yes |
| 8 | 85 Flatbush RHO Residential General Unsecured Claims | Impaired | $204,815 | Yes |
| 9 | 85 Flatbush RHO Residential Existing Equity Interests | Impaired | n/a | Yes |

US_Active\121219192\V-5

| Class | Designation | Treatment | Approximate Amount in Debtors' Disclosure Statement | Entitled to Vote |
|---|---|---|---|---|
| 10 | 85 Flatbush Mezz Other Priority Claims | Impaired | $0 | Yes |
| 11 | 85 Flatbush Mezz Claims | Impaired | $7,787,500 | Yes |
| 12 | 85 Flatbush Mezz Other Secured Claims | Impaired | $0 | Yes |
| 13 | 85 Flatbush Mezz General Unsecured Claims | Impaired | $171.59 | Yes |
| 14 | Insider General Unsecured Claims | Impaired | $1,708,629 | Yes |
| 15 | 85 Flatbush Mezz Existing Equity Interests | Impaired | n/a | No (deemed to reject) |

*85 Flatbush RHO Hotel Other Priority Claims (Class 1).*

(a)   Classification:   Class 1 consists of Allowed Other Priority Claims against 85 Flatbush RHO Hotel.

(b)   Treatment:  Except to the extent that a holder of an Allowed Other Priority Claim against 85 Flatbush RHO Hotel that has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash from the Plan Fund allocable to the Hotel Property, in an amount equal to such Claim, payable on the later of the Closing Date, the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or when such claim becomes payable in the ordinary course or as soon as reasonably practical thereafter.

(c)   Voting:  Class 1 is Unimpaired, and the holders of 85 Flatbush RHO Hotel Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to § 1126 of the

Bankruptcy Code. Therefore, holders of 85 Flatbush RHO Hotel Other Priority Claims are not entitled to vote to accept or reject the Plan.

*85 Flatbush RHO Residential Other Priority Claims (Class 2).*

(a)     Classification: Class 2 consists of Allowed Other Priority Claims against 85 Flatbush RHO Residential.

(b)     Treatment:  Except to the extent that a holder of an Allowed Other Priority Claim against 85 Flatbush RHO Residential that has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash from the Plan Fund allocable to the Residential Property, in an amount equal to such Claim, payable on the later of the Closing Date, the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or when such claim becomes payable in the ordinary course or as soon as reasonably practical thereafter.

(c)     Voting:  Class 2 is Unimpaired, and the holders of 85 Flatbush RHO Residential Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to § 1126 of the Bankruptcy Code.  Therefore, holders of 85 Flatbush RHO Residential Other Priority Claims are not entitled to vote to accept or reject the Plan.

*TH Holdco Secured Claim (Class 3).*

(a)     Classification:  Class 3 consists of the TH Holdco Secured Claim.  The TH Holdco Secured Claim is a Secured Claim pursuant to the TH Holdco Prepetition Loan Agreement, which is secured by the TH Holdco Mortgage and constitutes a first priority security interest on the Hotel Property and Residential Property subject to TH Holdco prevailing in the Adversary Proceeding pursuant to final order or judgment.  Nothing herein shall prejudice either TH Holdco's rights or the Mezz Lender's rights under the Intercreditor Agreement and under orders of this Bankruptcy CourtICA or in connection with the Adversary Proceeding.

(b)     Treatment:  TheTreatment:  To the extent TH Holdco prevails in the Adversary Proceeding pursuant to final order or judgment, the holder of the TH Holdco Secured Claim shall receive:

(i)     If the Hotel Property and/or Residential Property is sold to a party other than TH Holdco, Cash in an amount sufficient to satisfy the sum of the Allowed Class 3 Claim, together with all applicable prepetition and postpetition interest, costs and fees.  Pending the Closing of the Sale Transaction, the holder of the Class 3 Claims shall retain its Lien on the Hotel and Residential Property.

(ii)     If the Hotel and/or Residential Property is sold to TH Holdco pursuant to a TH Holdco Credit Bid, then TH Holdco shall receive the Hotel and/or Residential Property and any further distribution to which it is it entitled to on its unsecured deficiency Claim if TH Holdco

chooses to assert such unsecured deficiency Claim.  In any event, TH Holdco preserves all of its rights and claims against all guarantors and non-Debtor parties.

As part of the TH Holdco Credit Bid, TH Holdco or its nominee, or designee, may elect to take title of any of the Properties subject to the existing TH Holdco Mortgage (as reduced by the value of the TH Holdco Credit Bid), which TH Holdco Mortgage may be assigned to any such nominee's or designee's lender.  In the event TH Holdco or its nominee or designee elects to take title to any of the Properties subject to the existing TH Holdco Mortgage, Debtors shall have no further financial obligation to TH Holdco or any assignee of the TH Holdco Mortgage and shall be released from any and all liability to TH Holdco or any assignee with respect to such TH Holdco Mortgage upon the Closing. Nothing herein shall impact TH Holdco's rights or any other parties' rights as to any deficiency Claim against the Debtors or any guarantors or other non-Debtor parties. Notwithstanding anything to the contrary stated in the Plan, if the Mezz Lender prevails in the Adversary Proceeding pursuant to final order or judgment and exercises its purchase option rights, then the Mezz Lender further reserves the right to cancel or postpone the Auction, modify the Plan or support the Debtors' Plan.

Pursuant to § 1146(a) of the Bankruptcy Code, the deeds conveying any of the Properties to TH Holdco or its nominee or designee upon the Effective Date of this Plan shall be an instrument of transfer in connection with or in furtherance of the Plan and shall not be subject to tax under any law imposing a Transfer Tax.

(c)    Voting:  Class 3 is Impaired, and holder of the TH Holdco Secured Claim in Class 3 is entitled to vote to accept or reject the Plan.

*Flatbush RHO Hotel Other Secured Claims (Class 4).*

(a)    Classification:  Class 4 consists of the 85 Flatbush RHO Hotel Other Secured Claims.  To the extent that 85 Flatbush RHO Hotel Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 4.  TH Holdco asserts that Class 4 Allowed Priority Tax Claims which may also be Secured Claims will be paid in full in Cash as Allowed Priority Tax Claims as set forth in the treatment for Allowed Priority Tax Claims set forth above.

(b)    Treatment:  Except to the extent that a holder of an Allowed 85 Flatbush RHO Hotel Other Secured Claim has agreed to less favorable treatment of such Claim each such holder shall receive Cash from the Plan Fund allocable to the Hotel Property, in an amount equal to such Allowed Claim, payable on the later of the Effective Date and the date on which such 85 Flatbush RHO Hotel Other Secured Claim becomes an Allowed 85 Flatbush RHO Hotel Other Secured Claim.

(c)    Voting:  Class 4 is Unimpaired, and the holders of 85 Flatbush RHO Hotel Other Secured Claims are not entitled to vote to accept or reject the Plan.

*85 Flatbush RHO Residential Other Secured Claims (Class 5).*

(a)    Classification: Class 5 consists of the 85 Flatbush RHO Residential Other Secured Claims.  To the extent that 85 Flatbush RHO Residential Other Secured Claims are secured by

different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 5. TH Holdco asserts that Class 5 Allowed Priority Tax Claims which may also be Secured Claims will be paid in full in Cash as Allowed Priority Tax Claims as set forth in the treatment for Allowed Priority Tax Claims set forth above.

(b)    Treatment:  Except to the extent that a holder of an Allowed 85 Flatbush RHO Residential Other Secured Claim has agreed to less favorable treatment of such Claim each such holder shall receive Cash from the Plan Fund allocable to the Residential Property, in an amount equal to such Allowed Claim, payable on the later of the Effective Date and the date on which such 85 Flatbush RHO Residential Other Secured Claim becomes an Allowed 85 Flatbush RHO Residential Other Secured Claim.

(c)    Voting:  Class 5 is Unimpaired, and the holders of 85 Flatbush RHO Residential Other Secured Claims are not entitled to vote to accept or reject the Plan.

*85 Flatbush RHO Hotel General Unsecured Claims (Class 6).*

(a)    Classification:  Class 6 consists of General Unsecured Claims against 85 Flatbush RHO Hotel.

