A Mitchell Greene, Esq.
**LEECH TISHMAN ROBINSON BROG, PLLC**
875 Third Avenue
9th Floor
New York, New York 10022
Telephone: (212) 603-6300
Facsimile: (212) 956-2164
E-mail:amgreene@leechtishman.com

*Counsel to the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>   85 FLATBUSH RHO MEZZ LLC, et al.,[1]<br><br>                        Debtors | Case No. 20-23280 (RDD)<br>Chapter 11<br><br><br>(Jointly Administered) |

**DISCLOSURE STATEMENT FOR SECOND AMENDED CHAPTER 11**
**PLAN OF REORGANIZATION OF 85 FLATBUSH RHO MEZZ, LLC,**
**85 FLATBUSH RHO HOTEL LLC AND 85 FLATBUSH RHO RESIDENTIAL LLC**

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE SECOND AMENDED PLAN OF REORGANIZATION OF 85 FLATBUSH RHO MEZZ LLC, 85 FLATBUSH RHO HOTEL LLC AND 85 FLATBUSH RHO RESIDENTIAL LLC ("PLAN"). ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT ("DISCLOSURE STATEMENT") FOR THE PLAN HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES.**

---

[1] The Debtors (as defined) in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include: 85 Flatbush RHO Mezz LLC. (6184); 85 Flatbush RHO Hotel LLC (5027); and 85 Flatbush RHO Residential LLC (2261).

## I.   **INTRODUCTION**

On December 18, 2020 (the "Petition Date"), 85 Flatbush RHO Mezz LLC ("Mezz"), 85 Flatbush RHO Hotel LLC ("Hotel"), and 85 Flatbush RHO Residential LLC ("Residential" and with Mezz and Hotel, the "Debtors") each filed a voluntary petition pursuant to Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")[2] in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their respective business and manage their respective assets as debtors-in-possession. As of the date hereof, no creditors' committee has been appointed in these Chapter 11 Cases.

On _____, 2022, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical holder of an Allowed Claim to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The purpose of this Disclosure Statement is to provide holders of Claims who are entitled to vote to accept or reject the Plan with adequate information about (i) the Debtors' business and certain historical events, (ii) the Chapter 11 Cases, (iii) the Plan, (iv) the rights of holders of Claims and Interests under the Plan, and (v) other information necessary to enable each Holder of a Claim entitled to vote on the Plan to make an informed judgment as to whether to vote to accept or reject the Plan. Holders of Interests are not entitled to vote on the Plan. Solicitation of acceptances from classes that are not entitled to vote on the Plan, either because such class is not impaired or is conclusively deemed to have accepted or rejected the Plan, is not required.

Pursuant to section 1125 of the Bankruptcy Code, the Debtors submit this Disclosure Statement to all holders of Claims against the Debtors entitled to vote on the Plan to provide information deemed material, important, and necessary for the creditors to arrive at a reasonably informed decision in connection with the Plan filed concurrently herewith. The Disclosure Statement is also available to all holders of Claims against and Interests in the Debtors for informational purposes, including detailing the impact the Plan will have on such holders' Claims and Interests.

A copy of the Plan accompanies this Disclosure Statement. Capitalized terms used but not defined in this Disclosure Statement shall have the meaning for those terms set forth in the Plan.

Debtors seek approval of this Disclosure Statement and confirmation of their Second Amended Plan which is premised upon an investment of no less than $96,750,000 from the Hagler Funding in exchange for which Hagler or his designee shall be admitted as an additional equity member under the operating agreement of 85 Flatbush RHO Mezz LLC. A copy of the Declaration of Daryl Hagler setting forth his commitment to fund no less than the sum of $96,775,000 and his

---

2 Unless otherwise specifically stated, all references to "§" or "section" herein are to a section of the Bankruptcy Code; all references to "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); all references to "Local Rule" are to the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

letter agreement with the Debtors is identified on the ECF docket as document no. 231. The Debtors submit that the Hagler Funding along with the Debtors' available cash will provide for payment in full on account of their Allowed Claims on the Effective Date in accordance with the estimated claim amounts set forth on the Plan Funding Schedule attached hereto as <u>Exhibit A</u>.

The Bankruptcy Court has set _____, 2022, at 10:00 a.m. (prevailing Eastern Time) as the date for a hearing on the confirmation of the Plan (the "<u>Confirmation Hearing Date</u>").

The approval by the Bankruptcy Court of this Disclosure Statement does not constitute a recommendation as to the merits of the Plan, only that the Disclosure Statement contains "adequate information" from which creditors may form an opinion as to the merits of the Plan. Each creditor and interest holder should read the Disclosure Statement and the Plan in their entirety.

## II.    HISTORY OF THE DEBTORS AND THE BANKRUPTCY FILING

Mezz is the 100% owner of Hotel and Residential LLC. Hotel and Residential collectively own the real property and improvements thereon located at 85 Flatbush Avenue Extension, Brooklyn, New York (the "<u>Property</u>") at the intersection of Tillary Street and Flatbush Avenue Extension, just off the base of the Manhattan Bridge. The Property is a 132,641 square foot, twelve-story, mixed-use property consisting of a 174-room boutique hotel on the first six (6) floors known as the Tillary Hotel Brooklyn (the "<u>Hotel Property</u>"), a 58,652 square foot 64-unit luxury multi-family building and a 5,642 square foot parking garage (the "<u>Residential Property</u>"). The hotel is a full service upper upscale boutique hotel which also features a business center, fitness center, meeting space, restaurant, café and bar. The residential component of the Property has nine (9) studios, twenty-six (26) one-bedroom units, and twenty-nine (29) two-bedroom units. Of the sixty-four (64) units, currently, up to two (2) are occupied. At the time the Debtors' acquired the Property in September 2019, their original intention was to convert the residential component into condominiums.

The COVID-19 pandemic and the attendant quarantine and travel restrictions along with the NYC shutdown of indoor dining beginning in March 2020 had an immediate and since lasting effect on the hospitality industry as a whole and caused the Hotel to have to shut down operations for the month of April 2020. The Hotel reopened to provide shelter services from May 15, 2020 through June 30, 2020. The Hotel reopened to the public on July 15, 2020, but with a reduced occupancy rate, and the closure of its fitness center, meeting room and food service, resulting in limited revenue. Since October 2021, the Hotel Property was leased on a short-term basis to the New York City Department of Homeless Services to provide temporary housing for homeless individuals. The short-term lease expired on December 31, 2021, and Hotel now provides shelter services a month-to-month basis.

### 1.    Senior Loan Background

The Property was acquired by Hotel and Residential on September 19, 2019. The original senior lender, 85 Flatbush Avenue 1, LLC ("<u>85 Flatbush Avenue</u>"), through an assignment of mortgage from CMTG JP Finance, extended to Hotel and Residential a loan in the original principal amount of $57,500,000 plus a new advance in the amount of $12,500,000 for a total principal loan amount of $70,000,000 evidenced by a consolidated, amended and restated note and

consolidated, amended and restated mortgage and security agreement, which was assigned to TH Holdco LLC ("TH Holdco") on January 28, 2022 (the "TH Holdco Prepetition Loan Agreement"). The TH Holdco Prepetition Loan Agreement term was for 24 months, with a maturity date of October 1, 2021. That maturity date has not been extended.

Hotel made regular monthly payments of interest on the TH Holdco Prepetition Loan Agreement until February 2020.

## 2.     85 Flatbush Mezz Loan Agreement and Intercreditor Agreement

On September 19, 2019, the 85 Flatbush Mezz advanced a loan to Mezz in the original principal amount of $6,000,000 secured by the 85 Flatbush Hotel Pledge Agreement and 85 Flatbush Residential Pledge Agreement (the "85 Flatbush Mezz Loan Agreement").

85 Flatbush Avenue as the original senior lender and 85 Flatbush Mezz as the mezzanine lender are party to an Intercreditor Agreement dated September 19, 2019 and amended as of July 23, 2020 (the "Intercreditor Agreement") which set forth certain rights between the two lenders. 85 Flatbush Avenue's interest and rights under the Intercreditor Agreement are now assigned to TH Holdco. TH Holdco reserves all rights and remedies under the Intercreditor Agreement.

## 3.     December 2020 Foreclosure Sale

Prior to the bankruptcy filing, a Uniform Commercial Code foreclosure auction of the pledged equity interests was scheduled by 85 Flatbush Mezz for December 15, 2020 and then, at the Debtors' request, was rescheduled on two occasions with a final sale date of December 18, 2020. On December 18, 2020, the Debtors filed their Chapter 11 petitions and the automatic stay prevented the foreclosure sale from going forward.

Pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their business and manage their assets as debtors-in-possession. As of the date hereof, no creditors' committee has been appointed in these Chapter 11 Cases.

## III.   POSTPETITION DEVELOPMENTS

### 1.     Debtors' Counsel

After the Petition Date, the Debtors filed an application to retain and employ Robinson Brog Leinwand Greene Genovese & Gluck P.C. as its bankruptcy counsel [Docket No. 40], which the Bankruptcy Court approved thereafter [Docket No. 62].

On June 2, 2022, the Debtors filed an application to retain Leech Tishman Robinson Brog PLLC as substitution counsel to the Debtors effective as of May 16, 2022 [Docket No. 215], which the Bankruptcy Court approved by order entered on June 21, 2021 [Docket No. 226].

### 2.     Early Substantive Motions in Debtors' Cases

On December 18, 2020, the Debtors filed a *Motion for Approval of Adequate Assurance of Payment to Utility Services and Continuation of Service*. [Docket No. 3]. The Bankruptcy Court

entered an interim order granting the Motion on December 28, 2020, and a final order on January 6, 2021. [Docket Nos. 22 and 29].

On December 20, 2020, the Debtors filed a *Motion to Authorize Debtors to Pay Wages and Compensation and for Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations*. [Docket No. 6]. The Bankruptcy Court entered an interim wage order on December 28, 2020, and a final wage order on January 13, 2021. [Docket Nos. 22 and 32].

