Jerry Montag
SEYFARTH SHAW LLP
620 8th Avenue
New York, NY 10018
Telephone: (212) 218-4646
Facsimile: (917) 344-1339
Email: jmontag@seyfarth.com

M. Ryan Pinkston (*pro hac vice*)
SEYFARTH SHAW LLP
560 Mission Street, Suite 3100
San Francisco, California 94105
Telephone: (415) 544-1013
Facsimile: (415) 397-8549
Email: rpinkston@seyfarth.com

Kevin J. Nash
GOLDBERG WEPRIN FINKEL
GOLDSTEIN LLP
1501 Broadway, 22nd Floor
New York, New York 10036
Telephone : (212) 221-5700
Facsimile: (212) 221-6532
Email: kjnash@gwulaw.com

*Attorneys for 85 Flatbush Mezz LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 85 FLATBUSH RHO MEZZ LLC, *et al.*,[1] | Case No. 20-23280 (SHL) |
| Debtors. | Jointly Administered |

## <u>NOTICE OF APPEAL</u>

PLEASE TAKE NOTICE that secured creditor 85 Flatbush Mezz LLC, through its

undersigned counsel, hereby appeals to the United States District Court for the Southern District of

New York from the *Findings of Fact, Conclusions of Law, and Order Confirming TH Holdco*

---

[1] The debtors in these chapter 11 cases are 85 Flatbush RHO Mezz LLC, 85 Flatbush RHO Hotel LLC, and 85 Flatbush RHO Residential LLC.

*LLC's Second Amended Chapter 11 Plan, as Modified by This Order* (Dkt. No. 280) (the "Order")

entered by the United States Bankruptcy Court for the Southern District of New York on July 6,

2022, a copy of which Order is attached hereto as **Exhibit A**.

The names of all parties to the Order and the names, addresses, and telephone numbers of

their respective counsel are as follows:

| Counsel | Party |
|---|---|
| M. Ryan Pinkston (*pro hac vice*)<br>SEYFARTH SHAW LLP<br>560 Mission Street, Suite 3100<br>San Francisco, California 94105<br>Telephone:  (415) 544-1013<br><br>Jerry A. Montag<br>SEYFARTH SHAW LLP<br>620 8th Avenue<br>New York, NY  10018<br>Telephone:  (212) 218-4646<br><br>Kevin J. Nash<br>GOLDBERG WEPRIN FINKEL<br>GOLDSTEIN LLP<br>1501 Broadway, 22nd Floor<br>New York, New York 10036<br>Telephone : (212) 221-5700 | 85 Flatbush Mezz LLC |
| Lauren Macksoud<br>Sarah M. Schrag<br>DENTONS US LLP<br>1221 Avenue of the Americas<br>New York, New York 10020<br>Telephone: (212) 768-6700<br><br>Robert Richards (*pro hac vice*)<br>DENTONS US LLP<br>233 South Wacker Drive, Suite 5900<br>Chicago, Illinois 60606<br>Telephone: (312) 876-8000 | TH Holdco LLC |

Dated: July 20, 2022                       SEYFARTH SHAW LLP
        San Francisco, California

By:  /s/ *M. Ryan Pinkston*

          M. Ryan Pinkston (*pro hac vice*)
          SEYFARTH SHAW LLP
          560 Mission Street, Suite 3100
          San Francisco, California 94105
          Telephone:  (415) 544-1013
          Facsimile:  (415) 397-8549
          Email:  rpinkston@seyfarth.com

          Jerry A. Montag
          SEYFARTH SHAW LLP
          620 8th Avenue
          New York, NY  10018
          Telephone:  (212) 218-4646
          Facsimile:  (917) 344-1339
          Email:  jmontag@seyfarth.com

          Kevin J. Nash
          GOLDBERG WEPRIN FINKEL
          GOLDSTEIN LLP
          1501 Broadway, 22nd Floor
          New York, New York 10036
          Telephone : (212) 221-5700
          Facsimile: (212) 221-6532
          Email: kjnash@gwulaw.com

          *Attorneys for 85 Flatbush Mezz LLC*

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Case No. 20-23280 (RDD) |
| 85 FLATBUSH RHO MEZZ LLC, et al.,[1] | Chapter 11 |
| Debtors | |
| | (Jointly Administered) |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING TH HOLDCO LLC'S SECOND AMENDED CHAPTER 11 PLAN, AS MODIFIED BY THIS ORDER

### RECITALS

A.      On December 18, 2020 (the "Petition Date"), each of the Debtors[2] filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

B.      On March 29, 2021, the Bankruptcy Court entered the *Final Consent Order Authorizing (I) Use of Cash Collateral, (II) Granting Adequate Protection, and (III) Granting Related Relief* (the "Consent Order") (Docket No. 64);

C.      On February 20, 2022, TH Holdco filed the *Chapter 11 Plan Filed by Creditor TH Holdco LLC Related to 85 Flatbush RHO Mezz, LLC, 85 Flatbush RHO Hotel LLC, and 85 Flatbush*

---

[1] The Debtors (as defined) in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include:  85 Flatbush RHO Mezz LLC (6184); 85 Flatbush RHO Hotel LLC (5027); and 85 Flatbush RHO Residential LLC (2261).

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the *Second Amended Chapter 11 Plan Filed by Creditor TH Holdco LLC Related to 85 Flatbush RHO Mezz, LLC, 85 Flatbush RHO Hotel LLC, and 85 Flatbush RHO Residential LLC* dated May 26, 2022.  [Docket No. 211].

*RHO Residential LLC* [Docket No. 151] and the accompanying *Disclosure Statement* [Docket No. 152];

      D.      On February 24, 2022, TH Holdco filed its *Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballots, and (IV) Certain Dates with Respect Thereto* [Docket No. 158];

      E.      On April 4, 2022, TH Holdco filed its *Amended Chapter 11 Plan Filed by Creditor TH Holdco LLC Related to 85 Flatbush RHO Mezz, LLC, 85 Flatbush RHO Hotel LLC, and 85 Flatbush RHO Residential LLC* [Docket No. 175] and the accompanying *Amended Disclosure Statement* [Docket No. 177];

      F.      On May 26, 2022, TH Holdco filed its *Second Amended Chapter 11 Plan Filed by Creditor TH Holdco LLC Related to 85 Flatbush RHO Mezz, LLC, 85 Flatbush RHO Hotel LLC, and 85 Flatbush RHO Residential LLC* [Docket No. 211] (the "Plan") and the accompanying *Second Amended Disclosure Statemen*t [Docket No. 212] (the "Disclosure Statement");

      G.      On May 26, 2022, the Bankruptcy Court entered the *Order Granting TH Holdco LLC's Motion to Approve   (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballots, and (IV) Certain Dates with Respect Thereto*, approving, among other things, the Sale and Bid Procedures for the Properties and the form of Purchase Agreement [Docket No. 210] (the "Disclosure Statement Order");

      H.      The Disclosure Statement Order approved the Disclosure Statement as containing adequate information in accordance with Section 1125 of Bankruptcy Code, directed TH Holdco to solicit ballots accepting or rejecting the Plan, set deadlines for the filing of ballots and objections to the Plan, and approved and directed the form and manner of service of notice thereof;

US_ACTIVE\121644979\V-6

I.     Pursuant to the Disclosure Statement Order, a hearing (the "Confirmation Hearing") on confirmation of the Plan was scheduled for June 30, 2022;

J.     As set forth in the *Affidavit of Publication* filed on May 31, 2022 [Docket No. 214], the notice of sale (the "Notice of Sale") for the Debtors' Properties was published in the *Wall Street Journal* print edition for the period beginning on May 31, 2022.  The Notice of Sale will also be published in Green Street's Commercial Mortgage Alert on or about July 1, 2022;

K.     As evidenced by the *Affidavit of Service of Solicitation Materials* [Docket No. 216] (the "Solicitation Affidavit"), filed on June 2, 2022, the Disclosure Statement Order, Plan, Disclosure Statement, and an appropriate ballot or notification of non-voting status (the "Solicitation Package") was served upon all interested parties in accordance with the Disclosure Statement Order and applicable Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules");

L.     On June 24, 2022, TH Holdco caused to be filed the *Certification of Acceptances and Rejections of Plan* [Docket No. 252] (the "Certification of Ballots").  As set forth in the Certification of Ballots, eight (8) classes of claims and three (3) classes of interests were impaired by the Plan.  As set forth in the Certification of Ballots, the Plan has been accepted and/or deemed accepted by the holders of the impaired claims of creditors classified in Classes 1-14;

M.     On June 27, 2022, TH Holdco caused to be filed the Declaration of Franco Famularo, Chief Investment Officer at Ohana Real Estate Investors, an affiliate of TH Holdco (the "Famularo Declaration"), in support of confirmation of the Plan;

N.     On June 15, 2022, TH Holdco caused to be filed the *Notice of Filing of Plan Supplement for Second Amended Chapter 11 Plan Filed By Creditor TH Holdco LLC Related to 85 Flatbush RHO MEZZ, LLC, 85 Flatbush RHO Hotel LLC, and 85 Flatbush RHO Residential LLC* [Docket No. 223] (the "Plan Supplement") attaching thereto as an exhibit:  (a) the Schedule

3

of Executory Contracts and/or Unexpired Leases to be Rejected, (b) the Schedule of Executory Contracts and/or Unexpired Leases to be Assumed, and (c) the Proposed form of Confirmation Order; and

      O.    The Confirmation Hearing was held on June 30, 2022.

**NOW, THEREFORE,** it appearing to this Court that notice of the Confirmation Hearing and the opportunity for any party in interest to object to confirmation of the Plan was due and sufficient, adequate, and appropriate; and upon the Court's review of all objections to the Plan; and upon the Bankruptcy Court's review of the Certification of Ballots, the relevant certificates of service, and the form of Purchase Agreement; and upon all of the evidence proffered or adduced and the arguments of counsel made at the Confirmation Hearing, the Famularo Declaration, and the entire record of the Debtors' Chapter 11 Cases; and after due deliberation thereon and good cause appearing therefor, including for the reasons stated by the Court in its bench rulings at the Confirmation hearing, the Court makes the following:

### FINDINGS OF FACT AND CONCLUSIONS OF LAW[3]

      1.    <u>Exclusive Jurisdiction, Venue, Core Proceeding (28 U.S.C. §§ 157, 1334(a), 1408, and 1409)</u>. This Court has jurisdiction over the Debtors' Chapter 11 Cases and TH Holdco's request for Confirmation of the Plan pursuant to 28 U.S.C. §§ 157(a-(b) and 1334(b). Venue is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409. TH Holdco's request for Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2). The Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the

---

[3] In accordance with Bankruptcy Rules 7052 and 9014, the Bankruptcy Court makes the following findings of fact and conclusions of law which support confirmation of the Plan. To the extent any finding of fact contained herein shall later be determined to be a conclusion of law, it shall be so deemed and to the extent any conclusion of law contained herein shall later be determined to be a finding of fact it shall be so deemed. Each of the Recitals listed above are findings of fact and are true and correct.

US_ACTIVE\121644979\V-6

applicable provisions of the Bankruptcy Code and should be confirmed and to enter a final order,

including under the United States Constitution with respect to such matters.

      2.    <u>Service of Notice and Solicitation Package</u>.  As evidenced by the Solicitation Affidavit

and Certification of Ballots, the Solicitation Package was transmitted and served in compliance with

the Disclosure Statement Order and the Bankruptcy Rules, and such transmittal and service were

adequate and sufficient.  Adequate and sufficient notice of the Confirmation Hearing and the other

dates and hearings described in the Disclosure Statement Order was given in compliance with the

Disclosure Statement Order, and no other or further notice is or shall be required.

      3.    <u>The Sale of the Properties</u>.

      a.    The Plan provides for the sale of the Properties under the Purchase

Agreement, as the same may be modified under the Sale and Bid Procedures.

      b.    The Purchase Agreement provides for the Properties to be sold (i) to TH

Holdco[4] for the purchase price consisting of the TH Holdco Credit Bid or, in the event that another

bidder submits a higher and better bid at the Auction, which is approved by the Bankruptcy Court,

(ii) to the Purchaser for such amount.

      c.    As evidenced by the affidavits or certificates of service filed with the

Bankruptcy Court:  (i) proper, timely and adequate notice of the Notice of Sale, the Disclosure

Statement Order, and the Purchase Agreement, has been provided in accordance with Bankruptcy

Rules 2002, 6004, 9007 and 9014, (ii) such notice was good, sufficient, and appropriate under the

circumstances, and (iii) no other or further notice of the Sale and Bid Procedures and Purchase

Agreement is necessary or shall be required.

---

[4] TH Holdco includes any nominee, designee, or assignee of TH Holdco to whom TH Holdco has assigned or transferred its claim, in whole or in part, for purpose of making the TH Holdco Credit Bid or to whom TH Holdco may assign or transfer its rights as Purchaser, in whole or in part.

d.      Jones Lang LaSalle, as broker (the "<u>Broker</u>"), initially marketed the Properties commencing in October of 2021.  Following entry of the Disclosure Statement Order, the Broker resolicited offers to acquire the Properties from a wide variety of parties.  The Broker will conduct an Auction for the Properties, in accordance with the terms of the Sale and Bid Procedures, if one or more Qualified Competing Bid (as such term is defined in the Sale and Bid Procedures) is received in accordance with the terms of the Sale and Bid Procedures.

e.      The Purchase Agreement and the transactions contemplated by the Purchase Agreement were negotiated and have been and are undertaken by the Debtors and TH Holdco at arm's length, without collusion or fraud, and in good faith within the meaning of Section 363(m) of the Bankruptcy Code.  As a result of the foregoing, the Debtors and TH Holdco as Purchaser are entitled to the protections of Section 363(m) of the Bankruptcy Code with respect to the Sale Transaction.  A similar finding may be made by the Court if a another Qualified Bid is chosen as the highest and best bidder after the Auction, based on the record then before the Court.

f.      The Purchase Agreement was negotiated and proposed by the Debtors and TH Holdco without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtors nor TH Holdco have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under Section 363(n) of the Bankruptcy Code.

g.      The Sale and Bid Procedures were designed to obtain the highest value for the Properties, and the marketing and bidding processes implemented by the Broker were fair, proper, and reasonably calculated to result in the highest and best value received for the Properties.

h.      The consideration for the Properties offered by the Purchaser, including the TH Holdco Credit Bid, which serves as the opening bid for the Auction, is fair and reasonable, and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code.

6

i.      A sale of the Properties other than one free and clear of all Liens, Claims, Interests, and encumbrances, with the exception of the TH Holdco Mortgage (which may be assigned to a lender by the Purchaser) and the Permitted Exceptions (as defined in the Purchase Agreement) would materially and adversely impact the Debtors' bankruptcy estates, would yield substantially less value for the Debtors' estates, with less certainty than the available alternatives, and thus the alternative would be of substantially less benefit to the Debtors' estates. Therefore, the sale of the Properties under the Purchase Agreement free and clear of all Liens, Claims, Interests, and encumbrances, with the exception of the TH Holdco Mortgage and the Permitted Exceptions (as defined in the Purchase Agreement) is in the best interests of the Debtors and their estates, creditors, and other parties in interest.

j.      A reasonable opportunity to object or be heard with respect to the Sale Transaction under the Plan has been afforded to all interested persons and entities, including: (i) the Office of the United States Trustee; (ii) counsel for TH Holdco; (iii) all entities known to have asserted any Lien in or upon the Properties; (iv) all creditors and parties in interest of the Debtors; (v) all federal, state, and local taxing authorities which have a reasonably known interest in the sale of the Properties; (vi) the Internal Revenue Service; and (vi) all entities that have filed a notice of appearance in these Chapter 11 Cases under Bankruptcy Rule 2002.

k.      TH Holdco (or its nominee or designee) are not "insiders" of the Debtors, as that term is defined in Section 101(31) of the Bankruptcy Code.

l.      The transfer of the Properties to the Purchaser will be a legal, valid, and effective transfer of the Properties, and will vest Purchaser with all rights, title, and interests of the Debtors to the Properties free and clear of all Liens, Claims, Interests, and encumbrances, with the

exception of the TH Holdco Mortgage (which may be assigned to a lender by the Purchaser) and the Permitted Exceptions (as defined in the Purchase Agreement).

m.     TH Holdco would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates, and creditors, if the sale of the Properties to TH Holdco (or its nominee or designee) were not free and clear of all Liens, Claims, Interests, and encumbrances, other than the TH Holdco Mortgage (which may be assigned to a lender by the Purchaser) and the Permitted Exceptions (as defined in the Purchase Agreement), or if TH Holdco (or its nominee or designee) would, or in the future could, be liable for any of the Liens, Claims, Interests, and encumbrances (other than the TH Holdco Mortgage and the Permitted Exceptions).

n.     The Debtors may sell the Properties free and clear of all Liens of any kind or nature whatsoever because, in each case, one or more of the standards set forth in Sections 363(f)(1)-(5) and/or 1141(c) of the Bankruptcy Code has been satisfied.  Those holders of Liens who did not object, or which withdrew their objections, to the Sale Transaction are deemed to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code.

o.     The Debtors may sell the Properties free and clear of all Liens, Claims, Interests, and encumbrances, including but not limited to, mortgages, judgments, liens for delinquent real estate taxes, and attachments (other than the TH Holdco Mortgage (which may be assigned to a lender by the Purchaser) and the Permitted Exceptions), with all such Liens, Claims, Interests, and encumbrances to attach to the cash component of the purchase price for the Properties to be paid in accordance with Section 4 of the Plan.

8

p.      The Purchase Agreement, as it may be amended under the Sale and Bid Procedurds is a legal, valid, and binding contract between the Debtors and Purchaser and is enforceable according to its terms, and the Purchase Agreement is approved in all respects.

q.      As of the Closing Date (as defined in the Purchase Agreement), the consummation of the Sale Transaction and the other transactions contemplated by the Purchase Agreement will be legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including Sections 105(a), 363(b), 363(f), 363(m), 365(a), 365(b) and 365(f), 1123 and/or 1129, and 1146 thereof, and all of the applicable requirements of such Sections have been complied with in respect of the transaction.

4.      <u>Conditions Precedent</u>.  All of the conditions precedent to confirmation of the Plan, if any, set forth in the Plan have been met or waived on the record in open court.

5.      <u>Plan Compliance with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. U.S.C. § 1129(a))</u>.  As set forth below, the Plan complies with the applicable provisions of the Bankruptcy Code.

a.      The Plan properly classifies Claims and Interests as required by Section 1122 of the Bankruptcy Code.

b.      The Claims and Interests within each Class designated under the Plan are substantially similar.

c.      The classification of Claims and Interests was properly made and is appropriate in accordance with the terms of the Plan and the requirements of Section 1122 of the Bankruptcy Code for the purposes of tabulating ballots accepting and rejecting the Plan and for distribution of the consideration to be distributed to holders of Claims and Interests under the Plan.

9

d.      The Plan, as modified by this Order, specifies the classes of Claims and Interests that are impaired or not impaired under the Plan, as required by Section 1123(a)(2) of the Bankruptcy Code, and specifies the treatment of each class of Claims and Interests that are impaired under the Plan, as required by Section 1123(a)(3) of the Bankruptcy Code.

e.      The Plan provides the same treatment for each Claim or Interest of a particular class, unless the holder of a particular Claim or Interest agrees to a less favorable treatment, as required by Section 1123(a)(4) of the Bankruptcy Code.

f.      The Plan does not discriminate unfairly and is fair and equitable with respect to each class of Claims or Interests that is impaired under the Plan and has not accepted the Plan, as required by Section 1123(a)(4).

g.      The Plan provides adequate, proper, and legal means for the Plan's implementation, as more fully specified in Section 5 of the Plan, as required by Section 1123(a)(5) of the Bankruptcy Code.

h.      The Plan provides for its implementation through the sale of the Properties from Debtors to the Purchaser and the funding by TH Holdco under the terms of the Plan.

i.      The provisions of Section 9 of the Plan with respect to the assumption and assignment of Executory Contracts and Unexpired Leases in accordance with the Purchase Agreement or rejection of Executory Contracts and Unexpired Leases are fair and appropriate and are consistent with the provisions of Section 365 of the Bankruptcy Code, as required by Section 1123(b)(2) of the Bankruptcy Code.

j.      The Plan is consistent with the interests of creditors and equity security holders and with public policy as required by Section 1123(a)(7) of the Bankruptcy Code.

10

k.      TH Holdco, as proponent of the Plan, has complied with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, in particular with the requirements of Sections 1125 and 1126 of the Bankruptcy Code, including as follows:  TH Holdco duly and timely served copies of the Solicitation Package on all required parties pursuant to the Disclosure Statement Order.

l.      No creditor, other than TH Holdco has solicited acceptances of the Plan or participated in the offer, issuance, sale, or purchase of securities of the Debtors.

m.      As required by Section 1129(a)(3) of the Bankruptcy Code, the Plan has been proposed in good faith and not by any means forbidden by law and, viewed in the light of the totality of the circumstances surrounding the formulation, submission, distribution, and confirmation of the Plan, the Plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.

n.      As required by Section 1129(a)(4) of the Bankruptcy Code, any payment made or to be made by TH Holdco, the Debtors or any person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with this case, or in connection with the Plan and incident to this case, has been approved by, or will be subject to the approval of, this Court as reasonable.

o.      The Debtors shall be dissolved promptly after the Effective Date of the Plan. Kroll shall serve as Disbursing Agent to carry out and implement all provisions of the Plan and matters reasonably incidental thereto.  The Disbursing Agent will have all of the rights, powers, and duties necessary to carry out its responsibilities under the Plan.

11

  p.  All Avoidance Actions or Causes of Action of the Estates shall be deemed released as of the Effective Date.  The Adversary Proceeding (as such term is defined in the Disclosure Statement) filed by the Mezz Lender shall remain pending.

  q.  There are no rate changes provided for in the Plan, with respect to which rates a governmental regulatory commission has jurisdiction over the Debtors after confirmation pursuant to Section 1129(a)(6) of the Bankruptcy Code.

  r.  With respect to each impaired Class of Claims, each holder of a Claim of such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date pursuant to Section 1129(a)(7) of the Bankruptcy Code.

  s.  No holder of an allowed secured claim has made an election under Section 1111(b)(2) of the Bankruptcy Code.

  t.  Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that:  (A) the holders of allwed Claims of a kind specified in Section 507(a)(2) of the Bankruptcy Code will receive, on account of such Claims, Cash in an amount equal to such allowed Claim (plus statutory interest on such claim, if applicable), on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided, however, that any Allowed Administrative Expense Claim incurred by any of the Debtors representing liabilities incurred in the ordinary course of business by the Debtors shall be paid by the Debtors (or TH Holdco on behalf of the applicable Estate) in the ordinary course of business, consistent with past practice

US_ACTIVE\121644979\V-6

and in accordance with the terms, and subject to the conditions of any agreement governing, instruments evidencing, or other documents relating to such transactions, and (B) each holder of an allowed Claim of a kind specified in Section 507(a)(8) of the Bankruptcy Code will receive, on account of such claim, Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the (a) Effective Date, (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course.

u.      At least one class of Claims that is impaired under the Plan has accepted the Plan in each Estate, determined without including acceptance of the Plan by any insider holding a Claim in such class, pursuant to Section 1129(a)(10) of the Bankruptcy Code.

v.      The Purchaser shall pay all amounts due the Office of the United States Trustee under 28 U.S.C. §1930, and any applicable statutory interest thereon, in cash in full as required by statute and until the closing, conversion, or dismissal of these Chapter 11 Cases pursuant to Section 1129(a)(12) of the Bankruptcy Code.

w.      The Debtors shall file operating reports and quarterly affidavits of post-confirmation disbursements and provide copies to the Office of the United States Trustee until the closing, conversion, or dismissal of these Chapter 11 Cases.  After the Debtors' estates are fully administered for purposes of Section 350(a) of the Bankruptcy Code, the Debtors or TH Holdco shall file a motion to close such Debtors' Chapter 11 Cases and a Closing Report.

x.      The Debtors do not maintain any "retiree benefits," as that term is defined in Section 1114(a) of the Bankruptcy Code, making Section 1129(a)(13) of the Bankruptcy Code inapplicable.

US_ACTIVE\121644979\V-6

y.      The Debtors are not subject to any judicial or administrative order, or by statute, to pay any domestic support obligation, making Section 1129(a)(14) of the Bankruptcy Code inapplicable.

z.      The Debtors are not an individual, making Bankruptcy Section 1129(a)(15) inapplicable.

aa.     There are no provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust that apply to the Debtors because the Debtors are commercial businesses.  The Plan thus satisfies Section 1129(a)(16) of the Bankruptcy Code.

bb.     The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933, and there has been no objection filed by any governmental unit asserting such avoidance.  Accordingly, the Plan complies with Section 1129(d) of the Bankruptcy Code.

cc.     The Plan is feasible as required by Section 1129(a)(11) of the Bankruptcy Code, in that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, except to the extent that such liquidation or reorganization is proposed in the Plan.

dd.     The making and delivery of any instrument of transfer respecting the transfer of any asset pursuant to, under, or in furtherance of the Plan and any other related instruments contemplated under the Plan (collectively, the "Transfer Documents"), including, but not limited to any transfer of the Properties to the Purchaser, and the execution, delivery, recording, and performance of any of the Transfer Documents, and all of the transactions contemplated under the Plan, including, but not limited to, the deeds conveying the Properties to the Purchaser upon the

14

Effective Date of the Plan, shall be an instrument of transfer, shall be and hereby are fully exempt

from the imposition and payment of any and all stamp, transfer or similar taxes within the meaning

of Section 1146(a) of the Bankruptcy Code (including, without limitation, mortgage recording taxes,

New York City Real Property Transfer Tax and New York State Real Estate Transfer Tax) and shall

be accepted for filing without payment of such and constitute "the making or delivery of an

instrument of transfer under a plan confirmed under Section 1129" within the meaning of Section

1146 of the Bankruptcy Code and will be free of the imposition of taxes of the kind specified herein

and in Section 1146 of the Bankruptcy Code.

