**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>    85 FLATBUSH RHO MEZZ LLC, et al.,<br><br>                    Debtors | Case No. 20-23280 (RDD)<br>Chapter 11<br><br><br>(Jointly Administered) |

### DECLARATION OF FRANCO FAMULARO IN SUPPORT OF TH HOLDCO LLC'S OBJECTION TO MEZZ LENDER'S MOTION FOR A STAY PENDING APPEAL OF THE CONFIRMATION ORDER

I, Franco Famularo, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 and state as follows[1]:

1.      I am a partner and Chief Investment Officer at Ohana Real Estate Investors ("Ohana"). I am a resident of the State of California and am over the age of 18. TH Holdco LLC is an affiliate of Ohana. I submit this declaration in connection with TH Holdco's objection to the Secured Creditor 85 Flatbush Mezz LLC's Motion for Stay Pending Appeal or, Alternatively, Stay Pending Resolution of Adversary Proceeding (the "Stay Motion")[Docket No. 294].

2.      I know each of the following facts to be true of my own personal knowledge and, if called as a witness, I could and would competently testify with respect thereto.

3.      I incorporate by reference my prior declarations filed in this Court [Docket Nos. 174, 265 and 267], and my testimony (at pages 43 to 53 of the June 30, 2022 Confirmation Hearing), a copy of which is attached hereto as **Exhibit A**.

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed in the Objection and the TH Holdco Second Amended Plan.

US_ACTIVE\121958937\V-6

I.        Harms to TH Holdco and Accruing Chapter 11 Administrative Expenses

4.        TH Holdco and each of the Chapter 11 estates would suffer substantial harm if a stay pending appeal were issued, even for a short period of time.  Those harms include, but are not limited to:

    a.  Lost revenue and profits due to the apartments remaining almost entirely vacant;

    b.  Lost revenue and profits due to the hotel remaining subject to the below-market Department of Homeless Services lease;

    c.  Lost revenue and profits due to the retail, food & beverage, and parking spaces remaining vacant and unused;

    d.  Further damage to the property's reputation and perception in the market that could lead to depressed demand or the inability to hire sufficient staff to reopen;

    e.  Further potential damage to the property from lack of maintenance or as a result of current use of property, including risk of a casualty event impacting some or all of the property which may not be fully insured;

    f.  Increased costs to repair and renovate property, including the need for a material capital expenditure refresh of the property for a longer term stay which is important to keep any hotel or residential property commercially viable;

    g.  Further fines and penalties from delaying payment of property taxes and accrued liabilities;

    h.  Interest rate accruing on the existing debt;

    i.  Interest rate risks on going forward financing for the property in general;

    j.  The pendency of the appeal and any stay issued will make it more difficult and expensive to obtain additional financing or to refinance the Property;

    k.  Effects of possible recession impacting the property's revenues, occupancy and cash flow;

    l.  Effects of potential further COVID surges impacting the property's revenues, occupancy and cash flow;

    m.  Ohana's cost of capital;

    n.  Ongoing legal, operational and other costs of keeping the Chapter 11 cases open, including monthly operating reports, US Trustee Quarterly fees, motion practice (such as the pending insurance renewal motion) and similar Chapter 11 administration;

    o.  Ongoing asset management fees;

    p.  Risks of potential personal injury or other claims arising and being asserted as a Chapter 11 administrative expense;

    q.  Potential claims from the Class 6 and 8 claimants for interest on their claims due to delays in paying those claims;

    r.  Potential conversions of one or more of these Chapter 11 cases to Chapter 7 with associated loss of going concern value and the Section 1146 transfer tax exemption under a confirmed Chapter 11 plan;

    s.  Risk of a lift stay motion by taxing authorities to proceed with a sale of the delinquent taxes;

    t.    Risk of a lift stay motion by TH Holdco including due to lack of ongoing adequate protection (including, without limitation, related to the accruing real estate taxes with interest and penalties and/or market risks); and

    u.    Additional costs associated with responding to appeal, stay and other related motions.

5.    Some of these costs and risks are hard to quantify but should be considered in determining an appropriate bond amount for any stay.  Attached as **Exhibit B** is a chart summarizing certain key costs and risks that can be quantified for two scenarios: (i) a shorter term stay of 2 months and (ii) a longer term stay of 24 months.  Based on those two scenarios, a bond of at least $3.6 million for the 2 month short stay scenario and at least $65.6 million for the 24 month longer stay scenario should be required to protect TH Holdco and the Chapter 11 estates against these risks if a stay is issued.

II.    <u>Harms to Taxing Authorities, Trade and Other Creditors</u>

6.    On the Effective Date of the TH Holdco Plan (expected to occur in August 2022 absent an issuance of a stay pending appeal), substantial payment to creditors, totaling approximately $5 million, would be made in at least the amounts set forth below:

    a.    Pre-Petition Taxes - $122.44
    b.    Post-Petition Taxes - $2,910,644.68
    c.    Remaining Non-Tax Chapter 11 Administrative Expense Claims – Approximately $700,000 (including JLL brokerage fee and accrued Debtors counsel fees)
    d.    Class 6 and 8 Trade and General Unsecured Claims -$1,358,436.43

7.    These creditors would be paid in full on account of their claims if the TH Holdco goes effective in August 2022.  If the Stay Motion is granted, however, these creditors would be forced to continue to wait to receive payment on their claims and there is a risk they may never receive payment, especially in a scenario where these Chapter 11 cases are converted to Chapter 7 or the stay is lifted to allow TH Holdco to foreclose or the taxing authorities to conduct at delinquent tax sale.

III.    <u>Total Bond Requirement</u>

8.      Therefore, a total bond of at least $8.6 million (for the at least $3.6 million of damages set forth in Section I above plus the $5 million set forth in Section II above) should be required for a 2 month stay and a total bond of at least $70.6 million (for the at least $65.6 million of damages set forth in Section I above plus the $5 million set forth in Section II above) should be required for a 24 month stay.

9.      TH Holdco continues to maintain that the standards to issue a short or longer term stay have not been met here for the reasons set forth in its filed objection to the stay and that no short or long term stay should be issued here.

Executed on this 1st day of August, 2022.

/s/ *Franco Famularo*
Franco Famularo, Partner and CIO
Ohana Real Estate Investors

