UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re

85 FLATBUSH RHO MEZZ LLC, *et al.*,

                              Debtors.

-----------------------------------------------------------------x

85 FLATBUSH RHO MEZZ LLC, *et al.*,

                    Debtors-Appellants,

       – against –

TH HOLDCO LLC,

                    Appellee.

-----------------------------------------------------------------x

85 FLATBUSH MEZZ LLC,

                    Creditor-Appellant,

       – against –

TH HOLDCO LLC,

                    Appellee.

-----------------------------------------------------------------x

**OPINION & ORDER**

No. 22-CV-6241 (CS)

No. 22-CV-6233 (CS)

<u>Appearances</u>:

A. Mitchell Greene
Leech Tishman Robinson Brog PLLC
New York, New York
*Counsel for Debtors-Appellants*

M. Ryan Pinkston
Seyfarth Shaw LLP
San Francisco, California

Kevin J. Nash
Goldberg Weprin Finkel Goldstein LLP
New York, New York
*Counsel for Creditor-Appellant 85 Flatbush Mezz LLC*

Lauren Macksound
Sarah M. Schrag
Robert Richards
Dentons US LLP
New York, New York
Chicago, Illinois

Emilie B. Cooper
Harrison D. Polans
Fried, Frank, Harris, Shriver & Jacobson LLP
New York, New York
*Counsel for Appellee TH Holdco LLC*

Seibel, J.

Before the Court is the appeal of Debtors-Appellants 85 Flatbush RHO Mezz LLC

("Mezz"), 85 Flatbush RHO Hotel LLC ("Hotel"), and 85 Flatbush RHO Residential LLC

("Residential"), (collectively, "Debtors"), (No. 22-CV-6241 ECF No. 1), and the appeal of

Creditor-Appellant 85 Flatbush Mezz LLC ("Mezz Lender"), (No. 22-CV-6233 ECF No. 1).

The order from which both appeals are taken is the Findings of Fact, Conclusions of Law, and

Order Confirming TH Holdco LLC's Second Amended Chapter 11 Plan, as Modified by This

Order ("Confirmation Order") of Bankruptcy Judge Sean H. Lane.[1]  (JA-003478 to 601).[2]

---

[1] Bankruptcy Judge Robert D. Drain presided over the June 30, 2022 confirmation hearing (the "Confirmation Hearing"), but after his retirement Bankruptcy Judge Sean H. Lane was assigned to Debtors' cases, (Bankr. ECF No. 278), and signed the Confirmation Order, (Bankr. ECF No. 280).  "Bankr. ECF No." refers to documents filed in the United States Bankruptcy Court for the Southern District of New York under docket number 20-BK-23280.

[2] Citations with the prefix "JA" refer to documents in the Joint Appendix submitted in this Court by Debtors and Mezz Lender under docket number 22-CV-6241 at ECF No. 10 and under docket number 22-CV-6233 at ECF No. 8.

For the following reasons, Debtors' appeal and Mezz Lender's appeal are DENIED and the Confirmation Order is AFFIRMED.

## I.    **BACKGROUND**

I assume the parties' familiarity with the facts and recite only the facts relevant to the disposition of these matters.

Hotel and Residential, which are both owned by Mezz, acquired a hotel and residential property located at 85 Flatbush Extension in Brooklyn, New York (the "Property") on September 19, 2019. (JA-000011 ¶ 3.) To purchase the Property, Hotel and Residential took out a loan in the total principal amount of $70,000,000 (the "Senior Loan") from 85 Flatbush Avenue 1 LLC ("Original Lender"), and granted Original Lender a mortgage and security interest in the Property. (JA-003177 to 78.) The Senior Loan term was for 24 months, with a maturity date of October 1, 2021. (JA-000198.) At the same time, Mezz obtained a loan from Mezz Lender in the amount of $6,000,000 (the "Mezz Loan"), secured by a pledge of its interests in Hotel and Residential. (JA-003178.) On the same day Hotel and Residential purchased the Property, Original Lender and Mezz Lender entered into an Intercreditor Agreement ("ICA"), which was amended on July 23, 2020. (THS000642-704 ("ICA"); JA-003178.)[3]

---

[3] Citations with the prefix "THS" refer to documents in the Supplemental Appendix submitted in this Court by TH Holdco LLC ("TH Holdco") under docket number 22-CV-6241 at ECF No. 21 and under docket number 22-CV-6233 at ECF No. 13.

A.    **The Intercreditor Agreement**

Section 9(d) of the ICA, referred to as the "no-action clause," provides that if Mezz

Lender is deemed to be a creditor of Hotel or Residential in any "Proceeding,"[4] it waives its

rights to, among other things,

- "make any election, give any consent, commence any action, credit bid on all or any portion of the collateral for the Senior Loan or file any motion, claim, obligation, notice or application or take any other action in any Proceeding by or against Borrower or Guarantor without the prior consent of Senior Lender, except to the extent necessary to preserve or realize upon Mezzanine Lender's interest in the Equity Collateral; provided, however, that any such filing shall not be as a creditor of Borrower";

- "vote in any such Proceeding," as "Mezzanine Lender hereby appoints Senior Lender as its agent, and grants to Senior Lender an irrevocable power of attorney coupled with an interest, and its proxy, for the purpose of exercising any and all rights and taking any and all actions available to Mezzanine Lender in connection with any case by or against Borrower or any Guarantor in any Proceeding, including . . . the right to . . . vote to accept or reject a plan"; and

- "challenge (or join in another party's challenge to) the validity or amount of any claim submitted in such Proceeding by Senior Lender in good faith or any valuations of . . . any [] Senior Loan collateral submitted by Senior Lender in good faith."

(ICA § 9(d)(i)-(iii).)

Section 11 of the ICA provides that "[u]pon the occurrence of a Purchase Option Event,

Senior Lender shall provide prompt written notice thereof to Mezzanine Lender . . . and

Mezzanine Lender shall have the right to elect to purchase, in whole but not in part, the Senior

Loan for the Loan Purchase Price . . . provided that such right may only be exercised, and such

purchase may only be consummated, if . . . no Mezzanine Lender Intercreditor Event of Default

---

[4] The ICA defined a "Proceeding" to include any action relating to bankruptcy, insolvency or reorganization.  (ICA § 1(a).)

exists at the time of such exercise or at the time such purchase is to be consummated." (*Id.*

§ 11(a).) The ICA defines "Purchase Option Event" as when

> (i) Borrower has become a debtor in any Proceeding; (ii) the Senior Loan has
> been accelerated, (iii) any Enforcement Action described in clause (i) or (ii) of
> such definition has been commenced with respect to the Senior Loan and/or (iv)
> any Senior Loan Event of Default with respect to a monetary Event of Default or
> a non-monetary Event of Default exists and is continuing for a period of at least
> ninety (90) days.

(*Id.* § 1(a).) The ICA defines "Mezzanine Lender Intercreditor Event of Default" to include,

among other things, Mezz Lender being in "material breach of any term, covenant, condition or

agreement on its part to be performed or observed and contained in this [ICA]"; and an act by

Mezzanine Lender to

> object to, oppose, hinder, contest, interfere with or seek to enjoin or restrain . . .
> the exercise of rights or remedies by Senior Lender under the Senior Loan
> Documents while any Senior Event of Default or Continuing Senior Event of
> Default exists, in any case, except to the extent that the exercise of such rights or
> remedies are not in accordance with the terms of this [ICA].

(*Id.*) Section 11 further provides that "[t]he failure of Senior Lender to provide a Purchase

Notice to Mezzanine Lender regarding the occurrence of a Purchase Option Event shall have no

adverse effect on Senior Lender other than the resulting extension of time in which the Purchase

Notice may be given." (ICA § 11(a).)

Section 31 of the ICA states that TH Holdco and Mezz Lender "each acknowledge (and

waive any defense based on a claim) that monetary damages are not an adequate remedy to

redress a breach by the other party hereunder" and "the remedies of injunction, declaratory

judgment and specific performance shall be available to such non-breaching party." (ICA § 31.)

That section also states, "Notwithstanding the foregoing, if Senior Lender shall exercise any

right or remedy under the Senior Loan Documents that is not in violation of this Agreement,

including without limitation, any Enforcement Action, Mezzanine Lender agrees not to object to,

oppose, hinder, contest, interfere with or seek to enjoin or restrain any such action (whether through remedies of injunction, declaratory judgment or specific performance, the filing of a lis pendens or otherwise) in violation of this Agreement, all of which remedies are hereby waived." (*Id.*)

### B.    Bankruptcy Proceedings

On July 16, 2020, Original Lender sent Mezz Lender a notice to cure in accordance with Section 10(a) of the ICA, stating that Hotel and Residential had defaulted on their payments from March 2020 to July 2020 and giving Mezz Lender five days to cure through remittance of $368,272.22 to Original Lender.  (THS000927 ¶ 86.)  On July 22, 2020, TH Holdco alleges that Original Lender sent a notice to Debtors informing them that, because the events of default had not been cured, Original Lender was accelerating the indebtedness.  (THS000927 ¶ 88.)