(b)    Treatment:  Except to the extent that a holder of an Allowed 85 Flatbush RHO Hotel General Unsecured Claim (Class 6) has agreed to less favorable treatment of such Claim, each such holder shall receive Cash in an amount equal to the amount of the Allowed Claim, together with interest at the federal judgment rate, as follows: (i) an initial Cash distribution on or about the Effective Date of such Claim's Pro Rata share of the $1.25 million TH Holdco Unsecured Claim Dedicated Fund, (ii) quarterly distributions thereafter of such Claim's Pro Rata share of 50% of the excess cash flow from operations of the Hotel Property and the Residential Property until such Claim is paid in full in Cash together with interest at the federal judgment rate on such Claim and (iii) if any amounts remain unpaid on such Claim as of the 12 month anniversary of the Effective Date, a final Cash payment in an amount sufficient to pay the remaining unpaid amount of such Claim in full in Cash together with interest at the federal judgment rate on such Claim from the TH Holdco Unsecured Claim Additional Funding.

TH Holdco will also voluntarily further contribute any amount it would receive on its deficiency Claim to the other Class 6 and 8 General Unsecured Claimants while reserving its rights on such deficiency Claim as to all guarantors and all non-Debtor parties.

(c)    Voting:  Class 6 is impaired and holders of General Unsecured Claims in Class 6 are entitled to vote to accept or reject the Plan.

*85 Flatbush RHO Hotel Existing Equity Interests (Class 7).*

(a)    Classification: Class 7 consists of Existing Equity Interests in 85 Flatbush RHO Hotel.

(a)    Treatment:  On the Effective Date, or as soon thereafter as is reasonably practicable, Equity Interests in the Debtors will be cancelled and holders of Existing Equity Interests will not receive any recovery on account of their Equity Interests, provided however, that after payment is

made in full to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Fee Claims and Allowed Claims in Classes 1, 2, 3, 4, and 5 and to the extent there is any remaining Cash in the Plan Fund allocable to either the Hotel Property or the Residential Property for distribution to Class 7 Existing Equity Interests in 85 Flatbush RHO Hotel and Class 9 Existing Equity Interests in 85 Flatbush RHO Residential, any such funds shall be distributed to the holders of the 85 Flatbush Mezz Claim, subject to such holders' lien on the 85 Flatbush RHO Hotel Existing Equity Interests.

(b)      Voting: Class 7 is impaired by the Plan and the holders of Allowed Existing Equity Interests in 85 Flatbush RHO Hotel are entitled to vote to accept or reject the Plan.

*85 Flatbush RHO Residential General Unsecured Claims (Class 8).*

(a)      Classification: Class 8 consists of General Unsecured Claims against 85 Flatbush RHO Residential.

(b)      Treatment: Except to the extent that a holder of an Allowed 85 Flatbush RHO Residential General Unsecured Claim (Class 8) has agreed to less favorable treatment of such Claim, each such holder shall receive Cash in an amount equal to the amount of the Allowed Claim, together with interest at the federal judgment rate, as follows: (i) an initial Cash distribution on or about the Effective Date of such Claim's Pro Rata share of the $1.25 million TH Holdco Unsecured Claim Dedicated Fund, (ii) quarterly distributions thereafter of such Claim's Pro Rata share of 50% of the excess cash flow from operations of the Hotel Property and the Residential Property until such Claim is paid in full in Cash together with interest at the federal judgment rate on such Claim and (iii) if any amounts remain unpaid on such Claim as of the 12 month anniversary of the Effective Date, a final Cash payment in an amount sufficient to pay the remaining unpaid amount of such Claim in full in Cash together with interest at the federal judgment rate on such Claim from the TH Holdco Unsecured Claim Additional Funding.

TH Holdco will also voluntarily further contribute any amount it would receive on its deficiency Claim to the other Class 6 and 8 General Unsecured Claimants while reserving its rights on such deficiency Claim as to all guarantors and all non-Debtor parties.

(c)      Voting: Class 8 is impaired and holders of General Unsecured Claims in Class 8 are entitled to vote to accept or reject the Plan.

*85 Flatbush RHO Residential Existing Equity Interests (Class 9).*

(a)      Classification: Class 9 consists of Existing Equity Interests in 85 Flatbush RHO Residential.

(b)      Treatment: On the Effective Date, or as soon thereafter as is reasonably practicable, Equity Interests in the Debtors will be cancelled and holders of Existing Equity Interests will not receive any recovery on account of their Equity Interests, provided however, that after payment is made in full to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Fee Claims and Allowed Claims in Classes 1, 2, 3, 4 and 5 and to the extent there is any remaining Cash in the Plan Fund allocable to either the Hotel Property or the Residential Property for distribution to Class 7 Existing Equity Interests in 85 Flatbush RHO Hotel and Class 9 Existing

US_Active\121219192\V-5

Equity Interests in 85 Flatbush RHO Residential, any such funds shall be distributed to the holders of the 85 Flatbush Mezz Claim, subject to such holders' lien on the 85 Flatbush RHO Residential Existing Equity Interests.

(c)      Voting:  Class 9 is impaired by the Plan and the holders of Allowed Existing Equity Interests in 85 Flatbush RHO Residential are entitled to vote to accept or reject the Plan.

*85 Flatbush RHO Mezz Other Priority Claims (Class 10).*

(a)      Classification:  Class 10 consists of Allowed Other Priority Claims against 85 Flatbush RHO Mezz.

(b)      Treatment:  After payment is made in full to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Fee Claims and Allowed Claims in Classes 1, 2, 3, 4 and 5 and to the extent there is any remaining Cash in the Plan Fund, and except to the extent that a holder of an Allowed Other Priority Claim against 85 Flatbush RHO Mezz has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, their Pro Rata share of the remaining Cash from the Plan Fund, up to the full amount of their Allowed Claim, payable on the later of the Closing Date, the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or when such claim becomes payable in the ordinary course or as soon as reasonably practical thereafter.

(c)      Voting:  Class 10 is impaired, and the holders of Other Priority Claims against 85 Flatbush RHO Mezz are entitled to vote to accept or reject the Plan.

*85 Flatbush Mezz Claim (Class 11).*

(a)      Classification:  Class 11 consists of the 85 Flatbush Mezz Claim.  The 85 Flatbush Mezz Claim is a Secured Claim pursuant to the 85 Flatbush Mezz Loan Agreement, which is secured by the 85 Flatbush Hotel Pledge Agreement and 85 Flatbush Residential Pledge Agreement.

(b)      Treatment:  ~~After~~In the event the Mezz Lender does not prevail in the Adversary Proceeding pursuant to final order or judgment, then after payment is made in full to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Fee Claims and Allowed Claims in Classes 1, 2, 3, 4, 5 and 10 and to the extent there is any remaining Cash in the Plan Fund, the holder of the 85 Flatbush Mezz Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the remaining Cash from the Plan Fund up to the full amount of its Allowed Claim.  The 85 Flatbush Mezz Claim shall be subject in all respects to the Intercreditor Agreement.

(c)      Voting:  Class 11 is impaired, and holder of the 85 Flatbush Mezz Secured Claim is entitled to vote to accept or reject the Plan.

*85 Flatbush RHO Mezz Other Secured Claims (Class 12).*

(a)      Classification: Class 12 consists of the 85 Flatbush RHO Mezz Other Secured Claims.  To the extent that 85 Flatbush RHO Mezz Other Secured Claims are secured by different

29

collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 12.  There may not be any Claims in Class 12.

(b)     Treatment:  ~~After~~In the event the Mezz Lender does not prevail in the Adversary Proceeding pursuant to final order or judgment, then after payment is made in full to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Fee Claims, and Allowed Claims in Classes 1, 2, 3, 4, 5, 10 and 11, and to the extent there is any remaining Cash in the Plan Fund, such surplus shall be paid to Allowed Class 12 Other Secured Creditors, in accordance with their statutory priority as follows:  except to the extent that a holder of an Allowed 85 Flatbush RHO Mezz Other Secured Claim against 85 Flatbush RHO Mezz has agreed to less favorable treatment of such Claim, each holder of an Allowed 85 Flatbush RHO Mezz Other Secured Claim shall receive, at the option of 85 Flatbush RHO Mezz, (i) payment in full and final satisfaction of such Allowed Class 12 Claim, their Pro Rata share of the remaining Cash from the Plan Fund up to the amount of such Allowed Claim payable on the later of the Closing Date and the date on which such 85 Flatbush RHO Mezz Other Secured Claim becomes an Allowed Claim, or as soon as reasonably practical thereafter, (ii) delivery of the collateral securing such Allowed 85 Flatbush RHO Mezz Other Secured Claim and payment of any interest required under § 506(b) of the Bankruptcy Code, or (iii) such other treatment necessary to satisfy § 1129 of the Bankruptcy Code.