### 3. <u>Cash Collateral</u>

On December 20, 2020, Hotel filed a *Motion to Use 85 Flatbush Avenue's Cash Collateral*. [Docket No. 5]. On December 28, 2020, the Bankruptcy Court entered an *Interim Order Granting Debtors Motion to Use Cash Collateral*. [Docket No. 21]. The Bankruptcy Court entered a second Interim Cash Collateral Order on January 19, 2021. [Docket No. 34]. On March 29, 2021, the Court entered a *Final Consent Order Authorizing the Use of Cash Collateral and Granting Adequate Protection between the Debtors and 85 Flatbush Avenue* [Docket No. 64] (the "<u>Agreed Final Cash Collateral Order</u>") providing various acknowledgements and rights of 85 Flatbush Avenue as Lender, which rights are now held by TH Holdco as successor to 85 Flatbush Avenue. The Agreed Final Cash Collateral Order is now a Final Order.

The Agreed Final Cash Collateral Order fixed Lender's claim as of the Petition Date at $85,158,815.99 ('Lender Claim'), broken down as follows:

> **Unpaid principal balance $70,000,000.00**
> **Contract interest to 2/29/20 $496,222.22**
> **Default Interest to 12/18/20 $13,673,333.32**
> **(less) Interest Paid $(1,201.91)**
> **Protective Advance for Taxes $247,849.21**
> **Interest on Protective Advance $25,115.39**
> **Legal Fees $28,605.00**
> **Late Fee $24,751.00**
> **Entity Fees $2,641.74**
> **Exit Fee $525,000.00**
> **Servicing Fee $136,500.00**

### 4. <u>The Debtors' Exclusivity Periods</u>

The Debtors' exclusive right to file a Chapter 11 plan was set to expire on April 19, 2021. On March 31, 2021, the Debtors filed a *Motion to Extend the Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement* [Docket No. 65] ("<u>First Motion to Extend Exclusivity Period</u>"). On June 25, 2021, the Court held a hearing on the First Motion to Extend the Exclusivity Period, wherein it granted relief in the Debtors' favor and overruled all objections. [Docket No. 99]. On August 17, 2021, the Debtors filed a *Second Motion to Extend the Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement* [Docket No. 103] ("<u>Second Motion to Extend Exclusivity Period</u>"). The objections to the Second Motion to Extend Exclusivity Period were resolved through an agreed order summarized below.

On September 21, 2021, the Court entered an *Order Extending Exclusive Right to File a Plan of Reorganization and to Solicit Acceptances for the Debtors' Plan and For Related Relief* [Docket No. 125] (the "Final Exclusivity Order"). The Final Exclusivity Order extended Debtors' exclusive right to file a Chapter 11 plan through November 24, 2021 (the "Exclusivity Period"), and provided that if the Debtors filed a Chapter 11 plan during the Exclusivity Period, they would have the exclusive right to solicit acceptances for such plan through January 24, 2022 (the "Acceptance Period").

On November 24, 2021, the Debtors filed the Debtors' original plan. The Debtors' original plan was based on a sales process including an opportunity for the holder of senior mortgage debt or its nominee to credit bid. Debtors did not file an accompanying disclosure statement related to the Debtors' original Plan or otherwise solicit acceptance of the Debtors' original plan or seek to further extends the Acceptance Period. Therefore, the Exclusivity Period and the Acceptance Period both expired.

### 5. Claims Bar Date

On March 12, 2021, the Debtors filed a *Motion to Establish a Deadline to File Proofs of Claim*. [Docket No. 55]. In accordance with Bankruptcy Rule 3003(c)(3), by order dated March 15, 2021 [Docket No. 58] (the "Bar Date Order"), the Bankruptcy Court fixed April 21, 2021 (the "Bar Date") as the last day by which general creditors would be permitted to file claims in the Debtors' Chapter 11 Cases, and June 16, 2021 as the last day for governmental units to file claims in the Debtors' Chapter 11 Cases (the "Governmental Bar Date"). On May 26, 2021, the Debtors filed an Amended Schedule E/F scheduling additional creditors who may have claims against the Debtors. [Docket Nos. 80 and 81]. Pursuant to the Bar Date Order, the deadline to file a proof of claim for creditors scheduled on Amended Schedule E/F was extended to June 28, 2021 ("Supplemental Bar Date"). Pursuant to Bankruptcy Rule 3003(c)(2), any creditor whose claim had not been scheduled by the Debtors or was scheduled as disputed, contingent, or unliquidated and has failed to file a proof of claim on or before the Bar Date, the Supplemental Bar Date, or the Governmental Bar Date, as the case may be, is deemed not to be a creditor with respect to such claim for purposes of voting on and receiving a distribution under a Chapter 11 plan.

### 6. Filed and Scheduled Claims

### i. *Hotel and Residential Claims*

Secured Claims

85 Flatbush Avenue, predecessor in interest to TH Holdco, filed a Secured Claim in the amount of $85,158,815.99, not including post-petition interest and other costs, against Hotel and Residential, which amount is consistent with the Agreed Final Cash Collateral Order. To the extent that the value of the senior mortgages collateral exceeds this total prepetition claim amount, then TH Holdco asserts it is entitled to post-petition accrued amounts as follows as of June 30, 2022 (with additional post-petition interest, fees and costs continuing to accrue after June 30, 2022). There is no interest-on-interest in the calculation below:

| Nature of Post-petition Claims | Post-petition Amount Asserted by TH Holdco |
| --- | --- |

| | |
|---|---|
| Post-petition Interest at Default Rate (as of June 30, 2022) | $26,086,667 |
| Post-petition Interest at Default Rate on Protective Advance (as of June 30, 2022) | $92,365 |
| Post Loan Acquisition Attorney's Fees and Costs in 2022 as of April 25, 2022 | At least $650,000 (additional fees expected) |
| TOTAL POST-PETITION AS OF JUNE 30, 2022 | At least $26,829,032 (plus attorneys' fees and costs accruing from April 25, 2022 to June 30, 2022) |
| TOTAL PRE-PETITION AND POST-PETITION AS OF JUNE 30, 2022 | In excess of $111 million |

The Agreed Final Cash Collateral Order provides that: "The extent to which the Lender Claim is a Secured Claim will be determined by the Court based on the value of the Lender's Collateral, and is subject to section 506(a) and (b) of the Bankruptcy Code, and to applicable non-bankruptcy law, provided, however, that the Debtor acknowledges and agrees that the Lender has a valid and enforceable lien on the Property."

The Bankruptcy Court has not made any final determination as to the post-petition amounts owed to TH Holdco, if any, at this time. TH Holdco reserves all of its rights under the Final Cash Collateral Order.

Pursuant to the appraisal of the Property attached to the Debtors' objection to confirmation of the TH Holdco Plan [Document No. 230], the Hotel Property and Residential Property are valued at $72,000,000. Based on this valuation of the collateral, TH Holdco's claim is a Secured Claim only up to the amount of $72,000,000[3]. Thus, the Debtors dispute the amount of the TH Holdco Claim, including TH Holdco's right to post-petition interest.

TH Holdco asserts that the marketing process run by JLL and this Plan are the best indicator of the value of the Properties and that no separate appraisal is required. Debtors disagree.

<u>Chapter 11 Post-petition Administrative Claims and Priority Claims</u>

Administrative claims in these consist of professional fees, outstanding real estate taxes, and certain NYS taxes. Debtors' counsel has filed its fee application for the period ending June 8, 2022 seeking approval of fees and expenses aggregating $627,932.98. Debtors' counsel has been paid and was authorized to apply certain pre-petition retainer amounts pursuant to an interim compensation order entered on September 15, 2021. After application of the approved amounts, approximately $405,351 in fees and expenses is due and owing through June 8, 2022. Debtors' counsel will supplement or file additional fee applications seeking approval of fees incurred and

---

3 To the extent there are any liens that prime the TH Holdco mortgage, for example, real property taxes, the secured claim amount will be reduced.

reimbursement of expenses for the time period from June 9, 2022 through the Confirmation Date in accordance with the requirements of the Plan.

With respect to real estate taxes, the Property is identified as block 00120 with 4 separate lots as follows:

Lot 7503: assigned by NYC Department of Finance representing the whole building which is then broken down to:

Lot 1201: commercial unit next to the Hotel

Lot 1202: hotel property

Lot 1203: residential and garage property

As of 6/4/2022, Hotel and Residential owe real estate taxes in the aggregate amount of $2,188,134.80[4] which includes new charges that cover the time period July 1, 2022 through December 31, 2022 and will continue to accrue interest and other charges until paid.

There are also outstanding water charges due in the amount of $39,799.48.

Certain priority tax claims were also filed against Hotel. The New York State Department of Labor filed a claim in the amount of $0.00 pursuant to § 507(a) of the Bankruptcy Code in the event future liabilities become due. The New York State Tax Department filed two claims in the amounts of $91,872.96 for an administrative withholding and sales tax liability and a $635,682.55 priority withholding and sales tax liability.

Unsecured Claims

The Debtors estimate the aggregate amount of general unsecured claims against Hotel, Residential, and Mezz to be $1,346,147.04. Debtors estimate the aggregate amount of insider general unsecured claims against Hotel, Residential and Mezz to be $1,398,660. A breakdown of the claim amounts are set forth in the chart below.

A review of the back-up filed with most of the proofs of claim filed against Mezz reflect that the claims are properly asserted against Hotel and should be reclassified as such. If necessary, a motion to reclassify the subject claims will be filed.

> **ii.    *Mezz Claims***

Secured Claims

---

4 The New York City Department of Finance filed an administrative priority claim in the amount of $1,119,193.86 in the 85 Flatbush RHO Mezz case which represents the outstanding real estate taxes due as of the date of the filing of the claim. These amounts are included in the aggregate amount set forth above.

To date, filed Secured Claims against 85 Flatbush RHO Mezz total $7,787,611.90. Flatbush Mezz LLC filed a Secured Claim in the amount of $7,787,500.00.  The New York City Department Finance filed a Secured Claim in the amount of $111.90.

### 7.    <u>JLL Engagement as Real Estate Advisor and Marketing of the Assets</u>

On September 7, 2021, the Debtors filed an *Application for an Order Authorizing the Retention of Real Estate Advisor*, to permit JLL to arrange a joint venture, financing or recapitalization, sell, or otherwise dispose of the Hotel Property. [Docket No. 114].  On October 12, 2021, the Court entered an *Order Authorizing Retention of JLL as Real Estate Advisor*. [Docket No. 133].