6.      There are no filed and valid mechanics Liens against the Properties.

7.      The amendments to the Plan set forth in paragraph 2 of this Order improve the

treatment of Classes 6 and 8 under the Plan and do not requiring the re-noticing or re-solicitation of

the Plan under any applicable Bankruptcy Rule

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND**

**DETERMINED THAT:**

1.      Any and all objections to the Plan not previously resolved or withdrawn, including

*Debtors' Objection to Confirmation of Second Amended Chapter 11 Plan Filed by TH Holdco LLC*

[Docket No. 229] and *Objection to Confirmation of Amended Plan* [Docket No. 227], for all the

reasons stated by the Court on the record of the Confirmation Hearing, which are incorporated herein

by reference.

2.      The Plan, a copy of which is annexed hereto as **<u>Exhibit 1</u>** and as modified as set forth

in the last sentence of this paragraph, is confirmed pursuant to the terms and condition of this Order,

and the provisions of the Plan, as modified by this Order, shall bind the Debtors and all creditors and

equity security holders of the Debtors.  Based on the representations of TH Holdco's counsel at the

15

Pg 20 of 129

Confirmation Hearing, the treatment of Class 6 and Class 8 under the Second Amended Plan is hereby

modified to provide for the payment of all allowed Class 6 and Class 8 claims in full, in Cash, on the

Effective Date of the Plan, and such Classes shall be deemed unimpaired under Section 1124 of the

Bankruptcy Code. [5]

3.     If no Auction is required pursuant to the Sale and Bid Procedures, the TH Holdco

Credit Bid and other consideration to be provided under the Plan is approved and accepted, and TH

Holdco can immediately close the Sale Transaction without further order of this Court.

4.     If TH Holdco is the Purchaser, the TH Holdco Mortgage shall survive closing of the

Sale Transaction and may be assigned to any lender.

5.     The Plan meets each of the applicable requirements of Section 1129(a) of the

Bankruptcy Code).

6.     The Plan meets the requirements of Sections 1129(b)(1) and 1129(b)(2)(C) of the

Bankruptcy Code.

7.     <u>Approval of the Sale of the Properties</u>.

a.     The sale of the Properties to the Purchaser under the Purchase Agreement is

hereby approved in all respects pursuant to the terms and condition of this Order.  The Purchase

Agreement, a copy of which is annexed hereto as **<u>Exhibit 2</u>**, is approved in all respects pursuant to

the terms of and conditions of this Order.  The Debtors are authorized and directed to sell the

Properties and other purchased assets to the Purchaser as provided in the Sale and Bid Procedures and

---

[5] The term "TH Holdco Unsecured Claim Additional Funding," as defined in the Plan, shall be revised to mean payment of all allowed General Unsecured Claims in Classes 6 and 8 in full in Cash on the Effective Date of the Plan.

16

otherwise consummate the Sale Transaction contemplated by the Purchase Agreement upon the

Effective Date of the Plan.

     b.    Pursuant to Sections 105, 363, 365, 1123(b)(4), 1129 and 1146(a) of the

Bankruptcy Code, and consistent with the Sale and Bid Procedures, the Debtors and the Purchaser

(which may include TH Holdco, its nominee, designee, or assignee, if it is the winning bidder) are

authorized and directed to perform their obligations under and comply with the terms of the Purchase

Agreement and consummate the sale of the Properties, pursuant to and in accordance with the terms

and conditions of the Purchase Agreement.

     c.    Consistent with the Sale and Bid Procedures, the Debtors and the Purchaser are

authorized and directed to execute and deliver, and empowered to perform under, consummate, and

implement, the Purchase Agreement, together with all additional instruments and documents that may

be reasonably necessary or desirable to implement the Purchase Agreement, and to take all further

actions as may be reasonably requested by the Purchaser for the purposes of assigning, transferring,

granting, conveying, and conferring to the Purchaser or reducing to possession, the Properties, or as

may be appropriate to the performance of the obligations as contemplated by the Purchase Agreement.

     d.    The Purchase Agreement and any related agreements, documents, or other

instruments may be modified, amended or supplemented by the parties thereto in accordance with

the terms thereof and the Sale and Bid Procedures without further order of the Bankruptcy Court;

provided, that any such modification, amendment, or supplement is not material as to the Debtors.

     e.    All entities who are presently, or on the Closing Date may be, in possession

of any or all of the Properties are directed to surrender possession of such property to the Purchaser

on the Closing Date.

      f.      The transactions contemplated by the Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in Section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale of the Properties shall not affect the validity of the sale of the Properties to the Purchaser unless such authorization is duly stayed pending such appeal. Provided that it closes the transaction under the Purchase Agreement, the Purchaser is a purchaser in good faith of the Properties, and the Purchaser therefore is entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code.

      g.      The terms and provisions of the Purchase Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates and creditors, the Purchaser and its respective affiliates, successors and assigns, nominees, designees, and any affected third parties, including, but not limited to, all persons asserting a Lien in or against the Properties to be sold to the Purchaser pursuant to the Purchase Agreement.

      h.      The failure specifically to include any particular provisions of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Bankruptcy Court that the Purchase Agreement be authorized and approved in its entirety.

      8.      The transfer of the Properties to the Purchaser and the execution, closing, and consummation of all documents, agreements, and instruments required to be entered into and consummated as described in the Plan, the Purchase Agreement, and this Order are hereby approved under Sections 1123(a)(5)(D), 1123(b)(4), and 1123(b)(5) of the Bankruptcy Code. The Purchaser shall receive title, possession, and control of the Properties on the Closing Date upon such terms. The transfer of the Properties to the Purchaser shall be deemed an absolute and irrevocable transfer thereof, which the Debtors shall have made to the Purchaser for fair consideration and reasonably

18

equivalent value.  The transfer of the Properties to the Purchaser shall be, and hereby is, free and

clear of all Liens, Claims, Interests, and encumbrances, with the exception of the TH Holdco

Mortgage (which may be assigned to a lender by the Purchaser) and the Permitted Exceptions (as

defined in the Purchase Agreement), with all such Liens, Claims, Interests, and encumbrances to

attach to the cash component of the purchase price of the Properties.  The transfer of the Properties

to the Purchaser shall not be set aside due to any error in the description thereof.

9.      On the Closing Date, any and all Liens, Claims, Interests, and encumbrances or other

matters affecting title to the Properties that have not been expressly preserved under the Plan shall

be deemed extinguished as of such date.  Any remaining property of the Estates shall vest in the

Purchaser.  The Purchaser and/or the Disbursing Agent may operate, buy, use, acquire, and dispose

of the property of the Estates and may settle and compromise any Estate claims, interests, and causes

of action in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules with

any such proceeds to be distributed consistent with and in accordance with the Plan.

Notwithstanding any other provision of this Order or the Plan, any and all valid liens of the City of

New York shall retain their priority, and all real property taxes and charges and water and sewer

charges entitled to a lien priority under section 11-301 of the Administrative Code of the City of New

York shall be paid upon the closing of the Sale of the applicable Property, subject to any legal right

to contest the extent or amount of such charges.

10.      Any Executory Contracts or Unexpired Leases that the Debtors have not assumed and

assigned to TH Holdco as Purchaser in accordance with the Plan Supplement and/or the Purchase

Agreement are deemed rejected by the Debtors on the Effective Date, and this Order constitutes

approval of such rejections pursuant to Sections 365(a) and 1123 of the Bankruptcy Code.  Any

Purchaser other than TH Holdco may designate Executory Contracts and Unexpired Leases to be

19

US_ACTIVE\121644979\V-6

assumed and assigned or rejected in accordance with the terms of the Sale and Bid Procedures. Any

timely cure claims and timely filed rejection damage claims resulting from any such contract or lease

assumption or rejection, as the case may be, shall be the responsibility of the Purchaser; provided, that

if TH Holdco is the Purchaser, such claims shall be paid in accordance with the terms of the Plan. The

Debtors are authorized to assume and assign the Executory Contracts and Unexpired Leases designated

for assumption in the Plan Supplement and/or the Purchase Agreement, and this Order constitutes

approval of such assumptions and assignments pursuant to Sections 365(a) and 1123 of the Bankruptcy

Code in the event that TH Holdco is the Purchaser. Purchaser on behalf of the applicable Estate can

send any termination or nonrenewal notices for postpetition, month to month, or terminable at will

Executory Contracts, Unexpired Leases, or other agreements, to be effective July 31, 2022.

11.     Except as may be expressly provided for in the Plan or this Order, the Purchaser shall

have no liability or responsibility for any liability or other obligation of the Debtors arising under or

related to the Properties to the extent allowed by law. Without limiting the generality of the

foregoing, and except as otherwise specifically provided herein and in the Plan, to the extent allowed

by law, the Purchaser shall not be liable for any Claims against the Debtors or any of their

predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any

kind or character, including, but not limited to, any such liability that may be imposed by statute

(*e.g.*, under so-called "bulk sale" laws), or any theory of antitrust, environmental, successor, or

transferee liability, labor law, *de facto* merger, or substantial continuity, whether known or unknown

as of the Effective Date, now existing or hereafter arising, whether fixed or contingent, with respect

to the Debtors or any obligations of the Debtors arising prior to the Effective Date.

12.     Pursuant to Section 1142(b) of the Bankruptcy Code, the Debtors and/or the Purchaser

are authorized, empowered, and directed to (a) execute and deliver any instrument, agreement, or

document, and (b) perform any act that is necessary, desirable, or required to comply with the terms and conditions of the Plan and consummation of the Plan, and are authorized, empowered, and directed, without limitation, to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, and other agreements or documents created in connection with the Plan, including the closing documents in connection with the sale of the Properties under the Purchase Agreement.

13.    Pursuant to Section 1146(a) of the Bankruptcy Code:  (a) the creation, assignment, or recordation of instruments executed and delivered at the closing of the transfer of the Properties; (b) the making or assignment of any contract, lease, or sublease; (c) the making or delivery of any deed or other instrument of transfer or other consideration under, in the furtherance of, or in connection with the Plan, including, without limitation, the transfer of the Properties, and any other payments and transfers pursuant to the Plan as contemplated by the Purchase Agreement; (d) the delivery of deeds, bills of sale, or other transfers of tangible property; and (e) the making or delivery of any other instrument of transfer under the Plan, including, without limitation, the transfer of the Properties, and any other payments and transfers pursuant to or under the Plan as contemplated by the Purchase Agreement and subsequent transfers pursuant to  or under the Plan or this Order, including, but not limited to the deeds conveying the Properties to the Purchaser upon the Effective Date of the Plan shall be an instrument of transfer under, in connection with, or in furtherance of the Plan, are exempt from and will not be subject to any stamp tax or other similar tax or any tax held to be a stamp tax or other similar tax by applicable law, including, without limitation, New York City Real Property Transfer Tax and New York State Real Estate Transfer Tax.  Each and every federal, state, and local government agency or department is hereby directed to accept any and all documents necessary and appropriate to

21

consummate the sale of the Properties as set forth herein, and a copy of this Order may be filed in any

place where state, federal, or local law permits filing or recording.

14.    The Purchaser may enter into such agreements as are deemed by it to be necessary to

consummate the Plan, consistent with the Plan, without further order of the Bankruptcy Court.

15.    Except as specifically provided in the Plan or this Confirmation Order, the Purchaser

and the Disbursing Agent are authorized, directed, and empowered to do all things and take all

actions reasonably necessary to effectuate the consummation and implementation of the Plan,

including, but not limited to, executing all documents, filing all requisite documents with

appropriate state and local authorities, establishing all accounts, making all distributions, and

paying all costs in connection with consummating the Plan.

16.    Any Liens held against the Properties by any creditor of the Debtors must be

released as a condition to payment under the Plan of any Allowed Claim held by such creditor.

17.    This Confirmation Order and all related agreements and documents necessary to

implement the Plan shall be binding upon and inure to the benefit of any successors and assigns of

the Debtors and the Purchaser.

18.    The Plan Injunction and Limitation of Liability provisions of Section 11 of the Plan

(i) have been negotiated in good faith and at arms' length; (ii) are consistent with and permitted

pursuant to Sections 105, 524, 1123(b)(6), 1129, and 1142 of the Bankruptcy Code and applicable

caselaw, (iii) are integral to the structure of the Plan, formed part of the agreement among all parties

in interest embodied therein, and are each an essential means of implementing the Plan pursuant to

Section 1123(a)(5) of the Bankruptcy Code; (iv) are fair and equitable; and (v) confer material

benefits on the Debtors' estates, and are in the best interests of the Debtors and their estates, their

creditors, and holders of Interests.  Additionally, all interested parties have timely received due,

22

proper, and adequate notice of the release, exculpation, injunction, and limitation of liability provisions in the Plan and have not objected to them; accordingly, such provisions are hereby approved.

19.     After the Confirmation Date and before substantial consummation of the Plan as defined in Section 1101(2) of the Bankruptcy Code, the Debtors and/or TH Holdco may, under and consistent with Section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or this Order, and such matters as may be necessary to carry out the purposes and effects of the Plan, so long as such proceedings do not materially and adversely affect the treatment of holders of Claims under the Plan.

20.     In the event that the Debtors receive a refund or reimbursement belonging to the Purchaser, such payments shall be turned over to the Purchaser.  Any funds held by the Debtors as cash collateral and/or in the debtor in possession accounts shall be disbursed to the Purchaser at the Closing pursuant to the Purchase Agreement.

21.     The Debtors shall (1) pay all amounts due under 28 U.S.C. § 1930, and any applicable statutory interest thereon, in cash in full as required by statute until the closing, conversion, or dismissal of these Chapter 11 Cases, and (2) file all required reports until the closing, conversion, or dismissal of these Chapter 11 Cases.

22.     In addition to retaining jurisdiction with respect to any disputes concerning transfer taxes, the Bankruptcy Court shall retain jurisdiction of this case with respect to motions pending before this Court on or before the Effective Date and thereafter, and matters provided for in Section 13 of the Plan, including, but not limited to, the consideration of any objections filed within the

US_ACTIVE\121644979\V-6

time permitted pursuant to the Plan to the allowance of any Claim or Interest and other matters

arising out of or related to the Plan.

23.     Notice of the entry of this Confirmation Order, a copy of which is annexed hereto

as **Exhibit 3**, which form is hereby approved, shall be mailed by TH Holdco to all of the Debtors'

creditors, the Debtors' equity security holder, and other such parties as are entitled to notice within

five (5) business days of the date of entry of this Confirmation Order.

24.     **Any claims of a kind specified in paragraphs 2.1 and 9.3 of the Plan that are not

filed on or before the respective deadlines set forth therein shall not participate in any

distribution under the Plan and shall be forever barred**; neither the Debtors, nor their estates, the

Purchaser, nor any Disbursing Agent, nor any officer, member, manager, employee, or professional

person employed by any of the foregoing acting in such capacity shall have any liability therefor or

with respect thereto; and any holder of any such claim shall be forever barred from asserting any

such claim against the Debtors, their estates, the Purchaser, the Disbursing Agent, any officer,

member, manager, employee, or professional person employed by any of the foregoing acting in

such capacity, or its or their respective property, whether any such claim is deemed to arise prior to,

on, or subsequent to the Effective Date.

25.     Except as otherwise hereafter directed by the Bankruptcy Court, notice of all

subsequent pleadings in this case shall be limited to (i) the Debtors, (ii) Debtors' counsel, (iii) the

United States Trustee, (iv) TH Holdco and its counsel if it pertains to the Properties, (v) the

Disbursing Agent, and (vi) any party that would be directly affected by the relief sought.

26.     The failure to specifically describe or include any particular provision of the Plan in

this Order shall not diminish or impair the effectiveness of such provision, it being the intent of

this Court that the Plan be approved and confirmed in its entirety.

US_ACTIVE\121644979\V-6

27.     In the event of any conflict, discrepancy, or inconsistency between the terms and provisions of the Plan or the Purchase Agreement and the terms and provisions of this Order, the terms and provisions of this Order shall control.

28.     The provisions of this Order and the Purchase Agreement and any actions taken pursuant hereto or thereto shall survive entry of any order which may be entered:  (i) converting Debtors' bankruptcy cases from chapter 11 to chapter 7, (ii) dismissing Debtors' bankruptcy cases, or (iii) appointing a chapter 11 trustee or examiner, and the terms and provisions of the Purchase Agreement as well as the rights and interests granted pursuant to this Order and the Purchase Agreement shall continue in this or any superseding case, and shall be binding upon the Debtors, the Purchaser, and their respective successors and permitted assigns.

29.     Notwithstanding Bankruptcy Rules 3020(e) or 7062 or otherwise, the stays provided for under Bankruptcy Rule 3020(e) or any other applicable rule (*e.g.*, Rules 6004(h) or 6006(d)) are waived, for cause shown, and this Confirmation Order shall be effective and enforceable immediately upon entry.  The Purchaser is authorized to consummate the Plan and the Sale Transaction contemplated thereby immediately after entry of this Confirmation Order and upon, or concurrently with, satisfaction of the conditions set forth in the Plan.

Dated:  White Plains, New York
        July 6, 2022

                                        */s/ Sean H. Lane*
                                        Honorable Sean H. Lane
                                        United States Bankruptcy Judge

# <u>Exhibit 1</u>

(The TH Holdco Plan)

Lauren Macksoud
Sarah M. Schrag
**DENTONS US LLP**
1221 Avenue of the Americas
25th Floor
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
E-mail: lauren.macksoud@dentons.com
        sarah.schrag@dentons.com

Robert E. Richards (admitted *pro hac vice*)
**DENTONS US LLP**
233 South Wacker Drive
Suite 5900
Chicago, Illinois 60606
Telephone:  (312) 876-8000
Facsimile:  (312) 876-7934
E-mail: robert.richards@dentons.com

*Counsel to TH Holdco LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>85 FLATBUSH RHO MEZZ LLC, et al.,[1]<br><br>Debtors | Case No. 20-23280 (RDD)<br>Chapter 11<br><br><br>(Jointly Administered) |

**SECOND AMENDED CHAPTER 11 PLAN FILED BY CREDITOR TH HOLDCO LLC
RELATED TO 85 FLATBUSH RHO MEZZ, LLC, 85 FLATBUSH RHO HOTEL LLC,
AND 85 FLATBUSH RHO RESIDENTIAL LLC**

TH Holdco LLC as creditor files this second amended Chapter 11 plan related to the Debtors 85 Flatbush RHO Mezz, LLC, 85 Flatbush RHO Hotel LLC, and 85 Flatbush RHO Residential LLC pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in Section 1.A.

---

[1] The Debtors (as defined) in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include: 85 Flatbush RHO Mezz LLC (6184); 85 Flatbush RHO Hotel LLC (5027); and 85 Flatbush RHO Residential LLC (2261).

1

The Plan constitutes a separate chapter 11 plan for each Debtor. The classifications set forth in Classes shall be deemed to apply to each Debtor identified, except that Class 3 shall apply to each of the Debtors. TH Holdco reserves the right to proceed to seek confirmation with respect to the Plan as to each Debtor separately and to proceed to confirm the Plan with respect to some but not all of the Debtors.

## SECTION 1. DEFINITIONS AND INTERPRETATION.

### A.      Definitions.

1.1      ***85 Flatbush Avenue*** means 85 Flatbush Avenue 1 LLC.

1.2      ***85 Flatbush Mezz*** means 85 Flatbush Mezz LLC in its capacity as the prepetition mezzanine lender to 85 Flatbush RHO Mezz.

1.3      ***85 Flatbush Hotel Pledge Agreement*** means the Ownership Interest Pledge and Security Agreement dated September 19, 2019 which pledged and granted 85 Flatbush Mezz a security interest in 85 Flatbush RHO Mezz's membership interest in 85 Flatbush RHO Hotel as security for the 85 Flatbush Mezz Loan Agreement.

1.4      ***85 Flatbush Residential Pledge Agreement*** means the Ownership Interest Pledge and Security Agreement dated September 19, 2019 which pledged and granted 85 Flatbush Mezz a security interest in 85 Flatbush RHO Mezz's membership interest in 85 Flatbush RHO Residential as security for the 85 Flatbush Mezz Loan Agreement.

1.5      ***85 Flatbush Mezz Loan Agreement*** means that certain Mezzanine Promissory Note dated September 19, 2019 and Mezzanine Loan Agreement pursuant to which 85 Flatbush Mezz advanced a loan to 85 Flatbush RHO Mezz in the original principal amount of $6,000,000 secured by the 85 Flatbush Hotel Pledge Agreement and 85 Flatbush Residential Pledge Agreement.

1.6      ***85 Flatbush RHO Mezz*** means 85 Flatbush RHO Mezz LLC, a Debtor in these Chapter 11 Cases.

1.7      ***85 Flatbush RHO Hotel*** means 85 Flatbush RHO Hotel LLC, a Debtor in these Chapter 11 Cases.

1.8      ***85 Flatbush RHO Residential*** means 85 Flatbush RHO Residential LLC, a Debtor in these Chapter 11 Cases.

1.9      ***Administrative Expense Claim*** means any Claim for costs and expenses of Administration during the Chapter 11 Cases pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2) of the Bankruptcy Code, including, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the business of the Debtors (such as wages, salaries or commissions for services and payments for goods and other services and leased premises); (b) Fee Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1911 through 1930 of chapter 123 of title 28 of the United States Code, 28 U.S.C. section 1-1401.

2

1.10    ***Administrative Expense Claims Bar Date*** means the first Business Day that is 30 days following the Confirmation Date, except as otherwise specifically set forth in the Plan.

1.11    ***Administrative Expense Claims Objection Bar Date*** means the first Business Day that is 60 days following the Effective Date, except as otherwise specifically set forth in the Plan; provided that the Administrative Claims Objection Bar Date may be extended pursuant to an order of the Bankruptcy Court upon a motion filed by the Post-Effective Date Debtors after notice and a hearing.

1.12    ***Allowed*** means with reference to any Claim (a) any Claim against any Debtor that has been listed by the Debtor in its Schedules as of the date of the filing of this Plan as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed, (b) any Claim listed on the Schedules or included in a timely filed proof of Claim, as to which no objection to allowance has been, or subsequently is, interposed in accordance with Section 7.9 hereof or prior to the expiration of such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such Final Order is in favor of the respective holder, or (c) any Claim expressly allowed by a Final Order.  Any filed Proof of Claim in the 85 RHO Flatbush Hotel Case or in the 85 RHO Flatbush Residential Case which is not the subject of a pending objection as of the Confirmation Date shall be deemed Allowed unless such date is extended by the Bankruptcy Court for good cause shown.

1.13    ***Auction*** means the auction for the sale of the Hotel Property and/or Residential Property to be held in accordance with the Sale and Bid Procedures on or about a date that is 30 days after the entry of the Confirmation Order.

1.14    ***Available Cash*** means all Cash of the Debtor realized from its business operations, the sale or other disposition (other than the Sale Transaction) of its assets, the interest earned on its invested funds or from any other source or otherwise.

1.15    ***Avoidance Action*** means any action commenced, or that may be commenced, before or after the Effective Date pursuant to section 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code.

1.16    ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Case.

1.17    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Case and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Case under section 151 of title 28 of the United States Code.

1.18    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Case, and any Local Rules of the Bankruptcy Court.

3

1.19    ***Bar Date Order*** means that certain *Order Establishing Deadline for Filing Proofs of Claim Against the Debtors and Approving the Form and Manner of Notice Thereof* entered on March 15, 2021 at ECF No. 58 which established April 21, 2021 as the last day for creditors to file claims against the Debtors' Estates and established June 16, 2021 as the last date for Governmental Units to file claims against the applicable Debtor's estate.

1.20    ***Business Day*** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.21    ***Cash*** means legal tender of the United States of America.

1.22    ***Causes of Action*** means any action, Claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. Cause of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Avoidance Action; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

1.23    ***Chapter 11 Cases*** means the jointly-administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on December 18, 2020 and styled *In re 85 Flatbush RHO Mezz LLC, et al.*, Case No. 20-23280 (RDD).

1.24    ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.25    ***Claims Objection Bar Date*** means the first Business Day that is 60 days after the Effective Date; provided that the Claims Objection Bar Date may be extended pursuant to an order of the Bankruptcy Court upon a motion filed by the Post-Effective Date Debtors.

1.26    ***Class*** means any group of Claims or Interests classified pursuant to Section 3.1 of the Plan.

1.27    ***Closing Date*** means the date of the closing of the Sale Transaction.

1.28    ***Commencement Date*** means December 18, 2020.

1.29    ***Confirmation*** means the entry on the docket of the Chapter 11 Cases of the Confirmation Order.

1.30    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

4

1.31 ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.32 ***Confirmation Order*** means an order of the Bankruptcy Court (a) confirming the Plan; (b) approving the Sale Transaction; (c) determining that Purchaser is a good faith purchaser; (d) providing that the closing of the Sale Transaction will occur in accordance with the terms and conditions of the Purchase Agreement; and (e) providing that the delivery of the deed in accordance with the terms of the Confirmation Order and Purchase Agreement approved under this Plan, if confirmed by the Court, shall constitute the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title and may not be taxed under any law imposing a Transfer Tax.

1.33 ***Consummation*** means the occurrence of the Effective Date of the Plan.

1.34 ***Cure Obligation*** means all (a) amounts (or such other amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults; and (b) other obligations required to cure any non-monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed by the Debtors and assigned to Purchaser pursuant to sections 365 or 1123 of the Bankruptcy Code.

1.35 ***Debtor*** means any of the Debtors in its respective individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

1.36 ***Debtors*** mean 85 Flatbush RHO Mezz, 85 Flatbush RHO Hotel, and 85 Flatbush RHO Residential.

1.37 ***Disbursing Agent*** means the entity or person designated by the Plan Supplement or the Confirmation Order and charged with the responsibility of making the payments under the Plan.

1.38 ***Disclosure Statement*** means the second amended Disclosure Statement for the Plan which is prepared and distributed in accordance with sections 1125, 1126(b) and/or 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and/or other applicable law.

1.39 ***Disputed Claim*** means with respect to a Claim or Interest, any such Claim or Interest (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503 or 1111 of the Bankruptcy Code, or (b) for which a Proof of Claim or Interest has been filed, to the extent the Debtor or any party in interest has interposed a timely objection or request for estimation before the Confirmation Date in accordance with the Plan, which objection or request for estimation has not been withdrawn or determined by a Final Order.