# **<u>EXHIBIT A</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
IN RE:                      .   Case No. 20-23280(RDD)
                            .
                            .
85 FLATBUSH RHO MEZZ,       .   300 Quarropas Street
LLC,                        .   Room 147
                            .   White Plains, NY 10601
                            .
           Debtor.          .   June 30, 2022
. . . . . . . . . . . . ..      11:38 a.m.
```

TRANSCRIPT OF:

HEARING ON CONFIRMATION OF CHAPTER 11 PLAN OF TH HOLDCO LLC. RELATED DOCUMENTS: ORDER SIGNED ON 5/26/2022 GRANTING TH HOLDCO LLC'S MOTION TO APPROVE (I) THE ADEQUACY OF INFORMATION IN THE DISCLOSURE STATEMENT, (II) SOLICITATION AND NOTICE PROCEDURES, (III) FORMS OF BALLOTS, AND (IV) CERTAIN DATES WITH RESPECT THERETO.  HEARING TO BE HELD ON 6/30/2022 AT 10:00 A.M. AT VIDEOCONFERENCE (ZOOMGOV)(RDD)(ECF #210)

NOTICE OF HEARING/NOTICE OF ENTRY OF ORDER GRANTING TH HOLDCO LLCS MOTION TO APPROVE (I) THE ADEQUACY OF INFORMATION IN THE DISCLOSURE STATEMENT, (II) SOLICITATION AND NOTICE PROCEDURES, (III) FORMS OF BALLOTS, AND (IV) CERTAIN DATES WITH RESPECT THERETO (RELATED DOCUMENT(S)212, 211, 210)(ECF #213)

TH HOLDCO SECOND AMENDED PLAN - PURCHASE AND SALE AGREEMENT BY AND BETWEEN 85 FLATBUSH RHO HOTEL LLC AND 85 FLATBUSH RHO RESIDENTIAL LLC AS SELLERS, AND TH HOLDCO LLC (RELATED DOCUMENT(S)212, 211, 210) FILED BY LAUREN M. MACKSOUD ON BEHALF OF TH HOLDCO LLC (ECF #268)

RELATED: SECOND AMENDED PLAN FILED BY CREDITOR TH HOLDCO LLC RELATED TO 85 FLATBUSH RHO MEZZ LLC, 85 FLATBUSH RHO HOTEL LLC, AND 85 FLATBUSH RHO RESIDENTIAL LLC FILED BY LAUREN M. MACKSOUD ON BEHALF OF TH HOLDCO LLC (ECF #211)

OBJECTION TO CONFIRMATION OF AMENDED PLAN (RELATED DOCUMENT(S)211) FILED BY MICHAEL RYAN PINKSTON ON BEHALF OF 85 FLATBUSH MEZZ LLC (ECF #227)

OBJECTION LIMITED OBJECTION TO PLAN (RELATED DOCUMENT(S)211) FILED BY HUGH H. SHULL III ON BEHALF OF NYC DEPT. OF FIN. AND WATER BOARD (ECF #228)

OBJECTION - DEBTOR'S OBJECTION TO CONFIRMATION OF SECOND AMENDED CHAPTER 11 PLAN FILED BY CREDITOR TH HOLDCO LLC (RELATED DOCUMENT(S)211) FILED BY ARNOLD MITCHELL GREENE ON BEHALF OF 85 FLATBUSH RHO HOTEL LLC, 85 FLATBUSH RHO MEZZ LLC, 85 FLATBUSH RHO RESIDENTIAL LLC (ECF #229)

Famularo - Examination by the Court                    43

1  your right hand, please?

2          MR. FAMULARO:  Yes, Your Honor.

3              FRANCO FAMULARO, WITNESS, SWORN

4                       EXAMINATION

5  BY THE COURT:

6  Q   Okay.  You submitted two declarations in connection with

7  this hearing, this confirmation hearing.  One is dated June 27,

8  2022, and one is dated also June 27, 2022.  One is in support

9  of confirmation, and one is in -- the second one is in response

10 to the debtor's motion for an order under Section 363(k)

11 disqualifying the Holdco -- disqualifying TH Holdco from credit

12 bidding and to the debtor's second amended plan and for the

13 support of TH Holdco's second amended plan.

14          Those declarations refer to an earlier declaration

15 that appears at Docket 174 insofar as it addresses the

16 circumstances under which TH Holdco engaged in due diligence

17 and acquired the senior loan.  Sitting here today on June 30,

18 and knowing that those two declarations and, to the extent

19 incorporated, the earlier declaration from April 4, 2022, are

20 being -- are intended to be used as your direct testimony in

21 this confirmation hearing, is there anything in there that you

22 wish to change?

23 A   No, Your Honor.

24          THE COURT:  Okay.  Does anyone want to cross-examine

25 Mr. Famularo on any of his three declarations?

Famularo - Cross/L. Schwartz                    44

1           MS. L. SCHWARTZ:  Lori Schwartz, Robinson Brog, for

2    the debtors.  May I just have a moment, Judge, to look at the

3    declarations?

4           THE COURT:  Sure.

5                            (Pause)

6           MS. L. SCHWARTZ:  Lori Schwartz for the debtors,

7    Judge.  With respect to the declaration at ECF Document 265,

8    which is in support of confirmation of the plan --

9           THE COURT:  Right.

10          MS. L. SCHWARTZ:  -- the debtor does not have

11   questions.  I would like to ask a few questions with respect to

12   the response to the debtor's motion for the order regarding the

13   363(k) motion.

14          THE COURT:  Okay.  So, yes, you can go ahead then.

15          MS. L. SCHWARTZ:  Thank you.

16                       CROSS-EXAMINATION

17   BY MS. L. SCHWARTZ:

18   Q    Good morning.  Good afternoon, Mr. Famularo.  This -- my

19   name is Lori Schwartz.  My firm is counsel to the 85 Flatbush

20   debtors.

21   A    Hi, Ms. Schwartz.

22   Q    You submitted a declaration -- I'm identifying it as ECF

23   Document Number 267 -- in response to the debtor's motion

24   seeking to disqualify TH Holdco's credit bid.  In that -- are

25   you familiar with that declaration?

Famularo - Cross/L. Schwartz                    45

1  A     Yes, I am.

2  Q     Do you have a copy in front of you?

3  A     I do.

4  Q     Okay.  In that declaration, you indicate that you met with

5  Isaac Hager.  Is that correct?

6  A     Yes.

7  Q     And is it correct that you met with Mr. Hager at the

8  debtor's property?

9  A     Yes.

10  Q    Okay.  And do you recall any communications with Mr. Hager

11  after you met with him at the property?

12  A     Yes, Ms. Schwartz.

13  Q     And do you recall sending an email to Mr. Hager the day

14  after you met with him at the property?

15  A     I do.

16  Q     Okay.  And do you remember the contents of that email?

17  A     Yes.  And I believe it may have been an exhibit in

18  something that you guys filed.

19  Q     So your declaration indicates, and for lack of a better

20  word and with all due respect to Mr. Hager, that you weren't

21  necessarily impressed with his knowledge of the debtor's

22  property and operations.  So could you explain why you then

23  followed up with questions regarding the property and its

24  operations with Mr. Hager the day after the hotel tour?

25  A     Yeah.  Because during the tour, I asked a series of

Famularo - Cross/L. Schwartz                46

1  questions to Mr. Hager that he wasn't able to answer.  And so,

2  giving him the benefit of the doubt to some extent, I followed

3  up with him to see if I put it in -- if the -- if I put the

4  questions in writing, maybe it gave him an opportunity to

5  actually, you know, find some detailed responses or provide the

6  detailed information that we required.

7      I was also, you know, respecting the fact that Mr. Hager

8  clearly had a lot going on.  We were aware that he had some

9  other properties that were, you know, maybe under distress as

10  well, and so I didn't -- I wasn't totally sure that I should

11  hold him accountable on the fly to answering some of those

12  questions.  So I filed up with him via email just to politely

13  ask for, you know, some of those detail -- that detailed

14  information that I had asked about on our tour.

15  Q    Okay.  Did he respond to that email?

16  A    No.  It took -- I think it took some time for him to

17  ultimately respond.  I seem to recall it took at least a couple

18  of weeks.  And then when he finally did respond, it was really

19  just sort of a rehashing of what he had said on the tour which

20  was very high-level, inadequate level of detail for me to

21  actually understand what was going on, you know, and/or what

22  his overall business plan, you know, was at the time.

23  Q    And when you -- you sent Mr. Hager an email on October

24  18th -- I believe it's also included in the debtor's motion --

25  where you indicated that you were looking forward to hearing

Famularo - Cross/L. Schwartz                    47

1  from him and to continuing the conversations.  And what did you

2  mean by that?

3  A    Ms. Schwartz, I would say I try to be polite in my

4  interactions with folks, especially when I -- I'm meeting them

5  for the first time.  And so I think that's, you know, probably

6  where you hear that tone is simply me just telling him, you

7  know, I appreciate your time and I -- I know he had a lot going

8  on and, you know, look forward to hearing back on the questions

9  that I had asked about or the information that I had asked for.

10  So that's really kind of the nature of that communication.

11  Q    Okay.  Do you recall if you had any further communications

12  with Mr. Hager after that October 18th email?

13  A    I don't recall if I had any direct communications with

14  Mr. Hager.  I'm sure there was maybe some response when -- I

15  know we exhibited, you know, some communication that he had

16  sent, you know, but I don't know if I was directly copied on

17  it.  So I can't really speak to the fact of whether I was, you

18  know, in direct communication with Mr. Hager.

19  Q    Okay.  Do you recall participating in a phone call with

20  Mr. Hager on November 30th?

21  A    To be honest, no, I don't recall off the top of my head.

22  It's entirely possible, but I don't recall.

23  Q    Okay.  So if you don't recall, I guess asking for the

24  nature of that call wouldn't be terribly helpful.  Do you

25  recall if the communications regarding the property between

Famularo - Cross/L. Schwartz                    48

1  you, Ohana, I beg your pardon, and your colleagues and

2  Mr. Hager continued during November?

3  A    I think we were -- we potentially were still trying to get

4  the information that we had previously requested from

5  Mr. Hager.  I do recall at one point I think he sent my team

6  a -- you know, a collection of files, you know, or documents.

7  That may have been in November.  I would guess based on the

8  delayed responses, you know, given that it probably took a

9  couple of weeks or at least a few weeks for him to come back to

10  us, that probably fell in November.  But beyond that, I don't

11  recall specific dates or communications.

12  Q    Was anyone else assisting you, not Ohana-related, in

13  connection with these communications with Mr. Hager?