On December 18, 2020, Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  (JA-000001 to 64.)  Shortly thereafter, Debtors negotiated an agreement with Original Lender for the consensual use of cash collateral, (JA-000065 to 83), which fixed the Original Lender's claim as of the petition date in the amount of $85,158,815.99, (JA-000074).  On October 12, 2021, the Bankruptcy Court entered an order authorizing the Debtors' retention of Jones Lang LaSalle Americas, Inc. ("JLL") as their exclusive real estate advisor for the marketing and sale of the Property.  (JA-000084 to 96.)  As a result of JLL's marketing efforts, Debtors received six written offers, which were narrowed down to three proposals in the range of $80,000,000 to $86,500,000.  (JA-003183.)

Meanwhile, from September 2021 to December 2021, Debtors worked with Ohana Real Estate Investors LLC ("Ohana"), an alleged affiliate of TH Holdco, in what Debtors describe as an attempt to find a "white knight" to act as a plan sponsor or pursue a joint venture with

Debtors.  (JA-003117 to 18 ¶¶ 3-4.)  During that time, Isaac Hager, an equity holder in Debtors'

parent company, communicated with Franco Famularo, Ohana's chief investment officer.  Hager

alleges that Famularo assured him that "Ohana was prepared to become a joint venture partner,"

and Hager therefore "responded to Ohana's information requests and other inquiries regarding

the Debtors' Property to facilitate the joint venture that would result in a plan paying all creditors

in full."  (JA-003118 ¶ 4.)  According to TH Holdco, however, discussions between Ohana and

Debtors fell apart when Hager demanded that the owners of Debtors be made whole through

payment of at least $20 million, despite the fact that Debtors did not expect creditors to be paid

in full.  (JA-002515.)  TH Holdco contends that Ohana considered this demand to be

"unrealistic" and thereafter decided to cease communications with Debtors.  (*Id.*)  On February

4, 2022, a few months after the deterioration of the relationship between Hager and Famularo,

TH Holdco notified Debtors that it had purchased Original Lender's claim against both Hotel and

Residential.  (JA-000141 to 45.)

Debtors submitted a plan of reorganization to the Bankruptcy Court on November 24,

2021, the last day of Debtors' exclusivity period, (THS000001-03; JA-000097 to 140), but

Debtors did not file an accompanying disclosure statement as required, (*see* Bankr. ECF No.

142).  On February 20, 2022, TH Holdco filed its plan and disclosure statement, seeking to

acquire the Property by a credit bid of its recently acquired secured claim.  (JA-000151 to 335.)

On March 23, 2022, the day before objections to TH Holdco's plan were due, Mezz

Lender brought an adversary proceeding against TH Holdco (the "Adversary Proceeding").  (JA-

000491 to 571.)  The complaint filed in the Adversary Proceeding (the "Adversary Complaint")

sought a declaratory judgment that TH Holdco, as assignee of the Original Lender, breached the

ICA by failing to issue a purchase option notice, and that Mezz Lender therefore held an

exclusive option right to purchase the claim as of July 16, 2020. (JA-000501 to 03.)[5] The

Adversary Complaint also sought an award of specific performance directing TH Holdco to sell

and assign the Senior Loan to Mezz Lender based on what the purchase price would have been

as of July 16, 2020. (JA-000503 to 04.)

On May 26, 2022, TH Holdco filed its second amended plan, (the "TH Holdco Plan"),

(JA-002452 to 93), and accompanying disclosure statement, (JA-002494 to 555). On the same

day, the Bankruptcy Court approved the disclosure statement and scheduled the Confirmation

Hearing for June 30, 2022. (JA-002390 to 451.) In summary, the TH Holdco Plan provides for

the sale of the Property to (1) TH Holdco at the price of TH Holdco's credit bid, or (2) another

bidder who submits a higher bid through the auction approved by the Bankruptcy Court. (JA-

002018 to 19.)

On June 22, 2022, Mezz Lender and Debtors filed their objections to the TH Holdco

Plan, (JA-002880 to 86; JA-002896 to 908), and Mezz Lender attached to its objections a ballot

rejecting the plan, (JA-002888 to 91). Mezz Lender contended that the TH Holdco Plan was

unconfirmable under 11 U.S.C. § 1129 based on Mezz Lender's vote to reject it. (JA-002883 to

84 ¶¶ 7-9.) Mezz Lender also urged the Bankruptcy Court to adjourn the Confirmation Hearing

until after resolution of the Adversary Proceeding or to "permit competing plans of

reorganization to proceed simultaneously." (JA-002885 ¶¶ 10-11.) Debtors objected to the TH

Holdco Plan on the grounds that (1) the Adversary Proceeding had to be resolved prior to

confirmation to determine whether TH Holdco was entitled to credit bid, (2) TH Holdco's credit

---

[5] Mezz Lender alleged that at least three separate Purchase Option Events requiring such notice occurred, including on July 16, 2020, when Original Lender sent Mezz Lender notice of the need to cure Hotel and Residential's payment defaults; on August 20, 2020, when Original Lender accelerated the indebtedness and commenced a foreclosure action in state court; and on December 18, 2020, when Debtors filed for bankruptcy. (JA-000500 to 02.)

bid was overstated and violated Section 1129(a)(2) because it did not comply with Section 363(k), (3) the TH Holdco Plan was not proposed in good faith in violation of Section 1129(a)(3), and (4) Debtors should be permitted to solicit votes from creditors on their plan of reorganization. (JA-002903 to 07 ¶¶ 13-22.)

On the same date, Debtors moved to disqualify TH Holdco from credit bidding under 11 U.S.C. § 363(k), attaching Hager's declaration in support. (JA-003101 to 40.) In their motion, Debtors claimed that TH Holdco and its affiliates, namely Ohana, operated in bad faith in obtaining the assignment of the Senior Loan. (JA-003113 to 14.) Under Debtors' theory, Famularo duplicitously made Hager believe that Ohana sought to be a plan sponsor in order to get access to the Property and information to pass along to TH Holdco. (JA-003108 to 14.) In opposition, TH Holdco argued that as a general matter, "purchasing debt, including with a possible goal to later own property, does not in itself constitute bad faith and is very common." (JA-003380 ¶ 15.) TH Holdco also disputed Debtors' version of events, alleging that it never agreed to participate as a plan sponsor and that Debtors never referred TH Holdco to JLL to participate in the bidding process. (JA-003386 ¶¶ 32-33.) Famularo averred in his supporting declaration that he did not discuss becoming a joint venture partner with Hager, never suggested that Ohana was seeking to become a plan sponsor for the Debtors, (JA-003390 ¶ 4), and instead lost confidence in Hager as a result of the latter's lack of knowledge about the Property and apparent self-interest, (JA-003390 to 91 ¶¶ 5-6). Attached to the Famularo Declaration is an email in which Hager proposes a plan that would pay out $21.2 million to Debtors' owners before paying out some of the creditors, (JA-003396), which Famularo indicated was a contributing factor to Ohana's decision to end communications with Hager, (JA-003391 ¶ 6).

On June 22, 2022, Debtors also filed their second amended plan ("Debtors' Plan") and accompanying disclosure statement, (JA-003141 to 217), attaching to their plan the Declaration of Daryl Hagler, in which Hagler agreed to fund the plan in an amount not less than $96,775,000, (JA-003095 ¶ 3), and an appraisal report that valued the Property at $72,000,000, (JA-002931). Debtors' Plan proposed paying TH Holdco $85,158,816 and Mezz Lender $4,600,000, among other claims, out of the funding that Hagler was to provide.  (JA-003154; JA-003156; JA-003220 ¶ 9.)

On June 23, 2022, TH Holdco filed a balloting report, (JA-003245 to 67), which included a copy of the ballot on behalf of Mezz Lender accepting the TH Holdco Plan, (JA-003259 to 63.) TH Holdco also filed its objections to Debtors' Plan, arguing that the plan was not confirmable because it would incorrectly cap TH Holdco's claim, which actually exceeded $112 million with accrued and accruing post-petition interest; Debtors' appraisal was not the best evidence of valuation; Debtors were bound by the Bankruptcy Court's March 29, 2021 final cash collateral order, which required the inclusion of accruing interest; and the proposed distributions violated the ICA by subordinating TH Holdco's claim to Mezz Lender's.  (JA-003274 to 82.)

### C.    The Bankruptcy Court Hearings

The Bankruptcy Court held a series of hearings related to the plans proposed by TH Holdco and Debtors, as well as the Adversary Proceeding.  During these proceedings, Judge Drain addressed several of the issues relevant to this appeal.