(c)     Voting:  Class 12 is impaired, and the holders of Other Secured Claims against 85 Flatbush RHO Mezz are entitled to vote to accept or reject the Plan.

*85 Flatbush RHO Mezz General Unsecured Claims (Class 13).*

(a)     Classification:  Class 13 consists of General Unsecured Claims against 85 Flatbush RHO Mezz.

(b)     Treatment:  ~~After~~Solely in the event the Mezz Lender does not prevail in the Adversary Proceeding pursuant to final order or judgment and thereafter exercises its purchase option rights to acquire the senior loans for a price calculated as of July 16, 2020, after payment is made in full to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Fee Claims, and Allowed Claims in Classes 1, 2, 3, 4, 5, 10, 11 and 12, in to the extent there is any remaining Cash in the Plan Fund, on the Closing Date and except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim or has been paid before the Effective Date, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the remaining Cash from the Plan Fund up to the full amount of their Allowed Claim.  If Class 13 Allowed Claims are *de minimis*, TH Holdco with additional funding from its direct or indirect owners may elect to pay such Claims in full on or about the Effective Date.

(c)     Voting:  Class 13 is impaired and holders of General Unsecured Claims in Class 13 are entitled to vote to accept or reject the Plan.

*Insider General Unsecured Claims (Class 14)*

(a)     Classification:  Class 14 consists of Insider General Unsecured Claims.  To the extent the holder of any General Unsecured Claims is determined by the Bankruptcy Court to be in fact a Class 6, Class 8 or Class 13 General Unsecured Claim rather than a Class 14 General

Unsecured Claim, such claims shall instead be treated in accordance with the treatment of such Class.

(b)     Treatment:  After payment is made in full to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Fee Claims, and Allowed Claims in Classes 1, 2, 3, 4, 5, 10, 11, 12 and 13, in to the extent there is any remaining Cash in the Plan Fund, on the Closing Date and except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim or has been paid before the Effective Date, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the remaining Cash from the Plan Fund up to the full amount of their Allowed Claim.

(c)     Voting:  Class 14 is impaired and holders of Insider General Unsecured Claims in Class 14 are entitled to vote to accept or reject the Plan.

*85 Flatbush RHO Mezz Existing Equity Interests (Class 15).*

(a)     Classification:  Class 15 consists of Existing Equity Interests in 85 Flatbush RHO Mezz.

(b)     Treatment:  ~~On~~In the event the Mezz Lender does not prevail in the Adversary Proceeding pursuant to final order or judgment, then on the Effective Date, or as soon thereafter as is reasonably practicable, Equity Interests in the Debtors will be cancelled and holders of Existing Equity Interests will not receive any recovery on account of their Equity Interests~~ other than any remaining proceeds in the Plan Fund from an overbid from a Purchaser other than TH Holdco, which TH Holdco asserts is unlikely to occur~~.

(c)     Voting:  Class 15 is impaired by the Plan, and the holders of the Allowed Existing Equity Interests in 85 Flatbush RHO Mezz are conclusively presumed to have rejected the Plan pursuant to § 1126(g) of the Bankruptcy Code.

## 7.     MEANS FOR IMPLEMENTATION.

### A.     The Plan Fund.

~~The~~Subject to prevailing in the Adversary Proceeding pursuant to a final order or judgment, the Plan Fund shall be funded by (i) the TH Holdco Additional Consideration, (ii) the Sale Proceeds (if any), which shall be allocable to the Hotel Property and/or the Residential Property as set forth in the Purchase Agreement and (iii) the Debtors' Available Cash and shall be established upon the Closing Date.  Creditor distributions to be made separate from or later than the Closing Date shall be made by the Disbursing Agent under the Plan.

In addition, if TH Holdco acquires the Hotel Property and/or the Residential Property pursuant to the TH Holdco Credit Bid following completion of the Adversary Proceeding pursuant to final order or judgment, TH Holdco shall fund the TH Holdco Unsecured Claim Dedicated Fund for the sole Pro Rata benefit of holders of Allowed General Unsecured Claims in Classes 6 and 8. TH Holdco shall also fund the remaining amounts sufficient to pay the Allowed Class 6 and Class 8 Unsecured Claims in full with interest as set forth in the treatment of those Classes from the TH

31

Holdco Unsecured Claim Additional Fund.  The Sale and Bid Procedures will provide for sufficient incremental bidding so that holders of Allowed General Unsecured Claims in Classes 6 and 8 will receive the same or greater treatment on account of their Allowed Claims, if a successful bidder other than TH Holdco acquires the Hotel Property and/or the Residential Property.  Additionally, the Sale and Bid Procedures shall provide that an Auction Sale of the Properties will not occur until conclusion of the Adversary Proceeding pursuant to final order or judgment.

The amount of Priority Tax Claims are estimated to be at least $1,500,000.  In an April 4, 2022 email to TH Holdco's counsel discussed above, Debtors counsel states that aggregate outstanding real estate taxes aggregate approximately $1.62 million and that net professional fees and expenses for Debtors' counsel as of March 25, 2022 aggregate approximately $236,000.  Ohana related entities are prepared to fund through TH Holdco sufficient amounts for the Plan Fund to pay such Allowed Claims in full in accordance with the TH Holdco Plan.

While TH Holdco believes it can successfully operate the Hotel Property and the Residential Property, the funding for distributions to creditors under this Plan from the Plan Fund are not dependent on the success of such operations and will occur even if such operations are not immediately or ultimately successful.

### B.    Minimum Cash Distributions.

The Disbursing Agent shall not be required to make any payment to any holder of an Allowed Claim on any Distribution Date of Cash less than $10; provided, however, that if any distribution is not made, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.  The Disbursing Agent shall not be required to make any final distributions of Cash less than $10 to any holder of an Allowed Claim.  If either (a) all Allowed Claims (other than those whose distributions are deemed undeliverable hereunder) have been paid in full or (b) the amount of any final distributions to holders of Allowed Claims would be $10 or less and the aggregate amount of Cash available for distributions to holders of Allowed General Unsecured Claims is less than $2,500, then no further distribution shall be made by the Disbursing Agent and any surplus Cash shall be utilized to pay down any unpaid legal fees incurred by counsel to the Disbursing Agent post-confirmation.

### C.    Setoffs.

The Estates through the Disbursing Agent may, but shall not be required to, set off against any Claim, any causes of action or claims of any nature whatsoever that the Estates may have against the holder of such Claim; provided that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such cause of action or claim the Debtors may have against the holder of such Claim.  Nothing herein shall impact the TH Holdco Credit Bid.

### D.    The Sale.

There will be an Auction for the sale of the Hotel Property and/or Residential Property to be held in accordance with the Sale and Bid Procedures once those procedures have been approved by the Bankruptcy Court.  and in the event TH Holdco prevails in the Adversary Proceeding

pursuant to final order or judgment.  Currently, TH Holdco intends to purchase the Residential Property and the Hotel Property through an Asset Purchase Agreement, in form and substance reasonably acceptable to TH Holdco via a credit bid.  The opening bid is anticipated to be the TH Holdco Credit Bid of $90 million plus the TH Holdco Additional Consideration and TH Holdco Unsecured Claim Dedicated Funding of at least $1.6 million plus sufficient funds to pay Priority Tax Claims and Chapter 11 Administrative Expenses (which includes Professional Fee Claims and United States Trustee Fees)  as allowed by the Bankruptcy Court, which are expected to be in excess of $400,000 in total, for total consideration of in excess of $92 million.

Subject to prevailing in the Adversary Proceeding pursuant to final order or judgment, TH Holdco's credit bid for all of the assets, subject to the lien held by TH Holdco, will be allocated among such encumbered assets as announced by TH Holdco at or prior to the hearing on the Disclosure Statement or such higher and better bid as TH Holdco may thereafter submit.  TH Holdco intends to submit a single credit bid for both of the Hotel Property and the Residential Property.  If a Cash bid is approved pursuant to the Sale and Bidding Procedures for just the Hotel Property or just the Residential Property as a separate lot, then TH Holdco shall indicate the amount of the TH Holdco Credit Bid for the applicable Property it is acquiring through the Credit Bid.  TH Holdco does not anticipate any other bidder will bid more than the full amount of the Secured Claim held by TH Holdco (including accrued and accruing post-petition interest, costs and fees exceeds $107 million) and therefore, that TH Holdco will acquire the Hotel and Residential Property via its credit bid.  TH Holdco's assumptions and beliefs remain subject to the Mezz Lender's claims, rights and remedies in the Adversary Proceeding.