JLL launched their marketing efforts on October 12, 2021, creating and establishing a data room for interested parties which was accessible immediately upon their executing a confidentiality agreement.  A total of 69 confidentiality agreements were executed and JLL conducted 14 tours of the Hotel Property and the Residential Property.  The marketing period continued through November 17, 2021.  A total of six (6) written offers were received, that were later narrowed down to three (3) potential purchasers for the Hotel Property and the Residential Property ranging from $80,000,000 to $86,500,000.

### 8.    <u>Debtors' Original Plan</u>

On November 24, 2021, the Debtors filed their original plan which was premised upon a sale of the Property pursuant to sale and bid procedures approved by the Bankruptcy Court including the rights of the holder of the senior mortgage debt to credit bid.  Cash generated from the sale in conjunction with the Debtors cash on hand would fund plan payments pursuant to Bankruptcy Code priorities.

### 9.    <u>Meeting and Discussion with the Debtors' Minority Owner and Due Diligence</u>

TH Holdco asserts that in mid-October 2021, Franco Famularo, an executive with Ohana Real Estate (which is an affiliate of TH Holdco), had discussions with Isaac Hager, a minority owner of Mezz Debtor, who purported to have authority to represent the Debtors.  Mr. Famularo met with Mr. Hager for an on-site tour of the Property in October of 2021.  During their discussions, TH Holdco asserts that Mr. Hager, acting for the Debtors, demanded that as part of any bid from Ohana or its nominee, the owners of the Mezz Debtor be "made whole" by a payment of at least $20 million, including at least $15 million of cash consideration.  TH Holdco asserts that Mr. Hager asserted that payment must be made for the benefit of equity, even though the Debtors did not expect creditors to be paid in full, and required that any deal was predicated on Mr. Hager remaining as an investor in the Property.  TH Holdco asserts that when Mr. Famularo asked Mr. Hager why the Debtors expected a full recovery including a substantial cash payment when the creditors were being impaired, Mr. Hager represented that a separate rabbinical court ruling regarding a settlement between Mr. Hager and the majority owner of the Property effectively took precedence over the bankruptcy court process.

TH Holdco asserts that at no point did Mr. Hager or the Debtors' refer Ohana to JLL, suggest that Ohana negotiate through JLL, or propose that Ohana be a stalking horse bidder to

acquire the Property. Ohana considered the Debtors' demands to be unrealistic and improper, and determined that further negotiations with Debtors would not be productive.

Ohana thereafter continued to perform due diligence on the Property based on publicly available information (including key pleadings in the Bankruptcy Case docket and claims registers) and information provided by the then current senior lender, 85 Flatbush Avenue 1 LLC.

On November 3, 2021, TH Holdco asserts that Mr. Famularo was forwarded an unsolicited email from a real estate broker in New York City (not JLL) (the "November Email") which has been filed with the Bankruptcy Court. This email was originally sent by the broker to Chris Smith of Ohana, and the broker was soliciting interest from Ohana to provide capital to back the Debtors' business plan to seek a longer-term lease with DHS. TH Holdco asserts that the unsolicited email from the broker included information that clearly came from the Debtors, including (i) a market appraisal valuing the Property at $94 million as of September 11, 2019 (from the Debtors' original acquisition financing process) and (ii) a form of a DHS Lease which appears to be terminable at any time by DHS. This broker appears to be acting for the Debtors and/or its principals outside of the JLL process and in support of an insider bid. TH Holdco asserts that Ohana did not engage with the broker at that time.

Separately, in early January 2022, TH Holdco asserts that Mr. Famularo received an unsolicited call from that same real estate broker in New York City (not JLL) who claimed to represent the Debtors. Without knowing about Ohana's familiarity with the Property and ongoing due diligence or acknowledging the November Email, TH Holdco asserts that broker stated that he was helping the Debtors find mezzanine debt and equity to help them maintain ownership of the Property. TH Holdco asserts Ohana again declined to engage further, but that it was apparent that the Debtors were still acting outside of the JLL process in an attempt to retain ownership of the property.

TH Holdco asserts that this led Ohana to believe that the Debtors' principals and affiliates were interested only in maximizing recovery to equity and were putting their own interests ahead of those of the creditors. This was concerning to Ohana, as was the Debtors' failure to move their sale plan along (by, for example, not filing a disclosure statement within the exclusivity period). As such, through its affiliate TH Holdco, Ohana purchased the debt directly from the Pre-petition Lender after the Debtors' exclusivity expired as discussed below.

Debtors dispute certain of TH Holdco's assertions set forth above and submit that TH Holdco's acquisition of the Lender's mortgage and related loan documents were carried out in a manner calculated to circumvent the exclusive sales process being run by JLL and based on this inequitable and bad faith conduct it should be disqualified from credit bidding for the Property under its proposed sale plan. An objection to TH Holdco's plan and a motion seeking to disqualify TH Holdco from confirming its plan and credit bidding for the Property was filed on June 22, 2022 [Document Nos. 229-232].

### 10. Purchase of the Senior Mortgage Loan

TH Holdco is indirectly owned by Ohana related entities ("Ohana"). Ohana is a vertically integrated investment firm focused on full-service hotels. Ohana invests in both equity and credit

opportunities through dedicated commingled fund vehicles.  Founded in 2009, Ohana is currently headquartered in Redwood City, California and has approximately $2.0 billion under management (including $0.7 billion in regulatory assets under management).

On January 24, 2022, TH Holdco, an affiliate of Ohana, purchased the senior mortgage loan from 85 Flatbush Lender.

In early February, 2022, TH Holdco through its counsel reached out to Debtors' counsel to explore whether the terms of a consensual Chapter 11 plan could be reached and proposed a joint business/legal call between the parties.  TH Holdco asserts that proposal was ignored by Debtors' counsel.  Additionally, TH Holdco's counsel asked Debtors' counsel for an analysis of the cash necessary to pay priority claims and Chapter 11 administrative expenses which Debtors' counsel agreed to provide.  TH Holdco's counsel then followed up with Debtors' counsel on the analysis which Debtors' counsel was being advised was being worked on.  Parts of that analysis were provided on April 4, 2022 by Debtors' counsel to TH Holdco's counsel and subsequently, additional claims information and analysis has been provided by Debtors' counsel to TH Holdco's counsel.

### 11.     TH Holdco LLC's Plan and Disclosure Statement

On February 20, 2022, TH Holdco filed their original plan and disclosure statement.  The original plan contemplated a sale of the Property with a contribution of $200,000 for pro rata distribution to unsecured creditors.  TH Holdco's original disclosure statement was objected to by Debtors and 85 Flatbush Mezz on a variety of bases.  In response, TH Holdco filed an amended plan and amended disclosure statement prior to the April 6, 2022 hearing to consider approval of the TH Holdco disclosure statement.  After the April 6, 2022 hearing, TH Holdco further amended their plan and disclosure statement on April 20 and April 26, 2022 and again on May 13, 2022.  After a hearing held on May 18, 2022, the Court entered an order approving the TH Holdco second amended disclosure statement ("TH Holdco Disclosure Statement"), approving certain sale and bid procedures and solicitation materials and scheduling a hearing on confirmation of the TH Holdco second amended plan ("TH Holdco Plan") for June 30, 2022.  The TH Holdco Plan is premised upon an auction sale of the Property with TH Holdco submitting an initial opening credit bid of $90,000,000 plus a cash component to satisfy certain Priority and Administrative Claims, including Fee Claims.  The TH Holdco Plan also provides that to the extent TH Holdco is the successful bidder for the Property, TH Holdco will fund an initial $1.25 million distribution pool for pro rata distribution to unsecured creditors.  Allowed unsecured will receive payments on the balance of their allowed claims up to the full amount of their claim, plus interest, over time, either from cash flow from Property operations, or from additional funding from TH Holdco with such payments to be guaranteed by a credit worthy affiliate of Ohana.  The final payment will be made no later than one year after the TH Holdco Plan's Effective Date.

### 12.     Debtors' Amended Plan and Disclosure Statement

On March 30, 2022, the Debtors filed their (i) Amended Plan of Reorganization of 85 Flatbush RHO Mezz, LLC, 85 Flatbush RHO Hotel, LLC and 85 Flatbush RHO Residential LLC [Docket No. 161] and (ii) Disclosure Statement for Amended Plan of Reorganization of 85 Flatbush RHO Mezz LLC, 85 Flatbush RHO Hotel, LLC, and 85 Flatbush RHO Residential LLC

[Docket No. 162]. The Debtors' amended plan is a plan of reorganization rather than a sale-based plan. The Debtors' amended plan was to be implemented by the Debtor procuring a long term lease from the Department of Homeless Services which would enable the Debtors to obtain exit financing and an equity contribution that would be sufficient to satisfy the Allowed TH Holdco Secured Claim and all of the Debtors' other Allowed Claims except for the 85 Flatbush Mezz claim, which would be paid with an initial paydown and thereafter over a period of seven (7) years.

TH Holdco objected to the amended plan and disclosure statement on a variety of bases. The Debtors did not proceed to seek approval of the amended plan and disclosure statement.

### 13.    Debtors' Motion to Disqualify TH Holdco from Credit Bidding on the Property

TH Holdco presents a different perspective than the Debtors with respect to the communications between Franco Famularo, an executive with Ohana Real Estate (which is an affiliate of TH Holdco), and Isaac Hager, a minority owner of Mezz. Debtors believe TH Holdco's acquisition of the Lender's mortgage and related loan documents were carried out in a manner calculated to circumvent the exclusive sales process being run by JLL and based on this inequitable and bad faith conduct it should be disqualified from credit bidding for the Property under its proposed sale plan. A motion seeking to disqualify TH Holdco from confirming its plan and credit bidding for the Property was filed on June 22, 2022 [Docket No. 232].

### 14.    Debtors' Objection to TH Holdco Plan

On June 22, 2022, the Debtors filed their objection to confirmation of the TH Holdco Plan, asserting, amongst other objections, that the TH Holdco Plan cannot be confirmed as currently filed because it provides TH Holdco with the opportunity to credit bid in excess of the appraised value of the Property. The confirmation objection and appraisal are identified on the ECF docket as document nos. 229 and 230.