1.40 ***Distribution Date*** means a date or dates, as determined by the Disbursing Agent in accordance with the terms of the Plan, on which the Disbursing Agent makes a distribution to holders of Allowed Claims.

1.41 ***Distribution Record Date*** means the Effective Date of the Plan.

5

1.42    ***Effective Date*** means the date on which all conditions to the effectiveness of the Plan set forth in Section 10 hereof have been satisfied or waived in accordance with the terms of the Plan.

1.43    ***Entity*** has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.44    ***Estate*** means as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of each respective Debtor's Chapter 11 Case.

1.45    ***Estimated Professional Fee Escrow*** means the escrow account established by the Debtors or TH Holdco ten (10) days prior to the Effective Date holding sufficient Cash to pay the Fee Claims in full, less any applicable retainers held by such professionals, subject to their Allowance by the Bankruptcy Court upon the later of (i) the Effective Date or (ii) the date upon which the order relating to any such Allowed Fee Claim is entered or (iii) upon such other terms and conditions as may be agreed to between the holder of such an Allowed Fee Claim, and TH Holdco.  The Estimated Professional Fee Escrow shall be funded first from the Debtors' cash on hand as of the Effective Date of the Plan and thereafter from the Plan Fund.

1.46    ***Exculpated Parties*** means collectively: (a) the Debtors; (b) TH Holdco; (c) the Purchaser; and (d) with respect to each of the foregoing entities in clauses (a) through (c), such entities' successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, and other professionals, and such persons' respective heirs, executors, Estates, servants and nominees, in each case in their capacity as such.  Nothing herein shall be deemed to release or impact claims held by TH Holdco or any other party against non-Debtor guarantors or obligors of any nature.

1.47    ***Executory Contract*** means a contract or lease to which a Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

1.48    ***Existing Equity Interests*** means all Interests in a Debtor, including membership interests or the rights to acquire any such Interests.

1.49    ***Fee Claim*** means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Effective Date by professional persons retained by the Debtors pursuant to sections 327, 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

1.50    ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall

have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or section 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

1.51    *General Unsecured Claim* means any unsecured Claim that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.

1.52    *Governmental Unit* has the meaning set forth in section 101(27) of the Bankruptcy Code.

1.53    *Hotel* means 85 Flatbush RHO Hotel LLC.

1.54    *Hotel Property* means the real property and improvements thereon located at 85 Flatbush Extension, Brooklyn, New York (Block 120; Lots 1201, 1202).

1.55    *Impaired* means, with respect to a Claim, Interest or Class of Claims or Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.56    *Intercreditor Agreement* means that certain Intercreditor Agreement dated as of September 19, 2019 and as amended as of July 23, 2020 by and between 85 Flatbush Avenue (as now assigned to TH Holdco) as senior lender and 85 Flatbush Mezz as mezzanine lender.

1.57    *Interests* means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all instruments evidencing an ownership interest in the Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interests in the Debtor that existed immediately before the Effective Date.

1.58    *Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.59    *Mezz* means 85 Flatbush RHO Mezz LLC.

1.60    *Other Priority Claim* means any Claim against the Debtor entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

1.61    *Other Secured Claim* means a Secured Claim, other than the 85 Flatbush Avenue Secured Claim or 85 Flatbush Mezz Secured Claim.

1.62    *Person* means an individual, corporation, partnership, joint venture, association, Joint Stock Company, Limited Liability Company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit or other entity.

7

1.63    ***Plan*** means this second amended chapter 11 plan, including the exhibits hereto and the Plan Supplement, as the same may be amended or modified from time to time in accordance with Sections herein.

1.64    ***Plan Fund*** means the aggregate of: (1) the Sale Proceeds (if any), which shall be allocable to the Hotel Property and/or the Residential Property as set forth in the Purchase Agreement; (2) the TH Holdco Additional Consideration; and (3) the Debtors' Available Cash which shall be utilized to make payments to creditors in accordance with the terms of this Plan.  In addition to the Plan Fund, if the TH Holdco Credit Bid closes, TH Holdco shall fund the TH Holdco Unsecured Claim Dedicated Fund and the TH Holdco Unsecured Claim Additional Funding.

1.65    ***Plan Supplement*** means the compilation of documents and information, if any, required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; provided that, through the Effective Date, TH Holdco shall have the right to amend any schedules, exhibits, and the other documents contained in, and exhibits to, the Plan Supplement.

1.66    ***Plan Supplement Filing Deadline*** means the date that is no later than 15 days prior to the Confirmation Hearing.

1.67    ***Priority Tax Claim*** means any unsecured Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.68    ***Pro Rata*** means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims and Disputed Claims within such Class.

1.69    ***Proof of Claim*** means a Proof of Claim filed against a Debtor in its Chapter 11 Case.

1.70    ***Properties*** means the Hotel Property and/or the Residential Property.

1.71    ***Purchase Agreement*** means an Asset Purchase Agreement, in form and substance reasonably acceptable to TH Holdco, a form of which is attached as Exhibit F to the Disclosure Statement, which provides for the sale of the Hotel Property and/or Residential Property, submitted at or prior to the Auction, pursuant and subject to the Sale and Bid Procedures, and determined by TH Holdco (subject to approval by the Bankruptcy Court after notice and a hearing) pursuant to the Sale and Bid Procedures to reflect the highest or otherwise best offer for the Hotel Property and/or Residential Property.  The form of the Purchase Agreement is subject to approval of the Bankruptcy Court.  Potential Purchasers may submit a redline showing any changes they are requesting to the form of Purchase Agreement prior to the Auction.

1.72    ***Purchaser*** means TH Holdco.  The purchase price for the Hotel Property and/or Residential Property will be set forth in the executed Purchase Agreement filed promptly after the Confirmation Hearing.  The opening bid for the Auction shall be the TH Holdco Credit Bid with the TH Holdco Additional Consideration and TH Holdco Unsecured Claim Dedicated Fund.  In

8

the event that another bidder submits a higher and better bid at the Auction which is approved by the Bankruptcy Court, then the term Purchaser shall refer to such higher and better bidder.

1.73    ***Residential*** means 85 Flatbush RHO Residential LLC.

1.74    ***Residential Property*** means the real property and improvements thereon located at 85 Flatbush Extension, Brooklyn, New York (Block 120; Lot 1203).

1.75    ***Sale and Bid Procedures*** means the sale, bid and auction procedures as approved by the Bankruptcy Court establishing, among other things, procedures for the Auction and the terms and conditions related to the Sale Transaction under this Plan.  A proposed form of Sale and Bid Procedures is attached as Exhibit E to the Disclosure Statement.  The form of Sale and Bid Procedures is subject to approval of the Bankruptcy Court.

1.76    ***Sale Proceeds*** means any cash proceeds from the Sale Transaction net of closing costs directly related to the Sale Transaction including but not limited to Debtors' brokerage fees, title costs and other ordinary and necessary costs of, or credits related to, the transfer of title of the Hotel Property and/or Residential Property, in the event that a Sale Transaction involving a Cash bid is approved by the Bankruptcy Court and closes.

1.77    ***Sale Transaction*** means the sale of the Hotel Property and/or Residential Property pursuant to the Plan either via (i) a credit bid to TH Holdco or its nominee and/or (ii) to the winning Cash Purchaser or Purchasers at the Auction whose bids are approved by the Bankruptcy Court and who close such Purchaser's bid.

1.78    ***Schedule of Cure Costs*** means the schedule of any Executory Contracts and Unexpired Leases to be assumed by the Debtors and assigned to the Purchaser, to be filed with the Plan Supplement and/or the fully executed Purchase Agreement.

1.79    ***Schedules*** means the schedules of assets and liabilities and the statement of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended from time to time.

1.80    ***Secured Claim*** means a Claim, other than a Claim held by TH Holdco, to the extent (i) secured by property of the Estate, the amount of which is equal to or less than the value of such property (A) as set forth in the Plan, (B) as agreed to by the holder of such Claim and TH Holdco or (C) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (ii) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

1.81    ***TH Holdco*** means TH Holdco LLC as assignee of 85 Flatbush Avenue in its capacity as the prepetition lender to 85 Flatbush RHO Hotel and 85 Flatbush RHO Residential.  If TH Holdco credit bids to acquire the Hotel Property and Residential Property under section 363(k) of the Bankruptcy Code, then, in that context, the term "TH Holdco" includes any nominee, designee or assignee of TH Holdco to whom TH Holdco has assigned or transferred its claim, in whole or in part, for purpose of making such credit bid.

9

1.82    **_TH Holdco Additional Consideration_** shall mean Cash to be funded by TH Holdco to pay Allowed Cure Obligations, Allowed Administrative Expenses (including Professional Fees and United States Trustee Fees) and Allowed Priority Claims which shall be part of and paid from the Plan Fund.

1.83    **_TH Holdco Credit Bid_** means a credit bid for all of the assets subject to the lien held by TH Holdco in the aggregate amount of at least $90,000,000 plus the TH Holdco Additional Consideration, to be allocated among such encumbered assets as announced by TH Holdco at or prior to the hearing on the Disclosure Statement or such higher and better bid as TH Holdco may thereafter submit.  TH Holdco intends to submit a single credit bid for both of the Hotel Property and the Residential Property.  If a cash bid is approved pursuant to the Sale and Bidding Procedures for just the Hotel Property or just the Residential Property as a separate lot, then TH Holdco shall indicate the amount of the TH Holdco Credit Bid for the applicable Property it is acquiring through the Credit Bid.  TH Holdco reserves the right to increase the amount of its credit bid at the Auction or at any time prior to the Effective Date.  The TH Holdco Credit Bid may include an assumption in whole or in part of the TH Holdco Mortgage and any such assumption shall be treated as a dollar for dollar credit against the TH Holdco Credit Bid amount.

1.84    **_TH Holdco Initial Credit Bid_** means the initial TH Holdco Credit Bid for all of the assets subject to the lien held by TH Holdco in the aggregate amount of $90,000,000 plus the TH Holdco Additional Consideration of approximately $4 million, to be allocated among such encumbered assets as announced by TH Holdco at or prior to the Auction or such higher and better bid as TH Holdco may thereafter submit.

1.85    **_TH Holdco Guaranty_** means the guaranty, substantially in the form of Exhibit G to the Disclosure Statement, to be executed by OREI Long Term Equity Fund LP, a Delaware limited partnership, OREI Long Term Equity Fund A LP, a Delaware limited partnership, and TH Co-Invest LP, a Delaware limited partnership, each of which indirectly owns TH Holdco.

1.86    **_TH Holdco Mortgage_** means the first priority mortgage on the Hotel Property and Residential Property granted to 85 Flatbush Avenue and currently held by TH Holdco by 85 Flatbush RHO Hotel and 85 Flatbush RHO Residential to secure the TH Holdco Prepetition Loan.

1.87    **_TH Holdco Prepetition Loan Agreement_** means that certain Consolidated, Amended and Restated Note dated September 19, 2019 pursuant to which 85 Flatbush Avenue advanced a loan to 85 Flatbush RHO Hotel and 85 Flatbush RHO Residential in the original principal amount of $70,000,000 secured by the Hotel Property and Residential Property which is currently held by TH Holdco.

1.88    **_TH Holdco Unsecured Claim Additional Funding_** means payments to Allowed General Unsecured Claims in Classes 6 and 8 (i) in quarterly distributions of 50% of the excess cash flow from operations of the Hotel Property and the Residential Property until such Allowed General Unsecured Claims in Classes 6 and 8 are paid in full in Cash, together with interest at the federal judgment rate on such Claims (which interest shall begin accruing on the Effective Date and shall stop accruing at the time of payment in full), and/or (ii) a final distribution on the first 12-month anniversary of the Effective Date of all remaining unpaid amounts owed, if any, on such Allowed General Unsecured Claims in Classes 6 and 8, together with interest at the federal

judgment rate on such Claims (which interest shall begin accruing on the Effective Date and shall stop accruing at the time of payment in full), so that all such Claims are paid in full in Cash, to be funded by TH Holdco or by funding from the owners of TH Holdco.  TH Holdco will furnish, no later than the Effective Date of the Plan, the fully executed TH Holdco Guaranty, the form of which is attached as Exhibit G to the Disclosure Statement.

       1.89   ***TH Holdco Unsecured Claim Dedicated Fund*** means a segregated and dedicated fund of $1,250,000 cash provided by TH Holdco separate from its TH Holdco Credit Bid to be allocated Pro Rata, based on the total amount of Allowed General Unsecured Claims in Classes 6 and 8, among holders of Allowed General Unsecured Claims against 85 RHO Flatbush Hotel or 85 RHO Flatbush Residential but not with respect to any Allowed General Unsecured Claims against 85 RHO Flatbush Mezz.  This Fund shall be available only if TH Holdco closes the Sale Transaction as the successful acquirer of either the Hotel Property and the Residential Property or both Properties.

       1.90   ***Transfer Tax*** means a stamp, transfer, mortgage recording or similar tax, including, without limitation, New York City Real Property Transfer Tax and New York State Real Estate Transfer Tax.

       1.91   ***Unimpaired*** means, with respect to a Claim, Interest or Class of Claims or Interests, that such Claim or Interest is not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

## B.    Interpretation; Application of Definitions and Rules of Construction.

       Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained therein. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

## C.    Controlling Document

       In the event of an inconsistency between the Plan and the Plan Supplement, except for the terms of the Purchase Agreement, the terms of the Plan shall control (unless stated otherwise in the Plan).  The provisions of the Plan and of the Confirmation Order shall be construed in a manner

11

consistent with each other so as to effect the purposes of each; provided that, if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

## SECTION 2.  ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.

2.1    *Administrative Expense Claims*.

Except to the extent that a holder of an Allowed Administrative Expense Claim and the Debtors agree to different treatment, the Debtors shall pay to each holder of an Allowed Administrative Expense Claim, Cash in an amount equal to such Claim (plus statutory interest on such claim, if applicable), on or as soon thereafter as is reasonably practicable, the later of (a) the Closing Date or (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid by the Debtors (or TH Holdco on behalf of the applicable Estate) in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court (including the Bar Date Order), requests for payment of Administrative Expense Claims, other than requests for payment of Fee Claims, must be filed and served on the Debtors no later than the Administrative Expense Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.

Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims and that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors or their property, and the Administrative Expense Claims shall be deemed compromised, settled, and released as of the Effective Date.  The Debtors or TH Holdco must file and serve objections to Administrative Expense Claims on or before the Administrative Expense Claims Objection Bar Date.

2.2    *Fee Claims*.

All Entities seeking an award by the Bankruptcy Court of Fee Claims shall (i) provide a detailed estimate of all fees incurred through the Confirmation Hearing and estimated to be incurred through the Effective Date and (ii) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date which date may be extended by agreement between the parties.  No later than ten (10) days prior to the Effective Date, all entities holding claims for Fee Claims shall serve upon the Debtors and TH Holdco an updated notice of the estimated amount of their unpaid Fee Claim and the Debtors or TH Holdco shall segregate, into an Estimated Professional Fee Escrow, the amounts which are necessary to pay the amount of such Fee Claim,

in full (or in such amount as the Bankruptcy Court sets) subject to Allowance by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the date upon which the order relating to any such Allowed Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors.  The Debtors or Disbursing Agent with the prior written consent of TH Holdco are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.  TH Holdco does not consent to use of any of its collateral or proceeds thereof to pay fees and costs incurred in connection with litigation or actions adverse to TH Holdco, including, without limitation, in opposition to this Plan or challenging any aspect of TH Holdco's Claims in any manner, consistent with the Agreed Final Cash Collateral Order.  The Estimated Professional Fee Escrow shall be funded first from the Debtors' cash on hand as of the Effective Date of the Plan and thereafter from the Plan Fund.  TH Holdco with such funding support as may be needed from Ohana shall pay remaining amounts due for Allowed Professional Fee Claims when due to the extent not already paid from (i) retainers held by such professionals and (ii) the Plan Fund.

2.3    *Priority Tax Claims*.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Closing Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course.

## SECTION 3.   CLASSIFICATION OF CLAIMS AND INTERESTS.

3.1    *Classification in General*.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123 of the Bankruptcy Code; provided that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

3.2    *Summary of Classification*.

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) deemed to reject the Plan.  In accordance with section 1123 of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and, thus, are excluded from the classes of Claims and Interests set forth in this Section 3.  All of the potential Classes for the Debtors are set forth herein.  There may not be holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section 4.  TH Holdco

13

reserves the right to modify this Plan as to the treatment of any Class to provide more favorable treatment of such Class without resolicitation of votes on this Plan.

Claims in more than one Class (including Claims which are also Administrative Expense Claims and/or Priority Claims) shall only be entitled to a single payment in full including any applicable interest under this Plan.

TH Holdco reserves the right to reclassify any Claim which is filed against 85 Flatbush RHO Mezz which in fact appears to relate to 85 Flatbush RHO Hotel and/or 85 Flatbush RHO Residential to the applicable class in 85 Flatbush RHO Hotel and/or 85 Flatbush RHO Residential provided the treatment of such Claim upon reclassification is more favorable for the applicable creditor being reclassified.   TH Holdco will send written notice of any such proposed reclassification to the impacted creditor at least 10 Business Days before such reclassification with an opportunity for that claimant to object.

14

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | 85 Flatbush RHO Hotel Other Priority Claims | Unimpaired | No (presumed to accept) |
| 2 | 85 Flatbush RHO Residential Other Priority Claims | Unimpaired | No (presumed to accept) |
| 3 | TH Holdco Secured Claim | Impaired | Yes |
| 4 | 85 Flatbush RHO Hotel Other Secured Claims | Unimpaired | No (presumed to accept) |
| 5 | 85 Flatbush RHO Residential Other Secured Claims | Unimpaired | No (presumed to accept) |
| 6 | 85 Flatbush RHO Hotel General Unsecured Claims | Impaired | Yes |
| 7 | 85 Flatbush RHO Hotel Existing Equity Interests | Impaired | Yes |
| 8 | 85 Flatbush RHO Residential General Unsecured Claims | Impaired | Yes |
| 9 | 85 Flatbush RHO Residential Existing Equity Interests | Impaired | Yes |
| 10 | 85 Flatbush Mezz Other Priority Claims (if any) | Impaired | Yes |
| 11 | 85 Flatbush Mezz Claim | Impaired | Yes |
| 12 | 85 Flatbush Mezz Other Secured Claims (if any) | Impaired | Yes |
| 13 | 85 Flatbush Mezz General Unsecured Claims | Impaired | Yes |
| 14 | Insider General Unsecured Claims | Impaired | Yes |
| 15 | 85 Flatbush Mezz Existing Equity Interests | Impaired | No (deemed to reject) |

3.3    *Special Provision Governing Unimpaired Claims*.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or TH Holdco in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

US_Active\121166379\V-12

3.4    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

3.5    *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, TH Holdco shall request the Bankruptcy Court at the Confirmation Hearing to deem the Plan accepted by the holders of such Claims or Interests in such Class.

3.6    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

TH Holdco shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  TH Holdco reserves the right to modify the Plan, in accordance with Article 13 hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.  The Plan constitutes a separate Chapter 11 plan for each Debtor.

The classifications set forth in Classes shall be deemed to apply to each Debtor identified, except that Class 3 shall apply to each of the Debtors.  TH Holdco reserves the right to proceed to seek confirmation with respect to the Plan as to each Debtor separately and to proceed to confirm the Plan with respect to some but not all of the Debtors.

# SECTION 4.  TREATMENT OF CLAIMS AND INTERESTS.

4.1    *85 Flatbush RHO Hotel Other Priority Claims (Class 1).*

(a)    *Classification:*  Class 1 consists of Allowed Other Priority Claims against 85 Flatbush RHO Hotel.

(b)    *Treatment:*  Except to the extent that a holder of an Allowed Other Priority Claim against 85 Flatbush RHO Hotel that has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash from the Plan Fund allocable to the Hotel Property, in an amount equal to such Claim, payable on the later of the Closing Date, the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or when such claim becomes payable in the ordinary course or as soon as reasonably practical thereafter.

(c)    *Voting:*  Class 1 is Unimpaired, and the holders of 85 Flatbush RHO Hotel Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section

16

1126 of the Bankruptcy Code.  Therefore, holders of 85 Flatbush RHO Hotel Other Priority Claims are not entitled to vote to accept or reject the Plan.

4.2   *85 Flatbush RHO Residential Other Priority Claims (Class 2)*.

(a)   *Classification:* Class 2 consists of Allowed Other Priority Claims against 85 Flatbush RHO Residential.

(b)   *Treatment:*  Except to the extent that a holder of an Allowed Other Priority Claim against 85 Flatbush RHO Residential that has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash from the Plan Fund allocable to the Residential Property, in an amount equal to such Claim, payable on the later of the Closing Date, the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or when such claim becomes payable in the ordinary course or as soon as reasonably practical thereafter.

(c)   *Voting:*  Class 2 is Unimpaired, and the holders of 85 Flatbush RHO Residential Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.  Therefore, holders of 85 Flatbush RHO Residential Other Priority Claims are not entitled to vote to accept or reject the Plan.

4.3   *TH Holdco Secured Claim (Class 3)*.

(a)   *Classification:*  Class 3 consists of the TH Holdco Secured Claim.  The TH Holdco Secured Claim is a Claim pursuant to the TH Holdco Prepetition Loan Agreement, which is secured by the TH Holdco Mortgage and constitutes a first priority security interest on the Hotel Property and Residential Property.  Nothing herein shall prejudice TH Holdco's rights under the Intercreditor Agreement and under orders of this Bankruptcy Court.  TH Holdco is a creditor of 85 Flatbush RHO Hotel and 85 Flatbush RHO Residential and reserves all rights under the Intercreditor Agreement with respect to the ability to vote or direct the Mezz Lender's claim in the 85 Flatbush RHO Mezz case.

(b)   *Treatment:*  The holder of the TH Holdco Secured Claim shall receive:

(i)   if the Hotel Property and/or Residential Property is sold to a party other than TH Holdco, Cash in an amount sufficient to satisfy the sum of the Allowed Class 3 Claim, together with all applicable pre-petition and post-petition interest, costs and fees.  Pending the Closing of the Sale Transaction, the holder of the Class 3 Claims shall retain its Lien on the Hotel and Residential Property.

(ii)   If the Hotel and/or Residential Property is sold to TH Holdco pursuant to a TH Holdco Credit Bid, then TH Holdco shall receive the Hotel and/or Residential Property.  In any event, TH Holdco preserves all of its rights and claims against all guarantors and non-Debtor parties.

As part of the TH Holdco Credit Bid, TH Holdco its nominee or designee, may elect to take title to any of the Properties subject to the existing TH

17

Holdco Mortgage (as reduced by the value of the TH Holdco Credit Bid), which TH Holdco Mortgage may be assigned to any such nominee's or designee's lender.  In the event TH Holdco or its nominee or designee elects to take title to any of the Properties subject to the existing TH Holdco Mortgage, Debtors shall have no further financial obligation to TH Holdco or any assignee of the TH Holdco Mortgage and shall be released from any and all liability to TH Holdco or any assignee with respect to such TH Holdco Mortgage upon the Closing.  Nothing herein shall impact TH Holdco's rights as to any remaining claims against any guarantors or other non-Debtor parties.

Pursuant to Section 1146(a) of the Bankruptcy Code, the deeds conveying any of the Properties to TH Holdco or its nominee or designee upon the Effective Date of this Plan shall be an instrument of transfer in connection with or in furtherance of the Plan and shall not be subject to tax under any law imposing a Transfer Tax.

(c)    *Voting.*  Class 3 is Impaired, and holder of the TH Holdco Secured Claim in Class 3 is entitled to vote to accept or reject the Plan.

4.4    ***Flatbush RHO Hotel Other Secured Claims (Class 4).***

(a)    *Classification:*  Class 4 consists of the 85 Flatbush RHO Hotel Other Secured Claims.  To the extent that 85 Flatbush RHO Hotel Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 4.

(b)    *Treatment:*  Except to the extent that a holder of an Allowed 85 Flatbush RHO Hotel Other Secured Claim has agreed to less favorable treatment of such Claim each such holder shall receive Cash from the Plan Fund allocable to the Hotel Property, in an amount equal to such Allowed Claim, payable on the later of the Effective Date and the date on which such 85 Flatbush RHO Hotel Other Secured Claim becomes an Allowed 85 Flatbush RHO Hotel Other Secured Claim.

(c)    *Voting:*  Class 4 is Unimpaired, and the holders of 85 Flatbush RHO Hotel Other Secured Claims are not entitled to vote to accept or reject the Plan.

4.5    ***85 Flatbush RHO Residential Other Secured Claims (Class 5)***.

(a)    *Classification:* Class 5 consists of the 85 Flatbush RHO Residential Other Secured Claims.  To the extent that 85 Flatbush RHO Residential Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 5.

(b)    *Treatment:*  Except to the extent that a holder of an Allowed 85 Flatbush RHO Residential Other Secured Claim has agreed to less favorable treatment of such Claim each such holder shall receive Cash from the Plan Fund allocable to the Residential Property, in an amount equal to such Allowed Claim, payable on the later of the Effective Date and the date on

18

which such 85 Flatbush RHO Residential Other Secured Claim becomes an Allowed 85 Flatbush RHO Residential Other Secured Claim.

(c)    *Voting:*  Class 5 is Unimpaired, and the holders of 85 Flatbush RHO Residential Other Secured Claims are not entitled to vote to accept or reject the Plan.

4.6    ***85 Flatbush RHO Hotel General Unsecured Claims (Class 6)***.

(a)    *Classification:* Class 6 consists of General Unsecured Claims against 85 Flatbush RHO Hotel.

(b)    *Treatment:*  Except to the extent that a holder of an Allowed 85 Flatbush RHO Hotel General Unsecured Claim (Class 6) has agreed to less favorable treatment of such Claim, if TH Holdco is the Purchaser, each such holder shall receive Cash in an amount equal to the amount of the Allowed Claim, together with interest at the federal judgment rate (which interest shall begin accruing on the Effective Date and shall stop accruing at the time of payment in full), as follows: (i) an initial Cash distribution on or about the Effective Date of such Claim's Pro Rata share of the $1.25 million TH Holdco Unsecured Claim Dedicated Fund, (ii) quarterly distributions thereafter of such Claim's Pro Rata share of 50% of the excess cash flow from operations of the Hotel Property and the Residential Property until such Claim is paid in full in Cash together with interest at the federal judgment rate on such Claim (which interest shall begin accruing on the Effective Date and shall stop accruing at the time of payment in full), and (iii) if any amounts remain unpaid on such Claim as of the 12-month anniversary of the Effective Date, a final Cash payment in an amount sufficient to pay the remaining unpaid amount of such Claim in full in Cash together with interest at the federal judgment rate on such Claim (which interest shall begin accruing on the Effective Date and shall stop accruing at the time of payment in full) from the TH Holdco Unsecured Claim Additional Funding.