14  A    We were originally introduced to Mr. Hager through a

15  friend of ours named Ariel Aber, whom we referred to in our --

16  in my declaration.  And so Ariel was, you know, included on

17  some of those communications.  Ariel was, you know, knew Mr.

18  Hager through, I guess, just kind of being involved in the New

19  York City real estate investment space and that's how we

20  originally connected with Mr. Hager was through Ariel.

21  Q    And did Mr. Aber continue to communicate with the Ohana

22  Group subsequent to the end of your communications with Mr.

23  Hager?

24  A    Specifically on this property?

25  Q    Yes.

Famularo - Cross/L. Schwartz                         49

1  A    No.  No, I don't believe so.  If my memory serves --

2  serves me correctly, I -- we basically cut off communication,

3  you know, or trying to get information from Mr. Hager in --

4  some time in the first half of December, and after that time

5  period -- and that's when we obtained detailed information from

6  Madison, the former original senior lender that contained the

7  detailed information that we required to do our analyses, and

8  -- but Mr. Aber wasn't involved in those communications or in

9  the project after that.

10 Q    Do you recall when you first communicated with Madison,

11 the pre-petition lender, regarding the acquisition of the note?

12 A    I believe it was sometime in December.

13 Q    And at any point -- you noted in your declaration of an

14 issue with respect to -- I'll rephrase that.  Ohana was

15 introduced as a hotel partner of DivcoWest.  You contend in

16 your declaration that that's not correct.  Can you expand on

17 that?

18 A    Sure.  Yeah, I think that was a colloquial description of

19 our relationship with Divco, and I think Mr. Aber was really

20 referring to the fact that we had completed a couple of

21 investments in partnership with Divco over the past few years.

22 And -- but I don't think his intention was necessarily to say

23 that there is some formal connection between our firms or

24 anything like that.  I think he was simply, you know, trying to

25 validate us through, you know, in making this introduction to

1  Mr. Hager so that we could learn more about the situation, you

2  know, and what Mr. Hager, you know, was trying to accomplish.

3  Q    Did you ever clarify with Mr. Hager that Ohana and Divco

4  were not partners?

5  A    I didn't feel the need to.  I wasn't -- I didn't feel at

6  the time that there was some perception that we were somehow

7  the same firm or joined at the hip or there was some explicit

8  partnership or relationship.  So because of that I never went

9  out of my way to, you know, make sure that Mr. Hager understood

10 that there was no formal relationship or partnership if that

11 makes sense.

12 Q    Bear with me for just one moment.  And do you -- your

13 declaration indicates that you never discussed a joint venture

14 or planned sponsor arrangement with Mr. Hager.  That's your

15 recollection of the communication?

16 A    Correct.  I mean it's not -- not just my recollection.

17 It's fact.  We're -- we're very, very methodical at Ohana in

18 terms of how we communicate with outside parties regarding

19 relationships, and we never reached a point in our

20 conversations with Mr. Hager where that would have ever been

21 discussed.  So I can say unequivocally that we did not discuss

22 that.

23 Q    Okay.  And when you first approached Mr. Hager or if it

24 was through Mr. Aber, I'm not certain, was it with respect to

25 acquiring the property or was it in connection with the note

1  and the mortgage?

2  A    It was really, I think, just to learn more about the

3  situation.  So we -- we at Ohana, we have both a credit

4  investment strategy where we make loans or we buy loans.  We

5  also have an equity investment strategy where we buy

6  properties.  On our credit strategy we -- we've bought a number

7  of loans in New York and had been paid off on them, you know,

8  in all instances.  So there was really no predetermined

9  objective.  I think in our -- in a research process that we

10 were undergoing on the broader Brooklyn market, we found

11 through a public database, information on the Tillary Hotel and

12 the fact that it had been sold in 2019.  And so that's really

13 kind of the thread that we started pulling on, and that led us

14 to reach out to Mr. Aber who is familiar with the Brooklyn

15 market and ask him if he knew anything more about that

16 property, you know, or any of the folks involved.  And so he

17 said, yeah, you know, I know Mr. Hager and I can make an

18 introduction if that would be helpful.

19 Q    And does Ohana intend to operate the -- to the extent

20 confirmation proceeds and Ohana is the successful bidder, does

21 Ohana intend to operate the property as a hotel?

22 A    Well, I guess to be --

23 Q    (Indiscernible) I beg your pardon.

24 A    Yeah, just -- and just to be crystal clear, our objective

25 -- I don't want it to get lost in the mix.  Our objective was

Famularo - Cross/L. Schwartz                52

1   never predetermined.  Right?  I think based on our prior

2   experience, acquiring loans on hotels in New York, we thought

3   it was equally as likely that we get paid off in this type of

4   instance.  If our -- if our plan is confirmed and at the

5   auction, you know, we are ultimately the highest bidder and we

6   ultimately take possession of the hotel, our plan as a largely

7   dedicated hotel investment firm would be to operate the hotel

8   portion as a hotel.  We do believe that that's the highest and

9   best use and our plan would be to reoccupy the apartment units,

10  which have been left vacant for more than two years now, and

11  rent those out as apartments.

12  Q    Okay.

13       MS. SCHWARTZ:  I don't have any further questions.

14  Thank you, Judge.

15       THE COURT:  Okay.

16       MS. SCHWARTZ:  Thank you, Mr. Famularo.

17       THE COURT:  Okay.  Does anyone else have any

18  questions of Mr. Famularo?

19       MR. GRIFFIN:  Good afternoon, Your Honor.  Scott

20  Griffin from the law firm of Griffin Hamersky, LLP, on behalf

21  of the proposed plan funder, Mr. Daryl Hagler.  I'm relatively

22  new to this entire process, so I just have one question.  And I

23  apologize if it's been answered in some of the pleadings along

24  the way.

25                    CROSS-EXAMINATION

Famularo - Cross/Griffin                    53

BY MR. GRIFFIN:

Q    Good afternoon, Mr. Famularo.  Just one question.  Your credit bid, is that based on an appraisal of the property -- a recent appraisal of the property that you guys have done?

A    It is not.  No.  Not a -- not a formal third-party appraisal.

Q    Understood.  Have you -- have your firm conducted or is your firm planning to conduct an appraisal of the property?

A    No, we're not.

Q    Okay.  Or have a third party do so?

A    We're not.  No.

Q    Okay.  Thank you.

        MR. GRIFFIN:  Thank you, Your Honor.

        THE COURT:  Okay.  All right.  Do you have any redirect on those questions?

        MS. SCHWARTZ:  No, Judge.

        THE COURT:  No, I'm talking -- for Mr. Richards.

        MS. SCHWARTZ:  I'm sorry.

        MR. RICHARDS:  No redirect, Your Honor.

        THE COURT:  Okay.  All right.  Your testimony is complete, Mr. Famularo, so you can stay on the line, but you're no longer testifying as a witness.

        MR. FAMULARO:  Okay.  Thanks, Your Honor.

                    (Witness excused)

        THE COURT:  Okay.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>    85 FLATBUSH RHO MEZZ LLC, et al.,<br><br>                    Debtors | Case No. 20-23280 (RDD)<br>Chapter 11<br><br><br>(Jointly Administered) |

**DECLARATION OF FRANCO FAMULARO IN SUPPORT OF TH HOLDCO
LLC'S COMBINED (A) RESPONSE TO OBJECTIONS TO MOTION
TO APPROVE (I) THE ADEQUACY OF INFORMATION IN THE
DISCLOSURE STATEMENT, (II) SOLICITATION AND NOTICE
PROCEDURES, (III) FORMS OF BALLOTS, AND (IV) CERTAIN
DATES WITH RESPECT THERETO AND (B) OBJECTION TO DEBTORS'
DISCLOSURE STATEMENT FOR AMENDED PLAN OF REORGANIZATION**

I, Franco Famularo, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746

and state as follows[1]:

1.      I am a partner and Chief Investment Officer at Ohana Real Estate Investors

("Ohana").  I am a resident of the State of California and am over the age of 18.  TH Holdco LLC

is an affiliate of Ohana.  I submit this declaration in support of *TH Holdco LLC's Combined (A)*

*response to Objections to Motion to Approve (I) the Adequacy of Information in the Disclosure*

*Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballots, and (IV) Certain Dates*

*with Respect Thereto and (B) Objection to Debtors' Disclosure Statement for Amended Plan of*

*Reorganization* (the "Combined Response").

2.      I know each of the following facts to be true of my own personal knowledge and,

if called as a witness, I could and would competently testify with respect thereto.

3.      In mid-October 2021, I had discussions with Isaac Hager, a minority owner of the

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed in the Combined
Response.

85 Flatbush RHO Mezz LLC (the "Mezz Debtor"), who purported to have authority to represent the Debtors. I met with Mr. Hager for an on-site tour of the Property in October of 2021. During our discussions, Mr. Hager, acting for the Debtors, demanded that as part of any bid from Ohana or its nominee, the owners of the Mezz Debtor be "made whole" by a payment of at least $20 million, including at least $15 million of cash consideration. Mr. Hager asserted that payment must be made for the benefit of equity, even though the Debtors did not expect creditors to be paid in full, and required that any deal was predicated on Mr. Hager remaining as an investor in the Property. When I asked Mr. Hager why the Debtors expected a full recovery including a substantial cash payment when the creditors were being impaired, Mr. Hager represented that a separate rabbinical court ruling regarding a settlement between Mr. Hager and the majority owner of the Property effectively took precedence over the bankruptcy court process.