At the April 6, 2022 hearing, Judge Drain considered whether the Adversary Proceeding needed to be adjudicated before confirmation of a plan.  His preliminary view of the claims asserted in the Adversary Proceeding was that while Mezz Lender "may have a monetary claim against TH Holdco that will have to get resolve[d] in some form," it was not clear "why it's a

gate-keeping item."  (JA-000978 to 1031 ("4/6/22 Hr'g Tr.") at 11:15-17.)  Judge Drain further

described the Adversary Proceeding:

> What it is is an assertion that their rights arising from an alleged breach of the
> inter-creditor agreement's provisions that give, under certain circumstances, a
> purchase option to the MEZZ lender.  And that may or may not have a bearing on
> a credit bid right, but I don't see it as, again, a bar to proceeding with the
> disclosure statement . . . .   I think it can be dealt with . . . in the auction
> process . . . .

(*Id.* at 15:5-12.)  On the issue of whether TH Holdco acted in bad faith in the transfer of the

Senior Loan by going outside JLL's sales process, Judge Drain noted, "[L]ender misconduct

does not include buying someone else's claim with an eye to eventually acquiring the Debtor.

On the other hand, if you are doing that after having signed an NDA and going around the back

of the entity, the broker that has been hired to market the Debtor, that is a problem."  (*Id.* at

21:16-21.)

At the May 16, 2022 hearing, Judge Drain reiterated his impressions of the pending

Adversary Proceeding and its effect on confirmation,

> I actually don't think that the, even necessarily confirmation needs to be delayed
> as a result of the lawsuit. . . .  I don't think it's a showstopper to let, from letting
> the disclosure statement go out or scheduling the confirmation hearing.  Again
> because of the inter-creditor agreement's limitations in Section 9 – what is it 9(d)
> I think. . . .  [Y]ou can't challenge the validity of the claim . . . that's the basis for
> objecting to the credit bid, is that the claim isn't a claim.  So I think the lawsuit is
> about money, not about validity of a claim.

(JA-002348 to 89 ("5/16/22 Hr'g Tr.") at 34:1-18.)  He further noted that the claims

underpinning the Adversary Proceeding could be raised in state court "[b]ecause it doesn't really

affect the auction or the confirmation hearing, it's just a monetary claim between two non-

debtors."  (*Id.* at 36:2-6.)  Judge Drain also asked the parties about whether they believed the

"sales process to date has been flawed fundamentally and that some other broker needs to run it

under, you know, other procedures."  (*Id.* at 9:24-10:2.)  Both Debtors and Mezz Lender

responded that they supported JLL as the broker.  (*Id.* at 10:8-9 (Debtors' counsel stating,

"everyone supports JLL's continued engagement as the broker"); *id.* at 10:21-23 (Mezz Lender's

counsel stating, "We have no issue with Jones Lang.  We have no information that would even

remotely suggest that they shouldn't continue.").)  Further, a representative of JLL confirmed

that it had no non-disclosure agreement in place with TH Holdco, which Judge Drain said

"answer[ed his] concerns that [he] raised at the April 6th hearing."  (*Id.* at 11:10-14.)

       At the June 30, 2022 Confirmation Hearing, Judge Drain overruled both Mezz Lender's

and Debtors' objections to the TH Holdco Plan and denied Debtors' Section 363(k) motion.

With respect to Mezz Lender's objections to TH Holdco's Plan, Judge Drain held that the ICA

was binding for purposes of confirmation, (JA-003604 to 94 ("6/30/22 Hr'g Tr.") at 37:7-13); the

pending claim in the Adversary Proceeding did not need to be decided prior to plan confirmation,

(*id.* at 37:16-39:24); and TH Holdco could vote for Mezz Lender pursuant to both 11 U.S.C.

§ 1129(a)(10) and Section 9(d) of the ICA, (*id.* at 36:15-37:15).  In reviewing Debtors'

objections, Judge Drain reiterated that the Adversary Proceeding was not a gating issue, (*id.* at

66:14-23), found that the TH Holdco Plan was proposed in good faith under Section 1129(a)(3),

and determined that TH Holdco had not done anything improper that would disqualify it from

credit bidding under Section 363(k), (*id.* at 81:23-84:16).[6]

       At the hearing, Judge Drain also denied Debtors' motion for expedited treatment of their

request for approval of their disclosure statement and second amended chapter 11 plan.  (*Id.* at

85:15-86:2.)  Judge Drain noted that he rejected the motion for expedited treatment "primarily

because I don't believe the second amended plan is confirmable, but even if it were arguably

---

    [6] In denying Debtors' motion under Section 363(k), Judge Drain specified that that ruling
was "without prejudice as to future conduct."  (6/30/22 Hr'g Tr. at 86:13.)

confirmable, it should not – it doesn't warrant putting it on a parallel track with the plan that I've

just confirmed." (*Id.* at 85:15-23.)

### D. **Appeal**

On July 6, 2022, the Bankruptcy Court issued the Confirmation Order, holding that the

TH Holdco Plan complied with the applicable provisions of the Bankruptcy Code.

(Confirmation Order.)  On July 22, 2022, Debtors and Mezz Lender timely appealed the

Confirmation Order.  (No. 22-CV-6233 ECF No. 1; No. 22-CV-6241 ECF No. 1.)

## II.  **LEGAL STANDARD**

This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1) to hear appeals from final

judgments, orders, and decrees of a bankruptcy court.  "A district court reviews a bankruptcy

court's conclusions of law de novo, its discretionary decisions for abuse of discretion, and its

findings of fact for clear error." *In re Depietto*, No. 20-CV-8043, 2021 WL 3287416, at *4

(S.D.N.Y. Aug. 2, 2021).  "When reviewing for clear error, [the Court] may reverse only if [it is]

left with the definite and firm conviction that a mistake has been committed." *United States v.

Bershchansky*, 788 F.3d 102, 110 (2d Cir. 2015) (cleaned up).  "Thus, if the factual findings of

the bankruptcy court are plausible in light of the record viewed in its entirety, this Court may not

reverse it even though convinced that had it been sitting as the trier of fact, it would have

weighed the evidence differently." *Savage & Assocs., P.C. v. Williams Commc'ns (In re

Teligent Servs., Inc.)*, 372 B.R. 594, 599 (S.D.N.Y. 2007) (cleaned up).  And "[w]here there are

two permissible views of the evidence, the factfinder's choice between them cannot be clearly

erroneous." *Id.* (cleaned up).  Mixed questions of law and fact are reviewed "either de novo or

under the clearly erroneous standard depending on whether the question is predominately legal

or factual." *In re Am. Express Merchants' Litig.*, 554 F.3d 300, 316 n. 11 (2d Cir. 2009)

(cleaned up), *vacated on other grounds by Am. Express Co. v. Italian Colors Rest.*, 559 U.S. 1103 (2010).

## III.    DISCUSSION

"Confirmation of a plan of reorganization is the statutory goal of every chapter 11 case." *In re J. Reg. Co.*, 407 B.R. 520, 528 (Bankr. S.D.N.Y. 2009) (cleaned up).  "The proponent of the confirmation of a plan must prove by a preponderance of the evidence that it satisfies the relevant requirements of 11 U.S.C. § 1129(a), and if the plan is not fully consensual, 11 U.S.C. § 1129(b)."  *In re Breitburn Energy Partners LP*, 582 B.R. 321, 349 (Bankr. S.D.N.Y. 2018).  As relevant here, Section 1129(a)(8) provides that each class of claims or interests must accept the plan unless the class is not impaired under the plan.  Section 1129(b)(1) provides in relevant part that "[i]f all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

### A.    Mezz Lender's Objections

On appeal, Mezz Lender argues that the Bankruptcy Court erred in confirming the TH Holdco Plan over its objections.  Mezz Lender objected to confirmation of the TH Holdco Plan on three grounds:  that the TH Holdco Plan failed to (1) comply with 11 U.S.C. § 1129(a)(8) because Mezz Lender voted to reject the plan; (2) comply with 11 U.S.C. § 1129(b) because it was not fair and equitable, in that it provided that Mezz Lender's rights under its lien "shall pass to TH Holdco or any other Purchaser pursuant to the Sale Transaction on a free and clear basis," without any corresponding payment to Mezz Lender; and (3) account for Mezz Lender's right to

exercise its purchase option under the ICA.  (JA-002883 to 85.)  First, the Bankruptcy Court

found that TH Holdco could vote for Mezz Lender pursuant to Section 9(d) of the ICA, and that

the TH Holdco Plan satisfied Section 1129(a)(10).  (6/30/22 Hr'g Tr. at 36:15-39:24.)  Second,

the Bankruptcy Court held that the plan treated Mezz Lender fairly and satisfied the absolute

priority rule of Section 1129(b), in that it provided for Mezz Lender to be paid if there was

money available once TH Holdco, the senior lender under the ICA, was paid in full.  (*Id.* at 81:9-

22.)  Third, the Bankruptcy Court determined that there was no reason to decide the Adversary

Proceeding before confirmation of the TH Holdco Plan.  (*Id.* at 37:16-39:24.)