The Confirmation Order shall authorize and approve the Sale Transaction to the Purchaser under §§ 365, 1123(b)(4), 1129(b)(2)(A)(iii) and 1146(a) of the Bankruptcy Code.  The Auction shall be held promptly after the Confirmation Hearing pursuant to the Sale and Bid Procedures approved by the Bankruptcy Court attached as Exhibit E hereto.  A proposed form of Purchase Agreement based on a purchase agreement approved in another real estate case before this Bankruptcy Court is attached as Exhibit F hereto.  The proposed form of Sale and Bid Procedures and Purchase Agreement are subject to approval of the Bankruptcy Court.  Those procedures could be provided by the Debtors or JLL to any interested parties or bidders identified during the Debtors' marketing process.  Further, TH Holdco would advertise the opportunity to bid in the Wall Street Journal, National Edition, in a form of ad approved by the Bankruptcy Court in the Confirmation Order.  Given the 5 months of marketing and negotiations by the Debtors and JLL previously in this Disclosure Statement yielding an alleged high bid of $87.5 million, TH Holdco does not believe that a bid higher than the total value being provided to the Estates and creditors under the TH Holdco Plan is likely to be received.  Unless a higher and better bid from a qualified bidder is submitted by the bid deadline approved by the Bankruptcy Court, TH Holdco is requiring that the Confirmation Order provide that TH Holdco Credit Bid and other consideration pursuant to this Plan is deemed approved and accepted and can immediately close without further order of this Bankruptcy Court.

TH Holdco asserts that the amount of its credit bid is less than the amount of its claim acknowledged by the Debtors and approved by this Bankruptcy Court in the Agreed Final Cash Collateral Order.  TH Holdco's initial credit bid is $90 million.  TH Holdco reserves the right to increase the amount of its credit bid at the Auction or at any time prior to the Effective Date.

US_Active\121219192\V-5

E.      **Withholding and Reporting Requirements.**

Withholding Rights:  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

Forms:  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Person designated by the Post-Effective Date Debtors (which entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the tax Code and so notifies the Disbursing Agent.  If such request is made by TH Holdco or such other Person designated by TH Holdco and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to TH Holdco and any Claim in respect of such distribution shall be discharged and forever barred from assertion against any Debtor, TH Holdco and its respective property.

F.      **Exemption From Certain Transfer Taxes.**

To the maximum extent provided by § 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer under this Plan as confirmed by the Court, including an instrument of transfer executed in furtherance of the Sale Transaction contemplated by the Plan, shall not be subject to tax under any law imposing a Transfer Tax due on the sale of the Hotel Property and/or Residential Property in connection with or in furtherance of the Plan as confirmed by the Bankruptcy Court and the funding requirements contained herein and shall not be subject to any state, local or federal law imposing such tax and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

Pursuant to § 1146(a) of the Bankruptcy Code, the deeds conveying any of the Properties to TH Holdco or its nominee or designee upon the Effective Date of this Plan shall be an instrument of transfer in connection with or in furtherance of the Plan and shall not be subject to tax under any law imposing a Transfer Tax.

G.      **Effectuating Documents; Further Transactions.**

~~On~~Subject to prevailing in the Adversary Proceeding pursuant to final order or judgment, on and after the Effective Date, TH Holdco on behalf of the Debtors and the Estates is authorized

34

to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors and the Estates, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

## H.    Avoidance Actions and Other Causes of Action.

All Avoidance Actions and other Causes of Action against an Entity that shall be waived, relinquished, exculpated, released, compromised, or settled under the Plan or by a Bankruptcy Court order, unless otherwise expressly preserved in the Confirmation Order.

## I.    Closing of the Chapter 11 Cases.

After any of the Chapter 11 Cases of the Debtors have been fully administered, the Debtors or TH Holdco shall promptly seek authority from the Bankruptcy Court to close such applicable Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## J.    Wind Down.

The Debtors shall be dissolved promptly after the Effective Date. and following conclusion of the Adversary Proceeding.  The Disbursing Agent shall hold any funds for any Disputed Claims or other winddown expenses not yet paid or pre-paid until Disputed Claims are adjudicated in a Final Order or such other winddown expenses are paid in Cash.

## K.    Executory Contracts and Unexpired Leases

a.    Assumption and Assignment of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to §§ 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Purchase Agreement as being assumed or assumed and assigned to Purchaser in connection with Confirmation of the Plan or under the Purchase Agreement; (2) as of the Effective Date is subject to a pending motion to assume such Unexpired Lease or Executory Contract; (3) was previously assumed or assumed and assigned to a third party during the pendency of the Chapter 11 Cases; or (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan.  Notice of any Executory Contract or Expired Lease being assumed, assumed and assigned or rejected to the Plan shall be provided to the applicable contract counter party or lessor pursuant to the provisions in the Confirmation Order.

b.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any Cure Obligation due under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to § 365(b)(1) of the Bankruptcy Code,

by payment in Cash on the Closing Date, subject to the limitation described below, by the Debtor as an Administrative Claim or by the Purchaser, as applicable, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

In the event of a dispute regarding (1) the amount of the Cure Obligation, (2) the ability of the Debtors' Estates or any assignee to provide "adequate assurance of future performance" (within the meaning of § 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Obligations required by § 365(b)(1) of the Bankruptcy Code shall be satisfied following the entry of a Final Order or orders resolving the dispute and approving the assumption; provided that, depending on whether the Disbursing Agent or the Purchaser has the obligation to pay the Cure Obligation, such party may settle any dispute regarding the amount of any Cure Obligation without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

At least fourteen (14) days before the Confirmation Hearing, the Debtors or TH Holdco shall cause notice of proposed Cure Obligations to be sent to applicable counterparties to the Executory Contracts and Unexpired Leases. Any objection by such counterparty must be filed, served, and actually received by the Debtors and TH Holdco not later than ten (10) days after service of notice of the proposed assumption and associated Cure Obligation. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed cure amount will be deemed to have assented to such Cure Obligation and waived any objections to such assumption and assignment.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the Effective Date of assumption and/or assignment. Any prepetition default amount set forth in the Schedules and/or any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

         c.      Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be filed with Bankruptcy Court and served on the Debtors and TH Holdco no later than fourteen (14) days after the earlier of the Effective Date or the effective date of rejection of such Executory Contract or Unexpired Lease. In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be filed with the Bankruptcy Court and served on the Debtors, no later than fourteen (14) days after service of the proposed rejection of such Executory Contract or Unexpired Lease.

Any holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely filed as set forth in the paragraph above shall

not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estate, TH Holdco, the Purchaser or the Hotel Property or Residential Property for any of the foregoing without the need for any objection by the Debtors or TH Holdco further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' prepetition Executory Contracts or prepetition Unexpired Leases shall be classified as General Unsecured Claims, except as otherwise provided by order of the Bankruptcy Court.

d.    Purchase Agreement

The assumption or rejection of any Executory Contract or Unexpired Lease pursuant to the Plan shall be subject in all respects to Purchaser's rights and obligations, including any Cure Obligations assumed by it in accordance with the Purchase Agreement, with respect to any such Executory Contracts or Unexpired Leases assigned Purchaser pursuant to the terms of the Purchase Agreement.

e.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

f.    Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors or TH Holdco that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors' Estates have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or TH Holdco, shall have (sixty) 60 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

**L.** **Conditions Precedent to the Confirmation Hearing and the Effective Date.**

a.    Condition to the Confirmation Hearing

The occurrence of the Confirmation Hearing is subject to the following condition precedent:

(a)    The Purchase Agreement shall have been fully executed and the deposit required under the Purchase Agreement funded and placed in escrow.

(b)    The form of Confirmation Order shall be acceptable to TH Holdco in its reasonable discretion.

b.    Conditions Precedent to the Effective Date.