### 15.    Mezz Lenders' Adversary Proceeding

On March 23, 2022, 85 Flatbush Mezz filed an adversary proceeding (Adversary Proceeding 7:22-ap-07022-RDD) (the "Adversary Proceeding") against TH Holdco alleging that 85 Flatbush Avenue failed to issue purchase option notices to the Mezz Lender pursuant to the Intercreditor Agreement in July of 2020, August of 2020 and December of 2020, and that Mezz Lender retains the right to purchase the Senior Loan at the loan purchase price calculated as of July 16, 2020. The 85 Flatbush Mezz and TH Holdco are each pursuing discovery, which will be followed by the filing of dispositive motions, with the goal of obtaining a determination of the 85 Flatbush Mezz' claims in the Adversary Proceeding before an auction of the Property. The parties have taken opposing positions in the Adversary Proceeding. 85 Flatbush Mezz submits that the failure to provide the required purchase option notices pursuant to the Intercreditor Agreement cannot be genuinely disputed, and further asserts that the appropriate remedy is for 85 Flatbush Mezz to have the opportunity to purchase the Senior Loan for a purchase price calculated as of July 16, 2020. TH Holdco disputes this.

TH Holdco believes that the Adversary Proceeding lacks merit and asserts that it will be

promptly dismissed because, among other things, (i) 85 Flatbush Mezz's claims are contrary to the express terms of the ICA, (ii) 85 Flatbush Mezz was not ready, willing and able to consummate the purchase of the Senior Loan on closing date contemplated by the ICA, including because it did not have the funds to consummate the purchase, (iii) pursuant to the ICA, 85 Flatbush Mezz was not entitled to exercise the loan purchase option or consummate the purchase of the senior loan because of various events of default, and (iv) 85 Flatbush Mezz's claims are barred by equitable doctrines such as laches, unconscionable or inexcusable delay, bad faith, unclean hands, waiver and estoppel.

TH Holdco believes that the Adversary Proceeding can be ruled upon promptly, and a ruling on the Adversary Proceeding is not a condition to confirmation of the TH Holdco Plan. Further, TH Holdco disputes 85 Flatbush Mezz's position that the confirmation hearing, the auction, or its Plan's effective date should be delayed due to pendency of the Adversary Proceeding or any appeal of any ruling in the Adversary Proceeding.  TH Holdco further asserts that 85 Flatbush Mezz's position violates the Intercreditor Agreement and is meritless.

85 Flatbush Mezz asserts that TH Holdco's ability to pursue an auction will ultimately be negated by a successful challenge under the parties' Intercreditor Agreement in the Adversary Proceeding.

Debtors submit that any auction of the Property should not proceed until the Adversary Proceeding is fully adjudicated.

## IV.    THE CHAPTER 11 PLAN FILED BY THE DEBTORS

**THIS SECTION OF THIS DISCLOSURE STATEMENT PRESENTS ONLY A SUMMARY OF THE PLAN.   CREDITORS ARE URGED TO CONSULT WITH COUNSEL IN ORDER TO MAKE AN INFORMED DECISION WITH RESPECT TO THE PLAN.**

### 1.    Classification of Claims

A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of the Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that the Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and has not been paid, released, or otherwise satisfied or dealt with prior to the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

The term "impaired" as used below shall have the same meaning it has pursuant to § 1124 of the Bankruptcy Code.  Thus, a Class of Claims is impaired under the Plan unless, with respect to each and every Claim in the Class, the holder of such Claim receives, on the Effective Date of

the Plan, the total Allowed amount of such Claim in cash or the Plan leaves unaltered the legal, equitable, and contractual rights to which such Claim entitles the holder thereof. In the Debtors' plan, all classes of claims and interests are unimpaired and votes of holders of claims and interests will not be solicited.

Claims in more than one Class (including Claims which are also Administrative Expense Claims and/or Priority Claims) shall only be entitled to a single payment in full including any applicable interest under the Plan.

### 2.      **Unclassified Claims/Administrative Claims**

Except to the extent that a holder of an Allowed Administrative Expense Claim and the Debtors agree to different treatment, the Debtors shall pay to each holder of an Allowed Administrative Expense Claim, Cash in an amount equal to such Claim (plus statutory interest on such claim, if applicable), on or as soon thereafter as is reasonably practicable, the later of (a) the Closing Date or (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid by the Debtors the in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court (including the Bar Date Order), requests for payment of Administrative Expense Claims, other than requests for payment of Fee Claims, must be filed and served on the Debtors no later than the Administrative Expense Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.

Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims and that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors or their property, and the Administrative Expense Claims shall be deemed compromised, settled, and released as of the Effective Date. The Debtors must file and serve objections to Administrative Expense Claims on or before the Administrative Expense Claims Objection Bar Date.

Administrative Expense Claims shall be paid from the Debtors' cash on hand as of the Effective Date and the Hagler Funding.

### 3.      **Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course.

Priority Tax Claims shall be paid from the Debtors' cash on hand as of the Effective Date and the Hagler Funding.

### 4. Fee Claims

All Entities seeking an award by the Bankruptcy Court of Fee Claims shall (i) provide a detailed estimate of all fees incurred through the Confirmation Hearing and estimated to be incurred through the Effective Date and (ii) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date which date may be extended by agreement between the parties. No later than ten (10) days prior to the Effective Date, all entities holding claims for Fee Claims shall serve upon the Debtors an updated notice of the estimated amount of their unpaid Fee Claim and the Debtors shall segregate, into an Estimated Professional Fee Escrow, the amounts which are necessary to pay the amount of such Fee Claim, in full (or in such amount as the Bankruptcy Court sets) subject to Allowance by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the date upon which the order relating to any such Allowed Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors. The Debtors or Disbursing Agent are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval. The Estimated Professional Fee Escrow shall be funded from the Debtors' cash on hand as of the Effective Date of the Plan and the Hagler Funding.

### 5. U.S. Trustee Fees

The Disbursing Agent shall pay all outstanding U.S. Trustee Fees of the applicable Estate on an ongoing basis on the date such U.S. Trustee Fees become due and payable, until such time as a final decree is entered closing the applicable Chapter 11 Case, the applicable Chapter 11 Case is converted or dismissed, or the Bankruptcy Court orders otherwise.

U.S. Trustee Fees shall be paid from the Debtors' cash on hand as of the Effective Date and the Hagler Funding.

### 6. Classified Claims

The Plan provides for the division of claims and interests into separate classes. The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with § 1126 of the Bankruptcy Code, and (c) deemed to reject the Plan. In accordance with § 1123 of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and, thus, are excluded from the classes of Claims and Interests set forth in Section 3 of the Plan. Unless otherwise noted below, classified claims shall be paid from the Debtors' cash on hand as of the Effective Date and the Hagler Funding. All classes of claims and interests are unimpaired by the Plan and votes of holders of claims and interests will not be solicited.

| Class | Designation | Treatment | Approximate Amount in Disclosure Statement | Entitled to Vote |
|---|---|---|---|---|
| 1 | 85 Flatbush RHO Hotel Other Priority Claims | Unimpaired | $635,682.55 | No (presumed to accept) |
| 2 | 85 Flatbush RHO Residential Other Priority Claims | Unimpaired | $0 | No (presumed to accept) |
| 3 | TH Holdco Secured Claim | Unimpaired | $85,158,816[5] | No (presumed to accept) |
| 4 | 85 Flatbush RHO Hotel Other Secured Claims | Unimpaired | $2,036,341.69 | No (presumed to accept) |
| 5 | 85 Flatbush RHO Residential Other Secured Claims | Unimpaired | $151,793.11 | No (presumed to accept) |
| 6 | 85 Flatbush RHO Hotel General Unsecured Claims | Unimpaired | $1,141,332.04 | No (presumed to accept) |
| 7 | 85 Flatbush RHO Hotel Existing Equity Interests | Unimpaired | n/a | No (presumed to accept) |
| 8 | 85 Flatbush RHO Residential General Unsecured Claims | Unimpaired | $204,815 | No (presumed to accept) |
| 9 | 85 Flatbush RHO Residential Existing Equity Interests | Unimpaired | n/a | No (presumed to accept) |
| 10 | 85 Flatbush Mezz Claims | Unimpaired | $4,600,000 | No (presumed to accept) |
| 11 | 85 Flatbush Mezz General Unsecured Claims | Unimpaired | $171.59 | No (presumed to accept) |
| 12 | Insider General Unsecured Claims | Unimpaired | $1,398,660 | No (presumed to accept) |

---

[5] This is the amount set forth in the Agreed Final Cash Collateral Order and is not an acknowledgement of the amount of the TH Holdco Secured Claim.   The Bankruptcy Court has not made any final determination as to the post-petition amounts owed to TH Holdco, if any, at this time.   As the appraised value of the Property is $72,000,000, TH Holdco's claim is a secured claim only up to the amount of $72,000,000 and thus the Debtors' dispute the amount of the claim including TH Holdco's right to post-petition interest.

| Class | Designation | Treatment | Approximate Amount in Disclosure Statement | Entitled to Vote |
|-------|-------------|-----------|--------------------------------------------|------------------|
| 13 | 85 Flatbush Mezz Existing Equity Interests | Unimpaired | n/a | No (presumed to accept) |

*85 Flatbush RHO Hotel Other Priority Claims (Class 1).*

(a)    Classification:   Class 1 consists of Allowed Other Priority Claims against 85 Flatbush RHO Hotel.

(b)    Treatment:   Except to the extent that a holder of an Allowed Other Priority Claim against 85 Flatbush RHO Hotel that has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date, the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or when such claim becomes payable in the ordinary course or as soon as reasonably practical thereafter.

(c)    Voting:   Class 1 is Unimpaired, and the holders of 85 Flatbush RHO Hotel Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.  Therefore, holders of 85 Flatbush RHO Hotel Other Priority Claims are not entitled to vote to accept or reject the Plan.

*85 Flatbush RHO Residential Other Priority Claims (Class 2).*

(a)    Classification:  Class 2 consists of Allowed Other Priority Claims against 85 Flatbush RHO Residential.

(b)    Treatment:   Except to the extent that a holder of an Allowed Other Priority Claim against 85 Flatbush RHO Residential that has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date, the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or when such claim becomes payable in the ordinary course or as soon as reasonably practical thereafter.

(c)    Voting:  Class 2 is Unimpaired, and the holders of 85 Flatbush RHO Residential Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.  Therefore, holders of 85 Flatbush RHO Residential Other Priority Claims are not entitled to vote to accept or reject the Plan.