TH Holdco reserves its rights on its remaining claim as to all guarantors and all non-Debtor parties.

In the event that a Purchaser other than TH Holdco closes the Sale Transaction, payments to creditors shall be made in accordance with Bankruptcy Code priorities.  Class 6 General Unsecured Claims shall be paid their pro rata share of the remaining Sale Proceeds, in accordance with their statutory priority, by such Purchaser from the cash proceeds of such Sale Transaction.

*Voting:*  Class 6 is impaired and holders of General Unsecured Claims in Class 6 are entitled to vote to accept or reject the Plan.

4.7    ***85 Flatbush RHO Hotel Existing Equity Interests (Class 7)***.

(a)    *Classification:* Class 7 consists of Existing Equity Interests in 85 Flatbush RHO Hotel.

(b)    *Treatment:* On the Effective Date, or as soon thereafter as is reasonably practicable, Equity Interests in the Debtors will be cancelled and holders of Existing Equity Interests will not receive any recovery on account of their Equity Interests, provided however, that

19

after payment is made in full to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Fee Claims and Allowed Claims in Classes 1, 2, 3, 4, and 5, and to the extent there is any remaining Cash in the Plan Fund allocable to either the Hotel Property or the Residential Property for distribution to Class 7 Existing Equity Interests in 85 Flatbush RHO Hotel and Class 9 Existing Equity Interests in 85 Flatbush RHO Residential, any such funds shall be distributed to the holders of the 85 Flatbush Mezz Claim, subject to such holders' lien on the 85 Flatbush RHO Hotel Existing Equity Interests.

(c)     *Voting:* Class 7 is impaired by the Plan and the holders of Allowed Existing Equity Interests in 85 Flatbush RHO Hotel are entitled to vote to accept or reject the Plan.

4.8    ***85 Flatbush RHO Residential General Unsecured Claims (Class 8)***.

(a)     *Classification:* Class 8 consists of General Unsecured Claims against 85 Flatbush RHO Residential.

(b)     *Treatment:* Except to the extent that a holder of an Allowed 85 Flatbush RHO Residential General Unsecured Claim (Class 8) has agreed to less favorable treatment of such Claim, if TH Holdco is the Purchaser, each such holder shall receive Cash in an amount equal to the amount of the Allowed Claim, together with interest at the federal judgment rate (which interest shall begin accruing on the Effective Date and shall stop accruing at the time of payment in full), as follows: (i) an initial Cash distribution on or about the Effective Date of such Claim's Pro Rata share of the $1.25 million TH Holdco Unsecured Claim Dedicated Fund, (ii) quarterly distributions thereafter of such Claim's Pro Rata share of 50% of the excess cash flow from operations of the Hotel Property and the Residential Property until such Claim is paid in full in Cash together with interest at the federal judgment rate on such Claim (which interest shall begin accruing on the Effective Date and shall stop accruing at the time of payment in full), and (iii) if any amounts remain unpaid on such Claim as of the 12-month anniversary of the Effective Date, a final Cash payment in an amount sufficient to pay the remaining unpaid amount of such Claim in full in Cash together with interest at the federal judgment rate on such Claim (which interest shall begin accruing on the Effective Date and shall stop accruing at the time of payment in full) from the TH Holdco Unsecured Claim Additional Funding.

TH Holdco reserves its rights on its remaining claim as to all guarantors and all non-Debtor parties.

In the event that a Purchaser other than TH Holdco closes the Sale Transaction, payments to creditors shall be made in accordance with Bankruptcy Code priorities. Class 8 General Unsecured Claims shall be paid their pro rata share of the remaining Sale Proceeds, in accordance with their statutory priority, by such Purchaser from the cash proceeds of such Sale Transaction.

(c)     *Voting:* Class 8 is impaired and holders of General Unsecured Claims in Class 8 are entitled to vote to accept or reject the Plan.

4.9    ***85 Flatbush RHO Residential Existing Equity Interests (Class 9)***.

(a)     *Classification:* Class 9 consists of Existing Equity Interests in 85 Flatbush RHO Residential.

(b)      *Treatment:*  On the Effective Date, or as soon thereafter as is reasonably practicable, Equity Interests in the Debtors will be cancelled and holders of Existing Equity Interests will not receive any recovery on account of their Equity Interests, provided however, that after payment is made in full to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Fee Claims and Allowed Claims in Classes 1, 2, 3, 4, and 5, and to the extent there is any remaining Cash in the Plan Fund allocable to either the Hotel Property or the Residential Property for distribution to Class 7 Existing Equity Interests in 85 Flatbush RHO Hotel and Class 9 Existing Equity Interests in 85 Flatbush RHO Residential, any such funds shall be distributed to the holders of the 85 Flatbush Mezz Claim, subject to such holders' lien on the 85 Flatbush RHO Residential Existing Equity Interests.

(c)      *Voting:*  Class 9 is impaired by the Plan and the holders of Allowed Existing Equity Interests in 85 Flatbush RHO Residential are entitled to vote to accept or reject the Plan.

### 4.10    *85 Flatbush RHO Mezz Other Priority Claims (Class 10).*

(a)      *Classification:*  Class 10 consists of Allowed Other Priority Claims against 85 Flatbush RHO Mezz.  There may be not be any Claims in Class 10.

(b)      *Treatment:*  After payment is made in full to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Fee Claims and Allowed Claims in Classes 1, 2, 3, 4, and 5, and to the extent there is any remaining Cash in the Plan Fund, and except to the extent that a holder of an Allowed Other Priority Claim against 85 Flatbush RHO Mezz has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, their Pro Rata share of the remaining Cash from the Plan Fund, up to the full amount of their Allowed Claim, payable on the later of the Closing Date, the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or when such claim becomes payable in the ordinary course or as soon as reasonably practical thereafter.

(c)      *Voting:*  Class 10 is impaired, and the holders of Other Priority Claims against 85 Flatbush RHO Mezz are entitled to vote to accept or reject the Plan.

### 4.11    *85 Flatbush Mezz Claim (Class 11).*

(a)      *Classification:*  Class 11 consists of the 85 Flatbush Mezz Claim.  The 85 Flatbush Mezz Claim is a Secured Claim pursuant to the 85 Flatbush Mezz Loan Agreement, which is secured by the 85 Flatbush Hotel Pledge Agreement and 85 Flatbush Residential Pledge Agreement.

(b)      *Treatment:*  After payment is made in full to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Fee Claims and Allowed Claims in Classes 1, 2, 3, 4, 5, and 10, and to the extent there is any remaining Cash in the Plan Fund, the holder of the 85 Flatbush Mezz Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the remaining Cash from the Plan Fund up to the full amount of its Allowed Claim.  The 85 Flatbush Mezz Claim shall be subject in all respects to the Intercreditor Agreement, and TH Holdco reserves all rights and remedies under the Intercreditor Agreement, including but not limited to the right to vote the Mezz Lender's 85 Flatbush Mezz Claim (Class 11) in favor of the Plan pursuant to the power of attorney and Section 9 of the Intercreditor Agreement.

21

(c)     *Voting:*  Class 11 is impaired, and holder of the 85 Flatbush Mezz Secured Claim is entitled to vote to accept or reject the Plan.

4.12    ***85 Flatbush RHO Mezz Other Secured Claims (Class 12).***

(a)     *Classification:* Class 12 consists of the 85 Flatbush RHO Mezz Other Secured Claims.  To the extent that 85 Flatbush RHO Mezz Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 12.  There may not be any Claims in Class 12.

(b)     *Treatment:*     After payment is made in full to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Fee Claims, and Allowed Claims in Classes 1, 2, 3, 4, 5, 10, and 11, and to the extent there is any remaining Cash in the Plan Fund, such surplus shall be paid to Allowed Class 12 Other Secured Creditors, in accordance with their statutory priority as follows:  except to the extent that a holder of an Allowed 85 Flatbush RHO Mezz Other Secured Claim against 85 Flatbush RHO Mezz has agreed to less favorable treatment of such Claim, each holder of an Allowed 85 Flatbush RHO Mezz Other Secured Claim shall receive, at the option of 85 Flatbush RHO Mezz, (i) payment in full and final satisfaction of such Allowed Class 12 Claim, their Pro Rata share of the remaining Cash from the Plan Fund up to the amount of such Allowed Claim payable on the later of the Closing Date and the date on which such 85 Flatbush RHO Mezz Other Secured Claim becomes an Allowed Claim, or as soon as reasonably practical thereafter, (ii) delivery of the collateral securing such Allowed 85 Flatbush RHO Mezz Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code.

(c)     *Voting:*  Class 12 is impaired, and the holders of Other Secured Claims against 85 Flatbush RHO Mezz are entitled to vote to accept or reject the Plan.

4.13    ***85 Flatbush RHO Mezz General Unsecured Claims (Class 13)***

(a)     *Classification:*  Class 13 consists of General Unsecured Claims against 85 Flatbush RHO Mezz.

(b)     *Treatment:*     After payment is made in full to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Fee Claims, and Allowed Claims in Classes 1, 2, 3, 4, 5, 10, 11, and 12, in to the extent there is any remaining Cash in the Plan Fund, on the Closing Date and except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim or has been paid before the Effective Date, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the remaining Cash from the Plan Fund up to the full amount of their Allowed Claim.  If Class 13 Allowed Claims are *de minimis*, TH Holdco with additional funding from its direct or indirect owners may elect to pay such Claims in full on or about the Effective Date.

(c)     *Voting:*  Class 13 is impaired and holders of General Unsecured Claims in Class 13 are entitled to vote to accept or reject the Plan.

22

4.14    *Insider General Unsecured Claims (Class 14)*

(a)    *Classification:*  Class 14 consists of Insider General Unsecured Claims.  To the extent the holder of any General Unsecured Claim is determined by the Bankruptcy Court to be in fact a Class 6, Class 8 or Class 13 General Unsecured Claim or Class 15 Interest rather than a Class 14 General Unsecured Claim, such Claim shall instead be treated in accordance with the treatment of such Class.

(b)    *Treatment:*    After payment is made in full to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Fee Claims, and Allowed Claims in Classes 1, 2, 3, 4, 5, 10, 11, 12, and 13, in to the extent there is any remaining Cash in the Plan Fund, on the Closing Date and except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim or has been paid before the Effective Date, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the remaining Cash from the Plan Fund up to the full amount of their Allowed Claim.

(c)    *Voting:*  Class 14 is impaired and holders of Insider General Unsecured Claims in Class 14 are entitled to vote to accept or reject the Plan.

4.15    *85 Flatbush RHO Mezz Existing Equity Interests (Class 15*)

(a)    *Classification:*  Class 15 consists of Existing Equity Interests in 85 Flatbush RHO Mezz.

(b)    *Treatment:*  On the Effective Date, or as soon thereafter as is reasonably practicable, Equity Interests in the Debtors will be cancelled and holders of Existing Equity Interests will not receive any recovery on account of their Equity Interests other than any remaining proceeds in the Plan Fund from an overbid from a Purchaser other than TH Holdco.

(c)    *Voting*:  Class 15 is impaired by the Plan, and the holders of the Allowed Existing Equity Interests in 85 Flatbush RHO Mezz are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

## SECTION 5.  MEANS FOR IMPLEMENTATION.

5.1    *The Plan Fund*.

The Plan Fund shall be funded by (i) the TH Holdco Additional Consideration, (ii) the Sale Proceeds (if any), which shall be allocable to the Hotel Property and the Residential Property as set forth in the Purchase Agreement, and (iii) the Debtors' Available Cash, and shall be established upon the Closing Date.  Creditor distributions to be made separate from or later than the Closing Date shall be made by the Disbursing Agent under the Plan.

Any remaining retainers held by any of the Debtors' professionals shall be applied to the fees of such professional as provided in an order of the Bankruptcy Court allowing the fees of such professional.

23

In addition, if TH Holdco acquires the Hotel Property and/or the Residential Property pursuant to the TH Holdco Credit Bid, TH Holdco shall fund the TH Holdco Unsecured Claim Dedicated Fund for the sole Pro Rata benefit of holders of Allowed General Unsecured Claims in Classes 6 and 8 and the TH Holdco Unsecured Claim Additional Funding for the sole Pro Rata benefit of holders of Allowed General Unsecured Claims in Classes 6 and 8.

5.2    *The Sale*

The Confirmation Order shall authorize and approve the Sale Transaction to the Purchaser under sections 365, 1123(b)(4), 1129(b)(2)(A)(iii) and 1146(a) of the Bankruptcy Code. The Auction shall be held promptly after the Confirmation Hearing pursuant to the Sale and Bid Procedures approved by the Bankruptcy Court. A proposed form of the Sale and Bid Procedures is attached as Exhibit E to the Disclosure Statement. A proposed form of Purchase Agreement based on a purchase agreement approved in another real estate case before this Bankruptcy Court is attached as Exhibit F to the Disclosure Statement. The proposed form of the Sale and Bid Procedures and Purchase Agreement are subject to approval of the Bankruptcy Court. Those procedures may be provided by the Debtors or JLL to any interested parties or bidders identified during the Debtors' marketing process. Further, TH Holdco will advertise the opportunity to bid in the Wall Street Journal, National Edition, in a form of ad approved by the Bankruptcy Court in the Confirmation Order. If there is no Auction pursuant to the Sale and Bid Procedures, TH Holdco is requiring that the Confirmation Order provide that the TH Holdco Credit Bid and other consideration pursuant to this Plan is deemed approved and accepted and can immediately close without further order of this Bankruptcy Court.

The Sale and Bid Procedures will provide for sufficient incremental bidding so that holders of Allowed General Unsecured Claims in Classes 6 and 8 will receive the same or greater treatment on account of their Allowed Claim, if a successful bidder other than TH Holdco acquires the Hotel Property and/or the Residential Property.

5.3    **Intentionally Omitted**.

5.4    **Withholding and Reporting Requirements**.

(a)    *Withholding Rights:*    In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    *Forms:*    Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other

24

Person designated in the Confirmation Order (which entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the tax Code and so notifies the Disbursing Agent.  If such request is made by TH Holdco or such other Person designated by TH Holdco and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to TH Holdco and any Claim in respect of such distribution shall be discharged and forever barred from assertion against any Debtor, TH Holdco and its respective property.

5.5    *Exemption From Certain Transfer Taxes*.

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer under this Plan as confirmed by the Court, including an instrument of transfer executed in furtherance of the Sale Transaction contemplated by the Plan, shall not be subject to tax under any law imposing a Transfer Tax due on the sale of the Hotel Property and/or Residential Property in connection with or in furtherance of the Plan as confirmed by the Bankruptcy Court and the funding requirements contained herein and shall not be subject to any state, local or federal law imposing such tax and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

Pursuant to Section 1146(a) of the Bankruptcy Code, the deeds conveying any of the Properties to TH Holdco or its nominee or designee upon the Effective Date of this Plan shall be an instrument of transfer in connection with or in furtherance of the Plan and shall not be subject to tax under any law imposing a Transfer Tax.

5.6    *Effectuating Documents; Further Transactions*.

On and after the Effective Date, TH Holdco on behalf of the Debtors and the Estates is authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors and the Estates, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

5.7    *Avoidance Actions and Other Causes of Action.*

All Avoidance Actions and other Causes of Action against an Entity that shall be waived, relinquished, exculpated, released, compromised, or settled under the Plan or by a Bankruptcy Court order, unless otherwise expressly preserved in the Confirmation Order.

5.8    *Closing of the Chapter 11 Cases*.

After any of the Chapter 11 Cases of the Debtors have been fully administered, the Debtors or TH Holdco shall promptly seek authority from the Bankruptcy Court to close such applicable Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

25

## SECTION 6.  GOVERNANCE.

6.1    *Wind Down.*

The Debtors shall be dissolved promptly after the Effective Date.  The Disbursing Agent shall hold any funds for any Disputed Claims or other winddown expenses not yet paid or pre-paid until Disputed Claims are adjudicated in a Final Order or such other winddown expenses are paid in Cash.

6.2    *Intentionally Omitted.*

6.3    *Intentionally Omitted.*

6.4    *Intentionally Omitted*.

## SECTION 7.  DISTRIBUTIONS.

7.1    *Distribution Record Date*.

As of the close of business on the Distribution Record Date, the transfer register for each of the Classes of Claims or Interests as maintained by the Bankruptcy Court shall be deemed closed, and there shall be no further changes in the record of holders of any of the Claims or Interests.  The Disbursing Agent shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

7.2    *Date of Distributions*

Except as otherwise provided herein, and other than the distributions to be made at the Closing of the Sale Transaction, the Disbursing Agent shall make all distributions to Holders of Allowed Claims as set forth in the Plan.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

The Disbursing Agent shall reserve an amount sufficient to pay holders of Disputed Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims, unless otherwise ordered by the Bankruptcy Court.  In the event the holders of Allowed Claims have not received payment in full on account of their Claims after the resolution of all Disputed Claims, then the Disbursing Agent shall make a final Pro Rata distribution to all holders of Allowed Claims.

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

26

7.3     *Delivery of Distributions*.

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made to such holder without Interest; provided, however, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date the distribution is made. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to TH Holdco automatically and without need for a further order by the Bankruptcy Court for distribution in accordance with the Plan and the Claim of any such holder to such property or interest in property shall be released, settled, compromised, and forever barred. Neither the Debtors, TH Holdco nor the Disbursing Agent shall have any obligation to locate the current address for a returned distribution.

7.4     *Manner of Payment Under Plan*.

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer.

7.5     *Minimum Cash Distributions*.

The Disbursing Agent shall not be required to make any payment to any holder of an Allowed Claim on any Distribution Date of Cash less than $10; provided, however, that if any distribution is not made pursuant to this Section 7.5, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim. The Disbursing Agent shall not be required to make any final distributions of Cash less than $10 to any holder of an Allowed Claim. If either (a) all Allowed Claims (other than those whose distributions are deemed undeliverable hereunder) have been paid in full or (b) the amount of any final distributions to holders of Allowed Claims would be $10 or less and the aggregate amount of Cash available for distributions to holders of Allowed General Unsecured Claims is less than $2,500, then no further distribution shall be made by the Disbursing Agent and any surplus Cash shall be utilized to pay down any unpaid legal fees incurred by counsel to the Disbursing Agent post-confirmation.

7.6     *Setoffs*.

The Estates through the Disbursing Agent may, but shall not be required to, set off against any Claim, any claims of any nature whatsoever that the Estates may have against the holder of such Claim; provided that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such Claim the Debtors may have against the holder of such Claim. Nothing herein shall impact the TH Holdco Credit Bid.

7.7     *Distributions After Effective Date*.

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

27

7.8    *Allocation of Distributions Between Principal and Interest*.

Except as otherwise provided in this Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the accrued but unpaid interest first and then to principal (each as determined for U.S. federal income tax purposes).

7.9    *Payment of Disputed Claims.*

As Disputed Claims are resolved pursuant to Section 8 hereof, the Disbursing Agent shall make distributions on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date.  Such distributions shall be made on the first Distribution Date that is at least forty-five (45) days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the Disbursing Agent in its sole discretion.

## SECTION 8.  PROCEDURES FOR DISPUTED CLAIMS.

8.1    *Allowance of Claims*.

After the Effective Date, the Debtors and TH Holdco shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Disputed Claim, except with respect to any Claim deemed Allowed under this Plan.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.  Nothing herein shall impact the TH Holdco Credit Bid and TH Holdco's rights under orders of this Bankruptcy Court or the Intercreditor Agreement.

8.2    *Objections to Claims*.

As of the Effective Date, objections to and requests for estimation of, Claims against the Debtors may be interposed and prosecuted only by the Debtors or TH Holdco.  Such objections and requests for estimation shall be served and filed (a) on or before the 60th day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Debtors or TH Holdco. Once the TH Holdco Credit Bid is made and approved by the Court, nothing herein shall impact the TH Holdco Credit Bid and TH Holdco's rights under orders of this Bankruptcy Court or the Intercreditor Agreement.

8.3    *Estimation of Claims*.

The Debtors or TH Holdco may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor or TH Holdco previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any

28

Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor or TH Holdco, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court. Nothing herein shall impact the TH Holdco Credit Bid and TH Holdco's rights under orders of this Bankruptcy Court or the Intercreditor Agreement.

8.4 *No Distributions Pending Allowance*.

If an objection to a Claim is filed as set forth in Section 8, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim. Nothing herein shall impact the TH Holdco Credit Bid and TH Holdco's rights under orders of this Bankruptcy Court or the Intercreditor Agreement.

8.5 *Resolution of Claims*.

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors or TH Holdco shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action (to the extent preserved under the Confirmation Order and this Plan), suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or their estates may hold against any Person, without the approval of the Bankruptcy Court, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith. The Debtors, TH Holdco or their successor may pursue such retained Claims, rights, Causes of Action (to the extent preserved in the Confirmation Order), suits or proceedings, as appropriate, in accordance with the best interests of the Estates.

8.6 *Intentionally Omitted*

## SECTION 9. EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

9.1 *Assumption and Assignment of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Purchase Agreement as being assumed or assumed and assigned to Purchaser in connection with Confirmation of the Plan or under the Purchase Agreement; (2) as of the Effective Date is subject to a pending motion to assume such Unexpired Lease or Executory Contract; (3) was previously assumed or assumed and assigned to a third party during the pendency of the Chapter 11 Cases; or (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the

29

Plan. Notice of any Executory Contract or Unexpired Lease being assumed, assumed and assigned or rejected pursuant to the Plan shall be provided to the applicable contract counter party or lessor pursuant to the provisions in the Confirmation Order.

### 9.2    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Cure Obligation due under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in Cash on the Closing Date, subject to the limitation described below, by the Debtor as an Administrative Claim or by the Purchaser, as applicable, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

In the event of a dispute regarding (1) the amount of the Cure Obligation, (2) the ability of the Debtors' Estates or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Obligations required by section 365(b)(1) of the Bankruptcy Code shall be satisfied following the entry of a Final Order or orders resolving the dispute and approving the assumption; provided that, depending on whether the Disbursing Agent or the Purchaser has the obligation to pay the Cure Obligation, such party may settle any dispute regarding the amount of any Cure Obligation without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

At least fourteen (14) days before the Confirmation Hearing, the Debtors or TH Holdco shall cause notice of proposed Cure Obligations to be sent to applicable counterparties to the Executory Contracts and Unexpired Leases.  Any objection by such counterparty must be filed, served, and actually received by the Debtors and TH Holdco not later than ten (10) days after service of notice of the proposed assumption and associated Cure Obligation.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed cure amount will be deemed to have assented to such Cure Obligation and waived any objections to such assumption and assignment.

The Estates shall cause notice of proposed Cure Obligations to be sent to applicable counterparties to all the Executory Contracts and Unexpired Leases not later than ten (10) days after the Confirmation Order is entered, unless such notice was previously sent out pursuant to the paragraph immediately preceding this one.  Any objection by such counterparty must be filed, served, and actually received by the Debtors and TH Holdco not later than ten (10) days after service of notice of the proposed assumption and associated Cure Obligation.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed cure amount will be deemed to have assented to such Cure Obligation and waived any objections to such assumption and assignment.  Separate notice to the contract and lease counterparties shall be provided as to any other prevailing bidder or Back-Up Bidder at the Auction as set forth in the Sale and Bid Procedures immediately following the Auction.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-

related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the Effective Date of assumption and/or assignment. Any prepetition default amount set forth in the Schedules and/or any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

9.3    ***Claims Based on Rejection of Executory Contracts and Unexpired Leases***

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be filed with Bankruptcy Court and served on the Debtors and TH Holdco no later than fourteen (14) days after the earlier of the Effective Date or the effective date of rejection of such Executory Contract or Unexpired Lease. In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be filed with the Bankruptcy Court and served on the Debtors, no later than fourteen (14) days after service of the proposed rejection of such Executory Contract or Unexpired Lease.

**Any holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely filed as set forth in the paragraph above shall not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estate, TH Holdco, the Purchaser or the Hotel Property or Residential Property for any of the foregoing without the need for any objection by the Debtors or TH Holdco further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary**. All Allowed Claims arising from the rejection of the Debtors' prepetition Executory Contracts or prepetition Unexpired Leases shall be classified as General Unsecured Claims, except as otherwise provided by order of the Bankruptcy Court.

9.4    ***Purchase Agreement***

The assumption or rejection of any Executory Contract or Unexpired Lease pursuant to the Plan shall be subject in all respects to Purchaser's rights and obligations, including any Cure Obligations assumed by it in accordance with the Purchase Agreement, with respect to any such Executory Contracts or Unexpired Leases assigned Purchaser pursuant to the terms of the Purchase Agreement.

9.5    ***Modifications, Amendments, Supplements, Restatements, or Other Agreements***

Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all

31

Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

9.6    *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors or TH Holdco that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors' Estates have any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or TH Holdco, shall have 60 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

## SECTION 10.    CONDITIONS PRECEDENT TO THE CONFIRMATION HEARING AND THE EFFECTIVE DATE.

10.1    *Condition to the Confirmation Hearing*

The occurrence of the Confirmation Hearing is subject to the following condition precedent:

(a)    The form of Confirmation Order shall be acceptable to TH Holdco in its reasonable discretion.

10.2    *Conditions Precedent to the Effective Date*.