4.      At no point did the Mr. Hager or the Debtors' refer Ohana to JLL, suggest that Ohana negotiate through JLL, or propose that Ohana be a stalking horse bidder to acquire the Property. Ohana considered the Debtors' demands to be unrealistic and improper, and determined that further negotiations with Debtors would not be productive.

5.      Ohana thereafter continued to perform due diligence on the Property based on publicly available information (including key pleadings in the Bankruptcy Case docket and claims registers) and information provided by the then current senior lender, 85 Flatbush Avenue 1 LLC (the "Pre-petition Lender").

6.      On November 3, 2021, I was forwarded an unsolicited email from a real estate broker in New York City (not JLL) (the "November Email"). This email was originally sent by the broker to Chris Smith of Ohana, and the broker was soliciting interest from Ohana to provide capital to back the Debtors' business plan to seek a longer-term lease with DHS. The unsolicited

email from the broker included information that clearly came from the Debtors, including (i) a market appraisal valuing the Property at $94 million as of September 11, 2019 (from the Debtors' original acquisition financing process) and (ii) a form of a DHS Lease which appears to be terminable at any time by DHS. This broker appears to be acting for the Debtors and/or its principals outside of the JLL process and in support of an insider bid. Ohana did not engage with the broker at that time.

7.    Separately, in early January 2022, I received an unsolicited call from that same real estate broker in New York City (not JLL) who claimed to represent the Debtors. Without knowing about Ohana's familiarity with the Property and ongoing due diligence or acknowledging the November Email, that broker stated that he was helping the Debtors find mezzanine debt and equity to help them maintain ownership of the Property. I again declined to engage further, but it was apparent that the Debtors were still acting outside of the JLL process in an attempt to retain ownership of the property.

8.    The above led Ohana to believe that the Debtors' principals and affiliates were interested only in maximizing recovery to equity and were putting their own interests ahead of those of the creditors. This was concerning to Ohana, as was the Debtors' failure to move their sale plan along (by, for example, not filing a disclosure statement within the exclusivity period). As such, through its affiliate TH Holdco, Ohana purchased the debt directly from the Pre-petition Lender after the Debtors' exclusivity expired.

Executed on this 4th day of April, 2022.

/s/ Franco Famularo _____
Franco Famularo, Partner and CIO
Ohana Real Estate Investors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re<br><br> 85 FLATBUSH RHO MEZZ LLC, *et al.*,<br><br><div align="center">Debtors</div> | Case No. 20-23280 (RDD)<br>Chapter 11<br><br><br>(Jointly Administered) |

<div align="center">

**DECLARATION OF FRANCO FAMULARO IN SUPPORT OF**
**TH HOLDCO LLC'S REQUEST FOR CONFIRMATION OF**
**SECOND AMENDED CHAPTER 11 PLAN**

</div>

I, Franco Famularo, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746

and state as follows:

1.       I am a partner and Chief Investment Officer at Ohana Real Estate Investors

("Ohana").  I am a resident of the State of California and am over the age of 18.  TH Holdco LLC

("TH Holdco") is an affiliate of Ohana.  I submit this declaration ("Declaration") in support of TH

Holdco's request for an order confirming the *Second Amended Chapter 11 Plan Filed by Creditor*

*TH Holdco LLC Related to 85 Flatbush RHO Mezz, LLC, 85 Flatbush RHO Hotel LLC, and 85*

*Flatbush RHO Residential LLC* [Docket No. 211] (as the same has been or maybe amended,

modified, supplemented, or restated, the "Plan")[1] pursuant to Section 1129 of title 11 of the United

States Code, §§ 101 *et seq.* (the "Bankruptcy Code").

2.       I have reviewed, and I am generally familiar with, the terms and provisions of the

Plan, the documents comprising the Plan Supplement, the Disclosure Statement relating to the

Plan, and the requirements for confirmation of the Plan under Section 1129 of the Bankruptcy

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan (defined herein).

Code.  I was personally involved in the development and negotiations regarding the Plan and its related documents.

3.        Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussion with TH Holdco's counsel regarding applicable law, or my opinions based upon my experience, knowledge, and information concerning the Debtors' operations and the multifamily residential real estate industry. If called upon to testify, I could and would testify to the facts set forth herein.  I am authorized to submit this Declaration on behalf of TH Holdco.

4.        85 Flatbush RHO Mezz LLC ("85 Flatbush RHO Mezz" or the "Mezz Debtor") is the 100% owner of 85 Flatbush RHO Hotel LLC ("85 Flatbush RHO Hotel") and 85 Flatbush RHO Residential LLC ("85 Flatbush RHO Residential").  The property is located at 85 Flatbush Extension, Brooklyn, New York (the "Property").  The Property is a 132,641 square foot, twelve story, mixed-use property consisting of a 174-room boutique hotel on the first six (6) floors known as the Tillary Hotel Brooklyn, a 58,652 square foot 64-unit luxury multi-family building and a 5,642 square foot parking garage (together, the "Hotel Property").  The residential component of the Property has nine (9) studios, twenty-six (26) one-bedroom units, and twenty-nine (29) two bedroom units (together, the "Residential Property").  Of the sixty-four (64) units, currently, up to five (5) are occupied.  [Docket No. 103].

5.        85 Flatbush RHO Hotel owns and operates the Tillary Hotel Brooklyn, a 174 room boutique hotel located at 85 Flatbush Avenue Extension, Brooklyn, New York at the intersection of Tillary Street and Flatbush Extension, just off the base of the Manhattan Bridge.  The Property is a 12-story mixed use property consisting of the hotel, a sixty-four (64) unit luxury multifamily building and a parking garage.  The hotel operates from the first six (6) floors of the property.  The

2

hotel is a full service upper upscale boutique hotel which also features a business center, fitness center, meeting space, restaurant, café and bar.  85 Flatbush RHO Hotel is the fee owner of the six (6) floors it occupies, and 85 Flatbush RHO Residential owns the other six (6) floors.

6.      I have been advised that on September 19, 2019, 85 Flatbush Mezz LLC (the "Mezz Lender") advanced a loan to 85 Flatbush RHO Mezz in the original principal amount of $6,000,000 secured by the 85 Flatbush Hotel Pledge Agreement and 85 Flatbush Residential Pledge Agreement (the "85 Flatbush Mezz Loan Agreement").  85 Flatbush Avenue 1, LLC ("85 Flatbush Avenue") as the original senior lender and the Mezz Lender as the mezzanine lender are party to an Intercreditor Agreement dated September 19, 2019 and amended as of July 23, 2020 (the "Intercreditor Agreement"), which set forth certain rights between the two lenders.  85 Flatbush Avenue's interest and rights under the Intercreditor Agreement are now assigned to TH Holdco.

7.      Prior to the bankruptcy filing, a Uniform Commercial Code foreclosure auction of the pledge equity interest was scheduled by the Mezz Lender for December 15, 2020, and then, at the Debtors' request, was rescheduled on two occasions with a final sale date of December 18, 2020.

8.      On December 18, 2020, the Debtors filed their chapter 11 petitions (the "Petition Date") and the automatic stay prevented the foreclosure sale from going forward.  These Chapter 11 Cases are being jointly administered.

9.      Pursuant to the Plan, holders of Allowed Claims will receive creditor distributions on account of their Allowed Claims from the Plan Fund to be established and funded by the TH Holdco Additional Consideration (as defined in the Plan), the Sale Proceeds (if any), and the Debtors' available cash, which shall be distributed in accordance with the Plan and in accordance with the priorities established by the Bankruptcy Code.   The Plan contemplates a pro rata

121678590\V-4

distribution to unsecured creditors with unsecured claims in Classes 6 and 8 ultimately being paid in full with interest by the first anniversary of the Effective Date.

10.      TH Holdco filed a series of plan and disclosure statements starting on February 20, 2022, when *TH Holdco filed the Chapter 11 Plan Filed by Creditor TH Holdco LLC Related to 85 Flatbush RHO Mezz, LLC, 85 Flatbush RHO Hotel LLC, and 85 Flatbush RHO Residential LLC* [Docket No. 151] and the accompanying *Disclosure Statement* [Docket No. 152].

11.      On February 24, 2022, TH Holdco filed its *Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballots, and (IV) Certain Dates with Respect Thereto.* [Docket No. 158].

12.      On April 4, 2022, TH Holdco filed its *Amended Chapter 11 Plan Filed by Creditor TH Holdco LLC Related to 85 Flatbush RHO Mezz, LLC, 85 Flatbush RHO Hotel LLC, and 85 Flatbush RHO Residential LLC* [Docket No. 175] and the accompanying *Amended Disclosure Statement.* [Docket No. 177].

13.      On May 26, 2022, TH Holdco filed its *Second Amended Chapter 11 Plan Filed by Creditor TH Holdco LLC Related to 85 Flatbush RHO Mezz, LLC, 85 Flatbush RHO Hotel LLC, and 85 Flatbush RHO Residential LLC* [Docket No. 211] (the "Plan") and the accompanying *Second Amended Disclosure Statement* [Docket No. 212] (the "Disclosure Statement").

14.      On May 26, 2022, the Court entered the *Order Granting TH Holdco LLC's Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms of Ballots, and (IV) Certain Dates with Respect Thereto, approving, among other things, the Sale and Bid Procedures for the Properties and the form of Purchase Agreement* [Docket No. 210] (the "Disclosure Statement Order").

15.      The Disclosure Statement Order approved the Disclosure Statement as containing