### 1.    Whether the Bankruptcy Court Erred in Confirming the TH Holdco Plan Prior to Adjudication of the Adversary Proceeding

Mezz Lender argues that the Bankruptcy Court erred in confirming the TH Holdco Plan

before adjudication of the Adversary Proceeding, arguing that Judge Drain had to first decide

whether Mezz Lender or TH Holdco is the rightful owner of the Senior Loan, as that would

determine whether TH Holdco had the authority to propose a plan of reorganization.  (No. 22-

CV-6233 ECF No. 8 ("Mezz Lender Mem.") at 13-18.)  In opposition, TH Holdco claims that

that question did not have to be addressed because Mezz Lender was barred by Section 9(d) of

the ICA both from bringing the Adversary Proceeding and objecting to the TH Holdco Plan.

(No. 22-CV-6233 ECF No. 12 ("TH Holdco Opp. to Mezz Lender") at 17-34.)  Further, TH

Holdco argues, even if Section 9(d) did not bar Mezz Lender's actions, Mezz Lender would only

be entitled to the issuance of a purchase option notice, which would not itself render Mezz

Lender the senior claimholder.  (*Id.* at 31-32.)

At the heart of Mezz Lender's objection related to the Adversary Proceeding, and the

Adversary Proceeding itself, is the interplay of Sections 9, 11, and 31 of the ICA.  As they are

relevant to Mezz Lender's objection and were considered by the Bankruptcy Court, I will briefly

recount the arguments made in the Adversary Proceeding.[7]  In the Adversary Complaint, Mezz

Lender alleges that Original Lender's breach of Section 11, which required the Original Lender

to provide written notice to Mezz Lender of the "Senior Loan Event of Default,"[8] entitles Mezz

Lender to seek specific performance under Section 31, which lists specific performance as an

available remedy for non-breaching parties.  (JA-000502 to 03 ¶¶ 44, 47-52.)  Specifically, Mezz

Lender asks the Court to direct TH Holdco to sell and assign the Senior Loan to Mezz Lender

based on the purchase price as of July 16, 2020, the day Original Lender sent the notice to cure

to Mezz Lender and the first day upon which Mezz Lender alleges a purchase option notice

should have been issued.  (JA-000504 ¶ 52.)  In its Answer, TH Holdco argues that Mezz Lender

may not seek specific performance because the filing of the Adversary Proceeding and Mezz

Lender's objection to the TH Holdco Plan violate Sections 9(d) and 11 of the ICA.

(THS000932-33.)  First, TH Holdco argues that those actions on Mezz Lender's part are barred

because Section 9(d) prohibits Mezz Lender from taking "any . . . action in any Proceeding by or

against Borrower . . . without the prior consent" of TH Holdco," and Mezz Lender did not

receive TH Holdco's consent.  (THS000932.)  Second, TH Holdco alleges that Mezz Lender's

claims are barred by Section 11 because although that provision provides for written notice

before a "Purchase Option Event," it also states that "[t]he failure of Senior Lender to provide a

---

[7] As I held at a hearing on September 2, 2022, (*see* Minute Entry dated Sept. 2, 2022 in
No. 22-CV-6241), I will consider materials submitted in the Adversary Proceeding that existed
on the date of the Confirmation Order.  *See In re Food Fair, Inc.*, 15 B.R. 569, 572 (Bankr.
S.D.N.Y. 1981) ("[T]he record on appeal of one matter may be supplemented with materials
from other adversary proceedings arising from the same bankruptcy case and, both materials
from cases closely related to the appeal.").

[8] TH Holdco assumes, solely for purposes of its opposition to Mezz Lender's appeal, that
its predecessor (Original Lender) breached Section 11 of the ICA by failing to provide the
purchase option notice.  (TH Holdco Opp. to Mezz Lender at 19 n.3)

Purchase Notice to Mezzanine Lender regarding the occurrence of a Purchase Option Event shall

have no adverse effect on Senior Lender other than the resulting extension of time in which the

Purchase Notice may be given."  (THS000933.)

      Although both parties ask the Court to harmonize Sections 9(d) and 31, I decline to rule

on the merits of the Adversary Proceeding, and thus will discuss the provisions of the ICA only

for purposes of determining whether Judge Drain erred in confirming the TH Holdco Plan prior

to adjudication of the Adversary Proceeding.[9]  For the reasons detailed below, I find that Judge

Drain did not err in confirming the TH Holdco Plan over Mezz Lender's objections related to the

Adversary Proceeding.

      First, Section 11 of the ICA contemplates the exact breach alleged in this case – failure to

provide notice of a purchase option – and states explicitly that a breach of this provision "shall

have no adverse effect on Senior Lender other than the resulting extension of time in which the

Purchase Notice may be given."  (ICA § 11(a).)  Based on a plain reading of this provision, the

remedy available for Original Lender's alleged breach is an extension of time for TH Holdco to

provide the Purchase Notice.[10]  And even if other remedies are available, the provision makes

---

[9] Despite Mezz Lender's arguments in reply that TH Holdco "asks this Court to usurp the role of the Bankruptcy Court as the trier of fact and resolve contested issues regarding the ICA in the first instance," (No. 22-CV-6233 ECF No. 14 ("Mezz Lender Reply") at 3), Mezz Lender also asked this Court to harmonize the provisions of the ICA "such that Mezzanine Lender'[s] equitable rights and remedies, as recognized by the ICA, have real meaning," (Mezz Lender Mem. at 13), which I interpret as an invitation to decide the issues on the merits.  To the extent either party has invited me to weigh in definitively on the issues pending in the Adversary Proceeding, I decline to do so.

[10] Mezz Lender noted during the Confirmation Hearing that TH Holdco was also in default of the remedy provision of Section 11 by failing to provide an extension of the time for Mezz Lender to exercise its opportunity to purchase.  (6/30/22 Hr'g Tr. at 40:3-16.)  Judge Drain responded by noting that TH Holdco "can cure the default by providing notice if it actually has to, and that's what's at issue is whether it has to in the adversary proceeding."  (*Id.* at 40:17-20.)

clear that the Original Lender's breach "shall have no adverse effect" on TH Holdco. Mezz

Lender argues that its requested relief – the exercise of the purchase option and payment by

Mezz Lender for the Senior Loan – would not constitute an "adverse effect." (Mezz Lender

Mem. at 14.) But TH Holdco points out that it would be adversely affected by the granting of

Mezz Lender's requested specific performance because it would prevent TH Holdco from

enforcing Section 9(d), would interfere with confirmation of the TH Holdco Plan, and would

require TH Holdco to sell the Senior Loan valued as of July 2020 rather than "the date the

Mezzanine Lender purchases the Senior Loan in accordance with Section 11." (TH Holdco Opp.

to Mezz Lender at 25 & n.5.) The language of Section 11, at least, suggests that Mezz Lender

may not be entitled to its requested relief because it would "adverse[ly] affect" TH Holdco.

Second, as TH Holdco points out, Section 9(d) calls into question whether Mezz Lender

can even maintain the Adversary Proceeding or any objection to the confirmation of the TH

Holdco Plan. As detailed above, Section 9(d) lays out rights that Mezz Lender waived in

entering the ICA, including the right to

> file any motion, claim, obligation, notice, or application or take any other action
> in any Proceeding by or against Borrower . . . without the prior written consent of
> Senior Lender except to the extent necessary to preserve or realize upon
> Mezzanine Lender's interest in the Equity Collateral; provided, however, that any
> such filing shall not be as a creditor of Borrower.

(ICA § 9(d).) Based on a plain reading of Section 9(d), it would appear that Mezz Lender's

initiation of the Adversary Proceeding and filing of objections are actions proscribed by the ICA,

because they are actions taken in a proceeding against Debtors without prior consent of TH

Holdco. In response, Mezz Lender claims that "nowhere in the express terms of Section 9(d) is

Mezzanine Lender prohibited from filing an action based on the Original Lender's breaches."

(Mezz Lender Mem. at 15.) While this is true, TH Holdco is correct that Section 9(d) limits the

type of *proceeding* in which Mezz Lender can participate, not the type of *claims* it can bring. As

Judge Drain pointed out at the May 16, 2022 hearing, Mezz Lender could certainly bring a claim for breach of contract against TH Holdco in state court, but to the extent that it is attempting to enforce its contractual rights through this bankruptcy proceeding, Section 9(d) would appear to prohibit it. (5/16/22 Hr'g Tr. at 35:22-36:6.)[11]

Third, Mezz Lender's argument that Section 31 must be read to limit Section 9(d)'s waiver of certain of Mezz Lender's rights in bankruptcy proceedings does not make Judge Drain's decision unreasonable. Specifically, Mezz Lender argues that "[t]he availability of specific performance and Mezzanine Lender's right to purchase the Senior Loan must be kept alive" or "the right to a Purchase Option Notice in Section 11 of the ICA and the availability of specific performance in Section 31 are rendered entirely illusory." (Mezz Lender Mem. at 13-14.) But neither right is extinguished by reading Section 9(d) as TH Holdco suggests. Mezz Lender can seek enforcement of its right under Sections 11 and 31, just not in the bankruptcy case. Further, Section 31 makes clear that if TH Holdco exercises a right or remedy that is not a violation of the ICA, Mezz Lender cannot "object to, oppose, hinder, contest, interfere with or seek to enjoin or restrain any such action" including by way of specific performance. (ICA § 31.) As such, Mezz Lender must first show that TH Holdco has violated the ICA in proposing its plan before it can assert its right under Section 31 – which it has not done, as that is an issue in the pending Adversary Proceeding.