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a)    the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred and the Confirmation Order shall not be subject to any stay;

(b)    Debtors or TH Holdco shall have transferred to the Disbursing Agent within three (3) days from the entry of the Confirmation Order, the operating funds necessary to fund the Plan Fund pursuant to the terms of this Plan;

(c)    all actions, documents and agreements necessary to implement and consummate the Plan, including, without limitation, entry into the documents contained in the Plan Supplement required to be executed prior to the Confirmation Date, each in form and substance reasonably satisfactory to the Debtor and Purchaser, and the transactions and other matters contemplated thereby, shall have been effected or executed;

(d)    all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan, if any, shall be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

US_Active\121219192\V-5

(e)     the Sale Transaction shall have closed as to both the Hotel Property and the Residential Property;

(f)     with respect to the TH Holdco Credit Bid, no long-term lease or other material arrangement impacting the Property and its uses that is not acceptable to TH Holdco in its sole and absolute discretion shall be in place; and

(g)     all documents and agreements necessary to implement the Plan shall have (i) been tendered for delivery and (ii) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

(h)     TH Holdco shall prevail in the Adversary Proceeding pursuant to a final order or judgment, failing which the Auction of the Properties shall not proceed, and the Mezz Lender shall then have all of its rights under the ICA to purchase the Senior Loans for a purchase price calculated as of July 16, 2020, whereupon the Mezz Lender may cancel or postpone the Auction, modify the Plan or support the Debtors' Plan.

c.     Waiver of Conditions Precedent.

Each of the conditions precedent to the Effective Date in Section 10.2 of the Plan other than the condition set forth in Section 10.2(a) of the Plan may be waived in writing by TH Holdco except for the provisions of Section (L)(b)(h), which cannot be waived absent the Mezz Lender's express written consent.

d.     Effect of Failure of Conditions to Effective Date.

If the Confirmation Order is vacated due to a failure of a condition to the Effective Date to occur, (i) no distributions under the Plan shall be made; (ii) the Debtors and all holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date ever occurred; and (iii) all monies contributed to the Plan Fund shall be returned to TH Holdco within three (3) business days of the Confirmation Order being vacated.

## M.    Effect of Confirmation.

a.     Vesting of Assets.

On the Closing Date, pursuant to §1141(b) and (c) of the Bankruptcy Code, and as set forth in the Purchase Agreement, all property of the Debtors' Estates shall vest in the Purchaser free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided pursuant to this Plan and the Confirmation Order.

US_Active\121219192\V-5

b.      Release of Liens.

Except as otherwise determined to the contrary in the Adversary Proceeding or provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Closing Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the TH Holdco, unless sold to the Purchaser pursuant to the Sale Transaction, provided however, that the Lien securing the TH Holdco Secured Class 3 Claim shall not be deemed released until the TH Holdco Secured Class 3 Claim has been paid in full, from the proceeds of the Sale Transaction (or the TH Holdco Credit Bid) in accordance with the terms of this Plan.

As part of its credit bid, and subject to TH Holdco prevailing in the Adversary Proceeding pursuant to final order or judgment, TH Holdco, its nominee, or designee, may elect to take title of any of the Properties subject to the existing TH Holdco Mortgage, which TH Holdco Mortgage may be assigned to any such nominee's or designee's lender. In the event TH Holdco or its nominee or designee elects to take title to any of the Properties subject to the existing TH Holdco Mortgage, Debtors shall have no further financial obligation to TH Holdco or any assignee of the TH Holdco Mortgage and shall be released from any and all liability to TH Holdco or any assignee with respect to such TH Holdco Mortgage upon the Closing. Nothing herein shall impact TH Holdco's rights as to any deficiency Claim against the Debtors or claims against any guarantors or other non-Debtor parties.

c.      Subordinated Claims.

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, § 510(b) of the Bankruptcy Code, or otherwise. Pursuant to § 510 of the Bankruptcy Code, the Debtors reserve the right for TH Holdco to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

d.      Binding Effect.

Except as otherwise provided in § 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtor, and such holder's respective successors and assigns, whether or not the

Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

     e.      Term of Injunctions or Stays.

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under §§ 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

     f.      Plan Injunction.

Except (i) as otherwise provided under Final Order entered by the Bankruptcy Court or (ii) with respect to the obligations under the Plan, the entry of the Confirmation Order shall forever stay, restrain and permanently enjoin with respect to any Claim held against the Debtors as of the date of entry of the Confirmation Order (i) the commencement or continuation of any action, the employment of process, or any act to collect, enforce, attach, recover or offset from the Debtors, from the Hotel Property or Residential Property, or from property of the Estates that has been or is to be distributed under the Plan, and (ii) the creation, perfection or enforcement of any lien or encumbrance against the Hotel Property or Residential Property and any property of the Estates that has been or is to be, distributed under the Plan.  Except as otherwise provided in the Confirmation Order, the entry of the Confirmation Order shall constitute an injunction against the commencement or continuation of any action, the employment of process, or any act to collect, recover or offset from the Debtors, from the Hotel Property or Residential Property, or from property of the Estates, any claim, any obligation or debt that was held against the Debtors by any person or entity as of the Confirmation Date except pursuant to the terms of this Plan.  The entry of the Confirmation Order shall permanently enjoin all Creditors, their successors and assigns, from enforcing or seeking to enforce any such Claims.  Nothing herein shall impact TH Holdco's right to pursue claims against guarantors or other non-Debtor parties.

     g.      Limitation of Liability

To the extent permitted under § 1125(e) of the Bankruptcy Code, neither the Exculpated Parties nor any of their respective officers, directors, or employees (acting in such capacity) nor any professional person employed by any of them, shall have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, Confirmation or consummation of the Plan, the Disclosure Statement, the Plan Supplement or the any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan, provided that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in

US_Active\121219192\V-5

connection with, the Plan or any other related document, instrument, or agreement, except in the case of fraud, gross negligence, willful misconduct, malpractice, breach of fiduciary duty, criminal conduct, unauthorized use of confidential information that causes damages, or ultra vires acts. Nothing in Section 11.8 of the Plan shall limit the liability of the Debtors' professionals pursuant to Rule 1.8 (h)(1) of the New York State Rules of Professional Conduct. Nothing in the Plan or the confirmation order shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including, without limitation, any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Debtors or any of its respective members, shareholders, officers, directors, employees, attorneys, advisors, agents, representatives and assigns, nor shall anything in the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Debtors or any of its respective members, officers, directors, employees, attorneys, advisors, agents, representatives and assigns for any liability whatever, including without limitation, any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority, nor shall anything in this Plan exculpate Debtors or any of its respective members, officers, directors, employees, attorneys, advisors, agents, representatives and assigns from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority. Nothing herein is intended to impact the Adversary Proceeding.

h.     Solicitation of the Plan.

As of and subject to the occurrence of the Confirmation Date: TH Holdco shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, §§ 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation.

i.     Plan Supplement.

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court by no later than fifteen (15) days prior to the Confirmation Hearing and served upon all parties in interest. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

## V.     **MECHANICS OF HOW THE PLAN MAY BE ACCEPTED OR REJECTED**

In order for the Plan to be confirmed, various statutory conditions prescribed by the Bankruptcy Code must be satisfied, including: (a) acceptance of the Plan by at least one (1)

impaired Class entitled to vote on the Plan; (b) provision for payment or distribution under the Plan to each creditor of money and/or other property at least equal in value to what that creditor would have received in a Chapter 7 liquidation of the applicable Debtor; (c) a finding by the Bankruptcy Court that the Plan is feasible; and (d) with respect to each Class, either acceptance by that Class or a finding by the Bankruptcy Court that the Plan is "fair and equitable" and does not "discriminate unfairly" against that Class.

## 1.    Who May Vote

Only Classes that are impaired under the Plan are entitled to vote to accept or reject the Plan.  Generally, § 1124 of the Bankruptcy Code provides that a class of claims or interests is considered impaired unless the Allowed amount of class is paid in full upon consummation of the plan or a plan does not alter the legal, equitable, and contractual rights of the holder of the claim or interest.  In addition, these classes are impaired unless all outstanding defaults, other than defaults relating to the insolvency or financial condition of a debtor or the commencement of a Chapter 11 case, have been cured and the holders of claims or interests in these classes have been compensated for any damages incurred as a result of any reasonable reliance on any contractual provisions or applicable law to demand accelerated payment.