*TH Holdco Secured Claim (Class 3).*

(a)    Classification:  Class 3 consists of the TH Holdco Secured Claim.  The TH Holdco Secured Claim is a Claim pursuant to the TH Holdco Prepetition Loan Agreement, which is secured by the TH Holdco Mortgage and constitutes a first priority security interest on the Hotel

Property and Residential Property. Nothing herein shall prejudice TH Holdco's rights under the Intercreditor Agreement and under orders of this Bankruptcy Court. TH Holdco is a creditor of Hotel and Residential and reserves all rights under the Intercreditor Agreement with respect to the ability to vote or direct the 85 Flatbush Mezz claim in the 85 Flatbush RHO Mezz case.

(b)    Treatment:  The holder of the TH Holdco Secured Claim shall receive on the Effective Date, Cash in the amount of $85,158,816 or such amount as the Court determines to be the amount of the Allowed TH Holdco Secured Claim.

(c)    Voting:  Class 3 is Unimpaired, and holder of the TH Holdco Secured Claim in Class 3 is not entitled to vote to accept or reject the Plan.

*Flatbush RHO Hotel Other Secured Claims (Class 4).*

(a)    Classification:  Class 4 consists of the 85 Flatbush RHO Hotel Other Secured Claims. To the extent that 85 Flatbush RHO Hotel Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 4.

(b)    Treatment:  Except to the extent that a holder of an Allowed 85 Flatbush RHO Hotel Other Secured Claim has agreed to less favorable treatment of such Claim each such holder shall receive Cash, in an amount equal to such Allowed Claim, payable on the later of the Effective Date and the date on which such 85 Flatbush RHO Hotel Other Secured Claim becomes an Allowed 85 Flatbush RHO Hotel Other Secured Claim.

(c)    Voting:  Class 4 is Unimpaired, and the holders of 85 Flatbush RHO Hotel Other Secured Claims are not entitled to vote to accept or reject the Plan.

*85 Flatbush RHO Residential Other Secured Claims (Class 5).*

(a)    Classification: Class 5 consists of the 85 Flatbush RHO Residential Other Secured Claims. To the extent that 85 Flatbush RHO Residential Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 5.

(b)    Treatment:  Except to the extent that a holder of an Allowed 85 Flatbush RHO Residential Other Secured Claim has agreed to less favorable treatment of such Claim each such holder shall receive Cash, in an amount equal to such Allowed Claim, payable on the later of the Effective Date and the date on which such 85 Flatbush RHO Residential Other Secured Claim becomes an Allowed 85 Flatbush RHO Residential Other Secured Claim.

(c)    Voting:  Class 5 is Unimpaired, and the holders of 85 Flatbush RHO Residential Other Secured Claims are not entitled to vote to accept or reject the Plan.

*85 Flatbush RHO Hotel General Unsecured Claims (Class 6).*

(a)    Classification:  Class 6 consists of General Unsecured Claims against 85 Flatbush RHO Hotel.

(b)  Treatment:  Except to the extent that a holder of an Allowed 85 Flatbush RHO Hotel General Unsecured Claim (Class 6) has agreed to less favorable treatment of such Claim, each such holder shall receive Cash in an amount equal to the amount of the Allowed Claim, together with interest at the federal judgment rate on the Effective Date.

(c)  Voting:  Class 6 is Unimpaired and holders of General Unsecured Claims in Class 6 are not entitled to vote to accept or reject the Plan.

*85 Flatbush RHO Hotel Existing Equity Interests (Class 7).*

(a)  Classification: : Class 7 consists of Existing Equity Interests in 85 Flatbush RHO Hotel.

(a)  Treatment:  Mezz, the 100% owner of 85 Flatbush RHO Hotel LLC shall retain its equity interest in the 85 Flatbush RHO Hotel LLC.  In exchange for the Hagler Funding, Hagler or his designee shall be admitted as an additional equity member under the operating agreement of 85 Flatbush RHO Mezz LLC.

(b)  Voting:  Class 7 is Unimpaired by the Plan and the holders of Allowed Existing Equity Interests in 85 Flatbush RHO Hotel are not entitled to vote to accept or reject the Plan.

*85 Flatbush RHO Residential General Unsecured Claims (Class 8).*

(a)  Classification:  Class 8 consists of General Unsecured Claims against 85 Flatbush RHO Residential.

(b)  Treatment:  Except to the extent that a holder of an Allowed 85 Flatbush RHO Residential General Unsecured Claim (Class 8) has agreed to less favorable treatment of such Claim, each such holder shall receive Cash in an amount equal to the amount of the Allowed Claim, together with interest at the federal judgment rate on the Effective Date.

(c)  Voting:  Class 8 is Unimpaired and holders of General Unsecured Claims in Class 8 are entitled to vote to accept or reject the Plan.

*85 Flatbush RHO Residential Existing Equity Interests (Class 9).*

(a)  Classification:  Class 9 consists of Existing Equity Interests in 85 Flatbush RHO Residential.

(b)  Treatment:  Mezz, the 100% owner of 85 Flatbush RHO Residential LLC shall retain its equity interest in 85 Flatbush RHO Residential LLC.  In exchange for the Hagler Funding, Hagler or his designee shall be admitted as an additional equity member under the operating agreement of 85 Flatbush RHO Mezz LLC.

(c)  Voting:  Class 9 is Unimpaired by the Plan and the holders of Allowed Existing Equity Interests in 85 Flatbush RHO Residential are not entitled to vote to accept or reject the Plan.

*85 Flatbush Mezz Claim (Class 10).*

(a)      Classification:  Class 10 consists of the 85 Flatbush Mezz Claim.  The 85 Flatbush Mezz Claim is a Secured Claim pursuant to the 85 Flatbush Mezz Loan Agreement, which is secured by the 85 Flatbush Hotel Pledge Agreement and 85 Flatbush Residential Pledge Agreement.

(b)      Treatment:  The holder of the 85 Flatbush Mezz Claim shall receive, on the Effective Date, Cash in the amount of $4,600,000.

(c)      Voting: Class 10 is Unimpaired, and holder of the 85 Flatbush Mezz Secured Claim is entitled to vote to accept or reject the Plan.

*85 Flatbush RHO Mezz General Unsecured Claims (Class 11).*

(a)      Classification:  Class 11 consists of General Unsecured Claims against 85 Flatbush RHO Mezz.

(b)      Treatment:  Except to the extent that a holder of an Allowed 85 Flatbush Mezz General Unsecured Claim (Class 11) has agreed to less favorable treatment of such Claim, each such holder shall receive Cash in an amount equal to the amount of the Allowed Claim, together with interest at the federal judgment rate on the Effective Date.

(c)      Voting:  Class 11 is Unimpaired and holders of General Unsecured Claims in Class 11 are entitled to vote to accept or reject the Plan.

*Insider General Unsecured Claims (Class 12)*

(a)      Classification:  Class 12 consists of Insider General Unsecured Claims.  To the extent the holder of any General Unsecured Claim is determined by the Bankruptcy Court to be in fact a Class 6, Class 8 or Class 11 General Unsecured Claim or Class 13 Interest rather than a Class 12 General Unsecured Claim, such Claim shall instead be treated in accordance with the treatment of such Class.

(b)      Treatment:  Except to the extent that a holder of an Allowed Insider General Unsecured Claim (Class 12) has agreed to less favorable treatment of such Claim, each such holder shall receive Cash in an amount equal to the amount of the Allowed Claim, together with interest at the federal judgment rate on the Effective Date.

(c)      Voting:  Class 12 is Unimpaired and holders of Insider General Unsecured Claims in Class 14 are entitled to vote to accept or reject the Plan.

*85 Flatbush RHO Mezz Existing Equity Interests (Class 13).*

(a)      Classification:  : Class 13 consists of Existing Equity Interests in 85 Flatbush RHO Mezz.

(b)      Treatment: Mezz, the 100% owner of 85 Flatbush RHO Hotel LLC and 85 Flatbush RHO Residential LLC shall retain its equity interest in the 85 Flatbush RHO Hotel LLC and 85 Flatbush RHO Residential LLC.  In exchange for the Hagler Funding, Hagler or his designee shall

be admitted as an additional equity member under the operating agreement of 85 Flatbush RHO Mezz LLC.

(c)    Voting:    Class 13 is Unimpaired by the Plan, and the holders of the Allowed Existing Equity Interests in 85 Flatbush RHO Mezz are not entitled to vote to accept or reject the Plan.

## 7.    MEANS FOR IMPLEMENTATION.

### A.    The Hagler Funding.

The Plan Fund shall be funded by (i) the Debtors' Available Cash and (ii) the Hagler Funding. Creditor distributions to be made separate from or later than the Effective Date shall be made by the Disbursing Agent under the Plan.    The Hagler Funding amount is no less than $96,775,000.  Prior to the Confirmation Hearing, Hagler or his designee will escrow the sum of $2,500,000 which will serve as liquidated damages and be non-refundable if the Debtors' Plan is confirmed and Hagler or his designee defaults in its funding obligations, but will be refundable if the Debtors' Plan is not confirmed. The Hagler Funding in conjunction with the Debtors' available Cash is more than the amounts needed to make the required Plan payments in accordance with the Plan Funding Schedule attached hereto as Exhibit A.

Any remaining retainers held by any of the Debtors' professionals shall be applied to the fees of such professional as provided in an order of the Bankruptcy Court allowing the fees of such professional.

### B.    Minimum Cash Distributions.

The Disbursing Agent shall not be required to make any payment to any holder of an Allowed Claim on any Distribution Date of Cash less than $10; provided, however, that if any distribution is not made, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.  The Disbursing Agent shall not be required to make any final distributions of Cash less than $10 to any holder of an Allowed Claim.  If either (a) all Allowed Claims (other than those whose distributions are deemed undeliverable hereunder) have been paid in full or (b) the amount of any final distributions to holders of Allowed Claims would be $10 or less and the aggregate amount of Cash available for distributions to holders of Allowed General Unsecured Claims is less than $2,500, then no further distribution shall be made by the Disbursing Agent and any surplus Cash shall be utilized to pay down any unpaid legal fees incurred by counsel to the Disbursing Agent post-confirmation.