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a)    the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred and the Confirmation Order shall not be subject to any stay;

(b)    Debtors or TH Holdco shall have transferred to the Disbursing Agent within three (3) days from the entry of the Confirmation Order, the operating funds necessary to fund the Plan Fund pursuant to the terms of this Plan;

(c)    all actions, documents and agreements necessary to implement and consummate the Plan, including, without limitation, entry into the documents contained in the Plan Supplement required to be executed prior to the Confirmation Date, each in form and substance reasonably satisfactory to the Debtor and Purchaser, and the transactions and other matters contemplated thereby, shall have been effected or executed;

(d)    all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan, if any, shall be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

(e)    the Sale Transaction shall have closed as to both the Hotel Property and the Residential Property;

(f)    with respect to the TH Holdco Credit Bid, no long-term lease or other material arrangement impacting the Property and its uses that is not acceptable to TH Holdco in its sole and absolute discretion shall be in place; and

(g)    all documents and agreements necessary to implement the Plan shall have (i) been tendered for delivery and (ii) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

### 10.3    *Waiver of Conditions Precedent*.

Each of the conditions precedent to the Effective Date in Section 10.2 other than the condition set forth in section 10.2(a) may be waived in writing by TH Holdco.

### 10.4    *Effect of Failure of Conditions to Effective Date*.

If the Confirmation Order is vacated due to a failure of a condition to the Effective Date to occur, (i) no distributions under the Plan shall be made; (ii) the Debtor and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date ever occurred; and (iii) all monies contributed to the Plan Fund by Debtors shall be returned to TH Holdco within three (3) business days of the Confirmation Order being vacated.

## SECTION 11.    EFFECT OF CONFIRMATION.

### 11.1    *Vesting of Assets*.

On the Closing Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, and as set forth in the Purchase Agreement, all property of the Debtors' Estates shall vest in the Purchaser free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided pursuant to this Plan and the Confirmation Order.

### 11.2    *Release of Liens*.

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Closing Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the

US_Active\121166379\V-12

Estates shall pass to TH Holdco or any other Purchaser pursuant to the Sale Transaction on a free and clear basis, provided however, that the Lien securing the TH Holdco Secured Class 3 Claim shall not be deemed released until the TH Holdco Secured Class 3 Claim has been paid in full, from the proceeds of the Sale Transaction (or the TH Holdco Credit Bid) in accordance with the terms of this Plan.

As part of its credit bid, TH Holdco its nominee or designee, may elect to take title of any of the Properties subject to the existing TH Holdco Mortgage, which TH Holdco Mortgage may be assigned to any such nominee's or designee's lender. In the event TH Holdco or its nominee or designee elects to take title to any of the Properties subject to the existing TH Holdco Mortgage, Debtors shall have no further financial obligation to TH Holdco or any assignee of the TH Holdco Mortgage and shall be released from any and all liability to TH Holdco or any assignee with respect to such TH Holdco Mortgage upon the Closing. Nothing herein shall impact TH Holdco's rights as to any remaining claims against any guarantors or other non-Debtor parties.

11.3    ***Subordinated Claims***.

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right for TH Holdco to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

11.4    ***Binding Effect***.

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtor, and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

11.5    ***Intentionally Omitted***.

11.6    ***Term of Injunctions or Stays***.

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

11.7    ***Plan Injunction***.

Except (i) as otherwise provided under Final Order entered by the Bankruptcy Court or (ii) with respect to the obligations under the Plan, the entry of the Confirmation Order shall forever stay, restrain and permanently enjoin with respect to any Claim held against the Debtors as of the

34

date of entry of the Confirmation Order (i) the commencement or continuation of any action, the employment of process, or any act to collect, enforce, attach, recover or offset from the Debtors, from the Hotel Property or Residential Property, or from property of the Estates that has been or is to be distributed under the Plan, and (ii) the creation, perfection or enforcement of any lien or encumbrance against the Hotel Property or Residential Property and any property of the Estates that has been or is to be, distributed under the Plan.  Except as otherwise provided in the Confirmation Order, the entry of the Confirmation Order shall constitute an injunction against the commencement or continuation of any action, the employment of process, or any act to collect, recover or offset from the Debtors, from the Hotel Property or Residential Property, or from property of the Estates, any claim, any obligation or debt that was held against the Debtors by any person or entity as of the Confirmation Date except pursuant to the terms of this Plan.  The entry of the Confirmation Order shall permanently enjoin all Creditors, their successors and assigns, from enforcing or seeking to enforce any such Claims.  Nothing herein shall impact TH Holdco's right to pursue claims against guarantors or other non-Debtor parties.

11.8    *Limitation of Liability*

To the extent permitted under Section 1125(e) of the Bankruptcy Code, neither the Exculpated Parties nor any of their respective officers, directors, or employees (acting in such capacity) nor any professional person employed by any of them, shall have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, Confirmation or consummation of the Plan, the Disclosure Statement, the Plan Supplement or the any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan, provided that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement, except in the case of fraud, gross negligence, willful misconduct, malpractice, breach of fiduciary duty, criminal conduct, unauthorized use of confidential information that causes damages, or ultra vires acts.  Nothing in this Section 11.8 shall limit the liability of the Debtors' professionals pursuant to Rule 1.8 (h)(1) of the New York State Rules of Professional Conduct.  Nothing in the Plan or the confirmation order shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including, without limitation, any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Debtors or any of its respective members, shareholders, officers, directors, employees, attorneys, advisors, agents, representatives and assigns, nor shall anything in the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Debtors or any of its respective members, officers, directors, employees, attorneys, advisors, agents, representatives and assigns for any liability whatever, including without limitation, any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority, nor shall anything in this Plan exculpate Debtors or any of its respective members, officers, directors, employees, attorneys, advisors, agents, representatives and assigns from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority.

US_Active\121166379\V-12

11.9    *Intentionally Omitted*

11.10    *Solicitation of the Plan*.

As of and subject to the occurrence of the Confirmation Date: (a) TH Holdco shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation.

11.11    *Plan Supplement*.

The Plan Supplement, if any, shall be filed with the Clerk of the Bankruptcy Court by no later than fifteen (15) days prior to the Confirmation Hearing and served upon all parties in interest. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

## SECTION 12.    RETENTION OF JURISDICTION.

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Case for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance, classification, priority, compromise, estimation or payment of Claims resulting there from;

(b)    to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date;

(c)    to insure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d)    to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim;

(e)    to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(f)    to adjudicate any dispute related to the Sale Transaction;

(g)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the Consummation, implementation or enforcement of the Plan, including the Confirmation Order, or any other order of the Bankruptcy Court;

(h)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any

36

inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)    to hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

(j)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Purchase Agreement, or the Confirmation Order or any agreement, instrument, or other document governing or relating to any of the foregoing;

(k)    to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following Consummation;

(l)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)    to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations of the Debtors' tax liability under section 505(b) of the Bankruptcy Code);

(n)    to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(o)    to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(p)    to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(q)    to enter a final decree closing any of the Chapter 11 Cases;

(r)    to enforce all orders previously entered by the Bankruptcy Court;

(s)    to recover all assets of the Debtors and property of the Debtors' Estates, wherever located; and

(t)    to hear and determine any rights, Claims or Causes of Action held by or accruing to the Debtor pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

37

# SECTION 13.         MISCELLANEOUS PROVISIONS.

### 13.1    *Payment of Statutory Fees.*

On the Effective Date and thereafter as may be required, the Disbursing Agent shall pay all fees incurred pursuant to section 1930 of title 28 of the United States Code, together with interest, if any, pursuant to section 3717 of title 31 of the United States Code for the Chapter 11 Cases; provided, however, that after the Effective Date such fees shall only be payable with respect to the applicable Chapter 11 Case until such time as a final decree is entered closing the applicable Chapter 11 Case, a Final Order converting such case to a case under chapter 7 of the Bankruptcy Code is entered or a Final Order dismissing the applicable Chapter 11 Case is entered.

### 13.2    *Substantial Consummation*.

On the Closing Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 13.3    *Amendments*.

(a)      *Plan Modifications.*  The Plan may be amended, modified or supplemented by TH Holdco in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, TH Holdco may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.  TH Holdco reserves the right to modify this Plan as to the treatment of any Class to provide more favorable treatment of such Class without resolicitation of votes on this Plan.

(b)      *Other Amendments.*  Before the Effective Date, TH Holdco may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

### 13.4    *Revocation or Withdrawal of the Plan*.

TH Holdco reserves the right to revoke or withdraw the Plan, prior to the Confirmation Date.  If TH Holdco revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors, the Debtors' Estates, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Debtors' Estates, TH Holdco or any other Entity.

US_Active\121166379\V-12

13.5    *Severability of Plan Provisions Upon Confirmation*.

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of TH Holdco, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of TH Holdco; and (3) nonseverable and mutually dependent.

13.6    *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

13.7    *Time*.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

13.8    *Additional Documents*

On or before the Effective Date, TH Holdco may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  TH Holdco, the Debtors and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

13.9    *Immediate Binding Effect*.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Purchaser, the holders of Claims and Interests, the Exculpated Parties, and each of their respective successors and assigns.

US_Active\121166379\V-12

13.10   *Successor and Assigns*.

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

13.11   *Entire Agreement*.

On the Effective Date, the Plan, the Plan Supplement, the Purchase Agreement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

13.12   *Notices*.

All notices, requests and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by e-mail, addressed as follows:

    (i)    IF TO THE DEBTORS:

        GC Realty Advisors, LLC
        3284 N 29th Court
        Hollywood, Florida 33020
        Attn: David Goldwasser
        dgoldwasser@fiacp.com

        - and -

        Leech Tishman Robinson Brog
        875 Third Avenue, 9th Floor
        New York, New York 10022
        Telephone: (212) 603-6300
        E-mail: fbr@leechtishman.com
        Attention: Fred B. Ringel, Esq.

    (ii)    IF TO TH HOLDCO:

        TH Holdco, LLC
        c/o Dentons US LLP
        1221 Avenue of the Americas
        New York, New York 10020
        Attn.:  Lauren Macksoud and Christopher Milenkevich
        E-Mail:  lauren.macksoud@dentons.com
                christopher.milenkevich@dentons.com

After the Effective Date, the Debtors or TH Holdco shall have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, that they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors or TH Holdco are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

*[signatures on following page]*

41

Dated:        May 26, 2022
              New York, New York

                          TH Holdco, LLC


                          By: /s/ Franco Famularo
                                  Authorized Signatory

# **Exhibit 2**

(The Purchase Agreement)

Model Form

---

**PURCHASE AND SALE AGREEMENT**

By and Between

[85 Flatbush RHO Mezz LLC,] 85 Flatbush RHO Hotel LLC and 85 Flatbush RHO Residential LLC

as Sellers

and

[_____]

Dated as of: June __, 2022

The Property:

(i) 85 Flatbush Extension, Brooklyn, New York (Block 120; Lots 1201, 1202), and (ii) 85 Flatbush Extension, Brooklyn, New York (Block 120; Lot 1203)

---

# TABLE OF CONTENTS

**PAGE**

ARTICLE 1 DEFINITIONS .................................................................................................................2

ARTICLE 2 GENERAL TERMS ........................................................................................................2

      SECTION 2.1.     The Sale Transaction ..................................................................2
      SECTION 2.2.     Purchase Price ...........................................................................2

ARTICLE 3 PERMITTED EXCEPTIONS; TITLE INSURANCE.......................................................2

      SECTION 3.1.     Sale Subject to...........................................................................2
      SECTION 3.2.     Title Report ................................................................................3
      SECTION 3.3.     Permitted Exceptions.................................................................4

ARTICLE 4 APPORTIONMENTS AND PAYMENTS........................................................................5

      SECTION 4.1.     Apportionments Relating to the Property ..................................5
      SECTION 4.2.     Taxes and Assessments ...........................................................6
      SECTION 4.3.     Transfer of Utilities ...................................................................6
      SECTION 4.4.     Rents Received After Closing....................................................7
      SECTION 4.5.     Collection of Rents.....................................................................7
      SECTION 4.6.     Transfer Tax ..............................................................................7
      SECTION 4.7.     Tax Returns ...............................................................................7
      SECTION 4.8.     Violations ...................................................................................7
      SECTION 4.9.     Title Charges .............................................................................8
      SECTION 4.10.    Transaction Expenses ...............................................................8
      SECTION 4.11.    Assignment of Existing Mortgages ...........................................8
      SECTION 4.12.    Survival .....................................................................................8

ARTICLE 5 COVENANTS REGARDING THE PROPERTY...............................................................8

      SECTION 5.1.     Maintenance and Operation of the Property .............................8
      SECTION 5.2.     Leasing of the Property ..............................................................8
      SECTION 5.3.     Insurance ...................................................................................8
      SECTION 5.4.     Additional Responsibilities.........................................................9

ARTICLE 6 REPRESENTATIONS AND WARRANTIES OF PURCHASER .............................9

      SECTION 6.1.     Generally ...................................................................................9
      SECTION 6.2.     Closing Conditions; Survival of Representations and Warranties................. 10

ARTICLE 7 REPRESENTATIONS AND WARRANTIES OF SELLER ....................................10

      SECTION 7.1.     Generally .................................................................................10
      SECTION 7.2.     Property Representations..........................................................11
      SECTION 7.3.     Closing Conditions; Survival of Representations and Warranties................. 12
      SECTION 7.4.     Knowledge of Seller .................................................................13

ARTICLE 8 CLOSING DATE ...........................................................................................................13

      SECTION 8.1.     Closing Date .............................................................................13

121009049\V-9

ARTICLE 9 CLOSING DOCUMENTS ......................................................................... 13

    SECTION 9.1.    Closing ................................................................. 13
    SECTION 9.2.    Further Assurances ............................................. 13

ARTICLE 10 NOTICES ............................................................................................... 13

    SECTION 10.1.    Notices .............................................................. 13

ARTICLE 11 BROKER ................................................................................................ 14

ARTICLE 12 DEFAULTS; REMEDIES ....................................................................... 15

    SECTION 12.1.    Purchaser's Default ........................................... 15
    SECTION 12.2.    Seller's Default .................................................. 15

ARTICLE 13 CASUALTY; CONDEMNATION ............................................................. 15

    SECTION 13.1.    Casualty ............................................................ 15
    SECTION 13.2.    Condemnation .................................................... 15

ARTICLE 14 AS-IS; WHERE-IS; DISCLAIMER; WAIVER OF CLAIMS...................... 16

    SECTION 14.1.    Disclaimers; As-Is, Where-Is Condition .............. 16
    SECTION 14.2.    Acceptance of Closing Documents; Waivers ............... 17
    SECTION 14.3.    Survival ............................................................. 17

ARTICLE 15 ASSUMED LEASES AND CONTRACTS .............................................. 18

    SECTION 15.1.    Assumption and Assignment of Leases and Security Deposits. ............... 18
    SECTION 15.2.    Assumption and Assignment of Contracts. ................... 18

ARTICLE 16 Intentionally Omitted ............................................................................. 18

ARTICLE 17 BANKRUPTCY PROVISIONS ................................................................ 18

    SECTION 17.1.    Competing Transaction ...................................... 18
    SECTION 17.2.    Intentionally Omitted .......................................... 18
    SECTION 17.3.    Bankruptcy Court Filings .................................... 18
    SECTION 17.4.    Intentionally Omitted .......................................... 19
    SECTION 17.5.    Closing In The Event Of The Filing Of The Notice Of Appeal From The Confirmation Order .......................................... 19

ARTICLE 18 Intentionally Omitted ............................................................................. 19

ARTICLE 19 MISCELLANEOUS ................................................................................ 19

    SECTION 19.1.    Entire Agreement................................................ 19
    SECTION 19.2.    Modification........................................................ 19
    SECTION 19.3.    Binding Agreement ............................................. 19
    SECTION 19.4.    Assignment ....................................................... 19
    SECTION 19.5.    Illegality ............................................................ 19
    SECTION 19.6.    Choice of Law .................................................... 19
    SECTION 19.7.    Construction ...................................................... 20
    SECTION 19.8.    Binding Effect; Assignment; Successors and Assigns ................... 20

SECTION 19.9.      Ambiguities ............................................................................................. 20
SECTION 19.10.     Expenses ................................................................................................ 20
SECTION 19.11.     Counterparts .......................................................................................... 20
SECTION 19.12.     Waiver of Trial by Jury .......................................................................... 20
SECTION 19.13.     Third Party Beneficiaries ...................................................................... 21
SECTION 19.14.     Jurisdiction ............................................................................................ 21
SECTION 19.15.     No Recording .......................................................................................... 21
SECTION 19.16.     Not an Offer ............................................................................................ 21
SECTION 19.17.     Intentionally Omitted .............................................................................. 21
SECTION 19.18.     No Waiver ............................................................................................... 21
SECTION 19.19.     Severability ............................................................................................ 22
SECTION 19.20.     No Survival ............................................................................................. 22
SECTION 19.21.     Tax-Free Exchange ............................................................................... 22

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the "**Agreement**") is entered into by and between [85 Flatbush RHO Mezz LLC], 85 Flatbush RHO Hotel LLC and 85 Flatbush RHO Residential LLC (referred to herein, individually and/or collectively as the context may require, as the "**Seller**" and collectively as "**Debtors**"), and [_____] ("**Purchaser**" or "[_____]") as of the [__] day of June, 2022 (the "**Effective Date**").

WHEREAS, on December 18, 2020 (the "**Petition Date**"), the Debtors commenced voluntary petitions (the "**Petitions**") for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") before the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") under Case Nos. 20-23280-rdd; 20-23281-rdd; and 20-23282-rdd (the "**Cases**"), all of which Cases were jointly administered by Order of the Bankruptcy Court on December 28, 2020 under lead case 20-23280;

WHEREAS, Flatbush Avenue 1 LLC ("**85 Flatbush Lender**"), was a secured creditor and mortgagee of the Debtors;

WHEREAS, on March 29, 2021, the Bankruptcy Court entered the Final Consent Order Authorizing (I) Use of Cash Collateral, (II) Granting Adequate Protection, and (III) Granting Related Relief [Docket No. 64] (the "**Consent Order**"), pursuant to which the Debtors and the 85 Flatbush Lender agreed that as of Petition Date, the principal amount of the 85 Flatbush Lender's claims against the estates of the Debtors is $85,158,815.99;

WHEREAS, 85 Flatbush Lender filed its proofs of claim in the Debtors' Cases, reflecting that as of the Petition Date, the total amount due and owing from the Debtors to 85 Flatbush Lender was a sum not less than $85,158,815.99 (the "**85 Flatbush Lender Claim**");

WHEREAS, on February 20, 2022, TH Holdco LLC ("**TH Holdco**") filed the *Chapter 11 Plan Filed by Creditor TH Holdco LLC Related to 85 Flatbush RHO Mezz, LLC, 85 Flatbush RHO Hotel LLC, and 85 Flatbush RHO Residential, LLC* [Docket No. 151] (the "**TH Holdco Plan**") and accompanying Disclosure Statement [Docket No. 152] (the "**TH Holdco Disclosure Statement**");

WHEREAS, on May [__], 2022, the Bankruptcy Court entered an Order approving the TH Holdco Disclosure Statement [Docket No. _____] and granting related relief;

WHEREAS, on June [__], 2022, the Bankruptcy Court entered an Order, among other things, confirming the TH Holdco Plan, approving the Sale Transaction (defined below) and granting related relief [Docket No. _____] (the "**Confirmation Order**");

WHEREAS, subject to the Bankruptcy Court's entry of the Confirmation Order [, and any other approval of the Bankruptcy Court], Seller is authorized to sell the Properties; and

WHEREAS, subject to the Bankruptcy Court's entry of the Confirmation Order[, and any other approval of the Bankruptcy Court], Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller pursuant to the Plan and Confirmation Order, all of Seller's respective right, title and interest (if any) in and to the Properties, as more specifically provided herein.

NOW, THEREFORE, subject to the terms and conditions of this Agreement, for and in consideration of the sum of [_____] Dollars ($[_____].00) and other good and valuable consideration, including the mutual covenants and agreements set forth herein, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

For purposes of this Agreement, all capitalized terms and certain other terms used herein shall have the respective meanings specified in Schedule I attached hereto and made a part hereof.

## ARTICLE 2
## GENERAL TERMS

**SECTION 2.1.    The Sale Transaction**.

2.1.1.    Subject to the terms and conditions of this Agreement and the entry of (i) the Confirmation Order in connection with the Cases, Seller agrees to sell, transfer, convey and assign to Purchaser (or its nominee or designee), and Purchaser agrees to purchase and accept from Seller on the Closing Date (as defined herein), free and clear of all Liens, claims and all Interests (as defined in the Plan), subject only to Section 4.12 herein and Permitted Exceptions (as hereinafter defined), and any other interest to the extent acceptable to Purchaser, all of Seller's respective right, title and interest (if any) in and to (i) that certain real property and improvements as more particularly described on Schedule II attached hereto and made a part hereof together with the buildings and improvements thereon located at and commonly known as (i) 85 Flatbush Extension, Brooklyn, New York (Block 120; Lots 1201, 1202) (the "**Hotel Property**") and (ii) 85 Flatbush Extension, Brooklyn, New York (Block 120; Lot 1203) (the "**Residential Property**", and together with the Hotel Property, the "**Real Estate**"), and (ii) the furniture, furnishings, fixtures, equipment and other items of personal property exclusively owned by Seller located in or upon, and used in connection with, the Real Estate (collectively, the "**Personalty**").  The Real Estate and the Personalty are to be conveyed together with (x) the Leases (as hereinafter defined), together with, all rents and other sums due thereunder, whether acquiring prior to, on or after the Closing (collectively, the "Rents") and any and all guaranties and security deposits relating to the Leases (collectively, the "**Security Deposits**"), (y) all easements, rights of way, air and development rights, reservations, privileges, appurtenances, and other estates and rights of Seller, if any, pertaining to its interest in the Real Estate, and (z) all right, title and interest of Seller, if any, in and to all alleys adjoining its interest in the Real Estate and in and to the land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining its interest in the Real Estate to the center line thereof (the Real Estate and the Personalty, together with all of the foregoing, are hereinafter sometimes collectively referred to herein as the "**Property**" or the "**Properties**").

**SECTION 2.2.    Purchase Price**.

2.2.1.    Subject to the terms and conditions herein contained, including, without limitation, Section 17.1 of this Agreement, the "Purchase Price" for the Property and the various assignments incidental thereto referred to herein is [_____] MILLION DOLLARS AND NO CENTS (**$[_____].00**).  [FOR THE BID OF TH HOLDCO ONLY:  The Purchase Price shall be payable by credit bidding the amount of the Secured Claim set forth in the TH Holdco Plan or such other amount as may be bid by TH Holdco at any auction].  [FOR ALL OTHER BIDS:  The Purchase Price shall be payable in cash by wire transfer.]

2.2.2.    [The Parties agree that the Personalty has *de minimis* value.  Accordingly, no portion of the Purchase Price is attributable to the Personalty.]

## ARTICLE 3
## PERMITTED EXCEPTIONS; TITLE INSURANCE

**SECTION 3.1.    Sale Subject to**.  Subject to the terms and conditions of this Agreement, entry of the Confirmation Order, Seller shall convey, and Purchaser shall accept fee simple title to the Real Estate, insurable by [_____] (the "**Title Company**") at regular premiums, without exceptions or reservations of any type or kind, except (a) ALTA standard printed exceptions other than those that can

- 2 -

be removed by the Sale Order, or by an affidavit of Seller to be provided pursuant to Section 3.2.3 hereof, (b) the Permitted Exceptions, and (c) the obligations expressly assumed by Purchaser under this Agreement.

3.1.1.    Pursuant to the Confirmation Order, all liens, claims and encumbrances (the "**Liens**") shall attach to the net proceeds of the sale (the "**Net Proceeds**") to the same extent they encumber the Property.  To the extent Seller is required to satisfy any of the Liens from the Net Proceeds pursuant to the Confirmation Order, Seller shall make such payments in accordance with the Confirmation Order or by further order of the Bankruptcy Court.  Nothing herein is a waiver of the rights of Seller or any other third party to contest the validity, amount or priority of any Liens and the right of any claimant or lienholder to have their respective Liens satisfied from Net Proceeds.

SECTION 3.2.    **Title Report**.  Purchaser acknowledges that it has received and reviewed the Title Report; and Purchaser has agreed to take title to the Property free and clear of all Liens, subject only to Section 4.12 and the Permitted Exceptions.

3.2.1.    If any update to the Title Report or any update to a Survey (as hereinafter defined) reflects any title exceptions that are not Permitted Exceptions and, therefore, which Purchaser is not required to accept (the "**Non-Permitted Exceptions**"), Seller shall use its best efforts, at or prior to Closing, solely through the entry of the Confirmation Order and as provided in Section 3.1.1 above, to attempt to remove the following: (i) any and all of the Non-Permitted Exceptions that Seller placed of record or consented to be placed of record following the date of the Title Report, and (ii) any and all other Non-Permitted Exceptions that may be removed by the entry of the Confirmation Order.  Seller shall have no obligation with respect to the clearance of title as required hereunder other than the delivery of the Confirmation Order, and the Confirmation Order shall be subject to the reasonable consent of the Purchaser.

3.2.2.    Notwithstanding the foregoing or anything herein to the contrary, if the removal of any mechanics' or materialmen's liens filed against the Property is the responsibility of any Tenant of the Property pursuant to the terms of its Lease, Seller shall promptly deliver a notice to such Tenant with respect thereto and shall use its best efforts (without the expenditure by Seller of any funds and without the commencement or prosecution by Seller of an action or proceeding against such Tenant with respect thereto) to cause such Tenant to promptly remove such mechanics' or materialmen's lien.  Seller shall have no liability, nor shall Purchaser be entitled to any abatement or reduction of the Purchase Price or delay or adjournment of the Closing, if such Tenant fails to remove such mechanics' or materialmen's lien.  Seller shall promptly deliver to Purchaser a copy of any such notice delivered by Seller to any Tenant of the Property.