adequate information in accordance with Section 1125 of the Bankruptcy Code, directed TH Holdco to solicit ballots accepting or rejecting the Plan, set deadlines for the filing of ballots and objections to the Plan, and approved and directed the form and manner of service of notice thereof. TH Holdco's counsel thereafter proceeded to commence the process of soliciting votes with respect to the Plan.

16.     The Plan and Disclosure Statement provide, *inter alia,* for the sale of the Properties under the Purchase Agreement.  The Purchase Agreement provides for the Properties to be sold (i) to TH Holdco for the purchase price consisting of the TH Holdco Credit Bid or, in the event that another bidder submits a higher and better bid at the Auction which is approved by the Bankruptcy Court, (ii) to the rival Purchaser for such amount.

17.     As set forth in the *Affidavit of Publication* filed on May 31, 2022 [Docket No. 214], the notice of sale (the "Notice of Sale") for the Debtors' Properties was published in the *Wall Street Journal (National Edition)* print edition for a period beginning on May 31, 2022.  The Notice of Sale will also be published in *Green Street's Commercial Mortgage Alert* on July 1, 2022.

18.     Jones Lang LaSalle, as broker (the "Broker"), initially marketed the Properties commencing in October of 2021.  Following entry of the Disclosure Statement Order, the Broker resolicited offers to acquire the Properties from a wide variety of parties.  The Broker will conduct an Auction for the Properties, in accordance with the terms of the Sale and Bid Procedures, if one or more Qualified Competing Bid (as such term is defined in the Sale and Bid Procedures) is received in accordance with the terms of the Sale and Bid Procedures.

19.     I was advised by TH Holdco's counsel that the Disclosure Statement Order, Plan, Disclosure Statement, and an appropriate ballot or notification of non-voting status (the "Solicitation Package") was served upon all interested parties in accordance with the Disclosure

5

Statement Order and applicable Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").
[Docket No. 216].

20.     I have been provided with copies of the ballots cast by Classes 3 and 11[2] creditors
voting to accept the Plan, along with *TH Holdco LLC's Voting Record Certifying Acceptances and
Rejections of TH Holdco LLC's Second Amended Plan* [Docket No. 252] (the "Certification of
Ballots"). I am advised that, pursuant to the Plan, TH Holdco is to request that Classes 6-10 and
12-14, who failed to cast any ballots in connection with the Plan, be deemed by the Court to have
accepted the Plan. Counsel further advises that in the event the Court declines to deem Classes 6-
10 and 12-14 and/or Class 11 as accepting impaired voting classes, that the Debtors shall request
confirmation of the Plan to proceed pursuant to Section 1129(b) of the Bankruptcy Code.

21.     TH Holdco's counsel advises that the deadline to cast a ballot to accept or reject
the Plan or to object to confirmation of the Plan was fixed at Wednesday, June 22, 2022 and that
three objections were filed, one of which was resolved by inserting requested language into the
Confirmation Order, and the other two of which are meritless.

22.     On the basis of my responsibilities on behalf of TH Holdco, my participation in the
Plan process, and my regular discussions with TH Holdco's counsel, I believe that the Plan which
TH Holdco has requested be confirmed has been proposed in good faith. I strongly support
confirmation of the Plan over any other alternatives that have been considered to date and to the
best of my knowledge and understanding, the provisions of the Plan are in compliance with the
applicable laws and orders of this Court.

---

[2] TH Holdco, as agent and holder of power of attorney for the Mezz Lender, cast a Class 11 ballot to accept the Plan
on May 27, 2022, and then sent the Mezz Lender notice of the same (the "Class 11 Notice"). *See* **Exhibit 1B** attached
to the Certification of Ballots. TH Holdco also received an ineligible Class 11 ballot cast by the Mezz Lender in the
amount of $7,787,500.00 on June 22, 2022. *See* **Exhibit 1C** attached to the Certification of Ballots. This ineligible
Class 11 ballot purported to reject the Plan. As advised by TH Holdco's counsel, Class 11 is or should be deemed to
accept the Plan.

6

23.     I have reviewed the Certification of Ballots filed in connection with the Confirmation Hearing.  As set forth in the Certification of Ballots, 8 claims and 3 classes of interests are impaired by the Plan.  As set forth in the Certification of Ballots, the Plan has been accepted or deemed accepted by the holders of the impaired claims of creditors classified in Classes 1-14.

24.     I have been advised by TH Holdco's counsel that the 85 Flatbush RHO Hotel Other Priority Claims in Class 1, the 85 Flatbush RHO Residential Other Priority Claims in Class 2, the 85 Flatbush RHO Hotel Other Secured Claims in Class 4, and the 85 Flatbush RHO Residential Other Secured Claims in Class 5 are unimpaired and therefore votes for these classes of claims were not solicited.  I am also advised that Classes 3, 6, 7, 8, 9, 10, 11, 12, 13, and 14 impaired and were provided with a ballot to accept or reject the Plan.  I am further advised that Class 15 (85 Flatbush Mezz Existing Equity Interests) are not receiving any distribution under the Plan and are deemed to have rejected the Plan.  I understand that the Plan has been accepted by voting creditors in Classes 3 and 11 and that the court may deem the Classes 6-10 and 12-14 to be accepting impaired classes.  I am informed that in the event the Court declines to deem Classes 6-10 and 12-14 and/or Class 11 as accepting impaired voting classes, that notwithstanding the rejection of the Plan by Class 15, that the Plan can be confirmed and that TH Holdco may proceed with confirmation of the Plan because, to the best of my knowledge as informed by counsel for TH Holdco, the Plan does not discriminate unfairly and is fair and equitable with respect to each class of claims as required by Section 1129(b)(1) of the Bankruptcy Code.

**The Plan Satisfies Section 1129 of the Bankruptcy Code**

25.     On the basis of my understanding of the Plan, the events that have occurred prior to and during the Debtors' Chapter 11 Cases, and discussions I have had with TH Holdco's counsel regarding various orders entered during these Chapter 11 Cases and the requirements of the

7

Bankruptcy Code, I believe that the Plan satisfies all of the applicable requirements of Section 1129(a) of the Bankruptcy Code as described in this Declaration.

26. <u>Bankruptcy Code Section 1129(a)(1)</u>. On the basis of my understanding of the Bankruptcy Code, I believe the Plan complies with Section 1129(a)(1) of the Bankruptcy Code because the Plan complies with Bankruptcy Code Sections 1122 and 1123.

27. <u>Bankruptcy Code Section 1122</u>. The Plan designates the classification of Claims. The Plan provides for the separate classification of Claims against and Interests in the Debtors based upon the differences in legal nature and/or priority of such Claims and Interests. In total, there are fifteen (15) Classes of Claims: Class 1 (85 Flatbush RHO Hotel Other Priority Claims); Class 2 (85 Flatbush RHO Residential Other Priority Claims); Class 3 (TH Holdco Secured Claim); Class 4 (85 Flatbush RHO Hotel Other Secured Claims); Class 5 (85 Flatbush RHO Residential Other Secured Claims); Class 6 (85 Flatbush RHO Hotel General Unsecured Claims); Class 7 (85 Flatbush RHO Hotel Existing Equity Interests); Class 8 (85 Flatbush RHO Residential General Unsecured Claims); Class 9 (85 Flatbush RHO Residential Existing Equity Interests); Class 10 (85 Flatbush Mezz Other Priority Claims (if any)); Class 11 (85 Flatbush Mezz Claims); Class 12 (85 Flatbush Mezz Other Secured Claims (if any)); Class 13 (85 Flatbush Mezz General Unsecured Claims); Class 14 (Insider General Unsecured Claims); and Class 15 (85 Flatbush Mezz Existing Equity Interests). Each Class contains only Claims or Interests that are substantially similar to one another. The classification scheme was not proposed to create a consenting impaired Class or to manipulate voting.

28. <u>Bankruptcy Code Section 1123(a)(2)</u>. The Plan identifies each Class of Claims and Interests that is not impaired under the Plan.

29. <u>Bankruptcy Code Section 1123(a)(3)</u>. The Plan sets forth the treatment of impaired

121678590\V-4

Claims and Interests.

30.     Bankruptcy Code Section 1123(a)(4).  The Plan provides that, except as otherwise agreed to by a holder of a particular Claim or Interest, the treatment of each Claim or Interest in each particular Class is the same as the treatment of each other Claim or Interest in such Class unless the holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest.

31.     Bankruptcy Code Section 1123(a)(5).  The Plan provides adequate means for implementation of the Plan as required by Section 1123(a)(5) through, among other things, payment of Claims.  The Plan also contains miscellaneous provisions to aid in its implementation such as the process for objecting to claims, and assumption or rejection of executory contracts.

32.     Bankruptcy Code Section 1123(a)(6).  Under Section 6.1 of the Plan, after the Effective Date, the Debtors will be deemed dissolved. The Debtors will, thus, not be issuing securities.  I understand that the requirement under Section 1123(a)(6) of the Bankruptcy Code that the Debtors' organizational documents prohibit the issuance of non-voting equity securities is inapplicable in the Chapter 11 Cases.

33.     Bankruptcy Code Section 1123(a)(7).  The Plan complies with Section 1123(a)(7) as it contains only those provisions that are consistent with the interests of creditors and interest holders.  The Plan does not provide for the appointment of officers, directors, and trustees of the Debtors; instead, the Plan provides for the dissolution of the Debtors.

34.     Bankruptcy Code Section 1123(b)(1) and (2).  The Plan describes the treatment for the following Unimpaired Classes:  Class 1 (85 Flatbush RHO Hotel Other Priority Claims); Class 2 (85 Flatbush RHO Residential Other Priority Claims); Class 4 (85 Flatbush RHO Hotel Other Secured Claims); and Class 5 (85 Flatbush RHO Residential Other Secured Claims).  The Plan