---

[11] The "carve-out" in Section 9(d) – the provision excluding Mezz Lender's actions that are "necessary to preserve or realize upon Mezzanine Lender's interest in the Equity Collateral" – does not alter my conclusion that the Bankruptcy Court did not err in confirming the plan. Both parties assert differing interpretations of "Equity Collateral" and its application to the Adversary Proceeding, (*see* Mezz Lender Mem. at 14-15; TH Holdco Opp. to Mezz Lender at 20-21; Mezz Lender Reply at 8-9), which will be litigated and resolved in the Adversary Proceeding. Even if the carve-out were to apply to the Adversary Proceeding and the objection to confirmation, it is still unclear what Mezz Lender's appropriate remedy would be and why that remedy would require delaying confirmation of the TH Holdco Plan.

In considering the interaction of these three sections and the record before him, Judge Drain at the Confirmation Hearing found it "very hard to believe that the mezz lender can defeat the senior lender's exercise of its rights under the intercreditor agreement, including Section 9(d), at this stage of the case." (6/30/22 Hr'g Tr. at 38:20-23.)  He further noted that the Adversary Proceeding was in its "very early stages" and that Mezz Lender had failed to bring the action for two years.  (*Id.* at 37:22, 66:14-23.)[12]  As a result, he concluded, "I don't think that in light of that the party who I think had the onus to bring it to something, at least a lot closer to conclusion that we have here, can say that they can keep the gate shut."  (*Id.* at 66:14-19.)

I find that this decision was within Judge Drain's discretion, *see, e.g.*, *In re Best Prod. Co., Inc.*, 168 B.R. 35, 68 n.40 (Bankr. S.D.N.Y. 1994), *aff'd*, 68 F.3d 26 (2d Cir. 1995), and supported by the record available to him.  At the time of the Confirmation Order, Mezz Lender had not shown that there was a breach, whether the breach would entitle it to relief, or what the appropriate relief would be.[13]  Further, Mezz Lender had not shown that it would be irreparably harmed by confirmation, as it remained (and remains) free to pursue, and seek recovery in, the Adversary Proceeding or a lawsuit in another court.  To the extent Mezz Lender argues that recovery will not be possible as specific performance is the only available remedy, I find this

---

[12] The first alleged breach occurred in July 2020.  (JA-000492 ¶ 3.)  Mezz Lender did not bring its adversary proceeding until March 23, 2022, the day before TH Holdco was due to file its confirmation plan.  (JA-000491 to 504.)  No pre-trial order had been entered in the Adversary Proceeding as of the time of confirmation, (6/30/22 Hr'g Tr. at 34:20-24), the litigation was in "very early stages," (*id.* at 37:22), and between the May 16 and June 30 hearings, Mezz Lender did nothing to move the case forward, (*see* No. 22-AP-7022 (Bankr. S.D.N.Y.)).  Judge Drain thus acted reasonably in concluding that if there were in fact any urgency in deciding the Adversary Proceeding, Mezz Lender would have pursued it sooner and more aggressively.

[13] Nor had Mezz Lender shown that it was in a position to purchase the Property back in July 2020 or at the time of confirmation.  As Judge Drain recognized, it was wholly speculative that Mezz Lender would ever be the senior claimholder.  (*See* JA-000992 to 93.)

argument unconvincing, as Mezz Lender may still seek specific performance after the

confirmation of the TH Holdco Plan, which may only be provision of the notice, and the court

may reasonably find that monetary damages are more appropriate.

Accordingly, I find that the Bankruptcy Court did not err in confirming the TH Holdco

Plan prior to adjudication of the Adversary Proceeding.

> **2.    Whether the Bankruptcy Court Erred in Finding that the TH Holdco Plan Need Not Satisfy 11 U.S.C. § 1129(a)(8)**

Mezz Lender argues that confirmation of the TH Holdco Plan violates 11 U.S.C.

§ 1129(a)(8) because Mezz Lender voted to reject the plan, and TH Holdco should not have been

able to exercise its right to vote on Mezz Lender's behalf, as provided for in Section 9(d) of the

ICA, because of TH Holdco's predecessor's material breach of the contract.  (Mezz Lender

Mem. at 18-19; *see* JA-002888 to 91.)  TH Holdco responds that there was no material breach of

the ICA that would prohibit TH Holdco from enforcing Section 9(d), and even if it there were,

the plan would still be confirmable under Section 1129(a)(10).  (TH Holdco Opp. to Mezz

Lender at 34-39.)

Mezz Lender concedes that, generally, Section 9(d) permits TH Holdco to vote on behalf

of Mezz Lender for purposes of confirming a chapter 11 plan of reorganization.  (Mezz Lender

Mem. at 18.)  Specifically, Section 9(d)(ii) of the ICA provides that Mezz Lender waives its right

to "vote in any [Borrower Bankruptcy] Proceeding" as

> Mezzanine Lender hereby appoints Senior Lender as its agent, and grants to Senior Lender an irrevocable power of attorney coupled with an interest, and its proxy for the purpose of exercising any and all rights and taking any and all actions available to Mezzanine Lender in connection with any case by or against Borrower or any Guarantor in any Proceeding, including . . . the right to . . . vote to accept or reject a plan.

(ICA § 9(d)(ii).)  But Mezz Lender argues that TH Holdco cannot assert its right under this

provision because its predecessor materially breached the ICA by failing to provide the purchase

option notice.  (Mezz Lender Mem. at 18.)  In opposition, TH Holdco argues that the alleged

failure is not a material breach of the ICA, citing to Judge Drain's holdings at the Confirmation

Hearing that Mezz Lender "has not established a basis to relieve it of its obligations under

Section 9[(d)] of the intercreditor agreement" and that therefore "its vote which it submitted

notwithstanding that provision, would not be counted."  (TH Holdco Opp to Mezz at 35 (quoting

6/30/22 Hr'g Tr. at 39:14-17).)  For the same reasons that Judge Drain appropriately concluded

that Mezz Lender had failed to show, at the confirmation stage, that it was entitled to be relieved

of its obligations under Section 9(d) in connection with its initiation of the Adversary

Proceeding, the Bankruptcy Court did not err in determining that Mezz Lender had also failed to

show that that Section did not preclude its objection to confirmation.

Additionally, TH Holdco argues that it need not rely on the enforceability of Section 9(d),

because a different subdivision of Section 1129(a) is satisfied based on the vote in favor of the

TH Holdco Plan by the Class 3 creditors, who are impaired by that plan.  (TH Holdco Opp. to

Mezz at 36.)  Section 1129(a)(10) provides that a plan that impairs a class of claims can

nonetheless be confirmed if "at least one class of the claims that is impaired under the plan has

accepted the plan."  11 U.S.C. § 1129(a)(10).  At the Confirmation Hearing, the Bankruptcy

Court held that the law in this District, as articulated in *JPMorgan Chase Bank, N.A. v. Charter

Communications Operating, LLC (In re Charter Communications)*, 419 B.R. 221, 266 (Bankr.

S.D.N.Y. 2009), *aff'd*, 691 F.3d 476 (2d Cir. 2012), requires "only a single accepting impaired

class to vote in favor of the plan," (TH Holdco Opp. to Mezz at 36 (quoting 6/30/22 Hr'g Tr. at

36:17-36:6)), because "it is appropriate to test compliance with section 1129(a)(10) on a per-plan

basis, not . . . on a per-debtor basis."  *In re Charter Comm'cns*, 419 B.R. at 266.  Mezz Lender,

relying on District of Delaware cases, disagrees, arguing that "where, as here, multiple debtors

propose a single plan of reorganization, at least one impaired class of creditors with respect to

each debtor must vote to accept the plan." (Mezz Lender Reply at 12-13.) Specifically, Mezz

Lender relies on *In re Tribune Co.*, 464 B.R. 126 (Bankr. D. Del. 2011), in which the court

distinguished *In re Charter Communications* as standing for the proposition that Section

1129(a)(10) should apply on a per-plan basis only where "the debtors were managed on an

integrated basis making it reasonable and administratively convenient to propose a joint plan."

*In re Trib. Co.*, 464 B.R. at 182 (cleaned up). In addition to being an out-of-circuit case, *In re

Tribune*'s interpretation of *In re Charter Communications* would not alter the outcome in this

case: the Debtors in this action are integrated enough to make it reasonable and administratively

convenient to propose a joint plan, given that Mezz wholly owns both Hotel and Residential.

Accordingly, I find that Section 1129(a)(10) provides a separate ground for confirming the TH

Holdco Plan.