The Claims and Interests in Classes 3 and 6 through 14 are impaired by the Plan, and therefore the holders of Claims or Interest in such Classes are entitled to vote to accept or reject the Plan.  The Interest holders in Class 15 will not receive any distribution, and are therefore deemed to reject the Plan.

A creditor is entitled to vote only if either: (i) its Claim has been scheduled by the Debtor as not disputed, contingent, or unliquidated; or (ii) it has filed a proof of claim on or before the Bar Date or Supplemental Bar Date established by the Bankruptcy Court and no objection to such Claim is pending.

ANY HOLDER OF A CLAIM AS TO WHICH AN OBJECTION HAS BEEN FILED AND IS PENDING IS ENTITLED TO VOTE IN RESPECT OF SUCH CLAIM ONLY UP TO THE UNDISPUTED AMOUNT UNLESS THE CREDITOR HAS OBTAINED AN ORDER OF THE BANKRUPTCY COURT TEMPORARILY ALLOWING THE CLAIM FOR THE PURPOSE OF VOTING ON THE PLAN.  A CREDITOR'S VOTE MAY BE DISREGARDED IF THE BANKRUPTCY COURT DETERMINES THAT SUCH ACCEPTANCE OR REJECTION WAS NOT SOLICITED OR PROCURED IN ACCORDANCE WITH THE PROVISIONS OF THE BANKRUPTCY CODE.

## 2.    Voting Procedures

### A.    Solicitation Period

TH Holdco_shall commence the transmission of solicitation packages on or about _____, 2022.  In order to be counted, a ballot must be RECEIVED at the following address no later than 4:00 p.m. (prevailing Eastern time), on _____ __, 2022:

> Dentons US LLP - 85 Flatbush Balloting
> 1221 Avenue of the Americas

New York, New York 10020
Attention:  Sarah M. Schrag

Or electronically by email to 85FlatbushRHOballots@dentons.com.

A ballot will be sent to each holder of a Claim or Interest eligible to vote on the Plan, which will serve as the ballot for indicating acceptance or rejection of the Plan pursuant to the requirements of §§ 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rule 3018(c).

**3.      Confirmation of the Plan**

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

**A.      Confirmation Hearing**

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan.  The Bankruptcy Court has scheduled a telephonic or video hearing on confirmation of the Plan through zoom.gov for _____ __, 2022 (the "Confirmation Hearing").  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan, regardless of whether such party is entitled to vote.

**B.      Objections to Confirmation**

The Bankruptcy Court has directed that, on or before 4:00 p.m. (prevailing Eastern Time) on ____ __, 2022, any objections to the Plan are required to be in writing and filed with the Bankruptcy Court, and a copy served upon the U.S. Trustee, counsel for TH Holdco and counsel for the Debtors.  Unless otherwise ordered by the Bankruptcy Court, TH Holdco expects that timely-filed objections to confirmation of the Plan will be heard and held in conjunction with the Confirmation Hearing.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjourned hearing.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.  **IF AN OBJECTION TO CONFIRMATION IS NOT TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**4.      Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of § 1129(b) of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court may enter an order confirming the Plan.  These requirements include the following:

**A.      Best Interests Test**

Confirmation of the Plan requires that with respect to each impaired Class of Creditors, each holder of an Allowed Claim in such Class has either accepted the Plan or will receive under the Plan property of a value, as of the Effective Date, that is not less than the amount the holder

US_Active\121219192\V-5

would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.  It is TH Holdco's belief that creditors will receive a greater or equal distributions pursuant to the Plan than through a liquidation of the applicable Debtor's assets under Chapter 7 of the Bankruptcy Code. In this regard, TH Holdco believes that a forced fire sale of the Hotel Property and Residential Property in the current market will severely undermine any chance of preserving and maximizing the value of the Hotel Property and Residential Property, in particular, given the continuing adverse impact on the hospitality industry as a whole and the Hotel herein, which has only recently started to rebound.  This, coupled with the TH Holdco Secured Claim, which are secured by all of the assets of the Hotel Property and Residential Property, and the unnecessary added administrative cost given the fees due to a trustee under Chapter 7 of the Bankruptcy Code, which must be paid before any other unsecured or priority Claim under the Bankruptcy Code, would result in less available assets for creditors than under the Plan, which provides for 100% distributions to Allowed Secured Property Tax Claims, 100% distributions to Allowed Chapter 11 Administrative Claims (including Professional Fee Claims and United States Trustee Fees) and if the TH Holdco Plan is confirmed and TH Holdco acquires the Hotel Property and the Residential Property via a credit bid of at least $90 million, a Cash fund of $1,250,000 in the form of the TH Holdco General Unsecured Dedicated Fund plus additional funding to pay such Class 6 and Class 8 General Unsecured Claims in full with interest by the first anniversary of the Effective Date of the Plan.  TH Holdco asserts that Chapter 11 Administrative Expenses and Priority Claims would not receive payment in full (and may receive no distribution whatsoever after secured claims and Chapter 7 administrative expenses) and that no General Unsecured Claims in any of the three Estates would receive a distribution in a Chapter 7 case.

A copy of TH Holdco's liquidation analysis for each Estate is attached hereto as **Exhibit B** and further discussion of the best interests test and the Liquidation Analysis is set forth later in Alternatives to the Plan section of this Disclosure Statement.  The Debtors' Disclosure Statement (pages 52-53) includes their liquidation analysis which asserts a "value of the Hotel Property and Residential Property at $75 million" and total amount available for distribution in a Chapter 7 of $76 million.  The TH Holdco Liquidation Analysis (Exhibit B hereto) uses those same values.

Notwithstanding anything to contrary, TH Holdco's best interest analysis remains subject to the Mezz Lender's rights, claims and remedies in the Adversary Proceeding.

### B.        Feasibility of the Plan

In order for the Plan to be confirmed, the Bankruptcy Court must determine that it is feasible; *i.e.*, that as a practical matter, there are sufficient resources to meet the obligations under the Plan on a timely basis.

TH Holdco asserts that the TH Holdco Credit Bid can close promptly after the TH Holdco Plan is confirmed and upon the Effective Date of that Plan, the TH Holdco Additional Consideration will be sufficient to pay or reserve for Chapter 11 Administrative Expenses and Priority Claims in the 85 Flatbush RHO Hotel and 85 Flatbush RHO Residential cases. Ohana is providing the funding for the Plan Fund, the TH Holdco Unsecured Claim Dedicated Fund and the TH Holdco Unsecured Claim Additional Funding. Debtors dispute these assertions, and TH Holdco's ability to close is subject to prevailing in the Adversary Proceeding pursuant to final order or judgment.

US_Active\121219192\V-5

### C.    Acceptance by Impaired Classes

Section 1129(a)(8) of the Bankruptcy Code generally requires that each impaired Class must accept the Plan by the requisite votes for confirmation to occur.  A Class of impaired creditors will have accepted the Plan if at least two-thirds in amount and more than one-half in number of Allowed Claims actually voting in the Class have accepted it.

### D.    Cramdown

Even if the Plan is not accepted by all impaired classes, the Plan may nevertheless be confirmed by the Bankruptcy Court pursuant to its "cramdown" powers under § 1129(b) of the Bankruptcy Code if:  (i) the Plan is accepted by at least one impaired Class and the Plan meets all of the other requirements of § 1129(a) of the Bankruptcy Code; (ii) the Plan does not discriminate unfairly; and (iii) the Plan is fair and equitable to the rejecting Classes.  The Bankruptcy Court must determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any impaired dissenting Class of Claims.  A plan will not discriminate unfairly if no class receives more than it is legally entitled to receive for its Claims and Interests.  The meaning of the phrase "fair and equitable" is different when applied to secured claims and unsecured claims.

With respect to a Secured Claim, "fair and equitable" as applicable herein requires that any such Claim Holder retains their respective lien and receives present value interest on account of any deferred payout, equal to the Allowed amount of such Claim.  With respect to an Unsecured Claim, "fair and equitable" means either: (x) an impaired unsecured creditor receives property of a value equal to the amount of its Allowed Claim; or (y) the holders of Claims and Interests that are junior to the Claims of the dissenting Class will not receive any property under a plan unless such junior Claim or Interest makes a contribution of sufficient new value under the Plan.