### C.    Setoffs.

The Estates through the Disbursing Agent may, but shall not be required to, set off against any Claim, any claims of any nature whatsoever that the Estates may have against the holder of such Claim; provided that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such Claim the Debtors may have against the holder of such Claim.

### D.  Withholding and Reporting Requirements.

Withholding Rights:  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

Forms:  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Person designated in the Confirmation Order (which entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the tax code and so notifies the Disbursing Agent.  If such request is made by the Reorganized Debtors or such other Person designated by the Reorganized Debtors and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the Debtors and any Claim in respect of such distribution shall be discharged and forever barred from assertion against any Debtor and its respective property.

### E.  Exemption From Certain Transfer Taxes.

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer under this Plan as confirmed by the Court, including an instrument of transfer executed in furtherance of the Hagler Funding contemplated by the Plan, shall not be subject to tax under any law imposing a Transfer Tax in connection with or in furtherance of the Plan as confirmed by the Bankruptcy Court and the funding requirements contained herein and shall not be subject to any state, local or federal law imposing such tax and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### F.  Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized Debtors are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors and the Estates, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### G.    Avoidance Actions and Other Causes of Action.

All Avoidance Actions and other Causes of Action against an Entity that shall be waived, relinquished, exculpated, released, compromised, or settled under the Plan or by a Bankruptcy Court order, unless otherwise expressly preserved in the Confirmation Order.

### H.    Closing of the Chapter 11 Cases.

After any of the Chapter 11 Cases of the Debtors have been fully administered, the Debtors shall promptly seek authority from the Bankruptcy Court to close such applicable Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### I.    Executory Contracts and Unexpired Leases

a.    Assumption and Assignment of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) as of the Effective Date is subject to a pending motion to assume such Unexpired Lease or Executory Contract; (2) was previously assumed or assumed and assigned to a third party during the pendency of the Chapter 11 Cases; or (3) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan.  Notice of any Executory Contract or Unexpired Lease being assumed, assumed and assigned or rejected pursuant to the Plan shall be provided to the applicable contract counter party or lessor pursuant to the provisions in the Confirmation Order.

b.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any Cure Obligation due under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in Cash on the Effective Date, subject to the limitation described below, by the Debtor as an Administrative Claim, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

In the event of a dispute regarding (1) the amount of the Cure Obligation, (2) the ability of the Debtors' Estates or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Obligations required by section 365(b)(1) of the Bankruptcy Code shall be satisfied following the entry of a Final Order or orders resolving the dispute and approving the assumption; provided that, depending on whether the Debtor or Disbursing Agent has the obligation to pay the Cure Obligation, such party may settle any dispute regarding the amount of any Cure Obligation without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

At least fourteen (14) days before the Confirmation Hearing, the Debtors shall cause notice of proposed Cure Obligations to be sent to applicable counterparties to the Executory Contracts and Unexpired Leases. Any objection by such counterparty must be filed, served, and actually received by the Debtors not later than ten (10) days after service of notice of the proposed assumption and associated Cure Obligation. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed cure amount will be deemed to have assented to such Cure Obligation and waived any objections to such assumption and assignment.

The Estates shall cause notice of proposed Cure Obligations to be sent to applicable counterparties to all the Executory Contracts and Unexpired Leases not later than ten (10) days after the Confirmation Order is entered, unless such notice was previously sent out pursuant to the paragraph immediately preceding this one. Any objection by such counterparty must be filed, served, and actually received by the Debtors not later than ten (10) days after service of notice of the proposed assumption and associated Cure Obligation. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed cure amount will be deemed to have assented to such Cure Obligation and waived any objections to such assumption and assignment.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the Effective Date of assumption and/or assignment. Any prepetition default amount set forth in the Schedules and/or any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

c.      Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be filed with Bankruptcy Court and served on the Debtors no later than fourteen (14) days after the earlier of the Effective Date or the effective date of rejection of such Executory Contract or Unexpired Lease. In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be filed with the Bankruptcy Court and served on the Debtors, no later than fourteen (14) days after service of the proposed rejection of such Executory Contract or Unexpired Lease.

Any holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely filed as set forth in the paragraph above shall not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be

enforceable against the Debtors, the Debtors' Estates, or the Hotel Property or Residential Property for any of the foregoing without the need for any objection by the Debtors, further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' prepetition Executory Contracts or prepetition Unexpired Leases shall be classified as General Unsecured Claims, except as otherwise provided by order of the Bankruptcy Court.

        d.       Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

        e.       Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors' Estates have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors shall have 60 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

     **J.**       **Conditions Precedent to the Confirmation Hearing and the Effective Date.**

        a.       Conditions Precedent to the Effective Date.

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

        (i)       the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred and the Confirmation Order shall not be subject to any stay;

(ii)    all actions, documents and agreements necessary to implement and consummate the Plan, including, without limitation, entry into the documents contained in the Plan Supplement required to be executed prior to the Confirmation Date, each in form and substance reasonably satisfactory to the Debtor, and the transactions and other matters contemplated thereby, shall have been effected or executed;

(iii)   all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan, if any, shall be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

(iv)    the Closing Date shall have occurred; and

(v)     all documents and agreements necessary to implement the Plan shall have (i) been tendered for delivery and (ii) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

b.      Waiver of Conditions Precedent.

Each of the conditions precedent to the Effective Date in Section 10.2 of the Plan other than the condition set forth in Section 10.2(a) of the Plan may be waived in writing by Debtors.

c.      Effect of Failure of Conditions to Effective Date.

If the Confirmation Order is vacated due to a failure of a condition to the Effective Date to occur, (i) no distributions under the Plan shall be made; (ii) the Debtor and all holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date ever occurred; and (iii) all monies contributed by the Hagler Funding shall be returned within three (3) business days of the Confirmation Order being vacated.

## K.      Effect of Confirmation.

a.      Vesting of Assets.

On the Effective Date, the Hotel Property and Residential Property shall revest in the Reorganized Debtors free and clear of all liens, Claims and encumbrances, except for those expressly preserved or created under the Plan.  As of the Effective Date, all liens, claims and encumbrances that have not been expressly preserved under the Plan shall be deemed extinguished as of such date.  Any other asset of the Debtors, shall revest in the Reorganized Debtors free and clear of all Liens, Claims and encumbrances.

4872-3741-1109, v. 3

b.      Release of Liens.

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall pass to Debtors on a free and clear basis.

c.      Subordinated Claims.

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

d.      Binding Effect.

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtor, and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

e.      Term of Injunctions or Stays.

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

f.      Plan Injunction.

Except (i) as otherwise provided under Final Order entered by the Bankruptcy Court or (ii) with respect to the obligations under the Plan, the entry of the Confirmation Order shall forever stay, restrain and permanently enjoin with respect to any Claim held against the Debtors as of the date of entry of the Confirmation Order (i) the commencement or continuation of any action, the employment of process, or any act to collect, enforce, attach, recover or offset from the Debtors, from the Hotel Property or Residential Property, or from property of the Estates that has been or is to be distributed under the Plan, and (ii) the creation, perfection or enforcement of any lien or encumbrance against the Hotel Property or Residential Property and any property of the Estates that has been or is to be, distributed under the Plan.  Except as otherwise provided in the Confirmation Order, the entry of the Confirmation Order shall constitute an injunction against the commencement or continuation of any action, the employment of process, or any act to collect, recover or offset from the Debtors, from the Hotel Property or Residential Property, or from

{01154365.DOCX;2 }27

property of the Estates, any claim, any obligation or debt that was held against the Debtors by any person or entity as of the Confirmation Date except pursuant to the terms of this Plan.  The entry of the Confirmation Order shall permanently enjoin all Creditors, their successors and assigns, from enforcing or seeking to enforce any such Claims.

g.      Limitation of Liability

To the extent permitted under Section 1125(e) of the Bankruptcy Code, neither the Exculpated Parties nor any of their respective officers, directors, or employees (acting in such capacity) nor any professional person employed by any of them, shall have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, confirmation or consummation of the Plan, the Disclosure Statement, the Plan Supplement or the any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan, provided that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement, except in the case of fraud, gross negligence, willful misconduct, malpractice, breach of fiduciary duty, criminal conduct, unauthorized use of confidential information that causes damages, or ultra vires acts.  Nothing in this Section 11.8 shall limit the liability of the Debtors' professionals pursuant to Rule 1.8 (h)(1) of the New York State Rules of Professional Conduct.  Nothing in the Plan or the confirmation order shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including, without limitation, any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Debtors or any of its respective members, shareholders, officers, directors, employees, attorneys, advisors, agents, representatives and assigns, nor shall anything in the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Debtors or any of its respective members, officers, directors, employees, attorneys, advisors, agents, representatives and assigns for any liability whatever, including without limitation, any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority, nor shall anything in this Plan exculpate Debtors or any of its respective members, officers, directors, employees, attorneys, advisors, agents, representatives and assigns from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority.

h.      Release

Except as otherwise provided in the Plan, upon the Effective Date, in consideration of the Cash and other property to be distributed to or on behalf of the holders of Claims and Interests under the Plan, the Plan shall be deemed to resolve all disputes and constitute a settlement and release, between and among the Debtors, on the one hand, and each creditor and interest holder, on the other, from any claim or liability, whether legal, equitable, contractual, secured, unsecured, liquidated, unliquidated, disputed, undisputed, matured, unmatured, fixed or contingent, known or unknown, that the Debtors, their creditors or interest holders ever had or now have through the Effective Date in connection with their Claim or Interest (including,

without limitation, any claims the Debtors may assert on their own behalf or on behalf of creditors or interest holders pursuant to sections 510 and 542 through 553 of the Bankruptcy Code, any claims creditors or interest holders may have asserted derivatively on behalf of the Debtors absent bankruptcy, any claims based on the conduct of the Debtors' business affairs prior or subsequent to the commencement of the Chapter 11 Cases or any claims based on the negotiation, submission and confirmation of the Plan).  From and after the Effective Date, a copy of the Confirmation Order and the Plan shall constitute, and may be submitted as, a complete defense to any claim or liability released pursuant to Article 9 of the Plan.

i. Solicitation of the Plan.

As of and subject to the occurrence of the Confirmation Date: (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation.

j. Plan Supplement.