3.2.3.    In the event that there exist any Non-Permitted Exception which is not removed through the entry of the Confirmation Order, Purchaser may elect within ten (10) Business Days after the entry of the Confirmation Order, and may also elect within ten (10) Business Days after the delivery to Seller's counsel of any update to the Title Report showing any Non-Permitted Exception which is not removed through the entry of the Confirmation Order, as the case may be, to either (i) not consummate the transactions contemplated hereby, in which event this Agreement shall be terminated and of no further force and effect, and neither of the parties hereto shall have any rights or obligations to the other hereunder or (ii) consummate the transactions contemplated hereby subject to such additional exceptions and proceed to Closing without an abatement of the Purchase Price.  Purchaser's failure to timely deliver a notice electing to not consummate the transactions contemplated hereby shall be deemed Purchaser's election to consummate the transaction in accordance with the terms and conditions of this Agreement.  Notwithstanding the foregoing, if Purchaser elects to terminate this Agreement as set forth above, Seller shall have the right to void such termination by providing written notice to Purchaser that Seller elects, in its sole discretion, to cure the Non-Permitted Exception by either removing the same at or prior to Closing or providing Purchaser with a credit against the Purchase Price equal to the amount of the cost to cure the Non-Permitted Exception.  In the event Seller elects to cure the Non-Permitted Exceptions and the Title Company removes such Non-Permitted Exception(s) from the Title Report, Purchaser shall be obligated to complete the transaction contemplated by this Agreement.

- 3 -

121009049\V-9

3.2.4.    If required by the Title Company, Seller agrees to execute, acknowledge and deliver a standard and customary owner's title affidavit or related documentation at Closing as modified for a debtor in chapter 11 and such other matters as the Title Company may reasonably require in order to issue a policy of title insurance to Purchaser in the manner required under this Agreement; provided however that Seller shall not be obligated to pay any amounts to or claims of third parties in order to do so (other than as required by the Confirmation Order or pursuant to Sections 3.1.1 (as and to the extent provided for therein) and 3.2.1 above).

**SECTION 3.3.   Permitted Exceptions**.

"**Permitted Exceptions**" means:

3.3.1.    intentionally omitted;

3.3.2.    covenants, easements, restrictions and agreements of record, provided same does not render title uninsurable;

3.3.3.    any state of facts that an accurate survey of the Property would show (including encroachments, projections, retaining walls and stoops), and any further state of facts that an accurate survey since the date of such survey would show, provided that such state of facts do not render title uninsurable and such state of facts does not adversely affect the present use and operation of the Property (each a "**Survey**");

3.3.4.    Liens for unpaid taxes, water charges, sewer rents, vault charges, assessments, charges, rents and any other governmental charges, which are not yet due and payable and are apportioned in accordance with the provisions of Article 4 hereof;

3.3.5.    all rights and easements of record, for electricity, gas, telephone, water, cable television and any other utilities to maintain and operate lines, cables, poles and distribution boxes in, over and upon the Real Estate, as long as such improvement shall stand and that if any damage or destruction to the Property, that the Real Estate as it is currently constructed will be permitted to be reconstructed;

3.3.6.    possible minor projections and/or encroachments of less than one (1) foot of retaining walls, foundations, stoops, areas, steps, sills, trim, cornices, standpipes, fire escapes, coal chutes, casings, ledges, water tables, lintels, porticos, keystones, windows, hedges, copings, cellar doors, sidewalk elevators, fences, fire escapes and the like, or similar projections or objects upon, under or above any adjoining buildings and/or streets or avenues or those belonging to adjoining premises which encroach upon the Real Estate, or within any set back areas, provided that the Title Company shall insure that such projections or encroachments may remain undisturbed so long as the buildings and improvements shall stand and minor variations between the lines of record title and fences, retaining walls, hedges, and the like, provided they do not render title uninsurable;

3.3.7.    variations between the tax diagram or the tax map and the record description, to the extent they do not render title uninsurable;

3.3.8.    any and all violations of building, fire, sanitary, environmental, housing and similar laws, municipal ordinances, orders or requirements (collectively, "**Violations**") affecting the Property from or by any federal, state, county or municipal department, agency, authority or bureau having or asserting jurisdiction (each, a "**Governmental Authority**") that are noted or issued as of the Effective Date or at the date of Closing; provided, however, that Seller shall be responsible for the payment of all monetary fines and penalties associated with any Violations noted or issued against the Property (together with any interest accrued thereon) through Closing;

- 4 -

3.3.9.   building, zoning, subdivision and other governmental laws, codes and regulations, and landmark, historic and wetlands designations, which are not and would not be violated by the existing structures or present use thereof and which do not render title unmarketable or uninsurable;

3.3.10.  any matter created or caused by Purchaser;

3.3.11.  intentionally omitted;

3.3.12.  rights of the public and adjoining owners in highways, streets, roads and lanes crossing the Property provided that the Title Company shall insure (at no additional cost to Purchaser) that no third parties have any claims for adverse possession or easements by prescription by virtue of the use of such highways, streets, roads and lanes crossing the Property;

3.3.13.  standard exclusions from coverage contained in the printed jacket of the form of title policy employed by the Title Company, other than those that can be removed by the title affidavit that Seller is required to provide pursuant to the terms of this Agreement;

3.3.14.  any lien, encumbrance or other item from which the Property will be released pursuant to the Confirmation Order;

3.3.15.  the Leases or such of them as shall be in effect on the Closing Date, and the rights of the tenants, as tenant only, thereunder, provided that no tenant has any right to purchase the Property or right of first refusal;

3.3.16.  any matter that is the responsibility of the tenants pursuant to the terms of their Leases, and

3.3.17.  any matters which the Title Company may raise, provided that the Title Company shall agree to omit or insure without additional premium to Purchaser against collection of the same out of the Property.

## ARTICLE 4
## APPORTIONMENTS AND PAYMENTS

SECTION 4.1.  **Apportionments Relating to the Property**.  The following shall be apportioned between Seller and Purchaser at the Closing with respect to the Property, as of 11:59 PM of the day immediately preceding the Closing Date (the "**Apportionment Date**"), and the net aggregate amount thereof either shall be paid by Purchaser to Seller or credited to Purchaser towards the Purchase Price, as the case may be, at the Closing (provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate the Seller to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party, and notwithstanding the contrary;

4.1.1.   real property taxes, and any assessments (or installments thereof), including with respect to Business Improvement Districts, on the basis of the fiscal year for which payable; if the Apportionment Date shall be prior to the date on which the real property tax rate is fixed, the apportionment of real property taxes shall be made on the basis of the tax rate for the preceding year applied to the latest assessed valuation;

4.1.2.   to the extent not metered, water rates and charges, sewer taxes and rents and electricity and other utility charges;

4.1.3.   fuel oil and liquid propane gas, if any, at the cost per gallon most recently charged to Seller, based on the supplier's measurements thereof taken within ten (10) days of the Closing Date;

- 5 -

4.1.4.    rents and other revenues derived from the Leases (the "**Rents**"), shall be adjusted and prorated on an as, if and when collected basis pursuant to the terms herein.  Rents collected by Purchaser or Seller after the Closing from any Tenant or other party, allocable to periods prior to the Closing shall belong solely to Purchaser and Seller waives any rights to such Rents received after Closing;

4.1.5.    insurance proceeds received by Seller, if any, and payable to Purchaser pursuant to Article 13 hereof to the extent not applied to repair or restore the Property in accordance with the provisions of this Agreement;

4.1.6.    security deposits currently being held by or on behalf of Seller pursuant to the Leases shall be delivered to Purchaser at Closing;

4.1.7.    annual municipal permit and inspection fees and other fees for licenses and permits assigned to Purchaser, if any; and

4.1.8.    any and all amounts due under any Property Contracts, including any termination fees, shall be payable by Seller at or prior to Closing.

**SECTION 4.2.    Taxes and Assessments**.

4.2.1.    If, on the Closing Date, all or any portion of the Real Estate shall be or shall have been affected by assessments (including Business Improvement District assessments) that are, or which may become, payable in annual installments, of which the first installment is then a charge or lien or has been paid or if any of the improvements to be paid for thereby are in place or commenced, then, for purposes of this Agreement only, the installment(s) which shall have been paid or the installment which shall be then due and payable shall be apportioned between Seller and Purchaser and all of the unpaid installments of any such assessments, including those which are to become due and payable after the date hereof, shall continue to be Liens upon the Real Estate, it being understood and agreed that Seller and Purchaser shall be responsible for a pro rata share of such assessment, with Purchaser being responsible for the period from and after the Apportionment Date and Seller being responsible for the period prior to the Apportionment Date, regardless of when such installments are due and payable (provided, however, that, other than as provided in Article 3 nothing in this Agreement shall obligate Seller to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party). Notwithstanding any other provision of this Agreement, Seller shall have no responsibility for any taxes or assessments that become due or payable as a result of the loss of any exemption following the transfer of the Property.

4.2.2.    To the extent that any refund of real property taxes, assessments (including Business Improvement District assessments), water rates and charges, sewer taxes and rents or any other utility made after the Closing Date is applicable to a period before the Closing Date, such refund shall be payable to Seller or returned by Purchaser to Seller, net of the actual costs incurred by Purchaser in obtaining same.  Notwithstanding anything to the contrary any further refunds or abatements related to 421-a of the New York Real Property Tax Law shall be the property of the Purchaser.

4.2.3.    To the extent that any refund of real property taxes, assessments (including Business Improvement District assessments), water rates and charges or sewer taxes and rents made after the Closing Date is applicable to a period after the Closing Date, such refund shall be payable to Purchaser or returned by Seller to Purchaser, subject to the actual costs incurred by Seller, including reasonable attorneys' fees in obtaining same (provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate Seller to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party).

**SECTION 4.3.    Transfer of Utilities**.  Purchaser, at its sole cost and expense, shall cause the transfer of all utility services for the Real Estate to Purchaser's name as of the Closing Date and Seller

- 6 -

shall cooperate with Purchaser in connection therewith provided same is at no cost to Seller.  If utility services shall not have been transferred to Purchaser's name for the Real Estate effective as of the Closing Date, then, at the Closing, any such charges with respect to services not so transferred shall be prorated, based upon the per diem charges obtained by using the most recent period for which readings of such utility services shall then be available.  Purchaser, at its sole cost and expense, shall promptly thereafter cause such utility services to be transferred to Purchaser's name, and Seller shall cooperate with Purchaser in connection therewith.  Purchaser shall make all required deposits on account with utility companies or on account with municipalities and shall reasonably cooperate with Seller in having any deposits currently held by such companies and municipalities, returned to Seller, or Purchaser can credit to Seller at Closing.  However, Seller shall be solely responsible for obtaining the return of its own utility company deposits, if any (provided, however, that nothing in this Agreement shall obligate Seller to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party).

      **SECTION 4.4.   Rents Received After Closing**.  Subject to Section 4.5 hereof, if Purchaser shall receive Rents under any Lease after the Closing Date, such Rent shall belong to Purchaser. To the extent that Seller receives Rents after the Closing Date, the same shall be held in trust by Seller for Purchaser, and shall be promptly paid to Purchaser.

      **SECTION 4.5.   Collection of Rents**.  After the Closing Date, Purchaser shall bill Tenants for Rents as required by their respective Leases.  Seller shall have no right subsequent to the Closing to bring a legal proceeding against any Tenant.  Nothing in this Section 4.5 or any other provision of this Agreement shall be construed as an agreement on the part of Purchaser to refrain from its right to terminate any Lease pursuant to its terms.  Notwithstanding the foregoing, Purchaser shall receive a credit for any and all Rents which have been prepaid by tenants for periods subsequent to the Closing Date.  In the event Seller enters into any lease after execution of this Agreement, Seller shall advise Purchaser of any prepaid Rents received and Purchaser shall receive a credit on the Closing Date for the amount of prepaid Rent for the period subsequent to the Closing Date.

      **SECTION 4.6.   Transfer Tax**.  Except as expressly provided herein, each party shall bear its own costs and expenses, including attorney, accountant and other consultant fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby.  Notwithstanding anything to the contrary, it is the intention of Seller and the Purchaser that the Property should be sold pursuant to, and in accordance with the TH Holdco Plan providing for the sale of the Property pursuant to this Agreement and Bankruptcy Court approved sale procedures and that such sale shall be conducted pursuant to § 1146 of the Bankruptcy Code, which will serve to exempt the parties hereto from any requirement to pay any real property transfer taxes, transfer gains taxes, and other similar taxes and fees, if any, imposed on Seller by the state, county or municipality in which the Real Estate is located which are imposed in connection with the sale, assignment, transfer and conveyance of the Real Estate to Purchaser as contemplated by the provisions of this Agreement (collectively, the "**Transfer Tax**") that may arise in connection with the transfer of the Property through the transaction contemplated herein. In addition, pursuant to Section 1146(a) of the Bankruptcy Code, the deeds conveying any of the Properties to Purchaser or its nominee or designee upon the Effective Date of the Plan shall be an instrument of transfer in connection with or in furtherance of the Plan and shall not be subject to tax under any law imposing a stamp tax, real estate Transfer Tax, mortgage recording tax or similar tax.   Notwithstanding anything to the foregoing, if the Bankruptcy Court fails to enter an order exempting Transfer Tax, Seller shall have the option to pay the Transfer Tax or cancel the sale.  In the event Seller elects to terminate the Agreement as a result of if the Bankruptcy Court failing to enter an order exempting Transfer Tax, Purchaser shall have the option to vitiate Seller's termination, pay the Transfer Taxes and proceed with the Sale.

      **SECTION 4.7.   Tax Returns**.  At the Closing, Purchaser and Seller shall deliver to the Title Company a New York State Transfer Tax Return (TP-584), City of New York Real Property Transfer Tax Return (NYC-RPT) and Equalization form (RP-5217NYC) (collectively, the "**RE Tax Returns**") and deliver same to the Title Company for delivery to the appropriate authority.

      **SECTION 4.8.   Violations**.  Seller and Purchaser acknowledge that Purchaser is purchasing the Property subject to all Violations that may be of record with respect to the Real Estate as of the Closing

- 7 -

Date.  Seller hereby authorizes Purchaser to conduct a customary and ordinary search at the request of the Title Company for the purposes of determining whether any Violations have been noted or issued with respect to the Real Estate.  Seller and Purchaser shall each promptly notify the other party and provide the other party with a copy of all notes or notices of Violations which Seller or Purchaser shall receive after the date hereof through the date of Closing.

SECTION 4.9.  **Title Charges**.  Purchaser shall pay the cost of Purchaser's title insurance premiums and any title search costs, the cost of a survey for the Property or any update thereto and all recording and filing fees, including, but not limited to, those in connection with the Deed.  Notwithstanding anything in this Section and Agreement to the contrary, Seller shall be responsible for any charges associated with the recording of documents necessary to remove Non-Permitted Exceptions from the Title Report, it being agreed that Seller shall not be required to deliver any documents for recordation to clear title if the Title Company is prepared to insure over the same based upon the delivery of the Confirmation Order.

SECTION 4.10. **Transaction Expenses**.  Except as expressly provided herein, each party shall bear its own costs and expenses, including attorney, accountant and other consultant fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby.

SECTION 4.11. **Assignment of Existing Mortgages**.  Upon the request of the Purchaser, Seller shall cause the current mortgagee to assign the existing mortgage(s) to Purchaser's lender at Closing without cost to Seller and the sale of the Property shall be delivered subject to the existing Mortgages.

SECTION 4.12. **Survival**.  The provisions of this Article 4 shall survive the Closing.

## ARTICLE 5
## COVENANTS REGARDING THE PROPERTY

SECTION 5.1.  **Maintenance and Operation of the Property**.  Between the date hereof and the Closing Date, Seller shall not be obligated to maintain, repair, operate and manage the Property.  Notwithstanding the foregoing to the contrary, Seller shall be permitted to perform such work as Seller elects, in its sole and absolute discretion, provided that such work that not adversely affect the value or structure of the Property.

SECTION 5.2.  **Leasing of the Property**.  Seller shall not, between Effective Date and the Closing, be permitted to execute any Leases required by law or otherwise without Purchaser's prior written consent.  Seller shall not, between Effective Date and the Closing, without Purchaser's prior written consent, grant any concession or rent abatement for any period following the Closing.  If any space is vacant on the Closing Date, Purchaser shall accept the Property subject to such vacancy.  Seller shall not apply any security deposit on account of any rental due or to become due under any of the Leases, other than in accordance with the Leases, between now and the date of Closing; absent an express provision in any such Lease to the contrary, Seller shall not return any such security deposit to the Tenant thereunder with respect to any expiring or terminated Lease unless the Tenant thereunder shall have actually vacated the premises demised under such Lease.

Seller does not guarantee, represent or warrant to Purchaser that any of the Leases will be in effect on the Closing Date or whether or not Tenants under any or all of the Leases shall be in full compliance with the terms of such Leases.  Further, Purchaser acknowledges that whether or not any or all of the Leases are in effect or the Tenants thereunder are in compliance with their respective terms shall not be a condition to Closing.

SECTION 5.3.  **Insurance**.  Seller shall maintain in full force and effect the insurance policies, if any, currently in effect with respect to the Property (or replacements continuing similar coverage and

- 8 -

deliver to Purchaser, upon request, reasonable evidence of such insurance, including certificates of such insurance)

        **SECTION 5.4.   Additional Responsibilities**.

        5.4.1.    Seller shall cause any and all Property Contracts to be terminated at no expense to Purchaser prior to Closing.

        5.4.2.    Seller shall not remove from the Property any Personalty unless such item is replaced with a similar item of comparable utility and value.

        5.4.3.    Seller shall not knowingly take any action with respect to the Properties that Seller knows would result in a failure to comply in all material respects with all laws, ordinances, rules and regulations of any governmental authorities applicable to the Property or any portion thereof.

        5.4.4.    Seller shall not enter into any brokerage, leasing agency or similar agreements affecting the Property, other than in the ordinary course of business to rent vacant apartments, without the prior written consent of Purchaser, which consent shall not be unreasonably withheld conditioned or delayed.

        5.4.5.    Seller shall not grant any lien or cause any instrument to be recorded that would further encumber the Property in any manner, other than memoranda of lease and/or subordination, non-disturbance and attornment agreements with respect to Leases entered into in accordance with the terms hereof or Liens or encumbrances to be discharged as of the Closing Date.

**ARTICLE 6**
<u>**REPRESENTATIONS AND WARRANTIES OF PURCHASER**</u>

        **SECTION 6.1.   Generally**.  Purchaser represents and warrants to Seller the following are true and correct on the date hereof and as of the date of the Closing:

        6.1.1.    (a) Purchaser is a duly formed and validly existing [TYPE OF ENTITY] under the Laws of the [JURISDICTION OF FORMATION], (b) Purchaser has the full right, authority and corporate power to enter into this Agreement, to consummate the transactions contemplated herein and to perform its obligations hereunder and under those Closing Documents to which it is a party, (c) each of the Persons executing this Agreement on behalf of Purchaser is authorized to do so, and (d) this Agreement constitutes a valid and legally binding obligation of Purchaser enforceable against Purchaser in accordance with its terms;

        6.1.2.    there are no legal or administrative proceedings pending or, to the best of Purchaser's actual knowledge, without investigation, threatened against or affecting Purchaser that would adversely affect Purchaser's legal authority or financial ability to perform its obligations under this Agreement and the Closing Documents to which it is a party;

        6.1.3.    the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and the performance by Purchaser of its obligations hereunder and under the Closing Documents to which it is a party, do not and will not (a) violate or conflict with any judgment, decree or order of any court or any Law or permit applicable to it, or (b) breach any provisions of, or constitute a default under, any contract, agreement, instrument or obligation to which it is a party or by which Purchaser is bound;

        6.1.4.    the execution and delivery of this Agreement by Purchaser does not, and the performance of its obligations hereunder and under the Closing Documents to which it is a party will not, require the consent or approval of any public authority or any other Person or any lender from which

- 9 -

Purchaser may seek to obtain financing, as may be applicable provided however that Purchaser acknowledges that its obligations under this Agreement are not contingent upon any such financing;

6.1.5.    Purchaser's Federal Tax Identification Number is [_____].

**SECTION 6.2.   Closing Conditions; Survival of Representations and Warranties**.  The following are conditions precedent to the obligation of Seller to close title under this Agreement, any or all of which may at Seller's option be waived in writing:

6.2.1.    Intentionally Omitted.

6.2.2.    Purchaser shall have (or, with respect to obligations of Purchaser to be performed on the Closing Date, Purchaser shall be ready, willing and able to perform same on the Scheduled Closing Date) (a) delivered, or caused to be delivered, all of the Closing Documents to which it is a party and all other documents, instruments and other items required to be delivered by Purchaser at or prior to Closing (including, without limitation, pursuant to Section 9.1.2), (b) tendered the Purchase Price in accordance with the terms of this Agreement, and (c) performed in all material respects all other material obligations on Purchaser's part to be performed hereunder on or prior to the Closing Date.

6.2.3.    All other conditions precedent expressly set forth herein to Seller's obligation to consummate the transaction contemplated hereby have been satisfied (or waived in writing by Seller).

6.2.4.    The Bankruptcy Court shall have entered the Confirmation Order.

6.2.5.    The representations, warranties and certifications of Purchaser set forth in this Agreement shall not survive the Closing.

## ARTICLE 7
## REPRESENTATIONS AND WARRANTIES OF SELLER

**SECTION 7.1.   Generally**.  Seller represents, warrants and covenants to and with Purchaser that the following are true and correct on the date hereof and as of the date of the Closing:

7.1.1.    (a) Seller is the owner of all of the Property of the estate of the Debtors, (b) subject to the entry of the Bidding Procedures Order entered by the Bankruptcy Court, Seller has the full right, authority and power to enter into this Agreement, and, subject to the entry of the Confirmation Order, to consummate the transaction contemplated herein and to perform its obligations hereunder and under those Closing Documents to which it is a party all of which have been duly authorized by all necessary actions on the part of Seller, (c) each of the Persons executing this Agreement on behalf of Seller is authorized to do so, and (d) subject to the entry of the Confirmation Order, this Agreement constitutes a valid and legally binding obligation of Seller enforceable against it in accordance with its terms;

7.1.2.    the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the performance by Seller of its obligations hereunder and under the Closing Documents to which it is a party (other than being subject to Bankruptcy Court approval) do not and will not conflict with or violate any Law, rule, judgment, regulation, order, writ, injunction or decree of any court or governmental or quasi-governmental entity having jurisdiction over Seller or any of the parties comprising Seller, including the United States of America, the State of New York or any political subdivision of either of the foregoing, or any decision or ruling of any arbitrator to which Seller or any of the parties comprising Seller is a party or by which Seller or any of the parties comprising Seller is bound or affected, or breach any provisions of, or constitute a default under, any contract, agreement, instrument or obligation to which Seller or any of the parties comprising Seller is a party or by which any of them is bound; and

- 10 -

7.1.3.    Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code 1986, as amended, or any regulations promulgated thereunder (as such "foreign person" is defined in the Internal Revenue Code).

7.1.4.    Neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited by, or requires Seller to obtain any consent, authorization, approval or registration under any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Seller, except as required by the Bankruptcy Court.

7.1.5.    The Debtors' Federal Tax Identification Numbers are as follows:

[85 Flatbush RHO Mezz LLC ([_____6184])]

85 Flatbush RHO RHO Hotel LLC ([_____5027])

85 Flatbush RHO Residential LLC ([_____2261])

**SECTION 7.2.    Property Representations**.  Seller represents and warrants to Purchaser that, as of the date hereof, with respect to the Property:

7.2.1.    Seller has heretofore delivered to, or made available for review by, Purchaser a true and complete set of all written Leases, including any amendments, if applicable, and Purchaser acknowledges receipt and/or review of same.  Except as set forth in this Section or elsewhere in this Agreement, Seller makes no representation or warranty with respect to the Leases, it being understood and agreed that Purchaser has received and/or reviewed the same and the Tenant files and is fully familiar with the terms thereof and all other matters concerning the Leases.

7.2.2.    Intentionally Omitted.

7.2.3.    Intentionally Omitted.

7.2.4.    Intentionally Omitted.

7.2.5.    Intentionally Omitted

7.2.6.    Intentionally Omitted.

7.2.7.    Intentionally Omitted.

7.2.8.    Seller will keep all insurance policies in effect up to and including the Closing Date.

7.2.9.    There is no agreement in effect whereby Seller has agreed to sell or has granted any Person an option or right of first refusal to purchase all or any part of the Property.

7.2.10.    Neither Seller nor any Person who owns a direct or indirect interest in Seller (a "**Seller Party**") is a person or entity with whom United States persons or entities (collectively, a "U.S. Person") are restricted or prohibited from doing business under regulations of The U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") (including those named on OFAC's specially designated and blocked persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism) or other governmental action and no Seller Party has engaged or will not engage in any dealings or transactions or be otherwise associated with such persons or entities.  No Seller Party is now nor shall be at any time prior to or at the Closing a Person with whom a U.S. Person, including a United States Financial Institution as defined in 31 U.S.C. 5312, as periodically amended (a "Financial

121009049\V-9

Institution"), is prohibited from transacting business of the type contemplated by this Contract, whether such prohibition arises under United States law, regulation, executive orders and lists published by the OFAC (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise.

7.2.11.   No Seller Party: (i) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws (as hereinafter defined); (ii) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (iii) has had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws.  For purposes of this clause (I), the term "Anti-Money Laundering Laws" shall mean laws, regulations and sanctions, state and federal, criminal and civil, that: (w) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (x) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (y) require identification and documentation of the parties with whom a Financial Institution conducts business; or (z) are designed to disrupt the flow of funds to terrorist organizations.  Such laws, regulations and sanctions shall be deemed to include the USA PATRIOT Act of 2001, Pub. L. No. 107-56 (the "Patriot Act"), the Bank Secrecy Act, 31 U.S.C. Section 5311 et. seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et. seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957

7.2.12.   There are no employees of the Seller at the Property engaged in the operation and maintenance of the Property.

It shall be a condition to Closing that the representations and warranties of Seller contained in Sections 7.2 shall be true and correct in all material respects on the date hereof, and such representations and warranties shall survive the Closing.

**SECTION 7.3.   Closing Conditions; Survival of Representations and Warranties**.  The following are conditions precedent to the obligation of Purchaser to close title under this Agreement, any or all of which may at Purchaser's option be waived in writing:

7.3.1.    Except to the extent otherwise unnecessary as a result of the Confirmation Order, each of the representations and warranties of Seller set forth in this Agreement shall be deemed to have been repeated by Seller, at and as of the Closing Date, with the same force and effect as if first made on and as of such date.

7.3.2.    Seller shall have delivered all of the documents and other items required pursuant to Section 9.1.1 of this Agreement and shall have performed all other material covenants, undertakings and obligations herein agreed to be performed by it, and complied with all material conditions required by this Agreement to be performed or complied with by Seller at or prior to the Closing.