9

also describes the treatment for the following Impaired Classes: Class 3 (TH Holdco Secured Claim); Class 6 (85 Flatbush RHO Hotel General Unsecured Claims); Class 7 (85 Flatbush RHO Hotel Existing Equity Interests); Class 8 (85 Flatbush RHO Residential General Unsecured Claims); Class 9 (85 Flatbush RHO Residential Existing Equity Interests); Class 10 (85 Flatbush Mezz Other Priority Claims (if any)); Class 11 (85 Flatbush Mezz Claims); Class 12 (85 Flatbush Mezz Other Secured Claims (if any)); Class 13 (85 Flatbush Mezz General Unsecured Claims); Class 14 (Insider General Unsecured Claims); and Class 15 (85 Flatbush Mezz Existing Equity Interests).

35.    <u>Bankruptcy Code Section 1123(b)(2)</u>.  The Plan provides for the assumption or rejection of executory contracts and unexpired leases that have not been previously assumed or rejected under Section 365 of the Bankruptcy Code.

36.    <u>Bankruptcy Code Section 1123(b)(3)</u>.  The Plan, under Sections 7 and 8, provides for the settlement or adjustment of any rights, Claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date, except as otherwise provided in the Plan.

37.    <u>Bankruptcy Code Section 1123(b)(5)</u>.  The Plan leaves unaffected the rights of holders of Claims in Class 1 (85 Flatbush RHO Hotel Other Priority Claims); Class 2 (85 Flatbush RHO Residential Other Priority Claims); Class 4 (85 Flatbush RHO Hotel Other Secured Claims); and Class 5 (85 Flatbush RHO Residential Other Secured Claims), and modifies the rights of holders of Claims in Class 3 (TH Holdco Secured Claim); Class 6 (85 Flatbush RHO Hotel General Unsecured Claims); Class 7 (85 Flatbush RHO Hotel Existing Equity Interests); Class 8 (85 Flatbush RHO Residential General Unsecured Claims); Class 9 (85 Flatbush RHO Residential Existing Equity Interests); Class 10 (85 Flatbush Mezz Other Priority Claims (if any)); Class 11

10

(85 Flatbush Mezz Claims); Class 12 (85 Flatbush Mezz Other Secured Claims (if any)); Class 13

(85 Flatbush Mezz General Unsecured Claims); Class 14 (Insider General Unsecured Claims); and

Class 15 (85 Flatbush Mezz Existing Equity Interests).

38.     <u>Bankruptcy Code Section 1123(b)(6)</u>.  The Plan does not contain third party release

provisions.  The Plan contains normal and customary exculpation provisions.

39.     <u>Bankruptcy Code Section 1123(d)</u>.  Under Section 9.1 of the Plan, all executory

contracts and unexpired leases not previously rejected, assumed or assumed and assigned will be

automatically deemed rejected pursuant to Sections 365 and 1123 of the Bankruptcy Code unless

such executory contract or unexpired lease (1) is specifically described in the Purchase Agreement

as being rejected under the Plan or the Purchase Agreement; (2) as of the Effective Date is subject

to a pending motion to reject such Unexpired Lease or Executory Contract; (3) was previously

assumed or assumed and assigned to a third party during the pendency of the Chapter 11 Cases; or

(4) is a contract, instrument, release, indenture, or other agreement or document entered into in

connection with the Plan.

40.     Based upon the foregoing, I believe the Plan complies fully with the requirements

of Sections 1122 and 1123.  Therefore, the Plan satisfies the requirement of Section 1129(a)(1) of

the Bankruptcy Code.

41.     <u>Bankruptcy Code Section 1129(a)(2)</u>.  I believe that TH Holdco has complied with

the applicable provisions of the Bankruptcy Code, including Sections 1125 and 1126 of the

Bankruptcy Code regarding disclosure and plan solicitation.  TH Holdco, with the assistance of its

professionals, expended a significant amount of time and effort preparing the Disclosure

Statement.  On May 26, 2022, the Court approved the Disclosure Statement as having adequate

information for a hypothetical investor to make an informed decision regarding the Plan and

11

entered the Disclosure Statement Order.  [Docket No. 210].

42.     To the best of my knowledge, information and belief, TH Holdco has also complied with all other orders of the Bankruptcy Court entered during the pendency of these Chapter 11 Cases.

43.     In addition, TH Holdco has solicited and tabulated votes with respect to the Plan in accordance with the Disclosure Statement Order.  Accordingly, based on my understanding of the Bankruptcy Code, I believe TH Holdco has complied with Section 1129(a)(2) of the Bankruptcy Code.

44.     Bankruptcy Code Section 1129(a)(3).  I believe the Plan fairly achieves a result consistent with the objectives and purposes of the Bankruptcy Code of maximizing asset values and paying creditors provides independent evidence of TH Holdco's good faith in proposing the Plan.

45.     Bankruptcy Code Section 1129(a)(4).  It is my understanding that all payments for services provided to the Debtors during the Chapter 11 Cases must be approved by the Court as reasonable and the Plan satisfies this requirement.

46.     Bankruptcy Code Section 1129(a)(5).  I believe that the Plan provides adequate, proper, and legal means for the Plan's implementation. as more fully specified in Section 5 of the Plan, as required by Section 1123(a)(5) of the Bankruptcy Code.

47.     Bankruptcy Code Section 1129(a)(6).  There are no rate changes provided for in the Plan, with respect to which rates a governmental regulatory commission has jurisdiction over the Debtors after confirmation pursuant to Section 1129(a)(6) of the Bankruptcy Code.

48.     Bankruptcy Code Section 1129(a)(7).  With respect to each impaired Class of Claims, each holder of a Claim of such Class has accepted the Plan or will receive or retain under

12

the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date pursuant to Section 1129(a)(7) of the Bankruptcy Code. I believe that the Liquidation Analysis contained in the Disclosure Statement demonstrates that the Plan satisfies the requirements of Section 1129(a)(7) of the Bankruptcy Code. I understand that the Bankruptcy Code requires that, with respect to each impaired Class of Claims and Interests, each holder of a claim or equity interest must either (a) accept the plan, or (b) receive or retain under the plan property having a present value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. For purposes of determining whether the Plan meets this requirement, TH Holdco filed an estimated liquidation analysis as set forth at Exhibit B of the Disclosure Statement (the "Liquidation Analysis"), which I reviewed and hereby incorporate by reference.

49.     As described in more detail in the Liquidation Analysis, under chapter 7 of the Bankruptcy Code, I believe that the cash available for distribution to creditors would consist of the proceeds resulting from the sale of the Debtors' largest assets (mainly consisting of the Hotel Property and Residential Property) unless TH Holdco submitted a credit bid for the Properties, in which case there would be no cash proceeds from the Properties. Any such cash amount could be reduced by the costs and expenses of the liquidation, including, but not limited to, the appointment of a trustee and the trustee's employment of attorneys and other professionals, and transaction fees related to the sale of the Hotel Property and Residential Property to the extent it determined or agreed that such amounts can be paid before the secureds. The recovery of value under a chapter 7 liquidation may also be limited by projected market impediments, including reduced recoveries

13

from discounts buyers would require given a shorter due diligence period, negative perceptions involved in liquidation sales and the "bargain hunting" mentality of liquidation sales, the current state of the capital markets, and the limited universe of prospective buyers, especially given the large purchase price.  Bids for the property would also be less because there would be no exemption from transfer taxes under Section 1146 of the Bankruptcy Code which is not applicable in Chapter 7.  The Liquidation Analysis assumes an orderly and expedited liquidation of the Debtors' assets and assumes that the liquidation would occur following the appointment or election of a chapter 7 trustee.

50.     As set forth in the Liquidation Analysis, it is my belief the best interests test is satisfied as to every single holder of a Claim against or Interest in the Debtors.  Specifically, I believe that the Liquidation Analysis demonstrates that all Classes of Claims or Interests will recover value under the Plan equal to or in excess of what such Claims or Interests would receive in a hypothetical chapter 7 liquidation.  Significantly, I believe that its Plan is better for creditor recoveries (especially the General Unsecured Creditors in Classes 6 and 8 due to the $1,250,000 TH Holdco General Unsecured Dedicated Fund to fund an initial distribution to those classes and additional distributions to those classes which are guaranteed by two Ohana affiliates).

51.     <u>Bankruptcy Code Section 1129(a)(8)</u>.  Holders of Claims in Class 1 (85 Flatbush RHO Hotel Other Priority Claims), Class 2 (85 Flatbush RHO Residential Other Priority Claims) Class 4 (85 Flatbush RHO Hotel Other Secured Claims), and Class 5 (85 Flatbush RHO Residential Other Secured Claims) are not impaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Additionally, as evidenced by the Certification of Ballots, the Plan has been accepted by more than two-thirds in amount and one-half in number of holders of Claims in Classes 3 and 11 entitled to

121678590\V-4

vote and who voted on the Plan.  Because no holder of Classes 6-10 and 12-14 voted to accept or

reject the Plan, TH Holdco shall request that, at the confirmation hearing, the Bankruptcy Court

deem the Plan accepted by the holders of Claims in Class 6-10 and 12-14.  Thus, based on my

understanding of the Bankruptcy Code, as to such Classes, the requirements of Section 1129(a)(8)

have been satisfied.  Alternatively, TH Holdco would request confirmation of the Plan under

1129(b) notwithstanding the non-acceptance by Classes 6-14, as well as the deemed rejection by