I conclude that the Bankruptcy Court did not err in confirming the plan over Mezz

Lender's objection pursuant to Section 1129(a)(8).[14]

---

[14] To the extent that Mezz Lender's arguments on appeal encompass its objection under Section 1129(b), which it does not spell out explicitly, that argument is also rejected. During confirmation, Mezz Lender argued that the TH Holdco Plan unfairly and inequitably subordinated Mezz Lender's claims to TH Holdco's claims in violation of Section 1129(b). (JA-002884). At the Confirmation Hearing, Judge Drain rejected this argument and held that the plan treated Mezz Lender fairly and satisfied the absolute priority rule of Section 1129(b), given the subordination provisions in the ICA. (6/30/22 Hr'g Tr. at 81:9-22.) Similar to Mezz Lender's arguments related to the Adversary Proceeding, Mezz Lender's objection under Section 1129(b) rested on the premise that TH Holdco could not enforce the subordination provisions in the ICA, which Mezz Lender had not shown. For the reasons detailed above, I find that Judge Drain did not err in enforcing the ICA at this stage and confirming the TH Holdco Plan over Mezz Lender's objection under Section 1129(b).

## B.    Debtors' Objections

On appeal, Debtors argue that the Bankruptcy Court erred in overruling their objections and entering the Confirmation Order, in finding that TH Holdco was a good faith purchaser under Section 363(m), and in declining to give Debtors an opportunity to confirm their own plan of reorganization.  Debtors objected to confirmation of the TH Holdco Plan on the grounds that (1) the Adversary Proceeding had to be resolved prior to confirmation to determine whether TH Holdco was entitled to a credit bid,[15] (2) TH Holdco's credit bit was overstated and violated Section 1129(a)(2) because it did not comply with Section 363(k), (3) the TH Holdco Plan was not proposed in good faith in violation of Section 1129(a)(3), and (4) Debtors should be permitted to solicit votes from creditors on their plan of reorganization.  (JA-002903 to 07 ¶¶ 13-22.)

Judge Drain overruled Debtors' objections, finding that (1) the Adversary Proceeding was not a gating issue, (2) TH Holdco's credit bid did not violate Section 363(k), (3) the TH Holdco Plan was proposed in good faith under 1129(a)(3), and (4) Debtors' Plan was unconfirmable and did not warrant being put on a parallel track with the TH Holdco Plan. (6/30/22 Hr'g Tr. at 80:23-85:23.)  Judge Drain also denied (without prejudice as to future conduct) Debtors' motion to disqualify TH Holdco from credit bidding under Section 363(k). (*Id.* at 86:2-13.)

---

[15] For the reasons detailed above, I find that Judge Drain did not err in confirming the TH Holdco Plan prior to reaching the merits of the Adversary Proceeding.  Moreover, to the extent Debtors argue that it would be irreparably harmed should TH Holdco assert the equitable mootness doctrine as a defense to the Adversary Proceeding in the future, (No. 22-cv-6241 ECF No. 9 ("Debtors Mem.") at 28-30), I find this argument unconvincing, as "a risk of mootness, standing alone, does not constitute irreparable harm."  *In re Sabine Oil & Gas Corp.*, No. 16-CV-2561, 2016 WL 4203551, at *4 (S.D.N.Y. Aug. 9, 2016) (cleaned up).

   1.    **Whether the Bankruptcy Court Erred in Finding that the TH Holdco Plan Was Proposed in Good Faith Under 11 U.S.C. § 1129(a)(3)**

Debtors argue that the Bankruptcy Court erred in finding that the TH Holdco Plan was proposed in good faith under Section 1129(a)(3). First, Debtors argue, the Bankruptcy Court could not determine whether the plan was proposed in good faith prior to adjudicating the Adversary Proceeding and determining whether TH Holdco is "the correct plan proponent," given Original Lender's alleged breach of the ICA. (Debtors Mem. at 35-38.) Second, Debtors claim that TH Holdco did not propose the plan in good faith, given its alleged deceit in acquiring the Senior Loan. Debtors claim that TH Holdco misled them, through Famularo, into providing Ohana with non-public financial information about the Property under the guise that Ohana was interested in pursuing a joint venture with Debtors, when Ohana was instead using the information to help TH Holdco purchase the Senior Loan independently. (*Id.* at 38-41.)

Whether a party proposed a plan of reorganization in good faith is a mixed question of law and fact. *In re Chemtura Corp.*, 439 B.R. 561, 591 (Bankr. S.D.N.Y. 2021). Section 1129(a)(3) of the Bankruptcy Code requires that the party seeking confirmation show that "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3)*.* "Good faith," as used in this section, is not defined in the Bankruptcy Code, but the term is generally interpreted to mean that the plan "was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." *Argo Fund Ltd. v. Bd. of Dirs. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.)*, 528 F.3d 162, 174 (2d Cir. 2008) (cleaned up); *accord Kane v. Johns–Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988). Section 1129(a)(3) "speaks more to the process of plan development than to the content of the plan." *In re Chemtura*, 439 B.R. at 608 (cleaned up). It must be viewed "in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan." *In re*

*WorldCom, Inc.*, No. 02-13533, 2003 WL 23861928, at *51 (Bankr. S.D.N.Y. Oct. 31, 2003) (cleaned up). "Good faith has been found to be lacking if a plan is proposed with ulterior motives." *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 261 (Bankr. S.D.N.Y. 2014).

Debtors' first argument – that the TH Holdco Plan was not proposed in good faith because it may be determined in the Adversary Proceeding that TH Holdco is not the true owner of the Senior Loan – says little about TH Holdco's honest belief or intentions in proposing the plan. Debtors do not claim that TH Holdco intentionally misled the Court about its purchase of the Senior Loan or put forth the TH Holdco Plan intending to disrupt the reorganization process. Instead, Debtors assert that TH Holdco, prior to buying out Original Lender, must have known about Section 11 of the ICA and understood that Original Lender had failed to comply with it. (Debtors' Mem. at 40-41.) But Debtors provide no evidence that TH Holdco knew of Original Lender's alleged breach, let alone had any reason to believe that Original Lender's breach would deprive TH Holdco of its interest in the Senior Loan. And even if it did, this argument rests on the assumptions that the Bankruptcy Court in the Adversary Proceeding will find that Original Lender breached the ICA, that TH Holdco should have permitted Mezz Lender to purchase the Senior Loan, and that Mezz Lender would have been in a position to do so, none of which has yet been established. Such an attenuated and theoretical argument, which says nothing about TH Holdco's intentions at the time it proposed the plan, must fail.

Debtors' second argument also does not show that the Bankruptcy Court erred in making its good faith determination. At the Confirmation Hearing, Judge Drain determined that Famularo was a credible witness, and found that in light of the evidence presented, Debtors proved only that TH Holdco pursued a loan-to-own strategy, which is insufficient to establish bad faith. (6/30/22 Hr'g Tr. at 71:4-10 ("There is nothing in the bankruptcy code or the case law

that precludes a loan-to-own strategy.  And by the way, Mr. Famularo testified, and I found him

credible, that while TH Holdco was comfortable with owning the property, they would also be

comfortable with being paid off on the debt that they purchased.  And there's clearly nothing in

the bankruptcy code that precludes anyone from purchasing debt.")  Accordingly, Judge Drain

concluded that TH Holdco did not act in bad faith in at first considering purchasing the Property

from Debtors and then deciding to purchase the debt from Original Lender instead.  (*Id.*; *id.* at

83:3-5 ("I frankly don't believe that [TH Holdco] had violated any promise of commitment to

the debtor or debtor's owner.").)  Further, Judge Drain emphasized that cases from this District

consider, in their good faith analyses, the likelihood a plan will achieve results consistent with

the standards outlined in the Bankruptcy Code, which includes maximization of value for

creditors.  (*Id.* at 82:5-15 (citing *Greer II v. Gaston & Snow (In re Gaston & Snow)*, No. 93-CV-

8517, 1996 WL 694421, at *9 (Bankr. S.D.N.Y. Dec. 4, 1996), *In re 68 W. 127th St., LLC*, 285

B.R. 838 (Bankr. S.D.N.Y. 2002), and *In re Ditech Holding Corp.*, 606 B.R. 544 (S.D.N.Y.

2019).)  After reviewing the cases, Judge Drain concluded that "there is no evidence before me

to indicate that TH Holdco or its parent in acquiring the debt of the senior lender violated that

standard."  (*Id.*)[16]

---

[16] Judge Drain emphasized at the Confirmation Hearing that

> the parties were in agreement immediately before I approved the disclosure statement that
> a sale process as contemplated by the bidding procedures which culminates [in] an
> extensive process run by Jones Lang LaSalle starting in October 2021, in essence with
> TH Holdco as the stalking horse, will maximize the value of the property for creditors
> and to the extent there's leftover value for shareholders.