If Claimants do not vote in numbers and amounts sufficient to accept the Plan as proposed, TH Holdco as the plan proponent will nonetheless seek Confirmation of the Plan pursuant to § 1129(b) of the Bankruptcy Code.  At such time the Bankruptcy Court will determine whether, as follows:  (1) all of the requirements of § 1129(a) of the Bankruptcy Code have been met; (2) a class of creditors is receiving more than it is legally entitled for its respective Claims; and (3) if applicable, whether a dissenting secured class of creditors has retained their respective lien(s) in the applicable Debtor's Assets and is receiving present value interest on account of any deferred payouts equal to the Allowed Amount of such Claim(s).  TH Holdco believes that in a cramdown confirmation, the Plan satisfies the foregoing requirements.

## VI.    U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**The following discussion summarizes certain U.S. federal income tax consequences to the Debtors, Creditors and certain Holders of Claims of the implementation of the Plan.  This summary is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to any particular Debtor, Creditor or Holder of a Claim.  This discussion does not purport to be a complete analysis or listing of all potential tax considerations**.

The discussion is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof.  Legislative, judicial or administrative changes or new interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Plan.  Any such changes or new interpretations may have retroactive effect and could significantly affect the U.S. federal income tax consequences of the Plan described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. TH Holdco has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.  In addition, this discussion does not address any U.S. federal estate or gift tax considerations, the Medicare tax on net investment income, or any foreign, state or local tax consequences, nor does it purport to address the U.S. federal income tax consequences of the Plan to:  (i) special classes of taxpayers (such as, but not limited to, Persons who are related to the Debtors within the meaning of the Tax Code, non-U.S. persons, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities and Holders of Claims or Interests who are themselves in bankruptcy); or (ii) parties not entitled to vote on the Plan.

To the extent that the following discussion relates to the U.S. federal income tax consequences, it is limited to "U.S. Holders."  For purposes of the following discussion, you are a "U.S. Holder" if, for U.S. federal income tax purposes, you are:  (a) an individual who is a U.S. citizen or U.S. resident alien for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) that was created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (c) an estate whose income is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (1) if a court within the U.S. is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of Section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust, or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a "" States person" (within the meaning of Section 7701(a)(30) of the Tax Code).  For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult with their tax advisors regarding the U.S. federal income tax consequences of the Plan.

US_Active\121219192\V-5

This discussion assumes that Holders of Claims or Interests hold only Claims or Interests in a single Class. Holders of multiple Classes of Claims or Interests should consult their own tax advisors as to the effect such ownership may have on the U.S. federal income tax consequences described below. This discussion further assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

**THIS SUMMARY IS NOT INTENDED TO BE, AND SHOULD NOT BE CONSTRUED AS, LEGAL OR TAX ADVICE TO ANY DEBTOR, CREDITOR OR HOLDER OF CLAIMS OR INTERESTS. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER OF CLAIM'S PARTICULAR CIRCUMSTANCES. THE DEBTORS, CREDITORS AND HOLDERS OF CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL INCOME TAX CONSEQUENCES AND ANY OTHER POTENTIAL TAX CONSEQUENCES UNDER THE LAWS OF ANY STATE, LOCALITY OR OTHER RELEVANT TAXING JURISDICTION ARISING FROM THE PLAN.**

*Certain U.S. Federal Income Tax Consequences to the Debtors and Their Respective Members*

Generally, if a debt for which a debtor is personally liable is forgiven or discharged for less than the full amount owed, the debt is considered canceled for the amount it remained unpaid ("COD income"), and must be included in such debtor's gross income. However, under certain exceptions, COD income may be excluded from a debtor's gross income. A specific statutory exception applies to certain debtors if the discharge of indebtedness is granted in a case under Title 11 of the Bankruptcy Code and pursuant to a plan approved by a bankruptcy court in such case. A separate exception applies to taxpayers if the discharge occurs when the taxpayer is insolvent. Section 108 of the Tax Code requires the amount of COD income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer. Attribute reduction is calculated only after the tax for the year of the discharge has been determined. Section 108 of the Tax Code further provides that a taxpayer does not realize COD income from cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to a deduction.

Each Debtor is a limited liability company treated as a partnership for U.S. Federal income tax purposes. For each Debtor, and for U.S. Federal income tax purposes, all items of income, gain, deduction, loss and credit, including COD income, will flow through the Debtor to the members of the Debtor in accordance with their respective shares of such tax items. The exclusions of COD income from each Debtor's income for bankruptcy or insolvency does not prevent each Debtor's COD income from flowing through to the members of each Debtor. A member of Debtor will be eligible for exclusion of COD income only if the member is also discharged from liability in a case under Title 11 of the United States Code or if the member is insolvent. Accordingly, the members of the Debtors may have COD income even though the Debtors are discharged in a case under Title 11 of the United States Code and are insolvent. The COD income of each Debtor will flow through the Debtor to the members of the Debtor in accordance with their respective sharing of such COD income.

48

Under the Plan, certain Holders of Claims are expected to receive less than full payment on their Claims. The Debtor's liability to the Holders of such Claims in excess of the amount satisfied by Distributions under the Plan will be cancelled and therefore will result in COD income to the Debtor. To the extent that the consideration issued to Holders of Claims pursuant to the Plan is attributable to accrued but unpaid interest, the Debtors should be entitled to interest deductions in the amount of such accrued interest, but only to the extent the Debtors have not already deducted such amounts. The Debtors should not have COD income from the discharge of any accrued but unpaid interest pursuant to the Plan to the extent that the payment of such interest would have given rise to a deduction pursuant to Section 108(e)(2) of the Tax Code. The COD income of each Debtor will flow through the Debtor to the members of the Debtor in accordance with their respective sharing of such COD income.

The precise amount of taxable gain or loss, COD income, or both, which the Debtors or their members will realize as a result of effectuation of the Plan cannot presently be determined.

### Tax Consequences to Creditors

The U.S. federal income tax consequences of the implementation of the Plan to a creditor of the Debtors (a "Creditor") will depend on a number of factors, including the type of consideration received by the Creditor in exchange for its Claim, whether the Creditor reports income on the accrual or cash basis, whether the Creditor receives consideration in more than one tax year of the Creditor, whether the Creditor is a resident of the United States and whether all consideration received by the Creditor is deemed to be received by that Creditor in an integrated transaction. The U.S. federal income tax consequences of the receipt of Cash or property that is allocable to accrued interest are discussed below in the section entitled "Receipt of Interest."

(a)    Receipt of Cash and Other Property

A Creditor who receives Cash and/or other property in satisfaction of its Claim generally will recognize gain (or loss) on the exchange equal to the difference between the amount realized (not allocable to interest) and the Creditor's adjusted tax basis in its Claim. The character of any gain or loss as capital or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including (i) the nature and origin of the Claim (e.g., Claims arising in the ordinary course of a trade or business or made for investment purposes); (ii) the tax status of the Holder of the Claim; (iii) whether the Claim is a capital asset in the hands of the Holder; (iv) whether the Claim has been held by the Holder for more than one year; (v) the extent to which the Holder previously claimed a loss or a bad debt deduction with respect to the Claim; and (vi) the extent to which the Holder acquired the Claim at a market discount. Creditors should consult their own tax advisors regarding the amount and character of gain or loss, if any, to be recognized by them under the Plan.

(b)    Receipt of Interest

Pursuant to the Plan, all Distributions in respect of any Claim will be allocated first to the unaccrued but unpaid interest, and second to the principal (each as determined for U.S. federal income tax purposes). However, there is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.

US_Active\121219192\V-5

A portion of the consideration received by a Holder of a Claim in satisfaction of that Claim pursuant to the Plan may be allocated to the portion of such Claim (if any) that represents accrued but unpaid interest.  If any portion of the Distribution is required to be allocated to accrued interest, such portion would be taxable to the Holder as interest income, except to the extent the Holder has previously reported such interest as income.  A Holder will generally recognize a loss to the extent that any accrued interest was previously included in the Holder's gross income and is not paid in full.

In the event that a portion of the consideration received by a Holder of a Claim is treated by the tax authorities as accrued but unpaid interest (as opposed to principal treatment by such holder), only the balance of the Distribution would be considered received by the Holder in respect of the principal amount of the Claim.  Such an allocation would reduce the amount of the gain, or increase the amount of loss, realized by the Holder with respect to the Claim.  If any such loss were a capital loss, it would not offset any amount of the Distribution that was treated as ordinary interest income (except, in the case of individuals, to the limited extent that capital losses may be deducted against ordinary income).