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court by no later than fifteen (15) days prior to the Confirmation Hearing and served upon all parties in interest.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

## V. <u>MECHANICS OF HOW THE PLAN MAY BE ACCEPTED OR REJECTED</u>

In order for the Plan to be confirmed, various statutory conditions prescribed by the Bankruptcy Code must be satisfied, including: (a) acceptance of the Plan by at least one (1) impaired Class entitled to vote on the Plan; (b) provision for payment or distribution under the Plan to each creditor of money and/or other property at least equal in value to what that creditor would have received in a Chapter 7 liquidation of the applicable Debtor; (c) a finding by the Bankruptcy Court that the Plan is feasible; and (d) with respect to each Class, either acceptance by that Class or a finding by the Bankruptcy Court that the Plan is "fair and equitable" and does not "discriminate unfairly" against that Class.

### 1. <u>Who May Vote</u>

Only Classes that are impaired under the Plan are entitled to vote to accept or reject the Plan.  Generally, § 1124 of the Bankruptcy Code provides that a class of claims or interests is considered impaired unless the Allowed amount of class is paid in full upon consummation of the plan or a plan does not alter the legal, equitable, and contractual rights of the holder of the claim or interest.  In addition, these classes are impaired unless all outstanding defaults, other than defaults relating to the insolvency or financial condition of a debtor or the commencement of a Chapter 11 case, have been cured and the holders of claims or interests in these classes have been compensated for any damages incurred as a result of any reasonable reliance on any contractual provisions or applicable law to demand accelerated payment.

As set forth herein, there are no Classes of Claims or Interests that are impaired by the Plan. Accordingly, all Classes are deemed to have accepted the Plan and no votes will be solicited.

## 2.    Confirmation of the Plan

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A.    Confirmation Hearing

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. The Bankruptcy Court has scheduled a telephonic or video hearing on confirmation of the Plan through zoom.gov for _____,    2022    ("Confirmation Hearing"). Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan, regardless of whether such party is entitled to vote.

### B.    Objections to Confirmation

The Bankruptcy Court has directed that, on or before 4:00 p.m. (prevailing Eastern Time) on _____, 2022, any objections to the Plan are required to be in writing and filed with the Bankruptcy Court, and a copy served upon the U.S. Trustee, counsel for Debtors and counsel for TH Holdco. Unless otherwise ordered by the Bankruptcy Court, the Debtors expect that timely-filed objections to confirmation of the Plan will be heard and held in conjunction with the Confirmation Hearing. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjourned hearing.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. **IF AN OBJECTION TO CONFIRMATION IS NOT TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## 3.    Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of §§ 1129(a) and, if applicable, (b) of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court may enter an order confirming the Plan. These requirements include the following:

### A.    General Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(i)    The Plan complies with the applicable provisions of the Bankruptcy Code.

(ii)    The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(iii)    The Plan has been proposed in good faith and not by any means proscribed by

law.

(iv)     Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved or is subject to the approval of the Bankruptcy Court as reasonable.

(v)      The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in a plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is with the interests of creditors and equity holders and with public policy.

(vi)     With respect to each Class of Claims or Interests, each holder of an Impaired Claim or Impaired Interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test" below.

(vii)    Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of Claims or Interests has either accepted the Plan or is not impaired under the Plan.

(viii)   Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that administrative and priority claims will be paid in full on the Effective Date.

(ix)     At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

(x)      Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See "Feasibility Analysis" below.

(xi)     All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

### B.      Best Interests Test

Confirmation of the Plan requires that with respect to each impaired Class of Creditors, each holder of an Allowed Claim in such Class has either accepted the Plan or will receive under the Plan property of a value, as of the Effective Date, that is not less than the amount the holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.   The

Debtors' plan provides for a 100% recovery to creditors, with no class of creditors being impaired. As such, the Debtors' Plan provides for (1) a greater distribution pursuant to the Plan than through a liquidation of the applicable Debtors' assets under Chapter 7 of the Bankruptcy Code and (2) a greater creditor recovery than as proposed in the TH Holdco Plan. In a chapter 7 liquidation, the Debtors believe that a forced fire sale of the Hotel Property and Residential Property in the current market will severely undermine any chance of preserving and maximizing the value of the Hotel Property and Residential Property, in particular, given the continuing adverse impact on the hospitality industry as a whole and the Hotel herein, which has only recently started to rebound. This, coupled with the TH Holdco Secured Claim, which is secured by all of the assets of the Hotel Property and Residential Property, and the unnecessary added administrative cost given the fees due to a trustee under Chapter 7 of the Bankruptcy Code, which must be paid before any other unsecured or priority Claim under the Bankruptcy Code, would result in less available assets for creditors than under the Plan, which provides for 100% distributions to all Allowed Claims on the Effective Date of the Plan. The Debtors assert that Chapter 11 Administrative Expense Claims and Priority Claims would not receive payment in full (and may receive no distribution whatsoever after secured claims and Chapter 7 administrative expenses) and that no General Unsecured Claims in an of the three Estates would receive a distribution in a Chapter 7 case.

A copy of the Debtors' liquidation analysis for each Estate is attached hereto as **Exhibit B**.

### C.      Feasibility of the Plan

In order for the Plan to be confirmed, the Bankruptcy Court must determine that it is feasible; *i.e.*, that as a practical matter, there are sufficient resources to meet the obligations under the Plan on a timely basis.

Payments under the Plan are to be funded by the Debtors' available Cash and the Hagler Funding, proof of which will be provided prior to the Confirmation Hearing. These amounts aggregate more than the aggregate amount of required Plan payments and therefore the Debtors have sufficient resources to meet their Plan funding obligations. See Plan Funding Schedule attached hereto as Exhibit A.

## VI.    U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**The following discussion summarizes certain U.S. federal income tax consequences to the Debtors, Creditors and certain Holders of Claims of the implementation of the Plan. This summary is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to any particular Debtor, Creditor or Holder of a Claim. This discussion does not purport to be a complete analysis or listing of all potential tax considerations**.

The discussion is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof. Legislative, judicial or administrative changes or new interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Plan. Any such changes or new interpretations

may have retroactive effect and could significantly affect the U.S. federal income tax consequences of the Plan described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this discussion does not address any U.S. federal estate or gift tax considerations, the Medicare tax on net investment income, or any foreign, state or local tax consequences, nor does it purport to address the U.S. federal income tax consequences of the Plan to: (i) special classes of taxpayers (such as, but not limited to, Persons who are related to the Debtors within the meaning of the Tax Code, non-U.S. persons, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities and Holders of Claims or Interests who are themselves in bankruptcy); or (ii) parties not entitled to vote on the Plan.

To the extent that the following discussion relates to the U.S. federal income tax consequences, it is limited to "U.S. Holders." For purposes of the following discussion, you are a "U.S. Holder" if, for U.S. federal income tax purposes, you are: (a) an individual who is a U.S. citizen or U.S. resident alien for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) that was created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (c) an estate whose income is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (1) if a court within the U.S. is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of Section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust, or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a "" States person" (within the meaning of Section 7701(a)(30) of the Tax Code). For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult with their tax advisors regarding the U.S. federal income tax consequences of the Plan.

This discussion assumes that Holders of Claims or Interests hold only Claims or Interests in a single Class. Holders of multiple Classes of Claims or Interests should consult their own tax advisors as to the effect such ownership may have on the U.S. federal income tax consequences described below. This discussion further assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

4872-3741-1109, v. 3

**THIS SUMMARY IS NOT INTENDED TO BE, AND SHOULD NOT BE CONSTRUED AS, LEGAL OR TAX ADVICE TO ANY DEBTOR, CREDITOR OR HOLDER OF CLAIMS OR INTERESTS. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER OF CLAIM'S PARTICULAR CIRCUMSTANCES. THE DEBTORS, CREDITORS AND HOLDERS OF CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL INCOME TAX CONSEQUENCES AND ANY OTHER POTENTIAL TAX CONSEQUENCES UNDER THE LAWS OF ANY STATE, LOCALITY OR OTHER RELEVANT TAXING JURISDICTION ARISING FROM THE PLAN.**

*Certain U.S. Federal Income Tax Consequences to the Debtors and Their Respective Members*

Generally, if a debt for which a debtor is personally liable is forgiven or discharged for less than the full amount owed, the debt is considered canceled for the amount it remained unpaid ("COD income"), and must be included in such debtor's gross income. However, under certain exceptions, COD income may be excluded from a debtor's gross income. A specific statutory exception applies to certain debtors if the discharge of indebtedness is granted in a case under Title 11 of the Bankruptcy Code and pursuant to a plan approved by a bankruptcy court in such case. A separate exception applies to taxpayers if the discharge occurs when the taxpayer is insolvent. Section 108 of the Tax Code requires the amount of COD income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer. Attribute reduction is calculated only after the tax for the year of the discharge has been determined. Section 108 of the Tax Code further provides that a taxpayer does not realize COD income from cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to a deduction.

Each Debtor is a limited liability company treated as a partnership for U.S. Federal income tax purposes. For each Debtor, and for U.S. Federal income tax purposes, all items of income, gain, deduction, loss and credit, including COD income, will flow through the Debtor to the members of the Debtor in accordance with their respective shares of such tax items. The exclusions of COD income from each Debtor's income for bankruptcy or insolvency does not prevent each Debtor's COD income from flowing through to the members of each Debtor. A member of Debtor will be eligible for exclusion of COD income only if the member is also discharged from liability in a case under Title 11 of the United States Code or if the member is insolvent. Accordingly, the members of the Debtors may have COD income even though the Debtors are discharged in a case under Title 11 of the United States Code and are insolvent. The COD income of each Debtor will flow through the Debtor to the members of the Debtor in accordance with their respective sharing of such COD income.

Under the Plan, certain Holders of Claims are expected to receive less than full payment on their Claims. The Debtors' liability to the Holders of such Claims in excess of the amount satisfied by distributions under the Plan will be cancelled and therefore will result in COD income to the Debtor. To the extent that the consideration issued to Holders of Claims pursuant to the Plan is attributable to accrued but unpaid interest, the Debtors should be entitled to interest deductions in the amount of such accrued interest, but only to the extent the Debtors have not already deducted such amounts. The Debtors should not have COD income from the discharge of

any accrued but unpaid interest pursuant to the Plan to the extent that the payment of such interest would have given rise to a deduction pursuant to Section 108(e)(2) of the Tax Code.  The COD income of each Debtor will flow through the Debtor to the members of the Debtor in accordance with their respective sharing of such COD income.