7.3.3.    At the time of the Closing, title to the Property shall be as provided in this Agreement and the Title Company shall be willing to issue fee title insurance policies in favor of Purchaser subject only to the Permitted Exceptions.

7.3.4.    The representations, warranties and certifications of Seller set forth in this Agreement shall survive the Closing.

7.3.5.    The Bankruptcy Court shall have entered the final, non-appealable Confirmation Order.

- 12 -

121009049\V-9

SECTION 7.4.  **Knowledge of Seller**.  Whenever a representation or warranty is made in this Agreement on the basis of the knowledge of Seller, such representation and warranty is made solely on the basis of the actual, as distinguished from implied, imputed or constructive, knowledge on the date that such representation and warranty is made, without inquiry or investigation or duty, of the Seller, without attribution to such persons of facts or matters otherwise within the personal knowledge of any other officers, directors or employees of Seller, or third parties.

## ARTICLE 8
## CLOSING DATE

SECTION 8.1.  **Closing Date**.  The consummation of the transaction contemplated by this Agreement (the "**Closing**") shall take place on the "Closing Date" which shall be within the first business day following the fourteenth (14th) Business Day from the date the Bankruptcy Court shall have entered the final, non-appealable Confirmation Order (the "**Scheduled Closing Date**"), which "Closing Date" may be extended for a period of no more than 90 days at the absolute discretion of Purchaser.  The Scheduled Closing Date or any such other date to which the Closing may be adjourned by Purchaser pursuant to the terms of this Agreement, is referred to herein as the "**Closing Date**".  The Closing shall be held at the offices of the Purchaser, located at [_____], New York, New York [_____], otherwise at the offices of Purchaser's counsel, if any, provided such offices are located in New York City, New York.  Notwithstanding the foregoing, either Seller or Purchaser may elect to conduct the Closing pursuant to an escrow arrangement through Title Company or as may otherwise be agreed upon by Seller and Purchaser.  The Purchaser may, in its sole discretion, elect for an earlier Closing Date regardless of whether the Confirmation Order is at that point final and nonappealable.

## ARTICLE 9
## CLOSING DOCUMENTS

SECTION 9.1.  **Closing**.

9.1.1.    At the Closing, contemporaneously with Purchaser's delivery to Seller of all of the Closing Documents required to be delivered by Purchaser hereunder, Seller shall deliver or cause to be delivered to Purchaser, duly executed by Seller in recordable form, where applicable, those Closing Documents to be delivered by Seller as set forth on Schedule IV attached hereto and made a part hereof.

9.1.2.    At the Closing, contemporaneously with Seller's delivery to Purchaser of all of the Closing Documents required to be delivered by Seller hereunder, Purchaser shall deliver or cause to be delivered to Seller those Closing Documents to be delivered by Purchaser, duly executed by Purchaser in recordable form, where applicable, as set forth on Schedule V attached hereto and made a part hereof (the documents described in this Section 9.1.1 and in Section 9.1.2 and all other documents required to be delivered hereunder are referred to collectively as the **"Closing Documents"**).

SECTION 9.2.  **Further Assurances**.  Seller and Purchaser each agree, at any time and from time to time at or after the Closing, to execute, acknowledge where appropriate, and deliver or cause to be executed, acknowledged and delivered such further instruments and documents and to take such other action as the other of them or the Title Company may reasonably request to carry out the intents and purposes of this Agreement.  The provisions of this Section 9.2 shall survive the Closing.

## ARTICLE 10
## NOTICES

SECTION 10.1. **Notices**.  All notices, demands, consents, approvals, requests or other communications which any of the parties to this Agreement may desire or be required to give hereunder (collectively, "**Notices**") shall be in writing and shall be given by personal delivery, or reputable overnight courier service (charges prepaid), or email addressed as hereinafter provided, provided, however, that any Notice given by email shall also be given within one Business Day by personal delivery or reputable

- 13 -

overnight courier service (charges prepaid).  Except as otherwise specified herein, the time period in which a response to any notice or other communication must be made, if any, shall commence to run on the earliest to occur of (a) if by overnight express delivery or personal delivery, the date of receipt, or attempted delivery, if such communication is refused; (b) if given by email, the date on which such email is transmitted and confirmation of delivery thereof is received (provided same is followed within one Business Day with hard copy sent by personal delivery or reputable overnight delivery service (charges prepaid)); and (c) if sent by overnight courier service, one (1) Business Day after having been deposited for next day overnight delivery with any reputable overnight courier service (charges prepaid), if such mailing is refused.  Until further notice, notices and other communications under this Agreement shall be addressed to the parties listed below as follows:

| | |
|---|---|
| If to Seller, to: | ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C. Attn: Fred B. Ringel, Esq., 875 Third Avenue New York, New York 10022 Email: fbr@robinsonbrog.com Email: ls@robinsonbrog.com |
| with a copy to: If to Purchaser, to: | [_____] [_____] c/o [_____] Attention:. Email: Email: |
| with a copy to: | Dentons US LLP 1221 Avenue of the Americas, 25th Floor New York, New York 10020 Attention: Lauren Macksoud, Esq. Email: lauren.macksoud@dentons.com Email: chris.milenkevich@dentons.com |

Any party may designate another addressee, and/or change its address, for Notices hereunder by a Notice given pursuant to this Article 10.


## ARTICLE 11
## BROKER

Seller and Purchaser each represents and warrants to the other that it has not dealt with any broker, agent or any other Person in connection with the transaction contemplated by this Agreement. Purchaser hereby indemnifies Seller and holds Seller harmless from and against any and all claims for commission, fee or other compensation by any other Person who shall claim to have represented or dealt with Purchaser in connection with this Agreement and for any and all costs incurred by Seller in connection with such claims, including reasonable attorneys' fees and disbursements.  The Confirmation Order shall provide that Purchaser shall have no liability for any and all claims for commission, fee or other compensation by any Person who shall claim to have represented Seller in connection with this Agreement.  The provisions of this Article 11 shall survive the Closing or the sooner termination of this Agreement.

- 14 -

## ARTICLE 12
## DEFAULTS; REMEDIES

**SECTION 12.1. Purchaser's Default**.  If Purchaser shall (a) fail or refuse to close as and when required by the terms of this Agreement, or (b) otherwise be in default hereunder, which default shall continue for ten (10) days after notice to Purchaser specifying such default, the parties hereto agree that the damages that Seller would sustain as a result thereof would be substantial, but would be difficult to ascertain.  Accordingly, the parties hereto agree that in the event of such default, failure or refusal by Purchaser, to close, Seller's sole remedy shall be to terminate this Agreement.  In such event, Purchaser and Seller shall have no further rights or obligations under this Agreement, except those expressly provided herein to survive the termination of this Agreement.  Nothing contained in this Section shall limit or diminish Purchaser's obligations or liabilities under Article 6 or Section 19.10 hereof.

**SECTION 12.2. Seller's Default**.  If Seller shall (a) fail or refuse to close as required by the terms of this Agreement or (b) otherwise be in default hereunder, which default shall continue for ten (10) days after written notice to Seller thereof, then Purchaser's sole remedy shall be to either (i) terminate this Agreement or (ii) seek specific performance hereunder.  Purchaser expressly agrees however, that Purchaser shall not have the right to seek or recover any actual, consequential or punitive damages or any similar additional sums or amounts against Seller for any breach occurring prior to Closing.  Nothing herein shall limit or diminish Seller's obligations or liabilities under Article 7 or Section 19.10 hereof.

## ARTICLE 13
## CASUALTY; CONDEMNATION

**SECTION 13.1. Casualty**.  Seller agrees to give Purchaser immediate notice of any fire or other casualty occurring at the Property of which Seller obtains knowledge, between the date hereof and the date of the Closing, or of any actual or threatened condemnation of all or any part of the Property of which Seller obtains knowledge.  If prior to the Closing there shall occur damage to the Property caused by fire or other casualty which would cost an amount equal to a Material Part (as defined below) or more to repair, as reasonably determined by an engineer selected by Seller which is reasonably satisfactory to Purchaser, Purchaser may elect to terminate this Agreement by written notice given to Seller within ten (10) Business Days after Seller has given Purchaser the notice referred to in this Section hereof, or at the Closing, whichever is earlier, in which event this Agreement shall thereupon be null and void and neither party hereto shall thereupon have any further obligation to the other, except for the provisions hereof intended to survive the termination of this Agreement.  If Purchaser does not elect to terminate this Agreement, then the Closing shall take place as herein provided, without abatement of the Purchase Price, and Seller shall assign to Purchaser at the Closing, by written instrument, all of Seller's interest in and to any insurance proceeds or condemnation awards which may be payable to Seller on account of any such fire, casualty or condemnation, and shall deliver to Purchaser any such proceeds or awards actually theretofore paid, less any amounts (the "**Reimbursable Amounts**") (i) actually and reasonably expended or incurred by Seller in adjusting any insurance claim or negotiating and/or obtaining any condemnation award (including, without limitation, reasonable attorneys' fees and expenses) and/or (ii) theretofore actually and reasonably incurred or expended by or for the account of Seller for the cost of any compliance with laws, protective restoration or emergency repairs made by or on behalf of Seller.  The proceeds of rent interruption insurance, if any, shall on the Closing Date be appropriately apportioned between Purchaser and Seller.  For purposes of this Section 13.1, "**Material Part**" shall mean a casualty that causes damage that amounts to more than ten (10%) percent of the Purchase Price.

**SECTION 13.2. Condemnation**.  If, prior to the Closing, all or a Material Part (as hereinafter defined) of the Property is taken by eminent domain, Purchaser may, by notice to Seller given within ten (10) Business Days after notice from Seller to Purchaser of the taking, elect to cancel this Agreement.  In the event that Purchaser shall so timely elect, neither of the parties hereto shall have any rights or obligations to the other hereunder except those expressly stated to survive the termination of this Agreement.  Unless this Agreement is so canceled, or if less than a Material Part of the Property is taken by eminent domain, this Agreement shall remain in full force and effect in which event Seller shall, on the

- 15 -

Closing Date, and upon receipt of the balance of the Purchase Price, pay to Purchaser any sums of money collected by Seller as an award for any taking by eminent domain, after deducting any reasonable amount which Seller may have agreed or been obligated to pay in obtaining such award, including reasonable attorneys' fees and disbursements. Seller shall not negotiate, compromise, or settle any such award without Purchaser's prior consent, which consent shall not be unreasonably withheld, conditioned or delayed. In addition, Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any portion of any condemnation award not yet received by Seller. For purposes of this Section 13.2, "**Material Part**" shall mean a taking of more than ten (10%) percent of the Purchase Price. The provisions of this Article 13 are intended to constitute an "express provision to the contrary" within the meaning of Section 5-1311 of the New York General Obligations Law. This provision shall survive the Closing.

**ARTICLE 14**
**AS-IS; WHERE-IS;**
**DISCLAIMER; WAIVER OF CLAIMS**

**SECTION 14.1. Disclaimers; As-Is, Where-Is Condition**.

14.1.1.  Purchaser acknowledges and represents that it (a) is a sophisticated purchaser, with experience in owning and operating real property in the nature of the Property, (b) realizes the nature of this transaction, understands and is freely taking risks including the risks that Purchaser may be outbid at an Auction, if any, involved in connection with this transaction, (c) has undertaken such independent investigations and evaluations of the Property as it has determined to be necessary or desirable in connection with the transaction contemplated herein, including the matters set forth in Section 14.1.2 below, and (d) acknowledges that the foregoing is reflected in the Purchase Price and the terms upon which Purchaser is willing to purchase and Seller is willing to sell.

14.1.2.  Except as otherwise expressly set forth in this Agreement, the Property is being sold by Seller and Purchaser agrees to accept the Property AS IS AND WHERE IS, in its condition on the date hereof (subject to reasonable wear and tear and natural deterioration between the date hereof and the Closing Date). Purchaser acknowledges, represents and warrants that (i) Purchaser has had ample opportunity to make an independent investigation and examination of the Property (and all matters of every nature related thereto), and to become fully familiar with the physical condition, state of title, compliance with Law and environmental conditions of the Property, (ii) Purchaser inspected, examined, investigated and sampled the Property to its satisfaction and is familiar with the physical conditions, state of title, compliance with Law and environmental conditions of the Property and uses thereof and will rely on that inspection, examination, investigation and sampling, (iii) Purchaser has inspected, examined and investigated to its satisfaction all laws, ordinances, and governmental rules and regulations relating thereto and is purchasing the Property subject to any Violations thereof, (iv) Purchaser has inspected and examined to its satisfaction all licenses and permits relating to the facility, including but not limited to environmental and operational permits, and it agrees to be bound by the terms of those licenses and permits and/or will ensure that it obtains new or additional licenses and permits to fully comply with all applicable governmental rules and regulations, (v) Purchaser has independently investigated, analyzed and appraised the value and the profitability of the Property, (vi) Purchaser has independently investigated the tenant files made available for review by Purchaser and all other due diligence documents delivered to Purchaser by Seller, (vii) Purchaser has independently investigated and evaluated all matters of a financial nature relating to the Property, and (viii) Purchaser has been in possession of the Property and has been managing same, and (ix) Seller has not made and shall not make any verbal or written representations, warranties or statements of any nature or kind whatsoever to Purchaser, whether express or implied, except as expressly set forth in this Agreement, with respect to the above, and, in particular, except as expressly set forth herein, no representations or warranties have been made or shall be made with respect to (a) the physical condition or operation of the Property, including the existence of any environmental hazards or conditions thereon (including the presence of asbestos containing materials or the release or threatened release of Hazardous Materials), (b) the revenues or expenses of the Property, (c) the zoning and other laws applicable to the Property or the

- 16 -

compliance of the Property therewith, (d) the status of any approvals required for the development of the Property, (e) the nature and extent of any matter affecting title to the Property or to any Personalty, (f) the quantity, quality, or condition of the Personalty, or (g) any other matter or thing affecting or relating to the Property, or any portion thereof, the interests therein to be conveyed to Purchaser pursuant to the terms of the transactions contemplated hereby or the status thereof.  Purchaser has had the opportunity to inspect the Property and will rely on that inspection and its other investigations and evaluations of the Property.

14.1.3.  Except as expressly set forth in this Agreement, Purchaser acknowledges that Seller has not made, and Seller is not liable for or bound in any manner by, any express or implied warranties, guarantees, promises, statements, inducements, representations or information pertaining to the Property or any part thereof, the physical condition, size, zoning, income, expenses or operation thereof, the uses which can be made of the same or of any other manner or thing with respect thereto. Without limiting the foregoing, Purchaser acknowledges and agrees that Seller is not liable for or bound by, and Purchaser has not relied upon, any verbal or written statements, representations, or any other information respecting the Property furnished by Seller or any broker, employee, agent, consultant or other person representing or purportedly representing Seller.

14.1.4.  Intentionally omitted.

14.1.5.  Purchaser waives any and all rights to bring an action or a claim against Seller arising out of or related to (i) the past, present, or future environmental condition associated with the Property, (ii) past, present, or future environmental remediation of the Property, (iii) implied statements, representations and/or warranties made by Seller or Seller's agents concerning the environmental conditions of the Property and (iv) violation of any Environmental Law or liability imposed pursuant to any Environmental Law.

14.1.6.  Purchaser waives any and all rights to bring an action or claim against Seller for contribution or indemnification related to the cost or expenses that Purchaser may incur to investigate or remediate the Property and/or to defend against any governmental, citizen, or private actions or proceedings arising out of or related to the past, present, or future environmental conditions of the Property.

14.1.7.  Except as set forth in this Agreement, Seller hereby specifically disclaims any warranty, guaranty, oral or written, express or implied or arising by operation of law or otherwise, with respect to the matters referred to in this Section 14.1 and any warranty of condition, habitability, merchantability or fitness for a particular purpose, in respect to the Property.  Purchaser declares and acknowledges that this express disclaimer shall be considered a material and integral part of this sale and is reflected in the consideration payable by Purchaser hereunder and, as an inducement for Seller to proceed with this transaction, Purchaser further declares and acknowledges that this disclaimer has been brought to the attention of Purchaser and explained in detail and that Purchaser has voluntarily and knowingly consented thereto.

**SECTION 14.2. Acceptance of Closing Documents; Waivers**.  Except for those matters expressly set forth in this Agreement to survive the Closing and except for the agreements of Seller and Purchaser set forth in the Closing Documents or otherwise entered into at the Closing, Purchaser's acceptance of the Deed(s) and the other Closing Documents shall be and be deemed to be an acknowledgment by Purchaser that Seller has fully performed, discharged and complied with all of Seller's obligations, covenants and agreements hereunder to be performed prior to Closing and that Seller shall have no further liability with respect thereto.

**SECTION 14.3. Survival**.  The provisions of this Article 14 shall survive the Closing.

- 17 -

## ARTICLE 15
## ASSUMED LEASES AND CONTRACTS

**SECTION 15.1. Assumption and Assignment of Leases and Security Deposits.**, Upon the Closing Date, as to any Lease or Contract so designated by Purchaser in its sole discretion, Seller shall assign to Purchaser, and from and after the Closing Date, Purchaser does hereby agree to assume, any and all rights and liabilities in connection with such designated Leases, the Rents (including any arrears) and Security Deposits, as further set forth in the Assignment and Assumption and Assumption of Lease and Security Deposits attached hereto as Exhibit C and made a part hereof.

**SECTION 15.2. Assumption and Assignment of Contracts.** Upon the Closing Date, Seller shall assign to Purchaser, and from and after the Closing Date, Purchaser does hereby agree to assume, any and all liabilities in connection with the Contracts as set forth on Exhibit F, attached hereto and made a part hereof.

## ARTICLE 16
## Intentionally Omitted

## ARTICLE 17
## BANKRUPTCY PROVISIONS

**SECTION 17.1. Competing Transaction**.  Purchaser acknowledges and understands this Agreement is part of an extensive process undertaken by the Debtors' Estates and Purchaser in the Debtors' Chapter 11 Cases to identify and negotiate a transaction with a bidder who is prepared to pay the highest and best purchase price for the Properties.  As such, this Agreement is subject to approval by the Bankruptcy Court.  The Confirmation Order shall be in a form reasonably acceptable to Purchaser and Seller and shall contain, without limitation, the following provisions:

(i)      a finding that the proposed sale of the Properties was proper and sufficient under the Bankruptcy Code and the Bankruptcy Rules, and that all parties in interest entitled to notice of the Sale received such notice;

(ii)      except as set forth in Article 4, the sale of the Properties will be free of all Liens pursuant to Section 1123(a)(5)(D) of the Bankruptcy Code;

(iii)      Purchaser is not a mere continuation of Seller, there is no continuity of enterprise between Seller and Purchaser, Purchaser is not a successor to Seller and the transactions contemplated by this Agreement do not amount to, or otherwise constitute a consolidation, merger or *de facto* merger of Purchaser and Seller;

(iv)      Seller will reject all unexpired leases, executory contracts, tenancies and occupancies and Buyer shall not assume and is buying free and clear of all such unexpired leases, executory contracts, tenancies and occupancies listed on Schedule [___]; and

(v)      all Persons are enjoined from in any way pursuing Purchaser or the Properties by suit or otherwise to recover on any Liens which they may have against Debtor or the Properties as of the Closing Date.

**SECTION 17.2. Intentionally Omitted.**

**SECTION 17.3. Bankruptcy Court Filings**.  As promptly as practicable following the execution of this Agreement, Seller shall, at its sole costs and expense, file with and seek the approval of the Bankruptcy Court for the transactions contemplated hereby.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Confirmation Order

- 18 -

including furnishing affidavits or other Documents or information for filing with the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Purchaser under this Agreement.  In the event the entry of the Confirmation Order shall be appealed, each party shall use its respective commercially reasonable efforts to defend against such appeal.

**SECTION 17.4. Intentionally Omitted**.

**SECTION 17.5. Closing In The Event Of The Filing Of The Notice Of Appeal From The Confirmation Order**.  In the event the Bankruptcy Court enters the Confirmation Order and a notice of appeal is filed by any person or entity and no stay of the Confirmation Order is granted by the Bankruptcy Court or any other court with competent jurisdiction, Purchaser shall not be obligated to close the transaction approved by the Confirmation Order until any applicable appeal is exhausted.

**ARTICLE 18**
**Intentionally Omitted**

**ARTICLE 19**
**MISCELLANEOUS**

**SECTION 19.1. Entire Agreement**.  The Plan, this Agreement, the Exhibits and Schedules annexed hereto, and any contemporaneously executed agreements, are the entire agreement between Seller and Purchaser concerning the sale of the Property and all understandings and agreements heretofore had or made between the parties hereto are merged in this Agreement which, together with aforementioned agreements and other items, alone fully and completely expresses the agreement of the parties hereto.

**SECTION 19.2. Modification**.  Except as otherwise provided herein, this Agreement may not be changed, modified, supplemented or terminated, except by an instrument executed by the parties hereto which are or will be affected by the terms of such change, modification, supplement or termination.  Either party hereto may waive any of the terms and conditions of this Agreement made for its benefit, provided such waiver is in writing and signed by the party waiving such term or condition.

**SECTION 19.3. Binding Agreement**.  Subject to the provisions of this Agreement, the terms, covenants, agreements, conditions, representations and warranties contained in this Agreement shall inure to the benefit of and be binding upon the respective parties hereto.  This Agreement shall not inure to the benefit of or be enforceable by any other Person.

**SECTION 19.4. Assignment**.  Purchaser shall have the right to assign all rights of Purchaser hereunder to one or more (i) affiliate or affiliates of the Purchaser or (ii) third-party or third parties designated by Purchaser, for the purpose of acquiring title.  Such right of assignment shall be exercised on notice to Seller on or prior to the Closing Date.  Nothing herein shall prevent Purchaser from assigning its right to acquire title to each parcel that makes up the Property to multiple entities.  Purchaser shall provide reasonable allocations of the Purchase Price for each of the parcels that make up the Property to Seller on or prior to the Closing.

**SECTION 19.5. Illegality**.  If any term or provision of this Agreement or the application thereof to any Person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term and provision of this Agreement shall be valid and enforced to the fullest extent permitted by Law.

**SECTION 19.6. Choice of Law**.  EXCEPT IN SUCH MATTERS AS ARE GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE EXHIBITS AND SCHEDULES ANNEXED HERETO, SHALL BE GOVERNED BY, INTERPRETED UNDER, AND CONSTRUED AND ENFORCED

121009049\V-9

IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

SECTION 19.7. **Construction**.  The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of this Agreement, and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement.  Unless stated to the contrary, all references to Articles, Sections, paragraphs or clauses herein shall be to the specified Article, Section, paragraph or clause of this Agreement, and all references to Exhibits and Schedules shall be to the specified Exhibits and Schedules attached hereto.  All Exhibits and Schedules attached hereto are made a part hereof.  All terms defined herein shall have the same meaning in the Exhibits and Schedules, except as otherwise provided therein.  All references in this Agreement to "**this Agreement**" shall be deemed to include the Exhibits and Schedules attached hereto.  The terms "**hereby**", "**hereof**", "**hereto**", "**hereunder**" and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used.  Whenever in this Agreement provision is made for the payment of attorneys' fees, such provision shall be deemed to mean reasonable attorneys' fees and paralegals' fees.  The term "**including**" when used herein shall mean "**including, without limitation**." Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.

SECTION 19.8. **Binding Effect; Assignment; Successors and Assigns**.  This Agreement shall apply to, be binding in all respects upon and inure to the benefit of the parties and their respective successors, administrators and permitted assigns.  A successor to Seller shall include Seller as a liquidated debtor.  Except to the extent provided for in Section 19.4 of this Agreement, no assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of Law or otherwise) without the prior written consent of Purchaser and Seller and any attempted assignment without the required consents shall be void.  No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations.  Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.  This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their respective successors, administrators and permitted assigns.

SECTION 19.9. **Ambiguities**.  Each party acknowledges that it and its counsel have reviewed this Agreement, and the parties hereby agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

SECTION 19.10.**Expenses**.  If any legal action or other proceeding is brought for the enforcement of this Agreement or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover its fees and costs, including reasonable attorneys' fees, court costs and other costs incurred in such action or proceeding, in addition to any other relief to which it or they may be entitled. The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

SECTION 19.11.  **Counterparts**.  This Agreement may be executed in counterparts, each of which together shall be deemed to be an original and all of which shall constitute one and the same Agreement.  Any counterpart may be executed by PDF signature and such PDF signature shall be deemed an original.

SECTION 19.12.  **Waiver of Trial by Jury**.  THE RESPECTIVE PARTIES HERETO SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, OR FOR THE ENFORCEMENT OF ANY REMEDY UNDER ANY STATUTE, EMERGENCY OR OTHERWISE.

- 20 -

THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

**SECTION 19.13.  Third Party Beneficiaries**. Except as expressly set forth herein, no Person other than the parties hereto, shall have any rights or claims under this Agreement.

**SECTION 19.14.  Jurisdiction**.

19.14.1.          FOR THE PURPOSES OF ANY SUIT, ACTION OR PROCEEDING INVOLVING THIS AGREEMENT, PURCHASER AND SELLER EACH HEREBY EXPRESSLY SUBMIT TO THE JURISDICTION OF THE BANKRUPTCY COURT AND PURCHASER AND SELLER EACH AGREE THAT SUCH COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY SUCH SUIT, ACTION OR PROCEEDING COMMENCED BY EITHER PARTY.

19.14.2.          PURCHASER AND SELLER EACH HEREBY IRREVOCABLY WAIVE ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT BROUGHT IN ANY FEDERAL OR STATE COURT SITTING IN THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK AND HEREBY FURTHER IRREVOCABLY WAIVE ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

19.14.3.          THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

**SECTION 19.15.  No Recording**.  Purchaser covenants and agrees that it has no right and in no event will Purchaser record or cause to be recorded this Agreement or any memorandum hereof or affidavit, assignment or other document relating to this Agreement prior to the Closing and, if Purchaser breaches the provisions of this Section, Seller shall have the option of terminating this Agreement. Notwithstanding anything in the Section to the contrary, Purchaser shall be able to file and record a *lis pendens* if such is necessary to preserve its rights under this Agreement, including but not limited to in connection with an action for specific performance.