Class 15 (85 Flatbush Mezz Existing Equity Interests).

52.    TH Holdco voting the Class 11 Claims in favor of the power of attorney in the

Intercreditor Agreement was proper and effective.

53.    Holders of Interests in Class 15 (85 Flatbush Mezz Existing Equity Interests) are

impaired, will not receive any distribution under the Plan or retain any interests in the Debtors,

and are therefore deemed to have rejected the Plan.  As noted in above, I am advised that despite

the deemed rejection by Class 15, TH Holdco may proceed with confirmation of the plan because,

to the best of my knowledge, as informed by TH Holdco's counsel, the Plan does not discriminate

unfairly and is fair and equitable with respect to each class of claims and interests as required by

Section 1129(b) of the Bankruptcy Code.

54.    Bankruptcy Code Section 1129(a)(9).    Based on my understanding of the

Bankruptcy Code, the Plan complies with Section 1129(a)(9) of the Bankruptcy Code.  The Plan

provides that, holders of allowed Administrative Expense Claims will be paid in full, in Cash, on

the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar

days after the date such Claim becomes an Allowed Administrative Expense Claim, unless such

holder agrees to less favorable treatment.  Moreover, the Plan provides that, unless a holder agrees

to different treatment of such Claim, holders of Priority Tax Claims under Section 507(a) of the

121678590\V-4

Bankruptcy will receive, on account of such claim, Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course. Based on my understanding of the Bankruptcy Code, I believe, therefore, that the Plan satisfies the requirements of Section 1129(a)(9)(A), -(B), and -(C).

55.    <u>Bankruptcy Code Section 1129(a)(10)</u>. I believe that the Plan satisfies Bankruptcy Code Section 1129(a)(10). As set forth in the Certification of Ballots, Class 3 as to the Hotel and Residential Estates and Class 11 as to the Mezz Estate have each voted in favor of the Plan without considering the votes of insiders, and no other creditors voted to reject the Plan or filed an objection to the Plan (besides the NYC Dept. of Finance, which objection is resolved), meaning all impaired Classes of Claims entitled to vote on the Plan accepted or are deemed to have accepted the Plan. TH Holdco had authority to vote the Chapter 11 Claim in favor of the Plan under the Intercreditor Agreement and properly did so and the Class 11 ballot purporting to reject the Plan is ineffective.

56.    <u>Bankruptcy Code Section 1129(a)(11)</u>. I believe that the Plan is feasible within the meaning of Section 1129(a)(11) of the Bankruptcy Code in that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, except to the extent that such liquidation or reorganization is proposed in the Plan. The further distributions to Classes 6 and 8 under the Plan are guaranteed under the Plan by two Ohana related entities with substantial assets.

57.    <u>Bankruptcy Code Section 1129(a)(12)</u>. The Plan provides that the Purchaser shall pay all amounts due the Office of the United States Trustee under 28 U.S.C. § 1930, and any

applicable statutory interest thereon, in cash in full as required by statute and until the closing, conversion, or dismissal of these cases pursuant to Section 1129(a)(12) of the Bankruptcy Code.

58.    <u>Bankruptcy Code Section 1129(a)(13)</u>.  The Debtors have no retiree benefit plans and accordingly, Section 1129(a)(13) is inapplicable.

59.    <u>Bankruptcy Code Section 1129(a)(14)</u>.  The Debtors are not responsible for any domestic support obligations and accordingly, Section 1129(a)(14) is inapplicable.

60.    <u>Bankruptcy Code Section 1129(a)(15)</u>.  The Debtors are not an individual and accordingly, Section 1129(a)(15) is not applicable.

61.    <u>Bankruptcy Code Section 1129(a)(16)</u>.  The Debtors are a moneyed corporation and thus Section 1129(a)(16) is not applicable.

62.    <u>Bankruptcy Code Section 1129(b)</u>.  To the extent the Court does not deem Classes 6-14 Claims to have accepted the Plan and if Classes 6-15 are deemed to have rejected the Plan, I am advised that the requirements of Section 1129(a)(8) are not satisfied.  However, I am advised that the TH Holdco may seek confirmation of the Plan under Section 1129(b) of the Bankruptcy Code.  To the best of my knowledge, as informed by counsel to TH Holdco, the Plan does not discriminate unfairly and is fair and equitable with respect to each class of Claims and interests as required by Section 1129(b) of the Bankruptcy Code.

63.    Specifically, with respect to unsecured creditors, as I am informed by counsel for TH Holdco, "fair and equitable" means that the claimant will receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of the claim or that no class junior to the unsecured creditor class will receive any distribution.

64.    With respect to equity interests, as I am informed by counsel for TH Holdco, "fair and equitable" in in that no junior class of Claims or Interests is receiving a distribution under the

17

Plan.

65.      Based on the foregoing, I believe to the best of my knowledge, information and

belief that to the extent applicable, the Plan satisfies the requirements of Section 1129(a) (other

than Section 1129(a)(8)) and 1129(b) of the Bankruptcy Code.

66.      In summary, to the best of my knowledge, information and belief, TH Holdco has

formulated, negotiated, and proposed a Plan that treats all Classes of Claims fairly, equitably, and

reasonably, and effectively accomplishes the Auction for the sale of the Hotel Property and/or

Residential Property to be held in accordance with the Sale and Bid Procedures, and provides for

distributions in accordance with Bankruptcy Code priorities as set forth in the Plan.  To the best

of my knowledge, information and belief, confirmation and consummation of the Plan is in the

best interests of the Debtors' Estates and will maximize the return available to creditors.

Accordingly, I respectfully request that the Plan be confirmed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 27th day of June 2022.

*/s/ Franco Famularo*
Franco Famularo, Partner and CIO
Ohana Real Estate Investors

18

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re<br><br>    85 FLATBUSH RHO MEZZ LLC, et al.,<br><br>                    Debtors | Case No. 20-23280 (RDD)<br>Chapter 11<br><br><br>(Jointly Administered) |

**DECLARATION OF FRANCO FAMULARO IN RESPONSE TO (I) DEBTORS'
MOTION FOR ORDER PURSUANT TO 11 U.S.C. §363(k) DISQUALIFYING TH
HOLDCO LLC FROM CREDIT BIDDING AND GRANTING RELATED RELIEF,  (II)
DEBTORS' SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION,
AND (III) IN SUPPORT OF TH HOLDCO'S SECOND AMENDED PLAN**

I, Franco Famularo, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746

and state as follows[1]:

1.      I am a partner and Chief Investment Officer at Ohana Real Estate Investors

("Ohana").  I am a resident of the State of California and am over the age of 18.  TH Holdco LLC

is an affiliate of Ohana.  I submit this declaration in response to *Debtors' Motion for an Order*

*Pursuant to 11. U.S.C. §363(k) Disqualifying TH Holdco from Credit Bidding and Granting*

*Related Relief* [Docket No. 232], in opposition to the *Debtors' Second Amended Chapter 11 Plan*

*of Reorganization* [Docket No. 240], and in support of *TH Holdco's Second Amended Plan*

[Docket No. 211] (the "Plan").

2.      I know each of the following facts to be true of my own personal knowledge and,

if called as a witness, I could and would competently testify with respect thereto.

3.      Reference is made to my prior declaration, submitted on April 4, 2022, in support

of *TH Holdco's Combined (A) Response To Objections To Motion To Approve (I) The Adequacy*

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed in the Plan.

of Information In The Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Forms

of Ballots, and (IV) Certain Dates with Respect Thereto and (B) Objection To Debtors Disclosure

Statement For Amended Plan of Reorganization [Docket No. 174]. All statements made therein

are incorporated by reference here. Reference is also made to my *Declaration in Support of TH*

*Holdco LLC's Request for Confirmation of Second Amended Chapter 11 Plan*, submitted

concurrently herewith, which is also incorporated by reference herein.

4.      There was nothing nefarious about TH Holdco's acquisition of the TH Holdco

Prepetition Loan Agreement. I had conversations with Isaac Hager relating to the Property starting

in September of 2021. I met with Mr. Hager on October 13, 2021 for an on-site tour of the

Property. Mr. Hager's memory of those discussions and meetings is flawed as I never told Mr.

Hager that Ohana was prepared to become a joint venture partner with him or his partners, and

never suggested that Ohana was looking to serve as plan sponsor for the Debtors. Further, contrary

to Mr. Hager's assertion, my colleague Eddie Yu was not present at the October on-site tour.

5.      I have been involved in numerous due diligence and auction processes throughout

my career. I recall noting during my October on-site tour that Mr. Hager was not well informed

about the Property and its financial situation, he was unable to articulate a credible business plan,

and he was not forthcoming on basic facts about the project (such as the amount of and types of

claims against the Property). Mr. Hager's lack of knowledge of the Property and his inability to

answer basic questions was highly concerning. It caused an immediate loss of confidence. In my

experience, investors and principals are far more knowledgeable about the properties they own. I

followed up with Mr. Hager in order to obtain additional information about the Property. Mr.

Hager was quite delayed in responding and even when he did respond, his responses were lacking

the basic but critical information that an institutional investor would need to evaluate the Property

and the situation.