(6/30/22 Hr'g Tr. at 83:15-21.)  At the May 16, 2022 hearing, at which Judge Drain approved the
TH Holdco Plan's disclosure statement, Judge Drain asked the parties,

> I really just wanted to focus on whether the sale process as described in the disclosure
> statement was in fact one that had fleshed out, at least as of the date that the plan was
> filed, the highest and best value for the property, subject again to continuing on now that

Giving deference to Judge Drain's credibility determinations, as I must, *In re Kollel Mateh Efraim, LLC*, 456 B.R. 185, 191 (S.D.N.Y. 2011) ("This Court gives deference to the Bankruptcy Court's factual determinations because of its expertise and superior position to make determinations of credibility.") (cleaned up), I find that the Bankruptcy Court did not err in finding that the TH Holdco Plan was proposed in good faith.  Judge Drain considered the declarations of both Hager and Famularo, as well as Famularo's testimony during the Confirmation Hearing, in deciding whether TH Holdco acted in good faith, and ultimately decided that Famularo's version of events was more credible than Hager's and that TH Holdco did not mislead the Debtors in purchasing the Senior Loan from Original Lender.  Debtors have not provided any reason to regard those factual findings as clearly erroneous.  Further, I find that Famularo's decision to end communications with Hager after the latter's request to reserve $20 million for Debtors' owners was a reasonable response to a request that Famularo deemed neither feasible nor reasonable.  As Judge Drain observed, if anyone was acting in bad faith during this process, it was Hager, who attempted to circumvent JLL's sales process by working with Famularo independently while JLL was marketing the Property.  (JA-003679 ("In fact, if there's any inequitable conduct, it's by Mr. Hager, not Mr. Hagler, when [] knowing about Jones Lang LaSalle, he tried to go around them with some other broker in some sort of standalone process without informing Jones Lang LaSalle.  So enough.  This is just . . . kind of astounding

---

assuming a plan would be confirmed, TH Holdco would be a, effectively at least, a stalking horse bidder at its credit bid amount. . . .  So let me ask the objecting parties first. Do they believe that the sale process to date has been flawed fundamentally and that some other broker needs to run it under, you know, other procedures?

(5/16/22 Hr'g Tr. at 9:10-17.)  In response to this question, both Debtors and Mezz Lender stated that they had no issue with JLL's continued engagement, and did not raise any concerns that the process to date had been "flawed fundamentally."  (*Id.* at 10:8-23.)

that debtor's principal would make these arguments when he, himself, tried to circumvent the

sale process and no one has said – no one has given me any evidence that TH Holdco or its

parent – or its owner messed up the sale process.")

Accordingly, I find that the Bankruptcy Court did not err in finding that the TH Holdco

Plan was proposed in good faith under Section 1129(a)(3).

> ## 2.    Whether the Bankruptcy Court Erred in Finding that TH Holdco
> Was a Good Faith Purchaser Under 11 U.S.C. § 363(m)

Debtors argue that the Bankruptcy Court erred in finding that TH Holdco was a good

faith purchaser under Section 363(m).  First, Debtors argue, the sale of the Property is governed

by Section 1129 of the Bankruptcy Code, not Section 363.  (Debtors Mem. at 43-44.)  Second,

Debtors argue that the Bankruptcy Court made this determination prematurely as the auction was

not scheduled to take place until after confirmation.  (*Id.* at 44-46.)  TH Holdco, in its opposition,

claims that Debtors may not raise this issue on appeal because they failed to raise it before the

Bankruptcy Court, and even if they can, their claim is meritless because purchasers in plans

governed by Section 1129 can receive Section 363(m) protection and Debtors have failed to

present evidence that TH Holdco was not a good faith purchaser.  (No. 22-cv-6241 ECF No. 20

("TH Holdco Opp. to Debtors") at 21-25.)

Although the Bankruptcy Code does not define "good faith purchaser," the Second

Circuit has adopted the traditional equitable definition:  "one who purchases the assets for value,

in good faith and without notice of adverse claims."  *Licensing by Paolo, Inc. v. Sinatra (In re

Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997) (cleaned up).  To determine a purchaser's good faith,

courts look to "the integrity of his conduct during the course of the sale proceedings; where there

is a lack of such integrity, a good faith finding may not be made."  *Id.*  Good faith is absent

where a purchaser engaged in "fraud, collusion between the purchaser and other bidders or the

trustee, or an attempt to take grossly unfair advantage of other bidders." *Id.* "The 'good-faith purchaser' determination is a mixed question of law and fact." *Id.* (cleaned up).

I find that Debtors may raise this issue on appeal because it was properly before the Bankruptcy Court and addressed in the Confirmation Order. Debtors raised the good-faith aspect of the sale in its 363(k) motion, which was considered by Judge Drain and decided at the Confirmation Hearing. Judge Drain explicitly found that TH Holdco, as of that date, had not engaged in misconduct, "didn't violate any non-disclosure agreements," and did not appear to have "violated any promise of commitment to the debtor or the debtor's owner." (6/30/22 Hr'g Tr. at 82:22-83:5.)

Debtors, citing *In re Ditech*, argue that TH Holdco may not receive protection under Section 363(m) because it proposed a sale under Section 1123, which is governed by Section 1129, and there was no underlying motion to approve the sale under Section 363. Debtors rely on the following language from the opinion: "where a debtor proposes a sale pursuant to a plan, the sale is not under section 363 and, by its plan terms, section 363(f) is inapplicable." *In re Ditech*, 606 B.R. at 592. In opposition, TH Holdco argues that *Ditech* stands for the proposition that "while § 363 protections *may* be included in a plan, complying with certain other limitations under § 363 is not mandatory if the debtor chooses not to incorporate such § 363 limitations into the plan or confirmation order." (TH Holdco Opp. to Debtors at 23 (emphasis in original).) But a recent Eastern District of New York decision interpreting *Ditech* did not draw this same distinction; in response to the appellant's argument that Section 363 was irrelevant to a sale governed by Section 1123, Judge Donnelly emphasized that "*Ditech* involved a plan that explicitly called for the Debtors to sell the assets to the Buyers pursuant to section 1123 of the Bankruptcy Code whereas the Plan in this case states that the sale shall be conducted pursuant to

Bankruptcy Code section 363." *Ultimate Opportunities, LLC v. Plan Adm'r*, No. 20-CV-4927, 2021 WL 5205630, at *2 (E.D.N.Y. Nov. 9, 2021) (cleaned up), *appeal filed*, No. 21-2887 (2d Cir Nov. 22, 2021). This reasoning is consistent with the *Ditech* Court's reference to cases "that support the contrary proposition that section 363 is inapplicable in the plan sale context." 606 B.R. at 592-93 (citing, among other cases, *Miami Center Ltd. P'ship v. Bank of New York*, 838 F.3d 1547, 1553 (11th Cir. 1988), for the proposition that section 363(m) is not applicable to a plan sale). The cases cited by TH Holdco in its opposition predate *Ditech* and do not explicitly address the relationship between Sections 363 and 1123. (*See* TH Holdco Opp. to Debtors at 22-23.) Applying *Ditech*, it appears that Section 363(m) should not apply to the TH Holdco Plan, as that plan proposed that the sale be approved "under sections 365, 1123(b)(4), 1129(b)(2)(A)(iii) and 1146(a) of the Bankruptcy Code." (JA-003748.)

Despite the fact that the TH Holdco Plan was not proposed under Section 363, however, Debtors put the protections and limitations outlined in Section 363 before the Bankruptcy Court in filing their motion to disqualify TH Holdco from credit bidding. (JA-003101 to 15.) In that motion, Debtors argued that because TH Holdco acted in "bad faith," its "right to credit bid for the Property under section 363(k) at the auction sale of the Hotel Property and Residential Property should be denied." (JA-003112.) Accordingly, the Bankruptcy Court addressed Debtors' argument in the Confirmation Order, finding that "[t]he Purchase Agreement and the transactions contemplated by the Purchase Agreement were negotiated and have been and are undertaken by the Debtors and TH Holdco at arm's length, without collusion or fraud, and in good faith within the meaning of Section 363(m) of the Bankruptcy Code." (Confirmation Order at 6.) Although Debtors now argue that the Bankruptcy Court erred in considering Section 363, they attempted to use that section to defeat the TH Holdco Plan. To allow Debtors to both seek

disqualification of TH Holdco on Section 363(k) grounds and attempt to vacate the Confirmation

Order on the basis that the Bankruptcy Court should not have applied Section 363(m) would be

inequitable.

Third, Debtors argue that the Bankruptcy Court's good faith finding was premature

because the sale was scheduled to take place after confirmation.  In response, TH Holdco asserts

that the Bankruptcy Court had enough information before it to make its determination, including

a signed purchase agreement.  (TH Holdco Opp. to Debtors at 24.)  I agree.  As detailed above,

the TH Holdco Plan contemplated that TH Holdco would purchase the Property through its credit

bid unless another bidder committed to a higher bid through the auction process.  At the time of

the Confirmation Order, the Bankruptcy Court had already held multiple hearings on whether TH

Holdco acted in good faith in purchasing the Senior Loan from Original Lender, and had before

it TH Holdco's credit bid and the signed purchase agreement.  Moreover, Judge Drain explicitly

noted at the Confirmation Hearing that Debtors could still challenge TH Holdco's ability to

credit bid for cause if TH Holdco exhibited misconduct during the auction process.  (6/30/22

Hr'g Tr. at 86:2-13.)