To the extent that any portion of the Distribution is treated as interest, Holders may be required to provide certain tax information in order to avoid or reduce the withholding of taxes, if any.

(c)      Market Discount

The Tax Code generally requires Holders of debt instruments with "market discount" to treat as ordinary income any gain realized on the disposition of such debt instruments to the extent of the market discount accrued during the Holder's period of ownership.  "Market discount" generally means the amount by which the stated redemption price at maturity exceeds the Holder's adjusted tax basis in such debt instrument.  Holders should consult their own tax advisors as to the potential application of the market discount rules to them in light of their individual circumstances.

(d)      Backup Withholding

Under the Tax Code, interest, dividends and other "reportable payments" may, under certain circumstances, be subject to "backup withholding."  Backup withholding may apply to payments made pursuant to the Plan, unless you provide to the applicable withholding agent your taxpayer identification number, certified under penalties of perjury, as well as certain other information, or otherwise establish an exemption from backup withholding.  Backup withholding is not an additional tax.  Any amount withheld under the backup withholding rules is allowable as a credit against your U.S. federal income tax liability, if any, and a refund may be obtained from the IRS if the amounts withheld exceed your actual U.S. federal income tax liability and you timely provide the required information or appropriate claim form to the IRS.

**THIS SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES PURSUANT TO § 1125 OF THE BANKRUPTCY CODE.  TH HOLDCO MAKES NO REPRESENTATIONS CONCERNING, AND DOES NOT HEREBY**

US_Active\121219192\V-5

PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE TAX MATTERS
DESCRIBED HEREIN.

IN LIGHT OF THE UNCERTAINTY CONCERNING THE TAX
CONSEQUENCES FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE
TAX LAWS, TH HOLDCO ENCOURAGES EACH DEBTOR, CREDITOR, AND PARTY
IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL
AND TAX ADVISORS WITH RESPECT TO ALL SUCH MATTERS.

FOREIGN (*i.e.*, NON-UNITED STATES) CREDITORS ALSO ARE STRONGLY
URGED TO CONSULT WITH THEIR OWN LEGAL AND TAX ADVISORS.

## VII.    ALTERNATIVES TO THE PLAN

The alternative to the Plan would be a conversion of any of the Debtors' cases from Chapter
11 to Chapter 7 or confirmation of an alternative plan such as the Debtors' Amended Plan or
promulgation of a ~~Chapter 11~~modified plan ~~by~~in the event the Mezz Lender~~.~~ prevails in the
Adversary Proceeding pursuant to final order or judgment,

As stated above and as shown in the Liquidation Analysis attached hereto as **Exhibit B**,
TH Holdco asserts that liquidation under Chapter 7 would result in a significant reduction in value
given the state of the current hospitality market, and an additional layer of administrative expenses,
including Chapter 7 trustee commissions and fees for professionals retained by the Chapter 7
trustee, including attorneys, accountants, and brokers.  Pursuant to the provisions of the
Bankruptcy Code, these commissions and fees are required to be paid prior to the general
unsecured claims.

The Liquidation Analysis also assumes that the liquidation of each of the Debtors or their
Estates would commence under the direction of a Court-appointed Chapter 7 trustee and continue
for six (6) months (but with no material going concern operations during the Chapter 7 period),
during which time all of the Debtors' major assets (mainly consisting of the Hotel Property and
Residential Property) either would be sold or conveyed to the applicable lien holders and the Cash
proceeds, net of liquidation-related costs, would be distributed to creditors.  Although some assets
might be liquidated in less than six (6) months, other assets could be more difficult to collect or
sell, thus potentially requiring a liquidation period longer than six (6) months.  There would be
certain holding costs such as real estate and other taxes, utilities and maintenance until the real
estate is sold.

Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the
compensation of a Chapter 7 trustee, as well as compensation of counsel and other professionals
retained by the Chapter 7 trustee, asset disposition expenses, all unpaid expenses incurred by the
Debtors in their Chapter 11 Cases (such as compensation of attorneys, financial advisors, and
accountants) that are allowed in the Chapter 7 cases, litigation costs, and holding and other costs
of the Estates during the pendency of the Chapter 11 Cases.  There may be additional marketing
expenses and "learning curve" time if these Chapter 11 Cases were converted to Chapter 7.  The
Chapter 7 trustee may also attempt to assert a claim to a trustee's percentage fees.

The Plan proposed by TH Holdco provides that the transfer of the real property shall be exempt from transfer, stamp or similar taxes pursuant to § 1146(a) of the Bankruptcy Code. That exemption is not available in a Chapter 7 case and TH Holdco believes the need to pay transfer taxes in a Chapter 7 transfer of the Hotel Property and Residential Property would materially impact net proceeds or price versus a sale pursuant to a confirmed Chapter 11 plan.

The Debtors have also proposed the Debtors' Amended Plan. As discussed earlier in the introductory section of this Disclosure Statement, TH Holdco asserts that its Plan is better for creditor recoveries (especially the General Unsecured Creditors in Classes 6 and 8 due to the $1,250,000 TH Holdco General Unsecured Dedicated Fund and additional distributions) and more likely to be meet all of the confirmation standards than the Debtors' Amended Plan.

Accordingly, TH Holdco asserts that its Plan provides holders of Claims with the best chance of receiving a greater distribution on account of their respective Allowed Claims and being confirmed.

## VIII.  RETENTION OF JURISDICTION

On and after the Effective Date, the Plan provides that the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance, classification, priority, compromise, estimation or payment of Claims resulting there from;

(b)    to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date, including conclusion of the Adversary Proceeding or modification of the Plan depending on the outcome of the Adversary Proceeding;

(c)    to insure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d)    to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim;

(e)    to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(f)    to adjudicate any dispute related to the Sale Transaction;

(g)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the Consummation, implementation or enforcement of the Plan, including the Confirmation Order, or any other order of the Bankruptcy Court;

US_Active\121219192\V-5

(h)    to hear and determine any application to modify the Plan in accordance with § 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)    to hear and determine all applications under § 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

(j)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Purchase Agreement, or the Confirmation Order or any agreement, instrument, or other document governing or relating to any of the foregoing;

(k)    to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following Consummation;

(l)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)    to hear and determine matters concerning state, local and federal taxes in accordance with §§ 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations of the Debtors' tax liability under § 505(b) of the Bankruptcy Code);

(n)    to adjudicate, decide or resolve any and all matters related to § 1141 of the Bankruptcy Code;

(o)    to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(p)    to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(q)    to enter a final decree closing any of the Chapter 11 Cases;

(r)    to enforce all orders previously entered by the Bankruptcy Court;

(s)    to recover all assets of the Debtors and property of the Debtors' Estates, wherever located; and

(t)    to hear and determine any rights, Claims or Causes of Action held by or pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory to the extent they are expressly preserved under the Plan.

[*Remainder of Page Intentionally Left Blank*]

US_Active\121219192\V-5

## IX.    <u>CONCLUSION</u>

TH Holdco believes that Confirmation and Consummation of the Plan are in the best interests of the Debtors, their Estates and their creditors.  TH Holdco asserts that its Plan provides for an equitable distribution to holders of Claims and Interests.  TH Holdco believes that any alternative to Confirmation of the Plan, such as liquidation under Chapter 7 of the Bankruptcy Code or the Debtors' Amended Plan, could result in significant delay, litigation, and additional costs, as well as a reduction in the distributions to holders of Claims in certain Classes and further asserts that the Debtors' Amended Plan cannot be confirmed.  Consequently, TH Holdco urges all eligible holders of Impaired Claims and Interests to vote to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED on or before the Voting Deadline.

Dated:          New York, New York
                April 18, 2022

                                        TH Holdco LLC

                                        /s/ Franco Famularo
                                        Authorized Signatory

US_Active\121219192\V-5

# EXHIBIT A

**Second Amended Chapter 11 Plan Filed by TH Holdco**

## EXHIBIT B

**Liquidation Analysis**

## EXHIBIT C

**Summary of Claims by Estate (Both Scheduled Claims and Filed Proofs of Claim)**

# EXHIBIT D

**Redlines Showing Differences Between Second Amended Chapter 11 Plan Filed by TH Holdco on April [14], 2022 and Debtors' Plans**

## EXHIBIT E

**Proposed Form of Sale and Bid Procedures**

**EXHIBIT F**

**FORM OF PROPOSED PURCHASE AGREEMENT**