The precise amount of taxable gain or loss, COD income, or both, which the Debtors or their members will realize as a result of effectuation of the Plan cannot presently be determined.

*Tax Consequences to Creditors*

The U.S. federal income tax consequences of the implementation of the Plan to a creditor of the Debtors (a "Creditor") will depend on a number of factors, including the type of consideration received by the Creditor in exchange for its Claim, whether the Creditor reports income on the accrual or cash basis, whether the Creditor receives consideration in more than one tax year of the Creditor, whether the Creditor is a resident of the United States and whether all consideration received by the Creditor is deemed to be received by that Creditor in an integrated transaction.  The U.S. federal income tax consequences of the receipt of Cash or property that is allocable to accrued interest are discussed below in the section entitled "Receipt of Interest."

(a)    Receipt of Cash and Other Property

A Creditor who receives Cash and/or other property in satisfaction of its Claim generally will recognize gain (or loss) on the exchange equal to the difference between the amount realized (not allocable to interest) and the Creditor's adjusted tax basis in its Claim.  The character of any gain or loss as capital or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including (i) the nature and origin of the Claim (*e.g.*, Claims arising in the ordinary course of a trade or business or made for investment purposes); (ii) the tax status of the Holder of the Claim; (iii) whether the Claim is a capital asset in the hands of the Holder; (iv) whether the Claim has been held by the Holder for more than one year; (v) the extent to which the Holder previously claimed a loss or a bad debt deduction with respect to the Claim; and (vi) the extent to which the Holder acquired the Claim at a market discount. Creditors should consult their own tax advisors regarding the amount and character of gain or loss, if any, to be recognized by them under the Plan.

(b)    Receipt of Interest

Pursuant to the Plan, all distributions in respect of any Claim will be allocated first to the unaccrued but unpaid interest, and second to the principal (each as determined for U.S. federal income tax purposes).  However, there is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.

A portion of the consideration received by a Holder of a Claim in satisfaction of that Claim pursuant to the Plan may be allocated to the portion of such Claim (if any) that represents accrued but unpaid interest.  If any portion of the distribution is required to be allocated to accrued interest, such portion would be taxable to the Holder as interest income, except to the extent the Holder has previously reported such interest as income.  A Holder will generally recognize a loss to the extent that any accrued interest was previously included in the Holder's gross income and is not paid in full.

In the event that a portion of the consideration received by a Holder of a Claim is treated by the tax authorities as accrued but unpaid interest (as opposed to principal treatment by such holder), only the balance of the distribution would be considered received by the Holder in respect of the principal amount of the Claim.  Such an allocation would reduce the amount of the gain, or increase the amount of loss, realized by the Holder with respect to the Claim.  If any such loss were a capital loss, it would not offset any amount of the distribution that was treated as ordinary interest income (except, in the case of individuals, to the limited extent that capital losses may be deducted against ordinary income).

To the extent that any portion of the distribution is treated as interest, Holders may be required to provide certain tax information in order to avoid or reduce the withholding of taxes, if any.

(c)    Market Discount

The Tax Code generally requires Holders of debt instruments with "market discount" to treat as ordinary income any gain realized on the disposition of such debt instruments to the extent of the market discount accrued during the Holder's period of ownership.  "Market discount" generally means the amount by which the stated redemption price at maturity exceeds the Holder's adjusted tax basis in such debt instrument.  Holders should consult their own tax advisors as to the potential application of the market discount rules to them in light of their individual circumstances.

(d)    Backup Withholding

Under the Tax Code, interest, dividends and other "reportable payments" may, under certain circumstances, be subject to "backup withholding."  Backup withholding may apply to payments made pursuant to the Plan, unless you provide to the applicable withholding agent your taxpayer identification number, certified under penalties of perjury, as well as certain other information, or otherwise establish an exemption from backup withholding.  Backup withholding is not an additional tax.  Any amount withheld under the backup withholding rules is allowable as a credit against your U.S. federal income tax liability, if any, and a refund may be obtained from the IRS if the amounts withheld exceed your actual U.S. federal income tax liability and you timely provide the required information or appropriate claim form to the IRS.

**THIS SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES PURSUANT TO § 1125 OF THE BANKRUPTCY CODE.  THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DOES NOT HEREBY PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE TAX MATTERS DESCRIBED HEREIN.**

**IN LIGHT OF THE UNCERTAINTY CONCERNING THE TAX CONSEQUENCES FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE TAX LAWS, THE DEBTORS ENCOURAGE EACH CREDITOR, AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL AND TAX ADVISORS WITH RESPECT TO ALL SUCH MATTERS.**

**FOREIGN (*i.e.*, NON-UNITED STATES) CREDITORS ALSO ARE STRONGLY URGED TO CONSULT WITH THEIR OWN LEGAL AND TAX ADVISORS.**

## VII.  ALTERNATIVES TO THE PLAN

The alternative to the Plan would be a conversion of any of the Debtors' cases from Chapter 11 to Chapter 7 or confirmation of an alternative plan such as the TH Holdco Plan or promulgation of a Chapter 11 plan by 85 Flatbush Mezz.  Debtors reserve the right to seek confirmation of a plan for some, but not all of these jointly administered cases.

TH Holdco has also proposed a plan of liquidation where TH Holdco would put the Hotel Property and Residential Property up for sale and TH Holdco would credit bid the allowed amount of the TH Holdco Secured Claim, which TH Holdco asserts is not less than $90,000,000[6].  Under TH Holdco's plan, Holders of 85 Flatbush RHO Hotel General Unsecured Claims and 85 Flatbush RHO Residential General Unsecured Claims would receive 100% of their allowed claims within one year of the Effective Date of TH Holdco's plan.  However, under TH Holdco's plan of liquidation, 85 Flatbush Mezz General Unsecured Claims and Insider General Unsecured Claims would likely receive no recovery and 85 Flatbush Mezz Existing Equity Interests would be cancelled.

Accordingly, the Debtors asserts that their Plan provides holders of Claims with the best chance of receiving a greater distribution on account of their respective Allowed Claims and being confirmed.

## VIII.  RETENTION OF JURISDICTION

On and after the Effective Date, the Plan provides that the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)  to hear and determine motions and/or applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance, classification, priority, compromise, estimation or payment of Claims resulting there from;

(b)  to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date;

(c)  to insure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d)  to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim;

(e)  to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

---

6 As noted herein, Debtors dispute TH Holdco's right to credit bid and the amount of the secured claim.

(f)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the Consummation, implementation or enforcement of the Plan, including the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    to hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

(i)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)    to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following Consummation;

(k)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)    to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations of the Debtors' tax liability under section 505(b) of the Bankruptcy Code);

(m)    to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(n)    to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(o)    to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)    to enter a final decree closing any of the Chapter 11 Cases;

(q)    to enforce all orders previously entered by the Bankruptcy Court;

(r)    to recover all assets of the Debtors and property of the Debtors' Estates, wherever located; and

(s)    to hear and determine any rights, Claims or Causes of Action held by or accruing to the Debtor pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

## IX.   **CONCLUSION**

The Debtors believe that Confirmation and Consummation of the Plan are in the best interests of the Debtors, their Estates and their creditors.  The Debtors assert that their Plan provides for an equitable distribution to holders of Claims and Interests.  The Debtors believe that any alternative to Confirmation of the Debtors' Plan, such as liquidation under Chapter 7 of the Bankruptcy Code or the TH Holdco's Plan, could result in significant delay, litigation, and additional costs, as well as a reduction in the distributions to holders of Claims in certain Classes, and that their Plan is feasible and should be confirmed.

Dated:       June 23, 2022
             New York, New York

                                        85 Flatbush RHO Mezz LLC
                                        85 Flatbush RHO Hotel LLC
                                        85 Flatbush RHO Residential LLC
                                        By GC Realty Advisors, LLC, Manager


                                        By: _/s/ David Goldwasser_____
                                        David Goldwasser
                                        Managing Member

# **EXHIBIT A**

85 Flatbush Aggregate Plan Funding Amounts:

| | |
|---|---|
| RE Taxes as of 6/4/2022: | $2,188,134.80 |
| Water charges: | $39,799.48 |
| NYS Admin Tax Claim: | $91,872.96 |
| NYS Priority Tax Claim: | $635,682.55 |
| TH Holdco: | $85,158,816 (per cash collateral stipulation) |
| Unsecured Claims: | $1,346,147.04 (approximate) |
| Insider Unsecured Claims: | $1,398,660 |
| Mezz Lender: | $4,600,000 |
| UST Fees: | $250,000 (estimated) |
| RB Fees: | <u>$406,000 (through 6/8)</u> |
| | $96,115,112.38 |

# **<u>EXHIBIT B</u>**

| | |
|---|---:|
| **Available for distribution** | **$72,000,000** |
| **To the payment of:** | |
| Chapter 7 Administrative Claims: | |
| Chapter 7 trustee commissions and expenses (approximately 3% of $72,000,000) | $2,160,000 |
| Chapter 7 trustee broker commissions and expenses (approximately 3% of $72,000,000) | $2,160,000 |
| Chapter 7 trustee's professionals (attorneys, accountants, etc.) | $250,000 |
| New York City Secured Tax Claim | $2,188,134.80 |
| New York City Water Charges | $39,799.48 |
| TH Holdco Secured Claim | $72,000,000 |
| **Remaining Available Cash** | **(6,797,934.28)** |
| Chapter 11 Administrative Claims | $406,000 |
| New York State Administrative Tax Claim: | $91,872.96 |
| Priority Unsecured Claims | $635,682.55 |
| General Unsecured Claims | $1,346,147.04 |
| Insider General Unsecured Claims | $1,398,660 |
| 85 Flatbush Mezz Secured Claim | $7,787,500 |

**A chapter 7 liquidation, utilizing the current value of the Hotel Property and Residential Property at $72,000,000, eliminates any recovery to holders of claims junior in priority to the TH Holdco Secured Claim.  As the Debtors' proposed Plan provides for a 100% recovery to all classes of creditors, the Plan satisfies the Best Interests Test.**