**SECTION 19.16.  Not an Offer**.  Notwithstanding anything herein to the contrary, it is to be strictly understood and agreed that (a) the submission by Seller to Purchaser of any drafts of this Agreement or any correspondence with respect thereto shall (i) be deemed submission solely for Purchaser's consideration and not for acceptance and execution, (ii) have no binding force or effect, (iii) not constitute an option for the purchase of the Property or a lease or conveyance of the Property by Seller to Purchaser and (iv) not confer upon Purchaser or any other party any title or estate in the Property, (b) the terms and conditions of this Agreement shall not be binding upon either party hereto in any way unless and until it is unconditionally executed and delivered by both parties in their respective sole and absolute discretion and all conditions precedent to the effectiveness thereof shall have been fulfilled or waived, and (c) if this Agreement is not so executed and delivered for any reason whatsoever (including, without limitation, either party's willful or other refusal to do so or bad faith), neither party shall be liable to the other with respect to this Agreement on account of any written or parole representations, negotiations, any legal or equitable theory (including, without limitation, part performance, promissory estoppel, or undue enrichment) or otherwise.

**SECTION 19.17.  Intentionally Omitted**.

**SECTION 19.18.  No Waiver**.  The failure of either party hereto to seek redress for any breach, or to insist upon the strict performance, of any covenant or condition of the Agreement by the other shall not be, or be deemed to be, a waiver of the breach or failure to perform (unless the time specified herein for the exercise of such right, or satisfaction of such condition, has expired), nor prevent a subsequent act

- 21 -

or omission in violation of, or not strictly complying with, the terms hereof from constituting a default hereunder.

   **SECTION 19.19.  Severability**.  If any term, condition or provision of this Agreement or the application thereof to any circumstance or party hereto, is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement and the applicability of such term, condition or provision to other persons or circumstances shall not be affected thereby.  Each term, condition or provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

   **SECTION 19.20.  No Survival**.  The delivery and acceptance of the Deed(s) at the Closing shall be deemed to constitute full compliance by Seller with all of the terms, conditions and covenants of this Agreement on Seller's part to be performed, and, except as expressly set forth in this Agreement, the representations, warranties, covenants or other obligations of Seller set forth in this Agreement shall not survive the Closing, and no action based thereon shall be commenced after the Closing.

   **SECTION 19.21.  Tax-Free Exchange**.  Either party may, at its sole cost and expense, consummate the transaction as part of a like-kind exchange (the "**Exchange**") pursuant to Section 1031 of the Code, provided that: (i) the Exchange is effected through a qualified intermediary (as defined in Treas.  Reg. Section 1.1031(k)-1(g)(4)(iii)) and the other party is not be required to: (A) acquire or hold title to any real property other than the Premises; or (B) incur any costs to third parties (other than such party's obligation under this Agreement for the benefit of the qualified intermediary) for purposes of consummating, or otherwise in connection with, the Exchange.  Each party shall reasonably cooperate with the other, at the other party's cost and expense, to effectuate the Exchange, including the execution of a trust or escrow agreement or any other document or instrument customarily entered into with a qualified intermediary to effectuate the Exchange, provided that the Exchange and the related documentation shall not be contrary to or inconsistent with the terms of this Agreement.

**THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.**
**SIGNATURES FOLLOW ON THE NEXT PAGE.**

121009049\V-9

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

SELLERS

**[85 FLATBUSH RHO MEZZ LLC**,
a New York limited liability company


By: _____
Name:
Title:    Authorized Signatory]

**85 FLATBUSH RHO HOTEL LLC**,
a New York limited liability company


By: _____
Name:
Title:    Authorized Signatory

**85 FLATBUSH RHO RESIDENTIAL LLC**,
a New York limited liability company


By: _____
Name:
Title:    Authorized Signatory

121009049\V-9

PURCHASER

[_____]

By:    _____
            Name:
            Title:

## SCHEDULE I TO PURCHASE AND SALE AGREEMENT

## DEFINITIONS

For all purposes of this Agreement, the following terms shall have the respective meanings specified below:

"**Affiliate**" means a Person that: (a) directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with a specified Person; (b) is a director or officer of a specified Person or of an Affiliate of such specified Person within the meaning of clause (a) above; (c) is a partner, member, beneficiary of a trust or other owner of any stock or other evidence of beneficial ownership in a specified Person or an Affiliate of such specified Person within the meaning of clause (a) above; or (d) is related as an ancestor, descendant, sibling, or is the current spouse of a specified Person or an Affiliate of such specified Person within the meaning of clause (a) above.

"**Agreement**" means this Agreement, the Exhibits and Schedules and all amendments, modifications and extensions hereto and thereto.

"**Apportionment Date**" shall have the meaning set forth in Section 4.1.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York.

"**Bidding Procedures Order**" means [_____].

"**Business Day**" means each day, except Saturdays, Sundays and all days observed by the federal government as legal holidays.

"**Cash**" means legal tender of the United States of America.

"**Closing**" shall have the meaning set forth in Section 8.1.

"**Closing Date**" shall have the meaning set forth in Section 8.1.

"**Closing Documents**" shall have the meaning set forth in Section 9.1.2.

"**Condemnation**" means any condemnation, taking or any damages to the interest in the Real Estate by reason of a change of grade of any street, road or avenue.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan.

"**Deed**" means the deed to the Real Estate to be delivered by Seller to Purchaser pursuant to Schedule IV.

"**Exchange**" shall have the meaning set forth in Section 19.21.

"**Governmental Authority**" shall have the meaning set forth in Section 3.3.8.

"**Hazardous Material**" shall mean all materials and substances now or hereafter subject to any Environmental Laws, including (i) all substances which are designated pursuant to Section 311(b)(2)(A) of the Federal Water Pollution Control Act ("**FWPCA**"), 33 U.S.C. § 1251, et seq., (ii) any element, compound, mixture, solution, or substance which is designated pursuant to Section 102 of the Comprehensive Environmental Response, Compensation and Liability Act ("**CERCLA**"), 42 U.S.C. § 9601, et seq., (iii) any hazardous waste having the characteristics which are identified under or listed pursuant to Section 3001 of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq., (iv)

any toxic pollutant listed under Section 307(a) of FWPCA, (v) any hazardous air pollutant which is listed under Section 112 of the Clean Air Act, 42 U.S.C. § 7401, et seq., (vi) any imminently hazardous chemical substance or mixture with respect to which action has been taken pursuant to Section 7 of the Toxic Substances Control Act, 15 U.S.C. § 2601, et seq., (vii) "hazardous materials" within the meaning of the Hazardous Materials Transportation Act, 49 U.S.C. § 5101, et seq., (viii) any element or compound contained in the list of hazardous substances adopted by the United States Environmental Protection Agency ("**EPA**") or by the New York Department of Environmental Conservation ("**DEC**"), (ix) petroleum or petroleum by-products, (x) ACM, (xi) any radioactive material or substance, (xii) all toxic wastes, hazardous wastes and hazardous substances as defined by, used in, controlled by, or subject to all implementing regulations adopted and publications promulgated pursuant to the foregoing statutes, and (xiii) any other hazardous or toxic substance or pollutant identified in or regulated under any other applicable federal, state or local Environmental Laws.

"**Law**" means any law, rule, code, regulation, ordinance, moratorium, injunctive proceeding, restriction or similar matter imposed by any federal, state, municipal or local government or any public or quasi-public board, authority, commission, agency or department thereof having jurisdiction over the Property, or any portion thereof and/or Purchaser or Seller.

"**Leases**" shall mean the leases, licenses or other agreements, written or oral, regarding the right to use or occupy all or any portion of the Property, to which Seller is a party or by which Seller is bound of all or any portion of the Property.

"**Liens**" shall have the meaning set forth in Section 3.1.1.

"**Material Part**" shall have the meaning set forth in Section 13.2.

"**Net Proceeds**" shall have the meaning set forth in Section 3.1.1.

"**Non-Permitted Exceptions**" shall have the meaning set forth in Section 3.2.1.

"**Notices**" shall have the meaning set forth in Section 10.1.

"**Permitted Exceptions**" shall have the meaning set forth in Section 3.3.

"**Person**" means an individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, association, joint stock company, trust, un-incorporated organization or the federal government or any state or local government or any agency or political subdivision thereof.

"**Personalty**" shall have the meaning set forth in Section 2.1.1.

"**Property**" shall have the meaning set forth in Section 2.1.1.

"**Properties**" shall have the meaning set forth in Section 2.1.1.

"**Property Contracts**" shall mean all management, service, telecommunications, information service, equipment, supply and maintenance contracts, construction contracts in connection with the Properties that exist on the Effective Date to which Seller is bound or a party to.

"**Purchase Price**" shall have the meaning set forth in Section 2.2.1.

"**Purchaser**" shall mean [_____].

"**Purchaser-Related Parties**" means, individually and collectively, and to the extent applicable, (i) Purchaser, (ii) Affiliates of Purchaser, and (iii) the shareholders, officers, directors, employees,

- 2 -

members and constituent partners of Purchaser and/or of any direct or indirect partner or member of or corporate joint-venturer with Purchaser, and/or of any Affiliate of Purchaser.

"**Real Estate**" shall have the meaning set forth in Section 2.1.1.

"**RE Tax Returns**" shall have the meaning set forth in Section 4.8.

"**Rents**" shall have the meaning set forth in Section 4.1.4.

"**Sale Proceeds**" means any cash proceeds from the Sale Transaction net of closing costs directly related to the Sale Transaction including but not limited to Debtors' brokerage fees, title costs and other ordinary and necessary costs of, or credits related to, the transfer of title of the Hotel Property and/or Residential Property.

"**Sale Transaction**" shall mean the sale of the Hotel Property and/or Residential Property pursuant to the Plan.

"**Scheduled Closing Date**" shall have the meaning set forth in Section 8.1.

"**Seller**" shall have the meaning set forth in the Recitals.

"**Seller-Related Parties**" means individually and collectively, Seller and its officers, directors, members, employees, agents, representatives and contractors and Affiliates of Seller.

"**Tenant**" shall mean the then tenant under the Leases.

"**Title Company**" shall have the meaning set forth in Section 3.1.

"**Title Report**" means the Certificate of Title issued by the Title Company.

"**Transfer Tax**" shall have the meaning set forth in Section 4.7.

"**Unavoidable Delay**" shall mean any delays due to strikes, acts of God, governmental restrictions, enemy action, civil commotion, fire, unavoidable casualty or other causes similarly beyond the control of Seller; provided, however, that any lack of funds shall not be deemed a cause beyond the control of Seller.

"**Violations**" shall have the meaning set forth in Section 3.3.8.

121009049\V-9

**SCHEDULE II**

**PROPERTY DESCRIPTION**

**SCHEDULE III**

**SELLER'S WIRING INSTRUCTIONS**

## SCHEDULE IV

## CLOSING DOCUMENTS TO BE DELIVERED BY SELLER

1.      Statutory form of bargain and sale deed without covenants (the "**Deed**") substantially in the form attached hereto as Exhibit A containing the covenant required by Section 13 of the Lien Law, and properly executed and acknowledged so as to convey the title required to be conveyed by Seller under this Agreement.

2.      Bank or certified check(s), payable to the direct order of the appropriate tax collecting agencies or officials, in the amount of all documentary stamp and transfer and transfer gains taxes, and other taxes, fees and charges, payable by reason of or in connection with the conveyance and transfer of the Property by Seller to Purchaser.  In lieu of delivering such bank or certified checks, Seller may elect, by written notice to Purchaser given at least two (2) Business Days prior to Closing, to have Purchaser pay any of such taxes and charges and give Purchaser a credit on the Closing Date against the Purchase Price in the amount thereof.

3.      Copies of any required real property transfer tax returns properly executed and acknowledged by Seller and Purchaser, as applicable.

4.      All documents, as shall be reasonably necessary to evidence that Seller has proper authority to sell the Property and deliver the documents required to be delivered by Seller pursuant to this Agreement.

5.      All keys to entrance doors to, and equipment and utility rooms located in, the Property and in Seller's possession.

6.      A certificate of a duly authorized representative of Seller, sworn to under penalties of perjury, setting forth Seller's U.S. tax identification number and stating that Seller is a "**United States person**" within the meaning of Sections 1445(f)(3) and 7701(a)(30) of the tax Code.

7.      To the extent such are in the possession or control of Seller or its managing agent, original copies of all guarantees and warranties then in effect in respect of the Property.

8.      To the extent such are in the possession or control of Seller or its managing agent, original licenses and permits to be transferred hereunder, except to the extent the same are required to be and located at or are affixed of the Property.

9.      Certificate of an authorized representative of Seller with respect to the authority of the person(s) executing this Agreement and the other Closing Documents on behalf of Seller, if applicable.

10.     A Bill of Sale, without warranty, recourse or representation, conveying the Personalty to Purchaser substantially in the form attached hereto as Exhibit B.

11.     All existing surveys and building plans for the Property and the improvements thereon to the extent in Seller's possession.

12.     An Assignment and Assumption of Lease and Security Deposit, substantially in the form of Exhibit C attached hereto and made a part hereof, properly executed and acknowledged by Seller and Purchaser.

13.     All original Leases and tenant documents, to the extent in the possession of Seller.  In the event such original lease files are not in the possession of Seller, a certified copy of all Leases.

121009049\V-9

14.	A certified Rent Roll in the form attached as Exhibit D, stating the rent amount paid as of such date, and all security deposits being held, and any arrears schedule.

15.	A certificate dated as of Closing, certifying that all of the representations and warranties made by Seller herein are true and correct in all material respects or, to the extent the facts and circumstances arising after the date hereof underlying such representations and warranties may have changed as of the Closing, Seller shall certify as to such changed facts and circumstances.

16.	Any Title Affidavit or similar document required by the Title Company required in order to deliver title to the Properties to Purchaser in the manner required by this Agreement.

## SCHEDULE V

## PURCHASER'S CLOSING DOCUMENTS

1.      Copies of any required real property transfer tax returns properly executed and acknowledged by Purchaser and Seller.

2.      All documents as shall be reasonably necessary to evidence that Purchaser has proper authority to purchase the Property and deliver the documents required to be delivered by Purchaser pursuant to this Agreement.

3.      Certificate of an authorized representative of Purchaser with respect to the authority of the person(s) executing this Agreement and the other Closing Documents on behalf of Purchaser.

4.      Certificate in form and substance reasonably acceptable to Seller, signed and acknowledged by an authorized representative of Purchaser, restating and attesting, except as otherwise permitted pursuant to the terms of this Agreement, to be true and correct as of the Closing Date each of the represents and warranties of Purchaser set forth in this Agreement.

5.      An Assignment and Assumption of Lease and Security Deposit, substantially in the form of Exhibit C attached hereto and made a part hereof, properly executed and acknowledged by Seller and Purchaser.

6.      A certificate dated as of Closing, certifying that all of the representations and warranties made by Purchaser herein are true and correct in all material respects or, to the extent the facts and circumstances arising after the date hereof underlying such representations and warranties may have changed as of the Closing, Purchaser shall certify as to such changed facts and circumstances.

**EXHIBIT A**

**DEED**

[See Attached]

**Form of Bargain and Sale Deed**

WITHOUT COVENANT AGAINST GRANTOR'S ACTS

_____, a Delaware limited liability company

TO

_____,

a [_____]

ADDRESS:
BLOCK:

LOT:

COUNTY:

RETURN BY MAIL TO:

BARGAIN AND SALE DEED WITHOUT COVENANT AGAINST GRANTOR'S ACTS THIS INDENTURE,
made as of this _____ day of _____, 2022

BETWEEN _____, a _____ limited liability company having an address _____
("Seller") party of the first part, and [_____], a [_____], with
offices at [_____], party of the second part,

WITNESSETH, that the party of the first part, in consideration of ten dollars and other valuable
consideration paid by the party of the second part, does hereby grant and release unto the party of the
second part, the heirs or successors and assigns of the party of the second party forever,

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected,
situate, lying and being in the County of _____, City and State of New York, more commonly known as
_____ and more particularly described on Exhibit A attached hereto and hereby made part
hereof.

TOGETHER with all right, title and interest, if any, of the party of the first part in and to any streets and
roads abutting the above described premises to the center lines thereof; TOGETHER with the
appurtenances and all the estate and rights of the party of the first part in and to said premises;

TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or
successors and assigns of the party of the second part forever.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of
the first part will receive the consideration for this conveyance and will hold the right to receive such
consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and
will apply the same first to the payment of the cost of the improvement before using any part of the total of
the same for any other purpose.  The word "party" shall be construed as if it read "parties" whenever the
sense of this indenture so requires.

IN WITNESS WHEREOF, the party of the first part has duly executed this deed the day and year first above written.

_____,

By:    _____
       Name:
       Title:

STATE OF NEW YORK
COUNTY OF NEW YORK

On the _____ day of _____ in the year 2022 before me, the undersigned, a Notary Public in
and for said State, personally appeared _____, personally known to me or proved to me
on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the
within instrument and acknowledged to me that he/she/they executed the same in his/her/their
capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon
behalf of which the individual(s) acted, executed the instrument.

_____
Signature and Office of individual taking
acknowledgement

**Exhibit A**

**Legal Description**

**EXHIBIT B**

**FORM OF BILL OF SALE**

[See attached]

KNOW ALL MEN BY THESE PRESENTS,

That, subject to the terms and conditions hereinafter set forth, forth between _____, a Delaware limited liability company having an address _____ ("Seller") for and in consideration of the sum of [Ten Dollars ($10.00)], lawful money of the United States, to it in hand paid at or before delivery of these presents by _____, a Delaware limited liability company having an address _____ ("Purchaser"), the receipt of which is hereby acknowledged, has bargained and sold, and by these presents does grant and convey unto Purchaser its successors and assigns all right, title and interest of Seller in and to all of the fixtures, equipment and other items of personal property (collectively, the "Personal Property") attached to, contained in, appurtenant to or utilized in connection with the ownership or operation of, the premises and the improvements thereon located at _____ NY ("Premises"), including, without limitation, the items listed on Schedule A attached hereto).

Seller grants, conveys and assigns the Personal Property unto Purchaser without recourse and without representation or warranty of any kind, express or implied (except to the extent set forth in the Purchase and Sale Agreement, dated as of _____ __, 2022, by and between Seller and Purchaser, and subject to the limitations contained therein).

TO HAVE AND TO HOLD the same unto Purchaser, its successors and assigns forever.

SELLER HAS MADE NO WARRANTY THAT THE PERSONAL PROPERTY COVERED BY THIS BILL OF SALE IS MERCHANTABLE OR FIT FOR ANY PARTICULAR PURPOSE AND THE SAME IS SOLD IN AN "AS IS" "WHERE IS" CONDITION.  BY ACCEPTANCE HEREOF, PURCHASER AFFIRMS THAT, EXCEPT AS SET FORTH IN THE AGREEMENT, IT HAS NOT RELIED ON ANY WARRANTY OF SELLER WITH RESPECT TO THE PERSONAL PROPERTY AND THAT, EXCEPT AS SET FORTH IN THE AGREEMENT, THERE ARE NO REPRESENTATIONS OR WARRANTEES, EXPRESSED, IMPLIED OR STATUTORY.

This Bill of Sale shall be governed by and construed in accordance with the laws of the State of New York.

This Bill of Sale shall be binding upon, enforceable by and shall inure to the benefit of the parties hereto and their respective successors and assigns.

[Signature page follows immediately]

IN WITNESS WHEREOF, Seller has caused this instrument to be duly executed this day of
_____, 2022.

ASSIGNOR:

_____

By:    _____

Name:

**EXHIBIT C**

**ASSIGNMENT AND ASSUMPTION OF LEASE AND SECURITY DEPOSIT**

[See attached]

[IF APPLICABLE]

## <u>ASSIGNMENT OF AND ASSUMPTION OF</u>
## <u>LEASE AND SECURITY DEPOSIT</u>

**THIS AGREEMENT**, made and entered into this ___ day of _____, 2022 between _____, ("**Assignor**") and _____, a [TYPE OF ENTITY AND JURISDICTION OF FORMATION] ("**Assignee**").

## W I T N E S S E T H:

**WHEREAS**, pursuant to that certain Purchase and Sale Agreement, dated _____ __, 2021, between Assignor and Assignee (the "**PSA**"), Assignor has agreed to convey to Assignee, and Assignee has agreed to accept from Assignor, all of Assignor's right, title and interest in and to the real property, and the buildings and other improvements located thereon, owned by Assignor and commonly known by the address of _____.(the "**Premises**"); and

**WHEREAS**, Assignor desires to assign to Assignee all of Assignor's right, title and interest in and to the leases, tenancies, concessions, licenses and occupancies set forth on the rent roll attached hereto as <u>Schedule A</u> and made a part hereof (collectively, the "**Leases**"), on the terms and conditions hereinafter set forth; and Assignee desires to accept the assignment by Assignor of all of Assignor's right, title and interest in and to the Leases, on the terms and conditions hereinafter set forth, Assignee being willing to perform all duties and responsibilities of the lessor under the Lease as hereinafter set forth. Assignor desires to assign to Assignee all of the outstanding rents owns ("**Arrears**"), and Assignee desires to assume all of the Arrears (the Arrears shall be set forth on the rent roll annexed hereto as <u>Schedule A</u>).

**NOW, THEREFORE**, in consideration of the mutual acts, obligations and covenants of the parties, one to the other, and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged by the parties, one to the other, it is mutually understood and agreed as follows:

**Assignment.**  Assignor hereby assigns, sets over and transfers the Leases to Assignee, its successors and assigns, together with all of Assignor's right, title, interest, duties and responsibilities under the Leases including, without limitation any arrears or other outstanding payments due thereunder.  Assignor shall indemnify Assignee against any liability and expense arising out of any breach by the lessor under the Leases occurring prior to the date hereof.

**Acceptance of Assignment.**  Assignee hereby accepts the within assignment by Assignor of the Leases and all of Assignor's right, title, interest, duties and responsibilities thereunder arising from and after the date hereof, and Assignee hereby covenants to assume and perform all duties and responsibilities of the lessor under the Leases to the extent arising from and after the date hereof.  Assignee shall indemnify Assignor against any liability and expense arising out of any breach by the lessor under the Leases occurring from and after the date hereof.

**Assignee's Acknowledgement of Receipt of Security Deposits and Indemnification Relating Thereto.**  Assignee hereby acknowledges that Assignee has received security deposits under the Leases in the aggregate amount of _____ _____ /100s ($ _____) Dollars (collectively, the "Security Deposits"). Assignee shall indemnify and save and hold Assignor harmless from and against any and all costs, losses, liabilities and expenses, including reasonable attorneys' fees, court costs and costs of collection, arising out of any breach by Assignee under the Leases respecting the lessor's duty to refund the Security Deposits or any part thereof, to lessees or any lessee under the Leases.

**Survival.**  This Agreement and all indemnifications hereunder shall survive closing of that certain purchase and sale transaction contemplated by the PSA.

121009049\V-9

**Binding Effect.**  This Agreement shall be binding upon the parties hereto, their successors and assigns.

**Modification.**  This Agreement may not be modified, revoked or amended other than in writing.

**Governing Law.**  This Agreement shall be governed by and in accordance with the laws of the State of New York.

        **IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the date first above written.

                                  **ASSIGNOR**:

                                    _____

                                    By:    _____
                                                 Name:
                                                 Title:

                                    **ASSIGNEE**:

                                    By:    _____
                                                 Name:
                                                 Title:

**SCHEDULE A**

**EXHIBIT D**

**RENT ROLL**

[If Applicable]

**EXHIBIT E**

**Intentionally Omitted**

**EXHIBIT F**

**Assumed Contracts**

None

# **Exhibit 3**

(Confirmation Order Notice)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re<br><br>85 FLATBUSH RHO MEZZ LLC, et al.,[1]<br><br>Debtors | Case No. 20-23280 (RDD)<br>Confirmed Chapter 11<br><br><br>(Jointly Administered) |

**NOTICE OF ENTRY OF ORDER CONFIRMING SECOND AMENDED**
**CHAPTER 11 PLAN FILED BY CREDITOR TH HOLDCO LLC RELATED TO**
**85 FLATBUSH RHO MEZZ, LLC, 85 FLATBUSH RHO HOTEL LLC,**
**AND 85 FLATBUSH RHO RESIDENTIAL LLC**

**PLEASE TAKE NOTICE** that on June 30, 2022, the United States Bankruptcy Court for

the Southern District of New York signed the Findings of Fact, Conclusions of Law, and Order

Confirming TH Holdco's Second Amended Chapter 11 Plan (the "Plan") and Fixing Deadlines for

Filing Certain Claims (the "Confirmation Order"), which directed the mailing of a notice of entry

of the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE** that proofs of claim based on a rejection of an

executory contract or unexpired lease must be filed in accordance with the provisions of Section

9.3 of the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Plan and Confirmation Order contain

injunctive provisions which may be applicable to you.

**PLEASE TAKE FURTHER NOTICE** that the Plan and Confirmation Order may be

viewed at the Bankruptcy Court's Internet site at http://www.nysb.uscourts.gov.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include: 85 Flatbush RHO Mezz LLC (6184) (the "Mezz Debtor"); 85 Flatbush RHO Hotel LLC (5027) (the "Hotel Debtor"); and 85 Flatbush RHO Residential LLC (2261) (the "Residential Debtor", and together with the Mezz Debtor and the Hotel Debtor, the "Debtors").

Dated:  New York, New York
        June 30, 2022

**DENTONS US LLP**
Lauren Macksoud
Sarah M. Schrag
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6700
Fax: (212) 768-6800
Email: lauren.macksoud@dentons.com
        sarah.schrag@dentons.com

        -and-

Robert Richards  (admitted *pro hac vice*)
**DENTONS US LLP**
233 S. Wacker Drive
Suite 5900
Chicago, IL 60606
Telephone: (312) 876-8000
Facsimile: (312) 876-7934
Email: robert.richards@dentons.com

*Counsel to TH Holdco LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 20, 2022, I caused a true and correct copy of the foregoing

**Notice of Appeal** to be served via the Bankruptcy Court's CM/ECF system on all parties registered

to receive electronic notice in this case.


  <u>/s/ *M. Ryan Pinkston*                  </u>
        M. Ryan Pinkston

85027163v.1