6.     During my interactions with Mr. Hager, I also noted that he seemed very self-interested in terms of what he personally would get out of any transaction, versus what was best or even what was reasonably possible for the creditors or the bankruptcy estates.   What he represented, in terms of his expectation to receive a full recovery, despite the fact that creditors were being impaired, did not comport with how I understood the bankruptcy process to work.  *See* email from Mr. Hager to Mr. Aber dated November 11, 2021 attached hereto as **Exhibit A**.  Mr. Hager's representation that a separate rabbinical court ruling regarding a settlement between Mr. Hager and the majority owner of the Property took precedence over the bankruptcy court process seemed incorrect.  As a result of all of these factors, and of our overall impression of Mr. Hager as a businessman, we made a decision to move on and politely cut off direct communication with Mr. Hager.

7.     Mr. Hager suggests that Ohana was DivcoWest's "hotel partner".  That is not correct.  Ohana had no agreement with DivcoWest on TH Holdco and neither DivcoWest nor Ariel Aber has any authority to represent Ohana.  In Ohana's research on the background of the Property in September 2021, Ohana reached out to DivcoWest and Mr. Aber, who is DivcoWest's New York City market representative, to see if they knew anything about the Property.  Mr, Aber said that he knew Mr. Hager and offered to make an introduction.  Mr. Aber made that introduction, and in an effort to vouch for Ohana described us as DivcoWest's hotel partner (referring to three investments we partnered on previously).  Because Mr. Aber had the relationship with Mr. Hager, our initial introductory interactions with Mr. Hager were largely through Mr. Aber, but at no time did Mr. Aber have authority to speak on Ohana's behalf.

8.     I never suggested to Mr. Hager or Mr. Aber that Ohana would be submitting a letter

of intent related to the Property. Ohana has a distinct and comprehensive process that it must

follow before it submits a letter of intent, including extensive underwriting analyses, which were

not possible at that time due to the disparate and incomplete information that Mr. Hager shared

over an approximately two-month interaction.

9.      I have reviewed the BBG, Inc. ("BBG") appraisal report dated June 22, 2022, and

filed with the Court at Docket No. 230 (the "Appraisal"). This report lacks credibility. First of

all, the Appraisal is in direct conflict with the numerous other datapoints for a potential valuation

on the property including TH Holdco's $94 million credit bid, the Debtors' own statements about

negotiating a sale in the range of $80-$86.5 million at the end of JLL's first marketing process,

and the willingness of the Debtors and Daryl Hagler to offer "no less than $96,775,000" now.

Additionally, the Appraisal is misleading and there are a couple of notable errors in the Appraisal's

facts and methodologies.

10.      For instance, the Appraisal engagement letter was executed on June 21, 2022 (one

day before it was submitted to the court on June 22, 2022 (Appraisal at 110), but the date of

inspection and Market Value as-is date were February 16, 2022 (Appraisal at 11). The Appraisal

was also done on the premise that (1) the Property was 100% vacant at the time (even though it

was not, due to the month-to-month DHS lease, which is acknowledged multiple times throughout

the Appraisal) and (2) that the Property would be the most valuable if it were fully leased to DHS

to serve as a homeless shelter (Appraisal at 9) through Debtors modified business plan – hardly a

conclusion that a typical unbiased appraiser would arrive at on a newly built (9-year old) hotel and

multifamily building in downtown Brooklyn.

11.      Most notably, the Appraisal's as-is valuation is very unscientifically derived by first

estimating the projected valuation on an as-stabilized basis at $119,652,110. This as-stabilized

valuation explicitly assumes that the owner signs a long-term lease with DHS and that property is permanently converted to a homeless shelter. But then, to estimate the February 2022 as-is valuation, the appraiser deducts $48,000,000 from the as-stabilized valuation based on three incredible assumptions: (1) the appraiser assumes that the DHS lease could not be executed for 24 months (resulting in $21.2 million of lost value), (2) the owner would incur a $3.2 million leasing commission, and (3) another, very arbitrary and non-cash, $23.9 million should be deducted for "Entrepreneurial Incentive". I find it very confusing that the appraiser claims the highest and best use for the 9-year old property is a homeless shelter, only to then say that such a plan would cause 24 additional months of operating at 100% vacancy and would result in $48,000,000 of lost value. I also find it confusing that the Debtor would submit an Appraisal that emphasizes that the property is only worth $72 million under Debtor's previously stated business plan of pursuing a long-term DHS lease. Based on these logical inconsistencies, the appraiser's methodology seems transparently designed to generate an artificially low as-is valuation, and that valuation is, again, significantly below offers that were received less than a month prior.

12.    The Appraisal states that there are very few sales comps for hotels in this market, and uses that fact as a justification for pulling inferior sales comps in outlying locations and otherwise erroneously reporting sales comps. Notably, there is not a single hotel sales comp from Manhattan. The appraiser states, "After analyzing the [four] comparable sales, the concluded valuation of the hotel portion of the subject is $200,000 per room, or $34,800,000." In my opinion, the estimated value of the hotel at $200,000 per room grossly undervalues the hotel portion of the Property.

13.    The four comparable sales addressed in the Appraisal are easily challenged. Most notably, the very first "hotel" sales comp that appears in the table on page 73 of the Appraisal was

not, in fact, a hotel sale.  The purported $45 million sale of the Ace Hotel Brooklyn was actually a sale of the land underneath the Ace Hotel Brooklyn for $45 million.  The remaining leasehold interest in the Ace Hotel, and the value of its long-term property tax abatement were not sold as part of the 2021 transaction.  Those assets have a very significant value that the Appraisal ignores.  Confusing a land sale with the sale of a fee simple hotel property is beyond careless for an appraiser.  The remaining three properties are inferior physical properties in mostly inferior locations.  Two of them were from August 2020 and November 2021, during more depressed periods of the pandemic.  The fourth property is a physically inferior Hilton Garden Inn in outer Long Island City.

14.    Suffice it to say, we do not agree with the valuation provided in the Appraisal.  The bids generated by JLL's marketing process and the TH Holdco bid more accurately speak to the current value of the Property.  TH Holdco did nothing to justify being disqualified from submitting its bid.

Executed on this 27th day of June, 2022.

___/s/ Franco Famularo_____
Franco Famularo, Partner and CIO
Ohana Real Estate Investors

# Exhibit A

Message

| | |
|---|---|
| **From:** | Ariel Aber [AAber@divcowest.com] |
| **Sent:** | 11/18/2021 1:57:00 PM |
| **To:** | Eddie Yu [eyu@ohanare.com]; Woody Shattan [wshattan@ohanare.com]; Jackson Hunter [jhunter@divcowest.com]; Chase Parisi [CParisi@divcowest.com]; Alvaro Carrillo-Sanchez [ACarrillo-Sanchez@divcowest.com]; Roman Bertozzi [RBertozzi@divcowest.com] |
| **Subject:** | Fwd: 85 Flatbush Ext |

We obviously need real bask up to these numbers..

Sent from my iPhone

Begin forwarded message:

> **From:** Isaac Hager <Isaac@cornellrealty.com>
> **Date:** November 17, 2021 at 8:03:33 PM EST
> **To:** Ariel Aber <AAber@divcowest.com>
> **Subject: 85 Flatbush Ext**

[EXTERNAL EMAIL]

Hi Ariel,

This is the breakdown of equity and loans payoff for 85 Flatbush Ext.

Paying down 81 million to Madison Realty Capital

4 Million to Bluestone

Then we have equity in the deal a total of 21.2 million, out of this 75% is from the rubins that's $16,050,000, and the rest 5.3 mill is from me.

+ we have money escrow in the BK account, with that money we can settle all other 3rd party bills, liens, coned, sales tax etc.

Thanks
.......................................................
Isaac Hager
Cornell Realty Management LLC
75 Huntington St.
Brooklyn, NY 11231
Office. 718.942.9191 x 108
Cell. 917.497.2424

This message may contain confidential or privileged information and is intended only for the party named above. If you are not the addressee, you must not use, copy, disclose or take any action based on the information herein. Please notify the sender immediately by e-mail if you have received this message in error and delete this message from your system. This message is for information

purposes only and is not an offer to sell or a solicitation of an offer to buy any security. Any performance information provided is estimated and unaudited; no representation or warranty is made to, and no reliance should be placed on, the fairness, accuracy, completeness or timeliness of the information contained herein. Any investment strategy entered into for potential profit also involves risk of loss. For more information regarding how we collect and process personal information, please visit our **Privacy Policy.**

# EXHIBIT B

**Appeal and Stay Damages**

| Scenario | Stay | Appeal |
|---|---:|---:|
| Duration | 2 Months | 24 Months |
| Interest Expense | $837,113 | $9,879,052 |
| Loan Fees | – | 550,000 |
| Refinancing Costs | – | 1,650,000 |
| General Legal Costs | 400,000 | 4,800,000 |
| Appeal Legal Costs | 250,000 | 750,000 |
| Future Lost Profits & Carrying Costs | 305,066 | 12,953,771 |
| Maintenance & Repairs | 40,000 | 480,000 |
| Capex Refresh | – | 5,950,000 |
| Interest & Penalties on Unpaid Real Estate Taxes | 64,410 | 842,997 |
| Interest & Penalties on Unpaid Class 6 and 8 Claims | 10,984 | 136,000 |
| Asset Management Fee | 465,712 | 1,891,466 |
| Cost of Equity | 1,245,776 | 25,742,561 |
| **Total Damages** | **$3,619,060** | **$65,625,846** |