Accordingly, I find that the Bankruptcy Court did not err in finding that TH Holdco was a

good faith purchaser under Section 363(m).

### 3.  Whether the Bankruptcy Court Erred in Confirming the Plan Without a Hearing on the Value of Debtors' Property

Debtors argue that the Bankruptcy Court erred in confirming the TH Holdco Plan prior to

holding a hearing on the value of the Property.  (Debtors Mem. at 46-51.)  In opposition, TH

Holdco claims that the Confirmation Hearing served an as evidentiary hearing, at which

Famularo testified, and that Judge Drain determined that the auction process was sufficient to

establish the Property's value for purposes of confirmation.  (TH Holdco Opp. to Debtors at 25.)

Debtors attached to their objections an appraisal valuing the Property at $72 million, (JA-002921 to 3094), which was discussed at the Confirmation Hearing in the context of TH Holdco's credit bid.  TH Holdco argued that Debtors' appraisal was not relevant to the plan because TH Holdco had already bid $94 million for the Property and JLL had already received offers on the Property for amounts above $72 million.  (6/30/22 Hr'g Tr. at 56:10-19.).  Thus, TH Holdco asserted, it was clear that the appraisal did not accurately reflect the market value of the Property.  (*Id.* at 56:19-24.)  Judge Drain agreed, emphasizing that Hagler, Debtors' financier, had committed to spending $96 million:  "How can one say that the collateral is worth $72 million and also say . . . that Mr. Hagler is prepared to spend over $96 million for an equity interest shared with others in this property?  Doesn't that mean that the $72 million is just ludicrous?"  (*Id.* at 61:11-17; *see id.* at 62:14-19 ("[T]he only basis for the value of the equity of which Mr. Hagler is buying only a piece of is . . . the excess over what's owed to creditors of those other two operating debtors, and he's paying $96.75 million dollars for that.  He's obviously disagreeing with the $72 million appraisal and putting his money where his mouth is.").)  Further, Judge Drain agreed with Hagler's counsel that the appraisal was stale given that it was from March 2022.  (*Id.* at 63:9-12.)[17]

Debtors argue that their appraisal created an issue of fact as to the valuation of the Property that had to be resolved before confirmation.  Based on the facts outlined above, I disagree and find that the Bankruptcy Court did not abuse its discretion in determining that the appraisal submitted by Debtors was no bar to confirmation of the TH Holdco Plan and that further inquiry was unnecessary.  "[C]ourts have broad discretion to determine the extent and

---

[17] The report indicates that the appraised value was assessed on February 16, 2022.  (JA-002926; JA-002931.)

method of inquiry necessary for a valuation depending on the facts of each case." *In re Genco*, 513 B.R. at 242-43 (cleaned up). Based on the record, the Bankruptcy Court reasonably determined that a formal valuation process was unnecessary because the auction would determine the value of the Property. The TH Holdco Plan provides for the sale of the Property to (1) TH Holdco at the price of TH Holdco's credit bid, or (2) to another bidder who submits a higher bid through the auction approved by the Bankruptcy Court. (JA-002018 to 19.) In light of this process, Judge Drain determined that the value of the Property was irrelevant to TH Holdco's credit bid because under *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012), a secured creditor is permitted to bid its full claim, including post-petition interest. (6/30/22 Hr'g Tr. at 63:19-24.)[18] Thus, for purposes of TH Holdco's bid, Judge Drain concluded that "it doesn't matter how they value the property." (*Id.* at 63:20-21.) When Hagler's counsel attempted to argue that TH Holdco's credit bid is "subject to the value of the collateral," Judge Drain clarified,

> No, not subject to the value of the collateral. They set that by their bid. That the whole purpose of credit bidding as discussed by the Supreme Court in *RadLAX* is that the claim carries the right to credit bid in the full amount of the claim including post-petition interest, because the buyer with that claim has that right, and it can only be limited in very extraordinary circumstances under 363(k)'s for cause standard.

---

[18] In *RadLAX*, the Supreme Court held,

The ability to credit-bid helps to protect a creditor against the risk that its collateral will be sold at a depressed price. It enables the creditor to purchase the collateral for what it considers the fair market price (up to the amount of its security interest) without committing additional cash to protect the loan.

566 U.S. at 644 n.2. Given the Supreme Court's emphasis that a creditor may bid what "it considers the fair market price . . . up to the amount of its security interest," and the fact that the auction could generate a higher bid, Judge Drain's conclusion that the value of the collateral was irrelevant to TH Holdco's credit bid, and to confirmation of the TH Holdco Plan, is consistent with *RadLAX*.

(*Id.* at 64:2-9.)  In other words, the creditor "own[s] a claim that is in the dollar amount of X and they have the right to bid that full claim, including post-petition interest."  (*Id.* at 63:21-23.)

Debtors further fail to explain how Judge Drain abused his discretion in determining that their "stale" appraisal was irrelevant given that JLL had already received bids rendering the $72 million figure obsolete.  Indeed, Debtors' own counsel stated that even he "tend[s] to agree that appraisals are useless" and that "what a third-party will pay for the property is a better indicati[on] of value."  (*Id.* at 73:21-23.)

Accordingly, I find that the Bankruptcy Court did not err in determining that a formal valuation hearing was unnecessary to confirm the TH Holdco Plan.

### 4.    Whether the Bankruptcy Court Erred in Confirming Plan Over a Request to Delay

Debtors contend that the Bankruptcy Court erred in confirming the TH Holdco Plan over Debtors' request to delay confirmation so that the Court could consider their own plan of reorganization.  TH Holdco asserts in its opposition that the Bankruptcy Court had no obligation to consider Debtors' Plan because it did not meet the requirements of the Bankruptcy Code.

Debtors argue that their plan was "feasible" and that the Bankruptcy Court should have considered it under 11 U.S.C. § 1129(c).  Section 1129(c) provides that if the requirements of subsections (a) and (b) are met with respect to more than one plan, "the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm."  11 U.S.C. § 1129(c).  At the Confirmation Hearing, Judge Drain determined that Debtors' Plan was not confirmable under subsections (a) and (b), and "even if it were arguably confirmable, . . . it doesn't warrant putting it on a parallel track with the plan that I've just confirmed."  (6/30/22 Hr'g Tr. at 85:15-23.)  The Bankruptcy Court explained that Debtors' Plan was unconfirmable because it failed to correctly value the secured debt and violated the ICA by providing recovery

for Mezz Lender before TH Holdco's claim was paid in full.  (*Id.* at 78:2-9. ("But to say that a

plan that is on like two days['] notice, that would value the debt, the secured debt at $72 million

and say that the unsecured claim, the deficiency claim, which would be just the difference

between that and the $85 million when he paid as an unsecured claim in full with no interest, and

ignore the subordination agreement is just not a reason to hold up confirmation here and the sale

process that's in place.").

The Bankruptcy Court did not err in confirming the TH Holdco Plan over Debtors'

objection, given that Debtors failed to show that their proposed plan was confirmable under

subsections (a) and (b).  First, Debtors' Plan was not filed until June 22, 2022 and thus was not

properly before the Court as of the date of the Confirmation Hearing, given that the Bankruptcy

Court had not yet held a hearing on the disclosure statement, 11 U.S.C. § 1125(b), approved the

disclosure statement, 11 U.S.C. § 1125, or held a vote on the plan, 11 U.S.C. § 1126.

Nevertheless, the Bankruptcy Court considered the plan and reasonably found that it was not

confirmable because it undervalued the Property and subordinated TH Holdco's claim.  Because

Section 1129(c) only applies when subsections (a) and (b) are met, the Bankruptcy Court was

under no obligation to consider Debtors' Plan.  But even if it were, and the plan was confirmable,

the Bankruptcy Court was within its authority in deciding that the TH Holdco Plan was in the

best interest of the creditors and equity security holders.  As Judge Drain pointed out at the

Confirmation Hearing, the process contemplated in the TH Holdco Plan actually "led to the

emergence of a very credible competing bidder," referring to Hagler, "who has put more money

on the table . . . than the amounts that the senior lender stated at the time of the disclosure

statements."  (6/30/22 Hr'g Tr. at 83:22-25.)  The Bankruptcy Court reasonably concluded that

the TH Holdco Plan, which had already spurred a competitive bidding process that had driven

the assessed value of the Property up, was in the best of the creditors and equity holders. Debtors' argument that Debtors' Plan provided for "a better recovery to unsecured creditors of all three Debtors, including insider claims, and the Mezz Lender," (Debtors Mem. at 53), does not convince me otherwise, given that this assertion rests on a disputed assessment of the value of TH Holdco's claim and an outdated valuation of the Property, both of which make it hard to believe that Debtors would be able to deliver on their promises to creditors and equity holders.

Accordingly, I find that the Bankruptcy Court did not err in confirming the TH Holdco Plan over Debtors' request to delay confirmation.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Confirmation Order is AFFIRMED.  The Clerk of Court is respectfully directed to close the above-captioned cases.


**SO ORDERED.**

Dated:  October 20, 2022
         White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.